ALL COMMUNICATIONS SHOULD BE ADDRESSED TO THE CLERK

# Commonwealth of Massachusetts

**SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT**
**FOR CIVIL BUSINESS**

SUFFOLK COUNTY COURTHOUSE, 12TH FLOOR
THREE PEMBERTON SQUARE
BOSTON, MASSACHUSETTS 02108

**JOHN E. POWERS, III**
**CLERK MAGISTRATE**

*Clerk's Office*
SUFFOLK COUNTY

BOSTON, **March 12, 2025**

Robert M. Farrell, Clerk of Courts
United States District
Court for District of Massachusetts
United States Courthouse
1 Courthouse Way, Suite 2300
Boston, MA. 02210

Re: Janice Progin, Plaintiff vs. UMass Memorial Health Care, Inc., et. al., Defendants

Civil Action No. 2384CV02448

Dear Clerk Farrell:

Enclosed please find certified copies of the Petition for Removal, docket sheet and pleadings.

The following original pleading is missing from our case file (P#54) Scheduling Order.
If you have any question, please do not hesitate to call at (617) 788-7680.

Very Truly Yours,

Samantha Leake
Samantha Leake
Office Manager

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

**2384CV02448 John Doe Individually and on behalf of All Others Similarly Situated vs. UMass Memorial Health Care Inc**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Torts | **FILE DATE:** | 10/30/2023 |
| **ACTION CODE:** | B99 | **CASE TRACK:** | F - Fast Track |
| **DESCRIPTION:** | Other Tortious Action | | |
| **CASE DISPOSITION DATE:** | 03/06/2025 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 03/06/2025 |
| **CASE JUDGE:** | | **CASE SESSION:** | Business Litigation 1 |

**PARTIES**

CRTR2709-CR

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| Plaintiff | Attorney |
|---|---|
| John Doe Individually and on behalf of All Others Similarly Situated | **Attorney** **681627**<br>Jonathan Tucker Merrigan<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 10/30/2023 |
| | **Attorney** **686289**<br>Ryan Hawkins<br>Sweeney Merrigan Law LLP<br>Sweeney Merrigan Law LLP<br>268 Summer St LL<br>Boston, MA 02210<br>Work Phone (617) 830-5767<br>Added Date: 12/12/2023 |
| | **Attorney** **703701**<br>Erin E McHugh<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 10/30/2023 |
| | **Attorney** **706672**<br>Justin C Kenney<br>Ahmad, Zavitsanos, and Mensing PLLC<br>Ahmad, Zavitsanos, and Mensing PLLC<br>1221 McKinney St<br>Suite 2500<br>Houston, TX 77010<br>Work Phone (802) 258-7114<br>Added Date: 12/01/2023 |
| | **Attorney** **HV24097455TX**<br>Nathan B Campbell<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 10/30/2023 |
| | **Attorney** **HV24076463TX**<br>Foster C Johnson<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 10/30/2023 |
| | **Attorney** **HV20856750TX**<br>David E Warden<br>Ahmad, Zavitsanos & Mensing, P.C. |

| | |
|---|---|
| | 1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 10/30/2023 |
| | **Attorney** PHV6299686IL<br>Alex J Dravillas<br>Keller Postman LLC<br>150 N. Riverside Plaza<br>Suite 4100<br>Chicago, IL 60606<br>Work Phone (312) 741-5220<br>Added Date: 10/30/2023 |
| | **Attorney** PHV1029692DC<br>Sara Aguiniga<br>Keller Postman LLC<br>1100 Vermon Avenue, N.W.<br>12th Floor<br>Washington, DC 20005<br>Work Phone (209) 918-1123<br>Added Date: 10/30/2023 |
| | **Attorney** HV24125261TX<br>Carl J Gustafson<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Work Phone (713) 600-4924<br>Added Date: 10/30/2023 |
| **Defendant**<br>UMass Memorial Health Care Inc | **Attorney** 649407<br>James Hefferan Rollinson<br>Baker and Hostetler LLP<br>Baker and Hostetler LLP<br>Key Tower<br>127 Public Square Suite 2000<br>Cleveland, OH 44114-1214<br>Work Phone (216) 621-0200<br>Added Date: 10/30/2023 |
| | **Attorney** 708748<br>Keith M Taubenblatt<br>Jackson Lewis, P.C.<br>Jackson Lewis, P.C.<br>75 Park Plaza<br>4th Floor<br>Boston, MA 02116<br>Work Phone (617) 367-0025<br>Added Date: 01/14/2025 |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | |
|---|---|
| **Other interested party**<br>Paul G. Karlsgodt (PHV for Deft UMass)<br>Baker & Hostetler LLP<br>1801 California Street<br>Suite 4400<br>Denver, CO 80203 | |
| **Other interested party**<br>Progin, Janice | **Attorney** **215620**<br>Edward F Haber<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 10/30/2023 |

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 10/30/2023 | Civil Filing Fee (per Plaintiff)<br><br>Dismissed Type: Fees / Fines dismissed-case transferred<br>Dismissed Date: 10/30/2023<br>Dismissed Amount: 240.00<br>Dismissing Clerk / Judge: Kazanjian, Hon. Helene<br>Dismissed By: BLBOOK84 | 240.00 | 0.00 | 240.00 | 0.00 |
| 10/30/2023 | Civil Security Fee (G.L. c. 262, § 4A)<br><br>Dismissed Type: Fees / Fines dismissed-case transferred<br>Dismissed Date: 10/30/2023<br>Dismissed Amount: 20.00<br>Dismissing Clerk / Judge: Kazanjian, Hon. Helene<br>Dismissed By: BLBOOK84 | 20.00 | 0.00 | 20.00 | 0.00 |
| 10/30/2023 | Civil Surcharge (G.L. c. 262, § 4C)<br><br>Dismissed Type: Fees / Fines dismissed-case transferred<br>Dismissed Date: 10/30/2023<br>Dismissed Amount: 15.00<br>Dismissing Clerk / Judge: Kazanjian, Hon. Helene<br>Dismissed By: BLBOOK84 | 15.00 | 0.00 | 15.00 | 0.00 |
| | **Total** | **275.00** | **0.00** | **275.00** | **0.00** |

**INFORMATIONAL DOCKET ENTRIES**

| Date | Ref | Description | Judge |
|---|---|---|---|
| 10/30/2023 | | Attorney appearance<br>On this date Jonathan Tucker Merrigan, Esq. added for Plaintiff John Doe Individually and | |
| 10/30/2023 | | Attorney appearance<br>On this date Victoria M Santoro, Esq. added for Plaintiff John Doe Individually and | |
| 10/30/2023 | | Attorney appearance<br>On this date Erin E McHugh, Esq. added for Plaintiff John Doe Individually and | |
| 10/30/2023 | | Case assigned to:<br>DCM Track F - Fast Track was added on 10/30/2023 | |
| 10/30/2023 | | Case transferred from another court.<br><br>Transferred from Worcester Superior Court [2285CV01205] accepted into the Suffolk Superior Court Business Litigation Session "BLS1" (See P#51) | |
| 10/30/2023 | 1 | Complaint and Jury Demand | |
| 10/30/2023 | 2 | Civil action cover sheet filed.<br><br>re: complaint ($14,000,000.00) | |
| 10/30/2023 | 3 | Plaintiff John Doe Individually and on behalf of All Others Similarly Situated's Motion for<br>Impoundment of Personal Identifying Information; with Affidavit - DENIED at this time. The defendant has not yet filed an answer to the complaint. This motion has not been served pursuant to Rule 9A and thus there is no identifying information in the court file. Dated: 10/31/22 | Reardon |
| 10/30/2023 | 4 | Summons, returned SERVED<br>Defendant UMass Memorial Health Care Inc, by delivering by Email to Judy Anti, agent person in charge on 11/7/22<br><br>Applies To: UMass Memorial Health Care Inc (Defendant) | |
| 10/30/2023 | 5 | Notice of Removal | |
| 10/30/2023 | 6 | Corporate Disclosure Statement filed by Defendant UMass Memorial Health Care Inc | |
| 10/30/2023 | 7 | Defendant UMass Memorial Health Care Inc's Assented to Motion to Extend Time to 30 days after Decision on Plaintiff's Motion to Remand to Respond to Plaintiff's Complaint | |
| 10/30/2023 | | Attorney appearance<br>On this date James Hefferan Rollinson, Esq. added for Defendant UMass Memorial Health Care Inc | |
| 10/30/2023 | | Judge Allison D. Burroughs: Electronic Order entered granting (P#7) Motion for Extension of Time to 30 days after Decision on Plaintiff's Motion to Remand to Respond to Complaint. Dated: 12/5/22 | |

| | | |
|---|---|---|
| 10/30/2023 | 8 | Plaintiff John Doe Individually and on behalf of All Others Similarly Situated's Motion for Remand (First Motion) |
| 10/30/2023 | 9 | John Doe Individually and on behalf of All Others Similarly Situated's Memorandum of Law in Support of Motion to Remand |
| 10/30/2023 | 10 | James Hefferan Rollinson, Esq.'s MOTION to admit counsel pro hac vice: Paul G Karlsgodt to represent Defendant UMass Memorial Health Care Inc |
| 10/30/2023 | | Judge Allison D. Burroughs: Electronic Order entered granting (P#10) Motion to Appear Pro Hac Vice added Paul G. Karlsgodt |
| 10/30/2023 | 11 | Defendant UMass Memorial Health Care Inc's Assented to Motion to Extend Time to an Opposition to Plaintiff's First Motion to Remand |
| 10/30/2023 | | Judge Allison D. Burroughs: Electronic Order Entered Granting (P#11) Extension of Time 2/10/23 to File Response to First Motion to Remand |
| 10/30/2023 | 12 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Seth Meyer to represent Plaintiff John Doe |
| 10/30/2023 | 13 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Nathan Campbell to represent Plaintiff John Doe |
| 10/30/2023 | 14 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Foster C. Johnson to represent Plaintiff John Doe |
| 10/30/2023 | 15 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: David Warden to represent Plaintiff John Doe |
| 10/30/2023 | 16 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Alex Dravillas to represent Plaintiff John Doe |
| 10/30/2023 | | Judge Allison D. Burroughs: Electronic Order entered granting (P#15) Motion to admit Seth Meyer Pro Hac Vice |
| 10/30/2023 | | Attorney appearance<br>On this date Seth A Meyer added for Plaintiff John Doe Individually and on behalf of All Others Similarly Situated |
| 10/30/2023 | | Judge Allison D. Burroughs: Electronic Order entered granting (P#13, #14, #15 and #16) Motions to admit Pro Hac Vice of Nathan Campbell, Foster C Johnson, David Warden, and Alex Dravillas |
| 10/30/2023 | | Attorney appearance<br>On this date Nathan B Campbell added for Plaintiff John Doe Individually and on behalf of All Others Similarly Situated |
| 10/30/2023 | | Attorney appearance<br>On this date Foster C Johnson added for Plaintiff John Doe Individually and on behalf of All Others Similarly Situated |
| 10/30/2023 | | Attorney appearance<br>On this date David E Warden added for Plaintiff John Doe Individually and on behalf of All Others Similarly Situated |
| 10/30/2023 | | Attorney appearance<br>On this date Alex J Dravillas added for Plaintiff John Doe Individually and on behalf of All Others Similarly Situated |

| | | |
|---|---|---|
| 10/30/2023 | 17 | Plaintiff John Doe Individually and on behalf of All Others Similarly Situated's Joint Motion for Entry of Schedule Regarding Motions to Remand and to Extend Time for Defendants to Respond to the Complaints |
| 10/30/2023 | | Judge Allison D. Burroughs: Electronic Order entered granting (P#17) Motion for Entry of Schedule Regarding Motions to Remand and Extension of Time to Respond to Complaint |
| 10/30/2023 | 18 | John Doe Individually and on behalf of All Others Similarly Situated's Motion for leave to File Notice of Supplemental Authority |
| 10/30/2023 | 19 | Notice of Supplemental Authority re: (P#8)<br><br>Applies To: John Doe Individually and on behalf of All Others Similarly Situated (Plaintiff) |
| 10/30/2023 | | Judge Allison D. Burroughs: Electronic Order entered granting (P#18)Motion for Leave to file Document; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. Dated: 2/9/23 |
| 10/30/2023 | 20 | Notice of Supplemental Authorities re:(P#18)<br><br>Applies To: John Doe Individually and on behalf of All Others Similarly Situated (Plaintiff) |
| 10/30/2023 | | Attorney appearance of David Warden on behalf of Plaintiff John Doe |
| 10/30/2023 | 21 | Opposition to Plaintiffs' Motions to Remand (Omnibus Opposition) filed by UMass Memorial Health Care Inc |
| 10/30/2023 | 22 | Request for Judicial Notice in Support of Defendants UMass Memorial Health Care Inc., et al.'s Omnibus Opposition to Plaintiffs' Motions to Remand |
| 10/30/2023 | 23 | Plaintiff John Doe Individually and on behalf of All Others Similarly Situated's Supplemental, Reply in Support of Motion to Remand |
| 10/30/2023 | 24 | Reply/Sur-reply<br><br>Omnibus Reply in Support of Plaintiffs' Motion to Remand |
| 10/30/2023 | 25 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Sara Aguiniga to represent Plaintiff John Doe |
| 10/30/2023 | | Judge Allison D. Burroughs: Electronic Order entered granting (P#25) Motion to Admit Sara Aguiniga Pro Hac Vice for Plaintiff John Doe |
| 10/30/2023 | | Notice of Appearance of Sara Aguiniga to appear for Plaintiff John Doe |
| 10/30/2023 | | Attorney appearance<br>On this date Sara Aguiniga, Esq. added for Plaintiff John Doe Individually and on behalf of All Others Similarly Situated |

| | | | |
|---|---|---|---|
| 10/30/2023 | 26 | MEMORANDUM AND ORDER: CONCLUSION - Accordingly, Plaintiff's motion to remand, [ECF P#8], is GRANTED and this matter is remanded to state court for further proceedings. (Allison D. Burroughs, U.S. District Judge) Dated: July 13, 2023 (See P#26 for complete memorandum) | |
| 10/30/2023 | 27 | ORDER OF REMAND: In accordance with this Court's memorandum and Order dated July 13, 2023, GRANTING the Plaintiffs' Motion to Remand, it is hereby ordered that this case be REMANDED to Worcester County Superior Court for further proceedings. BY THE COURT (Burroughs, DJ) Dated: July 13, 2023 | |
| 10/30/2023 | 28 | Copy of docket entries received from U.S. District Court | |
| 10/30/2023 | 29 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: David Warden on behalf of Plaintiff John Doe; with affidavit | |
| 10/30/2023 | 30 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Seth Meyer on behalf of Plaintiff John Doe; with affidavit | |
| 10/30/2023 | 31 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Foster Johnson on behalf of Plaintiff John Doe; with affidavit | |
| 10/30/2023 | 32 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Alex Dravillas on behalf of Plaintiff John Doe; with affidavit | |
| 10/30/2023 | 33 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice: Nathan Campbell on behalf of Plaintiff John Doe; with affidavit | |
| 10/30/2023 | | Rule 9A notice of filing<br><br>and Listing of Documents | |
| 10/30/2023 | | Affidavit of compliance with Superior Court Rule 9A and certificate of service<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe Individually and on behalf of All Others Similarly Situated (Plaintiff) | |
| 10/30/2023 | | Endorsement on Motion for Admission of David Warden Pro Hac Vice (#29.0): ALLOWED<br>Dated: 1/31/23 | Bucci |
| 10/30/2023 | | Endorsement on Motion for Admission of Seth Meyer Pro Hac Vice (#30.0): ALLOWED<br>Dated: 1/31/23 | Bucci |
| 10/30/2023 | | Endorsement on Motion for admission Pro Hac Vice of Foster Johnson (#31.0): ALLOWED<br>Dated: 1/31/23<br><br>Judge: Bucci, Hon. Jeremy C | Bucci |
| 10/30/2023 | | Endorsement on Motion for Admission Pro Hac Vice of Alex Dravillas (#32.0): ALLOWED<br>Dated: 1/31/23<br><br>Judge: Bucci, Hon. Jeremy C | Bucci |

| | | | |
|---|---|---|---|
| 10/30/2023 | | Endorsement on Motion for admission Pro Hac Vice of Nathan Campbell (#33.0): ALLOWED<br>Dated: 1/31/23<br><br>Judge: Bucci, Hon. Jeremy C | Bucci |
| 10/30/2023 | | Attorney appearance<br>On this date Seth A Meyer dismissed/withdrawn for Plaintiff John Doe Individually and on behalf of All Others Similarly Situated | |
| 10/30/2023 | 34 | John Doe Individually and on behalf of All Others Similarly Situated's MOTION to consolidate with 2285CV01293 (now Suffolk Superior Court Case Number 2384CV02450) filed in the Worcester County.<br>(Joint Motion) | |
| 10/30/2023 | 35 | Plaintiff John Doe Individually and on behalf of All Others Similarly Situated's Joint Motion to<br>Appoint Interim Class Counsel | |
| 10/30/2023 | 36 | John Doe Individually and on behalf of All Others Similarly Situated's Memorandum<br>of Law in Support of Plaintiffs' Motion to Appoint Interim Class Counsel | |
| 10/30/2023 | 37 | Declaration of J. Tucker Merrigan in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel | |
| 10/30/2023 | 38 | Declaration of Warren Postman in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel | |
| 10/30/2023 | 39 | Declaration of Foster Johnson in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel | |
| 10/30/2023 | 40 | Declaration of Nicholas A. Coulson in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel | |
| 10/30/2023 | | Affidavit of compliance with Superior Court Rule 9A<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe Individually and on behalf of All Others Similarly Situated (Plaintiff) | |
| 10/30/2023 | | Rule 9A notice of filing<br><br>and Listing of Documents with Certificate of Service<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe Individually and on behalf of All Others Similarly Situated (Plaintiff) | |
| 10/30/2023 | | Endorsement on Motion to Consolidate with 2285CV01293 (Now Suffolk Superior Court No.2384CV02448-BLS1) (#34.0): ALLOWED<br>Dated: 8/17/23 | Goodwin |
| 10/30/2023 | | Endorsement on Motion of Appoint Interim Class Counsel (#35.0): Withdrawn by moving counsel. See Pleading #35. Dated: 8/28/23<br><br>Judge: Goodwin, Hon. Karen | Goodwin |
| 10/30/2023 | 41 | Plaintiff John Doe Individually and on behalf of All Others Similarly Situated's Assented to Motion to<br>Transfer to the Business Litigation Section | |

| | | | |
|---|---|---|---|
| 10/30/2023 | 42 | John Doe Individually and on behalf of All Others Similarly Situated's Memorandum in support of<br>Plaintiffs' Motion to Transfer Cases to the Business Litigation Section | |
| 10/30/2023 | 43 | Opposition to Motion to Appoint Interim Class Counsel filed by Janice Progin | |
| 10/30/2023 | 44 | Declaration of Edward F. Haber Regarding Janice Progin's Opposition to Motion to Appoint Class Counsel | |
| 10/30/2023 | | Notice of appearance of Edward F Haber on behalf of Interested Party Janice Progin | |
| 10/30/2023 | 45 | Withdrawal of Motion to Appoint Interim Class Counsel<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe Individually and on behalf of All Others Similarly Situated (Plaintiff) | |
| 10/30/2023 | | Endorsement on Motion to Appoint Interim Class Counsel (#35.0): Withdrawn by moving counsel. See Pleading #35. Dated: 8/28/23<br><br>Judge: Goodwin, Hon. Karen | Goodwin |
| 10/30/2023 | | Endorsement on Motion to Transfer to the Business Litigation Session (#41.0): ALLOWED<br>Contingent on acceptance by the BLS in accordance with S. Ct. Ad. Directive 17-1 Dated: 8/29/23<br><br>Judge: Goodwin, Hon. Karen | Goodwin |
| 10/30/2023 | 46 | Other Interested Party Janice Progin's Motion of<br>Consolidate and Transfer Cases to the Business Litigation Session | |
| 10/30/2023 | 47 | Janice Progin's Memorandum in support of<br>Motion to Consolidate and Transfer to the Business Litigation Session | |
| 10/30/2023 | 48 | Opposition to Janice Progin's Motion to Consolidate and Transfer Cases to the Business Litigation Session filed by UMass Memorial Health Care Inc | |
| 10/30/2023 | 49 | Reply/Sur-reply<br><br>Reply in Support of Janice Progin's Motion to Consolidate and Transfer Cases to the Business Litigation Session | |
| 10/30/2023 | | Rule 9A notice of filing | |
| 10/30/2023 | | Endorsement on Motion to Consolidate and Transfer Cases to the Business Litigation Session (#46.0): ALLOWED<br>Allowed to the extent this is constructed as a motion to transfer Civil Action No. 2285CV1293 to the Business Litigation Session (BLS). The transfer will not take place, however, unless and until the BLS accepts the case. This court previously allowed the motion to transfer Civil Action No. 2285CV01205 to the Business Litigation Session, similarly, is subject to acceptance by the BLS. No action taken on the motion to consolidate in the BLS because that decision will be made in the BLS if it accepts transfer. Dated: 9/6/23<br><br>Judge: Goodwin, Hon. Karen | Goodwin |
| 10/30/2023 | 50 | Jonathan Tucker Merrigan, Esq.'s MOTION to admit counsel pro hac vice:<br>Carl J. Gustafson on behalf of Plaintiff John Doe; with affidavit | |

| | | | |
|---|---|---|---|
| 10/30/2023 | | Affidavit of compliance with Superior Court Rule 9A<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe Individually and on behalf of All Others Similarly Situated (Plaintiff) | |
| 10/30/2023 | | Rule 9A notice of filing<br><br>and Listing of Documents with Certificate of Service<br><br>Applies To: Merrigan, Esq., Jonathan Tucker (Attorney) on behalf of John Doe Individually and on behalf of All Others Similarly Situated (Plaintiff) | |
| 10/30/2023 | | Endorsement on Motion for Admission Pro Hac Vice (#50.0): ALLOWED<br>Dated: 10/13/23<br><br>Judge: Wrenn, Hon. Daniel M | Wrenn |
| 10/30/2023 | | Attorney appearance<br>On this date Carl J Gustafson added for Plaintiff John Doe Individually and on behalf of All Others Similarly Situated | |
| 10/30/2023 | 51 | NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION "BLS1": The court has previously allowed a Motion to Transfer this case to the Business Litigation Session in Suffolk County. After review of that Motion and the relevant pleadings, this case has been accepted into the Suffolk Business Litigation Session and will be assigned to BLS1. As soon as the original papers are received from the Clerk's Office in the county that is transferring the case (Worcester), this case will be given a new Suffolk County docket number. The parties will be notified accordingly. Dated: September 11, 2023 (See P#51 for complete notice)<br><br>Judge: Salinger, Hon. Kenneth W | Salinger |
| 10/30/2023 | 52 | ORDER: TO TRANSFER:<br>This action came on before the Court, Karen Goodwin, Justice, upon Motion to Consolidate and Transfer to Business Litigation Session, which was filed, allowed, and accepted by Kenneth W. Salinger, Justice of the Superior Court & Administrative Justice of the Business Litigation Session, and it appearing to the Court therefrom that t Transfer is indicated, upon consideration thereof. It is ORDERED and ADJUDGED: That the above-entitled action be transferred to Superior Court Business Litigation Session. Dated at Worcester, Massachusetts this 23rd day of October 2023. | Goodwin |
| 10/30/2023 | 53 | Attested copy of docket entries received from Worcester Superior Court | |
| 11/03/2023 | | Civil action cover sheet mailed re: BLS | |
| 12/01/2023 | | Attorney appearance<br>On this date Justin C Kenney, Esq. added for Plaintiff John Doe Individually and on behalf of All Others Similarly Situated | |
| 12/01/2023 | | Attorney appearance electronically filed. | |
| 12/12/2023 | | Attorney appearance<br>On this date Ryan Hawkins, Esq. added for Plaintiff John Doe Individually and on behalf of All Others Similarly Situated | |
| 12/12/2023 | | Attorney appearance electronically filed. | |

| | | | |
|---|---|---|---|
| 12/29/2023 | | 's<br>Copied from linked case: 2384CV02450 | |
| 12/29/2023 | | Affidavit<br>Copied from linked case: 2384CV02450 | |
| 12/29/2023 | | 's<br>Copied from linked case: 2384CV02450 | |
| 12/29/2023 | | 's<br>Copied from linked case: 2384CV02450 | |
| 12/29/2023 | | 's<br>Copied from linked case: 2384CV02450 | |
| 01/02/2024 | | The following form was generated:<br><br>Notice to Appear - BLS<br>Sent On: 01/02/2024 15:58:55<br>Copied from linked case: 2384CV02450 | |
| 01/02/2024 | | The following form was generated:<br><br>Notice to Appear - BLS<br>Sent On: 01/02/2024 16:02:24 | |
| 01/05/2024 | | Endorsement on Motion for Admission of Christian Ieraci pro hac vice (#32.0): ALLOWED<br>(Dated 1/4/2024)<br><br>Judge: Krupp, Hon. Peter B<br>Copied from linked case: 2384CV02450 | |
| 01/05/2024 | 54 | ORDER: Re: Rule 16 Conference<br>(Dated: 1/2/24)<br><br>Judge: Krupp, Hon. Peter B | Krupp |
| 01/25/2024 | | Defendant UMass Memorial Health Care Inc's Motion and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases<br>Copied from linked case: 2384CV02450 | |
| 01/25/2024 | 55 | Amended: First amended complaint filed by John Doe Individually and on behalf of All Others Similarly Situated | |
| 01/30/2024 | | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on: 01/31/2024 02:00 PM<br>Has been: Canceled For the following reason: Joint request of parties<br>Hon. Peter B Krupp, Presiding<br>Staff:<br>Gloria Brooks, Assistant Clerk Magistrate<br>Copied from linked case: 2384CV02450 | |

| | | |
|---|---|---|
| 01/31/2024 | Endorsement on Motion and and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases (#33.0): ALLOWED<br>Both matters are stayed pending a decision in the Vita appeals. The hearing scheduled for 1/31/24 is CANCELED. Within 14 days after a decision in the Vita appeals, the parties shall notify the Court and provide three dates mutually agreeable to the parties in the following 60 days for the conduct of a Rule 16 Conference.<br>(Dated: 1/30/24)<br>Copied from linked case: 2384CV02450<br><br>Judge: Krupp, Hon. Peter B | Krupp |
| 01/31/2024 | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on:<br>01/31/2024 02:00 PM<br>Has been: Canceled For the following reason: Joint request of parties<br>Hon. Peter B Krupp, Presiding<br>Staff:<br>Gloria Brooks, Assistant Clerk Magistrate | Krupp |
| 05/17/2024 | Attorney appearance electronically filed. | |
| 01/06/2025 | The following form was generated:<br><br>Notice to Appear - BLS was generated but not submitted:<br>Copied from linked case: 2384CV02450 | |
| 01/06/2025 | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Plaintiff: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Defendant: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Other interested party: Edward F Haber, Esq. ehaber@shulaw.com<br>Other interested party: Paul G. Karlsgodt (PHV for Deft UMass) Baker & Hostetler LLP 1801 California Street Suite 4400, Denver, CO 80203<br>Sent On: 01/06/2025 13:37:30 | |
| 01/14/2025 | Attorney appearance electronically filed. | |
| 01/15/2025 | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on:<br>01/15/2025 11:00 AM<br>Has been: Held via Video/Phone<br>Hon. Peter B Krupp, Presiding<br>Copied from linked case: 2384CV02450 | |

**COMMONWEALTH OF MASSACHUSETTS**
**SUFFOLK COUNTY CIVIL**
**Docket Report**

| | | | |
|---|---|---|---|
| 01/15/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated but not submitted:<br>Copied from linked case: 2384CV02450 | |
| 01/15/2025 | | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on:<br>01/15/2025 11:00 AM<br>Has been: Held via Video/Phone<br>Hon. Peter B Krupp, Presiding | Krupp |
| 01/15/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Plaintiff: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Alex J Dravillas 150 N. Riverside Plaza Suite 4100, Chicago, IL 60606<br>Plaintiff: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Plaintiff: Carl J Gustafson 1221 McKinney Suite 2500, Houston, TX 77010<br>Plaintiff: Justin C Kenney, Esq. jkenneytx@gmail.com<br>Plaintiff: Ryan Hawkins, Esq. rmh@sweeneymerrigan.com<br>Defendant: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Defendant: Keith M Taubenblatt, Esq. keith.taubenblatt@jacksonlewis.com<br>Other interested party: Edward F Haber, Esq. ehaber@shulaw.com<br>Other interested party: Paul G. Karlsgodt (PHV for Deft UMass) Baker & Hostetler LLP 1801 California Street Suite 4400, Denver, CO 80203<br>Sent On: 01/15/2025 15:37:16 | |
| 01/30/2025 | 56 | ORDER: Scheduling Order<br>See paper #56<br>dated (1/15/25)<br><br>Notice Sent 2/3/25 | Krupp |
| 01/31/2025 | 57 | Amended: Second amended complaint filed by John Doe Individually and on behalf of All Others Similarly Situated | |
| 02/10/2025 | 58 | Defendant UMass Memorial Health Care Inc's Notice of Filing Notice of Removal<br>(U.S. Dist.# 25cv40022) | |
| 03/06/2025 | | REMOVED to the U.S. District Court of Massachusetts | |
| 03/06/2025 | | Case transferred to another court. | |

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

E-FILED

275.00

1

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. ~~2285CV01225D~~
2384CV02448-BLS 1

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Doe ("Plaintiff"), individually and on behalf of all other Citizens of the Commonwealth of Massachusetts similarly situated ("Class Members"), brings suit against Defendant UMass Memorial Health Care, Inc. ("Defendant"), and upon personal knowledge as to Plaintiff's own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendant assures visitors to its website that it is "committed to protecting your privacy" and that "We have designed our website to allow you to visit most areas without

identifying yourself or providing personal information."[1] Contrary to these assurances, however, Defendant does not follow these policies, nor the law prohibiting such disclosures.

3. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent.

4. Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these rerouting tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

5. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

6. On behalf of themselves and all similarly situated citizens in the Commonwealth of Massachusetts, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of his personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

[1] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

## PARTIES TO THE ACTION

7. Defendant UMass Memorial Health Care, Inc. is a Massachusetts corporation with its principal office at One Biotech Park, 365 Plantation Street, Worcester, MA 01605. Defendant is the largest health care system in Central Massachusetts.[2] Defendant owns and manages numerous healthcare facilities in Massachusetts, including UMass Memorial Medical Center, UMass Memorial Health Harrington Hospital, UMass Memorial Health Marlborough Hospital, Community Healthlink Behavioral Health Services, and UMass Memorial Health Clinton Hospital. [3]

8. Plaintiff, John Doe, is a Massachusetts citizen residing in Worcester County, Massachusetts, has been treated by Defendant's physicians, and has been a pâtient UMass Memorial Medical Center,[4] and thus also a patient of Defendant.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 365 Plantation Street, Worcester, MA 01605. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

10. Venue is appropriate in this venue because Defendant's principal place of business is in Worcester County and the acts or conduct giving rise to the cause of action asserted herein took place in Worcester County. G.L. c. 223, § 1. Venue is also appropriate in this Court because Plaintiff, John Doe, resides in Worcester County. G.L. c. 223, § 8(4).

---

[2] https://www.ummhealth.org/umass-memorial-health/about-us
[3] https://www.ummhealth.org/locations
[4] https://www.ummhealth.org/umass-memorial-medical-center

## FACTUAL BACKGROUND

**A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

11. Plaintiff John Doe is a patient of Defendant who has received treatment from UMass Memorial Medical Center.[5]

12. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

13. Medical patients in Massachusetts such as John Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

14. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

15. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

16. Defendant operates websites for patients, including www.ummhealth.org and www.harringtonhospital.org.

17. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

18. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses

---

[5] https://www.ummhealth.org/umass-memorial-medical-center

the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

19. Defendant's disclosures of patients' personal healthcare information occur because Defendant intentionally deploys source code on the websites it operates, including https://www.ummhealth.org/ and https://www.harringtonhospital.org/provider/, that cause patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

20. By design, third parties receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

21. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

22. The basic command that web browsers use to exchange data and user communications is called a GET request.[6] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

---

[6] https://www.w3schools.com/tags/ref_httpmethods.asp

23. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

24. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

25. Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties. Typically, users are provided no notice that these disclosures are being made. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

26. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

27. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

28. These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

29. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

30. Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

31. For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[7]

32. Because of their uniquely identifying characteristics, IP address are considered personally identifiable information. Tracking pixels can (and typically do) collect website visitors' IP addresses.

[7] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

33. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

34. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

35. Cookies are considered personal identifiers, and tracking pixels can collect cookies from website visitors.

36. A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

37. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

websites."[8] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[9] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[10]

38. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[11]

39. Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

40. A fourth kind of personally identifying information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is an identifying number string that is connected to a user's Facebook profile.[12] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[13]

41. Unique personal identifiers such as a person's Facebook are likewise capable of collection through pixel trackers.

**D. Facebook**

42. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

---

[8] https://www.blog.google/products/chrome/building-a-more-private-web/
[9] https://pixelprivacy.com/resources/browser-fingerprinting/
[10] https://www.blog.google/products/chrome/building-a-more-private-web/
[11] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[12] https://www.facebook.com/help/211813265517027
[13] https://smallseotools.com/find-facebook-id/

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

43. Facebook describes itself as a "real identity" platform.[14] This means that users are permitted only one account and must share "the name they go by in everyday life."[15] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[16]

44. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[17] Facebook has since evolved into one of the largest advertising companies in the world.[18] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[19] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[20]

45. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[21]

46. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

47. Facebook offers several advertising options based on the type of audience that an

---

[14] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[15] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[16] https://www.facebook.com/help/406644739431633
[17] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[18] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[19] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[20] https://www.facebook.com/business/ads/ad-targeting
[21] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

48. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[22] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

49. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

---

[22] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

50. One of Facebook's most powerful tools is called the "Meta Pixel."

51. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[23] Once activated, the Meta Pixel "tracks the people and type of actions they take."[24] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[25]

52. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences.

53. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

54. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[26] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[27]

55. Facebook warns web developers that its Pixel is a personal identifier because it

[23] https://developers.facebook.com/docs/meta-pixel/
[24] https://www.facebook.com/business/goals/retargeting
[25] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[26] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[27] https://www.oviond.com/understanding-the-facebook-pixel

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

enables Facebook "to match your website visitors to their respective Facebook User accounts."[28]

56. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[29]

57. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[30] Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[31]

58. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

59. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[32] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[33] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[34]

60. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and

---

[28] https://developers.facebook.com/docs/meta-pixel/get-started
[29] https://developers.facebook.com/docs/meta-pixel/get-started
[30] https://developers.facebook.com/docs/meta-pixel/
[31] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients
[32] https://developers.facebook.com/docs/meta-pixel/
[33] https://developers.facebook.com/docs/meta-pixel/
[34] https://developers.facebook.com/docs/meta-pixel/

specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[35]

61. Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

62. If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

63. Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[36] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[37]

64. Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." Thise are two forms of Advanced Matching: manual matching and automatic matching.[38] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

---

[35] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[36] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[37] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/
[38] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

65. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[39] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[40]

66. Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

67. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

68. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

69. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act,"

---

[39] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[40] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

"presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[41] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[42]

70. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like https://www.ummhealth.org/ and target users with advertising based on their web activity.

**D. Defendant has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

71. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

72. Facebook's intrusion into the personal data of the visitors to third-party websites

[41] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[42] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[43] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

73. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[44] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[45] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

74. Meta Pixel is wildly popular and embedded on millions of websites. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems.[46] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text

---

[43] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[44] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[45] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[46] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

75. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

76. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is transmitted to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

77. This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

78. For example, a patient searching for a doctor on Defendant's website located at www.harringtonhospital.org is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

patient's hometown, the patient's language preference, and other information that the patient provides:




79. All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

80. Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors on its websites to assist with them conditions such as substance abuse and addiction:

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number




81. Likewise, a patient who desires an appointment at a specific hospital using Defendant's websites also has that information forwarded to Facebook via the Meta Pixel contemporaneously with its transmission by patients:




82. In other words, Facebook learns not just that patients are seeking treatment, but

where and typically when they are seeking treatment.

83. Defendant also discloses patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, and communications made when patients are researching specific medical conditions such as COVID-19.

84. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal Health Information to their private identities and target them with advertising.

85. Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the websites that Defendant maintains. Plaintiff continued to have his privacy violated when Defendant permitted Facebook and other companies to send him targeted advertising related to his medical condition.

86. For example, Plaintiff John Doe visited Defendant's website in 2021 and 2022 at www.ummhealth.org and entered data, including sensitive medical information, such as details about his medical condition and doctor. The information that Plaintiff John Doe transmitted included queries about treatment for his medical condition.

87. Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiff's and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data.

**F. Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

88. Plaintiff and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

89. For example, when Plaintiff John Doe visited Defendant's website in 2022 at www.ummhealth.org there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.

90. Plaintiff and his fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

91. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Terms of Use" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:



Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

92. While disclosing that its website contains "cookies," Defendant's "Terms of Use" falsely promises patients that the "[u]se of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site."[47] Contrary to that promise, Defendant's website automatically transmits personally identifiable information to Facebook using multiple cookies, including c_user, datr, fr, and xs cookies.

93. To locate Defendant's "Privacy Policy," a patient is required to scroll through the "UMass Memorial Health Care Website Terms of Use Statement" to find a link entitled "Read Our Privacy Policy" that is buried in the website's general terms and conditions statement.[48]

94. Defendant's "Privacy Policy" gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises in its "Privacy Policy"[49] that protecting patients' health information is a priority:

> **JOINT NOTICE OF INFORMATION PRACTICES**
>
> **At UMass Memorial Health Care, your privacy is a priority. We follow strict federal and state guidelines to maintain the confidentiality of your medical (protected health) information. We also follow state guidelines regarding how long we must store your medical records and the requirements for proper disposal.**

95. Even if a patient stumbled upon Defendant's carefully hidden "Privacy Policy," nothing in that notice would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

---

[47] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement
[48] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement
[49] https://www.ummhealth.org/patients-visitors/joint-notice-information-practices

96. Defendant does not have a legal right to share Plaintiff's and Class Members' Protected Health Information without their written consent to third parties, because this information is protected from such disclosure by law. *E.g.* GL c. 214, §1B; 45 C.F.R. § 164.508. Much less is Defendant permitted to disclose patients' Protected Health Information to advertising and marketing companies like Facebook without express written authorization from patients. *E.g.* 940 Mass. Code Regs. 4.08(12).

97. Defendant failed to obtain a valid written authorization from Plaintiff or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

98. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

99. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiff and Class Members' Personal Health Information to Facebook or aid in the same.

**G. The disclosures of personal patient data to Facebook are unnecessary.**

100. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website.

101. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

102. Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**H. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

103. Patient confidentiality "is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." *Alberts v. Devine*, 395 Mass. 59, 65 (1985).

104. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiff and Class Member's privacy interests.

105. Patient Personal Health Information is specifically protected by law. *E.g.* G.L. 111, §70E(b); G.L. 214, §1B. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifying information such patient names, IP addresses, and other unique characteristics or codes. *E.g.* 105 Mass. Code Regs. 300.120; 45 C.F.R. § 164.514.

106. Massachusetts courts have long recognized that physicians owe a duty of confidentiality to patients, which prohibits them from disclosing patients' health information without patients' written consent. *Alberts v. Devine*, 395 Mass. 59, 68 (1985). And Massachusetts law subjects medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

107. Given the public policy expressed by these laws, Plaintiff and the Members of the Class had a reasonable expectation of privacy in their protected health information.

108. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

109. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

110. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[50]

111. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users

[50] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

chose not to share data when prompted.[51]

112. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[52]

113. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

## I. Plaintiff's Personal Health Data that Defendant collected, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.

114. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiff and Class Members.

115. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and

[51] https://www.wired.co.uk/article/apple-ios14-facebook
[52] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

location information" were being sold for approximately "$0.50 per 1,000 people."[53]

116. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[54] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[55]

117. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[56] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[57]

118. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[58]

119. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[59] and has paid

[53] https://ig.ft.com/how-much-is-your-personal-data-worth/
[54] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[55] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[56] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[57] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[58] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[59] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app

teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[60]

120. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[61]

121. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiff and the Class Member's property.

**J. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

122. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

123. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

124. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar

---

[60] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[61] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* *https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

advertising can be accomplished via disclosures to other third-party advertisers and marketers.

125. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

126. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**K. Facebook's history of egregious privacy violations.**

127. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

128. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

129. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

130. Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

131. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[62]

132. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[63]

133. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

134. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[64] Some companies were even able to read users' private messages.

135. In June 2020, after promising users that app developers would not have access to

[62] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[63] A similar case is pending in Texas.
[64] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html

data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[65] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

136. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[66]

137. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[67] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies

[65] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[66] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[67] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

could do with users' information."[68]

138. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[69]

139. These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[70]

140. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

141. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

142. Defendant seamlessly incorporated Meta Pixel and other trackers into its

[68] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[69] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[70] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiff and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

143. Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

144. The earliest that Plaintiff and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

145. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiff's Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

**CLASS ACTION ALLEGATIONS**

146. Defendant's conduct violates the law and breaches its express and implied privacy promises.

147. Defendant's unlawful conduct has injured Plaintiff and Class Members.

148. Defendant's conduct is ongoing.

149. Plaintiff brings this action individually and as a class action against Defendant.

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

150. Plaintiff seeks class certification for the following proposed Class:

> **The UMass Memorial Health Class:** During the fullest period allowed by law, all Massachusetts citizens who are, or were, patients of UMass Memorial Health, Inc. or any of its affiliates and who exchanged communications at Defendant's websites, including www.ummhealth.org, www.harringtonhospital.org, and any other UMass Memorial Health affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

151. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

152. Plaintiff reserves the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

153. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

154. **Numerosity:** While the exact number of Class Members is unknown to Plaintiff at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

155. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiff and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate G.L. c. 272, § 99;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiff and Class Members' Personal Health Information to Facebook;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiff and Class Members and, if so, the extent of that injury;

j. Whether Plaintiff and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiff and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

156. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

157. **Typicality:** Plaintiff's claims are typical of the claims of other Class Members and Plaintiff have substantially the same interest in this matter as other Class Members. Plaintiff has no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiff's claims arise out of the same set of facts and conduct as all other Class Members. Plaintiff and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiff and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

158. **Adequacy of Representation:** Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are coincident with, and not antagonistic to, those of other Class Members he seeks to represent. Plaintiff has no disabling conflicts with Class Members. Accordingly, Plaintiff is an adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

159. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

160. Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

161. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiff and the Class)

162. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

163. Plaintiff brings this claim on behalf of themselves and all members of the Class.

164. All conditions precedent to this action have been performed or have occurred.

165. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

166. Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

167. Defendant qualifies as a person under the statute.

168. All alleged communications between Plaintiff or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

169. An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire … communication

through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

170. Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiff's and Class Members' wire communications.

171. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire ... communication." G.L. c. 272, § 99B(3).

172. The "intercepting devices" used in this case include, but are not limited to:

a. Plaintiff and Class Members' personal computing devices;

b. Plaintiff and Class Members' web browsers;

c. Plaintiff and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

h. Computer servers of third parties (including Facebook) to which Plaintiff and Class Members' communications were disclosed.

173. Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

174. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that

were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

175. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

k. The precise dates and times when patients visit Defendant's websites;

l. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

m. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

176. Plaintiff and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

177. Neither Plaintiff nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiff or Class Members' consent.

178. Plaintiff and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

179. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

180. In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiff and the Class)**

181. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

182. Plaintiff bring this claim on behalf of herself and all members of the Class.

183. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

184. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

185. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

186. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

187. Plaintiff and Class Members are patients of Defendant.

188. Defendant owes Plaintiff and Class Members a duty of confidentiality.

189. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiff and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

190. The information disclosed included personally identifiable information, Plaintiff and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiff and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

191. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiff and Class Members' rights to privacy.

192. Plaintiff and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiff and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

193. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiff and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

194. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

195. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

196. Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

197. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

198. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

199. Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiff and Class Members' privacy.

200. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

201. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiff and the Class)**

202. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

203. Plaintiff brings this claim on behalf of themselves and all members of the Class.

204. All conditions precedent to this action have been performed or occurred.

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

205. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

206. As medical provider for Plaintiff and Class Members, Defendant owes Plaintiff and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiff or Class Members.

207. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiff and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

208. Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

**COUNT IV**
**Breach of Express Contract**
**(On Behalf of Plaintiff and the Class)**

209. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

210. Plaintiff bring this claim on behalf of herself and all members of the Class.

211. Plaintiff and Class Members entered into written agreements with Defendant as part of the medical services Defendant provided to Plaintiff and Class Members. The agreements involved a mutual exchange of consideration whereby Defendant provided these services in exchange for payment from Class Members, Class Members' insurance carriers, and/or government programs remitting payment on Class Members' behalf.

212. Plaintiff and Class Members and/or their insurance carriers paid Defendant for its services and performed under these agreements.

213. Defendant's disclosure of Plaintiff and Class Members' Private Health Information without their consent constitutes a material breach of the terms of these agreements by Defendant.

214. As a direct and proximate result of Defendant's breach of contract with Plaintiff and Class Members, Plaintiff and Class Members have been irreparably harmed.

215. Accordingly, Plaintiff, individually and on behalf of the Class, respectfully request this Court award all available damages for Defendant's breach of express contract.

**COUNT V**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

216. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

217. Plaintiff brings this claim on behalf of herself and all members of the Class.

218. Through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for the provision of medical care and treatment, as well as implied contracts for the Defendant to retain and protect the privacy of Plaintiff's and Class Members' Private Health Information.

219. Specifically, Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendant when they first went for medical treatment at one of Defendant's facilities.

220. The valid and enforceable implied contracts to provide medical healthcare services that Plaintiff and Class Members entered into with Defendant included Defendant's promise to not disclose nonpublic Private Health Information given to Defendant without their consent. Plaintiff and Class Members provided this Private Health Information in reliance of that promise.

221. Defendant solicited and invited Plaintiff and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services.

222. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's complied with relevant laws and regulations and would not allow third parties to collect or exploit their communications with Defendant without their consent.

223. Plaintiff and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of

surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

224. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members; and (b) protect Plaintiff and the Class Members' Private Health Information provided to obtain such healthcare. In exchange, Plaintiff and Class Members agreed to pay money for these services, and to turn over their Private Health Information through the use of Defendant's websites.

225. Both the provision of medical services healthcare and the protection of Plaintiff and Class Members' Private Health Information were material aspects of these implied contracts.

226. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

227. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiff and Class Members' Private Health Information without consent.

228. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiff and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiff and Class Members

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

229. A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

230. Plaintiff and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

231. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiff and Class Members' consent.

232. As a result of Defendant's failure to fulfill the data privacy promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare with data privacy they paid for and the healthcare they received.

233. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff and Class Members' Private Health Information without consent, neither the Plaintiff,

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

234. As a direct and proximate result of these failures, Plaintiff and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

235. Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result.

236. Plaintiff and the Class Members are also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

237. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

238. Plaintiff hereby pleads this Count in the alternative to Counts IV and V.

239. Plaintiff brings this claim on behalf of herself and all members of the Class.

240. Plaintiff and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade

for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

241. Plaintiff and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

242. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

243. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

244. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all others similarly situated, ask for judgment in his favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiff as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiff or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f. Imposing a constructive trust against Defendant through which Plaintiff and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiff and Class Members' right to privacy;

h. Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiff and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiff and Class Members may be entitled.

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

**RESPECTFULLY SUBMITTED,**
**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ________
Assistant Clerk

Dated: October 24, 2022

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

E-FILED

2

# CIVIL ACTION COVER SHEET

DOCKET NUMBER 23-2448 2285CV01205D

Trial Court of Massachusetts
The Superior Court

COUNTY Worcester

| | |
|---|---|
| Plaintiff: John Doe | Defendant: Umass Memorial Health Care, Inc. |
| ADDRESS: c/o Sweeney Merrigan Law | ADDRESS: One Biotech Park |
| 268 Summer St., LL | 365 Plantation Street |
| Boston, MA 02210 | Worcester, MA 01605 |
| Plaintiff Attorney: Jonathan T. Merrigan | Defendant Attorney: |
| ADDRESS: Sweeney Merrigan Law | ADDRESS: |
| 268 Summer Street, LL | |
| Boston, MA 02210 | |
| BBO: 681627 | BBO: |

SUFFOLK SUPERIOR COURT CIVIL CLERK'S OFFICE FILED OCT 3 0 2023 JOHN E. POWERS, III ACTING CLERK MAGISTRATE

**TYPE OF ACTION AND TRACK DESIGNATION (see instructions section below)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B99 | Violation of MA Wiretapping Law | F | ☒ YES ☐ NO |

*If "Other" please describe:

Is there a claim under G.L. c. 93A? ☐ YES ☒ NO

Is there a class action under Mass. R. Civ. P. 23? ☒ YES ☐ NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**

A. Documented medical expenses to date
1. Total hospital expenses
2. Total doctor expenses
3. Total chiropractic expenses
4. Total physical therapy expenses
5. Total other expenses (describe below)

Subtotal (1-5): $0.00

B. Documented lost wages and compensation to date
C. Documented property damages to date
D. Reasonably anticipated future medical and hospital expenses
E. Reasonably anticipated lost wages
F. Other documented items of damages (describe below) $50,000,000.00+

Plaintiffs and Class Members have suffered damages pursuant to G.L.c.272 Â§99.

TOTAL (A-F): $50,000,000+

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

Defendant disclosed Plaintiffs and Class Members' personal health information to third parties in violation of G.L. c. 272 Â§ 99.

**CONTRACT CLAIMS**

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).

| Item # | Detailed Description of Each Claim | Amount |
|---|---|---|
| 1. | Defendant breached express and implied contractual duties by disclosing Class Members' personal information. | $14,000,000.00+ |
| | Total | $14,000,000.00+ |

Signature of Attorney/Unrepresented Plaintiff: X /s/ Jonathan T. Merrigan Date: October 24, 2022

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

Signature of Attorney/Unrepresented Plaintiff: X /s/ Jonathan T. Merrigan Date: October 24, 2022



I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Date Filed 10/24/2022 2:12 PM
Superior Court - Worcester
Docket Number

# CIVIL ACTION COVER SHEET INSTRUCTIONS
# SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

**AC Actions Involving the State/Municipality ***

AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. (A)
AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. (A)
AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. (A)
AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. (A)
AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. (A)

**CN Contract/Business Cases**

A01 Services, Labor, and Materials (F)
A02 Goods Sold and Delivered (F)
A03 Commercial Paper (F)
A04 Employment Contract (F)
A05 Consumer Revolving Credit - M.R.C.P. 8.1 (F)
A06 Insurance Contract (F)
A08 Sale or Lease of Real Estate (F)
A12 Construction Dispute (A)
A14 Interpleader (F)
BA1 Governance, Conduct, Internal Affairs of Entities (A)
BA3 Liability of Shareholders, Directors, Officers, Partners, etc. (A)
BB1 Shareholder Derivative (A)
BB2 Securities Transactions (A)
BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. (A)
BD1 Intellectual Property (A)
BD2 Proprietary Information or Trade Secrets (A)
BG1 Financial Institutions/Funds (A)
BH1 Violation of Antitrust or Trade Regulation Laws (A)
A99 Other Contract/Business Action - Specify (F)

* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

† Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

D01 Specific Performance of a Contract (A)
D02 Reach and Apply (F)
D03 Injunction (F)
D04 Reform/ Cancel Instrument (F)
D05 Equitable Replevin (F)
D06 Contribution or Indemnification (F)
D07 Imposition of a Trust (A)
D08 Minority Shareholder's Suit (A)
D09 Interference in Contractual Relationship (F)
D10 Accounting (A)
D11 Enforcement of Restrictive Covenant (F)
D12 Dissolution of a Partnership (F)
D13 Declaratory Judgment, G.L. c. 231A (A)
D14 Dissolution of a Corporation (F)
D99 Other Equity Action (F)

**PA Civil Actions Involving Incarcerated Party †**

PA1 Contract Action involving an Incarcerated Party (A)
PB1 Tortious Action involving an Incarcerated Party (A)
PC1 Real Property Action involving an Incarcerated Party (F)
PD1 Equity Action involving an Incarcerated Party (F)
PE1 Administrative Action involving an Incarcerated Party (F)

**TR Torts**

B03 Motor Vehicle Negligence - Personal Injury/Property Damage (F)
B04 Other Negligence - Personal Injury/Property Damage (F)
B05 Products Liability (A)
B06 Malpractice - Medical (A)
B07 Malpractice - Other (A)
B08 Wrongful Death - Non-medical (A)
B15 Defamation (A)
B19 Asbestos (A)
B20 Personal Injury - Slip & Fall (F)
B21 Environmental (F)
B22 Employment Discrimination (F)
BE1 Fraud, Business Torts, etc. (A)
B99 Other Tortious Action (F)

**RP Summary Process (Real Property)**

S01 Summary Process - Residential (X)
S02 Summary Process - Commercial/ Non-residential (F)

**RP Real Property**

C01 Land Taking (F)
C02 Zoning Appeal, G.L. c. 40A (F)
C03 Dispute Concerning Title (F)
C04 Foreclosure of a Mortgage (X)
C05 Condominium Lien & Charges (X)
C99 Other Real Property Action (F)

**MC Miscellaneous Civil Actions**

E18 Foreign Discovery Proceeding (X)
E97 Prisoner Habeas Corpus (X)
E22 Lottery Assignment, G.L. c. 10, § 28 (X)

**AB Abuse/Harassment Prevention**

E15 Abuse Prevention Petition, G.L. c. 209A (X)
E21 Protection from Harassment, G.L. c. 258E (X)

**AA Administrative Civil Actions**

E02 Appeal from Administrative Agency, G.L. c. 30A (X)
E03 Certiorari Action, G.L. c. 249, § 4 (X)
E05 Confirmation of Arbitration Awards (X)
E06 Mass Antitrust Act, G.L. c. 93, § 9 (A)
E07 Mass Antitrust Act, G.L. c. 93, § 8 (X)
E08 Appointment of a Receiver (X)
E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A (A)
E10 Summary Process Appeal (X)
E11 Worker's Compensation (X)
E16 Auto Surcharge Appeal (X)
E17 Civil Rights Act, G.L. c.12, § 11H (A)
E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) (X)
E25 Pleural Registry (Asbestos cases)
E94 Forfeiture, G.L. c. 265, § 56 (X)
E95 Forfeiture, G.L. c. 94C, § 47 (F)
E99 Other Administrative Action (X)
Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B (F)
Z02 Appeal Bond Denial (X)

**SO Sex Offender Review**

E12 SDP Commitment, G.L. c. 123A, § 12 (X)
E14 SDP Petition, G.L. c. 123A, § 9(b) (X)

**RC Restricted Civil Actions**

E19 Sex Offender Registry, G.L. c. 6, § 178M (X)
E27 Minor Seeking Consent, G.L. c.112, § 12S (X)

**TRANSFER YOUR SELECTION TO THE FACE SHEET**

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF** - The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT** - If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

**A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.**
**FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY MAY RESULT IN DISMISSAL OF THIS ACTION.**

Date Filed 10/25/2022 2:06 PM
Superior Court - Worcester
Docket Number 2285CV01205

3

E-FILED

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| WORCESTER, S.S. | | SUPERIOR COURT |
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | 2384CV02448-BLS1 |
| Plaintiff | § | C.A. No. ~~2285CV01205~~D |
| v. | § | SUFFOLK SUPERIOR COURT CIVIL CLERK'S OFFICE FILED OCT 30 2023 JOHN E. POWERS, III ACTING CLERK MAGISTRATE |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

**PLAINTIFF'S MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION**

Now comes the Plaintiff, John Doe, individually and on behalf of all others similarly situated, to impound their names and/or other identifying information for the pendency of this case pursuant to Massachusetts Uniform Rules on Impoundment Procedure ("URIP") Rule 2[1]. The material sought to be impounded are the plaintiffs' names and/or other identifying information[2] for the pendency of this matter. Impoundment is necessary in this matter because the facts of the underlying action relate directly and specifically to all plaintiffs' sensitive medical information. Specifically, the claim arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent. Therefore, in order to protect the medical information that will

[1] URIP Rule 2 provides: "The motion shall describe with particularity (i) the material sought to be impounded, (ii) the duration for which impoundment is sought, (iii) the reasons impoundment is necessary, and (iv) the reasons other alternatives to impoundment will not afford adequate protection."

[2] This could include social media handles, IP addresses, etc.

Denied at this time. The defendant has not yet filed an answer to the complaint. This motion has not been served pursuant to Rule 9A and thus there is no identifying information in the court file. [signature] 10/31/22

Notices Mailed 11/3/22

Date Filed 10/25/2022 2:06 PM
Superior Court - Worcester
Docket Number 2285CV01205

necessarily be disclosed as part of the factual allegations and discovery in this matter, it is necessary to file this Complaint and proceed with the use of a pseudonym.

Alternatives to impoundment would not serve the same function and would not adequately protect the plaintiff, whose personal medical information has already been improperly used by the Defendant. Plaintiffs recognize that Massachusetts adheres to a presumption of openness, but this presumption is offset by the equally if not more important premise that the citizens of Massachusetts have a right to the privacy and confidentiality of their medical information, a right which is protected by statute, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

Perhaps as importantly, proceeding with the Plaintiffs' full names would have the unwelcome effect of making impoundment a more laborious, tedious and inefficient task. For each piece of discovery regarding the Plaintiffs' medical information, Plaintiffs would have to seek impoundment of those materials. It would impact the ability to move forward efficiently in both written and oral discovery. An impoundment order (attached at Exhibit B) would serve both purposes of protecting the Plaintiffs' private medical information and also allowing efficient prosecution of this case.

WHEREFORE, Plaintiff respectfully requests this court ALLOW Plaintiff's Motion for Impoundment of Personal Identifying Information and request a hearing on the same.

Date Filed 10/25/2022 2:06 PM
Superior Court - Worcester
Docket Number 2285CV01205

**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ________
Assistant Clerk

Dated: October 25, 2022

Filed 10/25/2022 2:06 PM
Superior Court - Worcester
Docket Number 2285CV01205

E-FILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. 2285CV01205 D

3.19.

**AFFIDAVIT OF ATTORNEY J. TUCKER MERRIGAN IN SUPPORT OF PLAINTIFF'S MOTION FOR IMPOUNDMENT OF PERSONAL IDENTIFYING INFORMATION**

I, J. Tucker Merrigan, hereby state and depose:

1. I am counsel for the Plaintiff in the above-captioned case.
2. The information inappropriately obtained by the Defendant in this matter is of a highly sensitive, personal and confidential nature.
3. In order to protect the privacy interests of the Plaintiffs in this case, it is necessary to proceed under a pseudonym so as not to cause further harm by additional, repeated disclosure of highly confidential medical information throughout the course of this litigation.
4. Allowing the plaintiffs to file under a pseudonym also allows for the most efficient disclosure of documents and discovery.

Signed under the pains and penalties of perjury this 25th day of October, 2022.

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

Date Filed 10/25/2022 2:06 PM
Superior Court - Worcester
Docket Number 2285CV01205

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2285CV01205 |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

**ORDER**

SO ORDERED, that Plaintiff's name and any identifying information shall be impounded for the pendency of this litigation. The Court finds that good cause for impoundment of the plaintiff's name has been shown by the movant to protect the plaintiff's interest in their private, sensitive and confidential medical records. The Court finds that there is no less restrictive measure available to protect this interest and that the degree, duration and manner of impoundment ordered herein are no broader than necessary.

It is ORDERED that the Clerk of this Court shall impound the Plaintiff's name in this case. Any such materials that identify the plaintiff shall be kept separate and apart from those materials to which the public has access. The filer of any document shall ensure that the Plaintiff's name is redacted from all public filings. The Clerk shall redact any individual docket entries as necessary. The docket and case filings shall otherwise remain available to the public.

____________________
By the Court

| CLERK'S NOTICE | DOCKET NUMBER<br>2285CV01205 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>John Doe, Ind. And ON Behalf Of All Others vs. Umass Memorial Health Care, Inc. | | Dennis P. McManus, Clerk of Courts |
| TO:<br>File Copy | | COURT NAME & ADDRESS<br>Worcester County Superior Court<br>225 Main Street<br>Worcester, MA 01608 |

You are hereby notified that on 10/31/2022 the following entry was made on the above referenced docket:

Endorsement on Motion for Impoundment of Personal Identifying Information (#3.0): DENIED
Denied at this time. The defendant has not yet filed an answer to the complaint. This motion has not been served pursuant to Rule 9A and thus there is no identifying information in the court file. Notices mailed 11/3/22

Judge: Reardon, Jr., Hon. James G

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| 11/03/2022 | Hon. James G Reardon, Jr. | (508)831-2350 |

Date Filed 11/18/2022 2:31 PM
Superior Court - Worcester
Docket Number 2285CV01205

E-FILED

4

| Summons | CIVIL DOCKET NO. 2384CV02448-BLS ~~2285CV01205~~ | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: John Doe, individually and on behalf of all others similarly situated Plaintiff(s) vs. UMass Memorial Healthcare, Inc. Defendant(s) | | Dennis P. McManus Clerk of Courts, Worcester County. COURT NAME & ADDRESS: Worcester Superior Court, 225 Main Street, Worcester, MA 01608 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

THIS SUMMONS IS DIRECTED TO UMass Memorial Healthcare, Inc. (Defendant's name)

<u>You are being sued.</u> The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the Worcester Superior Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. <u>You must respond to this lawsuit in writing within 20 days.</u>

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. How to Respond.

To respond to this lawsuit, you must file a written to response with the court and mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your signed original response with the Clerk's Office for Civil Business, Worcester Superior Court 225 Main Street, Worcester, MA 01608 (address), by mail or in person AND

b) Delivering or mailing a copy of your response to the Plaintiff's Attorney/Plaintiff at the following address: Sweeney Merrigan Law, LLP, 268 Summer St, LL, Boston, MA 02210

3. What to Include in Your Response.

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must specifically request a jury trial in your court no more than 10 days after sending your Answer.

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Date Fi 11/18/2022 2:31 PM
Superior Court - Worcester
Docket Number 2285CV01205

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings:**

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger, Chief Justice on ______________, 20____. (Seal)

Clerk-Magistrate ______________

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

I here
in thi

**Worcester County Sheriff's Office P.O. Box 1066 Worcester, MA 01613**
**(508) 752-1100**

11/10/2022

I hereby certify and return that on 11/7/2022 at 10:19 AM I served a true and attested copy of the SUMMONS AND COMPLAINT, MOTION TO STAY DISCOVERY AND ALL PENDING TIMELINES in this action in the following manner: To wit, by delivering BY EMAIL to JUDY ANTI,, agent, person in charge at the time of service for UMASS MEMORIAL HEALTHCARE, INC. at JUDY.ANTI@UMASSMEMORIAL.ORG (working remotely). Service Fee ($30.00) Attest ($5.00) Mailing ($3) ($3.00) Mileage ($3.84) Office Expense ($20.00) Conveyance ($2.00) Total: $63.84

N.B.

Sarah M Kontaxi
Deputy Sheriff

SUMM

INAL

rev. 1/2019

2385CV01205-D

5

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

FILED

JUL 21 2023

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.:<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D]<br><br>ATTEST: CLERK<br><br>2384CV02448 BLS1<br><br>DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1442(a)(1) |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**NOTICE OF REMOVAL**

To the Honorable Judges of the United States District Court for the District of Massachusetts and Plaintiff John Doe:

Over the past two decades, the federal government has engaged in an extensive effort to build a nationwide health information technology infrastructure. This case challenges the legitimacy of actions UMass Memorial Health Care, Inc. ("UMass Memorial") has taken in connection with pursuing that directive. UMass Memorial therefore removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

In like circumstances, as explained *infra* at pp. 9-10, district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *see also Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020).

In support of removal, UMass Memorial provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

## NATURE OF THE CASE

1. UMass Memorial is a Massachusetts nonprofit charitable corporation that is the direct or indirect corporate member of each of the entities that makes up the UMass Memorial healthcare system.

2. On October 24, 2022, Plaintiff John Doe filed a complaint against UMass Memorial, in the Superior Court of the Commonwealth of Massachusetts for the County of Worcester, Case No. 2285CV01205D.

3. Plaintiff served UMass Memorial with the Complaint, effective on November 7, 2022.

4. Plaintiff's Complaint purports to challenge UMass Memorial's routine on-line practices as various invasions of privacy, illegal wiretapping, and breach of contract. *See generally* Complaint.

5. UMass Memorial (and its affiliates) operates websites, including www.ummhealth.org and www.harringtonhospital.org, that provide information to the public about UMass Memorial and access to medical records through an Epic myChart patient portal.

6. Plaintiff is a UMass Memorial patient "who has received treatment from UMass Memorial Medical Center," and alleges that he "visited Defendant's website in 2021 and 2022 at ummhealth.org." Compl. ¶¶ 8, 11, 86, 89. "Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups." *Id.* ¶ 17.

7. Plaintiff alleges that the Facebook[1] or Meta Pixel, allegedly used on the UMass Memorial websites, "is embedded on the websites of many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems. This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites." Compl. ¶ 74. "[T]he moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook." *Id.* ¶ 75. "Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information . . . is transmitted to Facebook via the Meta Pixel." *Id.* ¶ 76.

8. The Meta Pixel is one of several tools offered by Facebook that allows Facebook "to share analytics metrics with the websites host," and "allows business [sic] to measure the effectiveness of their advertising by understanding the actions people take on their websites." Compl. ¶¶ 53-54. "A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic." *Id.* ¶ 71. Facebook offers the Pixel as a piece of code for website owners to integrate into their website to assist in advertising. *Id.* ¶¶ 49-54.

9. Plaintiff does not assert that UMass Memorial discloses names, social security numbers, diagnoses, birth dates, or comparable information to the third-parties.

[1] Facebook rebranded itself as Meta in 2021.

## BASIS FOR REMOVAL

10. UMass Memorial removes this case pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a). That statute permits removal when the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office …" *Id.* § 1442(a)(1).

11. The United States Supreme Court has directed that the federal officer removal statute is to be broadly construed, and defendants remove under this statute when they are acting under color of federal office. *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). To do so, a defendant must show that (a) it is a "person" within the meaning of the statute, "acting under a federal officer's authority"; (b) that the charged conduct was carried out "for or relating to" the asserted official authority; and (c) the defendant can assert a "colorable federal defense." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022); *see also O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 53 (D. Mass. 2008) (proper removal under federal officer removal statute).[2]

12. Since at least 2004, the federal government – through executive order, legislation, and regulatory and sub-regulatory action – has directed and overseen a public-private initiative to develop a nationwide infrastructure for health information technology. It has incentivized and directed providers who participate in the Medicare and Medicaid program (like UMass Memorial's clinical affiliates) to offer patients online access to their records, and to optimize patient engagement with their medical information. The federal government has also modeled the

[2] In 2011, Congress amended § 1442(a)(1) to reach removal based on a suit "for or relating to any act under color of [federal] office." *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 (adding "or relating to" language to the provision). "Circuits have consistently given this requirement a broad reading and held that no causal link is required." *Moore*, 25 F.4th at 35.

Case 4:22-cv-12022-ADB Document 1 Filed 11/28/22 Page 5 of 14

behavior it wants to see; it has created a portal for Medicare beneficiaries and worked with the same third-party services, with the same "source code," at issue in this case.

13. UMass Memorial has dutifully assisted and followed the federal government's direction in this effort. In so doing, it has acted within the penumbra of federal action and office. Given this, and the Supreme Court's directive that the federal officer removal statute must be broadly construed, and because this suit challenges this federally-directed conduct, the requirements of the federal removal statute are satisfied.

***The Meaningful Use Program***

14. In 2004, President Bush issued an Executive Order that established a National Health Information Technology Coordinator (ONC). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

15. Five years later, Congress codified the office in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009). At that time, Congress allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [ONC]." *Id.*

16. Consistent with its mandate, the ONC has published guidance for private providers to follow, including through five-year strategic plans. In the 2015-2020 plan, it dictated that "federal agencies" were to "collaborate with . . . private stakeholders to . . . build a culture of electronic health information access and use." ONC, *Federal Health Information Technology Strategic Plan 2015-2020*, available at https://dashboard.healthit.gov/strategic-plan/federal-health-it- strategic-plan-2015-2020.php) (emphasis added). And, in the 2020-2025 plan, it noted

that this has already happened, saying: "The federal government and private sector have worked together to help digitize health information and healthcare." ONC, *Federal Health Information Technology Strategic Plan 2020-2025* available at https://www.healthit.gov/sites/default/files/page/2020-01/2020-2025FederalHealthIT%20StrategicPlan_0.pdf ("2020-2025 Strategic Plan").

17. One critical aspect of this strategy is CMS' "Meaningful Use" program. 42 C.F.R. § 495.2-495.370. As the name implies, the program aims to increase patient's "meaningful use" and engagement with electronic health records through the creation of patient portals.

18. Under this program, providers must meet certain criteria in order to receive full Medicare reimbursement, one of which is having an interoperable patient portal. Regulations provided for incentive payments of up to two percent for providers who reached certain level engagement with electronic health record use through the patient portal.

19. To achieve those specifications, CMS recommends that providers create patient "portals" that allow users to communicate directly with their providers and immediately access (or transfer) their medical records.

20. The ONC has specified how providers can optimize such portals, explaining that they "must be engaging and user-friendly." ONC has also specified "how a patient portal helps achieve meaningful use requirements," and how a provider can "actively promote and facilitate portal use." ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013) available at https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengagement.pdf.

Case 4:22-cv-12022-ADB Document 1 Filed 11/28/22 Page 7 of 14

21. In addition to this guidance, CMS has created its own portal, offering a model for private providers to follow. To optimize individual engagement with the portal, CMS relies on third-party marketers, like Google and Facebook. By working with over two dozen third-party servicers, CMS is able to provide users with the information most relevant to them. *See generally* Medicare.gov, Privacy Policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

***UMass Memorial Is A "Person"***

22. By the plain terms of the statute, removal is permitted by "any person acting under that officer." 42 U.S.C. § 1442(a)(1).

23. While the statute is silent as to the definition of a "person", organizations, corporate defendants, and government entities have routinely removed under this provision and been deemed a "person" under the statute. *See, e.g., Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (quasi-public telephone company); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 58 (D. Mass. 2008) (corporation); *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 32 (1st Cir. 2022) (same); *Genereux v. American Beryllia Corp.*, 577 F.3d 350 (1st Cir. 2009) (same); *Teague v. Grand River Dam Auth.*, 279 F. Supp. 703, 704–05 (N.D. Okla. 1968) (public Grand River Dam Authority).

24. UMass Memorial is a non-profit charitable corporation organized in Massachusetts, Compl. ¶ 7, and since the federal officer statute is to be broadly construed, UMass Memorial qualifies as a person under that statute.[3]

[3] Although in many cases, UMass Memorial does not meet the statutory definition of a "person," here, the federal officer statute's broad construction weighs in favor of that interpretation.

***UMass Memorial is Effectively Acting Under a Federal Officer***

25. This element focuses on the relationship between the federal government and the private entity. It asks whether the entity is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior," and whether the relationship between the government and private entity involves "subjection, guidance, or control." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 151-152, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007). To that end, the federal officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Id.* at 147–49.

26. Here these fundamental requirements are met. The federal government is incentivizing, regulating, monitoring, and supervising UMass Memorial's actions in the Meaningful Use program in order to meet the federal government's national priority of interoperable health information technology.

27. First, UMass Memorial (along with countless other entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information. The federal government itself has repeatedly acknowledged the private sector's essential role in the project, most recently stating that "the federal government and private sector have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

28. Second, in the absence of UMass Memorial's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission. As its efforts to digitize information and increase patient engagement with Medicare beneficiaries underscores, it would likely attempt to do exactly that.

29. Third, the government has specified how to best enhance patient engagement, including through a patient portal. It has clarified how to generally design the portals, and has told entities how best to market their on-line resources. Furthermore, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

30. Finally, the government has created an office dedicated to this issue and has closely monitored the work of private entities (like UMass Memorial). It has also supervised the general development of this information technology infrastructure. And, because Meaningful Use incentives are available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes UMass Memorial and comparable organizations to not only maintain public websites and/or patient portals, but also to achieve meaningful use of them.

31. In like circumstances, courts have held that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *UPMC*, 2020 WL 4381675, at *6 (holding that the University of Pittsburgh Medical Center's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute); *see also Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) (same; "[b]ecause [ProMedica Health System's] participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

32. In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of Plaintiff's personally identifiable information to third parties for internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The UPMC court was focused on both the portal and the public website as being ways of furthering

Case 1:25-cv-… Document 101 Filed 03/18/25 Page 90 of 1163

the government's goal of increasing patient engagement with electronic health records. *See, e.g.*, "UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria." *Id.* at *6. Here, as in UPMC, "[t]here is plainly a connection or association between [the medical provider's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiff's claims are therefore 'for or relating to' an act under color of federal office." *Id.*

***Plaintiff's Claims Relate to the Actions Under Color of Federal Office***

33. Under Section 1442(a)(1), the conduct at issue in the case must also "have been undertaken for or relating to" the federal office. "Circuits have consistently given this requirement a broad reading . . ." *Moore*, 25 F.4th at 35. In fact, any single claim is independently sufficient to satisfy the "for or relating to" requirement under § 1442(a)(1). *Id.* (citing *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 945 (7th Cir. 2020)).

34. Plaintiff's complaint directly challenges UMass Memorial's website analytics practices, which help drive patients to UMass Memorial websites.

35. Plaintiff's Complaint also generally targets UMass Memorial's alleged tracking of online behaviors through source code and cookies, along with the use of marketing companies in conjunction with its public medical websites. This – as manifested by the government's own use of these third parties – is precisely what the Meaningful Use program envisions.

36. Indeed, as Plaintiff himself alleges, the entire point of using the third-party services is to direct traffic to, and increase engagement with, UMass Memorial websites. For example, he alleges that "[a] third-party website that incorporates Meta Pixel benefits from the ability to

analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts." Compl. ¶ 71. Likewise, he says that the Meta Pixel helps to "track[] the people and type of actions they take." *Id.* ¶ 51.

***UMass Memorial Raises Colorable Federal Defenses to Plaintiff's Claims***

37. The final requirement for removal under this statute erects a low bar and merely requires that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v. Cal.*, 489 U.S. 121, 129-30 (1989); *Moore*, 25 F.4th at 37 (a "colorable federal defense" need not be "clearly sustainable," but rather, a federal defense is colorable unless it is "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous") (citations omitted); *accord. Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The question is not whether a defendant's claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.")

38. There are at least two colorable federal defenses to the claims at issue here that satisfy this requirement.

39. First, in response to Plaintiff's repeated claims that "protected health information" was disclosed, UMass Memorial will argue that the information purportedly disclosed (*i.e.*, IP addresses and other web metadata) is outside of the purview of protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Another district court has already made this holding in an analogous case against numerous health care providers challenging alleged disclosures on the Internet through routine website traffic. *See Smith*

*v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017). This defense turns on an interpretation of federal law and on its own is sufficient to satisfy this element's low bar.

40. Second, to the extent that Plaintiff's claims ever could create a viable cause of action under Massachusetts law, UMass Memorial will argue that federal law preempts Plaintiff's common-law claims for alleged invasion of privacy. *See generally*, Compl. ¶¶ 202-208.

41. Because each of the requirements of the statute are satisfied, removal to this Court is proper.

**PROCEDURAL REQUIREMENTS FOR REMOVAL**

42. UMass Memorial satisfies all of the procedural requirements under 28 U.S.C. § 1446.

43. UMass Memorial is filing this Notice of Removal within thirty (20) days of its receipt of the Complaint by "service," 28 U.S.C. § 1446.

44. UMass Memorial files this Notice in the United States District Court of the District of Massachusetts, because the State court in which the action is pending, the Superior Court of the Commonwealth of Massachusetts for the County of Worcester, is within this federal judicial district. This Notice is signed pursuant to Federal Rules of Civil Procedure, Rule 11.

45. UMass Memorial has attached a copy of "all process, pleadings, orders, and other documents," currently on file in the state court, including Plaintiff's Complaint.

46. Upon filing this notice, UMass Memorial will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the State court.

**CONCLUSION**

As set forth above, Plaintiff's Complaint directly challenges practices and procedures UMass Memorial has taken acting under color of federal law in implementing federal policy to

Case 4:22-cv-12022-ADB Document 1 Filed 11/28/22 Page 13 of 14

nationalize the health information technology infrastructure. Plaintiff's Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

**WHEREFORE**, UMass Memorial respectfully removes this action from the Superior Court of the Commonwealth of Massachusetts for the County of Worcester and requests that this Court issue such orders and process as may be necessary to preserve its jurisdiction over this matter.

Dated: November 28, 2022

Respectfully submitted,

/s/ James H. Rollinson
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Case 4:22-cv-12022-ADB Document 1 Filed 11/28/22 Page 14 of 14

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 28, 2022 copies of the foregoing notice of removal were served on the following by regular mail and email at the addresses listed below.

Jonathan T. Merrigan
J. Tucker Merrigan
Victoria Santoro Mair
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
Ahmad, Zavitsanos, & Mensing, P.C.
1221 McKinney Street, Suite 3460
Houston, TX 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Attorneys for Plaintiff*

/s/ James H. Rollinson
*One of the attorneys for defendants*

Case 4:22-cv-12022-ADB Document 1-1 Filed 11/28/22 Page 1 of 56

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2285CV01205 -D |
| Plaintiff | § | FILED |
| v. | § | JUL 21 2023 |
| UMASS MEMORIAL HEALTH CARE, INC, | § | ATTEST: CLERK |
| Defendant. | § | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Doe ("Plaintiff"), individually and on behalf of all other Citizens of the Commonwealth of Massachusetts similarly situated ("Class Members"), brings suit against Defendant UMass Memorial Health Care, Inc. ("Defendant"), and upon personal knowledge as to Plaintiff's own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendant assures visitors to its website that it is "committed to protecting your privacy" and that "We have designed our website to allow you to visit most areas without

identifying yourself or providing personal information."[1] Contrary to these assurances, however, Defendant does not follow these policies, nor the law prohibiting such disclosures.

3. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent.

4. Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these rerouting tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

5. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

6. On behalf of themselves and all similarly situated citizens in the Commonwealth of Massachusetts, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of his personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

---

[1] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

## PARTIES TO THE ACTION

7. Defendant UMass Memorial Health Care, Inc. is a Massachusetts corporation with its principal office at One Biotech Park, 365 Plantation Street, Worcester, MA 01605. Defendant is the largest health care system in Central Massachusetts.[2] Defendant owns and manages numerous healthcare facilities in Massachusetts, including UMass Memorial Medical Center, UMass Memorial Health Harrington Hospital, UMass Memorial Health Marlborough Hospital, Community Healthlink Behavioral Health Services, and UMass Memorial Health Clinton Hospital. [3]

8. Plaintiff, John Doe, is a Massachusetts citizen residing in Worcester County, Massachusetts, has been treated by Defendant's physicians, and has been a patient UMass Memorial Medical Center,[4] and thus also a patient of Defendant.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 365 Plantation Street, Worcester, MA 01605. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

10. Venue is appropriate in this venue because Defendant's principal place of business is in Worcester County and the acts or conduct giving rise to the cause of action asserted herein took place in Worcester County. G.L. c. 223, § 1. Venue is also appropriate in this Court because Plaintiff, John Doe, resides in Worcester County. G.L. c. 223, § 8(4).

---

[2] https://www.ummhealth.org/umass-memorial-health/about-us
[3] https://www.ummhealth.org/locations
[4] https://www.ummhealth.org/umass-memorial-medical-center

## FACTUAL BACKGROUND

**A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

11. Plaintiff John Doe is a patient of Defendant who has received treatment from UMass Memorial Medical Center.[5]

12. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

13. Medical patients in Massachusetts such as John Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

14. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

15. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

16. Defendant operates websites for patients, including www.ummhealth.org and www.harringtonhospital.org.

17. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

18. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses

[5] https://www.ummhealth.org/umass-memorial-medical-center

the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

19. Defendant's disclosures of patients' personal healthcare information occur because Defendant intentionally deploys source code on the websites it operates, including https://www.ummhealth.org/ and https://www.harringtonhospital.org/provider/, that cause patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

20. By design, third parties receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

21. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

22. The basic command that web browsers use to exchange data and user communications is called a GET request.[6] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

---

[6] https://www.w3schools.com/tags/ref_httpmethods.asp

23. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

24. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

25. Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties. Typically, users are provided no notice that these disclosures are being made. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

26. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

27. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

28. These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

29. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

30. Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

31. For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[7]

32. Because of their uniquely identifying characteristics, IP address are considered personally identifiable information. Tracking pixels can (and typically do) collect website visitors' IP addresses.

[7] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

33. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

34. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

35. Cookies are considered personal identifiers, and tracking pixels can collect cookies from website visitors.

36. A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

37. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across

websites."[8] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[9] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[10]

38. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[11]

39. Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

40. A fourth kind of personally identifying information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is an identifying number string that is connected to a user's Facebook profile.[12] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[13]

41. Unique personal identifiers such as a person's Facebook are likewise capable of collection through pixel trackers.

**D. Facebook**

42. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

---

[8] https://www.blog.google/products/chrome/building-a-more-private-web/
[9] https://pixelprivacy.com/resources/browser-fingerprinting/
[10] https://www.blog.google/products/chrome/building-a-more-private-web/
[11] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[12] https://www.facebook.com/help/211813265517027
[13] https://smallseotools.com/find-facebook-id/

43. Facebook describes itself as a "real identity" platform.[14] This means that users are permitted only one account and must share "the name they go by in everyday life."[15] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[16]

44. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[17] Facebook has since evolved into one of the largest advertising companies in the world.[18] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[19] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[20]

45. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[21]

46. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

47. Facebook offers several advertising options based on the type of audience that an

---

[14] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[15] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[16] https://www.facebook.com/help/406644739431633
[17] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[18] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[19] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[20] https://www.facebook.com/business/ads/ad-targeting
[21] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

48. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[22] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

49. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

[22] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

50. One of Facebook's most powerful tools is called the "Meta Pixel."

51. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[23] Once activated, the Meta Pixel "tracks the people and type of actions they take."[24] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[25]

52. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences.

53. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

54. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[26] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[27]

55. Facebook warns web developers that its Pixel is a personal identifier because it

[23] https://developers.facebook.com/docs/meta-pixel/
[24] https://www.facebook.com/business/goals/retargeting
[25] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[26] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[27] https://www.oviond.com/understanding-the-facebook-pixel

enables Facebook "to match your website visitors to their respective Facebook User accounts."[28]

56. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[29]

57. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[30] Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[31]

58. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

59. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[32] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[33] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[34]

60. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and

---

[28] https://developers.facebook.com/docs/meta-pixel/get-started
[29] https://developers.facebook.com/docs/meta-pixel/get-started
[30] https://developers.facebook.com/docs/meta-pixel/
[31] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients
[32] https://developers.facebook.com/docs/meta-pixel/
[33] https://developers.facebook.com/docs/meta-pixel/
[34] https://developers.facebook.com/docs/meta-pixel/

specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[35]

61. Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

62. If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

63. Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[36] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[37]

64. Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." Thise are two forms of Advanced Matching: manual matching and automatic matching.[38] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

[35] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[36] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[37] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/
[38] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

Case 4:22-cv-12022-ADB Document 1-1 Filed 11/28/22 Page 15 of 56

65. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[39] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[40]

66. Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

67. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

68. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

69. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act,"

---

[39] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[40] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

"presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[41] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[42]

70. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like https://www.ummhealth.org/ and target users with advertising based on their web activity.

**D. Defendant has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

71. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

72. Facebook's intrusion into the personal data of the visitors to third-party websites

[41] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[42] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[43] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

73. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[44] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[45] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

74. Meta Pixel is wildly popular and embedded on millions of websites. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems.[46] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text

[43] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[44] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[45] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[46] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

75. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

76. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is transmitted to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

77. This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

78. For example, a patient searching for a doctor on Defendant's website located at www.harringtonhospital.org is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the

patient's hometown, the patient's language preference, and other information that the patient provides:




79. All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

80. Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors on its websites to assist with them conditions such as substance abuse and addiction:




81. Likewise, a patient who desires an appointment at a specific hospital using Defendant's websites also has that information forwarded to Facebook via the Meta Pixel contemporaneously with its transmission by patients:




82. In other words, Facebook learns not just that patients are seeking treatment, but

where and typically when they are seeking treatment.

83. Defendant also discloses patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, and communications made when patients are researching specific medical conditions such as COVID-19.

84. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal Health Information to their private identities and target them with advertising.

85. Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the websites that Defendant maintains. Plaintiff continued to have his privacy violated when Defendant permitted Facebook and other companies to send him targeted advertising related to his medical condition.

86. For example, Plaintiff John Doe visited Defendant's website in 2021 and 2022 at www.ummhealth.org and entered data, including sensitive medical information, such as details about his medical condition and doctor. The information that Plaintiff John Doe transmitted included queries about treatment for his medical condition.

87. Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiff's and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data.

**F. Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

88. Plaintiff and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

89. For example, when Plaintiff John Doe visited Defendant's website in 2022 at www.ummhealth.org there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.

90. Plaintiff and his fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

91. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Terms of Use" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:



92. While disclosing that its website contains "cookies," Defendant's "Terms of Use" falsely promises patients that the "[u]se of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site."[47] Contrary to that promise, Defendant's website automatically transmits personally identifiable information to Facebook using multiple cookies, including c_user, datr, fr, and xs cookies.

93. To locate Defendant's "Privacy Policy," a patient is required to scroll through the "UMass Memorial Health Care Website Terms of Use Statement" to find a link entitled "Read Our Privacy Policy" that is buried in the website's general terms and conditions statement.[48]

94. Defendant's "Privacy Policy" gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises in its "Privacy Policy"[49] that protecting patients' health information is a priority:

> **JOINT NOTICE OF INFORMATION PRACTICES**
>
> At UMass Memorial Health Care, your privacy is a priority. We follow strict federal and state guidelines to maintain the confidentiality of your medical (protected health) information. We also follow state guidelines regarding how long we must store your medical records and the requirements for proper disposal.

95. Even if a patient stumbled upon Defendant's carefully hidden "Privacy Policy," nothing in that notice would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

---

[47] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement
[48] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement
[49] https://www.ummhealth.org/patients-visitors/joint-notice-information-practices

96. Defendant does not have a legal right to share Plaintiff's and Class Members' Protected Health Information without their written consent to third parties, because this information is protected from such disclosure by law. *E.g.* GL c. 214, §1B; 45 C.F.R. § 164.508. Much less is Defendant permitted to disclose patients' Protected Health Information to advertising and marketing companies like Facebook without express written authorization from patients. *E.g.* 940 Mass. Code Regs. 4.08(12).

97. Defendant failed to obtain a valid written authorization from Plaintiff or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

98. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

99. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiff and Class Members' Personal Health Information to Facebook or aid in the same.

**G. The disclosures of personal patient data to Facebook are unnecessary.**

100. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website.

101. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

102. Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

## H. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.

103. Patient confidentiality "is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." *Alberts v. Devine*, 395 Mass. 59, 65 (1985).

104. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiff and Class Member's privacy interests.

105. Patient Personal Health Information is specifically protected by law. *E.g.* G.L. 111, §70E(b); G.L. 214, §1B. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifying information such patient names, IP addresses, and other unique characteristics or codes. *E.g.* 105 Mass. Code Regs. 300.120; 45 C.F.R. § 164.514.

Case 4:22-cv-12202-ADB Document 1-1 Filed 11/28/22 Page 26 of 56

106. Massachusetts courts have long recognized that physicians owe a duty of confidentiality to patients, which prohibits them from disclosing patients' health information without patients' written consent. *Alberts v. Devine*, 395 Mass. 59, 68 (1985). And Massachusetts law subjects medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

107. Given the public policy expressed by these laws, Plaintiff and the Members of the Class had a reasonable expectation of privacy in their protected health information.

108. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

109. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

110. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[50]

111. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users

[50] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

chose not to share data when prompted.[51]

112. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[52]

113. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**I. Plaintiff's Personal Health Data that Defendant collected, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.**

114. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiff and Class Members.

115. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and

[51] https://www.wired.co.uk/article/apple-ios14-facebook
[52] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

location information" were being sold for approximately "$0.50 per 1,000 people."[53]

116. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[54] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[55]

117. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[56] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[57]

118. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[58]

119. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[59] and has paid

[53] https://ig.ft.com/how-much-is-your-personal-data-worth/
[54] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[55] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[56] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[57] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[58] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[59] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounciations-app

teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[60]

120. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[61]

121. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiff and the Class Member's property.

### J. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.

122. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

123. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

124. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar

[60] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[61] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* *https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

advertising can be accomplished via disclosures to other third-party advertisers and marketers.

125. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

126. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**K. Facebook's history of egregious privacy violations.**

127. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

128. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

129. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

130. Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

131. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[62]

132. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[63]

133. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

134. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[64] Some companies were even able to read users' private messages.

135. In June 2020, after promising users that app developers would not have access to

[62] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[63] A similar case is pending in Texas.
[64] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html

data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[65] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

136. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[66]

137. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[67] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies

[65] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[66] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[67] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

could do with users' information."[68]

138. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[69]

139. These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[70]

140. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

## TOLLING, CONCEALMENT, AND ESTOPPEL

141. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

142. Defendant seamlessly incorporated Meta Pixel and other trackers into its

[68] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[69] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[70] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiff and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

143. Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

144. The earliest that Plaintiff and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

145. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiff's Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

146. Defendant's conduct violates the law and breaches its express and implied privacy promises.

147. Defendant's unlawful conduct has injured Plaintiff and Class Members.

148. Defendant's conduct is ongoing.

149. Plaintiff brings this action individually and as a class action against Defendant.

150. Plaintiff seeks class certification for the following proposed Class:

> **The UMass Memorial Health Class:** During the fullest period allowed by law, all Massachusetts citizens who are, or were, patients of UMass Memorial Health, Inc. or any of its affiliates and who exchanged communications at Defendant's websites, including www.ummhealth.org, www.harringtonhospital.org, and any other UMass Memorial Health affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

151. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

152. Plaintiff reserves the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

153. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

154. **Numerosity:** While the exact number of Class Members is unknown to Plaintiff at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

155. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiff and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate G.L. c. 272, § 99;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiff and Class Members' Personal Health Information to Facebook;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiff and Class Members and, if so, the extent of that injury;

j. Whether Plaintiff and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiff and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

156. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

157. **Typicality:** Plaintiff's claims are typical of the claims of other Class Members and Plaintiff have substantially the same interest in this matter as other Class Members. Plaintiff has no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiff's claims arise out of the same set of facts and conduct as all other Class Members. Plaintiff and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiff and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

158. **Adequacy of Representation:** Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are coincident with, and not antagonistic to, those of other Class Members he seeks to represent. Plaintiff has no disabling conflicts with Class Members. Accordingly, Plaintiff is an adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

159. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

160. Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

161. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiff and the Class)

162. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

163. Plaintiff brings this claim on behalf of themselves and all members of the Class.

164. All conditions precedent to this action have been performed or have occurred.

165. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

166. Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

167. Defendant qualifies as a person under the statute.

168. All alleged communications between Plaintiff or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

169. An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire … communication

through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

170. Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiff's and Class Members' wire communications.

171. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire ... communication." G.L. c. 272, § 99B(3).

172. The "intercepting devices" used in this case include, but are not limited to:

a. Plaintiff and Class Members' personal computing devices;

b. Plaintiff and Class Members' web browsers;

c. Plaintiff and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

h. Computer servers of third parties (including Facebook) to which Plaintiff and Class Members' communications were disclosed.

173. Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

174. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that

were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

175. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

k. The precise dates and times when patients visit Defendant's websites;

l. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

176. Plaintiff and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

177. Neither Plaintiff nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiff or Class Members' consent.

178. Plaintiff and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

179. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

180. In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiff and the Class)**

181. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

182. Plaintiff bring this claim on behalf of herself and all members of the Class.

183. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

184. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

185. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

186. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

187. Plaintiff and Class Members are patients of Defendant.

188. Defendant owes Plaintiff and Class Members a duty of confidentiality.

189. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiff and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

190. The information disclosed included personally identifiable information, Plaintiff and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiff and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

191. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiff and Class Members' rights to privacy.

192. Plaintiff and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiff and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

193. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiff and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

194. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of

the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

195. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

196. Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

197. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

198. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

199. Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiff and Class Members' privacy.

200. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

201. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT III
## Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality
## (On Behalf of Plaintiff and the Class)

202. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

203. Plaintiff brings this claim on behalf of themselves and all members of the Class.

204. All conditions precedent to this action have been performed or occurred.

205. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

206. As medical provider for Plaintiff and Class Members, Defendant owes Plaintiff and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiff or Class Members.

207. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiff and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

208. Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT IV**
**Breach of Express Contract**
**(On Behalf of Plaintiff and the Class)**

209. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

210. Plaintiff bring this claim on behalf of herself and all members of the Class.

211. Plaintiff and Class Members entered into written agreements with Defendant as part of the medical services Defendant provided to Plaintiff and Class Members. The agreements involved a mutual exchange of consideration whereby Defendant provided these services in exchange for payment from Class Members, Class Members' insurance carriers, and/or government programs remitting payment on Class Members' behalf.

212. Plaintiff and Class Members and/or their insurance carriers paid Defendant for its services and performed under these agreements.

213. Defendant's disclosure of Plaintiff and Class Members' Private Health Information without their consent constitutes a material breach of the terms of these agreements by Defendant.

214. As a direct and proximate result of Defendant's breach of contract with Plaintiff and Class Members, Plaintiff and Class Members have been irreparably harmed.

215. Accordingly, Plaintiff, individually and on behalf of the Class, respectfully request this Court award all available damages for Defendant's breach of express contract.

**COUNT V**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

216. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

217. Plaintiff brings this claim on behalf of herself and all members of the Class.

218. Through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for the provision of medical care and treatment, as well as implied contracts for the Defendant to retain and protect the privacy of Plaintiff's and Class Members' Private Health Information.

219. Specifically, Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendant when they first went for medical treatment at one of Defendant's facilities.

220. The valid and enforceable implied contracts to provide medical healthcare services that Plaintiff and Class Members entered into with Defendant included Defendant's promise to not disclose nonpublic Private Health Information given to Defendant without their consent. Plaintiff and Class Members provided this Private Health Information in reliance of that promise.

221. Defendant solicited and invited Plaintiff and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services.

222. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's complied with relevant laws and regulations and would not allow third parties to collect or exploit their communications with Defendant without their consent.

223. Plaintiff and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of

surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

224. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members; and (b) protect Plaintiff and the Class Members' Private Health Information provided to obtain such healthcare. In exchange, Plaintiff and Class Members agreed to pay money for these services, and to turn over their Private Health Information through the use of Defendant's websites.

225. Both the provision of medical services healthcare and the protection of Plaintiff and Class Members' Private Health Information were material aspects of these implied contracts.

226. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

227. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiff and Class Members' Private Health Information without consent.

228. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiff and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiff and Class Members

would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

229. A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

230. Plaintiff and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

231. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiff and Class Members' consent.

232. As a result of Defendant's failure to fulfill the data privacy promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare with data privacy they paid for and the healthcare they received.

233. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff and Class Members' Private Health Information without consent, neither the Plaintiff,

the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

234. As a direct and proximate result of these failures, Plaintiff and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

235. Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result.

236. Plaintiff and the Class Members are also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

237. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

238. Plaintiff hereby pleads this Count in the alternative to Counts IV and V.

239. Plaintiff brings this claim on behalf of herself and all members of the Class.

240. Plaintiff and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade

for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

241. Plaintiff and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

242. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

243. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

244. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all others similarly situated, ask for judgment in his favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiff as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiff or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f. Imposing a constructive trust against Defendant through which Plaintiff and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiff and Class Members' right to privacy;

h. Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiff and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiff and Class Members may be entitled.

**RESPECTFULLY SUBMITTED,**
**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 24, 2022

Case 4:22-cv-12022-ADB Document 1-1 Filed 11/28/22 Page 53 of 56

**COMMONWEALTH OF MASSACHUSETTS**

**NORFOLK, ss.**

**NOLFOLK SUPERIOR COURT**
**CIVIL ACTION NO. 2082CV00259**

---

**JOHN BEADES**

**Plaintiff,**

**v.**

**P. GIOIOSO & SONS, INC., and VERIZON NEW ENGLAND, I.N.C.**

**Defendants.**

---

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**MOTION TO STAY DISCOVERY AND ALL PENDING TIMELINES**

Now comes plaintiff's counsel in the above matter and moves to stay discovery and all pending timelines for a period of 60 days. As reason, plaintiff's counsel has filed a Motion to Withdraw. An additional 60 days will allow the plaintiff to obtain new counsel if the Motion to Withdraw is allowed.

For these reasons, plaintiff's counsel respectfully request that the Court allow the Motion to Stay Discovery and All Pending Timelines, and for such other relief to which the plaintiff may be entitled.

Respectfully Submitted,
Plaintiff
By his Attorneys

/s/ Matthieu J. Parenteau

---

Matthieu J. Parenteau
BBO# 679941
Dylan T. Hixson
BBO# 705456
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL

Case 4:22-cv-12022-ADB Document 1-1 Filed 11/28/22 Page 56 of 56

Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
Matthieu@SweeneyMerrigan.com
Dylan@SweeneyMerrigan.com

## CERTIFICATE OF SERVICE

I, Matthieu J. Parenteau do hereby certify that on October 27, 2022, I served a copy of the Motion to Withdraw by mailing a copy first-class mail postage prepaid to Defendants Counsel of Record, and by mailing a copy by first-class mail postage prepaid and certified mail to Mr. John Beades at 19 Birch Street, Dedham, Massachusetts, and via Email to beadesjohn3@gmail.com

/s/ Matthieu J. Parenteau

**Matthieu J. Parenteau**

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

2285CV01205-D

FILED JUL 21 2023 ATTEST: CLERK

**I. (a) PLAINTIFFS**
John Doe, individually and on behalf of all others similarly situated

**(b)** County of Residence of First Listed Plaintiff: Worcester
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Matthew T. Merrigan, Victoria Santoro Mair & Erin E. McHugh, Sweeney Merrigan Law, 268 Summer St. LL, Boston MA 02210, Tele: (617) 391-9001

**DEFENDANTS**
UMass Memorial Health Care, Inc.

County of Residence of First Listed Defendant: Worchester
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
James H. Rollinson, Baker Hosteter LLP, 127 Public Square, Suite 2000, Cleveland, OH 44114 (216) 621-0200

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 3 Federal Question *(U.S. Government Not a Party)*
- [X] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [ ] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [X] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [X] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1442

Brief description of cause:
Removing case based on federal officer statute

## VII. REQUESTED IN COMPLAINT:

- [X] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE: 11/28/2022
SIGNATURE OF ATTORNEY OF RECORD: /s/JamesH.Rollinson

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

Case 4:22-cv-12022-ADB Document 1-2 Filed 11/28/22 Page 2 of 2

ATTACHMENT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) John Doe, individually and on behalf of all similarly situated, v. UMass Memorial Health Care, Inc.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

- [ ] I. 160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.
- [ ] II. 110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.
- [X] III. 120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

______________________________

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES [ ] NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES [ ] NO [X]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES [ ] NO [X]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES [ ] NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES [ ] NO [X]

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division [ ] Central Division [ ] Western Division [ ]

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division [ ] Central Division [X] Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES [ ] NO [X]

(PLEASE TYPE OR PRINT)

ATTORNEY'S OR PRO SE'S NAME James H. Rollinson

ADDRESS Baker Hostetler LLP, 127 Public Square, Suite 2000, Cleveland, Ohio 44114

TELEPHONE NO. (216) 621-0200

EMAIL ADDRESS jrollinson@bakerlaw.com

Case 4:22-cv-12022-ADB Document 5 Filed 11/29/22 Page 1 of 3

~~2385CV01265-D~~
2384CV02448-BLS1

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

6

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 1:22-cv-12022 |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

**UMASS MEMORIAL HEALTH CARE, INC.'S CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 7.1. of the Federal Rules of Civil Procedure, Defendant UMass Memorial Health Care, Inc. ("UMass Memorial") states:

1. No public company owns more than ten percent (10%) of its stock.

2. UMass Memorial does not have a parent corporation.

Dated: November 29, 2022

Respectfully submitted,
/s/ *James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

I HEREBY ATTEST AND CERTIFY ON
March 7, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 29, 2022, copies of the foregoing corporate disclosure statement were served on the following by regular mail and email at the addresses listed below.

Jonathan T. Merrigan
J. Tucker Merrigan
Victoria Santoro Mair
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
Ahmad, Zavitsanos, & Mensing, P.C.
1221 McKinney Street, Suite 3460
Houston, TX 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Attorneys for Plaintiff*

/s/ James H. Rollinson
*One of the attorneys for defendants*

Case 4:22-cv-12022-ADB Document 7 Filed 12/02/22 Page 1 of 4

7

2285CV01205-D

IN THE UNITED STATES DISTRICT COURT FOR 2384CV02448-BLS/
THE DISTRICT OF MASSACHUSETTS

SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

JOHN DOE, INDIVIDUALLY AND ON BEHAL OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Civil Action Case No.: 4:22-cv-12022

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**DEFENDANT'S ASSENTED-TO MOTION TO EXTEND TIME**

Pursuant to Fed. R. Civ. P. 6(b)(1), Defendant UMass Memorial Health Care, Inc. ("Defendant") hereby moves to extend the time in which it may respond to Plaintiff John Doe's ("Plaintiff") Complaint by up to thirty (30) days after Plaintiff's expected motion to remand is decided by the Court.

Plaintiff filed his Complaint against Defendant in the Superior Court of the Commonwealth of Massachusetts for the County of Worcester, Case No. 2285CV01205D, on October 24, 2022. Defendant removed the action to this Court on November 28, 2022. Pursuant to Federal Rules of Civil Procedure, Rule 81(c)(2)(C), Defendant's deadline to file its responsive pleading is December 5, 2022. Defendant intends to file a motion to dismiss. Plaintiff intends to file a motion to remand the action back to state court.

As grounds for this motion, the Parties agree that, for the sake of judicial economy, briefing on a motion to dismiss should occur after Plaintiff's motion to remand is decided by the Court provided that the action remains before this Court. Defendant therefore, with Plaintiff's assent,

Case 4:22-cv-12022-ADB Document 7 Filed 12/02/22 Page 2 of 4

respectfully requests that its deadline to respond to the Complaint be extended until thirty (30) days after Plaintiff's motion to remand is decided.[1]

Dated: December 2, 2022

Respectfully submitted,

/s/ *James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Assistant Clerk

[1] This extension will not alter the date of any event or any deadline fixed by Court order.

Case 4:22-cv-12022-ADB Document 7 Filed 12/02/22 Page 3 of 4

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(2)**

I, James Rollinson, hereby certify that I have conferred with Plaintiff's counsel of record on this motion and that Plaintiff's counsel assented to the motion.

/s/ James H. Rollinson
*One of the attorneys for defendants*

Case 4:22-cv-12022-ADB Document 7 Filed 12/02/22 Page 4 of 4

## CERTIFICATE OF SERVICE

I hereby certify that, on December 2, 2022 copies of the foregoing notice of removal were served on the following by regular mail and email at the addresses listed below.

Jonathan T. Merrigan
J. Tucker Merrigan
Victoria Santoro Mair
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
Ahmad, Zavitsanos, & Mensing, P.C.
1221 McKinney Street, Suite 3460
Houston, TX 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Attorneys for Plaintiff*

*/s/* James H. Rollinson
*One of the attorneys for defendants*

Case 4:22-cv-12022-ADB Document 9 Filed 01/06/23 Page 1 of 4

6

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01205-D~~
2384CV02448
BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

## MOTION FOR REMAND

Pursuant to 28 USC § 1447, Plaintiff John Doe, individually and on behalf of all others similarly situated, respectfully submits this motion to remand this case for lack of subject matter jurisdiction. In support of the motion for remand, Plaintiff files the accompany memorandum of law.

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023

Case 4:22-cv-12022-ADB Document 9 Filed 01/06/23 Page 2 of 4

Dated: January 6, 2023

Respectfully submitted,

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for Plaintiff and Class Members***

I HEREBY ATTEST AND CERTIFY ON March 7, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Assistant Clerk

Case 4:22-cv-12022-ADB Document 9 Filed 01/06/23 Page 3 of 4

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel with counsel for Defendant on January 6, 2023 and attempted in good faith to reach agreement on this motion. Defendant opposes the relief requested in this motion.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

Case 4:22-cv-12022-ADB Document 9 Filed 01/06/23 Page 4 of 4

## CERTIFICATE OF SERVICE

I hereby certify that, on January 6, 2022, copies of the foregoing Motion to Remand were served on the following via ECF:

James H. Rollinson (BBO # 649407)
jrollinson@bakerlaw.com
BAKER & HOSTETLER LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114-1214
(216) 621-0200 (telephone)
(216) 696-0740 (facsimile)

*Attorney for Defendant UMass Memorial Health Care, Inc.*

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 1 of 26

9

~~2285CV01205-D~~
2384CV02448-BLS1

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO REMAND**

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

## TABLE OF CONTENTS

TABLE OF CONTENTS ........ i

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 2

A. Plaintiff's lawsuit against UMass Memorial ........ 2

B. UMass Memorial continued to hide its misconduct from the public even after multiple hospital systems across the county conceded that disclosing patients' personal health information to Facebook was a serious privacy violation. ........ 5

C. UMass Memorial removes this case to federal court. ........ 6

LEGAL STANDARD ........ 7

ARGUMENT AND AUTHORITIES ........ 7

A. UMass Memorial was not "acting under a federal officer's authority" when it installed the Facebook Meta Pixel tool on its websites ........ 7

1. UMass Memorial has no factual basis for asserting federal officer jurisdiction. ........ 8

2. No federal authority ordered UMass Memorial to install Facebook's Meta Pixel tool on its websites. ........ 10

3. UMass Memorial was not "acting under" a federal officer because the Meaningful Use Program is a prototypical regulatory program that cannot create federal officer jurisdiction. ........ 11

B. UMass Memorial cannot show that embedding Meta Pixel into its website "relates to" any "official authority." ........ 18

**CONCLUSION** ........ 20

## TABLE OF AUTHORITIES

Cases

Arness v. Boeing North American, Inc.,
997 F.Supp. 1268 (C.D. Cal., 1998)........ 13

*Box v. PetroTel, Inc.*,
33 F.4th 195 (5th Cir. 2022)........ 12

*Camacho v. Autoridad de Telefonos de Puerto Rico*,
868 F.2d 482 (1st Cir. 1989)........ 11

*City of Annapolis, Md. v. BP, P.L.C.*,
No. SAG-21-00772, 2022 WL 4548226 (D. Md. Sept. 29, 2022)........ 18, 19

*Doe I v. UPMC*,
No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020)........ 15, 16, 17

*Doe v. ProMedica Health Sys., Inc.*,
No. 3:20-CV-1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020)........ 15, 16

*Exxon Mobil*,
462 F. Supp. 3d........ 19

*Good v. Armstrong World Industries, Inc.*,
914 F.Supp. 1125 (E.D.Pa., 1996)........ 13

*Hilbert v. Aeroquip, Inc.*,
486 F. Supp. 2d 135 (D. Mass. 2007)........ 7

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994)........ 7

*Maglioli v. Alliance HC Holdings LLC*,
16 F.4th 393 (3d Cir. 2021)........ 12, 13, 14, 15

*Massachusetts v. Exxon Mobil Corp.*,
462 F. Supp. 3d 1 (D. Mass. 2020)........ 18

Moore v. Elec. Boat Corp.,
25 F.4th 30 (1st Cir. 2022)........ 7, 10, 11

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*,
647 F. App'x 619 (6th Cir. 2016)........ 12, 13, 14, 16

*Rhode Island v. Shell Oil Products Co.*,
979 F.3d 50 (1st Cir. 2020)........ 7, 16, 18, 19

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 4 of 26

*Sawyer v. Foster Wheeler LLC*,
860 F.3d 249 (4th Cir. 2017) ........ 18

*Veneruso v. Mount Vernon Neighborhood Health Ctr.*,
586 F. App'x 604 (2d Cir. 2014) ........ 13

*Watson v. Philip Morris Companies, Inc.*,
551 U.S. 142 (2007) ........ 8, 12, 14, 17

*White v. United States*,
2017 WL 3262165 (E.D.Tex., 2017) ........ 9

Statutes

28 U.S.C. § 1442(a)(1) ........ 6, 7

28 U.S.C. § 1446 ........ 7

28 USC § 1447(c) ........ 7

GL c. 214, §1B ........ 5

Regulations

940 Mass. Code Regs. 4.08(12) ........ 5

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 5 of 26

## INTRODUCTION

In this lawsuit, Massachusetts citizens sued a Massachusetts corporation for violating Massachusetts law. There is no diversity of parties. Nor does this case does arise from federal questions. It arises from Defendant UMass Memorial's decision to violate its patients' state law privacy rights by selling or bartering their personal health information to Facebook in exchange for access to Facebook's Meta Pixel tool without those patients' knowledge or consent.

The Massachusetts defendant, UMass Memorial, seeks to avoid state court by arguing that it is entitled to the protections of federal officer jurisdiction. Yet UMass Memorial does not aver (1) that it is a federal officer or agency; (2) that it is a federal government contractor with contractual obligations to set up healthcare websites on behalf of the federal government; (3) that any regulations ***required*** UMass Memorial to embed its website with code that forwards patient health information to Facebook without patients' prior consent; or (4) that any federal officer oversaw and directed UMass Memorial to embed its website with code that forwards patient health information to Facebook without patients' prior consent.

Instead, UMass Memorial claims it was "incentivized" by federal guidelines (i.e., the American Recovery and Reinvestment Act of 2009's "Meaningful Use Program") for creating Electronic Health Records (EHR) to install software code on its website that surreptitiously transmitted patients' health information to Facebook without their knowledge or consent. But UMass Memorial's federal officer jurisdiction theory has multiple flaws.

First, compliance with a regulatory framework like the Meaningful Use Program does not mean a private actor is acting "under the color of federal office." Rather, to qualify for federal officer jurisdiction a private actor must be helping or assisting the government with the *government's own tasks or duties*, which the government would have to undertake itself if the

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 6 of 26

private actor did not. The Meaningful Use Program incentivizes hospitals and health care providers to use Electronic Health Records (EHR), rather than old-fashioned paper "charts," and putting the EHR on secure patient portals where patients can access them.[1] If private actors did not choose to participate in the program, the government would not get into the hospital business or become a health provider to create and maintain EHR. Accordingly, UMass Memorial's participation in the Meaningful Use Program does not fall within the ambit of federal officer jurisdiction.

Second, federal officer jurisdiction requires that the complained-of acts "relate to" the delegated federal authority. But UMass Memorial offers no explanation for how its use of the Meta Pixel to send patients' health information to Facebook has anything to do with the Meaningful Use Program—other than that they both involve the internet. UMass Memorial does not, for example, suggest that any federal officer instructed UMass Memorial to install software on its website to surreptitiously forward patients' personal medical information to Facebook without their knowledge or consent. Nor does UMass allege that it received any "incentive" payments for sharing its patients' health data with Facebook via the Meta Pixel tool.

Accordingly, because this Court does not have subject matter jurisdiction, John Doe and the putative plaintiff class of Massachusetts citizens ask the Court to grant this motion to remand.

## BACKGROUND

### A. Plaintiff's lawsuit against UMass Memorial.[2]

1. On October 24, 2022, Plaintiff John Doe sued UMass Memorial on behalf of himself and a class of Massachusetts citizens treated at UMass Memorial who exchanged communications on UMass Memorial's websites that caused disclosure of patients' personal health information to third parties, including Facebook. *See* ECF No. 1-1 at ¶¶ 149–150.

[1] https://compliancy-group.com/what-is-the-hitech-act/

[2] The factual allegations in this section may be found in Plaintiff's complaint at ECF No. 1-1, ¶¶ 11-102.

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 7 of 26

2. John Doe alleged six claims against UMass Memorial, all of which sounded in Massachusetts statutory or common law: (1) Massachusetts Wiretap Statute violations; (2) Massachusetts Privacy Statute violations; (3) breach of common law duty of confidentiality; (4) breach of express contract; (5) breach of implied contract; and (6) unjust enrichment. *See* ECF No. 1-1 at ¶¶ 162–244. John Doe alleged no federal claims against UMass Memorial.

3. Plaintiff's claims arise from UMass Memorial's systematic violation of the medical privacy rights of its patients. *Id.* at ¶¶ 1-6; 11-126. Specifically, Plaintiff seeks to hold UMass Memorial liable for installing software code on its websites (the Facebook Meta Pixel tool) that results in the contents of patients' communications about their medical conditions, treatments, doctors, and other sensitive information being automatically shared with Facebook without patients' knowledge or consent. *Id.* That software code was Facebook's "Meta Pixel."

4. The Meta Pixel is a snippet of code embedded on a website that tracks users' activities as they navigate through a website.[3] Once activated, the Meta Pixel "tracks the people and type of actions they take."[4] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[5]

5. For Facebook, the Meta Pixel tool embedded on a third-party website acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address. The Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific

[3] https://developers.facebook.com/docs/meta-pixel/
[4] https://www.facebook.com/business/goals/retargeting
[5] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[6]

6. Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When the Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook then aggregates this data against all websites.[7] Facebook benefits from obtaining this information because it improves its advertising, including its ability to identify and target users with ads.

7. Shockingly, the Meta Pixel is incorporated on many websites where users submit information that by law must be kept confidential. Recently, journalists determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States.[8] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook.

8. UMass Memorial is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal medical information through the UMass

[6] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[7] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[8] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

Memorial website, that information (such as what the patient is being treated for, their doctor, and other personally identifying data) is transmitted to Facebook via the Meta Pixel. That information is then used by Facebook to sell advertising. Thus, UMass Memorial knowingly discloses information that allows Facebook and other advertisers to link its patients' health information to their private identities and target them with advertising.

9. UMass does not have a legal right to share Plaintiff's and Class Members' Protected Health Information without their written consent, because this information is protected from such disclosure by law. *E.g.* GL c. 214, §1B. Much less is UMass permitted to disclose patients' Protected Health Information to advertising and marketing companies like Facebook without express written authorization from patients. *E.g.* 940 Mass. Code Regs. 4.08(12).

10. Worse, UMass Memorial actively deceived patients into believing that UMass Memorial would not share their personal health information with advertising companies like Facebook. UMass Memorial expressly promises in its "Privacy Policy"[9] that protecting patients' health information is a priority and that UMass Memorial follows Massachusetts state law guidelines "to maintain the confidentiality" of their protected health information. Even if a patient stumbled upon UMass Memorial's carefully hidden "Privacy Policy," nothing in this policy would be understood by any patient to mean that UMass Memorial is routinely allowing Facebook to capture and exploit patients' personal health information.

**B. UMass Memorial continued to hide its misconduct from the public even after multiple hospital systems across the county conceded that disclosing patients' personal health information to Facebook was a serious privacy violation.**

11. In exchange for disclosing their patients' personal health information, hospitals like UMass Memorial are compensated by Facebook with enhanced online advertising services.

[9] https://www.ummhealth.org/patients-visitors/joint-notice-information-practices

12. On June 16, 2022, an investigative article published by the Markup revealed that hospital systems like UMass Memorial had been routinely bartering their patients' medical information in return for access to the Facebook Meta Pixel tool. After publication of the Markup's investigative article in June 2022, hospital systems around the United States began self-reporting data breaches arising from their installation of pixel technology on their websites.[10]

13. Unlike the responsible hospital systems who have informed their patients of the serious privacy violations resulting from the installation of Facebook's Meta Pixel tool on their websites, UMass Memorial did nothing. Indeed, not only did UMass Memorial hide these privacy violations from its patients, but UMass Memorial continued to collect and transmit its patients' personal health information to Facebook despite widespread knowledge that such collection and disclosure of such information is patently illegal and in violation of patients' privacy rights.

**C. UMass Memorial removes this case to federal court.**

14. On November 28, 2022, UMass Memorial removed this case to the Eastern Division of the District of Massachusetts. ECF No. 1. UMass Memorial alleged only one basis for this Court's subject matter jurisdiction: statutory jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *E.g.*, ECF No. 1 at 1. UMass Memorial claims that it is entitled to be treated like a federal officer because it "acted within the penumbra of federal action and office" when it set up and operated its websites. *Id.* at ¶¶ 13, 22–41.

15. UMass Memorial's notice of removal was supported by no affidavits, declarations, or other evidence. *See generally* ECF No. 1. UMass Memorial also failed to comply with Local Rule 81.1(a) which requires that "[w]ithin 28 days after filing a notice for removal of an action

[10] https://www.scmagazine.com/analysis/breach/pixel-fallout-expands-community-health-informs-1-5m-of-unauthorized-disclosure; https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

from a state court to this court pursuant to 28 U.S.C. § 1446, the party filing the notice shall file certified or attested copies of all records and proceedings in the state court and a certified or attested copy of all docket entries in the state court."

## LEGAL STANDARD

A district court must remand a case to state court if "at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 USC § 1447(c). Removal statutes are strictly construed, and the removing party bears the burden of establishing federal jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Hilbert v. Aeroquip, Inc.*, 486 F. Supp. 2d 135, 143 (D. Mass. 2007) ("If the right to remove is doubtful, the case should be remanded.") (citations omitted).

## ARGUMENT AND AUTHORITIES

There is no dispute that UMass Memorial is not a federal agency or officer. It therefore bears the burden under 28 U.S.C. § 1442(a)(1) to establish: (1) that it was "acting under a federal officer's authority"; (2) that the charged conduct was carried out "for or relating to" the asserted official authority, and (3) that it "will assert a colorable federal defense to the suit." Moore v. Elec. Boat Corp., 25 F.4th 30, 34 (1st Cir. 2022). UMass Memorial cannot meet the first two requirements, which means this Court lacks subject matter jurisdiction.

### A. UMass Memorial was not "acting under a federal officer's authority" when it installed the Facebook Meta Pixel tool on its websites.

"'Acting under' connotes 'subjection, guidance, or control' and involves 'an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" *Rhode Island v. Shell Oil Products Co.*, 979 F.3d 50, 59 (1st Cir. 2020), *cert. granted, judgment vacated on other grounds*, 141 S. Ct. 2666, 210 L. Ed. 2d 830 (2021) (quoting *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 152 (2007)). UMass Memorial was not told to embed Facebook's Meta Pixel tool on its website

by any federal authority. Much less did UMass Memorial's conformity with published laws or regulations transform it into a subordinate agent of a superior federal officer. Accordingly, UMass Memorial cannot meet its burden to demonstrate that the Court has jurisdiction over this case.

**1. UMass Memorial has no factual basis for asserting federal officer jurisdiction.**

UMass Memorial does not allege that any federal officer directed it to embed its website with any specific code—much less code that forwards patient health information to Facebook without patients' prior consent. Instead, UMass Memorial theorizes that the mere existence of a federal program, referred to as the "Meaningful Use Program," which incentivizes hospitals to implement electronic health records, creates federal officer jurisdiction here. There are multiple factual and legal problems with this theory.

First, UMass Memorial offers no evidentiary support of how it participates in this voluntary program. UMass Memorial does not aver that it participated in the program; it does not aver that it took any incentive payments from the program; nor does UMass Memorial claim that the program required it to install Facebook's Meta Pixel software on its website. Instead, UMass Memorial just generally describes the Meaningful Use Program.[11]

Second, UMass Memorial's discussion of the Meaningful Use Program is highly misleading. The Meaningful Use Program is a federal program that encourages health providers to (1) create and maintain Electronic Health Records (EHR) rather than paper documentation; (2) make EHR available to patients via electronic patient portals; and (3) encourage patients to use

[11] *See, e.g.,* ECF No. 1 at ¶ 12 (the federal government "has incentivized and directed providers who participate in the Medicare and Medicaid program (like UMass Memorial's clinical affiliates) to offer patients online access to their records, and to optimize patient engagement with their medical information."); ¶¶ 12–13 ("The federal government has also modeled the behavior it wants to see . . . UMass Memorial has dutifully assisted and followed the federal government's direction in this effort."); ¶ 17 ("providers must meet certain criteria in order to receive full Medicare reimbursement," without ever stating that UMass Memorial meets the criteria); ¶ 27 ("UMass Memorial (along with countless other entities) is helping the government produce the nationwide interoperable information technology infrastructure for health information," without ever identifying what UMass Memorial has done).

those electronic patient portals to access their EHR (*i.e.*, "meaningful use").[12] In this way, the program seeks to move health providers away from maintaining physical, written copies of patients' "charts," and instead have health providers document and maintain clinical data and visit summaries in an electronic format that patients can access via an electronic patient portal with their health provider. Thus, the Meaningful Use Program is focused on encouraging hospitals and health providers to maintain EHR—rather than paper charts—when capturing "clinical data" and make the EHR accessible to patients via a patient portal.[13]

The American Recovery and Reinvestment Act of 2009 (the "Recovery Act") provided financial incentives to medical professionals and hospitals that achieved "meaningful use" of electronic health records. *See White v. United States,* 2017 WL 3262165, at *1 (E.D.Tex., 2017) (summarizing history of the "meaningful use" program"). The goal of these provisions was "to promote the adoption of EHR technology and electronic health information to improve the quality and cost of health care in the United States." *Id.* Under the Medicare EHR incentive program, eligible hospitals could qualify for incentive payments from the government if they successfully demonstrated "meaningful use of Certified Electronic Record Technology." *Id.*

UMass Memorial says that it has "dutifully assisted and followed the federal government's direction" "to offer patients online access to their records, and to optimize patient engagement with their medical information." ECF No. 1, ¶¶ 12, 13. That is all well and good, but Plaintiff's lawsuit has no relationship to EHR, patient portals, or access to patient portals. Put differently, if the Meaningful Use Program had never existed, Plaintiff's claim would be the same.

Plaintiff's claim in this lawsuit is that UMass Memorial installed Facebook's Meta Pixel

---

12 https://www.cms.gov/regulations-and-guidance/legislation/ehrincentiveprograms

13 https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/Downloads/Stages_ofMeaningfulUseTablepdf.pdf

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 14 of 26

tool on its website, with the result that patients' protected health information is being sent to Facebook without patients' knowledge or consent. The Meta Pixel tool is not a necessary component of creating or storing EHR. Nor is the Meta Pixel a necessary component of enabling patients to access a patient portal or their EHR. UMass Memorial does not claim otherwise.

Put simply, the Meaningful Use Program is about encouraging patients' meaningful use of their own EHR on a *private patient portal*—not the "meaningful use" of *UMass Memorial's public-facing website*. UMass Memorial knew that by embedding the Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiff's and the Class Members' personal health information, including sensitive medical information and personally identifying data. UMass Memorial made that decision to barter its patients' personal health information to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited UMass Memorial and Facebook, it also betrayed the privacy rights of Plaintiff and the Class Members.

No one in the government told UMass Memorial to violate Massachusetts law by sending patients' personal health information to Facebook without their knowledge or consent. Much less was UMass "incentivized" to break the law by any federal program. Accordingly, UMass Memorial has no factual basis for removal under "federal officer" jurisdiction.

**2. No federal authority ordered UMass Memorial to install Facebook's Meta Pixel tool on its websites.**

The paradigmatic example of "acting under a federal officer's authority" is when a federal officer exercises control and direction over a ***federal contractor's*** actions. *See, e.g.*, *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35–36 (1st Cir. 2022) ("The Navy oversaw every aspect of the design, construction, maintenance, and modernization of the submarine, including the use of asbestos in the construction of the submarine. The undisputed record demonstrates that Moore's claims clearly

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 15 of 26

'relate to' Electric Boat's contracted work while 'acting under' the Navy."). For example, when the government provides detailed specifications to a contractor for the installation of asbestos on a submarine, the contractor may be said to be "acting under" federal authority. *Id.*

Even when a private party is not in a contractor relationship with the government, the private party can "act[] under a federal officer's authority" when "acting under express orders, control and direction[s] of federal officers." *Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989) (telephone company directed to cooperate in wiretap).

Neither situation is presented here. UMass Memorial does not aver that it entered any contracts or agreements with any federal officer to set up or operate websites. *See generally* ECF No. 1. And it identifies no officers—or any persons at all—who expressly ordered, controlled, or directed UMass Memorial to embed its website with code that would transfer patient information to third parties such as Facebook. *Id.*

**3. UMass Memorial was not "acting under" a federal officer because the Meaningful Use Program is a prototypical regulatory program that cannot create federal officer jurisdiction.**

UMass Memorial claims that it was incentivized by the Medicare and Medicaid programs to offer patients online access to their EHR because of the Meaningful Use Program. Without citing any relevant portion of the Meaningful Use Program, UMass Memorial alleges that this federal program somehow encouraged UMass Memorial to violate multiple state and federal laws by installing software code that transmitted its patients' personal health information to Facebook without their knowledge or consent. *See* ECF No. 1 at ¶ 12 (the federal government "has incentivized and directed providers who participate in the Medicare and Medicaid program (like UMass Memorial's clinical affiliates) to offer patients online access to their records, and to optimize patient engagement with their medical information.").

UMass Memorial does not cite a single statute, regulation, or published guidance relating to the Meaningful Use Program that requires or endorses transmitting patient information to third-party advertising companies without patients' consent, despite summarily stating that this "is precisely what the Meaningful Use Program envisions." *Id.* at ¶ 35. Even accepting UMass Memorial's tenuous and unsupported claim that there is some connection between EHR and Meta Pixel (and there is not, as discussed in Section B), UMass Memorial's participation in the Meaningful Use Program does not constitute acting under the color of federal office.

In applying the "acting under" prong, federal courts consistently distinguish between (1) the relationship of a regulator and the regulated, in which the regulated party is not "acting under" a federal officer merely by complying with the law; and (2) the relationship between a private actor performing a task that the federal officer would otherwise have to do himself.

Only when a federal officer is directing or controlling a private actor's conduct does a private actor's conduct count as "acting under" a federal officer. *See Watson*, 551 U.S. at 153 ("[a] private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official'"); *Box v. PetroTel, Inc.*, 33 F.4th 195, 199 (5th Cir. 2022) ("PetroTel did not show that it helped the DFC carry out a duty, activity, or task that the DFC otherwise would have had to do itself."); *Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393, 405 (3d Cir. 2021) (rejecting federal officer jurisdiction because nursing homes do not assist or help carry out duties of federal superior even though highly regulated); *Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 622-23 (6th Cir. 2016) ("regulation of an activity cannot, no matter how extensive or complex it may be," be a delegation of federal officer authority; instead, it requires that a private actor "takes on a job that the government would otherwise have to do."); *Veneruso v. Mount*

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 17 of 26

*Vernon Neighborhood Health Ctr.*, 586 F. App'x 604, 607-08 (2d Cir. 2014) (rejecting argument that recipient of federal funds was acting under federal officer because of expansive regulations tied to receipt of funds).

By contrast, "if the corporation establishes only that the relevant acts occurred under the general auspices of federal direction then it is not entitled to § 1442(a)(1) removal." Arness v. Boeing North American, Inc., 997 F.Supp. 1268, 1273 (C.D. Cal., 1998) (quoting *Good v. Armstrong World Industries, Inc.,* 914 F.Supp. 1125, 1128 (E.D.Pa., 1996)).

The Meaningful Use Program is a prototypical example of a carrot-and-stick regulatory framework set up by a regulator to incentivize compliance and maximize market efficiencies, like the Medicare Advantage framework that the Sixth Circuit determined did not entitle Humana to federal officer removal in *Ohio State Chiropractic*. 647 F. App'x at 623. UMass Memorial has an "arms-length relationship" with the government here, where the government has enacted a regulatory framework that UMass Memorial (supposedly) complies with in exchange for higher Medicare reimbursement rates; UMass Memorial is not performing a task the government would otherwise undertake itself. *Id.* If no hospitals or health providers decided to partake in the Meaningful Use Program and create and maintain EHR, "it is doubtful that the government would get into the business of offering its own [medical services and creating and storing EHR]." *Id.* In the same vein, the Third Circuit rejected the argument that a nursing home was entitled to federal officer removal because, while highly regulated, nursing homes are not "delegated federal authority, nor do they provide a service that the federal government would otherwise provide." *Maglioli*, 16 F.4th at 405.

Through the Meaningful Use Program, the government is not delegating a duty to create EHR and make EHR accessible to patients. The government is not a doctor or a hospital, just like

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 18 of 26

it is not a nursing home provider. Instead, the government has created a regulatory framework to embody certain policy choices and try to create efficiencies. *See Ohio State Chiropractic*, 647 F. App'x at 623 ("Congress created Medicare Advantage in the hope that the private sector would make delivering Medicare benefits cheaper and more efficient."). The participants in that regulatory framework *comply* with the law; they are not assisting the government in carrying out its own tasks.

The fact that a regulatory framework is extensive or that it cannot achieve the government's aims without the compliance of regulated parties makes no difference when analyzing federal officer jurisdiction. *Watson*, 551 U.S. at 157; *Ohio State Chiropractic*, 647 F. App'x at 623. The "help" or "assistance" the private actor provides must go beyond complying with the law and instead help or assist the government in carrying out *its own task* or *enforcing* the law. *Maglioli*, 16 F.4th 405 ("The nursing homes here do not assist or help carry out the duties of a federal superior. . . . They are not delegated federal authority, nor do they provide a service that the federal government would otherwise provide."). Taxpayers who fill out complex federal tax forms, or airline passengers who obey federal regulations prohibiting smoking on airplanes certainly "help" or "assist" federal law enforcement authorities in some sense of those words, but these individuals do not "act under" an agency or officer of the federal government for purposes of removal. *Watson*, 551 U.S. at 152. "One would usually describe the behavior of the taxpayers, airline passengers, and prisoners we have described as ***compliance*** with the law (or ***acquiescence*** to an order), not as 'acting under' a federal official who is giving an order or enforcing the law." *Watson*, 551 U.S. at 152 (italics in original; bold added).

The same reasoning applies here. Just as taxpayers, airline passengers, and prisoners are all "incentivized" to comply with the law, UMass Memorial may well be "incentivized" to make

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 19 of 26

EHR available to patients—in both cases compliance is more attractive than noncompliance. But there are critical differences between that proposition and what UMass Memorial must establish to create subject matter jurisdiction under the federal officer removal statute. First, an "incentive" is not the same thing as subjection, direction, or control; even "guidance" is not control. *See Maglioli*, 16 F.4th 405. Second, UMass Memorial says it has an incentive to create and maintain electronic health records, *not* install Meta Pixel on its website and surreptitiously forward patients' personal medical information to Facebook without those patients' knowledge or consent. UMass Memorial asks this Court to assume, without any legal or factual support, that UMass Memorial must use Meta Pixel to create and maintain EHR. Not only is that assumption unsupported, it is absurd—the Federal Government does not "incentivize" private actors to break state and federal law.

Ignoring the Federal Circuit court consensus that there must be more than regulation for a private actor to act under the color of federal office, UMass Memorial asks this Court to follow two unpublished, out-of-Circuit district court decisions that are inconsistent with First Circuit precedent. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20-CV-1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) (following *UPMC*). In *UPMC*, the Western District of Pennsylvania held that a hospital was entitled to federal officer removal when sued for disclosing personally identifiable health information to third parties for internet marketing purposes because "the fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide EHR network" made UPMC more like a government contractor than a regulated entity. *Id.* at *6. In *ProMedica*, the Northern District of Ohio simply applied the holding of *UPMC*. 2020

WL 7705627 at *2-3. This Court should not follow *UPMC* because it is unpersuasive for at least two reasons.

First, the district court in *UPMC* incorrectly conflated "meaningful use" of *patient portals*—the focus of the Meaningful Use Program—with "meaningful use" of a hospital's *public-facing website*, which the defendant hospital apparently used third-party tracking cookies to monitor. *See* 2020 WL 4381675, at *5. UMass Memorial asks this Court to make this same error, conflating the maintenance of EHR on a patient portal with website users' activity on UMass Memorial's public-facing website. ECF No. 1-1, ¶ 29 (referencing "public websites and/or patient portals," when the Meaningful Use Program is about *patient portals*). But the Meaningful Use Program is *not* about making a hospital's public-facing websites more user-friendly or driving clicks to that website (something the government has zero interest in); it is about ensuring patients can access their electronic health records through a patient portal.

Second, the *UPMC* court incorrectly focused on the fact that the defendant hospital received an incentive payment for creating and maintaining EHR, rather than focusing on whether the government would undertake that task itself if the hospital system did not. *Id.* at *5-*6. But the mere fact of a financial incentive cannot turn a private actor into a person acting under the authority of a federal officer. *See Rhode Island v. Shell Oil Prods. Co., L.L.C.*, 979 F.3d 50, 59-60 (1st Cir. 2020) (rejecting that oil companies were acting under a federal officer even though they had contracts to provide oil to government); *Ohio State Chiropractic*, 647 F. App'x at 623 (rejecting that Humana was acting under federal officer as a Medicare Advantage organization even though it made profit by providing care for beneficiaries at a cost lower than the value of the Medicare payments it received from government).

In other words, the question is not whether the private actor is paid; the question is whether the private actor's task is a governmental task that the government would undertake itself if the private actor did not perform it. *Watson*, 551 U.S. at 153. The district court in *UPMC* did not grapple with that critical question. And the answer to that question here mandates remand: the government would not (and could not) create and store electronic health records itself or make patient portals for private hospital systems if providers declined to participate in the Meaningful Use Program. The government is not a doctor or hospital that generates the clinical data that goes into EHR in the first place and no federal officer has duties for building private hospital system websites.

Finally, in an attempt to create federal officer jurisdiction out of thin air, UMass Memorial suggests that the government "modeled" what UMass Memorial did by installing tracking cookies on its own websites. *See id.* at ¶ 29. But even if UMass Memorial is correct that the government uses tracking cookies (unknown), and even if such "modeling" could constitute subjection, direction, or control (a doubtful proposition), there are significant problems with this argument.

First, the conduct at issue in the lawsuit is not whether UMass Memorial tracked the online behavior of patients or website users. The conduct at issue is whether UMass Memorial surreptitiously gave its patients' medical information to Facebook without its patients' knowledge or consent so that Facebook could sell advertising. Second, the government is not a hospital with a physician-patient relationship like UMass Memorial, which expressly promised its patients that it would keep their health information confidential. ECF No. 1-1, ¶¶ 94-95. In other words, there is no evidence that the government "modeled" the specific misconduct at issue in this lawsuit: i.e., UMass Memorial's transmission of its patients' personal health information to Facebook without their knowledge or consent.

**B. UMass Memorial cannot show that embedding Meta Pixel into its website "relates to" any "official authority."**

To establish federal officer jurisdiction, UMass Memorial must also show that there is "a *connection or association* between the act in question and the federal office." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (emphasis in original) (quotation and citation omitted). While this element does not require a causal relationship, it does have substantive limits. *See Shell Oil*, 979 F.3d at 60 (finding no nexus between government's contracts to buy oil products and companies' misrepresentations about harm to environment); *see also Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 1, 47 (D. Mass. 2020) (rejecting that marketing and sale tactics for oil and products were "related to" drilling and production activities "supposedly done under the direction of the federal government"); *City of Annapolis, Md. v. BP, P.L.C.*, No. SAG-21-00772, 2022 WL 4548226 (D. Md. Sept. 29, 2022) (finding no nexus for misrepresentations about oil products just because government was a target of misrepresentations as a customer of the oil products). UMass Memorial cannot meet this "related to" standard.

The conduct in question here is UMass's installation of a hidden tool on its website that transmits patients' health data to Facebook so that Facebook can sell advertising—all without patients' knowledge or consent. There is no "connection or association" between this conduct and anything that the Centers for Medicare and Medicaid Services(or any other federal office) directed UMass Memorial to do. The only way that UMass's transmittal of protected health data to Facebook "relates to" EHR and the Meaningful Use Program is that they both occur via the internet. That is insufficient under the First Circuit's recent opinion in *Shell Oil.*

In *Shell Oil,* the plaintiff, Rhode Island, sued various oil companies for knowingly misrepresenting the harm their products caused the environment. In seeking to remove to federal court, the oil companies pointed to their contracts with the federal government to claim they acted

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 23 of 26

under the color of federal office in selling oil products to support federal officer jurisdiction. 979 F.3d at 59, *cert. granted, judgment vacated on other grounds*, 141 S. Ct. 2666 (2021). The First Circuit compared the scope of those contracts to the plaintiff's allegations and found no nexus existed. *See id.* ("There is simply no nexus between anything for which [plaintiff] seeks damages and anything the oil companies allegedly did at the behest of a federal officer."). Because the contracts with the government "mandate[d] none of [the alleged] activities" (*i.e.*, engaging in a "misinformation campaign" about the harmful effects of their products on the environment), the First Circuit held that there was no nexus between anything the oil companies did under the color of federal office (sell oil to government) and the act the plaintiff complained of (misrepresentations to the public). *See id.*; *see also Exxon Mobil*, 462 F. Supp. 3d at 47; *BP*, 2022 WL 4548226, at *8.

The same result follows here. It is undisputed that no federal officer "mandated" that UMass Memorial install software on its website that transmitted its patients' personal health information to Facebook without their knowledge or consent. Rather, like in *Shell Oil,* UMass Memorial made a conscious decision to mislead its customers for its own benefit.

UMass Memorial's decision to barter its patients' personal health information to Facebook has no relationship to government incentives for UMass to make electronic health records available via a patient portal. Nor do Plaintiff's state law claims implicate anything that UMass did at the behest of a federal officer. In short, there is "no nexus" between the accused conduct (sending patient information to Facebook) and anything that UMass was told to do by a federal officer.

By contrast, accepting UMass Memorial's expansive "relates to" theory would mean creating federal officer jurisdiction for *anything* a hospital does on its website. Indeed, under UMass Memorial's theory, all of the following misconduct would also "relate to" the Meaningful Use Program and create federal officer jurisdiction: (1) UMass Memorial engaging in false

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 24 of 26

advertising on its website; (2) UMass Memorial committing copyright or trademark violations on its website; and (3) UMass Memorial posting defamatory content on its website. None of this conduct has any "connection or association" with EHR, patient portals, or patients accessing their EHR on a patient portal. The same is true of UMass Memorial's decision to share its patients' health information with Facebook.

If the First Circuit found no nexus in *Shell*—even though the complained-of act (misrepresentations about oil products) and the federal authority (contracts for oil products) both involved selling oil—then there can similarly be no nexus when the complained-of act and the federal authority both involve the internet—an even more expansive and nebulous concept than selling oil. Accordingly, UMass Memorial cannot carry its burden to establish a nexus between the complained-of acts and the supposed delegated federal authority (the Meaningful Use Program) to support federal officer jurisdiction.

## CONCLUSION

UMass Memorial reads the federal officer removal statute so expansively that it becomes limitless. Any activity on the internet by a private actor who is "incentivized" to use electronic records becomes an activity under the color of federal office. That proposition is unprecedented. Since UMass Memorial has not proved that it acted under federal authority or that it is being sued for acts connected with that federal authority, it has not established federal officer jurisdiction. This case should thus be remanded to state court.

Case 4:22-cv-12022-ADB Document 10 Filed 01/06/23 Page 25 of 26

Respectfully submitted,


_/s/ Jonathan T. Merrigan_
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for Plaintiff***


I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 6, 2022, copies of the foregoing Motion to Remand were served on the following via ECF:

James H. Rollinson (BBO # 649407)
jrollinson@bakerlaw.com
**BAKER & HOSTETLER** LLP
127 Public Square, Suite 2000
Cleveland, Ohio 44114-1214
(216) 621-0200 (telephone)
(216) 696-0740 (facsimile)

*Attorney for Defendant UMass Memorial Health Care, Inc.*

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

Case 4:22-cv-12022-ADB Document 11 Filed 01/08/23 Page 1 of 3

10

2385CV01206-D
2384CV02448
BLS1

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated,<br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.<br><br>Defendant. | Case No.: 4:22-cv-12022 |

FILED
JUL 21 2023
ATTEST: CLERK

SUFFOLK SUPERIOR COURT CLERK'S OFFICE FILED OCT 30 2023 ACTING CLERK MAGISTRATE

**MOTION FOR *PRO HAC VICE* ADMISSION OF PAUL G. KARLSGODT**

Defendant, UMass Memorial Health Care, Inc., pursuant to Local Rule 83.5.3, moves for the *pro hac vice* admission of attorney Paul G. Karlsgodt of Baker & Hostetler LLP and states as follows:

1. 1. Defendant requests that the Court permit its counsel, Paul G. Karlsgodt, to appear *pro hac* vice in this action, and in support submits the Certification of Paul G. Karlsgodt, which is attached hereto as **Exhibit A.**

2. As set forth in the Certification, Mr. Karlsgodt is not a member of the bar of this Court. He is a member in good standing in every jurisdiction where he has been admitted to practice, is not the subject of any disciplinary proceedings, and has not previously had a *pro hac vice* admission to this Court revoked for misconduct. Mr. Karlsgodt has read and agrees to this Court's Local Rules.

3. Furthermore, Mr. Rollinson, the undersigned attorney, is a member in good standing of the bar of this Court and will continue to represent Defendant in this action.

4. Defendant has also paid the necessary *pro hac vice* admission fees with the filing of this Motion.

5. Based on the foregoing, the requirements of Local Rule 83.5.3 have been satisfied and the Motion should be granted.

WHEREFORE, Defendant UMass Memorial Health Care, Inc. respectfully requests that the Court grant this Motion and admit the *pro hac vice* admission of Mr. Karlsgodt in this action on behalf of Defendant.

Dated: January 8, 2023

Respectfully submitted,

/s/ *James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON
March 7, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______________
Assistant Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2023, the foregoing was filed via the Court's ECF system and served on all counsel of record.

/s/ James H. Rollinson
*One of the attorneys for Defendant*

Case 4:22-cv-12022-ADB Document 11-1 Filed 01/03/23 Page 1 of 4

**IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | ~~2285CV01206-D~~<br>Case No.: 4:22-cv-12022<br>2384CV02448-BLS1<br><br>**FILED**<br>JUL 21 2023<br>ATTEST: [signature] CLERK |

**CERTIFICATION OF PAUL G. KARLSGODT**

I, Paul G. Karlsgodt, hereby certify and state under the penalty of perjury as follows:

1. I make this certification in support of the Motion for *Pro Hac Vice* Admission and have personal knowledge of the facts stated herein.

2. I am a partner in the law firm of Baker & Hostetler LLP, 1801 California Street, Suite 4400, Denver, Colorado 80203. My telephone number is (303) 861-0600, and my email is pkarlsgodt@bakerlaw.com.

3. In accordance with Local Rule 85.5.3(e), I certify that I am a member in good standing of the Bars of the States of Colorado and Washington. I also am admitted to practice in the following courts: District of Colorado; Tenth Circuit Court of Appeals; Ninth Circuit Court of Appeals; Northern District of Illinois (General Bar); Eastern District of Missouri; Seventh Circuit Court of Appeals; Western District of Washington; Eighth Circuit Court of Appeals; Western District of New York; Sixth Circuit Court of Appeals; Western District of Wisconsin; Western District of Michigan; Central District of Illinois; Fourth Circuit Court of Appeals; Southern District of Illinois (General); Third Circuit Court of Appeals; and the Southern District of Indiana.

Case 4:22-cv-12022-ADB Document 11-1 Filed 01/03/23 Page 2 of 4

4. There are no disciplinary proceedings pending against me as a member of the Bar in any jurisdiction where I have been admitted to practice, or in any other jurisdiction.

5. I have not previously had a *pro hac vice* admission to this court (or other admission for a limited purpose under this rule) revoked for misconduct.

6. I have read and agree to comply with the Local Rules of the United States District Court for the District of Massachusetts.

Signed under the penalty of perjury on this 3rd day of January, 2023

*/s/ Paul G. Karlsgodt*

# State of Colorado,

**STATE OF COLORADO, ss:**

*I, **Cheryl Stevens**, Clerk of the Supreme Court of the State of Colorado, do hereby certify that*

***PAUL KARLSGODT***

*has been duly licensed and admitted to practice as an*

## ATTORNEY AND COUNSELOR AT LAW

*within this State; and that his/her name appears upon the Roll of Attorneys and Counselors at Law in my office of date the **31st** day of **October** A.D. **1997** and that at the date hereof the said **PAUL KARLSGODT** is in good standing at this Bar.*

**IN WITNESS WHEREOF,** *I have hereunto subscribed my name and affixed the Seal of said Supreme Court, at Denver, in said State, this **16th** day of **December** A.D. **2022***

**Cheryl Stevens**

Clerk

By ______________________

Deputy Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| IN THE MATTER OF THE ADMISSION<br>OF<br>PAUL G. KARLSGODT<br>TO PRACTICE IN THE COURTS OF THIS STATE | BAR NO. 40311<br>**CERTIFICATE**<br>**OF**<br>**GOOD STANDING** |

I, Sarah R. Pendleton, Deputy Clerk of the Supreme Court of the State of Washington, hereby certify

**PAUL G. KARLSGODT**

was regularly admitted to practice as an Attorney and Counselor at Law in the Supreme Court and all the Courts of the State of Washington on July 11, 2008, and is now and has continuously since that date been an attorney in good standing, and has a current status of active.

SEAL OF THE SUPREME COURT • STATE OF WASHINGTON •

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the 19th day of December, 2022.

Sarah R. Pendleton
Supreme Court Deputy Clerk
Washington State Supreme Court

Case 4:22-cv-12022-ADB Document 13 Filed 01/18/23 Page 1 of 4

11

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

2285CV01205-D

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC.,

Defendant.

Case No.: 4:22-cv-1202-ADB

2384CV02448-BLS1

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D]

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

Defendant.

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**DEFENDANT'S ASSENTED-TO MOTION TO EXTEND TIME**

Pursuant to Fed. R. Civ. P. 6(b)(1), Defendant UMass Memorial Health Care, Inc. ("Defendant") hereby moves to extend the time in which it may submit an Opposition to Plaintiff John Doe's ("Plaintiff") Motion for Remand by twenty-one (21) days, from January 20, 2023, up to and including February 10, 2023.

Plaintiff filed his Motion for Remand in this Court on January 6, 2023. Pursuant to Local Rule 7.1(b)(2), Defendant's deadline to file its Opposition to the Motion for Remand is January 20, 2023.

As grounds for this motion, there are certain scheduling conflicts among Defendant's Counsel which has made the turnaround time to file an Opposition to the Motion for Remand difficult. Defendant, therefore, with Plaintiff's assent, respectfully requests that its deadline to submit an Opposition to the Motion for Remand be extended by twenty-one (21) days, from January 20, 2023, up to and including February 10, 2023.[1]

[1] This extension will not alter the date of any event or any deadline fixed by Court order.

Case 4:22-cv-12022-ADB Document 13 Filed 01/18/23 Page 2 of 4

Parties have agreed to similarly extend Plaintiff's time to file a reply by an additional twenty-one (21) days.

Dated: January 18, 2023

Respectfully submitted,

/s/ Stephen T. Paterniti
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (admitted pro hac vice)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____
Assistant Clerk

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(2)**

I, Stephen T. Paterniti, hereby certify that I have conferred with Plaintiff's counsel of record on this motion and that Plaintiff's counsel assented to the motion.

*/s/ Stephen T. Paterniti*
*One of the attorneys for defendant*

Case 4:22-cv-12022-ADB Document 13 Filed 01/18/23 Page 4 of 4

## CERTIFICATE OF SERVICE

I hereby certify that, on January 18, 2023, copies of the foregoing assented-to motion were served on the following via email at the addresses listed below.

Jonathan T. Merrigan
J. Tucker Merrigan
Victoria Santoro Mair
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
Ahmad, Zavitsanos, & Mensing, P.C.
1221 McKinney Street, Suite 3460
Houston, TX 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Attorneys for Plaintiff*

*/s/ Stephen T. Paterniti*
*One of the attorneys for defendants*

4876-0478-8555, v. 1

12

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01000-D~~
2384CR02448-BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

SUPERIOR COURT CIVIL CLERK'S OFFICE FILED OCT 30 2023 JOHN E. POWERS III ACTING CLERK MAGISTRATE

**MOTION FOR *PRO HAC VICE* ADMISSION OF SETH MEYER**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Seth Meyer of Keller Postman LLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Meyer. In support of this motion, the undersigned attorney states as follows:

1. Mr. Meyer is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Meyer has a business address of 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. His telephone number is (312) 741-5220.

3. Mr. Meyer is a member in good standing of Bars of the State of Illinois, the State of Michigan, the State of New York, the State of Texas, the State of Utah, and the State of Wyoming. *See* Declaration of Seth Meyer ("Meyer Decl.") ¶2.

4. Mr. Meyer is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Meyer Decl. ¶4. Mr. Meyer will comply with all applicable rules of court including the Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Meyer in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Meyer will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Seth Meyer be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: January 20, 2023

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on January 20, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 20th day of January 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01205-D~~
2384CV02448-BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**DECLARATION OF SETH MEYER**

I, SETH MEYER, declare as follows:

1. I am an attorney with Keller Postman LLC, with a business address of 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member in good standing of every bar in which I have been admitted to the practice of law. Specifically, I am a member in good standing of the Bars of the State of Illinois, the State of Michigan, the State of New York, the State of Texas, the State of Utah, and the State of Wyoming.

3. I have never been suspended or disbarred in the jurisdictions listed in Paragraph 2, and there are no disciplinary actions pending against me in any federal or state court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear pro hac vice in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to

all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. There are no disciplinary proceedings pending against me in any jurisdiction.

7. A member of the bar of this Court is advancing the present motion and has filed a notice of appearance in this case.

Dated: January 20, 2023
Chicago, Illinois

Respectfully Submitted,

**KELLER POSTMAN LLC**

By: */s/ Seth Meyer*
Seth Meyer
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com

13

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01205-D~~
2384CV02448BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**MOTION FOR *PRO HAC VICE***
**ADMISSION OF NATHAN CAMPBELL**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Nathan Campbell of Ahmad, Zavitsanos & Mensing, PLLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Campbell. In support of this motion, the undersigned attorney states as follows:

1. Mr. Campbell is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Campbell has a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. His telephone number is (713) 655-1101.

3. Mr. Campbell is a member in good standing of Bars of The State of Texas, The Supreme Court of Texas, The US District Court for the Eastern District of Texas, The US District Court for the Southern District of Texas, and the Fifth Circuit Court of Appeals. *See* Declaration of Nathan Campbell ("Campbell Decl.") ¶2.

Case 4:22-cv-12022-ADB Document 16 Filed 01/20/23 Page 2 of 3

4. Mr. Campbell is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Campbell Decl. ¶4. Mr. Campbell will comply with all applicable rules of court including the Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Campbell in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Campbell will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Nathan Campbell be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: January 20, 2023

Respectfully submitted,

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Case 4:22-cv-12022-ADB Document 16 Filed 01/20/23 Page 3 of 3

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on January 20, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 20th day of January 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

Case 4:22-cv-12022-ADB Document 16-1 Filed 01/20/23 Page 1 of 2

2285CV01205-D
2384CV02448-BLS1

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

## DECLARATION OF NATHAN CAMPBELL

I, NATHAN CAMPBELL, declare as follows:

1. I am an attorney with Ahmad, Zavitsanos & Mensing, PLLC, with a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member in good standing of every bar in which I have been admitted to the practice of law. Specifically, I am a member in good standing of the Bars of The State of Texas, The Supreme Court of Texas, The US District Court for the Eastern District of Texas, The US District Court for the Southern District of Texas, and the Fifth Circuit Court of Appeals.

3. I have never been suspended or disbarred in the jurisdictions listed in Paragraph 2, and there are no disciplinary actions pending against me in any federal or state court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear pro hac vice in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to

all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. There are no disciplinary proceedings pending against me in any jurisdiction.

7. A member of the bar of this Court is advancing the present motion and has filed a notice of appearance in this case.

Dated: January 20, 2023
Houston, Texas

Respectfully Submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

By: _/s/ Nathan Campbell_
Nathan Campbell
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101
ncampbell@azalaw.com

14

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01205-D~~
2384CV02448-BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
CLERK/MAGISTRATE

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**MOTION FOR *PRO HAC VICE***
**ADMISSION OF FOSTER C. JOHNSON**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Foster C. Johnson of Ahmad, Zavitsanos & Mensing, PLLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Johnson. In support of this motion, the undersigned attorney states as follows:

1. Mr. Johnson is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Johnson has a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. His telephone number is (713) 600-4915.

3. Mr. Johnson is a member in good standing of the Bars of The State of Texas, The State of California, The US District Court for the Central District of California, the US District Court for the Eastern District of Texas, the US District Court for the Southern District of Texas, and the US District Court for the Northern District of Texas. *See* Declaration of Foster Johnson ("Johnson Decl.") ¶2.

4. Mr. Johnson is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Johnson Decl. ¶4. Mr. Johnson will comply with all applicable rules of court including the Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Johnson in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Johnson will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Foster C. Johnson be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: January 20, 2023

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Case 4:22-cv-12022-ADB Document 17 Filed 01/20/23 Page 3 of 9

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on January 20, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 20th day of January 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01205-D~~
2384CV02448
BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**DECLARATION OF FOSTER C. JOHNSON**

I, FOSTER JOHNSON, declare as follows:

1. I am an attorney with Ahmad, Zavitsanos & Mensing, PLLC, with a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member in good standing of every bar in which I have been admitted to the practice of law. Specifically, I am a member in good standing of the Bars of The State of Texas, The State of California, The US District Court for the Central District of California, the US District Court for the Eastern District of Texas, the US District Court for the Southern District of Texas, and the US District Court for the Northern District of Texas.

3. I have never been suspended or disbarred in the jurisdictions listed in Paragraph 2, and there are no disciplinary actions pending against me in any federal or state court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear pro hac vice in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. There are no disciplinary proceedings pending against me in any jurisdiction.

7. A member of the bar of this Court is advancing the present motion and has filed a notice of appearance in this case.

Dated: January 20, 2023
Houston, Texas

Respectfully Submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

By: _/s/ Foster C. Johnson_
Foster C. Johnson
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 600-4915
fjohnson@azalaw.com

15

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01205-D~~
2384CV02448-BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ACTING CLERK MAGISTRATE

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**MOTION FOR *PRO HAC VICE* ADMISSION OF DAVID WARDEN**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney David Warden of Ahmad, Zavitsanos & Mensing, PLLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Warden. In support of this motion, the undersigned attorney states as follows:

1. Mr. Warden is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Warden has a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. His telephone number is (713) 655-1101.

3. Mr. Warden is a member in good standing of Bars of the State of Texas, the US District Court for the Southern District of Texas, the US District Court for the Southern District of New York, the Patent & Trademark Appeal Board, the Federal Circuit Court of Appeals, and

Case 4:22-cv-12022-ADB Document 18 Filed 01/20/23 Page 2 of 3

the US Court of Appeals for the Fifth Circuit. *See* Declaration of David Warden ("Warden Decl.") ¶2.

4. Mr. Warden is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Warden Decl. ¶4. Mr. Warden will comply with all applicable rules of court including the Local Rules.

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Warden in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Warden will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that David Warden be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: January 20, 2023

Respectfully submitted,

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Case 4:22-cv-12022-ADB Document 18 Filed 01/20/23 Page 3 of 3

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on January 20, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 20th day of January 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

Case 4:22-cv-12022-ADB Document 18-1 Filed 01/20/23 Page 1 of 2

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01205-D~~
2384CV02448-BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

## DECLARATION OF DAVID WARDEN

I, DAVID WARDEN, declare as follows:

1. I am an attorney with Ahmad, Zavitsanos & Mensing, PLLC, with a business address of 1221 McKinney, Suite 2500, Houston, Texas 77010. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member in good standing of every bar in which I have been admitted to the practice of law. Specifically, I am a member in good standing of the Bars of the State of Texas, the US District Court for the Southern District of Texas, the US District Court for the Southern District of New York, the Patent & Trademark Appeal Board, the Federal Circuit Court of Appeals, and the US Court of Appeals for the Fifth Circuit.

3. I have never been suspended or disbarred in the jurisdictions listed in Paragraph 2, and there are no disciplinary actions pending against me in any federal or state court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear pro hac vice in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. There are no disciplinary proceedings pending against me in any jurisdiction.

7. A member of the bar of this Court is advancing the present motion and has filed a notice of appearance in this case.

Dated: January 20, 2023
Houston, Texas

Respectfully Submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

By: /s/ David Warden
David Warden
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101
dwarden@azalaw.com

Case 4:22-cv-12022-ADB Document 19 Filed 01/20/23 Page 2 of 3

16

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01205-D~~
2384CV02448-BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
JUL 18 2023
ACTING CLERK MAGISTRATE

FILED
JUL 21 2023
ATTEST: CLERK

**MOTION FOR *PRO HAC VICE***
**ADMISSION OF ALEX DRAVILLAS**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Alex Dravillas of Keller Postman LLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Mr. Dravillas. In support of this motion, the undersigned attorney states as follows:

1. Mr. Dravillas is a reputable member in good standing of every jurisdiction where he has been admitted to practice.

2. Mr. Dravillas has a business address of 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. His telephone number is (312) 741-5220.

3. Mr. Dravillas is a member in good standing of Bar of The State of Illinois. *See* Declaration of Alex Dravillas ("Dravillas Decl.") ¶2.

4. Mr. Dravillas is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Dravillas Decl. ¶4. Mr. Dravillas will comply with all applicable rules of court including the Local Rules.

Case 4:22-cv-12022-ADB Document 19 Filed 01/20/23 Page 2 of 3

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Mr. Dravillas in the representation of Plaintiffs, and it is anticipated that upon his admission *pro hac vice*, Mr. Dravillas will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Alex Dravillas be admitted to practice before this court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Dated: January 20, 2023

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON
March 7, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on January 20, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 20th day of January 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01205 D~~
2384CV02448-BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**DECLARATION OF ALEX DRAVILLAS**

I, ALEX DRAVILLAS, declare as follows:

1. I am an attorney with Keller Postman LLC, with a business address of 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member in good standing of every bar in which I have been admitted to the practice of law. Specifically, I am a member in good standing of the Bar of the State of Illinois.

3. I have never been suspended or disbarred in the jurisdictions listed in Paragraph 2, and there are no disciplinary actions pending against me in any federal or state court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear pro hac vice in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the

Case 4:22-cv-12022-ADB Document 19-1 Filed 01/20/23 Page 2 of 2

disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. There are no disciplinary proceedings pending against me in any jurisdiction.

7. A member of the bar of this Court is advancing the present motion and has filed a notice of appearance in this case.

Dated: January 20, 2023
Chicago, Illinois

Respectfully Submitted,

**KELLER POSTMAN LLC**

By: *_/s/ Alex Dravillas_*
Alex Dravillas
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
ajd@kellerpostman.com

Case 4:22-cv-12022-ADB Document 24 Filed 02/02/23 Page 1 of 7
17

IN THE UNITED STATES DISTRICT COURT FOR 2384CV02448-BLS1
THE DISTRICT OF MASSACHUSETTS ~~2285CV01205-D~~

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 4:22-cv-12022

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D]

FILED
JUL 21 2023
ATTEST: [signature] CLERK

LISA COLLETON, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 4:22-cv-40154

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01293D]

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
JOHN E. POWERS, III
ASST. CLERK MAGISTRATE

JANICE PROGIN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC., *et al.*,

Defendants.

Case No.: 4:23-cv-10113-ADB

[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02889]

**JOINT MOTION FOR ENTRY OF SCHEDULE REGARDING MOTIONS TO REMAND AND TO EXTEND TIME FOR DEFEENDANTS TO RESPOND TO THE COMPLAINTS**

The Plaintiffs John Doe, Lisa Colleton and Janice Progin in each of the above referenced actions, and UMass Memorial Healthcare, the common defendant in each of those actions, along with the additional defendants in the Progin Action (the "Parties"), jointly move this Court to enter a scheduling order for the briefing of Motions to Remand each of these actions, as set forth below.

Each of the above actions were filed in the Massachusetts state court. The Doe class action case was filed first, with the Colleton and Progin class action cases filed in succeeding months, making similar claims against UMass Memorial Healthcare, the common defendant and against the additional defendants in the Progin Action. The Doe and Colleton Actions were filed in the Worcester Superior Court. The Progin Action was filed in the Business Litigation Section of the Suffolk Superior Court.

The Defendants removed each of these actions to this Court alleging federal jurisdiction under the federal officer removal provision of 28 U.S.C. § 1442(a)(1). The Doe Action was removed on November 28, 2022, the Colleton Action was removed on December 28, 2022, and the Progin Action was removed on January 17, 2023. Plaintiff Doe filed a Motion to Remand the Doe Action on January 6, 2023 (Doe ECF 9 and 10). Plaintiffs Colleton filed a Motion to Remand the Colleton action on January 27, 2023 (Colleton ECF 13). Progin will be filing a Motion to Remand her case by February 16, 2023.

Since the bases for seeking removal of the three actions are similar, the Parties anticipate that some, but not necessarily all, of the legal issues raised in their respective Motions to Remand will be the same. Accordingly, coordinated briefing on the Motions to Remand would serve the interests of legal and judicial economy. Accordingly, the Parties respectfully move this Court to establish the following uniform dates for the remaining briefing of the Motions to Remand in the three related actions.

1. Plaintiff Progin will file her Motion to Remand by February 16, 2023.

2. Defendants will file their Oppositions to each of the Motions to Remand by March 20, 2023. Defendants shall file a single omnibus opposition to the three Motions to Remand, and the opposition memoranda may be up to 25 pages.
3. Plaintiffs shall file their replies in support of their Motions to Remand by April 19, 2023. Plaintiffs shall file a single omnibus reply in support of the three Motions to Remand. Each Plaintiff may also file a supplemental reply, not exceeding 5 pages, addressing issues specific to the Motion to Remand that Plaintiff's action.

By making this request of the Court, the Parties seek to streamline the Court's consideration of the removal to this Court and associated remand motions. The Parties do not seek consolidation of these actions at this time, nor do the Parties intend in any way to interfere with this Court's determination of its jurisdiction in these matters.

The Parties also move this Court to order that the Defendants' time to move, plead, answer, or otherwise respond to each of the complaints in the above referenced actions shall be extended until 30 days after the Court rules on the Motions to Remand.

Dated: February 2, 2023

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 6816272
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (pro hac vice)
David Warden (pro hac vice)
Nathan Campbell (pro hac vice)
**AHMAD, ZAVITSANOS & MENSING, PLLC**

1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (pro hac vice)
Alex Dravillas (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Counsel for John Doe***

/s/ William P. Doyle III
William Patrick Doyle III, BBO #556999
**COLONNA, DOYLE AND SIMEOLOA**
26 Main St, 3rd Floor
Lynnfield, MA 01940
(781) 245-1127
bill@colonna-doyle.com

Nicholas A. Coulson
Lance Spitzig
**LIDDLE SHEETS COULSON P.C.**
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
ncoulson@lsccounsel.com
lspitzig@lsccounsel.com

***Counsel for Lisa Colleton***

*/s/ Edward F. Haber*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Janice Progin***

*/s/ James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
**BAKER & HOSTETLER LLP**
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlgodt
**BAKER & HOSTETLER LLP**
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully
**BAKER & HOSTETLER LLP**
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

Stephen T. Paterniti (BBO #564860)
**JACKSON LEWIS P.C.**
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

***Counsel for Defendants***

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 2, 2023, a copy of this Joint Motion for Entry of Schedule Regarding Motions to Remand and to Extend Time for Defendants to Respond to the Complaints was filed electronically and served on all counsel of record via ECF:

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

18

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2384CV02448 BLS1

~~2385CV01005-D~~

JOHN DOE, et al.,

Plaintiffs,

v

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 4:22-cv-12022

FILED

JUL 21 2023

ATTEST: CLERK

COURT CLERK'S OFFICE FILED

OCT 30 2023

JOHN E. POWERS, III ACTING CLERK MAGISTRATE

**MOTION FOR LEAVE TO FILE NOTICE OF SUPPLEMENTAL AUTHORITY**

Following John Doe's filing of his motion to remand to state court, ECF No. 9, there have been three recent decisions of federal district courts that are directly on point to the arguments made in John Doe's motion, including one order in the District of Massachusetts.

John Doe therefore asks for leave to supplement his motion with the attached one-page notice of supplemental authority. *See* FED. R. CIV. P. 16(c)(2)(K) (permitting Court at any pretrial conference to dispose of pending motions); *Cf.* FED. R. APP. P. 28(j) (permitting prompt advisement of "pertinent and significant authorities" after a party's brief has been filed).

Dated: February 8, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**Sweeney Merrigan Law**
268 Summer St. LL Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Case 4:22-cv-12022-ADB Document 26 Filed 02/08/23 Page 2 of 3

victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**Ahmad, Zavitsanos & Mensing, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for Plaintiff and Class Members***

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with opposing counsel on February 8, 2023, regarding the relief requested in this motion. Opposing counsel indicated that the Defendant does not intend to oppose the Motion for Leave to File Notice of Supplemental Authority, but does oppose Plaintiff's underlying Motion to Remand and will substantively address its position and response in its forthcoming opposition brief.

/s/ J. Tucker Merrigan
J. Tucker Merrigan

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____
Assistant Clerk

Case 4:22-cv-12022-ADB Document 26 Filed 02/08/23 Page 3 of 3

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 8, 2023, a copy of this Motion was filed electronically and served on all counsel of record via ECF:

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

Case 4:22-cv-12022-ADB Document 27 Filed 02/08/23 Page 1 of 9

19

8

2285CV01905-D
2384CV02448-BLS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022 |

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 30 2023
ACTING CLERK MAGISTRATE

FILED
JUL 21 2023
ATTEST: CLERK

NOTICE OF SUPPLEMENTAL AUTHORITY

On January 6, 2023, John Doe filed a motion to remand and a memorandum in support of the same. ECF Nos. 9–10. Since then, there have been three decisions that are directly on point to the arguments made in John Doe's motion, including one in the District of Massachusetts.

On January 10, 2023, the Eastern District of Missouri ordered remand despite the defendant health system arguing for federal officer jurisdiction because it "set up electronic access to medical information for its patients through its voluntary participation in a federal program." *Doe v. BJC Health System*, No. 4:22-cv-00919-RWS, 2023 WL 369427, at *1 (E.D. Mo. Jan. 10, 2023).

On January 25, 2023, the District of Massachusetts sua sponte ordered remand of a lawsuit where the healthcare defendant similarly alleged entitlement to federal officer jurisdiction, in a case closely analogous to this one. *Doe v. Cape Cod Healthcare, Inc.*, No. 23-CV-10080, Elec. Order (D. Mass. Jan. 25, 2023) ("The removal in this case was improvidently taken.").

On February 1, 2023, the Northern District of California likewise entered an order remanding a healthcare privacy lawsuit and rejecting federal officer jurisdiction. *Quinto v. Regents Univ. Cal.*, No. 3:22-cv-04429-JD, 2023 WL 148050, at *4 (N.D. Cal. Feb. 1, 2023).

For convenience, all three orders are attached. Exs. 1–3.

Dated: February 8, 2023

Respectfully submitted,

/s/ J. Tucker Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**Sweeney Merrigan Law**
268 Summer St. LL Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**Ahmad, Zavitsanos & Mensing, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

*Attorneys for Plaintiff and Class Members*

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Assistant Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 8, 2023, a copy of this Motion was filed electronically and served on all counsel of record via ECF:

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

2023 WL 369427
Only the Westlaw citation
is currently available.
United States District Court,
E.D. Missouri, Eastern Division.

JOHN DOE, I, et al., Plaintiffs,
v.
BJC HEALTH SYSTEM, Defendant.

Case No. 4:22 CV 919 RWS
|
Filed: 01/10/2023

**MEMORANDUM AND ORDER OF REMAND**

RODNEY W. SIPPEL UNITED STATES DISTRICT JUDGE

*1 On July 25, 2022, plaintiffs filed this putative class action in state court alleging that BJC Health System ("BJC") violated its patients' privacy by causing the transmission of their personal and medical information to Facebook, Google, and other third-party marketing companies without their knowledge or consent. Plaintiffs allege that these disclosures occur through computer source code used by BJC on its websites and patient portals, which patients use to access their private medical information. Plaintiffs bring Missouri state law claims for breach of fiduciary duty and intrusion upon seclusion, as well as violations of the Missouri Merchandising Practices Act and the Missouri felony computer crimes and identity theft statutes.

BJC timely removed the action to this Court, claiming federal subject matter jurisdiction exists under the federal officer removal statute, 28 U.S.C. § 1442(a). According to BJC, it was acting under the direction of the federal government when it set up electronic access to medical information for its patients through its voluntary participation in a federal program.[1] In support of removal, BJC cited two unpublished district court opinions from Pennsylvania and Ohio[2] which found that healthcare providers' participation in the program met the requirements for removal under the federal officer removal statute. However, these non-binding decisions apply a different test for federal officer removal that what the Eighth Circuit Court of Appeals applies.

1 The program at issue is the Promoting Interoperability program, formerly referred to as the "Meaningful Use Program," and is a voluntary federal program that offers incentive payments to healthcare providers who meet certain program requirements.

2 The cases are *Doe I v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), and *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020).

This Court is bound to apply the law of the Eighth Circuit. Under the binding authority of this circuit, the requirements of the federal officer removal statute are not met in this case. Remand is therefore required.

## Discussion

A defendant may remove a civil action to federal court only if the action could have been filed originally in federal court. *See* 28 U.S.C. § 1441(a); *Gore v. Trans World Airlines*, 210 F.3d 944, 948 (8th Cir. 2000). Where a complaint pleads only state law claims, a federal court normally does not have jurisdiction based on a federal defense. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004). However, the federal officer removal statute provides an exception to that rule. 28 U.S.C. § 1442(a)(1).

The federal officer removal statute "grants independent jurisdictional grounds over cases involving federal officers where a district court otherwise would not have jurisdiction." *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012) (cleaned up).[3] The statute authorizes removal of any civil action commenced in state court that is brought against an "officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1) (emphasis added). "The federal officer removal statute is to be liberally construed, and thus the typical presumption against removal does not apply." *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021) (cleaned up).

3 One holding of *Jacks* was subsequently abrogated on grounds not relevant to this case by *BP P.L.C. v. Mayor and City Council of Baltimore*, 141 S. Ct. 1532, 1538 (2021).

*2 "When the removing party is not itself a federal officer or agency, it may remove a case only if it shows that it was 'acting under' a federal officer or agency in carrying out the acts that underlie the plaintiff's complaint." *Buljic*, 22 F.4th at 738 (citing *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007)). This requires BJC to establish that "(1) it acted under the direction of a federal officer, (2) there is a causal connection between [BJC's] actions and the official authority, (3) [BJC] has a colorable federal defense to the plaintiffs' claims, and (4) [BJC] is a 'person,' within the meaning of the statute." *Id.* (citing *Jacks*, 701 F.3d at 1230).

BJC contends that it meets the first two requirements because it was "assisting the federal government in carrying out" the federal mission of making electronic health records available to patients through its participation in the Promoting Interoperability program, which is a voluntary federal program that offers incentive payments to healthcare providers who meet certain program requirements. BJC does not argue that it is required by federal law to participate in this program, and the federal government has not contracted with BJC to create the websites or patient portals at issue in this case. The issue here, then, is whether BJC was "acting under" a federal officer or agency by virtue of its voluntary participation in a federal program. Although other district courts outside this circuit may disagree, I conclude the answer is no.

Although "not limitless, the words 'acting under' are broad." Jacks, 701 F.3d at 1230 (cleaned up). "To satisfy the 'acted under' requirement of § 1442(a)(1), a private person's actions must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Graves v. 3M Company*, 17 F.4th 764, 769 (8th Cir. 2021) (cleaned up). "The Supreme Court held in *Watson* that a private party may not remove under § 1442(a)(1) simply because 'a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail.' " *Id.* (quoting *Watson*, 551 U.S. at 145). Instead, "[t]he assistance that private contractors provide federal officers [must go] beyond simple compliance with the law and help[ ] officers fulfill other basic governmental tasks." *Watson*, 551 U.S. at 153. The private entity's "actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior,' " *Jacks*, 701 F.3d at 1230 (quoting *Watson*, 551 U.S. at 152), and this relationship "typically involves subjection, guidance, or control." *Watson*, 551 U.S. at 151 (quotation omitted).

"The fact that an entity [ ] is subject to pervasive federal regulation alone is not sufficient to confer federal jurisdiction. This is so because '[a] private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' " *Buljic*, 22 F.4th at 739 (quoting *Watson*, 551 U.S. at 153). "It is not enough that a private person or entity merely operate in an area directed, supervised and monitored by a federal regulatory agency or other such federal entity." *Jacks*, 701 F.3d at 1230; *see also* *Graves*, 17 F.4th at 769; *Jacks*, 701 F.3d at 1231 ("Taxpayers who fill out complex federal tax forms, or airline passengers who obey federal regulations prohibiting smoking certainly 'help' or 'assist' the federal law enforcement authorities in some sense of those words, but these individuals do not 'act under' an agency or officer of the federal government for purposes of removal under the statute.") (internal citation omitted).

***3** In *Buljic*, the Eighth Circuit summarized cases where this element was satisfied as follows:

> For this element, "[t]he paradigm is a private person acting under the direction of a federal law enforcement officer." *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018) (citing *Watson*, 551 U.S. at 149, 127 S. Ct. 2301); *see, e.g.*, *Maryland v. Soper*, 270 U.S. 9, 30, 46 S. Ct. 185, 70 L. Ed. 449 (1926) (explaining that a private party acting as federal officers' driver in a distillery raid had "the same right to the benefit of" the removal provision as did the federal agents). Courts have also found this element satisfied where a private contractor provided the government with a product that it needed or performed a job that the government would otherwise have to perform. In *Jacks*, for example, we explained that a health insurance provider that provided insurance to federal employees was acting under the direction of a federal officer because the federal government had enlisted it to "help the government fulfill the basic task of establishing a health benefits

> program for federal employees"—a task that was imposed on the government by statute. 701 F.3d at 1233; *see also In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 469 (3d Cir. 2015) (explaining that a nonprofit community defender acts under a federal officer by representing indigent federal defendants in part because it is delegated authority from the federal government and provides a service that the federal government would otherwise have to provide itself); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 136–37 (2d Cir. 2008) (finding "acting under" element satisfied where defendant chemical companies contracted with the federal government to provide a product—Agent Orange—that the government otherwise "would have had to produce itself").

22 F.4th at 739.

The first case relied upon by defendant, *Doe, et al. v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), describes the purpose and operation of the Promoting Interoperability program as follows (a description with which neither this Court nor the plaintiffs take issue):

> The federal government, as one of the largest purchasers of healthcare services, has emphasized the important role that health [information technology] plays in improving both the quality and efficiency of healthcare in the United States. To that end, President Bush first established the National Health Information Technology Coordinator by executive order in 2004. Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). The National Coordinator, an advisor to the Secretary of DHHS, was "to provide leadership for the development and nationwide implementation of an interoperable health information technology infrastructure to improve the quality and efficiency of health care." *Id.* The National Coordinator's responsibilities included coordinating efforts of the public and private healthcare sectors and collaborating with public and private interests. *Id.* Then, in 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act (HITECH Act), which created the Office of the National Coordinator for Health Information Technology (ONC) within DHHS. 42 U.S.C. § 300jj-11. The HITECH Act gave the ONC much the same responsibilities and objectives as the 2004 executive order gave the National Coordinator, including coordinating and collaborating with the private healthcare sector. *Id.* The Act also appropriated funds for DHHS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States." 42 U.S.C. § 300jj–31. In that vein, the Act created the Meaningful Use Program. 42 U.S.C. §§ 1395w-4(o), 1395ww(n); 42 C.F.R. § 495.2. Under this program, eligible healthcare providers receive incentive payments from DHHS if they demonstrate "meaningful use" of certified EHR technology. 42 U.S.C. §§ 1395w-4(o), 1395ww(n); 42 C.F.R. § 495.2. DHHS structured the Meaningful Use Program in stages. 75 Fed. Reg. 44,321–

22; 42 C.F.R. §§ 495.20–495.24. At each progressive stage, DHHS increased the criteria required to receive greater incentive payments. 75 Fed. Reg. 44,321–22; 42 C.F.R. §§ 495.20–495.24. For example, to receive incentive payments at Stage 2, an eligible provider must, among other things, show that a certain percentage of patients' health records are available to the patients in an electronic format. At Stage 3, an eligible provider must show that a certain percentage of patients have also actually accessed their records electronically. According to UPMC [defendant healthcare provider], "[o]nline patient portals have been the most effective and efficient way to meet many of the objectives in the federal Meaningful Use Program." (ECF No. 1, at ¶ 30). And, meeting the program's criteria relative to patient participation and usership requires raising awareness of a provider's website and patient portal, as well as ensuring that the website and portal are "engaging and user-friendly."

***4** UPMC, 2020 WL 4381675, at *5 (cleaned up). The *UPMC* court then concludes that "the fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide EHR network shows the relationship between UPMC and DHHS is less like the regulator-regulated relationship in *Watson* and more like the government contractor relation in *Papp*." *Id.* at 6. Because "plaintiffs' allegations are directed at this relationship, UPMC is therefore 'acting under' a federal superior for purposes of the federal officer removal statute." *Id.*

I decline to follow the *UPMC* court's[4] analysis as I am not persuaded that BJC's receipt of statutory incentive payments means that it is "acting under" a federal officer for purposes of the federal officer removal statute. BJC is not assisting or helping a federal officer carry out her duties or tasks by creating a website and patient portal to allow patients online access to medical information (and allegedly transmitting their private data to third parties without their knowledge or consent). Despite the federal government's expressed desire to encourage "the implementation of interoperable health information technology infrastructure,"[5] the statute neither authorizes nor obligates the federal government to create such an infrastructure itself. "[W]hile the federal government may have an interest in ensuring [an interoperable health information technology infrastructure], it is typically not the duty or task of the federal government to [provide patients online access to medical information]." *Buljic*, 22 F.4th at 740 (cleaned up) (rejecting meat processors claim that it was "acting under" the direction of the federal government while operating its facility during the pandemic). Therefore, it cannot be said that BJC's creation of a website and online patient portal fulfills a "basic government task" that the federal government itself would otherwise be required to carry out. This key fact distinguishes this case from *Jacks*, in which the defendant was contracted by the federal government to provide health insurance to federal workers, a task that was imposed upon the government by statute. *See* *Jacks*, 701 F.3d at 1233.

4 I likewise reject the reasoning of *ProMedica*, which adopts, without additional analysis, the reasoning of the *UPMC* court.

5 Neither plaintiffs nor the Court dispute the importance of such a goal, "but the fact that an industry is considered critical does not necessarily mean that every entity within it fulfills a basic governmental task or that workers within that industry are acting under the direction of federal officers." *Buljic*, 22 F.4th at 740.

Nor does the receipt of incentive payments by BJC make its relationship with DHHS "less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp*." UPMC, 2020 WL 4381675, at *5. Neither the *UPMC* court nor BJC have explained how voluntary participation in a government program somehow brings BJC closer to "acting under" a federal officer than other private entities subject to mandatory regulation by the government, and I can discern no meaningful distinction between the two in this instance. As noted by plaintiffs, the Promoting Interoperability program does not require its voluntary participants to create online patient access to medical information to receive incentive payments, as many of the program's incentive payments are directed at areas that do not even relate to electronic health records. Nor was BJC required by the federal government to set up its website or online patient portal in the manner alleged so as to transmit patients' private data to third parties without their knowledge or consent. There is no indication that the government supervised or controlled the manner in which BJC built its website or patient portal. While the government may have encouraged healthcare providers such as BJC to participate in the Promoting Interoperability program by offering incentive payments, there is no evidence that it directed BJC to do so or that it required the creation of an online patient portal (especially one designed as alleged) as part of its participation in the program. Under these facts, BJC has failed to demonstrate the type of "subjection, guidance, or control" necessary to establish federal officer removal jurisdiction in this case.

***5** BJC must satisfy each element of the federal removal statute, and its failure to demonstrate that the first element has been met is sufficient to remand this action to state court without discussion of the remaining elements. *Buljic*, 22 F.4th at 742 (concluding that because defendant was not "acting under" a federal officer, case not eligible for removal under the federal officer removal statute and the court "need not reach the remaining elements of the statute."). Therefore, I need not – and therefore do not – address the remaining arguments of the parties except to clarify that as to satisfy the second element, the removing party must show "a causal connection between the charged conduct and asserted official authority." *Graves*, 17 F.4th at 769. This "causal connection" requirement remains the test in the Eighth Circuit.[6] *Id.*; *Buljic*, 22 F.4th at 738. Although BJC contends that it meets the second element because plaintiffs' allegations are directed, related to, or connected with its decision to create a patient portal, this argument is insufficient to meet the causal connection test because BJC was not "acting under" the direction of a federal officer and was

never instructed by a federal officer to set up its online access to patient health information in the manner alleged by plaintiffs. BJC cannot meet the second element of the federal officer removal statute, either.

6 BJC calls plaintiffs' failure to address the *UPMC* and *ProMedica* decisions in their motion to remand a "glaring omission," (ECF 12 at 5), but the only "glaring omission" the Court finds in the briefing is BJC's. BJC failed to acknowledge that it advanced an interpretation of the second element of the test that is not the law of the Eighth Circuit. Instead, BJC cited cases from the Seventh and Fifth Circuit Courts of Appeal, which have held that the statute as amended in 2011 broadened federal officer removal to actions "not just causally connected, but alternatively connected or associated, with acts under color of federal office." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 291-91 (5th Cir. 2020) (en banc); *see also* *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 944-45 (7th Cir. 2020).

## Conclusion

This Court lacks subject matter jurisdiction under the federal officer removal statute. As BJC advances no other ground for removal, plaintiffs' motion to remand this action to state court will be granted.

Accordingly,

**IT IS HEREBY ORDERED THAT** the motion to remand [9] is granted, and this case is remanded to the Twenty-Second Judicial Circuit Court of the City of St. Louis, Missouri.

Dated this 10th day of January, 2023.

**All Citations**

Slip Copy, 2023 WL 369427

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-10080-RGS Document 12 Filed 01/25/23 Page 1 of 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Jane Doe
*individually and on behalf of all others similarly situated*

Plaintiff

v.

Civil Action No. 1:23-10080-RGS

Cape Cod Healthcare, Inc.

Defendant

FILED
JUL 21 2023
ATTEST: [signature] CLERK

ORDER OF REMAND

January 25, 2023

STEARNS, D.J.

In accordance with the court's Electronic Order [Dkt. # 10] entered on January 25, 2023, it is ORDERED that the above-entitled action be, and hereby is, REMANDED to the Barnstable Superior Court.

By the court,

/s/ Arnold Pacho
Deputy Clerk

CLOSED

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:23-cv-10080-RGS

Doe v. Cape Cod Healthcare, Inc.,
Assigned to: Judge Richard G. Stearns
Case in other court: Massachusetts Superior Court, 2272CV00493
Cause: 28:1442 Notice of Removal

Date Filed: 01/12/2023
Date Terminated: 01/25/2023
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Jane Doe**
*individually and on behalf of all others similarly situated*

represented by **Jonathan Tucker Merrigan**
Sweeney Merrigan Law
268 Summer Street, LL
Boston, MA 02210
617-391-9001
Email: tucker@sweeneymerrigan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria M. Mair**
Sweeney Merrigan Law, LLP
268 Summer Street, LL
Boston, MA 02210
617-523-8300
Email: victoria@sweeneymerrigan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Cape Cod Healthcare, Inc.,**

represented by **Justin J. Wolosz**
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
617-248-5000
Fax: 617-248-4000
Email: jwolosz@choate.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam J. Bookbinder**
Choate, Hall & Stewart LLP
Two International Place
100-150 Oliver Street
Boston, MA 02110

617-248-5000
Email: abookbinder@choate.com
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2023 | 1 | NOTICE OF REMOVAL by Cape Cod Healthcare, Inc., ( Filing fee: $ 402, receipt number AMADC-9666771 Fee Status: Filing Fee paid) (Attachments: # 1 Exhibit 1 - State Court Complaint, # 2 Exhibit 2 - State Court Docket, # 3 Exhibit 3 - State Court Civil Action Cover Sheet, # 4 Exhibit 4 - Plaintiff's Motion for Impoundment, # 5 Exhibit 5 - Affidavit In Support of Motion for Impoundment, # 6 Exhibit 6 - Order re Motion for Impoundment, # 7 Exhibit 7 - Motion for Appointment of Special Process Server, # 8 Exhibit 8 - Order re Motion for Special Process Server, # 9 Exhibit 9 - Summons - Proof of Service, # 10 Civil Cover Sheet Civil Action Cover Sheet, # 11 Category Form Category Form)(Wolosz, Justin) (Entered: 01/12/2023) |
| 01/12/2023 | 2 | CORPORATE DISCLOSURE STATEMENT by Cape Cod Healthcare, Inc.,. (Wolosz, Justin) (Entered: 01/12/2023) |
| 01/12/2023 | 3 | NOTICE of Appearance by Justin J. Wolosz on behalf of Cape Cod Healthcare, Inc., (Wolosz, Justin) (Entered: 01/12/2023) |
| 01/13/2023 | 4 | ELECTRONIC NOTICE of Case Assignment. Judge Allison D. Burroughs assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Judith G. Dein. (Finn, Mary) (Entered: 01/13/2023) |
| 01/13/2023 | 5 | NOTICE of Appearance by Adam J. Bookbinder on behalf of Cape Cod Healthcare, Inc., (Bookbinder, Adam) (Entered: 01/13/2023) |
| 01/16/2023 | 6 | Certified Copy of Notice of Removal Provided to Defense Counsel by Email (Warnock, Douglas) (Entered: 01/16/2023) |
| 01/17/2023 | 7 | Judge Allison D. Burroughs: ORDER entered. ORDER OF RECUSAL.(McManus, Caetlin) (Entered: 01/17/2023) |
| 01/17/2023 | 8 | ELECTRONIC NOTICE of Reassignment. Judge Richard G. Stearns added. Judge Allison D. Burroughs no longer assigned to case. (Finn, Mary) (Entered: 01/17/2023) |
| 01/18/2023 | 9 | Assented to MOTION for Extension of Time to Answer or Otherwise Respond to Complaint by Cape Cod Healthcare, Inc.,.(Wolosz, Justin) (Entered: 01/18/2023) |
| 01/25/2023 | 10 | Judge Richard G. Stearns: ELECTRONIC ORDER entered re 1 Notice of Removal filed by Cape Cod Healthcare, Inc.<br>Plaintiff Jane Doe filed this class action lawsuit against the Cape Cod Hospital in the Barnstable Superior Court alleging that it violated various Massachusetts statutes by its disclosure, without her consent, of her identity, physicians, treatments, etc., to Facebook and other third-parties "through the deployment of various digital and marketing rerouting tools embedded on its websites." Compl. para. 4. Cape Cod Hospital removed the case here pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a). Dkt # 1 para. 9 asserting "all of the Complaint's challenged conduct 'relat[es] to' [the hospital's] efforts under federal programs like the Meaningful Use Program and Merit-Based Incentive Payment System (MIPS) to enhance patient engagement and expand access to EHR [Electronic Health Records]." Id. para. 12. |

Case 4:22-cv-12202-ADB Document 27-2 Filed 02/08/23 Page 4 of 5

| | | |
|---|---|---|
| | | The removal in this case was improvidently taken. The federal officer removal statute (in its most recent 2011 iteration) applies only to private parties acting under the direction of or in relation to an assertion of authority by an officer of the United States or any of its agencies, who is able to assert a colorable (that is, not wholly frivolous) federal defense to the conduct charged. The "charged conduct" must "relate to an act under color of federal office." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35 (1st Cir. 2022). While given a broad reading, it does not apply to the voluntary and unilateral adoption of a practice that may be consistent in some respects with a nonbinding federal policy. *See Watson v. Phillip Morris Companies, Inc.*, 551 U.S. 142 (2007) ("Such aid does not include simply complying with the law.") (emphasis in original). Cape Cod Hospital theorizes that the mere existence of two federal programs -- the Meaningful Use Program and Merit-Based Incentive Payment System, which incentivizes hospitals to implement electronic health records, creates federal officer jurisdiction here. If one takes the defendant's reasoning to its logical conclusion, the federal officer removal statute would sweep into the federal courts any case involving an instance in which a third-party voluntarily incorporated in its business model a practice consistent with a policy promoted by the federal government as socially desirable, which given the size of the federal government and the hundreds of agencies and officials issuing pronouncements on its behalf, would apply to nearly the entire gamut of human behavior. This is inconsistent with the constitutional role of the federal court as a court of limited jurisdiction. Defendants argument, in other words, would reconjure a minnow of a statute intended to protect parties who act at the affirmative direction of federal officers from enmeshment in state-court ligation, into a federal jurisdictional whale.<br><br>Nor does Cape Cod Hospital satisfy the third requirement for removal -- the colorable defense exception. While, as Judge Lynch points out in Elec. Boat Corp., the exception is liberally construed, the most that Cape Cod Hospital suggests is possible compliance with the Health Insurance Portability and Accountability Act (HIPAA) requirements "preempts the Massachusetts laws upon which plaintiff relies, in whole or in part." Dkt #1 para. 28. The touchstone of preemption of a state common-law or statutory claim is a clear indication of Congressional intent. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 16 (1st Cir. 1994). This is especially true when federal law or policy is said to entrench on matters historically committed to the police powers of the state. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Here, Congress has given no whiff of a suggestion that the "Meaningful Use Program" was created to displace the Massachusetts Wiretapping Statute, the Massachusetts Privacy Act, or state common-law claims of fiduciary duty, breach of contract, and unjust enrichment. Whether these causes of action are viable is, of course, a matter not for this court but for the Massachusetts state court to address on remand.<br><br>The clerk will return this case to the Barnstable Superior Court.<br><br>(Zierk, Marsha) (Entered: 01/25/2023) |
| 01/25/2023 | 11 | Judge Richard G. Stearns: ORDER entered. ORDER OF REMAND to the Barnstable Superior Court. (Pacho, Arnold) (Entered: 01/25/2023) |
| 01/25/2023 | 12 | Certified copy of 10 Order, 11 Order of Remand to the State Court, and case file mailed to the Barnstable Superior Court on 1/25/2023. (Pacho, Arnold) (Entered: 01/25/2023) |

**PACER Service Center**

**Transaction Receipt**

| 01/25/2023 12:52:13 | | | |
|---|---|---|---|
| **PACER Login:** | paul.turkevich | **Client Code:** | CLH015 |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-10080-RGS |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KRYSTAL QUINTO, *individually and on behalf of all other persons similarly situated*,

Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,

Defendant.

Case No. 3:22-cv-04429-JD

**ORDER RE REMAND**

Plaintiff Krystal Quinto sued defendant The Regents of the University of California ("UC") on behalf of herself and a putative class of California residents, alleging that her "personally identifiable information and protected health information" was unlawfully disclosed in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56 *et seq.*, and her privacy rights under the California Constitution. Dkt. No. 1, Ex. A (Complaint) ¶¶ 11, 69-97. The complaint was originally filed in Alameda County Superior Court. UC timely removed the action to this Court under the federal officer removal statute. Dkt. No. 1 (Notice of Removal [NOR]).

Quinto says that UC was not acting under the direction of a federal officer in connection with the challenged actions, and asks that this case be remanded to state court. Dkt. No. 12. UC argues in favor of remaining here. Dkt. No. 18. The case was removed improvidently and without jurisdiction, and is remanded to the Superior Court. 28 U.S.C. § 1447(c).

**BACKGROUND**

UC owns and operates UCLA Health, through which it "offers a full range of medical services, including primary and outpatient care, and treats thousands of patients each year." Complaint ¶ 6. Quinto is a patient of UCLA Health and uses its website, www.uclahealth.org, "to book medical appointments and access the UCLA patient portal." *Id.* ¶ 8. She alleges that when

she clicks on links and conducts searches on the website, the internet communications that facilitate those actions are secretly disclosed to Facebook, "alongside additional information that transcribes the communication's content" -- that is, Quinto's private medical information -- "and the individual's identity." *Id.* ¶ 29. Quinto says that these disclosures occur because the website embeds a piece of code called the "Facebook Tracking Pixel." *Id.* ¶ 28.

For its part, UC says that the Facebook Tracking Pixel is a component of its "website analytics practices," used to "drive patients to the UCLA Health website." NOR ¶ 34. UC says that the federal government, through the so-called "Meaningful Use" program, has "incentivized and directed providers who participate in the Medicare and Medicaid program (like UCLA Health) to offer patients online access to their [health] records, and to optimize patient engagement with their medical information." *Id.* ¶¶ 12, 17 (citing 42 C.F.R. §§ 495.2-495.370). As part of this program, the federal government gave incentive payments to healthcare providers who promoted patient engagement through the "meaningful use of certified [electronic health record] technology." 42 U.S.C. §§ 1395w-4(o), 1395ww(n); *see also* 42 C.F.R. §§ 495.20-495.24; NOR ¶ 18. The federal government provided guidance about how private providers could optimize their health portals, and offered a model for providers to follow that uses third-party marketers like Facebook to increase engagement. *See* NOR ¶ 20.[1]

**DISCUSSION**

Section 1442 provides that a person "acting under" the direction of a federal officer may remove to federal court a civil or criminal action commenced against that person in state court. 28 U.S.C. § 1442(a)(1). Congress adopted this provision before the Civil War to ensure that attempts by southern states to challenge federal authority would be heard in federal court. *See Jalili-Farshchi v. Aldersly*, No. 3:21-cv-04727-JD, 2021 WL 6133168, at *3 (N.D. Cal. Dec. 29, 2021). As the plain language of Section 1442(a) indicates, it is intended to protect federal officers from interference with their official duties through state-court litigation. *See Arizona v. Manypenny*, 451 U.S. 232, 241-42 (1981). The statute "responds to three general concerns: (1) 'State-court

[1] UC's request for judicial notice of relevant guidance from the federal government, Dkt. No. 19, is granted.



United States District Court
Northern District of California

proceedings may reflect "local prejudice" against unpopular federal laws or federal officials'; (2) 'States hostile to the Federal Government may impede' federal law; and (3) 'States may deprive federal officials of a federal forum in which to assert federal immunity defenses.'" *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018) (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007)). Section 1442 is liberally construed to address these issues, but is not limitless in scope. *See id.* (citing *Watson*, 551 U.S. at 147); *see also Geisse v. Bayer HealthCare Pharms. Inc.*, No. 17-cv-07026-JD, 2019 WL 1239854, at *4 (N.D. Cal. Mar. 18, 2019).

To remove under the section, UC must show "that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) (citation omitted); *see also Jalili-Farshchi*, 2021 WL 6133168, at *4.

The Ninth Circuit has identified several factors that are relevant to assessing whether a private person is acting pursuant to a federal officer's directions. These include whether the person: (1) "is acting on behalf of the officer in a manner akin to an agency relationship," (2) "is subject to the officer's close direction," (3) "is assisting the federal officer in fulfilling basic governmental tasks that the Government itself would have had to perform if it had not contracted with a private firm," and (4) is engaged in "activity [that] is so closely related to the government's implementation of its federal duties that the private person faces a significant risk of state-court prejudice, just as a government employee would in similar circumstances." *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 756-57 (9th Cir. 2022) (internal quotations and citations omitted). While federal regulations subject private persons to some degree of control, "'simply *complying*' with a law or regulation is not enough to 'bring a private person within the scope of the statute.'" *Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 684 (9th Cir. 2022) (emphasis in original) (quoting *Watson*, 551 U.S. at 152); *see also Jalili-Farshchi*, 2021 WL 6133168, at *4.

Quinto does not dispute that UC is a person within the meaning of the statute or that UC has a colorable federal defense to her claims. *See* Dkt. Nos. 12, 20. The salient question is whether UC acted at the direction of a federal officer or agency.

United States District Court
Northern District of California

Case 3:22-cv-02022-DB Document 21-3 Filed 03/29/23 Page 4 of 5

On the record before the Court, UC has not shown that it acted under a federal officer or agency. UC says that it uses the Facebook Tracking Pixel as part of its broader effort to assist the federal government in achieving its "mission of a nationwide digitized healthcare system." Dkt. No. 18 at 11. That is not enough for removal on federal officer grounds. Contrary to UC's suggestion, *see id.* at 12, receiving incentive payments for acting in a way that promotes a broad federal interest -- in an area outside the traditional responsibility of the federal government -- is not the same as being contracted to carry out, or assist with, a basic governmental duty.

To illustrate why this is so, consider two recent Ninth Circuit cases. In one, a nursing home that complied with federal directives regarding the administration of infectious-disease testing could be said to help the government in its mission to curb a global pandemic. *See Saldana*, 27 F.4th at 684-85. In another, an oil company that extracted offshore oil resources pursuant to a lease executed with the government could be said to promote the federal government's interests in national security. *See City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1108 (9th Cir. 2022). In each case, the private entity's conduct was clearly related to a federal policy or program, but not a specific obligation or responsibility that would traditionally fall to the federal government, or that the government had otherwise assumed by statute. For this reason, the Ninth Circuit determined in each case that federal officer removal was improper, as the entity was not acting on the government's behalf or fulfilling a basic governmental duty. *See Saldana*, 27 F.4th at 685 ("Without more than government regulations and recommendations, [the nursing home] has failed to establish that it was 'acting under' a federal official, and it has not identified a duty of the federal government that it performed."); *Honolulu*, 39 F.4th at 1108 ("Congress endorsed oil operations and considered making a national oil company, but that does not show that oil production was a basic governmental task."). The same outcome is warranted here.

UC says it was subject to the close direction of a federal officer or agency by virtue of the "specific framework and guidelines" that the Meaningful Use program sets out for healthcare providers to follow. Dkt. No. 18 at 12; *see also* NOR ¶¶ 25-32. But merely being subject to a regulatory scheme is not the same as acting under a federal agency's close direction. *See Riggs v.*

United States District Court
Northern District of California

*Airbus Helicopters, Inc.*, 939 F.3d 981, 985 (9th Cir. 2019) ("'[A]cting under' requirement is not satisfied by mere compliance with a regulation 'even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.'") (quoting *Watson*, 551 U.S. at 153); *see also Westbrook v. San Pablo Healthcare & Wellness Ctr.*, No. 21-cv-06474-JD, 2022 WL 2072933, at *2 (N.D. Cal. June 9, 2022).

UC is not similarly situated to the defendant in *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014), where the Ninth Circuit "sustained the removal by a military contractor of a state court lawsuit alleging a failure to warn about asbestos hazards in naval equipment." *Jalili-Farshchi*, 2021 WL 6133168, at *4. The defendant in *Leite* "provided declarations by senior officers in the United States Navy stating that the Navy exercised complete control over the form and content of all warnings made by contractors, and that contractors could not include warnings unless specifically required and approved by the Navy." *Id.* (citing *Leite*, 749 F.3d at 1123). UC points to nothing resembling this level of direction and control.

UC's heavy reliance on two out-of-circuit district courts is misplaced. *See* Dkt. No. 18 at 1 (citing *Doe I v. UPMC*, No. 2:20-cv-00359, 2020 WL 4381675 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20-cv-01581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020)). These cases entailed an overly broad interpretation of what it means to assist a federal superior with its tasks or duties, which "would permit removal to federal court in circumstances far beyond anything Congress intended." *Jalili-Farshchi*, 2021 WL 6133168, at *4. Consequently, the cases provide no basis for finding jurisdiction here.

**IT IS SO ORDERED.**

Dated: February 1, 2023

JAMES DONATO
United States District Judge

United States District Court
Northern District of California

18 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

2384CV02448-BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>(Leave to file granted 2/9/23) |

SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED
OCT 26 2023
JOHN E. POWERS III
ACTING CLERK MAGISTRATE

**NOTICE OF SUPPLEMENTAL AUTHORITY**

On January 6, 2023, John Doe filed a motion to remand and a memorandum in support of the same. ECF Nos. 9–10. Since then, there have been three decisions that are directly on point to the arguments made in John Doe's motion, including one in the District of Massachusetts.

On January 10, 2023, the Eastern District of Missouri ordered remand despite the defendant health system arguing for federal officer jurisdiction because it "set up electronic access to medical information for its patients through its voluntary participation in a federal program." *Doe v. BJC Health System*, No. 4:22-cv-00919-RWS, 2023 WL 369427, at *1 (E.D. Mo. Jan. 10, 2023).

On January 25, 2023, the District of Massachusetts sua sponte ordered remand of a lawsuit where the healthcare defendant similarly alleged entitlement to federal officer jurisdiction, in a case closely analogous to this one. *Doe v. Cape Cod Healthcare, Inc.*, No. 23-CV-10080, Elec. Order (D. Mass. Jan. 25, 2023) ("The removal in this case was improvidently taken.").

On February 1, 2023, the Northern District of California likewise entered an order remanding a healthcare privacy lawsuit and rejecting federal officer jurisdiction. *Quinto v. Regents Univ. Cal.*, No. 3:22-cv-04429-JD, 2023 WL 148050, at *4 (N.D. Cal. Feb. 1, 2023).

For convenience, all three orders are attached. Exs. 1–3.

Dated: February 9, 2023

Respectfully submitted,

/s/ J. Tucker Merrigan
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**Sweeney Merrigan Law**
268 Summer St. LL Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**Ahmad, Zavitsanos & Mensing, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for Plaintiff and Class Members***

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Case 4:22-cv-12022-ADB Document 29 Filed 02/09/23 Page 3 of 3

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 9, 2023, a copy of this Motion was filed electronically and served on all counsel of record via ECF:

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

2023 WL 369427
Only the Westlaw citation
is currently available.
United States District Court,
E.D. Missouri, Eastern Division.

JOHN DOE, I, et al., Plaintiffs,
v.
BJC HEALTH SYSTEM, Defendant.

Case No. 4:22 CV 919 RWS
|
Filed: 01/10/2023

**MEMORANDUM AND ORDER OF REMAND**

RODNEY W. SIPPEL UNITED STATES DISTRICT JUDGE

*1 On July 25, 2022, plaintiffs filed this putative class action in state court alleging that BJC Health System ("BJC") violated its patients' privacy by causing the transmission of their personal and medical information to Facebook, Google, and other third-party marketing companies without their knowledge or consent. Plaintiffs allege that these disclosures occur through computer source code used by BJC on its websites and patient portals, which patients use to access their private medical information. Plaintiffs bring Missouri state law claims for breach of fiduciary duty and intrusion upon seclusion, as well as violations of the Missouri Merchandising Practices Act and the Missouri felony computer crimes and identity theft statutes.

BJC timely removed the action to this Court, claiming federal subject matter jurisdiction exists under the federal officer removal statute, 28 U.S.C. § 1442(a). According to BJC, it was acting under the direction of the federal government when it set up electronic access to medical information for its patients through its voluntary participation in a federal program.[1] In support of removal, BJC cited two unpublished district court opinions from Pennsylvania and Ohio[2] which found that healthcare providers' participation in the program met the requirements for removal under the federal officer removal statute. However, these non-binding decisions apply a different test for federal officer removal that what the Eighth Circuit Court of Appeals applies.

1 The program at issue is the Promoting Interoperability program, formerly referred to as the "Meaningful Use Program," and is a voluntary federal program that offers incentive payments to healthcare providers who meet certain program requirements.

2 The cases are *Doe I v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), and *Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, *3 (N.D. Ohio Oct. 30, 2020).

This Court is bound to apply the law of the Eighth Circuit. Under the binding authority of this circuit, the requirements of the federal officer removal statute are not met in this case. Remand is therefore required.

**Discussion**

A defendant may remove a civil action to federal court only if the action could have been filed originally in federal court. *See* 28 U.S.C. § 1441(a); *Gore v. Trans World Airlines*, 210 F.3d 944, 948 (8th Cir. 2000). Where a complaint pleads only state law claims, a federal court normally does not have jurisdiction based on a federal defense. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004). However, the federal officer removal statute provides an exception to that rule. 28 U.S.C. § 1442(a)(1).

The federal officer removal statute "grants independent jurisdictional grounds over cases involving federal officers where a district court otherwise would not have jurisdiction." *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012) (cleaned up).[3] The statute authorizes removal of any civil action commenced in state court that is brought against an "officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1) (emphasis added). "The federal officer removal statute is to be liberally construed, and thus the typical presumption against removal does not apply." *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021) (cleaned up).

3 One holding of *Jacks* was subsequently abrogated on grounds not relevant to this case by *BP P.L.C. v. Mayor and City Council of Baltimore*, 141 S. Ct. 1532, 1538 (2021).

***2** "When the removing party is not itself a federal officer or agency, it may remove a case only if it shows that it was 'acting under' a federal officer or agency in carrying out the acts that underlie the plaintiff's complaint." *Buljic*, 22 F.4th at 738 (citing *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007)). This requires BJC to establish that "(1) it acted under the direction of a federal officer, (2) there is a causal connection between [BJC's] actions and the official authority, (3) [BJC] has a colorable federal defense to the plaintiffs' claims, and (4) [BJC] is a 'person,' within the meaning of the statute." *Id.* (citing *Jacks*, 701 F.3d at 1230).

BJC contends that it meets the first two requirements because it was "assisting the federal government in carrying out" the federal mission of making electronic health records available to patients through its participation in the Promoting Interoperability program, which is a voluntary federal program that offers incentive payments to healthcare providers who meet certain program requirements. BJC does not argue that it is required by federal law to participate in this program, and the federal government has not contracted with BJC to create the websites or patient portals at issue in this case. The issue here, then, is whether BJC was "acting under" a federal officer or agency by virtue of its voluntary participation in a federal program. Although other district courts outside this circuit may disagree, I conclude the answer is no.

Although "not limitless, the words 'acting under' are broad." Jacks, 701 F.3d at 1230 (cleaned up). "To satisfy the 'acted under' requirement of § 1442(a)(1), a private person's actions must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Graves v. 3M Company*, 17 F.4th 764, 769 (8th Cir. 2021) (cleaned up). "The Supreme Court held in *Watson* that a private party may not remove under § 1442(a)(1) simply because 'a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail.' " *Id.* (quoting *Watson*, 551 U.S. at 145). Instead, "[t]he assistance that private contractors provide federal officers [must go] beyond simple compliance with the law and help[ ] officers fulfill other basic governmental tasks." *Watson*, 551 U.S. at 153. The private entity's "actions 'must involve an effort to assist, or to help carry out, the duties or tasks of the federal superior,' " *Jacks*, 701 F.3d at 1230 (quoting *Watson*, 551 U.S. at 152), and this relationship "typically involves subjection, guidance, or control." *Watson*, 551 U.S. at 151 (quotation omitted).

"The fact that an entity [ ] is subject to pervasive federal regulation alone is not sufficient to confer federal jurisdiction. This is so because '[a] private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' " *Buljic*, 22 F.4th at 739 (quoting *Watson*, 551 U.S. at 153). "It is not enough that a private person or entity merely operate in an area directed, supervised and monitored by a federal regulatory agency or other such federal entity." *Jacks*, 701 F.3d at 1230; *see also* *Graves*, 17 F.4th at 769; *Jacks*, 701 F.3d at 1231 ("Taxpayers who fill out complex federal tax forms, or airline passengers who obey federal regulations prohibiting smoking certainly 'help' or 'assist' the federal law enforcement authorities in some sense of those words, but these individuals do not 'act under' an agency or officer of the federal government for purposes of removal under the statute.") (internal citation omitted).

***3** In *Buljic*, the Eighth Circuit summarized cases where this element was satisfied as follows:

> For this element, "[t]he paradigm is a private person acting under the direction of a federal law enforcement officer." *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018) (citing *Watson*, 551 U.S. at 149, 127 S. Ct. 2301); *see, e.g.*, *Maryland v. Soper*, 270 U.S. 9, 30, 46 S. Ct. 185, 70 L. Ed. 449 (1926) (explaining that a private party acting as federal officers' driver in a distillery raid had "the same right to the benefit of" the removal provision as did the federal agents). Courts have also found this element satisfied where a private contractor provided the government with a product that it needed or performed a job that the government would otherwise have to perform. In *Jacks*, for example, we explained that a health insurance provider that provided insurance to federal employees was acting under the direction of a federal officer because the federal government had enlisted it to "help the government fulfill the basic task of establishing a health benefits

program for federal employees"—a task that was imposed on the government by statute. 701 F.3d at 1233; *see also In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 469 (3d Cir. 2015) (explaining that a nonprofit community defender acts under a federal officer by representing indigent federal defendants in part because it is delegated authority from the federal government and provides a service that the federal government would otherwise have to provide itself); *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 136–37 (2d Cir. 2008) (finding "acting under" element satisfied where defendant chemical companies contracted with the federal government to provide a product—Agent Orange—that the government otherwise "would have had to produce itself").

22 F.4th at 739.

The first case relied upon by defendant, *Doe, et al. v. UPMC*, 2020 WL 4381675, *7 (W.D. Pa. Jul. 31, 2020), describes the purpose and operation of the Promoting Interoperability program as follows (a description with which neither this Court nor the plaintiffs take issue):

> The federal government, as one of the largest purchasers of healthcare services, has emphasized the important role that health [information technology] plays in improving both the quality and efficiency of healthcare in the United States. To that end, President Bush first established the National Health Information Technology Coordinator by executive order in 2004. Exec. Order No. 13,335, 69 Fed. Reg. 24,059 (Apr. 27, 2004). The National Coordinator, an advisor to the Secretary of DHHS, was "to provide leadership for the development and nationwide implementation of an interoperable health information technology infrastructure to improve the quality and efficiency of health care." *Id.* The National Coordinator's responsibilities included coordinating efforts of the public and private healthcare sectors and collaborating with public and private interests. *Id.* Then, in 2009, Congress enacted the Health Information Technology for Economic and Clinical Health Act (HITECH Act), which created the Office of the National Coordinator for Health Information Technology (ONC) within DHHS. 42 U.S.C. § 300jj-11. The HITECH Act gave the ONC much the same responsibilities and objectives as the 2004 executive order gave the National Coordinator, including coordinating and collaborating with the private healthcare sector. *Id.* The Act also appropriated funds for DHHS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States." 42 U.S.C. § 300jj–31. In that vein, the Act created the Meaningful Use Program. 42 U.S.C. §§ 1395w-4(o), 1395ww(n); 42 C.F.R. § 495.2. Under this program, eligible healthcare providers receive incentive payments from DHHS if they demonstrate "meaningful use" of certified EHR technology. 42 U.S.C. §§ 1395w-4(o), 1395ww(n); 42 C.F.R. § 495.2. DHHS structured the Meaningful Use Program in stages. 75 Fed. Reg. 44,321–

22; 42 C.F.R. §§ 495.20–495.24. At each progressive stage, DHHS increased the criteria required to receive greater incentive payments. 75 Fed. Reg. 44,321–22; 42 C.F.R. §§ 495.20–495.24. For example, to receive incentive payments at Stage 2, an eligible provider must, among other things, show that a certain percentage of patients' health records are available to the patients in an electronic format. At Stage 3, an eligible provider must show that a certain percentage of patients have also actually accessed their records electronically. According to UPMC [defendant healthcare provider], "[o]nline patient portals have been the most effective and efficient way to meet many of the objectives in the federal Meaningful Use Program." (ECF No. 1, at ¶ 30). And, meeting the program's criteria relative to patient participation and usership requires raising awareness of a provider's website and patient portal, as well as ensuring that the website and portal are "engaging and user-friendly."

***4** *UPMC*, 2020 WL 4381675, at *5 (cleaned up). The *UPMC* court then concludes that "the fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide EHR network shows the relationship between UPMC and DHHS is less like the regulator-regulated relationship in *Watson* and more like the government contractor relation in *Papp*." *Id.* at 6. Because "plaintiffs' allegations are directed at this relationship, UPMC is therefore 'acting under' a federal superior for purposes of the federal officer removal statute." *Id.*

I decline to follow the *UPMC* court's[4] analysis as I am not persuaded that BJC's receipt of statutory incentive payments means that it is "acting under" a federal officer for purposes of the federal officer removal statute. BJC is not assisting or helping a federal officer carry out her duties or tasks by creating a website and patient portal to allow patients online access to medical information (and allegedly transmitting their private data to third parties without their knowledge or consent). Despite the federal government's expressed desire to encourage "the implementation of interoperable health information technology infrastructure,"[5] the statute neither authorizes nor obligates the federal government to create such an infrastructure itself. "[W]hile the federal government may have an interest in ensuring [an interoperable health information technology infrastructure], it is typically not the duty or task of the federal government to [provide patients online access to medical information]." *Buljic*, 22 F.4th at 740 (cleaned up) (rejecting meat processors claim that it was "acting under" the direction of the federal government while operating its facility during the pandemic). Therefore, it cannot be said that BJC's creation of a website and online patient portal fulfills a "basic government task" that the federal government itself would otherwise be required to carry out. This key fact distinguishes this case from *Jacks*, in which the defendant was contracted by the federal government to provide health insurance to federal workers, a task that was imposed upon the government by statute. *See* *Jacks*, 701 F.3d at 1233.

4 I likewise reject the reasoning of *ProMedica*, which adopts, without additional analysis, the reasoning of the *UPMC* court.

5 Neither plaintiffs nor the Court dispute the importance of such a goal, "but the fact that an industry is considered critical does not necessarily mean that every entity within it fulfills a basic governmental task or that workers within that industry are acting under the direction of federal officers." *Buljic*, 22 F.4th at 740.

Nor does the receipt of incentive payments by BJC make its relationship with DHHS "less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp*." *UPMC*, 2020 WL 4381675, at *5. Neither the *UPMC* court nor BJC have explained how voluntary participation in a government program somehow brings BJC closer to "acting under" a federal officer than other private entities subject to mandatory regulation by the government, and I can discern no meaningful distinction between the two in this instance. As noted by plaintiffs, the Promoting Interoperability program does not require its voluntary participants to create online patient access to medical information to receive incentive payments, as many of the program's incentive payments are directed at areas that do not even relate to electronic health records. Nor was BJC required by the federal government to set up its website or online patient portal in the manner alleged so as to transmit patients' private data to third parties without their knowledge or consent. There is no indication that the government supervised or controlled the manner in which BJC built its website or patient portal. While the government may have encouraged healthcare providers such as BJC to participate in the Promoting Interoperability program by offering incentive payments, there is no evidence that it directed BJC to do so or that it required the creation of an online patient portal (especially one designed as alleged) as part of its participation in the program. Under these facts, BJC has failed to demonstrate the type of "subjection, guidance, or control" necessary to establish federal officer removal jurisdiction in this case.

***5** BJC must satisfy each element of the federal removal statute, and its failure to demonstrate that the first element has been met is sufficient to remand this action to state court without discussion of the remaining elements. *Buljic*, 22 F.4th at 742 (concluding that because defendant was not "acting under" a federal officer, case not eligible for removal under the federal officer removal statute and the court "need not reach the remaining elements of the statute."). Therefore, I need not – and therefore do not – address the remaining arguments of the parties except to clarify that as to satisfy the second element, the removing party must show "a causal connection between the charged conduct and asserted official authority." *Graves*, 17 F.4th at 769. This "causal connection" requirement remains the test in the Eighth Circuit.[6] *Id.*; *Buljic*, 22 F.4th at 738. Although BJC contends that it meets the second element because plaintiffs' allegations are directed, related to, or connected with its decision to create a patient portal, this argument is insufficient to meet the causal connection test because BJC was not "acting under" the direction of a federal officer and was

never instructed by a federal officer to set up its online access to patient health information in the manner alleged by plaintiffs. BJC cannot meet the second element of the federal officer removal statute, either.

6 BJC calls plaintiffs' failure to address the *UPMC* and *ProMedica* decisions in their motion to remand a "glaring omission," (ECF 12 at 5), but the only "glaring omission" the Court finds in the briefing is BJC's. BJC failed to acknowledge that it advanced an interpretation of the second element of the test that is not the law of the Eighth Circuit. Instead, BJC cited cases from the Seventh and Fifth Circuit Courts of Appeal, which have held that the statute as amended in 2011 broadened federal officer removal to actions "not just causally connected, but alternatively connected or associated, with acts under color of federal office." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 291-91 (5th Cir. 2020) (en banc); *see also* *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 944-45 (7th Cir. 2020).

## Conclusion

This Court lacks subject matter jurisdiction under the federal officer removal statute. As BJC advances no other ground for removal, plaintiffs' motion to remand this action to state court will be granted.

Accordingly,

**IT IS HEREBY ORDERED THAT** the motion to remand [9] is granted, and this case is remanded to the Twenty-Second Judicial Circuit Court of the City of St. Louis, Missouri.

Dated this 10th day of January, 2023.

**All Citations**

Slip Copy, 2023 WL 369427

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Jane Doe
*individually and on behalf of*
*all others similarly situated*

Plaintiff

v.

Civil Action No. 1:23-10080-RGS

Cape Cod Healthcare, Inc.

Defendant

ORDER OF REMAND

January 25, 2023

STEARNS, D.J.

In accordance with the court's Electronic Order [Dkt. # 10] entered on January 25, 2023, it is ORDERED that the above-entitled action be, and hereby is, REMANDED to the Barnstable Superior Court.

By the court,

/s/ Arnold Pacho
Deputy Clerk

Case 4:22-cv-12022-ADB Document 29-2 Filed 02/09/23 Page 2 of 5



CLOSED

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:23-cv-10080-RGS

Doe v. Cape Cod Healthcare, Inc.,
Assigned to: Judge Richard G. Stearns
Case in other court: Massachusetts Superior Court, 2272CV00493
Cause: 28:1442 Notice of Removal

Date Filed: 01/12/2023
Date Terminated: 01/25/2023
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Jane Doe**
*individually and on behalf of all others similarly situated*

represented by **Jonathan Tucker Merrigan**
Sweeney Merrigan Law
268 Summer Street, LL
Boston, MA 02210
617-391-9001
Email: tucker@sweeneymerrigan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria M. Mair**
Sweeney Merrigan Law, LLP
268 Summer Street, LL
Boston, MA 02210
617-523-8300
Email: victoria@sweeneymerrigan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Cape Cod Healthcare, Inc.,**

represented by **Justin J. Wolosz**
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
617-248-5000
Fax: 617-248-4000
Email: jwolosz@choate.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam J. Bookbinder**
Choate, Hall & Stewart LLP
Two International Place
100-150 Oliver Street
Boston, MA 02110

Case 4:22-cv-12022-ADB Document 29-2 Filed 02/09/23 Page 3 of 6

617-248-5000
Email: abookbinder@choate.com
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2023 | 1 | NOTICE OF REMOVAL by Cape Cod Healthcare, Inc., ( Filing fee: $ 402, receipt number AMADC-9666771 Fee Status: Filing Fee paid) (Attachments: # 1 Exhibit 1 - State Court Complaint, # 2 Exhibit 2 - State Court Docket, # 3 Exhibit 3 - State Court Civil Action Cover Sheet, # 4 Exhibit 4 - Plaintiff's Motion for Impoundment, # 5 Exhibit 5 - Affidavit In Support of Motion for Impoundment, # 6 Exhibit 6 - Order re Motion for Impoundment, # 7 Exhibit 7 - Motion for Appointment of Special Process Server, # 8 Exhibit 8 - Order re Motion for Special Process Server, # 9 Exhibit 9 - Summons - Proof of Service, # 10 Civil Cover Sheet Civil Action Cover Sheet, # 11 Category Form Category Form)(Wolosz, Justin) (Entered: 01/12/2023) |
| 01/12/2023 | 2 | CORPORATE DISCLOSURE STATEMENT by Cape Cod Healthcare, Inc.,. (Wolosz, Justin) (Entered: 01/12/2023) |
| 01/12/2023 | 3 | NOTICE of Appearance by Justin J. Wolosz on behalf of Cape Cod Healthcare, Inc., (Wolosz, Justin) (Entered: 01/12/2023) |
| 01/13/2023 | 4 | ELECTRONIC NOTICE of Case Assignment. Judge Allison D. Burroughs assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Judith G. Dein. (Finn, Mary) (Entered: 01/13/2023) |
| 01/13/2023 | 5 | NOTICE of Appearance by Adam J. Bookbinder on behalf of Cape Cod Healthcare, Inc., (Bookbinder, Adam) (Entered: 01/13/2023) |
| 01/16/2023 | 6 | Certified Copy of Notice of Removal Provided to Defense Counsel by Email (Warnock, Douglas) (Entered: 01/16/2023) |
| 01/17/2023 | 7 | Judge Allison D. Burroughs: ORDER entered. ORDER OF RECUSAL.(McManus, Caetlin) (Entered: 01/17/2023) |
| 01/17/2023 | 8 | ELECTRONIC NOTICE of Reassignment. Judge Richard G. Stearns added. Judge Allison D. Burroughs no longer assigned to case. (Finn, Mary) (Entered: 01/17/2023) |
| 01/18/2023 | 9 | Assented to MOTION for Extension of Time to Answer or Otherwise Respond to Complaint by Cape Cod Healthcare, Inc.,.(Wolosz, Justin) (Entered: 01/18/2023) |
| 01/25/2023 | 10 | Judge Richard G. Stearns: ELECTRONIC ORDER entered re 1 Notice of Removal filed by Cape Cod Healthcare, Inc.<br>Plaintiff Jane Doe filed this class action lawsuit against the Cape Cod Hospital in the Barnstable Superior Court alleging that it violated various Massachusetts statutes by its disclosure, without her consent, of her identity, physicians, treatments, etc., to Facebook and other third-parties "through the deployment of various digital and marketing rerouting tools embedded on its websites." Compl. para. 4. Cape Cod Hospital removed the case here pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a). Dkt # 1 para. 9 asserting "all of the Complaint's challenged conduct 'relat[es] to' [the hospital's] efforts under federal programs like the Meaningful Use Program and Merit-Based Incentive Payment System (MIPS) to enhance patient engagement and expand access to EHR [Electronic Health Records]." Id. para. 12. |

| | | |
|---|---|---|
| | | The removal in this case was improvidently taken. The federal officer removal statute (in its most recent 2011 iteration) applies only to private parties acting under the direction of or in relation to an assertion of authority by an officer of the United States or any of its agencies, who is able to assert a colorable (that is, not wholly frivolous) federal defense to the conduct charged. The "charged conduct" must "relate to an act under color of federal office." *Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35 (1st Cir. 2022). While given a broad reading, it does not apply to the voluntary and unilateral adoption of a practice that may be consistent in some respects with a nonbinding federal policy. *See Watson v. Phillip Morris Companies, Inc.*, 551 U.S. 142 (2007) ("Such aid does not include simply complying with the law.") (emphasis in original). Cape Cod Hospital theorizes that the mere existence of two federal programs -- the Meaningful Use Program and Merit-Based Incentive Payment System, which incentivizes hospitals to implement electronic health records, creates federal officer jurisdiction here. If one takes the defendant's reasoning to its logical conclusion, the federal officer removal statute would sweep into the federal courts any case involving an instance in which a third-party voluntarily incorporated in its business model a practice consistent with a policy promoted by the federal government as socially desirable, which given the size of the federal government and the hundreds of agencies and officials issuing pronouncements on its behalf, would apply to nearly the entire gamut of human behavior. This is inconsistent with the constitutional role of the federal court as a court of limited jurisdiction. Defendants argument, in other words, would reconjure a minnow of a statute intended to protect parties who act at the affirmative direction of federal officers from enmeshment in state-court ligation, into a federal jurisdictional whale.<br><br>Nor does Cape Cod Hospital satisfy the third requirement for removal -- the colorable defense exception. While, as Judge Lynch points out in Elec. Boat Corp., the exception is liberally construed, the most that Cape Cod Hospital suggests is possible compliance with the Health Insurance Portability and Accountability Act (HIPAA) requirements "preempts the Massachusetts laws upon which plaintiff relies, in whole or in part." Dkt #1 para. 28. The touchstone of preemption of a state common-law or statutory claim is a clear indication of Congressional intent. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 16 (1st Cir. 1994). This is especially true when federal law or policy is said to entrench on matters historically committed to the police powers of the state. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). Here, Congress has given no whiff of a suggestion that the "Meaningful Use Program" was created to displace the Massachusetts Wiretapping Statute, the Massachusetts Privacy Act, or state common-law claims of fiduciary duty, breach of contract, and unjust enrichment. Whether these causes of action are viable is, of course, a matter not for this court but for the Massachusetts state court to address on remand.<br><br>The clerk will return this case to the Barnstable Superior Court.<br><br>(Zierk, Marsha) (Entered: 01/25/2023) |
| 01/25/2023 | 11 | Judge Richard G. Stearns: ORDER entered. ORDER OF REMAND to the Barnstable Superior Court. (Pacho, Arnold) (Entered: 01/25/2023) |
| 01/25/2023 | 12 | Certified copy of 10 Order, 11 Order of Remand to the State Court, and case file mailed to the Barnstable Superior Court on 1/25/2023. (Pacho, Arnold) (Entered: 01/25/2023) |

| PACER Service Center |
|---|
| **Transaction Receipt** |

Case 4:22-cv-12022-ADB Document 29-2 Filed 02/09/23 Page 5 of 5

| 01/25/2023 12:52:13 | | | |
|---|---|---|---|
| **PACER Login:** | paul.turkevich | **Client Code:** | CLH015 |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-10080-RGS |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KRYSTAL QUINTO, *individually and on behalf of all other persons similarly situated,*

Plaintiff,

v.

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,

Defendant.

Case No. 3:22-cv-04429-JD

**ORDER RE REMAND**

Plaintiff Krystal Quinto sued defendant The Regents of the University of California ("UC") on behalf of herself and a putative class of California residents, alleging that her "personally identifiable information and protected health information" was unlawfully disclosed in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56 *et seq.*, and her privacy rights under the California Constitution. Dkt. No. 1, Ex. A (Complaint) ¶¶ 11, 69-97. The complaint was originally filed in Alameda County Superior Court. UC timely removed the action to this Court under the federal officer removal statute. Dkt. No. 1 (Notice of Removal [NOR]).

Quinto says that UC was not acting under the direction of a federal officer in connection with the challenged actions, and asks that this case be remanded to state court. Dkt. No. 12. UC argues in favor of remaining here. Dkt. No. 18. The case was removed improvidently and without jurisdiction, and is remanded to the Superior Court. 28 U.S.C. § 1447(c).

**BACKGROUND**

UC owns and operates UCLA Health, through which it "offers a full range of medical services, including primary and outpatient care, and treats thousands of patients each year." Complaint ¶ 6. Quinto is a patient of UCLA Health and uses its website, www.uclahealth.org, "to book medical appointments and access the UCLA patient portal." *Id.* ¶ 8. She alleges that when

United States District Court
Northern District of California

she clicks on links and conducts searches on the website, the internet communications that facilitate those actions are secretly disclosed to Facebook, "alongside additional information that transcribes the communication's content" -- that is, Quinto's private medical information -- "and the individual's identity." *Id.* ¶ 29. Quinto says that these disclosures occur because the website embeds a piece of code called the "Facebook Tracking Pixel." *Id.* ¶ 28.

For its part, UC says that the Facebook Tracking Pixel is a component of its "website analytics practices," used to "drive patients to the UCLA Health website." NOR ¶ 34. UC says that the federal government, through the so-called "Meaningful Use" program, has "incentivized and directed providers who participate in the Medicare and Medicaid program (like UCLA Health) to offer patients online access to their [health] records, and to optimize patient engagement with their medical information." *Id.* ¶¶ 12, 17 (citing 42 C.F.R. §§ 495.2-495.370). As part of this program, the federal government gave incentive payments to healthcare providers who promoted patient engagement through the "meaningful use of certified [electronic health record] technology." 42 U.S.C. §§ 1395w-4(o), 1395ww(n); *see also* 42 C.F.R. §§ 495.20-495.24; NOR ¶ 18. The federal government provided guidance about how private providers could optimize their health portals, and offered a model for providers to follow that uses third-party marketers like Facebook to increase engagement. *See* NOR ¶ 20.[1]

United States District Court
Northern District of California

## DISCUSSION

Section 1442 provides that a person "acting under" the direction of a federal officer may remove to federal court a civil or criminal action commenced against that person in state court. 28 U.S.C. § 1442(a)(1). Congress adopted this provision before the Civil War to ensure that attempts by southern states to challenge federal authority would be heard in federal court. *See Jalili-Farshchi v. Aldersly*, No. 3:21-cv-04727-JD, 2021 WL 6133168, at *3 (N.D. Cal. Dec. 29, 2021). As the plain language of Section 1442(a) indicates, it is intended to protect federal officers from interference with their official duties through state-court litigation. *See Arizona v. Manypenny*, 451 U.S. 232, 241-42 (1981). The statute "responds to three general concerns: (1) 'State-court

[1] UC's request for judicial notice of relevant guidance from the federal government, Dkt. No. 19, is granted.

proceedings may reflect "local prejudice" against unpopular federal laws or federal officials'; (2) 'States hostile to the Federal Government may impede' federal law; and (3) 'States may deprive federal officials of a federal forum in which to assert federal immunity defenses.'" *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018) (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007)). Section 1442 is liberally construed to address these issues, but is not limitless in scope. *See id.* (citing *Watson*, 551 U.S. at 147); *see also Geisse v. Bayer HealthCare Pharms. Inc.*, No. 17-cv-07026-JD, 2019 WL 1239854, at *4 (N.D. Cal. Mar. 18, 2019).

To remove under the section, UC must show "that (a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017) (citation omitted); *see also Jalili-Farshchi*, 2021 WL 6133168, at *4.

The Ninth Circuit has identified several factors that are relevant to assessing whether a private person is acting pursuant to a federal officer's directions. These include whether the person: (1) "is acting on behalf of the officer in a manner akin to an agency relationship," (2) "is subject to the officer's close direction," (3) "is assisting the federal officer in fulfilling basic governmental tasks that the Government itself would have had to perform if it had not contracted with a private firm," and (4) is engaged in "activity [that] is so closely related to the government's implementation of its federal duties that the private person faces a significant risk of state-court prejudice, just as a government employee would in similar circumstances." *Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 756-57 (9th Cir. 2022) (internal quotations and citations omitted). While federal regulations subject private persons to some degree of control, "'simply *complying*' with a law or regulation is not enough to 'bring a private person within the scope of the statute.'" *Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 684 (9th Cir. 2022) (emphasis in original) (quoting *Watson*, 551 U.S. at 152); *see also Jalili-Farshchi*, 2021 WL 6133168, at *4.

Quinto does not dispute that UC is a person within the meaning of the statute or that UC has a colorable federal defense to her claims. *See* Dkt. Nos. 12, 20. The salient question is whether UC acted at the direction of a federal officer or agency.



United States District Court
Northern District of California

On the record before the Court, UC has not shown that it acted under a federal officer or agency. UC says that it uses the Facebook Tracking Pixel as part of its broader effort to assist the federal government in achieving its "mission of a nationwide digitized healthcare system." Dkt. No. 18 at 11. That is not enough for removal on federal officer grounds. Contrary to UC's suggestion, *see id.* at 12, receiving incentive payments for acting in a way that promotes a broad federal interest -- in an area outside the traditional responsibility of the federal government -- is not the same as being contracted to carry out, or assist with, a basic governmental duty.

To illustrate why this is so, consider two recent Ninth Circuit cases. In one, a nursing home that complied with federal directives regarding the administration of infectious-disease testing could be said to help the government in its mission to curb a global pandemic. *See Saldana*, 27 F.4th at 684-85. In another, an oil company that extracted offshore oil resources pursuant to a lease executed with the government could be said to promote the federal government's interests in national security. *See City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1108 (9th Cir. 2022). In each case, the private entity's conduct was clearly related to a federal policy or program, but not a specific obligation or responsibility that would traditionally fall to the federal government, or that the government had otherwise assumed by statute. For this reason, the Ninth Circuit determined in each case that federal officer removal was improper, as the entity was not acting on the government's behalf or fulfilling a basic governmental duty. *See Saldana*, 27 F.4th at 685 ("Without more than government regulations and recommendations, [the nursing home] has failed to establish that it was 'acting under' a federal official, and it has not identified a duty of the federal government that it performed."); *Honolulu*, 39 F.4th at 1108 ("Congress endorsed oil operations and considered making a national oil company, but that does not show that oil production was a basic governmental task."). The same outcome is warranted here.

UC says it was subject to the close direction of a federal officer or agency by virtue of the "specific framework and guidelines" that the Meaningful Use program sets out for healthcare providers to follow. Dkt. No. 18 at 12; *see also* NOR ¶¶ 25-32. But merely being subject to a regulatory scheme is not the same as acting under a federal agency's close direction. *See Riggs v.*

United States District Court
Northern District of California

*Airbus Helicopters, Inc.*, 939 F.3d 981, 985 (9th Cir. 2019) ("'[A]cting under' requirement is not satisfied by mere compliance with a regulation 'even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.'") (quoting *Watson*, 551 U.S. at 153); *see also Westbrook v. San Pablo Healthcare & Wellness Ctr.*, No. 21-cv-06474-JD, 2022 WL 2072933, at *2 (N.D. Cal. June 9, 2022).

UC is not similarly situated to the defendant in *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014), where the Ninth Circuit "sustained the removal by a military contractor of a state court lawsuit alleging a failure to warn about asbestos hazards in naval equipment." *Jalili-Farshchi*, 2021 WL 6133168, at *4. The defendant in *Leite* "provided declarations by senior officers in the United States Navy stating that the Navy exercised complete control over the form and content of all warnings made by contractors, and that contractors could not include warnings unless specifically required and approved by the Navy." *Id.* (citing *Leite*, 749 F.3d at 1123). UC points to nothing resembling this level of direction and control.

UC's heavy reliance on two out-of-circuit district courts is misplaced. *See* Dkt. No. 18 at 1 (citing *Doe I v. UPMC*, No. 2:20-cv-00359, 2020 WL 4381675 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20-cv-01581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020)). These cases entailed an overly broad interpretation of what it means to assist a federal superior with its tasks or duties, which "would permit removal to federal court in circumstances far beyond anything Congress intended." *Jalili-Farshchi*, 2021 WL 6133168, at *4. Consequently, the cases provide no basis for finding jurisdiction here.

**IT IS SO ORDERED.**

Dated: February 1, 2023

JAMES DONATO
United States District Judge

United States District Court
Northern District of California

Case 4:22-cv-12022-ADB Document 31 Filed 03/20/23 Page 1 of 29

21

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

2384CV02448-BLS1

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 4:22-cv-12022-ADB

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D]

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
FILED

OCT 30 2023

JOHN E. POWERS III
ACTING CLERK MAGISTRATE

LISA COLLETON, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 1:22-cv-40154-ADB

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01293D]

JANICE PROGIN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC., *et al.*,

Defendants.

Case No.: 4:23-cv-10113-ADB

[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02889]

**DEFENDANTS UMASS MEMORIAL HEALTH CARE, INC., *et al.*'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTIONS TO REMAND**

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. STATEMENT OF FACTS .......... 2

A. President Bush Establishes the Position of National Health Information Technology Coordinator .......... 2

B. The National Coordinator Makes Access to Online Health Care Records a National Priority .......... 3

C. Congress Uses Financial Incentives to Ensure that Health Care Providers Make Their Health Care Records Available to Patients and their Caretakers Online .......... 3

D. The National Coordinator Makes Online Access to Health Information a Key Component of the Meaningful Use Regulations .......... 5

E. The National Coordinator Directs Healthcare Providers to Make Patient Portals Available to their Patients Online .......... 6

F. UMass Memorial Acted in Response to and in Furtherance of this Federal Directive .......... 6

III. STANDARD OF REVIEW .......... 7

IV. ARGUMENT .......... 9

A. UMass Memorial was "Acting Under" a Federal Authority When Implementing the Meaningful Use Program .......... 9

a. UMass Memorial Assisted the Federal Government in Building a Nationwide Electronic Health Records System. .......... 9

b. UMass Memorial Followed the Close Direction of the Federal Government .......... 13

c. If not for Private Actors Like UMass Memorial, The Federal Government Itself Would Have Had to Build the Electronic Records System. .......... 15

d. Plaintiffs' Case Law is Inapt and Distinguishable. .......... 16

e. Plaintiffs' Efforts to Attack UPMC and ProMedica Miss the Mark. .......... 17

B. UMass Memorial Easily Satisfies the "Relating To" Requirement. .......... 19

C. UMass Memorial Has Presented A "Colorable Federal Defense" .......... 21

V. CONCLUSION .......... 22

Case 4:22-cv-12022-ADB Document 31 Filed 03/20/23 Page 3 of 29

## TABLE OF AUTHORITIES

**Cases**

*Buckman Co. v. Plaintiffs' Legal Comm.*,
531 U.S. 341 (2001) ........ 22

*Doe I v. UPMC*,
No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020) ........ passim

*Doe v. BJC Health System*,
No. 4:22-CV-919, 2023 WL 369427 (E.D. Mo. Jan. 10, 2023) ........ 12

*Doe v. Cape Cod Healthcare, Inc.*,
No. 1:23-cv-10080, slip op. at ECF No. 10 (D. Mass. Jan. 25, 2023) ........ 12, 13

*Doe v. ProMedica Health Sys., Inc.*,
No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020) ........ passim

*Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*,
865 F.3d 1237 (9th Cir. 2017) ........ 14

*In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*,
790 F.3d 457 (3d Cir. 2015) ........ 8

*Jefferson Cnty., Ala. V. Acker*,
527 U.S. 423 (1999) ........ 8, 21

*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286, 292 (5th Cir. 2020) ........ 19

*Moore v. Elec. Boat Corp.*,
25 F.4th 30 (1st Cir. 2022) ........ passim

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ........ 12, 19

*O'Connell v. Foster Wheeler Energy Corp.*,
544 F. Supp. 2d 51 (D. Mass. 2008) ........ 8, 13

*Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*,
647 F. App'x 619 (6th Cir. 2016) ........ 16, 18

*Quinto v. The Regence of the Univ. of Cal.*,
No. 3:22-cv-04429-JD, 2023 WL 1448050 (N.D. Cal. Feb. 1, 2023) ........ 12, 13

*Rhode Island v. Shell Oil Prods. Co., L.L.C.*,
979 F.3d 50 (1st Cir. 2020) .......... 17, 18, 20

*Shepherd v. Air & Liquid Sys. Corp.*,
No. CA 12-143L, 2012 WL 5874781 (D.R.I. Nov. 20, 2012) .......... 8, 13

*Smith v. Facebook*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) .......... 21

*Watson v. Philip Morris Cos.*,
551 U.S. 142 (2007) .......... 2, 9, 10, 12

*White v. United States*,
2017 WL 3262165 (E.D. Tex., 2017) .......... 16

*Winters v. Diamond Shamrock Chemical Co.*,
149 F.3d 387 (5th Cir. 1998) .......... 15

**Statutes**

28 U.S.C. § 1442(a)(1) .......... 1, 7

42 U.S.C. § 1395w .......... 4

42 U.S.C. § 300jj .......... 4

American Recovery and Reinvestment Act of 2009,
Pub. L. No. 111-5, 123 Stat. 115 (2009) .......... 4

Removal Clarification Act of 2011,
Pub. L. No. 112-51, 125 Stat. 545 (2011) .......... 19

**Regulations**

42 C.F.R. § 495.20 .......... 5

45 C.F.R. § 170.102 .......... 6

45 C.F.R. § 170.314 .......... 5

Exec. Order 13335 (Apr. 27, 2004) .......... passim

Case 4:22-cv-12022-ADB Document 31 Filed 03/20/23 Page 5 of 29

**Rules and Other Authorities**

DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES, *Medicare and Medicaid Programs*; *Electronic Health Record Incentive Program*, 75 Fed. Reg. 144, 44314 (Jul. 28, 2010). ........ 5

NAT'L LEARNING CONSORTIUM, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013) ........ 6

Office of the National Coordinator for Health Information Technology, 2011-2015 Federal Health Information Technology Strategic Plan ........ 11, 15

Office of the National Coordinator for Health Information Technology, 2015-2020 Federal Health Information Technology Strategic Plan ........ 11, 15

Office of the National Coordinator for Health Information Technology, 2020-2025 Federal Health Information Technology Strategic Plan ........ 11

## I. INTRODUCTION

The federal officer removal statute permits removal, in pertinent part, when the defendant is "any officer (or any person acting under that officer) of the United States or of any agency therefore . . . for or relating to any act under color of such office …" 28 U.S.C. § 1442(a)(1) (emphasis added). Through the Meaningful Use program and regulations, the federal government has incentivized and directed health care providers like Defendant UMass Memorial Health Care, Inc. ("UMass Memorial") to offer patients online access to their records, and to optimize patient engagement with their medical information, including through the use of patient portals.[1] As evidenced in the supporting declaration of Dr. Eric Alper ("Alper Decl."), UMass Memorial assisted the federal government in carrying out this federal directive by increasing web traffic to UMass Memorial's website, which contains a link to a patient portal on UMass Memorial's website.[2] Alper Decl. ¶ 6.

Plaintiffs have brought three related putative class actions against UMass Memorial: *Doe v. UMass Memorial Health Care, Inc.*, Case No. 4:22-cv-12022-ADB ("*Doe*"), *Colleton v. UMass Memorial Health Care, Inc.*, Case No. 1:22-cv-40154-ADB ("*Colleton*"), and *Progin v. UMass Memorial Health Care Inc., et al.*, Case No. 4:23-cv-10113-ADB ("*Progin*").[3] In each case, Plaintiffs challenge UMass Memorial's alleged efforts to optimize, and monitor traffic to, its

[1] *See, e.g., Doe* Compl. at ¶¶ 14–20 (describing federal "Meaningful Use" Program).

[2] As noted in UMass Memorial's Notice of Removal (*Doe* Compl. ¶¶ at 1, 5), UMass Memorial is a non-profit charitable corporation that operates hospital websites, including but not limited to www.ummhealth.org and www.harringtonhospital.org, which provide information to the public about UMass Memorial and access to medical records through an Epic myChart patient portal.

[3] In *Doe* and *Colleton*, UMass Memorial Health Care, Inc. is the sole defendant. The *Progin* Complaint erroneously names UMass Memorial Hospitals, Inc. as a defendant , which is the former name of the entity that is now known as UMass Memorial Community Hospitals, Inc. As for the other named defendants in *Progin*, UMass Memorial Health Care, Inc. is their ultimate parent company. *See Progin* Dkt. 2. This Omnibus Opposition refers to a singular "Defendant" and/or "UMass Memorial" for simplicity to encompass all Defendants.

website. *See, e.g.*, *Doe* Compl. ¶¶ 16, 17, 74–76; *Colleton* Compl. ¶¶ 14–16; *Progin* Compl. ¶¶ 19–21. As UMass Memorial's alleged efforts were in furtherance of assisting the federal government's goal, this is sufficient to effectuate removal to this Court under the federal officer removal statute, which must be liberally and broadly construed. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

In like circumstances, at least two district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020); *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). Because those cases are directly on point, well-reasoned, and consistent with longstanding Supreme Court and First Circuit precedent, UMass Memorial respectfully urges the Court to follow them and similarly deny Plaintiffs' motions to remand.

## II. STATEMENT OF FACTS

In this case, Plaintiffs' complaints directly challenge actions that UMass Memorial allegedly took in connection with optimizing and monitoring traffic to its website that links to an electronic health record patient portal. For reasons discussed below, driving website traffic to the patient portal assists the federal government in carrying out its federal mission to create a unified system for patient electronic health records and optimizing patient access to their own health information.

### *A. President Bush Establishes the Position of National Health Information Technology Coordinator*

In 2004, President George W. Bush issued an Executive Order that established a National Health Information Technology Coordinator ("National Coordinator"). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

Case 4:22-cv-12022-ADB Document 31 Filed 03/20/23 Page 8 of 29

Through the Executive Order, President Bush further ordered the National Coordinator to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." *Id.*

### *B. The National Coordinator Makes Access to Online Health Care Records a National Priority*

From the outset, one important piece of this federal health information technology mission was the ability for individuals to be able to access their health records online. *See* TOMMY G. THOMPSON & DAVID J. BRAILER, MD, PHD, *The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care*, at pg. e (July 21, 2004). But years later, when the percentage of Americans accessing their health information online remained low, the National Coordinator reported in 2015: "To truly empower consumers and move the health care system to become more patient-centered, *the government will need to help change these dynamics*." *Id.* (emphasis added). *See also, e.g.*, Joan Neuner, MD, MPH, et al., *Meaningful Use and the Patient Portal: Patient enrollment, use and satisfaction with patient portals at a later-adopting center*, AM. J. MED. QUAL. (Mar. 2015), at pg. 1 ("only 28% of physicians reported having EHRs that allowed patient access to records. Despite this, the architects of the MU rules have set the high bar for patient EHR access and communication.").

### *C. Congress Uses Financial Incentives to Ensure that Health Care Providers Make Their Health Care Records Available to Patients and their Caretakers Online*

In 2009, Congress codified the Office of the National Coordinator ("ONC") in the Health Information Technology for Economic and Clinical Health Act of 2009. American Recovery and

Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, 247 (2009).[4] At that time, Congress allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [National Coordinator]." *Id.*

As with President Bush's Executive Order, Congress tasked the National Coordinator with a series of responsibilities under federal law, including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect to each of the following: "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(3)(A) (Strategic plan).

Congress further codified a series of incentive payments for the Department of Health and Human Services, in conjunction with the Centers for Medicare and Medicaid Services, to make to health care providers for their adoption of health information technology, including through the Medicare program. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (CONG. RES. SERV. Apr. 27, 2009) (discussing various financial incentives).

As the Congressional Research Service explained at the time: "Beginning in 2011, the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and

[4] "There is established within the Department of Health and Human Services an Office of the National Coordinator for Health Information Technology." 42 U.S.C. § 300jj-11(a).

use certified EHRs. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified EHRs." *Id.*

### D. *The National Coordinator Makes Online Access to Health Information a Key Component of the Meaningful Use Regulations*

The following year, the Department of Health and Human Services adopted the Meaningful Use regulations. *See* DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES, *Medicare and Medicaid Programs*; *Electronic Health Record Incentive Program*, 75 Fed. Reg. 144, 44314 (Jul. 28, 2010). In introducing the final regulations the agencies stated as follows: "Certified EHR technology used in a meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.*, at 44321.

One central component of the meaningful use regulations was the ability for patients to access their health care records online. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients with the ability to *view online*, download, and transmit information about a hospital admission.") (emphasis added); *see also id.* at (ii)(B) (same); REBECCA MITCHELL COELIUS, *Get the facts regarding view, download and transmit 2014 requirements,* HealthITbuzz, The Latest on Health IT from the ONC, at pg. 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will attest for *use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.") (emphasis in original).

The regulations required health care providers to attest to the National Coordinator and to the Centers for Medicare and Medicaid Services on their progress with respect to this criteria in particular. *See* 45 C.F.R. § 170.314(e)(1)(i) (requiring reporting on "Patient engagement" for

Case 4:22-cv-12202-ADB Document 31 Filed 03/29/23 Page 12 of 29

"[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3d party the data specified below," including "[t]he Common [Meaningful Use] Data Set"); 45 C.F.R. § 170.102 (Definitions) (defining the term "Common [Meaningful Use] Data Set" to include "[s]moking status," "[m]edications," "[m]edication allergies," "[l]aboratory tests," "[l]aboratory value(s)/result(s)," "[v]ital signs," "[c]are plan field(s), including goals and instructions," and "[p]rocedures").

### *E. The National Coordinator Directs Healthcare Providers to Make Patient Portals Available to their Patients Online*

To meet these criteria, the federal government directed health care providers to make online patient portals available to their patients: "You will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively into your practice operations." NAT'L LEARNING CONSORTIUM, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013).

The government told health care providers that they "should understand the elements of an effective portal program and apply them to the specific needs of your practice." *Id.* Recommended governmental actions included "1. Learn the benefits of patient portals for patients and providers. 2. Understand how a patient portal helps achieve meaningful use requirements. 3. Implement proactive, engaging portal features. 4. Implement the portal with a systematic process. 5. *Actively promote and facilitate portal use*." *Id.* (emphasis added).

### *F. UMass Memorial Acted in Response to and in Furtherance of this Federal Directive*

UMass Memorial gave its patients the opportunity to access their personal electronic health records with UMass Memorial through an Epic myChart patient portal. *See Doe* Compl. at ¶¶ 5, 36; *see also Doe* Compl. ¶¶ 74–75 (discussing patient portal); *Progin* Compl. ¶ 20 (same). In

UMass Memorial's patient portal, patients can access medical information, including medical test results. *See* Alper Decl. ¶ 6. Every year, UMass Memorial has submitted reports on its involvement in the Meaningful Use Program[5] to the Center for Medicare and Medicaid Services (CMS). *Id.* ¶ 8. These reports have been specifically prepared in order to meet federal Meaningful Use requirements and included submissions regarding the UMass Memorial patient portal and patients' use of that portal. *Id.* In the years that UMass Memorial satisfied the Meaningful Use Program criteria, UMass Memorial and its hospitals and providers received incentive payments from the federal government for their development and use of the UMass Memorial patient portal. *Id.* ¶ 9. UMass Memorial has been successful in meeting federal Meaningful Use criteria at least in part because of increased patient awareness and increased patient use of the UMass Memorial patient portal. *Id.* ¶ 10. Plaintiffs' complaints challenge UMass Memorial's website management practices designed to increase web traffic and increase engagement with UMass Memorial's website in furtherance of the goals of the Meaningful Use Program. *See, e.g.*, *Doe* Compl. ¶¶ 4, 17, 29, 44–48, 52–54, 71, 122.

## III. STANDARD OF REVIEW

The federal office removal statute permits removal when the defendant is "any officer (or *any person acting under that officer*) of the United States or of any agency therefore, in an office or individual capacity, for or *relating to* any act under color of such office …" 28 U.S.C. § 1442(a)(1) (emphasis added). As a threshold matter, the Supreme Court has made clear that the federal officer removal statute ***must*** be "liberally construed" in favor of removal jurisdiction. *See Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35 n.3 (1st Cir. 2022) (citing *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)). Indeed, "the policy favoring removal 'should not be

[5] The Meaningful Use Program is now known as the Promoting Interoperability Program.

frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54 n.5 (D. Mass. 2008) (citing *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)). This is unlike the typical presumption that federal jurisdiction is limited. *See, e.g., In re Commonwealth's Motion to Appoint Couns. Against or Directed to Def. Ass'n of Philadelphia*, 790 F.3d 457, 466–67 (3d Cir. 2015). In this significant way, the federal officer removal statute differs from other removal statutes. *O'Connell*, 544 F. Supp. 2d at 54 n.5.

Contrary to Plaintiffs' merits-based characterizations of their cases, the Court instead must "credit [defendant's] theory of the case." *See Jefferson Cnty., Ala. V. Acker*, 527 U.S. 423, 432 (1999). The Court therefore construes the facts in the removal notice in the light most favorable to the defendant. *See, e.g., Shepherd v. Air & Liquid Sys. Corp.*, No. CA 12-143L, 2012 WL 5874781, at *5 (D.R.I. Nov. 20, 2012).

To invoke federal officer jurisdiction, UMass Memorial must show that (a) it is a "person" within the meaning of the statute; (b) it "act[ed] under" a federal officer; (c) there is some causal connection between its actions and plaintiff's claims; and (d) it can assert a "colorable federal defense." *Moore*, 25 F.4th at 34 (citations omitted).

Plaintiffs concede that UMass Memorial is a "person" but argue that: (1) UMass Memorial is not "acting under" a federal authority because it was not "told," "directed," or "ordered" by a federal authority to implement the Meaningful Use program or use the Facebook pixel; (2) there is no "causal connection" between UMass Memorial's actions and any federal authority; and (3) UMass Memorial has failed to raise a colorable federal defense. Each argument fails.

## IV. ARGUMENT

### *A. UMass Memorial was "Acting Under" a Federal Authority When Implementing the Meaningful Use Program*

"'The words 'acting under' are broad,' and the Supreme Court has made clear that the statute ***must*** be 'liberally construed.'" *Watson*, 551 U.S. at 147 (emphasis added). To that end, the Supreme Court in *Watson* has identified several factors courts should consider (liberally) in determining whether a person is "acting under" a federal officer for purposes of jurisdiction:

First, the Court considers whether the person is acting on behalf of the officer in a manner akin to an agency relationship. *Id.* at 151–52; *see also Moore,* 25 F.4th at 34 n.3. Second, the Court considers whether the person is subject to the officer's close direction, such as acting under the "subjection, guidance or control" of the officer, or in a relationship which is an unusually close one involving detailed regulation, monitoring or supervision. *Watson*, 551 U.S. at 151; *Moore,* 25 F.4th at 34 n.3. Third, the Court considers whether the private person is assisting the federal officer in fulfilling basic government tasks that the Government would have to perform if it had not contracted with a private firm. *Watson*, 551 U.S. at 153–54; *Moore,* 25 F.4th at 34 n.3.

#### *a. UMass Memorial Assisted the Federal Government in Building a Nationwide Electronic Health Records System*

With regard to the first factor (the type of relationship between the entity and the federal government), *Watson* clarified that the types of relationships that may trigger the federal officer removal statute include, *but are not limited to*, those established by contract, *payment*, employer-employee relationships, and agent-principal arrangements. 551 U.S. at 156. In arguing that UMass Memorial was not an agent of the government and/or was "ordered" by the government to act, Plaintiffs misstate the legal standard. *See Doe* Dkt. 10 at 7, 10–16; *Colleton* Dkt. 13, Ex. 1 at 5–8; *Progin* Dkt. 14 at 10–11. The proper question is whether the private entity's complained-of conduct

"'involve[s] an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior.'" *Watson*, 551 U.S. at 152 (emphasis in original). That requirement is met here.

A close examination of UMass Memorial's actions within the Meaningful Use program demonstrates that UMass Memorial was *at minimum* assisting the federal government. The government paying providers like UMass Memorial for their compliance with the Meaningful Use program (*see* Alper Decl.¶¶ 5, 8) reflects the "payment" relationship *Watson* specifically identified as one that can satisfy the "acting under" requirement. 551 U.S. at 156. This payment relationship demonstrates how the federal government used private healthcare providers like UMass Memorial to fulfill a federal goal, not merely regulating healthcare providers. *Moore*, 25 F.4th at 35 n.3.

In *UPMC*, as in this case, plaintiffs sought redress under state law for a hospital system's alleged unauthorized disclosure of their personally identifiable information to third parties (including Facebook) for marketing purposes. 2020 WL 4381675 at *1. The *UPMC* court explained:

> UPMC, as a participant in the Meaningful Use Program, *receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria.* (ECF No. 1, at ¶ 39). In particular, UPMC must, among other things, *raise awareness and increase usability of the UPMC website and the MyUPMC portal*. Id. at 1, ¶ 42. Plaintiffs' Complaint *addresses the design and functionality of UPMC's website and patient portal, implicating UPMC's implementation of the Meaningful Use Program, particularly as the implementation involves patient engagement and usership. The fact that the government offers payment in exchange for UPMC's voluntary participation in implementing a nationwide EHR network* shows the relationship between UPMC and DHHS is less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp*. And, Plaintiffs' allegations are directed at this relationship. UPMC is therefore "acting under" a federal superior for purposes of the federal officer removal statute.

*UPMC*, 2020 WL 4381675 at *6 (emphasis added). But the federal government has done more than simply provide payment. The Meaningful Use program prescribes a specific framework and guidelines for providers to follow, and the federal government monitored compliance with the

program through UMass Memorial submitting detailed reports on patient portal activities. *See* Request for Judicial Notice ("RJN"), Ex. B, 2011-2015 Fed. Health Info. Strategic Plan. Through these reports, the federal government monitored UMass Memorial's activities in increasing the use of the patient portal. *See* Alper Decl. ¶ 7. The federal government also offered a model for providers to follow that uses third-party marketers like Facebook to increase engagements.[6]

Indeed, the federal government has repeatedly emphasized the collaborative nature of the Meaningful Use program, further highlighting the close relationship between the government and UMass Memorial:

- "[F]ederal agencies" were to "**collaborate** with … **private stakeholders** to … build a culture of electronic health information access and use."[7]
- "Federal, state, and local governments, along with the **private sector**, have **worked together** to help digitize health information and healthcare."[8]

While Plaintiffs argue that such statements of collaboration show that UMass Memorial was not under the *direction* of the federal government (*Doe* Dkt. 10 at 15; *Colleton* Dkt. 13, Ex. 1 at 11), this ignores that it is the National Coordinator who is responsible for leading this effort. *See* RJN, Ex. A (Exec. Ord. 13,335).

Under nearly identical facts, the *UPMC* and *ProMedica* courts held that the healthcare providers acted like government contractors in implementing the Meaningful Use program, thus

[6] *See generally* https://www.medicare.gov/privacy-policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

[7] *See* RJN, Ex. D, ONC's updated 2015-2020 Federal Health IT Strategic Plan, at 8.

[8] *See* RJN, Ex. E, ONC's updated 2020-2025 Federal Health IT Strategic Plan, at 2.

qualifying for removal under Section 1442(a)(1).[9] *UPMC*, 2020 WL 4381675 at *6; *ProMedica*, 2020 WL 7705627 at **2–3. As the *ProMedica* Court explained: "The aim of [the Meaningful Use program] is to create a unified system of patient electronic health records. Because Defendant's participation assisted the federal government in achieving that goal, Defendant has satisfied the 'acting under' prong." *Id.* (emphasis added).

Other courts have ruled differently, as Plaintiffs note, including *Doe v. BJC Health System*, No. 4:22-CV-919, 2023 WL 369427, at *4 (E.D. Mo. Jan. 10, 2023), *Quinto v. The Regence of the Univ. of Cal.*, No. 3:22-cv-04429-JD, 2023 WL 1448050, at *3 (N.D. Cal. Feb. 1, 2023), and *Doe v. Cape Cod Healthcare, Inc.*, No. 1:23-cv-10080, slip op. at ECF No. 10 (D. Mass. Jan. 25, 2023). Those decisions were wrongly decided or distinguishable.

*BJC* is currently being appealed to the Eighth Circuit and had focused its decision on the view that the statute "neither authorizes nor obligates the federal government to create the [electronic health records] itself." 2023 WL 369427 at *4. But this reading ignores the *obligations* placed on the National Coordinator in Executive Order 13335, which provided that the National Coordinator "*shall*, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology." *See* RJN, Ex. A. (emphasis added).

[9] While *UPMC* and *ProMedica* are decisions by district courts within the Third and Sixth Circuits, respectively, First Circuit law does not differ from Third or Sixth Circuit law in any way that would support a different outcome. *See, e.g., Moore*, 25 F.4th at 35 n.3 (citing to Third Circuit decision). The federal officer removal statute is a federal statute that has been interpreted by the Supreme Court on both the "acting under" and the "relating to" language at issue, as the First Circuit has explained. *Id.*; *see Watson*, 551 U.S. at 151–52; *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). Thus, there can be no circuit split; there is only different case law decided on its own unique facts analyzing whether or not removal is appropriate under the Supreme Court's guidance.

*Cape Cod* was decided *sua sponte* without either party having had the opportunity to brief the issues and ignored the fact that health care providers do far more than simply comply with the law. Slip op. at ECF No. 10. It also determined that the defendant had not presented a colorable defense, without analyzing the HIPAA duty-based defense or the type of federal preemption defense raised by UMass Memorial here. *Id.*

Similarly, *Quinto* emphasized that "merely being subject to a regulatory scheme is not the same as acting under a federal agency's close direction." 2023 WL 1448050 at *3. Again, UMass Memorial is not merely subject to a regulatory scheme, but rather has been paid incentive benefits by the federal government to fulfill the government's own mission of developing a nationwide electronic health records system. *See* Alper Decl. ¶¶ 5, 8. Furthermore, *Quinto* relied on two cases in the Ninth Circuit where the "private entity's conduct was clearly related to a federal policy or program, but not a specific obligation or responsibility that would traditionally fall to the federal government, or that the government had otherwise assumed by statute." 2023 WL 1448050 at *3. Unlike here, where the obligation of the National Coordinator in Executive Order 13335 led to the development of a nationwide electronic health records infrastructure. *See* RJN, Ex. A.

Courts within the First Circuit have regularly accepted cases removed under the federal officer removal statute in circumstances where, like here, the entity "assist[ed]" or "help[ed] carry out" the tasks of the federal government. *See, e.g., Moore,* 25 F.4th at 34 n.3 (holding that "the words 'acting under' are 'broad' and 'liberally construed'"); *O'Connell*, 544 F. Supp. 2d at 55 (finding that defendant's "affidavits and attached exhibits clearly establish a plausible" federal government reliance); *Shepherd*, 2012 WL 5874781 at **4–5 (same).

***b. UMass Memorial Followed the Close Direction of the Federal Government***

For this factor, the Court considers whether the defendant is subject to the officer's close direction, such as acting under the "subjection, guidance, or control" of the officer. *Moore,* 25

F.4th at 34 n.3. Plaintiffs argue that UMass Memorial is not "acting under" a federal authority because it was not "told," "directed," or "ordered" by a federal authority (*Doe* Dkt. 10 at 1, 7, 8, 10, 11, 18, 19; *see also Colleton* Dkt. 13, Ex. 1 at 5–7; *Progin* Dkt. 14 at 8-13), but rather "decided to partake in the Meaningful Use Program . . ." *Doe* Dkt. 10 at 13. As a threshold matter, Plaintiffs misstate the legal standard.[10] The entity need not be under direct orders by a federal authority, as the First Circuit has long recognized. *See Moore*, 25 F.4th at 34 n.3 (recognizing First Circuit precedent for broadly construing "acting under" a federal officer); *see also Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1248 (9th Cir. 2017) ("Nowhere [is there] support for the proposition that only non-discretionary choices qualify for removal."). To the contrary, "[f]or a private entity to be "acting under" a federal officer, the private entity must be involved in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior," which is precisely what UMass Memorial is doing here. *Moore,* 25 F.4th at 34 n.3 (citing to *Watson*, 551 U.S. at 147) (emphasis in original). "And the words 'acting under' are 'broad' and 'liberally construed.'" *Id.*

As the *UPMC* and *ProMedica* decisions illustrate, participation in the Meaningful Use Program is sufficient to satisfy the "acting under" requirement. The *UPMC* court also emphasized that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior." *Id.* at *4. "The private entity need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." *Id.* at *5.

[10] *Doe* Plaintiff complains that UMass Memorial did not attach an "affidavit" or "declaration" to its already-detailed notice of removal. *Doe* Dkt. 10 at 6. Plaintiff cites to no law requiring this because there is none. To the contrary, 28 U.S.C. § 1446(a) only requires a "short and plain statement of the grounds for removal," which is precisely what UMass Memorial prepared.

Case 4:22-cv-12022-ADB Document 31 Filed 03/10/23 Page 20 of 29

Here, the Meaningful Use program prescribes a specific framework and guidelines for providers to follow, and the federal government monitored compliance with the program through UMass Memorial submitting detailed reports on patient portal activities. Alper Decl. ¶ 7. The federal government also offered a model for providers to follow that uses third-party marketers like Facebook to increase engagements.[11] Thus, UMass Memorial's actions go well beyond that of merely complying with federal laws and regulations and illustrate at least "detailed regulation" or "monitoring" by the federal government. *See* RJN, Ex. B at 7 ("monitor[] health IT successes"); *Moore,* 25 F.4th at 35; *see also UPMC*, 2020 WL 4381675 at *6 (describing the criteria required for compliance with the Meaningful Use program). Thus, in implementing the Meaningful Use program, UMass Memorial followed the close direction of the federal government.

***c. If not for Private Actors Like UMass Memorial, The Federal Government Itself Would Have Had to Build the Electronic Records System***

In the absence of UMass Memorial's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its federal mission of digitizing health information and increasing engagement with Medicare beneficiaries. *See* RJN, Ex. D at 4 ("participation of over thirty-five federal entities… demonstrate the extensive interest across the government to digitize the health experience for all individuals"); *see also Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998) (defendant performed a job that the government itself would otherwise have to do). As the *UPMC* court recognized, the "federal government, as one of the largest purchasers of healthcare services,

[11] *See generally* https://www.medicare.gov/privacy-policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

has emphasized the important role that health [information technology] plays in improving both the quality and efficiency of healthcare in the United States." *UPMC*, 2020 WL 4381675 at *5.

Indeed, President Bush's Executive Order 13335 created a mandatory obligation that the National Coordinator "*shall*, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology." RJN, Ex. A. (emphasis added).

Without the use of private entities, the National Coordinator would be responsible for building this electronic records system itself.

#### *d. Plaintiffs' Case Law is Inapt and Distinguishable*

In their Motions, Plaintiffs rely on cases that are distinguishable and inapt. For example, *Ohio State Chiropractic* involved a contract between CMS and an insurance company participating in the Medicare Advantage Program. *Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 622–23 (6th Cir. 2016). The insurance company "profit[s] by providing care at a cost lower than the value of [per-beneficiary rates set by CMS]." *Id.* at 624. This has nothing to do with the federal government using healthcare entities to fulfill the federal goal of a nationwide internet healthcare system. *See UPMC*, 2020 WL 4381675 at **4–6; *ProMedica*, 2020 WL 7705627 at **2–3. As the *Doe* Plaintiff acknowledges by citing to *White v. United States*, 2017 WL 3262165, at *1 (E.D. Tex., 2017),[12] the Meaningful Use Program served "to improve the quality and cost of health care in the United States," a momentous undertaking.

Plaintiffs otherwise cite to cases holding that a private actor's mere compliance with regulations or orders does not satisfy the "acting under" requirement. *See Doe* Dkt. 10 at 12 (string-citing cases); *Progin* Dkt. 14 at 11 (same). Again, this argument is a red herring because this case

[12] *White* did not involve the federal officer removal statute.

Case 4:22-cv-12022-ADB Document 31 Filed 03/29/23 Page 22 of 29

involves far more than simply complying with regulations or orders; as noted, it involves the federal government relying on healthcare entities to fulfill the federal mission of a nationwide digitized healthcare system. *See UPMC*, 2020 WL 4381675 at *6; *ProMedica*, 2020 WL 7705627 at **2–3. Moreover, no arms-length business arrangements with the federal government are at issue like in *Rhode Island v. Shell Oil Prods. Co., L.L.C.*, 979 F.3d 50 (1st Cir. 2020). As the *UPMC* and *ProMedica* courts held, the relationship between the healthcare entity and the federal government here is more akin to a government-contractor relationship. *UPMC*, 2020 WL 4381675 at *6; *ProMedica*, 2020 WL 7705627 at **2–3.

This is also why the First Circuit's decision in *Moore* is instructive. *Moore* involved a federal contractor removing a case involving injuries allegedly arising from a product manufactured for the government, and explained that "[c]ourts have consistently held that the 'acting under' requirement is *easily satisfied*" in that context. *Moore,* 25 F.4th at 34 n.3 (citing to cases). Similarly here, and like the providers in *UPMC* and *ProMedica*, UMass Memorial functions like a federal contractor by implementing and/or assisting in implementing federal policy to nationalize the health information technology infrastructure. *See also* Alper Decl. ¶¶ 5–9.

***e. Plaintiffs' Efforts to Attack UPMC and ProMedica Miss the Mark***

The *Doe* and *Colleton* Plaintiffs do not attempt to distinguish *UPMC* or *ProMedica*, and simply attempt to attack the decisions on two unavailing grounds: [13]

First, *Doe* Plaintiff complains that the *UPMC* court "incorrectly conflated" the meaningful use of patient portals and the use of public-facing hospital websites. *Doe* Dkt. 10 at 16. Yet, just like in *UPMC*, *Doe* Plaintiff's Complaint targets, not only the public website, but also the UMass

[13] The *Doe* Plaintiff attempts to minimize *ProMedica*: "In *ProMedica*, the Northern District of Ohio simply applied the holding of *UPMC*," without explaining the court's reasoning. *See Doe* Dkt. 10 at 15. The *Colleton* Plaintiff attempts to brush both on-point decisions off, contending courts "have rejected [their] line of reasoning." *See Colleton* Dkt. 13, Ex. 1 at 7.

Case 4:22-cv-12022-ADB Document 31 Filed 03/10/23 Page 23 of 29

Memorial patient portal. *See, e.g.*, *Doe* Compl. ¶ 75 (discussing "clicking a button to register, login, or logout of a patient portal"); *id.* ¶ 190 (discussing "appointments," "bill payment," and "logins"). *Doe* Plaintiff is careful not to contend otherwise in his motion. Moreover, the public-facing website is relevant to the Meaningful Use Program because (a) it contains a link to UMass Memorial's patient portal, and (b) its design and functionality help drive patient engagement and usership, as *Doe* Plaintiff himself acknowledges. *See, e.g., Doe* Compl. ¶¶ 4, 90, 17, 29, 44-48, 52–54, 71, 122, 140.

Second, the *Doe* Plaintiff complains that the *UPMC* court "incorrectly focused on the fact that the defendant hospital received an incentive payment for creating and maintaining EHR." *Doe* Dkt. 10 at 16. This argument misses the mark. As the *ProMedica* court succinctly explained: "Because Defendant's participation assisted the federal government in achieving th[e] goal [of creating a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong." *ProMedica*, 2020 WL 7705627 at **2–3. The financial incentives under the Meaningful Use Program illustrate how UPMC and countless other medical providers (including UMass Memorial) have assisted the federal government by "rais[ing] awareness and increas[ing] usability of the UPMC website and the MyUPMC portal." *UPMC*, 2020 WL 4381675 at *6. Moreover, the two cases cited by the *Doe* Plaintiff in support did not involve incentive payments and had nothing to do with the federal goal of a nationwide internet healthcare system. *See Shell Oil*, 979 F.3d at 59[14] ("three contracts with the federal government related to the production of oil"); *Ohio State Chiropractic* 647 F. App'x at 622–24 (contract between CMS and insurance company participating in Medicare Advantage Program).

[14] The *Shell Oil* judgment was vacated by the Supreme Court and the case was remanded to the First Circuit on procedural grounds. *Shell Oil Prod. Co. v. Rhode Island*, 210 L. Ed. 2d 830 (2021).

### *B. UMass Memorial Easily Satisfies the "Relating To" Requirement*

In 2011, Congress amended the federal officer removal statute to *broaden* the scope of removable claims by adding the relevant "related to" language. *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545 (2011) (adding "or relating to" language to the provision).

The Fifth Circuit explained, through this statutory amendment, "Congress broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc) (emphasis in original); *see also id.* at 296 (same).

Similarly, the First Circuit recently clarified that "[c]ircuits have consistently given this requirement a *broad reading* and held that *no causal link is required.*" *Moore,* 25 F.4th at 35 (emphasis added). As the United States Supreme Court has explained, "[t]he ordinary meaning of these words is a broad one—'to stand *in some relation*; to have *bearing or concern*; to *pertain*; refer; to bring into *association* with or *connection* with.'" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (citing to Black's Law Dictionary 1158 (5th ed. 1979)) (emphasis added).

Here, the "very act" of UMass Memorial's use of technology on its website and patient portal was in furtherance of the government's directive to optimize patient engagement with their medical information. *See, e.g, Doe* Compl. ¶¶ 12; 13, 16, 21.

Indeed, the *UPMC* court emphasized that plaintiffs' "allegations target mechanisms by which UPMC manages and markets its website and patient portal. *There is plainly a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program*, particularly the incentives that are tied to patient participation and usability. Plaintiffs' claims are therefore 'for or relating to' an act under color of federal office." 2020 WL 4381675 at *6 (emphasis added). The *ProMedica* court also noted that "the claims alleged by

Plaintiff implicate Defendant's electronic-health-record patient portal, and Defendant's handling of this electronic information is central to the claims in this case." 2020 WL 7705627 at *3.

Consistent with the liberal construction of the "relating to" requirement, the plain language of Section 1442(a), and the guidance of the *UPMC* and *ProMedica* decisions, UMass Memorial satisfies the "relating to" requirement.

Plaintiffs argue that UMass Memorial's "installation of a hidden tool on its website that transmits patients' health data to Facebook" bears no connection or association with the Meaningful Use Program. *Doe* Dkt. 10 at 18; *see also Progin* Dkt. 14 at 19–20. Those are precisely the kind of merits-based "specific allegations" that courts have rejected in the "relating for" analysis. *See Moore,* 25 F.4th at 36 (rejecting plaintiff's attempt "to defend against removal with more specific allegations Electric Boat in particular failed to provide safe equipment, provide adequate safety measures and protection, maintain proper and safe conditions on the premises, and follow state and federal laws and regulations.").

The *Doe* Plaintiff otherwise relies exclusively on the *Shell Oil* decision. *Doe* Dkt. 10 at 18–20. In *Shell Oil,* the First Circuit flagged the obvious lack of a "nexus" between (a) defendants "damaging the environment and engag[ing] in a misinformation campaign about the harmful effects of their products on the earth's climate," and (b) "three contracts with the federal government related to the production of oil." *Shell Oil*, 979 F.3d at 59–60. Here, by contrast, as the *UPMC* court explained: the "relating to" requirement is easily satisfied because "plaintiffs' allegations target mechanisms by which UPMC manages and markets its website and patient portal," and thus "[t]here is plainly a connection or association between [the hospital's] website management and marketing strategies and the Meaningful Use program . . ." *UPMC*, 2020 WL 4381675 at *6; *see* Compl. ¶¶ 4, 17, 29, 44–48, 52–54, 71, 122.

### *C. UMass Memorial Has Presented A "Colorable Federal Defense"*

Plaintiffs also improperly argue the merits of UMass Memorial's defenses in an effort to support her claim that UMass Memorial has not presented a colorable federal defense. *Colleton* Dkt. 13, Ex. 1. at 10–11; *Progin* Dkt. 14 at 5-8. However, as UMass Memorial pointed out in its Notices of Removal, a "'colorable federal defense' need not be 'clearly sustainable,' but rather, a federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" *Doe* Dkt. 1 ¶ 37 (quoting *Moore*, 25 F.4th at 37); *see also Jefferson,* 527 U.S. at 431 (explaining the defendant does not have to "win his case before he can have it removed").

UMass Memorial has presented a clear and substantial duty-based federal defense under HIPAA. "In the federal officer removal context, a duty-based defense must be one that is based on a federal duty to act, or the lack of such a duty, such as denying alleged violations of a federal duty." *UPMC*, 2020 WL 4381675 at *6 (W.D. Pa. July 31, 2020) (citations and quotations omitted). Like the *UPMC* plaintiff, Plaintiffs' Complaints frames their allegations in reference to HIPAA. *See Colleton* Compl. ¶ 47 (Under HIPAA, "IP addresses are individually identifiable health information."); *Progin* Compl. ¶¶ 24, 46 (HIPAA "prohibits health care providers such as Defendants from using or disclosing individuals' protected health information…"). Consistent with persuasive caselaw on point, UMass Memorial's duty-based defense is that Plaintiffs' "protected health information" that was allegedly disclosed is not protected by HIPAA and does not constitute PHI. *Smith v. Facebook*, 262 F. Supp. 3d 943, 954–55 (N.D. Cal. 2017) (dismissing state-law claims, rejecting argument that HIPAA applied to internet metadata because "[t]he same pages are available to every computer, tablet, smartphone, or automated crawler that send GET requests to these URLs," and thus also "[n]othing about the URLs, or the contents of the pages

located at those URLs, relates 'to the past, present, or future physical or mental health or condition of an individual'") (quoting 45 C.F.R. § 160.103, emphasis in original).

Whether HIPAA applies to Plaintiffs' browsing on a public healthcare website is a question of federal law that should be decided by federal courts. Although Plaintiff's merits-based argument misses the mark, the merits are irrelevant at this stage; the operative question is whether UMass Memorial's asserted defense is "colorable," and it is under *Smith.*

Another colorable federal defense here is preemption. "A defense based on federal preemption of state law is also sufficient to raise a colorable federal defense for the purposes of the federal officer removal statute." *UPMC*, 2020 WL 4381675 at *7. In *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 343 (2001), the Supreme Court held that plaintiffs' state law fraud on the Food and Drug Administration claims brought against the defendant inevitably conflicted with the FDA's responsibility to police fraud consistently with the Agency's judgment and objections. The Supreme Court held that federal preemption is warranted where "the relationship between a federal agency and the entity it regulates is inherently federal in character." *Id.* at 347. As the *UPMC* court recognized under similar circumstances, "the relationship between [a health care provider] and DHHS is 'inherently federal' in nature, such that the issue of whether [Plaintiff's] state-law claims are preempted under the principles articulated in *Buckman* should be decided by a federal court." *UPMC*, 2020 WL 4381675 at *7. As such, the *UPMC* court, as should this Court here, determined that the health care provider had raised colorable federal defenses.

## V. CONCLUSION

UMass Memorial respectfully asks the Court to deny Plaintiffs' motions to remand.

Case 4:22-cv-12022-ADB Document 31 Filed 03/20/23 Page 28 of 29

Dated: March 20, 2023

Respectfully submitted,

/s/ Stephen T. Paterniti
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (admitted pro hac vice in *Doe*)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Assistant Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 20, 2023 copies of the foregoing memorandum were transmitted electronically via CM/ECF System to the following recipients.

Jonathan T. Merrigan
J. Tucker Merrigan
Victoria Santoro Mair
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, TX 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
KELLERMAN POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Attorneys for Plaintiff John Doe*

William Patrick Doyle III
COLONNA, DOYLE AND SIMEOLOA
26 Main St, 3rd Floor
Lynnfield, MA 01940
bill@colonna-doyle.com

Nicholas A. Coulson
Lance Spitzig
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
ncoulson@lsccounsel.com
lspitzig@lsccounsel.com

*Attorneys for Plaintiff Lisa Colleton*

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff Janice Progin*

*/s/ Stephen T. Paterniti*
*One of the attorneys for defendant*

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 4:22-cv-12022-ADB

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D]

LISA COLLETON, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 1:22-cv-40154-ADB

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01293D]

JANICE PROGIN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC., *et al.*,

Defendants.

Case No.: 4:23-cv-10113-ADB

[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02889]

**[PROPOSED] ORDER ON PLAINTIFFS' MOTIONS TO REMAND**

Pending before the Court in the above-captioned actions are Plaintiffs' Motions to Remand. Upon consideration of Defendants' Omnibus Opposition to Plaintiffs' Motions to Remand, and the parties' respective submissions and arguments in support thereof and in opposition thereto, it is hereby:

ORDERED that Plaintiffs' Motions are DENIED.

SO ORDERED.

Entered this ______________ day of __________________ 2023.

______________________________________

HON. ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 4:22-cv-12022-ADB

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D]

LISA COLLETON, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

Case No.: 1:22-cv-40154-ADB

[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01293D]

JANICE PROGIN, on behalf of herself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC., *et al.*,

Defendants.

Case No.: 4:23-cv-10113-ADB

[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02889]

**DECLARATION OF ERIC ALPER, MD**

I, Eric Alper, MD make this declaration pursuant to 28 U.S.C. § 1746 and hereby declare and state as follows:

1. I am over the age of 21 and competent to make this declaration. I have personal knowledge of the information set forth in this declaration and could testify to these matters if asked to do so.
2. I am currently the SVP, Chief Quality Officer, Chief Clinical Informatics Officer at UMass Memorial Health Care, Inc. ("UMass Memorial"). I am a graduate of UMass Chan Medical School.
3. In my position as Chief Clinical Informatics Officer, my responsibilities include participation in various governance and operational committees and the guidance of various programs and projects related to UMass Memorial's electronic health records.
4. My responsibilities included participating as a member of the Information Services steering committee at UMass Memorial, and I am personally familiar with UMass Memorial's participation and involvement in the Meaningful Use Program.[1]
5. UMass Memorial hospitals and physicians have participated in the federal Meaningful Use Program for over a decade. Both the UMass Memorial hospitals and physicians applied for and received Meaningful Use Program funds from the Department of Health & Human Services ("DHHS"), in part for its development and use of the UMass Memorial patient portal (which is accessible through a link on www.ummhealth.org and www.harringtonhospital.org), in accordance with the Meaningful Use Program's criteria. Failure to meet those criteria can also subject UMass Memorial to financial penalties in the form of reduced payments from DHHS.

---

[1] The Meaningful Use Program is now known as the Promoting Interoperability Program.

6. As part of its participation in the Meaningful Use Program, UMass Memorial created an online patient portal for use by patients called myChart through which UMass Memorial patients can access medical information, including medical test results. In accordance with Meaningful Use Program requirements, UMass Memorial had to, and did, raise awareness and increase usability of the UMass Memorial website and the UMass Memorial portal.

7. Every year, UMass Memorial has submitted reports or attestations on its involvement in the Meaningful Use Program to the Center for Medicare and Medicaid Services (CMS). These reports or attestations have been specifically prepared in order to meet federal Meaningful Use Program requirements and included submissions regarding the UMass Memorial patient portal and patients' use of that portal.

8. In the years that UMass Memorial satisfied the Meaningful Use Program criteria, UMass Memorial and its hospitals and providers received incentive payments from the federal government for their development and use of the UMass Memorial patient portal.

9. UMass Memorial has been successful in meeting federal Meaningful Use Program criteria at least in part because of increased patient awareness and increased patient use of the UMass Memorial patient portal.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct.

**Eric Alper, MD**

DATED: March 16, 2023

LOCATION: Worcester, Massachusetts

## CERTIFICATE OF SERVICE

I hereby certify that, on March 20, 2023 copies of the foregoing declaration were transmitted electronically via CM/ECF System to the following recipients.

Jonathan T. Merrigan
J. Tucker Merrigan
Victoria Santoro Mair
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, TX 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
KELLERMAN POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Attorneys for Plaintiff John Doe*

William Patrick Doyle III
COLONNA, DOYLE AND SIMEOLOA
26 Main St, 3rd Floor
Lynnfield, MA 01940
bill@colonna-doyle.com

Nicholas A. Coulson
Lance Spitzig
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
ncoulson@lsccounsel.com
lspitzig@lsccounsel.com

*Attorneys for Plaintiff Lisa Colleton*

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff Janice Progin*

/s/ Stephen T. Paterniti
*One of the attorneys for defendant*

2384CV02448-BLS1

22

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022-ADB<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |
| LISA COLLETON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 1:22-cv-40154-ADB<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01293D] |
| JANICE PROGIN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., *et al.*,<br><br>Defendants. | Case No.: 4:23-cv-10113-ADB<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2284CV02889] |

SUPERIOR COURT
CLERK'S OFFICE
FILED
OCT 30 2023
ACTING CLERK MAGISTRATE

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS UMASS MEMORIAL HEALTH CARE, INC., *et al.*'S OMNIBUS OPPOSITION TO PLAINTIFFS' MOTIONS TO REMAND**

Pursuant to Federal Rules of Evidence ("FRE"), Rule 201(b), Defendant UMass Memorial Health Care, Inc. ("UMass Memorial")[1] respectfully requests that the Court take judicial notice of the information and facts contained in the following listed Exhibits (the "Request"). These Exhibits constitute self-authenticating evidence under FRE 902(5), and require no extrinsic evidence of authenticity in order to be admitted, because they are official publications issued by public authorities. Additionally, the information and facts in the Exhibits are not subject to reasonable dispute because they can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned.

Attached as **Exhibit A** is a true and correct copy of Executive Order 13,335–Incentives for the Use of Health and Information Technology and Establishing the Position of the National Health Information Technology Coordinator, dated April 27, 2004, and obtained from the United States Government Publishing Office website, GovInfo.gov, at https://www.govinfo.gov/content/pkg/WCPD-2004-05-03/pdf/WCPD-2004-05-03-Pg702.pdf.

Attached as **Exhibit B** is a true and correct copy of the Office of the National Coordinator for Health Information Technology's ("ONC") 2011-2015 Federal Health Information Technology Strategic Plan obtained from the ONC website, HeathIT.gov, at https://www.healthit.gov/sites/default/files/utility/final-federal-health-it-strategic-plan-0911.pdf.

Attached as **Exhibit C** is a true and correct copy of the ONC's publication entitled "Connecting Health and Care for the Nation: A 10-Year Vision to Achieve an Interoperable Health

---

[1] In *Doe* and *Colleton*, UMass Memorial Health Care, Inc. is the sole defendant. The *Progin* Complaint erroneously names UMass Memorial Hospitals, Inc. as a defendant, which is the former name of the entity that is now known as UMass Memorial Community Hospitals, Inc. As for the other named defendants in *Progin*, UMass Memorial Health Care, Inc. is their ultimate parent company. *See Progin* Dkt. 2. This Request for Judicial Notice refers to a singular "Defendant" and/or "UMass Memorial" for simplicity to encompass all Defendants.

IT Infrastructure," obtained from the ONC website, HeathIT.gov, at https://www.healthit.gov/sites/default/files/ONC10yearInteroperabilityConceptPaper.pdf.

Attached as **Exhibit D** is a true and correct copy of ONC's 2015-2020 Federal Health IT Strategic Plan obtained from the ONC website, HealthIT.com, at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf.

Attached as **Exhibit E** is a true and correct copy of ONC's 2020-2025 Federal Health IT Strategic Plan, obtained from the ONC website, HealthIT.gov, at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf.

UMass Memorial respectfully submits that, pursuant to FRE 201(c)(2), the Court should grant the Request in its entirety, because UMass Memorial has supplied the Court with all necessary information to allow the Court to take judicial notice of the attached Exhibits and the information and facts contained therein.

Case 4:22-cv-12022-ADB Document 32 Filed 03/20/23 Page 4 of 5

Dated: March 20, 2023

Respectfully submitted,

/s/ Stephen T. Paterniti
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (admitted pro hac vice in *Doe*)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

## CERTIFICATE OF SERVICE

I hereby certify that, on March 20, 2023 copies of the foregoing were transmitted electronically via CM/ECF System to the following recipients.

Jonathan T. Merrigan
J. Tucker Merrigan
Victoria Santoro Mair
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson
David Warden
Nathan Campbell
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, TX 77010
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer
Alex Dravillas
KELLERMAN POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
sam@kellerpostman.com
adj@kellerpostman.com

*Attorneys for Plaintiff John Doe*

William Patrick Doyle III
COLONNA, DOYLE AND SIMEOLOA
26 Main St, 3rd Floor
Lynnfield, MA 01940
bill@colonna-doyle.com

Nicholas A. Coulson
Lance Spitzig
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
ncoulson@lsccounsel.com
lspitzig@lsccounsel.com

*Attorneys for Plaintiff Lisa Colleton*

Edward F. Haber
Michelle H. Blauner
Patrick J. Vallely
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Attorneys for Plaintiff Janice Progin*

/s/ Stephen T. Paterniti
*One of the attorneys for defendant*

Case 4:22-cv-12202-ADB Document 32-1 Filed 03/13/23 Page 1 of 4

# EXHIBIT A

U.S. GOVERNMENT INFORMATION GPO Case 4:22-cv-00220-ADB Document 32-1 Filed 03/20/23 Page 2 of 4 Case 4:22-cv-00220-ADB Document 10 Filed 08/19/23 Page 318 of 1163



to get it so the docs are able to talk to each other, and they've got to buy into this.

And so the reason why we've started this process now is we want to encourage insurance companies and State Governments, doctors organizations, AMA and others, to understand the great benefit for the American people by implementing information technology in the health care field.

By introducing information technology, health care will be better, the cost will go down, the quality will go up, and there's no telling whether other benefits will inure to our society. In other words, when we get this done—and we will, because America is a land of doers and entrepreneurs; our job is to set the goal and then to encourage and incent people to achieve the goal—but when we get this implemented, America will remain on the leading edge of technological change. This is the kind of innovation that's practical and makes sense, that will keep us to be the leader in the world.

And when we're the leader of the world, it means our people have a chance to make a better living. See, when you're the leader, particularly when it comes to innovation and technology, your society improves a lot. The quality of life goes up. People's pay goes up. People in America are more likely to realize the American Dream. It's essential that we be in a society of innovators and change, and this is an area where there is a huge opportunity.

And I look forward to working with people to achieve this objective. I want to thank those up here who are doing a good job. Tony, you all have made us proud. I'm giving Tony the credit, but you deserve it. [*Laughter*]

Marlene, thank you for your vision. We look forward to working with Johns Hopkins as to how—to better learn how to encourage implementation of this opportunity. And when we get it done—we will—we will—this is America, after all. [*Laughter*] And when we get it done, we'll all be able to say, "We've done our duty, job well done. Now we go on to the next issue after this." But let's get this one right.

Thank you all for coming. We've enjoyed it. I hope you found it as interesting as I have to listen to the great opportunities in front of us, some of the challenges that have been overcome, and recognizing that we've got other challenges to overcome. But our spirits are high. Our spirits are high because this country can overcome any challenge in our way.

God bless. Thank the healers who are here. God bless the veterans as well.

NOTE: The President spoke at 1:50 p.m. at the Department of Veterans Affairs Medical Center. In his remarks, he referred to Gov. Robert L. Ehrlich of Maryland, his wife, Kendel, and their newborn son, Joshua; former Gov. William Donald Schaefer of Maryland; George W. Owings, secretary-nominee, and Lawrence J. Kimble, acting secretary, Maryland Department of Veterans Affairs; and Nelson J. Sabatini, secretary, Maryland Department of Health and Mental Hygiene.

## Executive Order 13335—Incentives for the Use of Health Information Technology and Establishing the Position of the National Health Information Technology Coordinator

*April 27, 2004*

By the authority vested in me as President by the Constitution and the laws of the United States of America, and to provide leadership for the development and nationwide implementation of an interoperable health information technology infrastructure to improve the quality and efficiency of health care, it is hereby ordered as follows:

***Section 1.*** *Establishment.* (a) The Secretary of Health and Human Services (Secretary) shall establish within the Office of the Secretary the position of National Health Information Technology Coordinator.

(b) The National Health Information Technology Coordinator (National Coordinator), appointed by the Secretary in consultation with the President or his designee, will report directly to the Secretary.

(c) The Secretary shall provide the National Coordinator with appropriate staff, administrative support, and other resources to meet its responsibilities under this order.

(d) The Secretary shall ensure that the National Coordinator begins operations within 90 days of the date of this order.

Case 4:22-cv-02202-ADB Document 1032-1 Filed 03/19/23 Page 3 of 4



***Sec. 2.*** *Policy.* In fulfilling its responsibilities, the work of the National Coordinator shall be consistent with a vision of developing a nationwide interoperable health information technology infrastructure that:

(a) Ensures that appropriate information to guide medical decisions is available at the time and place of care;

(b) Improves health care quality, reduces medical errors, and advances the delivery of appropriate, evidence-based medical care;

(c) Reduces health care costs resulting from inefficiency, medical errors, inappropriate care, and incomplete information;

(d) Promotes a more effective marketplace, greater competition, and increased choice through the wider availability of accurate information on health care costs, quality, and outcomes;

(e) Improves the coordination of care and information among hospitals, laboratories, physician offices, and other ambulatory care providers through an effective infrastructure for the secure and authorized exchange of health care information; and

(f) Ensures that patients' individually identifiable health information is secure and protected.

***Sec. 3.*** *Responsibilities of the National Health Information Technology Coordinator.* (a) The National Coordinator shall, to the extent permitted by law, develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures. The National Coordinator shall report to the Secretary regarding progress on the development and implementation of the strategic plan within 90 days after the National Coordinator begins operations and periodically thereafter. The plan shall:

(i) Advance the development, adoption, and implementation of health care information technology standards nationally through collaboration among public and private interests, and consistent with current efforts to set health information technology standards for use by the Federal Government;

(ii) Ensure that key technical, scientific, economic, and other issues affecting the public and private adoption of health information technology are addressed;

(iii) Evaluate evidence on the benefits and costs of interoperable health information technology and assess to whom these benefits and costs accrue;

(iv) Address privacy and security issues related to interoperable health information technology and recommend methods to ensure appropriate authorization, authentication, and encryption of data for transmission over the Internet;

(v) Not assume or rely upon additional Federal resources or spending to accomplish adoption of interoperable health information technology; and

(vi) Include measurable outcome goals.

(b) The National Coordinator shall:

(i) Serve as the Secretary's principal advisor on the development, application, and use of health information technology, and direct the Department of Health and Human Service's health information technology programs;

(ii) Ensure that health information technology policy and programs of the Department of Health and Human Services (HHS) are coordinated with those of relevant executive branch agencies (including Federal commissions) with a goal of avoiding duplication of efforts and of helping to ensure that each agency undertakes activities primarily within the areas of its greatest expertise and technical capability;

(iii) To the extent permitted by law, coordinate outreach and consultation by the relevant executive branch agencies (including Federal commissions) with public and private parties of interest, including consumers, providers, payers, and administrators; and

(iv) At the request of the Office of Management and Budget, provide comments and advice regarding specific Federal health information technology programs.

***Sec. 4.*** *Reports.* To facilitate the development of interoperable health information technologies, the Secretary of Health and Human Services shall report to the President

within 90 days of this order on options to provide incentives in HHS programs that will promote the adoption of interoperable health information technology. In addition, the following reports shall be submitted to the President through the Secretary:

(a) The Director of the Office of Personnel Management shall report within 90 days of this order on options to provide incentives in the Federal Employee Health Benefit Program that will promote the adoption of interoperable health information technology; and

(b) Within 90 days, the Secretary of Veterans Affairs and the Secretary of Defense shall jointly report on the approaches the Departments could take to work more actively with the private sector to make their health information systems available as an affordable option for providers in rural and medically underserved communities.

***Sec. 5.*** *Administration and Judicial Review.* (a) The actions directed by this order shall be carried out subject to the availability of appropriations and to the extent permitted by law.

(b) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity against the United States, its agencies, its entities or instrumentalities, its officers or employees, or any other person.

**George W. Bush**

The White House,
April 27, 2004.

[Filed with the Office of the Federal Register, 8:45 a.m., April 29, 2004]

NOTE: This Executive order was published in the *Federal Register* on April 30.

## Remarks Following Discussions With Prime Minister Goran Persson of Sweden and an Exchange With Reporters

*April 28, 2004*

***President Bush.*** Okay, listen. There will be two opening statements. We'll answer a couple of questions. We'll alternate an American—not yet, a couple of opening statements. Thank you.

Welcome. Mr. Prime Minister, thanks for coming. We just had a really good discussion about common opportunities. The Prime Minister has got a clear vision about freedom and opportunity, and he's an optimistic person. He's optimistic that by working together we can achieve great things in the 21st century. We had a good discussion about bilateral relations. I reminded him there's a lot of Swedish Americans who are really proud of their heritage, proud of their home country.

So Mr. Prime Minister, welcome back. Thanks for your time. Thanks for your consideration.

***Prime Minister Persson.*** Thank you, sir. And let me also underline that we have had a very fruitful discussion, not least with the background to improve, strengthen the transatlantic relations between U.S. and Europe. It's not only about security and foreign policy; it's also about economic relations and international cooperations, not least inside multilateral structures like United Nations. With that as a framework, we have covered a discussion about Iraq, Palestinian-Israel conflict, the situation in Afghanistan, also North Korea and European matters.

And thank you, Mr. President, for receiving me. As always, frank and friendly discussion.

***President Bush.*** Frank and friendly. Deb [Deb Riechmann, Associated Press].

### *Situation in Iraq*

***Q.*** Mr. President, is it going to take an all-out military offensive to put down the insurgency in Fallujah? And can you really have a successful transfer of power in 60 days if Iraq is wracked by violence?

***President Bush.*** First, we will have a successful transfer of power. I assured the Prime Minister that the June 30th date is a solid date, and I appreciate so very much the work by the United Nations and Mr. Brahimi to lay the groundwork for the transfer of sovereignty.

Secondly, I have laid out a broad strategy that says that Iraq will be as secure as possible, that we will deal with those who want

# EXHIBIT B

# Office of the National Coordinator for Health Information Technology (ONC)

# Federal Health Information Technology Strategic Plan

# 2011 – 2015

# Table of Contents

Introduction 3

Federal Health IT Vision and Mission 6

Federal Health IT Principles 7

Goal I: Achieve Adoption and Information Exchange through Meaningful Use of Health IT 8

Goal II: Improve Care, Improve Population Health, and Reduce Health Care Costs through the Use of Health IT 21

Goal III: Inspire Confidence and Trust in Health IT 28

Goal IV: Empower Individuals with Health IT to Improve their Health and the Health Care System 36

Goal V: Achieve Rapid Learning and Technological Advancement 43

Appendix A: Performance Measures 49

Appendix B: Programs, Initiatives, and Federal Engagement 51

Appendix C: HIT Standards and HIT Policy Committees Information Flow 65

Appendix E: Statutes and Regulations 67

Appendix F: Goals, Objectives, and Strategies 70

Appendix G: Acronyms 74

ONC 77

Acknowledgements 77

Notes 78

# Putting the I in Health IT℠

# Introduction

The technologies collectively known as health information technology (health IT) share a common attribute: they enable the secure collection and exchange of vast amounts of health data about individuals. The collection and movement of this data will power the health care of the future. Health IT has the potential to empower individuals and increase transparency; enhance the ability to study care delivery and payment systems; and ultimately achieve improvements in care, efficiency, and population health.

However, these technologies – including electronic health records (EHRs), personal health records (PHRs), telehealth devices, remote monitoring technologies, and mobile health applications – are remarkably underutilized today. In 2010, only 25 percent of physician offices and 15 percent of acute care hospitals took advantage of EHRs.[i] Even fewer used remote monitoring and telehealth technologies. While many consumers access their banking information online daily, only 7 percent have used the web to access their personal health information.[ii]

Recent legislation has established an agenda and committed significant resources for health IT. The Health Information Technology for Economic and Clinical Health (HITECH) Act, passed as part of the American Recovery and Reinvestment Act of 2009, allocated billions of dollars for the health care system to adopt and meaningfully use health IT to improve health. The Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, (referred to collectively as the Affordable Care Act) builds on the HITECH Act and recognizes health IT as a critical enabler to broad transformations in health care. This document is the Federal Health IT Strategic Plan, developed under the leadership of the Office of the National Coordinator for Health Information Technology (ONC) and in close collaboration with other federal partners, for working with the private and public sectors to realize Congress and the Administration's health IT agenda.

The first Federal Health IT Strategic Plan was published in June 2008. Section 3001(c)(3) of the Public Health Service Act, as added by the HITECH Act, requires the National Coordinator to update and republish the Plan. This Plan updates the previous version to take into account the rapidly changing landscape of health IT and health IT policy. In order to update the Plan, ONC leveraged the strategic framework put forth by the HIT Policy Committee and obtained additional input by conducting interviews with representatives from federal agencies/offices and the private sector. ONC also engaged its federal partners, the private sector and members of the public to provide comments on multiple versions of the Plan.

*Goal I*, "Achieve Adoption and Information Exchange through Meaningful Use of Health IT" discusses the centerpiece of the government's health IT strategy over the next five years. "Meaningful use" is aimed at widespread adoption and information exchange in its first two stages, and will then build to improve health outcomes in the third stage. Activities are focused on two areas: defining the meaningful use of certified EHR technology; and encouraging the achievement of meaningful use through the CMS administered Medicare and Medicaid EHR Incentive Programs and the support of meaningful use through grant programs, including information exchange with public health departments and laboratories.

*Goal II*, "Improve Care, Improve Population Health, and Reduce Health Care Costs through the Use of Health IT," discusses the specific ways health IT is contributing to the goals of health care reform: improved care, improved population health, and reduced per capita costs of health care. Widespread adoption of EHRs, information exchange, quality improvement initiatives, and health care reform pilots are required to implement the Affordable Care Act. As part of each of these activities, the government is investing in and leveraging health IT to transform the health care system.

*Goal III*, "Inspire Confidence and Trust in Health IT," focuses on government efforts to update its approach to privacy and security issues related to health IT, and build greater confidence and trust in

EHRs and health information exchange among providers and the public. The digitization of health records will create a new set of challenges for protecting the privacy and security of health information, but it will also open new opportunities for improving safeguards.

*Goal IV*, "Empower Individuals with Health IT to Improve their Health and the Health Care System," discusses how the government is designing health IT policies and programs to meet individual needs and expectations, provide individuals with access to their information, help facilitate a strong consumer health IT market, and better integrate individuals' and clinicians' communications through health IT. A public that has a voice in designing national health IT policies and programs and is empowered with access to its health information through useful tools can be a powerful driver in moving toward patient-centered health care.

*Goal V*, "Achieve Rapid Learning and Technological Advancement," focuses on demonstrating ways health IT and meaningful use can enable innovation and appropriate use of health information to improve knowledge about health care across populations. In the long run, the government is pursuing a vision of a learning health system, in which a vast array of health care data can be appropriately aggregated, analyzed, and leveraged using real-time algorithms and functions.[iii] This future will require technical innovation to build on the foundation of meaningful use, as well as finding new ways to use that foundation in the practice of health care.

ONC will track national progress towards achieving the goals laid out in this Plan. Ongoing collaboration with federal agencies, states and providers will be necessary in order to realize these goals. The Plan is meant to be a living document that will be updated based on experience with stage one meaningful use and the implementation of a robust evaluation program.




**Figure 1; Federal Health IT Strategy Map**

Case 4:22-cv-01202-ADB Document 32-2 Filed 03/02/23 Page 7 of 81

# Federal Health IT Vision and Mission

## Vision

A health system that uses information to empower individuals and to improve the health of the population.

## Mission

To improve health and health care for all Americans through the use of information and technology.

# Federal Health IT Principles

**In developing and executing the federal health IT strategy, the government strives to**

- **Put individuals and their interests first.** In order to enhance the health and well-being of all Americans, the government must meet the needs and protect the rights of each individual.
- **Be a worthy steward of the country's money and trust.** The government seeks to use its resources judiciously. This means relying to the extent possible on private markets to accomplish important societal objectives, and acting to correct market failures when necessary. It also means developing governmental policies through open and transparent processes.
- **Support health IT benefits for all.** All Americans should have equal access to quality health care. This includes the benefits conferred by health IT. The government will endeavor to assure that underserved and at-risk individuals enjoy these benefits to the same extent as all other citizens.
- **Focus on outcomes.** Federal health IT policy will constantly focus on improving the outcomes of care, so as to advance the health of Americans and the performance of their health care system.
- **Build boldly on what works.** The government will set ambitious goals and then work methodically to achieve them, monitoring health IT successes, and looking for ways to expand upon programs that work. It will seek to be nimble and action-oriented: evaluating existing government activities, learning from experience, and changing course if necessary.
- **Encourage innovation.** The government is working to create an environment of testing, learning, and improving, thereby fostering breakthroughs that quickly and radically transform health care. The government will support innovation in health IT.

# Goal I: Achieve Adoption and Information Exchange through Meaningful Use of Health IT

The first priority in realizing the benefits of health IT is to achieve nationwide adoption of EHRs and widespread information exchange. As patients and providers experience the benefits of EHRs, they will demand nothing less from their health care practices. The Medicare and Medicaid EHR Incentive Programs accelerate the realization of this future by offering financial incentives to hundreds of thousands of eligible professionals, eligible hospitals and critical access hospitals for incorporating certified EHR technology into their practices. "Meaningful use" is much more than just adoption – these providers will also be required to maintain data confidentiality, share information securely with each other, engage patients with their electronic health information, and improve care.

There are a few well-defined barriers that have slowed acceptance of EHRs and widespread information exchange. Small- and medium-sized providers often do not have sufficient capital to implement EHR systems. There is a lack of skilled health IT professionals to support providers as they transition from paper records to EHRs. Using EHRs may alter current provider workflows, and many providers struggle to select systems, use them in ways that will improve care, and make the necessary changes to their processes. Finally, information exchange, which is central to realizing the benefits of EHRs, is not fully possible today – there is no interoperable infrastructure to securely exchange health information nationwide among providers, between providers and patients, and between providers and public health agencies (see Objectives I.B and I.C).

Through the HITECH Act, the Department of Health and Human Services (HHS) created a set of far-reaching programs to help providers overcome such barriers. For the Medicare and Medicaid EHR Incentive Programs, the three progressive stages of meaningful use will define what eligible professionals and hospitals can and should accomplish through the adoption and use of EHRs over the next five years. Stage one objectives focus on adopting EHRs and beginning to take advantage of basic electronic data capture, medication ordering, and decision-support tools. We expect future stages to become more rigorous, for example, by requiring providers not only to adopt the technology but to use it to exchange health information and – ultimately – to achieve improvements in care, efficiency, and population health (*see Goal II*). We anticipate that future stages of meaningful use will be aligned to support advancing nationwide-wide health goals, as defined in the HHS Strategic Plan, and the priority areas identified in the National Quality Strategy.

In addition to incentive payments, the HITECH Act programs provide significant support for providers to achieve adoption and meaningful use, including implementation support, workforce training, and information exchange support. Programs are focused on the providers that need the most help – solo and small group practices, community health centers, critical access hospitals, and providers located in rural and underserved areas. In 2010, HHS issued rules establishing the requirements of the first stage of meaningful use. HHS expects to articulate two further stages through rulemaking over the next five years. Participation in the Medicare and Medicaid EHR Incentive Programs is voluntary, but beginning in 2015, eligible professionals and hospitals under the Medicare EHR Incentive Programs will face payment reductions if they do not meet the meaningful use requirements.

In implementing the Medicare and Medicaid EHR Incentive Programs, the government is taking advantage of the experience of federal agencies that deliver health care (Department of Veterans Affairs, Department of Defense, and Indian Health Service) that have already-developed EHR systems which have been in place for over a decade. These agencies' experiences in using EHRs can offer important insights and best practices for the nationwide adoption of EHRs.

It is the government's goal that such a large-scale movement will create a tipping point – that the adoption and meaningful use of EHRs will become ubiquitous across the nation. To this end, the government is seeking to encourage meaningful use through other mechanisms in addition to HITECH Act programs. This includes supporting the above-mentioned federal agencies that deliver health care and federal grant recipients (critical access hospitals, community health centers, etc.) in meeting meaningful use requirements. We expect that medical societies and professional licensing and certifying bodies will also help to encourage meaningful use among their members. Some private insurers are already mirroring the Medicare and Medicaid EHR Incentive Programs and providing incentives for the achievement of meaningful use among their provider communities. For providers ineligible for incentive payments under the Medicare and Medicaid EHR Incentive Programs (for example, long-term and post-acute care facilities, community mental health centers, and some behavioral health providers), the government is developing technology and policy solutions that will build on the Department's meaningful use efforts and fit their unique needs (*see Strategy I.C.3*).

The government's objectives to "Achieve Adoption and Information Exchange through Meaningful Use of Health IT" are:

A. Accelerate adoption of electronic health records

B. Facilitate information exchange to support meaningful use of electronic health records

C. Support health IT adoption and information exchange for public health and populations with unique needs

**Spotlight on Health Outcomes**

## Use of health IT can improve health outcomes and enhance care coordination

George is a 62-year-old man with diabetes, hypertension, and heart failure who smokes one pack of cigarettes every day. George's primary care provider (PCP) is reviewing an EHR-generated listing of patients with an HbA1c test result over 9. She notices that George is on her list with an HbA1c of 11.2 and that he missed his last appointment and has not yet rescheduled. George's PCP emails him via secure messaging to request he make an appointment and get the following tests in advance of the visit: HbA1c and cholesterol panel. She orders these tests via computerized provider order entry (CPOE). George goes online to schedule his appointment. Prior to his appointment, George's PCP checks his lab results which are sent electronically to the EHR and sees that his HbA1c and cholesterol are still elevated. A nurse uses clinical decision support to determine that George would benefit from diabetes self-management and smoking cessation counseling, which she gives before his appointment. During his appointment, George's PCP talks to him about adding a new medication to better control his diabetes and increasing the dose of his cholesterol medicine. She sends the new prescriptions electronically to George's pharmacy so that they will be ready for pick-up when he leaves the office visit. Clinical decision support also reminds the PCP that George is due for eye and foot exams. She performs a foot exam and sends an electronic referral to the ophthalmologist's office, who will contact George via secure messaging to schedule an appointment. The ophthalmologist has access to George's record and can input data and recommendations that are viewable by his PCP, thus creating a "seamless care" model. To help him with his multiple conditions, George is set up with a case manager who will work with George to develop strategies to quit smoking and eat healthier/exercise more. The case manager has access to the full EHR and can communicate directly with the rest of the team to update them on George's progress.

Jane is an 83-year-old woman with COPD, hypertension, and peripheral vascular disease who is admitted to the hospital with pneumonia. As the admitting physician is ordering an antibiotic for pneumonia, a drug-allergy warning pops up on the screen alerting the physician that Jane had an anaphylactic reaction to penicillin in the past and another antibiotic is preferred – saving Jane from an adverse drug event. Jane is at high-risk for developing a clot in her legs, which can lead to a pulmonary embolism. As part of the admissions order set, the physician is prompted to choose a type of prophylaxis for clots, which reduces her risk of developing this complication and a prolonged hospital stay. The nurse who admits Jane notices a small decubitus ulcer present on admission. She documents the ulcer on her mobile device and monitors and treats it with the aid of clinical decision support.

*These "Spotlight on Health Outcomes" are intended to highlight exemplary ways that widespread adoption and use of health IT and electronic health information exchange could help transform and improve health care. Some of these examples are only aspirational today or only exist in select communities or health systems. However, these examples illustrate the type of transformed health care that could be possible with the achievement of the goals of this Plan.*

## OBJECTIVE A

### Accelerate adoption of electronic health records

**Strategy I.A.1: Provide financial incentive payments for the adoption and meaningful use of certified EHR technology.**

Central to the HITECH Act is the establishment of the Medicare and Medicaid EHR Incentive Programs, which makes available incentive payments that could total an estimated $27 billion over 10 years, to encourage eligible professionals and hospitals to adopt and meaningfully use certified EHR technology.[iv] The programs generally require providers to do the following:adopt EHRs that are certified according to standards, implementation specifications, and certification criteria adopted by the Secretary, and meet certain objectives and measures using certified EHR technology established for progressive stages of meaningful use as defined in CMS rules. CMS' final rule for stage one meaningful use was published in July 2010. Stage one meaningful use objectives include:

- Recording patient information into EHRs, such as gender, race, preferred language, height, weight, smoking status, and blood pressure
- Using a software application to inform clinical decisions
- Entering medical prescriptions electronically
- Providing patients with a timely electronic copy of their health information
- Securing EHRs to protect the privacy of patient data

Future stages of meaningful use are likely to include a combination of new objectives, some of which may require new EHR functionality, changes to existing objectives, such as an increase in the threshold or broadening of the definition. In the future stages of the Medicare and Medicaid EHR Incentive Programs, the government expects to reward improvement against predetermined thresholds that are associated with the adoption and use of EHRs. Stages two and three are anticipated to transition gradually away from further process requirements like those included in stage one, to requirements for improvement in outcomes and quality of care. Any such improvement measures will be in line with nationwide health goals as laid out in the HHS Strategic Plan and with the national priorities identified in the National Quality Strategy.[v] In order to receive incentive payments, eligible providers must demonstrate that they can use certified EHR technology to incorporate more sophisticated uses of health IT, such as clinical decision support (CDS), patient registries, reminder systems, and changes to workflow and clinical care redesign into their practices (see *Goal II*).

**Strategy I.A.2: Provide implementation support to health care providers to help them adopt, implement, and use certified EHR technology.**

The Regional Extension Center (REC) Program, established through the HITECH Act with more than $720 million in grants over a four-year project period, has set up 62 centers across the nation with staff and resources dedicated to helping providers implement and become meaningful users of certified EHR technology. Additionally, HRSA's Health Center Controlled Network (HCCN) Program provides resources to community health centers to implement health IT, including EHRs. Further support is provided by the Health Information Technology Research Center (HITRC), which will work to gather relevant information on effective practices and help the RECs collaborate with one another and with relevant stakeholders to identify and share best practices in EHR adoption, meaningful use, and provider support. Through its regional offices and other outlets, CMS offers support to states to encourage adoption of EHR technology.

**Strategy I.A.3: Support the development of a trained workforce to implement and use health IT technologies.**

To meet the anticipated growth in demand for health IT professionals, HITECH made available $118 million to support the training and development of more than 50,000 new health IT

professionals. Four grant programs will prepare qualified individuals to serve in 12 high priority roles related to the implementation and maintenance of EHR systems.

Three grant programs work together to prepare a workforce in six of these priority roles for which community colleges are the natural home for training: Community College Consortia to Educate Health Information Technology Professionals; Curriculum Development Centers; and Competency Examination for Individuals Completing Non-Degree Training. A fourth program, Assistance for University-Based Training, will prepare students for six different roles, for which universities are the natural home for training.[vi]

**Strategy I.A.4: Encourage the inclusion of meaningful use in professional certification and medical education.**

The federal government will encourage meaningful use to be incorporated into the U.S. medical education and accreditation processes. To this end, ONC and CMS are collaborating with various professional certification and medical education organizations to assist providers in adopting and becoming meaningful users and to incorporate meaningful use into the professional certification and medical education organizations' professional requirements. The American Board of Medical Specialties, a professional certification body, has taken steps to assist and encourage physicians in the adoption and meaningful use of EHRs, with the ultimate goal that such EHR use and competencies should become an element of professional certification.

**Strategy I.A.5: Establish criteria and a process to certify EHR technology that can support meaningful use criteria.**

In order for eligible providers, eligible hospitals, and critical access hospitals to qualify for the Medicare and Medicaid EHR Incentive Programs, they must first adopt certified EHR technology that meets established criteria, which are aligned with the Medicare and Medicaid EHR Incentive Programs meaningful use requirements. The HHS Secretary has adopted EHR standards, implementation specifications and certification criteria, as well as a process for EHR technology to gain certification. These programs aid providers in selecting certified EHR technologies that support them in becoming meaningful users. ONC collaborated extensively with the National Institute of Standards and Technology (NIST) to establish the certification processes.

Established through rulemaking in 2010 and 2011, ONC's certification programs specify how organizations can become authorized by the National Coordinator to certify EHR technology as being compliant with the standards, implementation specifications, and certification criteria adopted by the HHS Secretary.

ONC published the Initial Set of Standards, Implementation Specifications, and Certification Criteria interim final rule in January 2010 and a final rule in July 2010. The certification criteria establish the required capabilities, standards, and implementation specifications in EHR technology that supports the achievement of meaningful use stage one. The certification criteria will continue to evolve with future rulemakings, as further stages of meaningful use are established.

ONC, with its federal partners, will consider whether to adopt certification criteria for health IT that is used by non-eligible providers (such as long-term and post-acute care facilities), and whether the availability of certification for specific types of health IT would be beneficial.

**Strategy I.A.6: Communicate the value of EHRs and the benefits of achieving meaningful use.**

HHS is conducting outreach to providers to increase awareness of the HITECH Act programs that are available to support efforts to attain meaningful use and to share evidence and best practices on the use of health IT to improve health. Primary care providers are a primary audience for this strategy (see Strategies III.B.1 and IV.A.2 for outreach directed at individuals). The strategy will have four aims:

- Raise awareness among providers about the availability and benefits of EHRs and other health IT
- Educate providers about privacy and security protections as they relate to EHRs and other health IT
- Encourage providers to participate in HITECH Act programs and other federal initiatives (e.g., Medicare and Medicaid EHR Incentive Programs, grants, contracts) in order to take full advantage of EHRs and other health IT
- Increase provider understanding of health IT products and services, so that they may make informed decisions and take full advantage of the technologies' benefits

The education and outreach strategy is being developed by ONC, CMS, and the Office for Civil Rights (OCR), and will be implemented over the next two years.

### Strategy I.A.7: Align federal programs and services with the adoption and meaningful use of certified EHR technology.

HHS is committed to encouraging providers that are not eligible for the Medicare and Medicaid EHR Incentive Programs to use EHR technologies to improve the care they provide to patients. For future stages of meaningful use, HHS plans to propose more rigorous health information exchange requirements which may encourage providers that are not eligible for the incentive programs (e.g., long-term and post-acute care facilities, community mental health centers or substance use disorder treatment providers) to adopt health IT and participate in health information exchange. The Federal Health IT Taskforce,[vii] consisting of the National Coordinator for Health IT, administration officials, and other federal agency leads for health IT, is the key federal committee responsible for coordinating federal health IT investments and aligning programs to support meaningful use of certified EHR technology.

Specifically, the Department of Defense (DoD), Department of Veterans Affairs (VA), and Indian Health Service (IHS) are developing plans for their health care systems to align with meaningful use. Similarly, the Health Resources and Services Administration (HRSA) and the Federal Communications Commission (FCC) are developing plans to encourage their grantees and subsidy recipients, respectively, to become meaningful users. The Substance Abuse and Mental Health Services Administration (SAMHSA) is working to foster adoption and implementation of certified EHRs among its providers that are ineligible for the Medicare and Medicaid EHR Incentive Programs, including community mental health centers and substance use disorder treatment facilities. Finally, the Office of Personnel Management (OPM) is developing a strategy to encourage health plans that provide coverage through the Federal Employee Health Benefits (FEHB) Program to support EHR adoption and meaningful use among their networks of providers.

### Strategy I.A.8: Work with private sector payers and provider groups to encourage providers to achieve meaningful use.

The federal government will support the efforts of private payers and private provider groups to encourage their networks of providers to achieve meaningful use. Some major payers have begun to implement incentive programs that will work in parallel with the Medicare and Medicaid EHR Incentive Programs and utilize meaningful use objectives. These programs have the potential to play a role in expanding the number of providers who achieve meaningful use, and may also provide incentives for providers who are not eligible for the Medicare and Medicaid EHR Incentive Programs. In addition, some private sector payers are implementing new payment models that increasingly rely on collaboration among health care providers to coordinate patient care and achieve efficiencies. These new payment models are helping to create a business case for providers not eligible for incentives under the Medicare and Medicaid EHR Incentive Programs to adopt health IT and participate in health information exchange.

### Strategy I.A.9: Encourage and facilitate improved usability of EHR technology.

The government is collaborating with industry and researchers to improve the usability of EHRs. The usability of EHRs is considered a key barrier to adopting health IT and achieving meaningful use. NIST is conducting ongoing research and advancing the development of standards and test methods that can be used to evaluate and improve the usability of EHRs. It has released a Common Industry Format (CIF), a standard for developers to report usability test findings and demonstrate evidence of usability in their products in a format that allows for independent evaluation of a single product and comparison across multiple products. NIST is also developing guidance and tools for RECs and professional societies on available tools and resources to incorporate concepts of usability in selecting and implementing EHR systems. The Food and Drug Administration (FDA), in collaboration with NIST and the Agency for Healthcare Research and Quality (AHRQ), will develop best practices to address systematic evaluation of usability with regard to patient safety to ultimately improve patient care. AHRQ is developing toolkits that medical practices can use to assess the usability of EHR systems and assess the redesign workflow. In addition, AHRQ is conducting research and convening industry workgroups that provide perspectives on what constitutes usability and how to systematically improve the usability of EHRs.

ONC will explore ways to improve the ability of providers to select or change EHR products by improving data portability. Reducing the cost associated with switching products while increasing data fluidity and choice can help drive market competition to improve the usability of EHR products.

ONC has directed one of its four Strategic Health IT Advanced Research Projects (SHARP) (see Strategy V.B.2) to further EHR usability through the identification and development of better cognitive and user-centered design. In addition, ONC is working with private sector groups to encourage the collection of usability information and its dissemination to vendors and consumers through mechanisms they can trust.

## OBJECTIVE B

## Facilitate information exchange to support meaningful use of electronic health records

For future stages of meaningful use, the plan is to propose health information exchange and interoperability requirements that are more rigorous, so that patient information follows patients to the point of care and informs critical health decisions. This will require overcoming barriers across geographies and stakeholders (i.e. providers, laboratories, hospitals, pharmacies, behavioral health clinics, and patients), including insufficient demand for electronic health information, lack of a business model for facilitating exchange, and disparate federal, state, and local policies that hinder exchange. It will also require more rigorous standards to support interoperability so that the data that is exchanged can be used for multiple purposes.

Historically there have been significant barriers to the adoption and use of EHRs to exchange information, including their cost, low provider demand, the perceived lack of financial return for investing in them, and the technical and logistical challenges involved in installing, maintaining and updating them.[viii] But the Medicare and Medicaid EHR Incentive Programs and the Affordable Care Act payment reforms are sparking a paradigm shift in the collection and use of health care data that addresses some of these challenges head on. First, the Medicare and Medicaid EHR Incentive Programs reward eligible professionals and hospitals who digitize health care information. We anticipate that the requirements for sharing information electronically across provider settings will grow stronger in future stages. Second, ongoing payment reforms initiated by the Affordable Care Act – including accountable care organizations, medical home models, and bundled payments – are an even more important potential driver of provider motivation to exchange information. Private sector payers may also adopt similar payment reforms to align with Medicare and Medicaid. To prepare for such reforms, hospitals are already reaching out to their surrounding community providers to share

information and EHR systems. Eventually, as digital health information becomes more widely available, exchanging it will be more natural and incentives will become less relevant. Several challenges also exist to creating a national infrastructure whereby business networks can connect to one another, including but not limited to the development of consistent standards to ensure interoperability and privacy and security protocols to ensure trust that the network will handle information appropriately. Health information exchanges (HIEs) must be designed to address legal, organizational, and technical challenges that might otherwise impede their sustainability.

With demand increasing, the government is helping to ensure that exchange standards and infrastructure are in place to meet it. This does not mean constructing significant new national infrastructure from scratch. Rather, the federal government, in close collaboration with state governments, is helping evolve the various current exchange models, so that – taken together – they may serve every health care provider and meet a broader set of health care needs. There are many examples of information sharing that are already occurring in the health care system, and the government will foster the growth and development of these models. Where there are gaps in exchange options, the government will identify the specific barriers to exchange and develop plans to address them. Finally, so that communication and information sharing can take place across various information exchange models – both public and private – the government will advance national adoption of key exchange standards.

### Strategy I.B.1: Foster business models that create health information exchange.

Many sustainable exchange options already exist for certain providers and certain types of health information. Some hospital networks and group provider practices have found a business case for investing in information exchange within their networks. Vendors of EHR systems are developing "information networks" for their customers. Communities are creating health information networks to facilitate information sharing among providers. Diagnostic lab companies and electronic prescription companies are offering services that enable exchange of specific pieces of health information for providers able to pay for them. The Nationwide Health Information Network standards, services, and policies – including the Nationwide Health Information Exchange and Direct protocols – are being used by many health care organizations as the preferred solution to exchanging information across organizational and geographic boundaries. Protocols such as Blue Button (*see Strategy IV.B.2)* provide a method to electronically exchange health information between providers and consumers. The Blue Button is an initiative at DoD, VA, and CMS that enables individuals to access a web-based portal to download their personal health information and share this information with health care providers, caregivers, and others they trust.

For as many providers as possible, the first priority is finding the right combination of already-available exchange models that will enable them to electronically exchange lab results, patient care summaries, and medication histories. State-level grantees in the State HIE Cooperative Agreement Program are identifying, articulating, and promoting adoption pathways that will help providers do just that. RECs will work with individual providers to identify and implement the right pathway.

ONC is also making it easier, faster, more secure, and less expensive to transport health information. The Direct project at ONC enables a simple, secure, scalable, standards-based way to send authenticated, encrypted information directly to known, trusted recipients over the Internet. Direct helps some providers satisfy the stage one meaningful use requirements by allowing a secure method of pushing content from a sender to a receiver. For example, by leveraging Direct, a primary care physician can send a secure email with a clinical summary of a patient to a referring specialist. Direct is a national solution to health information exchange that can rapidly lower the cost and complexity of local interfaces between providers, laboratories, hospitals, pharmacies, and patients, in turn substantially lowering the cost of providing information exchange services. In some cases this could make it possible for a small provider to

connect to a lab company or a health information exchange organization, where it may have been cost prohibitive for them to do so otherwise. Federal partners that provide health care services, including the VA, are implementing Direct as a consistent, national solution for directed exchange in local communities. The RECs will promote EHRs that already have the Nationwide Health Information Network Direct interfaces built in, lowering the cost of exchange for small providers. Continuing work to simplify and extend the Nationwide Health Information Network will continue to focus on lowering the cost of exchange and improving the interoperability of EHR systems.

ONC continues to work with the private sector and federal health care organizations to further refine the standards, services, and policies for securely exchanging authorized health information between providers through the Nationwide Health Information Network Exchange protocols. For example, the query/response protocols provide a method of exchanging information, when authorized, between a provider and another authenticated entity that may have information on a patient that is necessary for care. In this case, a query is sent to providers with an authorization and responses are sent with the needed information. This model provides a high level of information exchange potential and capability. It also requires a robust electronic health record system and investment. Currently, the Nationwide Health Information Network Exchange is primarily used by a group of federal agencies and private organizations that have come together to securely exchange electronic health information and are demonstrating the capabilities of information exchange. Today, select participants in the Nationwide Health Information Network Exchange are: exchanging summary patient records for Social Security Administration (SSA) disability determination purposes; exchanging summary patient records for the Virtual Lifetime Electronic Health Record (VLER); and participating in bio-surveillance and case reporting with CDC. The Exchange protocols and the pilot programs that are using them will help pave the way for broader adoption of query/response exchanges as envisioned by the authors of the President's Council of Advisors on Science and Technology (PCAST) December 8, 2010 report, *Realizing the Full Potential of Health Information Technology To Improve Healthcare for Americans: The Path Forward* and many health information thought leaders.

In addition to the exchange of health information between providers, the exchange of information that engages individuals and gives them access to their health data is a top priority of the Medicare and Medicaid EHR Incentive Programs. The best way to empower individuals and reorient the health care system to be more patient-centered is to give patients access to their personal health information. Information exchange protocols such as the Blue Button format that was developed and adopted by the VA, DoD, and CMS, is one way to put patients at the center and give them control of their information. ONC supports the exchange of information with consumers and the re-use of such information for themselves and with providers.

This portfolio of exchange mechanisms is part of a broad national strategy to have an interconnected health system through the Nationwide Health Information Network. The Nationwide Health Information Network is being developed by ONC to provide the building blocks for a secure, nationwide, interoperable health information infrastructure that can connect providers, consumers, and others involved in the health care system. Exchange, Direct and evolving methods of health information exchange create an infrastructure that is critical to enabling health information to follow a patient and be available for clinical decision making and uses beyond patient care, such as measuring quality.

Finally, the government will also seek to remove unnecessary regulatory barriers to sustainable exchange options, helping them to develop. In collaboration with the State HIE Cooperative Agreement Program, for instance, state governments will look for ways to align Medicaid policies to health information exchange requirements.

### Strategy I.B.2: Monitor health information exchange options and fill the gaps for providers that do not have viable options.

Many providers – particularly those in areas with low hospital and provider density – are not currently supported by sustainable information exchange models. A main focus of the State HIE Cooperative Agreement Program is expanding existing networks to help these providers. The program is investing over $500 million in supporting state-level initiatives to expand capacity for exchanging health information both within and across states. It encourages states to develop statewide HIE plans which will align with the nationally recognized standards and services and state Medicaid initiatives. States will support providers by building on existing exchange activities, providing critical shared services and infrastructure such as provider directories, record locator services, and master patient indices, increasing the use of standards, services, and policies needed for widespread information sharing, and enhancing the information exchange capabilities of key trading partners including clinical laboratories, pharmacies, and public health agencies.

In order to exchange health information electronically, providers must have broadband Internet access. The FCC's Rural Healthcare Program subsidizes broadband access for health care providers that are disadvantaged in meeting this requirement. The program is authorized to spend up to $400 million per year to ease the burden of costly telecommunications services for rural health care providers. The program is divided into two different components: one that subsidizes ongoing monthly costs, and one that helps providers build new infrastructure where the existing infrastructure is insufficient. In addition, the U.S. Department of Agriculture (USDA)'s Broadband Technologies Opportunities Program (BTOP) and Department of Commerce's Broadband Initiatives Program (BIP) were collectively funded by over $4 billion through the Recovery Act to support broadband grants around the country. Health care was one of the strategic priorities of these grant programs.

The government will also encourage consumers to gather and exchange their own individual health information. Informed and engaged consumers who have access to their own interoperable health records can be a powerful force for bringing that information with them to the point of care. See Goal IV for more detail on how the government will accelerate consumers' and caregivers' access to their electronic health information in a format they can use and reuse.

### Strategy I.B.3: Ensure that health information exchange takes place across individual exchange models, and advance health systems and data interoperability.

Electronic health information can be a critical element in the implementation of business models, such as bundled payments and accountable care organizations being implemented through the Affordable Care Act. These delivery system reform models will rely on richer and more timely information to better align payments with the actual costs of providing efficient care. These efforts, as well as future proposals for subsequent stages of meaningful use, will rely on these emerging models for sustainable information exchange and will likely require greater capacity for connecting the various models – so that providers may securely send health information to any other authorized provider through the Internet. HHS recognizes that the government has a duty to help ensure that health information can flow where needed and follow patients where they go, consistent with patient preferences. CMS recently reinforced this policy in its proposed regulations on accountable care organizations[ix]. ONC is putting in place the standards, services, and policies to support the infrastructure needed to connect these emerging models for exchange.

Nationally, the government is developing a standards and interoperability framework (S&I framework) to harmonize existing standards and improve sharing of standards across different organizations and federal agencies, making it easier to broaden interoperability through shared standards for data and services. In order to support exchange and advance interoperability, there are three types of standards that the S&I framework will support.

First, the S&I framework will focus on identifying transport standards. These standards enable one provider to exchange data with another provider, or

one system to another system, securely. A second type of standards is necessary for the data to be interoperable between different providers, or systems. These are known as content standards, which allow data to be packaged or "read" in a way that is useful for the provider. For example, the Medicare and Medicaid Incentive Programs' stage one criteria require that an eligible professional generate and transmit prescriptions electronically. The S&I framework ensures that standards are available that enable certified EHR technology to view data in a way that is usable to the provider in ordering the prescription and usable to the pharmacist receiving the prescription. Lastly, the S&I framework will identify vocabulary and terminology standards and value sets in order to achieve semantic interoperability at the level of individual data elements. ONC will work to reduce variability in vocabulary and terminology standards which will help to reduce costs and to move toward more semantically interoperable health information exchange. ONC will work with its federal partners and standards development organizations to harmonize the existing standards and vocabularies they produce to create the building blocks and implementation packages in support of national priorities, including meaningful use.

The S&I framework is intended to be flexible, so that it can be used to establish meta-data standards, or "data about data," that include additional information about the context in which the data has been collected. The S&I framework will provide tools, data and meta-data standards, value sets, and service descriptions in an integrated and harmonized way to support meaningful use and interoperability, and focus these efforts on the highest priority kinds of information exchange. ONC is leading this effort in close collaboration with other federal agencies. The S&I framework will support not only existing specifications for the Nationwide Health Information Network, but also support new meta-data tagged approaches recommended by the President's Council of Advisors on Science and Technology (PCAST) December 8, 2010 report, *Realizing the Full Potential of Health Information Technology To Improve Healthcare for Americans: The Path Forward.*

ONC, and its federal partners, will continue to use the HIT Policy and HIT Standards Committees (ONC's federal advisory committees) to provide recommendations on priorities for standards. ONC, and its partners, will promote the adoption of standards through the Medicare and Medicaid Incentive Programs and other federal programs.

In establishing and maintaining the S&I framework, ONC will leverage the National Information Exchange Model (NIEM) processes. NIEM is a government collaborative of the U.S. Department of Justice, the U.S. Department of Homeland Security, and HHS designed to develop, disseminate, and support enterprise-wide information exchange standards and processes to enable jurisdictions to effectively share critical information. NIEM processes will help ensure that existing applicable standards are re-used when possible, creating efficiencies in the government standards work. ONC will work with its federal partners to leverage the NIEM processes where possible and add to it as necessary.

This strategy recognizes the experience and leadership of federal agencies and offices – including National Institutes of Health/National Library of Medicine (NIH/NLM), Centers for Disease Control and Prevention (CDC), CMS, AHRQ, FDA, and the Office of the Assistant Secretary for Planning and Evaluation (ASPE) – and private sector standards development organizations and aims to leverage existing standards and standards development processes where possible. The federal government has a role in ensuring that standards designated for U.S. health information exchange are readily available and are regularly maintained and enhanced in response to feedback from implementers and users. Federal agencies encourage the adoption and use of standards, participate and coordinate actively in standards development organizations, and direct and support specific standards development projects to address implementation problems and fill gaps. In the case of some terminologies and code sets, federal agencies, including NIH, CDC, CMS, and FDA, support the development and ongoing maintenance and free dissemination of designated standards and

promote their use across the spectrum of health care, public health, and research.

Using the integrated set of specifications developed in the S&I framework and shared services and infrastructure (e.g., provider directories, record locator services, and master patient indices), the Nationwide Health Information Network will be the preferred solution to securely exchange information nationwide to support meaningful use. Health care organizations using the Nationwide Health Information Network to share health information can serve as innovators, creating a pathway to more advanced health information exchange and interoperability.

In order to engender trust and interoperability and facilitate broad participation in the Nationwide Health Information Network, ONC will establish a governance mechanism through rulemaking that seeks to include accountability and oversight of nationwide information exchange. The Nationwide Health Information Network governance rules will be established as a voluntary solution to health information exchange. The government will pursue various options to encourage participation in this preferred solution to nationwide information exchange.

In carrying out its assigned duties, ONC is tracking standards activities in other countries and learning from their experiences with health IT and health information exchange. Currently, ONC is working to identify whether there are internationally recognized standards that should be endorsed for use in the United States. To further this effort, ONC intends to participate in international efforts to identify interoperability standards and implementation specifications for EHR technologies that will facilitate data and systems integration. ONC's input into these international standards activities should ensure that U.S. standards will work with the international community in the event of global public health emergencies.

## OBJECTIVE C

## Support health IT adoption and information exchange for public health and populations with unique needs

**Strategy I.C.1: Ensure public health agencies are able to receive and share information with providers using certified EHR technology.**

CDC, CMS, FDA, NIH, HRSA, the Assistant Secretary for Preparedness and Response (ASPR), and ONC are working together to ensure that meaningful use of certified EHR technology supports the needs of public health agencies. Meaningful use stage one currently includes an objective on the menu set to submit electronic syndromic surveillance data, immunization registries, and electronic lab reporting to public health agencies. This will pave the way for EHRs to exchange information with local, state, and federal public health agencies and will set the stage for two-way communication between providers and these public health agencies prior to, during, and after an incident. Eventually, information exchange between providers and public health entities can be expanded. It can include routine and emergency public health preparedness and response, and many-ways exchange of information (i.e., between different providers, public health agencies at different jurisdictions, and public health reference laboratories) for immunizations, public health case reports, and situational awareness reports. CDC is helping local and state public health agencies prepare their systems and processes for such changes. Through the State HIE Cooperative Agreement Program, state governments and state Medicaid agencies will play a key role in building the public health infrastructure to support meaningful use. As with clinical data, public health departments require public health standards to effectively exchange information. CDC's Public Health Informatics and Technology Program Office (PHITPO) at the Office of Surveillance, Epidemiology and Laboratory Services (OSELS) is leading the development of public health standards in coordination with FDA, NIH and other agencies, that align with certified EHR technology.

### Strategy I.C.2: Track health disparities and promote health IT that reduces them.

In order to achieve nationwide adoption and meaningful use of certified EHRs, it is critical that providers who face unequal challenges in adopting and using EHRs be included in the government's initiatives. The RECs are providing outreach and technical assistance to support providers who serve underserved communities and resource-poor settings, including small practice settings, rural hospitals/clinics, community health centers, and Critical Access Hospitals. The RECs will work through community-based organizations and will develop tailored solutions and best practices to reach these providers. RECs will also collaborate with groups representing underserved and minority providers on the national and local levels.

ONC is also investing in better ways to monitor and identify disparities in health IT adoption. This effort can enable ONC to measure health IT adoption disparities and focus resources on areas of greatest need to mitigate disparities.

HHS is evaluating approaches for using health IT to collect and analyze data about disparities (on the bases of race, ethnicity, gender, primary language, and disability status) in health and health care provision, and using this data to improve the care of underserved populations. Beacon Community grantees are acting as test sites for using health IT for this purpose. RECs will disseminate best practices identified by Beacon Communities to providers and other organizations serving underserved communities. NIST will provide technical guidance for EHR design and development, in order to help prevent the creation or exacerbation of health care disparities with the adoption and utilization of EHRs.

Through efforts underway related to the Medicare and Medicaid EHR Incentive Programs, the Children's Health Insurance Program Reauthorization Act (CHIPRA) of 2009, and other initiatives authorized by the Affordable Care Act, HHS is developing electronic clinical quality measures that enable providers and hospitals to gauge the health status of their communities. Also, standards developed to support meaningful use will strengthen data collection and quality measurement, enabling quality improvement efforts that reduce health disparities.

Existing health IT applications such as telehealth can be used to address gaps in access and quality of health care services. Telehealth uses electronic information and telecommunications technologies such as videoconferencing and wireless communication to support long-distance care. The HRSA Health Disparities Collaboratives (HDC) were created to assist in the transformation of primary health care practices in order to improve the care provided to everyone and to eliminate health disparities. HDC now continues as a private endeavor. HRSA's Telehealth Network Grant Program supports established telehealth networks that are looking to expand the number of sites that are receiving clinical services. HRSA's Telehealth Resource Program funds Centers of Excellence, which provide technical assistance on telehealth to any HRSA grantee in the country. In addition, IHS, VA, CMS, and USDA all take advantage of telehealth technologies to meet the needs of disparate populations. In order to improve access to quality health care services through telehealth, ONC is working with states to increase medical licensure portability by streamlining licensure application and credentials verification processes so providers can more easily apply for a license in multiple states. ONC is also working with HRSA on developing a report to Congress for the use of health information technology in underserved communities.

### Strategy I.C.3: Support health IT adoption and information exchange in long-term/ post-acute, behavioral health, and emergency care settings.

Providers working in long-term and post-acute care (LTPAC) and behavioral health settings are essential partners in patient care coordination. ONC, CMS, and ASPE will collaborate to address quality measures and evolving clinical decision support opportunities that will promote appropriate exchange of health information in LTPAC and behavioral health care settings for optimal coordination of care.

HHS will build on meaningful use to adopt electronic standards for the exchange of clinical data among facilities and community-based LTPAC settings, including, where available, standards for messaging and nomenclature. ONC will leverage the State HIE and Beacon Community grant programs in demonstrating methods for which the electronic exchange of information with LTPAC entities can improve care coordination. In addition, HHS will identify opportunities in the Affordable Care Act to support the use of health information exchange technologies by LTPAC and behavioral health providers to improve quality of care and care coordination.

SAMHSA, in collaboration with ONC, will explore approaches to support adoption of certified EHR technology within the behavioral health community.

ONC is working with SAMHSA and HRSA to address the policies and standards concerning the unique needs of behavioral health IT adoption and information exchange. This includes work on data and meta-data standards that can provide additional clinical context such as patient preferences and sources of data to help enable data segmentation and secure exchange of sensitive health information. The ability to integrate mental health data into the primary care and related safety net system is essential for coordinating care.

Recognizing that emergency care settings are essential places for patient care coordination, ONC and ASPR will explore ways to address the need for clinical data to be available in emergency care situations and identify policies and standards that are necessary to support these needs.

# Goal II: Improve Care, Improve Population Health, and Reduce Health Care Costs through the Use of Health IT

The recently passed Affordable Care Act will transform American health care from a system that emphasizes transactions to a system that emphasizes improved care, improved population health, and reduced per capita costs of health care. The widespread adoption and meaningful use of certified EHR technology is a necessary interim step in this transformation. It will be essential to build upon this health IT infrastructure and use the information made available by EHRs in order to move toward HHS' three overarching aims. But while health IT is necessary to affect such changes, technology by itself is insufficient. For this reason, federal health IT investments are being made in lockstep with other reform efforts, many of which were initiated and funded by the Affordable Care Act.

Programs underway at ONC and AHRQ are looking at ways to combine more sophisticated uses of health IT and clinical care redesign to achieve better health outcomes and improve health system performance. The HITRC and REC programs will make these best practices – such as using clinical decision support tools, patient registries, and reminder systems – available to providers throughout the country. The CHIPRA Quality Demonstration grants are also expected to demonstrate promising new ways that health IT can be used to improve pediatric health care. CMS expects that for future stages of meaningful use, the financial incentives will encourage providers to use more sophisticated health IT to achieve higher level improvement measures. HHS will leverage both the Medicare and Medicaid EHR Incentive Programs and the implementation of administrative simplification requirements under Section 1104 of the Affordable Care Act to create cost savings through increased standardization and automation of health care administrative functions.

A key part of the Affordable Care Act is the development of quality and outcome measures. E-measures can facilitate the electronic capture, reuse and reporting of health data. E-measures will support federal and state quality improvement efforts and enable providers to assess their own performance with their patients.

Central to both the HITECH Act and the Affordable Care Act is fostering and learning from breakthrough examples of health care delivery system change, which can then serve as models for more widespread changes. The Beacon Community grants from the HITECH Act have created 17 demonstration communities in which clinicians, hospitals, payers, and patients will show how advanced uses of health IT can achieve improvement goals in care, efficiency, and population health. The new CMS Center for Medicare and Medicaid Innovation will test a range of innovative payment and service delivery models, many of which will require advanced uses of health IT to achieve their objectives. These examples may employ the latest health IT – remote monitoring, telehealth, mobile health (mHealth) applications, and the most advanced means of information exchange – and could become achievable, sustainable, and replicable examples of how the government can build upon the nationwide adoption and meaningful use of EHRs.

Finally, the Affordable Care Act directs HHS to develop a national strategy for prevention and health promotion. Health IT will play a fundamental role in supporting this national strategy, providing the necessary infrastructure for disease prevention, early detection, and condition management before an illness becomes severe. CDC, in collaboration with state, local, and other federal public health agencies, leads federal efforts to provide and improve the core capacities of the public health IT infrastructure. Health IT facilitates coordination across public health entities and other organizations, improves identification of at-risk populations and their adherence to public health guidelines, expedites responses to threats, notifiable conditions, and adverse population events, and promotes consumer

participation in public health by encouraging healthy behaviors and behaviors that screen for, detect, and effectively manage disease.

The government has four objectives to "Improve Care, Improve Population Health, and Reduce Health Care Costs through the Use of Health IT":

A. Support more sophisticated uses of EHRs and other health IT to improve health system performance

B. Better manage care, efficiency, and population health through EHR-generated reporting measures

C. Demonstrate health IT-enabled reform of payment structures, clinical practices, and population health management

D. Support new approaches to the use of health IT in research, public and population health, and national health security

## Spotlight on Health Outcomes

### Health IT and information sharing can improve medical decision-making

Meaningful use of EHRs can result in more effective management of the risk factors associated with heart disease. George's PCP works within a patient-centered medical home model that provides the organizational infrastructure and support so that she can best manage George's care. This model helps to improve coordination of George's care by enabling any specialists George sees and PCP to electronically access and share critical information to make better informed, appropriate and timely care decisions. Through electronic information exchange, all the providers on George's care team are able to seamlessly review George's most recent blood pressure reading, smoking status, labs, diagnostic tests, and clinic visit notes. George's cardiologist is able to make recommendations using information in real time, and his PCP can view the care plan in the EHR. All of these providers can share in the reward for providing better value health care and keeping George healthy.

While in the hospital, Jane's physician notices she is slurring her speech and exhibiting some slight right arm weakness. He believes she is having a stroke and instructs the care team to start the appropriate treatment protocol. To confirm the diagnosis, Jane's phycian consults her health record that is shared by all the providers on her care team. He notices that in a visit with her PCP last week, there is no indication of a problem with Jane's speech or strength in either arm, which suggests these symptoms are new. The physician discusses with Jane and her family that she is likely having a stroke. With the patient's and her family's consent, the medical team performs a CT scan of Jane's head and starts medication immediately to break up the clot and save Jane from a potentially debilitating stroke. Without the shared information on hand, Jane's symptoms may not have been noticed.

*These "Spotlight on Health Outcomes" are intended to highlight exemplary ways that widespread adoption and use of health IT and electronic health information exchange could help transform and improve health care. Some of these examples are only aspirational today or only exist in select communities or health systems. However, these examples illustrate the type of transformed health care that could be possible with the achievement of the goals of this Plan.* ***See endnotes for citations.***

## OBJECTIVE A

## Support more sophisticated uses of EHRs and other health IT to improve health system performance

**Strategy II.A.1: Identify and implement best practices that use EHRs and other health IT to improve care, efficiency, and population health.**

Goal I of this plan describes the Medicare and Medicaid EHR Incentive Programs' payments available to providers who become meaningful users – the centerpiece of the government's health IT strategy. The success of the meaningful use program will create the fundamental health IT adoption within the health system necessary to support the health reform efforts outlined in the Affordable Care Act. The Medicare and Medicaid EHR Incentive Programs, as established by the HITECH Act, represent a significant step in enhancing the performance of the health system. The Medicare and Medicaid EHR Incentive Programs also create a basic health IT and information exchange foundation that can support further improvement interventions that are either not possible or too difficult and burdensome on providers without this foundation.

The HITRC program makes tools and best practices available to providers as they implement clinical care redesign and more sophisticated health IT into their offices. HITRC will identify ways to build on EHR use by changing clinical workflows and integrating EHR software, patient registries, and medication reminder systems. The use of these tools can support better decision-making at the point of care and increased adherence to treatment regimens, helping move health care from a reactive system to one that focuses on prevention and improved care management.

Clinical decision support (CDS) systems are tools that leverage EHRs to improve clinical processes. Broadly, these software systems build off of EHRs, giving providers helpful information and analytical support at the point of care. Various clinical decision support rules can help providers analyze patient information, supply them with performance reports against quality measures, and assist them with diagnoses.

AHRQ and CDC will continue their critical role in assessing and promoting best practices related to how health IT can be utilized to improve quality of care, patient engagement in self-care, management of chronic diseases, and management of public and population health.

Promising practices and lessons learned from the CMS CHIPRA Quality Demonstrations will be communicated on a regular basis to State Medicaid and CHIP programs to further promote successful HIT and EHR initiatives important to vulnerable populations.

With the establishment of the REC program, the government now has a way to disseminate tools and best practices to providers that need the most help in implementing them into their practices. The RECs will build on their existing relationships with these providers to help them achieve improved health outcomes through more sophisticated uses of EHRs and other health IT.

**Strategy II.A.2: Create administrative efficiencies to reduce cost and burden for providers, payers, and government health programs.**

For future stages of meaningful use, HHS expects to propose measures that simplify administrative processes and help lower costs in the clinical setting.

In January 2009, HHS adopted modifications to two HIPAA Administrative Simplification medical data code set standards for medical diagnosis and inpatient procedure coding. Under these regulations, covered entities will be required to transition from using the International Classification of Diseases, Ninth Revision, Clinical Modification (ICD-9-CM) in HIPAA-covered transactions to using the International Classification of Diseases, Tenth Revision, Clinical Modification (ICD-10-CM/PCS), Procedure Coding System in October 2013. ICD-10-CM/PCS code sets will enable a more granular understanding of health care treatments and outcomes, and more complete analyses of treatment

costs, ultimately allowing for better disease management and more efficient health care delivery.

In expanding coverage to as many as 32 million new Americans, the Affordable Care Act called for some specific technology-enabled improvements in the government's administration of health care. These include: standards and protocols for streamlining eligibility and enrollment into federal and state health and human services programs; a consumer portal for accessing health insurance information online; and the creation of new health insurance exchanges by 2014. To fulfill the requirement under Section 1561 of the Affordable Care Act to develop interoperable and secure standards and protocols to facilitate enrollment of individuals in federal and state health and human services programs, ONC organized a workgroup, under the auspices of the HIT Policy Committee and HIT Standards Committee, that produced recommendations to those committees, which were approved by the full committees to facilitate more seamless enrollment processes. The government will incorporate standards and criteria as a condition for receiving federal grant funding for these systems, and will employ other mechanisms to further the development of efficient eligibility and enrollment systems. ONC will support the implementation of these health information technology improvements where mandated by law, and in all cases will ensure that the Affordable Care Act technology implementation efforts are synchronized with federal priorities for meaningful use and health IT privacy and security. HHS will also reduce the burden for providers when reporting required data to federal agencies through use of data standards and efficient and effective information exchange planning and design.

## OBJECTIVE B

## Better manage care, efficiency, and population health through EHR-generated reporting measures

**Strategy II.B.1: Identify specific measures that align with the National Quality Strategy.**

In March 2011, HHS established the National Quality Strategy, as required by the Affordable Care Act. The Plan initially focuses on six priorities that have great potential for rapidly improving health outcomes and increasing the effectiveness of care for all populations. As the National Quality Strategy is implemented in 2011 and beyond, HHS will work with stakeholders to create specific quantitative goals and measures for each of these priorities. A part of these activities will be the development of e-measures that can collect and report data through EHRs. HHS agencies will work together to ensure the development of e-measures that are aligned across reporting programs to reduce the burden on providers and that can be supported by the implementation of the Medicare and Medicaid EHR Incentive Programs.

**Strategy II.B.2: Establish standards, specifications, and certification criteria for collecting and reporting measures through certified EHR technology.**

Based on the measures defined in II.B.1, ONC, in collaboration with others in HHS, VA, and DoD will establish standards, specifications, and certification criteria for EHRs that facilitate the collection and reporting of e-measures. Using the S&I framework, these e-measures will be harmonized with other standards used to support data collection and information exchange. The development of e-measures will lead to more cost efficient and timely assessments of health care performance.

Building e-measures into EHRs will allow providers to assess and monitor their health care performance. ONC will make available open source tools that help providers submit quality measures to government agencies, better understand their patient populations, and identify opportunities for improving the health of their patients.

Case 4:22-cv-00202-DB Document 1-2 Filed 03/3/2023 Page 26 of 81

## OBJECTIVE C

### Demonstrate health IT-enabled reform of payment structures, clinical practices, and population health management

**Strategy II.C.1: Fund and administer demonstration communities to show how the advanced use of health IT can achieve measurable improvements in care, efficiency, and population health.**

ONC is funding 17 Beacon Communities with the specific mission to identify and show improvement on care, efficiency, and population health outcomes through the use of health IT. VA and HRSA are partnering with ONC to support these Beacon Communities. By 2014, Beacon communities are expected to demonstrate that their advanced uses of health IT, and associated outcome improvements, are both possible and replicable. By 2015, they are anticipated to show how these efforts can be expanded to other communities and how they can be sustained over time. Key findings from these communities will be incorporated into guidance for RECs, State HIE programs, and meaningful use proposed objectives, and thus, will be expanded to a national scale.

**Strategy II.C.2: Align health IT initiatives and clinical and payment reform pilots and demonstrations.**

The Affordable Care Act authorized a wide range of innovative programs using payment reforms to promote quality, efficiency, and equity of care. These include bundled payment pilots, medical home pilots, and others. CMS will have the charge to quickly and effectively translate knowledge from these innovative programs into wider CMS policy. Health IT will be an important tool to support many of these demonstration projects. The federal government will work to assure that, when appropriate, health IT is properly leveraged for these innovative programs, and that proven outcomes associated with defined uses of health IT are encouraged in the wider health care community.

Outside of ONC and CMS, there are many other examples of health IT-enabled reform being implemented today. Private sector technology companies, provider networks, payers, and public providers such as VA, IHS, and DoD, are funding a wide range of initiatives that experiment with health IT in clinical settings, including the expanded potential for open source electronic health record systems that will complement private sector proprietary systems. These initiatives offer an important opportunity for capturing best practices and applying them to the wider health care system. The federal government will monitor and study such efforts around the country and seek to expand on already-successful programs.

## OBJECTIVE D

### Support new approaches to the use of health IT in research, public and population health, and national health security

**Strategy II.D.1: Establish new approaches to and identify ways health IT can support national prevention, health promotion, public health, and national health security.**

The Affordable Care Act included significant resources for improving public health and prevention. These new strategies will influence the way public health is administered across the country and health IT will be a fundamental part of that change. Public health IT infrastructure investments, such as those discussed in Strategy II.D.2 below, will be updated and aligned with these approaches to public and population health.

The Prevention and Public Health Fund has supported a new program entitled Strengthening Public Health Infrastructure for Improved Health Outcomes, to increase the performance management capacity of public health departments and ensure that public health goals are being met. Health IT and communications infrastructure is one of the four areas of improvement sought through the program. In FY 2010, CDC awarded a total of $42.5 million to

projects at state and local public health departments.[x]

Health IT is critical in supporting new approaches to national health security. The use of health IT during a public health emergency can facilitate continuity of care for the impacted population by enabling electronic health information to flow for emergency care. In the event of a natural disaster, having health records in an electronic form can help avoid the impact of destroyed paper records and ensure that the affected population's health information can be accessed in the event of displacement.

### Strategy II.D.2: Invest in health IT infrastructure to support the National Prevention and Health Promotion Strategy.

CDC, in collaboration with public health agencies at the federal, state, and local levels, will invest in public health IT infrastructure to improve a number of the public health agencies' core capacities. These capacities include:

- Anticipating, preventing, and responding to health threats, reportable diseases, and adverse population events
- Identifying populations with specific health care needs (e.g. at risk populations, children, etc.) and promoting their adherence to public health guidelines
- Preparing for and responding to emergencies
- Communicating with consumers and encouraging their participation in public health

For instance, CDC programs support information exchange across jurisdictional boundaries by integrating with the Nationwide Health Information Network, and provide agencies with common tools for disease detection, monitoring, and real-time situational awareness. The National Electronic Disease Surveillance System (NEDSS) advances the transition to standards-based electronic data exchange for reportable disease surveillance, improving agencies' capabilities in detecting and responding to reportable diseases. The National Environmental Public Health Tracking Network melds data from environmental hazard monitoring and human exposure and health effect surveillance into a network of standardized electronic data systems. Continued investments in these and other programs will support the National Prevention and Health Promotion Strategy.

### Strategy II.D.3: Ensure a mechanism for information exchange in support of research and the translation of research findings back into clinical practice.

In order to support information exchange vital for research, information in an EHR, with the appropriate privacy protections, should be accessible by researchers, research systems, biorepositories, registries, and other types of research databases. In turn, adopted health IT interoperability standards should be used in research studies – and enhanced to cover unique research needs – in order to facilitate both the use of health care data in research and the translation of research results into clinical practice. This two-way interaction between research and clinical care, facilitated by health IT, has the potential to accelerate the generation of important new information on medical interventions, personalized treatments and public health initiatives utilizing population-based knowledge as well as the development of new tools for medicine, such as computerized decision support systems. For example, the Electronic Medical Records and Genomics (eMERGE) Network has developed and applied approaches to research that combine DNA biorepositories with EHR systems for large-scale, high-throughput genetic research such as genome-wide association studies on a variety of diseases. The consortia, like the NIH-supported Clinical and Translational Science Award (CTSA) programs, are maximizing the ability of researchers to leverage the wealth of existing data to strengthen knowledge building and evidence creation, and ultimately improve clinical and preventive care through a more rapid progression of knowledge from the laboratory to clinical care implementation. Another example is The Cancer Biomedical Informatics Grid (caBIG), an information network sponsored by the National Cancer Institute (NCI), which provides tools, data, and services to enable researchers, providers, and

patients throughout the oncology community to collaborate and share expertise and data.

Meaningful use of certified EHR technology in clinical research presents an opportunity to use data collected through routine operations in a clinical practice to generate and test hypotheses about the relationships among patients, diseases, therapies, prevention, treatment and recovery, and clinical outcomes. It can improve the understanding of the correlations between genotypes and phenotypes and genomic and epigenetic interactions and interrelationships, improve the identification and tracking of medical events such as epidemics and adverse events related to treatment, and facilitate surveys of the health of the public at speeds approaching real time. Data from EHRs are crucial for patient-centered research and can provide insights for researchers and benefits for patients and providers in terms of improved care and personalized treatments. These efforts will be consistent with the privacy and security activities outlined in Goal III of this Plan. Using EHRs may eliminate redundant data entry, thus improving data quality and processing speed; may stimulate a learning health system in which the translation of research findings into clinical care supports continual improvement in knowledge, treatment and health; and may increase opportunities for patients to participate in research, particularly in underserved communities and public health settings.

The efficient collection and exchange of EHR data for research purposes, coupled with the use of applicable EHR interoperability standards in research studies, would also ensure that key findings that lead to improvements in population and individual health are rapidly translated back into clinical practice. This will help to create the learning health system envisioned in Goal V of this Plan.

# Goal III: Inspire Confidence and Trust in Health IT

Protecting the privacy and security of health care information, and ensuring the safe use of health technology, have long been core responsibilities of the government. These responsibilities have needed to evolve constantly with the development of new technologies and the adoption of new health care practices. Health IT – with its potentially dramatic impact on the practice of medicine – requires the government to further evaluate and update policies and programs in privacy and security areas over the next five years. In evaluating and updating its policies and programs, the government will rely on the *Fair Information Practice Principles*[xi] and the *Nationwide Privacy and Security Framework for Electronic Exchange of Individually Identifiable Health Information.* [xii]

EHRs and other health IT will enhance the quality and value of health care, but only if there are appropriate protections in place to keep health information private and secure. Privacy and security are the bedrock of building trust, a must-have component that is essential to achieving meaningful use and realizing the value of health IT. Patients and providers must feel confident that laws, policies, and processes are in place to keep their health information private and secure, and that they will be enforced when violations occur.

To that end, the HHS Office for Civil Rights (OCR) is fulfilling new obligations under the HITECH Act to modify the Privacy and Security Rules under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) to strengthen the privacy and security protections for health information and the enforcement of and penalties for violating the HIPAA rules.

These added privacy and security protections are an integral piece of the government's increased efforts to broaden the use of IT in health care. ONC is also exploring areas beyond HIPAA that are necessary to ensure trust in widespread health information exchange, including governance of the Nationwide Health Information Network. Through the health IT certification program and ONC's partnership with other federal entities, ONC is working to enhance privacy and security features in EHRs and to work with HITECH grantees to make sure appropriate privacy and security strategies are in place.

ONC is collaborating with OCR on a comprehensive communications plan to reach out to providers, consumers, and other stakeholders to educate and inform them of the importance of health IT security and ways they can help to keep protected health information secure.

In addition to added privacy and security protections, ONC and OCR recognize the importance of increasing efforts to inform individuals and providers of patients' rights with regard to their protected health information and to increase public transparency regarding the potential uses of protected health information. Individuals must understand their rights, be aware of the federal government's efforts to protect those rights, and be notified of any breaches of unsecured protected health information that occur.

In addition to the HIPAA Privacy and Security Rules, which provide a set of national standards for the protection of certain health information, other federal laws afford additional protections for information which may be particularly sensitive, such as that related to individuals who are treated for alcohol and/or drug abuse. SAMHSA, working with ONC and OCR will address issues of behavioral health privacy and confidentiality in the health IT environment.

EHRs and other health IT offer tremendous potential to improve patient safety and to help health care providers practice safer and more effective care. ONC took a key first step toward thoroughly assessing health IT patient safety concerns through the commission of a report by the Institute of Medicine (IOM). In addition, ONC is engaged in an ongoing effort to disseminate best practice resources to providers to help equip them with the latest information, so as to avoid common challenges to safe and effective implementation and use of EHRs and other health IT.

The government's objectives to "Inspire Confidence and Trust in Health IT" are:

A. Protect confidentiality, integrity, and availability of health information

B. Inform individuals of their rights and increase transparency regarding the uses of protected health information

C. Improve safety and effectiveness of health IT

**Spotlight on Health Outcomes**

## Use of health IT can enhance patient trust and care management

Three years ago, George's PCP's practice was flooded during a hurricane. Fortunately, George's provider had an EHR system that backed up all of George's medical information on a remote, secure server. When George was displaced after the storm, his new PCP was able to retrieve his entire medical record, rather than George having to reconstruct his medical history from memory. George's provider was able to see what medications, allergies, coexisting conditions, and risks she must manage to ensure that George's care is continued.

When Jane has concerns about her ability to manage her COPD and especially when she is concerned about developing an infection, she is able to exchange secure messages with her PCP to get feedback without requiring a trip to the provider's office. When Jane describes to her provider some early warning signs of an infection, her provider electronically prescribes antibiotics that she is able to take immediately to stem the possibility of an infection. Jane enjoys being able to log into her online portal and show her children that she is indeed managing her blood pressure well and can answer their questions regarding what medications she is taking and her latest lab test results. Jane's PCP is able to proactively address Jane's questions about the correct dosage of her medications in real time and without the added delay of having to wait until her next appointment.

*These "Spotlight on Health Outcomes" are intended to highlight exemplary ways that widespread adoption and use of health IT and electronic health information exchange could help transform and improve health care. Some of these examples are only aspirational today or only exist in select communities or health systems. However, these examples illustrate the type of transformed health care that could be possible with the achievement of the goals of this Plan.*

## OBJECTIVE A

## Protect confidentiality, integrity, and availability of health information

**Strategy III.A.1: Promulgate appropriate and enforceable federal policies to protect the privacy and security of health information.**

It is HHS' policy that the privacy and security of individually identifiable health information should be protected wherever it is electronically transmitted, maintained, or received. While the HIPAA Privacy and Security Rules are key safeguards, they are not the only means available for affording this protection. HHS will work with other federal agencies, states and other stakeholders to ensure that appropriate policies are in place.

The means for collecting, managing, storing, and transmitting electronic health information are rapidly advancing. ONC, along with its federal partners, will strive to ensure that federal privacy and security policies, including regulations and guidance, keep pace with this evolving field.

As a first step, OCR is crafting rules to implement the modifications to the HIPAA Privacy and Security Rules as required by the HITECH Act. Among other changes, these rules will:

- Impose direct liability on business associates for compliance with certain provisions of the HIPAA Privacy and Security Rules
- Establish new restrictions on the sale of protected health information
- Establish stronger restrictions on disclosing health information for marketing and fundraising purposes
- Provide increased transparency regarding how health information is shared
- Strengthen individuals' rights to access their health information electronically

OCR has also issued rules required by the HITECH Act that specify the conditions under which covered entities must notify individuals, HHS, and in some cases the media, of breaches of unsecured protected health information.

HHS has commenced the process of exploring broader privacy and security policies that may be necessary to ensure trust in electronic health information exchange. In exploring these topics, ONC will be guided by the *Nationwide Privacy and Security Framework for Electronic Exchange of Individually Identifiable Health Information,* a set of privacy and security principles grounded in the fair information practice principles (FIPPs) released in 2008. The process of updating HHS's approach to privacy and security policies begins with input from ONC's federal advisory committees – the HIT Policy Committee and HIT Standards Committee – which identify, assess and recommend solutions to evolving privacy and security issues. These recommendations are considered by ONC in light of other policies and activities and are brought by ONC to an HHS Inter-Division Task Force that is charged with establishing policy direction in this area. ONC then gathers broader Federal feedback through the Federal Health IT Task Force. The goal is to resolve federal policy direction on this first set of privacy and security issues by the end of 2011.

HHS will address, at a minimum, the following key policy areas:

- Individual choice to participate in health information exchange
- Access limitations and transparency for electronic health information exchange
- Security, including provider and patient authentication and de-identification of personal health information
- Integrity of health information
- Secondary uses of health information for the purposes of quality improvement, public health, and research
- In consultation with the Federal Trade Commission (FTC), potential regulation models with respect to personal health records (PHRs)

There are a number of potential levers for instituting any new privacy and security policies that develop

out of this process, including formal rulemaking where authorized, which would provide the opportunity for public comment. It is expected that privacy and security will be components of ONC's anticipated regulations to establish a governance mechanism for the Nationwide Health Information Network. Concerns with exchanging digital information over the Internet are not confined to the health care sphere. ONC is collaborating with other federal agencies to learn from and implement consistent approaches to privacy and security. For example, ONC is working with the Presidential workgroup formulating the National Strategy for Trusted Identities in Cyberspace. In addition, as a participant in the National Science and Technology Committee's Subcommittee on Privacy and Internet Policy, ONC is working with other agencies to address privacy issues arising from the evolving means of collecting and analyzing data, including health information, as it flows over the Internet.

### Strategy III.A.2: Enforce existing federal privacy and security laws and maintain consistency with federal policy.

In order for providers and patients to have trust in health IT and information exchange, they must be confident that privacy and security laws are in place and will be enforced. OCR is charged with civil enforcement of the HIPAA Privacy, Security, and Breach Notification Rules, the primary federal regulations protecting health information. The HITECH Act strengthens OCR's civil enforcement of the HIPAA Rules by establishing four categories of violations that reflect increasing levels of culpability; four corresponding tiers of penalty amounts that significantly increase the minimum penalty amount for each violation; and a maximum penalty amount of $1.5 million for all violations of an identical provision during a calendar year. OCR also plans to conduct periodic audits that will assess covered entities' and business associates' compliance with the HIPAA Privacy and Security Rules. OCR will employ all of its enforcement tools – including imposing the increased penalty amounts for HIPAA violations, conducting compliance reviews, entering resolution agreements that are satisfactory to HHS for informally resolving indications of noncompliance, and conducting periodic audits – to improve compliance with the Privacy and Security Rules.

### Strategy III.A.3: Encourage the incorporation of privacy and security functionality into health IT.

The use of appropriate technology can greatly enhance the privacy and security of health information. ONC, working with NIST and other federal partners, will encourage the incorporation of privacy and security functions into EHRs and other health IT. ONC and OCR seek to ensure that certified EHRs facilitate health care providers' compliance with the requirements of the HIPAA Security Rule. ONC's Final Rule on Standards and Certification Criteria for EHRs, issued in conjunction with the Medicare and Medicaid EHR Incentive Programs' stage one meaningful use requirements, requires that certified EHRs be capable of:

- Encrypting health information to keep it secure
- Establishing access controls that permit only authorized users to access the system
- Generating audit logs to record certain actions related to electronic health information
- Automatically logging off a user after a set time of inactivity

ONC will continue to identify additional security features that may be incorporated into EHR certification and standards in future stages of meaningful use.

### Strategy III.A.4: Assess technical solutions that could support more granular patient choice and data segmentation.

Some individuals may want to give consent for some, but not all, of their personal health information to be exchanged (often called "data segmentation"). For example, an individual may not want information about his/her substance abuse treatment shared, but may still want to take advantage of the benefits of sharing the remainder of his/her health information electronically. Today, many EHR systems do not have the capability to

support more granular patient consent and data segmentation. In accordance with the HITECH Act, ONC is investigating, through research and potential demonstration projects, innovative means for protecting the privacy of health information, such as data segmentation and consent management tools. ONC will work closely with its SHARP grantee that is conducting research in this area.

In addition, ONC and SAMHSA are pilot testing the development of service specifications and reference models that can segment personal, electronic health care records into more or less sensitive parts and share sensitive parts only with appropriate authorization. This pilot will be broadly applicable, but particularly useful in the context of exchanging behavioral health information.

### Strategy III.A.5: Identify health IT system security vulnerabilities and develop strategic solutions.

ONC will conduct analysis and research to identify the security vulnerabilities of existing and emerging health IT systems in order to identify where to best target its resources. As part of this effort, ONC will analyze health information breaches that are reported to HHS in order to identify the most likely sources of vulnerability. In addition, ONC will participate in the President's cybersecurity initiative and work with other federal partners, including the Federal CIO Council, to identify large-scale security threats and to develop strategic solutions. ONC will also conduct research to identify best practices for ensuring electronic health information remains available in the event of a system failure, cyber-attack, or other emergency event.

ONC is aware of the potential for the use of EHRs to facilitate fraud and will consider how to address the potential for fraud through its existing policies and programs. For example, ONC, following the leadership of the White House, is developing a national framework for high assurance physician identity management. The framework is intended to provide a simple but highly trustworthy means of assuring that physicians are who they claim to be in health information exchange. This framework, which will be piloted by key federal stakeholders such as CMS and VA, should have a major impact on reducing medical identity theft and fraud. In addition, ONC will support the efforts of other federal agencies, including CMS and OIG, to explore a variety of options to improve efforts to combat fraud.

### Strategy III.A.6: Identify health IT privacy and security requirements and best practices, and communicate them through health IT programs.

ONC, OCR, and SAMHSA will seek to ensure that privacy and security policies and recommended best practices remain aligned with advancements in technology. Privacy and security requirements and priorities will be identified based on analyses of security incidents and vulnerabilities, and best practices will be developed and disseminated. Where necessary, OCR will update guidance to reflect evolving privacy and security threats, for example the 2006 guidance on securing remote and mobile access, which has its basis in OMB memorandum M-06-16. ONC will work with OCR and SAMHSA to develop educational and guidance materials on privacy and security best practices for organizations implementing health IT. OCR will continue to issue guidance on complying with the HIPAA Privacy and Security Rules, and SAMHSA will continue to issue guidance on complying with 42 CFR Part 2. Additionally, State HIE Cooperative Agreements, Beacon Communities grants, and SHARP grants will demonstrate how privacy and security best practices can be identified, implemented, and brought to scale. Similarly, information on these privacy and security requirements and best practices will be channeled through the HITRC and the RECs, which offer opportunities to disseminate best practices to providers working to achieve meaningful use.

Some stakeholders have identified the variance in state health privacy laws as an impediment to exchanging health information among states. ONC will work with state governments and State HIE grantees to identify and develop best practices to exchange health information electronically among states with varying privacy laws. In addition, ONC is exploring technology solutions to aid implementation in a computable format of patient

Case 1:25-cv-01202-ADB Document 182-2 Filed 03/19/25 Page 354 of 1163

consent and to enable information exchange among states.

State HIE grantees are required to incorporate privacy and security strategies into their implementation plans. ONC will work with the grantees to ensure that these privacy and security strategies are strong as part of its evaluation of the states' overall implementation plans. This work will be further informed by VA and DoD's experience with the VLER program, that facilitates information exchange of a Veteran's health record among different systems and states that may have differing privacy laws.

Privacy and security are key components in ONC's workforce education program as well as the materials being produced by the workforce curriculum development centers. ONC will review and evaluate these materials to help ensure that future health IT professionals are well educated on privacy and security requirements and best practices to ensure compliance with these policies.

## OBJECTIVE B

## Inform individuals of their rights and increase transparency regarding the uses of protected health information

### Strategy III.B.1: Inform individuals about their privacy and security rights and how their information may be used and shared.

As part of its health IT education and outreach strategy, HHS will inform providers and individuals about the privacy and security rights and protections that are in place to safeguard their electronic health information. See Strategies I.A.6 and IV.A.2 for a more detailed discussion of this strategy. To support the goals of the HITECH Act (Sec. 13403(b), Education on Health Information Privacy), OCR and ONC are working in partnership to execute this education and outreach strategy over a two-year period in order to inform individuals about how their information is safeguarded, how their information may be used and shared, and how individuals can exercise their rights under the HIPAA Privacy Rule. This education and outreach will also inform individuals about best practices that they can use to protect the privacy of health data they generate or maintain in consumer health IT tools. In order to accommodate the needs of non-English speaking individuals, these campaign materials will be available in multiple languages.

In an effort to help individuals easily access information about existing HHS privacy efforts and the policies supporting them, HHS launched an online resource center. The site provides transparency about HHS policies on the collection, use, and exchange of personally identifiable health information, and the privacy and security requirements for entities that collect and maintain health information.

### Strategy III.B.2: Increase transparency regarding the development of policies and standards related to uses and sharing of protected health information.

ONC will engage with a wide range of consumer organizations and diverse communities in an effort to increase transparency of privacy and security issues and to develop policies and standards to address the consumer organizations and diverse communities' interests. The HIT Policy Committee and the HIT Standards Committee each have a Privacy and Security Workgroup that holds public meetings and makes recommendations to its parent federal advisory committee (FACA) related to privacy and security requirements, which in turn considers the workgroup's advice and may submit related recommendations to the National Coordinator. To date, these federal advisory committees have made recommendations on various privacy and security issues, including meaningful use criteria, certification criteria, individual consent, provider authentication, patient identification and use of intermediaries or third party service providers in arrangements to exchange individually identifiable health information. The Committees will explore new issues as they arise. ONC will actively seek public input into the development of these policies and standards through its federal advisory committees.

**Strategy III.B.3: Maintain strong breach notification requirements.**

To maintain consumer trust in EHRs and other health IT, individuals must be adequately informed of the use and sharing of their health information and appropriately notified when their personal health information has been compromised. OCR has issued an interim final regulation on breach notification that improves transparency and acts as an incentive to the health care industry to improve privacy and security by requiring HIPAA-covered entities to promptly notify affected individuals, the HHS Secretary, and, in some cases, the media, of a breach of unsecured protected health information, as well as requiring business associates to notify covered entities of a breach of unsecured protected health information. OCR is in the process of issuing a final breach notification regulation that responds to comments on the interim final breach notification rule. Similar breach notification provisions implemented and enforced by the FTC apply to non-HIPAA covered entities, such as vendors of certain PHRs and their third party service providers.

## OBJECTIVE C

## Improve safety and effectiveness of health IT

**Strategy III.C.1: Provide implementation and best practice tools for the effective use of health IT.**

AHRQ's Health IT Portfolio supports health services research grants and contracts that create new knowledge, synthesize and disseminate best evidence and provide tools for implementation addressing health IT's impact on the quality of health care. Current initiatives address clinical decision support, patient safety, patient centered care, quality measurement, and usability and workflow issues. In addition, ONC is actively working to make resources available to providers that allow them to maximize the value of using health IT by avoiding common challenges and legal issues associated with adoption, implementation, and use of EHRs and other health IT. Professional societies, licensing boards, and continuing education programs are developing best practice resources related to issues such as workflow redesign, the need for ongoing maintenance and upgrades, and legal concerns related to vendor contract clauses. There are important legal issues that providers should be aware of when entering into agreements with EHR and other health IT vendors. ONC will work to equip providers with information and help address potential barriers they may face in achieving meaningful use, including improved usability of EHR technology (*see Strategy I.A.9*). ONC and RECs will ensure that appropriate best practice resources about these issues are distributed to the providers that need them.

**Strategy III.C.2: Evaluate safety concerns and update approach to health IT safety.**

ONC has commissioned the Institute of Medicine (IOM) to conduct a formal study of health IT patient safety concerns and to recommend additional actions and strategies to address those concerns, as well as to define the role of public and private sectors in ensuring safety of health IT-assisted health care services.

**Strategy III.C.3: Monitor patient safety issues related to health IT and address concerns.**

While developing an updated overall approach to health IT safety, HHS agencies are monitoring patient safety issues and addressing immediate concerns. ONC is exploring mechanisms to improve data integrity, including an assessment of existing and emerging technologies that may allow for automated resolution of inaccurate or questionable data in EHRs and PHRs.

AHRQ, in conjunction with FDA and ONC, developed a new protocol for reporting patient safety events involving HIT devices. This protocol was developed as part of the AHRQ Common Formats for reporting patient safety events and is available on the AHRQ Web site. AHRQ and FDA collaborated in order to harmonize HIT event reporting not only with Common Formats for other event types but also with FDA's MedSun system for reporting adverse events associated with devices. It is the goal of AHRQ, FDA, and ONC that providers

Case 5:22-cv-01202-ADB Document 102-2 Filed 03/13/23 Page 36 of 81

experiencing adverse events involving HIT will be able to report such events once and have the information flow to those interested in and authorized to receive it, e.g., Patient Safety Organizations, state reporting systems, accrediting bodies, and the FDA. It is expected that by providing standardized Formats for reporting HIT events efficiently, information can be aggregated, learning accelerated, and care made safer.

# Goal IV: Empower Individuals with Health IT to Improve their Health and the Health Care System

Individual participation is a critical, yet currently underutilized, component in improving health and the overall health care system. Health care, which often means initiating medical solutions after something has gone wrong, can only go so far in improving health. Individuals' behaviors, and the ways in which communities foster healthy behaviors, are much more powerful forces for improving population health. But medical solutions, too, can become more centered on the individual: by arming people with knowledge and by giving them and their loved ones greater control over their own care. [xiii]

Health IT, which encompasses a broad category of tools and services, is critical in both empowering individuals to manage their health and shifting care to be more patient-centered so patients can be more active in health decisions and treatments. Existing and emerging technologies allow data to flow directly to and from the individual, wherever the individual may be. As a result, patient interactions with the health care system are no longer confined by the walls of the clinical setting and may occur frequently in between visits. PHRs allow patients to capture their own health observations and in some instances, to access their health information from providers. Mobile phones with glucometers allow individuals to track their blood sugar levels through their mobile devices. Mobile phones and related applications are also being used to send reminders to take medications or to send free health tips to help during a pregnancy. In mental health, mobile apps are being utilized to track moods and provide therapeutic interventions with personalized messages, exercises, and coaching. Using these tools and others, individuals can become more attuned to healthy behaviors, monitor their health, make informed personal health decisions, and receive preventative care. Patients managing illnesses or other ailments can use health IT to connect with other patients that share a similar condition, keep better track of their health care, receive health care solutions remotely, and participate in their care coordination.

However, only 7 percent of Americans have used a web site to access their health information online.[xiv] Even fewer have used mobile health (mHealth) applications and remote monitoring technologies. These low rates are the result of multiple dynamics: most consumers are not aware of nor able to afford the technologies, do not have access to their health information, or do not expect to take as active a role in their health and health care as they might in other aspects of their lives. As a result, they have not created a robust marketplace for technology innovation. To truly empower consumers and move the health care system to become more patient-centered, the government will need to help change these dynamics.

For individuals to become empowered they need to be included in the policymaking process. This means both understanding the government's approach to health IT and being able to shape the direction of policies and programs. An HHS-led health IT education and outreach strategy will seek to engage the public in dialogue about health IT and provide an opportunity to shape its future and the public's own expectations.

The single biggest lever to individual empowerment is access to data. Individual access to data can augment and improve patient-provider communications. It is not meant to replace this relationship, but rather to enhance it. Such data liquidity will make health IT meaningful for individuals, promote technological innovation, move care to center more on the individual, and ultimately have a direct effect on population health. Right now, there are too many barriers to individual and caregiver access to personal health care information. Engaging individuals with health data is a top priority of the Medicare and Medicaid EHR Incentive Programs. Other policies and regulations, such as the HIPAA Privacy Rule, will work in concert with meaningful use efforts to facilitate improved individual access to data. And the government intends to continue to develop tools

and serve as a model for exchanging data with individuals, as reflected in the Blue Button initiative at VA, DoD and CMS (see strategy IV.B.2 below for more information).

Consumer health IT is an emerging industry – it is new, fast-growing, and on the cutting edge of technology innovation. While the government will not lead the innovation that is likely to take place over the next five years – that is the role of the private sector – it will remain an active partner to address a number of key steps to collaborate with the industry and foster health IT research and innovation. If the government makes more of the data it collects available—as well as encouraging others to do the same--technology companies can develop applications and business models that make the information relevant and marketable to individuals. NIH and other government institutions directly fund research and development. HHS launches contests and challenge grants to focus innovation on specific areas that will benefit health care and the public good. These strategies to promote health IT innovation are discussed in more detail in Goal V Objective B, "Broaden the capacity of health IT through innovation and research."

As consumer technologies evolve and become more prevalent, and as individuals grow more accustomed to interacting with their health information using health IT, there will be a need to better integrate clinical practices with individual use of health IT outside of the care environment. Through ONC's EHR certification program, the government will facilitate the creation of clinical EHR systems that can accept information from consumer applications. The government will also help clinicians empower individuals with technology, and will encourage clinical practices to take advantage of consumer-generated health information, both of which are steps in achieving the ultimate aim of moving to more patient-centric care.

The government's objectives to "Empower Individuals with Health IT to Improve their Health and the Health Care System" are:

A. Engage individuals with health IT
B. Accelerate individual and caregiver access to their electronic health information in a format they can use and reuse
C. Integrate patient-generated health information and consumer health IT with clinical applications to support patient-centered care

## Spotlight on Health Outcomes

***Empowering patients with health IT can improve care management and quality of life***

The ability to easily access health information electronically has spurred innovation in the development of mobile technology applications and other tools that can help patients better manage chronic diseases and stay healthy. After George is diagnosed with chronic heart failure, he and his PCP decide to use a new mobile health device to help him track his health status. Using sensors and an easy-to-use interface on his Smartphone, the device records his exercise patterns, heart rate, weight and diet. This information is uploaded to an online site where George sets goals, tracks progress, and engages in contests with other individuals managing CHF. Periodically, over the course of a year, George notices abnormalities in his trends and logs onto his personal health portal: a site where his personal health information is stored and both he and his provider have access to this electronic health information. There he uploads data from his mobile app, and sends a secure email to his provider to ask questions about what he is viewing in the portal. Without having to wait until the next appointment, the provider is able to tell George that everything looks fine and to encourage him to keep up the good work. When George does have his regular in-person visit a year later, his blood pressure is under control at 128/88 and his LDL is 70. These results, which George anticipated after noticing positive trends in his data and feeling better, indicate a significant improvement in George's cardiovascular health and a dramatic decrease in risk of a heart attack.

After her hospitalization, Jane's family decides they would like to take care of her at home and are equipped by the hospital with a remote monitoring system. Remote monitoring systems may reduce medical complications and hospitalizations by giving providers more frequent data readings on their patients. When used by homebound, chronically ill patients, these systems could be linked to EHRs to alert providers of a problem and allow the provider to react more quickly to adjust a medication or troubleshoot the problem. Jane's particular device allows her to do weekly remote visits with a nurse, instead of returning to a medical facility for these visits. The nurse is able to take readings on Jane's blood pressure, glucose levels, and weight, while interacting with her over video conference to check in on symptoms and see how Jane is doing with her medications. Using this device, the nurse is able to answer Jane's questions without needing an in-person office visit, and to identify major problems before they require an emergency room visit. Jane's quality of life is greatly improved, and she has been able to reduce the number of times she and her family have needed to go to the hospital and spend time in waiting rooms. These remote monitoring systems have also enabled Jane from needing to live in an assisted living environment.

*These "Spotlight on Health Outcomes" are intended to highlight exemplary ways that widespread adoption and use of health IT and electronic health information exchange could help transform and improve health care. Some of these examples are only aspirational today or only exist in select communities or health systems. However, these examples illustrate the type of transformed health care that could be possible with the achievement of the goals of this Plan.*

## OBJECTIVE A

### Engage individuals with health IT

**Strategy IV.A.1: Listen to individuals and implement health IT policies and programs to meet their priorities.**

The benefits of health IT can only be realized if individuals are fully involved in the development of health IT policy and confident that electronic health information is kept private and secure. When including individuals in the health IT policymaking process, the government cannot expect them to come to Washington, D.C. or to seek out rulemaking processes. To truly be representative, ONC will seek to participate in on-going public conversations about health IT. These conversations are already taking place, whether it is in online forums serving specific demographics, community-based faith groups, or chronic disease advocacy groups. ONC will participate in these public dialogues with the aim of learning how health IT policy and programs can support individual empowerment.

These efforts will be complemented by the primary formal mechanism established by the HITECH Act for public input into health IT policy: the federal advisory committees. As mentioned previously, there are two committees – the HIT Policy Committee (HITPC) and the HIT Standards Committee (HITSC) – and several "sub-committees," or workgroups. The HITPC and HITSC make recommendations to the National Coordinator on crucial policy and program decisions on an ongoing basis. While individuals and consumer advocates have been represented on some of the Committees already, the federal government will strengthen that representation going forward.

ONC will also reach out to consumer organizations directly, both to engage them in its own work and to encourage them to reach out to their constituents in the context of their own efforts as well.

**Strategy IV.A.2: Communicate with individuals openly and spread messages through existing communication networks and dialogues.**

The HHS-led education and outreach strategy discussed in strategies I.A.6 and III.B.1 will engage consumers as an important audience. Education and outreach efforts will be aimed at helping people understand the transition to EHRs, the value of health IT more broadly and how health IT can be leveraged to make informed choices and support behavioral change related to their physical and behavioral health and care. In order to effectively reach millions of Americans, HHS intends to collaborate whenever possible with communication networks that already exist (such as health care advocacy groups, faith-based groups, groups aimed at supporting specific demographics, etc.) and to take advantage of social media (such as blogs and online social forums).

ONC has already reached out to numerous consumer organizations, including those representing individuals with disabilities, non-English speaking populations, and people with lower literacy levels, to involve them in discussions to shape ONC's programs and activities.

## OBJECTIVE B

### Accelerate individual and caregiver access to their electronic health information in a format they can use and reuse

**Strategy IV.B.1: Through Medicare and Medicaid EHR Incentive Programs, encourage providers to give patients access to their health information in an electronic format.**

A primary barrier to individual access to information is the lack of a business case for providers to share that information. Providers record and store patient health data in a health record; for them to also share that information with patients has historically caused additional administrative burden and cost. While individuals have a right to access their health information under the HIPAA Privacy Rule, there has been little financial incentive for providers to proactively share a copy of the medical record with the patient or to minimize the burden for the patient

Case 4:22-cv-12022-ADB Document 12-2 Filed 03/20/23 Page 45 of 81

to obtain a copy of the medical record. EHRs, however, reduce this additional burden and meaningful use incentive payments help make a business case for doing so. The first stage of meaningful use requires providers to send patients a clinical summary of each office visit and an electronic copy of their health information within three days of their request, and includes a menu set item to identify and provide patient-specific education resources to patients. We expect that future stages of meaningful use will build on these requirements.

ONC is exploring ways to encourage EHR vendors to add features that would allow patients to access and download their health information through consumer e-health tools, such as PHRs and secure mHealth application on smart phones and other mobile devices. It is important that personal health data be not only downloadable, but also available in a format that can be re-used by other applications and support interactions between EHRs and external sources of patient-specific education resources, such as those available through NIH/NLM's MedlinePlus Connect interface.

### Strategy IV.B.2: Through federal agencies that deliver or pay for health care, act as a model for sharing information with individuals and make available tools to do so.

Beyond simple access, better tools and processes are necessary to make information more useful to individuals and their caregivers. The government will be a leader in providing information to individuals. For example, the Blue Button is a web-based feature through which patients may easily download a copy of their health information and share it with health care providers, caregivers, and others they trust. This feature is available on the DoD, VA, and CMS websites for their respective beneficiaries to use. This model is a key step forward in privately and securely sharing information with individuals, which will be enhanced over time. Using the Blue Button in combination with PHRs and other consumer health IT, individuals will be able to collect, aggregate, and analyze their health care information. Over the next five years, the government will consider more advanced features of health information sharing with individuals, including data subscriptions, standardized code sets, standards for consumer health IT applications, and applications that enable information to be exchanged through mobile devices.

The Nationwide Health Information Network has already demonstrated sharing of patient-health information between the VA, DoD, SSA, and many private sector partners. Extending the Nationwide Health Information Network specifications with additional building blocks such as the Direct specifications will include protocols for provider-patient secure messaging, which is a major step towards patient-centered care.

The Federal Health IT Taskforce has recognized individual access to data as a primary objective. As done with the Blue Button initiative, it will continue to seek ways to align government investments with methods for giving individuals useful and reusable copies of their own data.

### Strategy IV.B.3: Establish public policies that foster individual and caregiver access to their health information while protecting privacy and security.

While the Medicare and Medicaid EHR Incentive Programs provide incentives for individual and caregiver access to health information, there remain policy opportunities and barriers that the government will address outside of this program. For instance, CMS and OCR are looking at ways to enable individuals to request access to their test results directly from laboratories. CMS has also issued guidance to laboratories to clarify this issue. OCR has proposed to revise the HIPAA regulations such that a covered entity health plan would be required to provide an enrollee access to the enrollee's electronic claims data in the electronic form and format requested by the enrollee, if it is readily producible in such form and format. These policy issues may evolve over the next five years, but HHS will support approaches that:

- Feature a transparent, understandable, and easy to use online process that enables consumers to download and reuse their data

- Accommodate the range of user capabilities, languages and access considerations, including effective strategies for ensuring accessibility and usability of electronic health information for people with disabilities and meaningful access to such information for individuals with limited English proficiency
- Provide strong privacy and security protections

Some of HHS' priority policy work related to individual access to information has been discussed in Goal III, including: modifications to HIPAA as stipulated in the HITECH Act, individual consent to participate in health information exchange, and authorization and authentication.

## OBJECTIVE C

## Integrate patient-generated health information and consumer health IT with clinical applications to support patient-centered care

**Strategy IV.C.1: Support the development of standards and tools that make EHR technology capable of interacting with consumer health IT and build these requirements for the use of standards and tools into EHR certification.**

There are a number of compelling examples of technologies that enable individuals to manage their own health and care, and capture more complete information about themselves. EHRs should be able to interact with these devices, so that a provider can access information that a patient using health IT chooses to share with him or her. ONC, in partnership with FDA and other federal agencies, will promote standards to enable integration, including standards for devices and EHR interoperability, standards for data integration, such as glucometer measurements and unique device identifiers (UDI), for identifying the source of the device generated data. Through the adoption of certification criteria, ONC could encourage the use of these standards and tools that may enable EHRs to receive information from any consumer health IT device that also uses similar standards and tools.

**Strategy IV.C.2: Solicit and integrate patient-generated health information into EHRs and quality measurements.**

There are two main types of patient-generated health information - both of which could help achieve the goal of improved care, improved population health, and reduced per capita costs of health care:

1. "Patient-generated insights" are individual's observations and perceptions about their own health or care. These observations of daily living could come in the form of surveys, health journal entries, online blog entries, or any number of other media
2. "Device-generated data" is data captured by medical devices or other consumer health IT.

While we acknowledge there are policy questions that need to be examined related to the integration of patient-generated health information into EHRs, this information can be valuable to providers in adjusting treatment regimens, valuable to individuals in understanding and improving their health choices, and valuable to the health system in measuring and rewarding for health care quality. As part of its health care quality activities, HHS is studying opportunities to encourage providers to solicit and report patient-generated information on physical and behavioral health. This includes ensuring that this information could be captured and integrated into EHRs as part of meaningful use, and exploring standards and specifications that will enable that integration.

**Strategy IV.C.3: Encourage the use of consumer health IT to move toward patient-centered care.**

Today, eighty percent of people on the Internet use it to search for health information.[xv] Online resources, including advice from peers, are a significant source of health information. Many people use the Internet to seek advice and to share their experience, but far fewer have gone online to review test results, used a PHR, or emailed their doctor.[xvi] Consumers have expressed interest in the use of health IT tools to make sure their health record is correct, review test results, email providers,

schedule appointments online, and refill prescriptions online, all of which lend themselves to more patient-centered care.[xvii]

To further the use of consumer health IT, ONC and CDC are working with two Beacon communities to design tools that aim to help patients better manage their diabetes. This program is modeled after Text4Baby, a free text messaging service for pregnant women and new moms that delivers timely and practical tips customized for each stage of a woman's pregnancy or her baby's age. Text4Baby is the result of a public-private partnership with HHS, the White House Office of Science and Technology Policy and many private sector partners.

For care to truly become more patient-centered, providers will need to adopt new processes and uses of health IT that empower individuals in understanding and directing their care. HHS' primary approach to encouraging changes in provider behavior is through the implementation of quality measures and the attachment of incentives or penalties to improving on these measures. To this end, the National Quality Strategy, the National Prevention and Health Promotion Strategy and the Medicare and Medicaid EHR Incentive Programs will work in concert to promote the integration of consumer technologies and patient provided health information into clinical workflows to improve physical and behavioral health and care.

There are four domains of quality improvement that can help lead to patient-centered care:

1. **Self-management/activation** refers to measures of quality improvement that assess the degree to which patients understand the role they are meant to play in their care process, and the degree to which patients have the knowledge, skills, confidence, and self management resources/support to move forward in this role.
2. **Honoring patient preferences and shared decision making** refers to measures of quality improvement that assess the degree to which patients have the knowledge to make informed decisions about their care. It also encompasses measures that assess the quality of decision making, patient connectedness to resources, patient preferences, and care provider adherence to patient preferences.
3. **Patient health outcomes** refers to measures of quality improvement that assess the degree to which the care provided affects disease/disability, health risk, and functional health status at the individual patient and population level.
4. **Community resources coordination / connection** refers to measures of quality improvement that assess if, and to what extent, patients are connected to community resources.

Certain consumer health IT applications, when used by consumers and providers in concert, enable improvement in these domains. Future quality measures and meaningful use requirements will help to realize these benefits.

# Goal V: Achieve Rapid Learning and Technological Advancement

Meaningful use of certified EHR technology will help the health care system "catch up" with proven technology and process changes that have been available for years. Technology is not in stasis – it is a dynamic industry prone to innovation which, though at times disruptive, can yield enormous benefits. There are two areas where the government is working in concert with the framework of meaningful use and the Affordable Care Act to prepare for a future that is hard to predict: 1) enabling health IT innovation and research, and 2) leading the creation of a learning health system.

### Health IT Innovation and Research

The future of health IT rests in innovation. The government will embrace ongoing technology advancements whether they are incremental or fundamental. This means both adapting government strategy to advances in technology, and continuing to encourage rapid industry innovation.

Though there have been great leaps in health IT in the past few years, the most remarkable gains are likely still ahead of us. Possibilities include new ways of engaging individuals with their health information, new ways of aggregating and analyzing data, new ways of connecting the clinical setting more directly with individuals' everyday lives, and new ways of protecting privacy and ensuring the security of health information. The government's first step to enabling innovation is liberating data that is useful to consumers, providers, and innovators. But the government will also invest directly in research and development, use government mechanisms as levers for fostering adoption of innovative technology, and encourage collaboration and targeted innovation in the health IT industry.

### The Learning Health System

A nation of providers who are meaningful users of health IT will create very large amounts of clinical information that is captured and stored in electronic, computable form, and represented using defined standards. Developing effective privacy policies and technologies that can de-identify personally identifiable health information will be challenging, yet is essential to ensuring public trust and safeguarding sensitive information. Through carefully designed and trusted mechanisms, this data will be able to flow securely from the system that collected it to other systems, such as research consortia, registries, and biorepositories, with an authorized use for it. The secondary use and population level analysis of this information holds great promise for many forms of biomedical research, public and population health, such as tracking and management of epidemics, and improving quality and efficiency of prevention and care.

The government's vision for realizing the value of this information is a learning health system – an environment where a vast array of health care data can be appropriately aggregated and analyzed, turning data into knowledge that can be put to immediate use. A learning health system can shorten the gap between the creation of new knowledge and its widespread adoption in health care from the often-quoted 17 years to 17 months, or even 17 weeks. Through a learning health system, the right information will be available to support a given decision, whether it is about the efficacy of a treatment or medication for an individual patient, predicting a national pandemic, or deciding whether to proceed with the research and development for a potential new treatment.[xviii]

The learning health system will benefit from the potential of Medicare and Medicaid EHR Incentive Programs payments and payment reforms initiated by the Affordable Care Act to motivate demand for health care information, and to create the policies and infrastructure for information exchange. The government's strategy to promote health information exchange is described in Goal I, and focuses on fostering exchange at the local level

where there are existing business models for information exchange. We expect future stages of meaningful use to require more rigorous information exchange requirements and will work in concert with the Affordable Care Act to create demand for health care information throughout the health care system. Drivers for information exchange will be coupled with federal leadership on national standards, privacy and security requirements, and infrastructure that supports information exchange.

The learning health system will use the policies, requirements, and infrastructure created to support meaningful use of certified EHRs, and will build on them to support more sophisticated modes of information exchange necessary for a system that can "learn." ONC commissioned the Institute of Medicine (IOM) to convene national private and public sector leaders in health care for a workshop series on *The Electronic Infrastructure to Support a Learning Healthcare System.* The report resulting from these workshops series describes how lessons from current smaller-scale examples of learning health care systems, can be put into a policy framework that could be implemented on a national scale.[xix]

After soliciting input from the private sector, ONC will work with federal partners to establish an initial group to ascertain how to structure a learning health system. Initial efforts will focus on creating a federated model for the learning health system that bridges disparate systems. Additional efforts will focus on expanding the learning health system to include additional public and private sector entities.

The government's objectives to "Achieve Rapid Learning and Technological Advancement" are:

A. Lead the creation of a learning health system to support quality, research, and public and population health

B. Broaden the capacity of health IT through innovation and research

## Spotlight on Health Outcomes

### *A learning health system can lead to earlier detection and better risk management*

The use of health IT can enable a learning health system to help prevent and monitor adverse events caused by new drugs. As George begins therapy using a new drug, information about his health can be captured in the EHR and findings may be automatically transmitted from the EHRs in which they are collected and reported in aggregate via a standard format to oversight agencies, such as the FDA, or to the company which manufactures the drug. By making this information available quickly in the learning health system, population-level data could be aggregated for earlier signaling of possible adverse reactions to new drugs. If a potential adverse reaction is identified, EHRs can serve another role in helping providers to quickly identify each of their patients taking a certain medication and notify the patients via their preferred communication channel about the potential risks.

The nationwide adoption and meaningful use of EHRs could facilitate the collection of clinical and research data from disparate sources including hospital systems, provider offices, laboratories, biorepositories, registries, and other research databases. Some stakeholders within the health care industry – such as researchers – are currently on the cutting edge of analyzing EHR-generated data to identify patient populations that are at-risk for preventable hospitalizations. EHR-generated data combined with analytical systems can be a boon to predictive modeling and knowledge generation. As an elderly woman with multiple medical conditions, Jane is part of an at-risk population. As these populations are identified earlier and risk factors are better understood, the learning health system could also enable resources, such as disease management and case management, to be deployed earlier to help avoid preventable hospitalizations. Currently, good clinical information regarding patient-centered outcomes on the best treatment options for patients with multiple diagnoses is lacking. In the long-term, EHR-generated data could be used to translate research findings to better inform preventive approaches, establish correlations, identify risks, and develop a deeper understanding of disease in patients with multiple conditions.

*These "Spotlight on Health Outcomes" are intended to highlight exemplary ways that widespread adoption and use of health IT and electronic health information exchange could help transform and improve health care. Some of these examples are only aspirational today or only exist in select communities or health systems. However, these examples illustrate the type of transformed health care that could be possible with the achievement of the goals of this Plan.*

## OBJECTIVE A

# Lead the creation of a learning health system to support quality, research, and public and population health

### Strategy V.A.1: Establish an initial group of learning health system participants.

The learning health system's success will depend in part on the participation of a select number of institutions that collect and use large amounts of health care data. ONC recognizes this initial group of participants is only a sub-set of a broader set of activities occurring in the public and private sectors, and plans to engage both sectors early in the process and expand participation in the learning health system over time (see Strategy V.A.4).

Several federal organizations are already fostering learning health systems scaled to their own agencies, and some of these agencies will be key initial members of this group. The efforts of these agencies provide a base of experience on which to build the system at a larger scale. FDA's Sentinel Initiative is a national electronic system that is currently being designed to enhance FDA's ability to track the safety of drugs, vaccines, biologics, and medical devices after they reach the market. CDC's programs are supporting a national surveillance network through which health care organizations, public health entities, health information exchanges, and others are able to contribute to the picture of the health of the nation. Its goal is to be able to provide nationwide and regional situational awareness for all-hazard health-related threats and to support national, state, and local responses to those threats. CDC also has the National Environmental Public Health Tracking Network, which integrates health, exposure, and hazard data from a variety of national, state, and local sources. It offers new understanding of how hazardous substances can contribute to illness and potentially be prevented.

### Strategy V.A.2: Develop standards, policies, and technologies to connect participants within the learning health system.

In order to make the learning health system a reality on a national scale, standards, policies, and mutually reinforcing technologies must be put in place to ensure that data collected at the point of care can be de-identified, aggregated, queried and analyzed for population health studies and quality improvement. Data used in these studies must be represented compatibly across participating organizations. Many of these can be built upon already-existing standards, policies, and technologies stemming from meaningful use and the State HIE, Beacon Community and SHARP grantees, but new standards, policies and technologies will also be needed.

To begin identifying specific standards, policies, and technologies needed for the learning health system, the Institute of Medicine (IOM) convened, with ONC support, an *Electronic Infrastructure to Support a Learning Healthcare System* workshop series in 2010. The report stemming from the workshop series, *Digital Infrastructure for the Learning Health System: The Foundation for Continuous Improvement in Health and Health Care – Workshop Series Summary,*[xx] takes lessons from current examples of learning health care systems, including those in the private sector, and broadens them to propose technologies and policies that could be implemented on a national scale. It provides the federal government a path forward to implement such a framework, and makes recommendations to address the policy and technical barriers that will need to be addressed.[xxi] ONC is working to ensure that its ongoing efforts related to standards, certification, and governance of nationwide health information exchange will align with the vision for a learning health system.

### Strategy V.A.3: Engage patients, providers, researchers, and institutions to exchange information through the learning health system.

The learning health system will only be as valuable as the information that is exchanged. As more organizations and members participate in the learning health system, more knowledge will reach more entities to make a positive impact on clinical and research practices. ONC will engage the sources of critical information – patients and providers – so

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 47 of 81

that they understand the learning health system, its relation to and interaction with research, and the benefits of such research to inform the learning health system. Increasing the engagement and understanding of patients and providers may increase their willingness to participate in information sharing that they trust and that is private and secure, including for secondary uses of EHR data in research. Consumers stand to directly benefit from more information flowing into the learning health system which would allow for a better understanding of which subgroups may respond better to certain medications or treatments. Consumers are also likely to benefit from the availability of population level data in interacting with their clinicians about what treatment is right for them. Work to engage patients and providers will be done directly and through representative consumer and provider groups, as well as in public health settings in underserved communities.

### Strategy V.A.4: Grow the learning health system by adding more members and expanding policies and standards as needed.

The government will seek to expand participation in the learning health system early in the process, beyond the initial group of federal partners, to add private sector partners. Future participants could include public and private provider groups, Health Information Exchanges, payers, small community medical and behavioral health practices, registries and additional federal agencies. Incentives to join this group will include the positive results of the initial exchange activities and the possibility of reciprocal benefit. The private sector is already coming together to share data and knowledge via various consortiums, and ONC will continue to coordinate and learn from these efforts. As standards and policies are expanded to support system growth, the learning health system will engage the private sector and will also support government efforts at the state, local, and tribal levels. Over the next five years, the government will expand on the findings of the IOM study (see strategy V.A.2) and continue evolving the federal plan for the learning health system.

## OBJECTIVE B

## Broaden the capacity of health IT through innovation and research

### Strategy V.B.1: Liberate health data to enable health IT innovation.

Facilitating access to health data, in accordance with privacy and security protections, is a key mechanism of the government to encourage innovation in the industry and demonstrate to the public the value of health IT. Rich and high quality data are the starting point for building applications that provide value to individuals and care providers. For instance, PHRs become much more interesting if they can use the patient's entire medical history to provide advice on how to reach personal health goals. Huge quantities of data exist already, but in forms that are not easily usable for those that could benefit from the data. The government is working on multiple fronts to correct this.

The first priority is giving individuals timely access to their electronic personal health information. The government is working to facilitate the ability for users to successfully access, retrieve, process, and act on the data easily and efficiently. This approach is discussed at length in Goal IV Objective B. In addition, the government is also seeking innovative means for protecting users' personal health information, including effective techniques to de-identify and segment data, and to facilitate informed choice. As individuals become empowered with their health data, demand for consumer health IT applications will likely accelerate.

Outside of individual health information, the government is a leading generator of health care data. HHS maintains valuable information about the health care system's performance (e.g., the safety and efficacy of treatments, disease surveillance). Although much of this data is already public, it has historically been stored in disparate datasets that are largely inaccessible or unusable for developers. HHS is now taking an active role in getting this data in the hands of developers to activate innovation. This includes the launch of **HHS.gov/Open**, a website tailored to providing the public more transparency

into HHS' administration, and the Community Health Data Initiative (CHDI), a public-private partnership committed to innovation through the use of public data. CHDI is making many large data sets, and tools that make those data sets useful, readily downloadable from the CHDI website. It has also organized contests and challenges to ignite innovation using this data, such as the Health 2.0 Developer Challenge. In that ongoing contest, anyone interested in submitting a challenge can do so. Technology companies, health care companies, and government agencies work together to both identify specific market needs, and develop software solutions using data to meet those needs. Dozens of compelling applications have already been built as a result of this challenge.

### Strategy V.B.2: Make targeted investments in health IT research.

The federal government is committed to investing directly in health IT research and development in areas that hold great promise for improving the health of individuals and populations. NIH and ARHQ, in particular, are funding dozens of research projects related to the development of health IT. Through the HITECH Act, ONC established the Strategic Health IT Advanced Research Projects (SHARP) Program, a four-year program funding research in health IT security, patient-centered cognitive support, health care applications and network platform architectures, and secondary use of EHR data. The progress made by grantees will assist in developing best practices which can be applied nationwide, possibly through meaningful use requirements. AHRQ sponsors projects focused on best practices and integration of health IT into the practice of medicine. Focus topics include usability of EHRs, clinical decision support, consumer health IT, health information exchanges, and telehealth.

The Networking and Information Technology Research and Development (NITRD) Program coordinates federal research and development investments in computing, networking, and software. As required under the HITECH Act, NITRD is developing a program and strategic plan to coordinate research and development relating to health IT. This work will make the pursuit of important opportunities for technology breakthroughs through coordinated inter-agency initiatives possible, and will ensure that programs of different agencies are non-redundant and mutually reinforcing. In December 2010, PCAST issued a report on all NITRD activities called *Designing a Digital Future: Federally Funded Research and Development in Networking and Information Technology*, which emphasizes the importance of research to improve health IT.[xxii]

### Strategy V.B.3: Employ government programs and services as test beds for innovative health IT.

Government agencies are leaders in adopting innovative health IT into provider and payer settings. Applying advanced health IT to the government's own health care practices and payment administration creates a large market for technologies, helps to prove their value, and creates best practices for wider adoption.

VA's Care Coordination Services uses health informatics, e-care, and disease management technologies to avoid unnecessary admission to long-term institutional care facilities. Technologies include videophones, messaging devices, biometric devices, digital cameras, and remote monitoring devices. VHA also has an award-winning PHR, "My Health*e*Vet," which gives its patients access to their health information along with other VA information and services. DoD's MiCare portal enables its patients to manage their medical information through a PHR of their choice. IHS is in the process of developing a PHR for its patients which will support meaningful use requirements.

CMS is piloting free PHR options for Medicare recipients. "Medicare PHR Choice" gives people living in Arizona and Utah a choice among four vendors' PHRs, and automatically updates their online record with Part A and Part B claims. "My Personal Health Record South Carolina" allows participants to see their medical history based on the past two years of claims. Additional information can be added manually, and the PHR provides helpful resources to understand diagnoses, conditions, and procedures.

**Strategy V.B.4: Monitor and promote industry innovation.**

The government facilitates and monitors the health IT industry and stays abreast of innovation's impact on federal policies and programs in order to further promote innovation within the industry. Such activity is conducted primarily through panels, conferences, white papers, and similar outreach efforts. The government also plans to promote innovation through open innovation prizes and challenge grants focused on specific health IT problems. Potential focus areas include helping to ensure privacy and security in the digital health infrastructure, increasing the usability of health information systems to enhance provider interactions, the creation of new analytical techniques to inform improved care, and the development of more efficient methods of data compression and communication through modalities such as mobile health.

**Strategy V.B.5: Provide clear direction to the health IT industry regarding government roles and policies for protecting individuals while not stifling innovation.**

ONC commissioned the Institute of Medicine (IOM) to thoroughly evaluate health IT patient safety concerns and to recommend additional actions and strategies to address those concerns, as well as to define the role of public and private sectors in ensuring the safety of health IT-assisted health care services. Over the next two years, ONC, in collaboration with federal partners, will develop a consistent approach to health IT that protects individuals without stifling innovation. The government is committed to being as open and transparent as possible in formulating its approach.

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 50 of 81

# Appendix A: Performance Measures

The performance measures below reflect key aspects of progress towards achieving the goals in this Federal Health IT Strategic Plan for 2011-2015, and the overarching goal that all Americans will benefit from EHRs. These performance measures are not intended to be a complete set, but a subset of key indicators in assessing progress. Supporting information for these performance measures is contained in ONC's Annual Performance Plan and Report, which is integrated into the annual Congressional Budget Justification, which is available on the HHS website. The most recent assessment about the status of meeting each goal is also included to provide a baseline from which ONC aims to improve performance.

| Goal | Performance Measures | Most Recent Assessment of Performance | Data Sources |
|---|---|---|---|
| I. Achieve Adoption and Information Exchange through Meaningful Use of Health IT | ▪ Increase the percentage of eligible professionals receiving Medicare and Medicaid EHR Incentive Programs payments | ▪ N/A Baseline TBD (FY 2011) | ▪ Centers for Medicare & Medicaid Services (CMS) Meaningful Use Registration and Attestation System |
| | Better performance in hospitals:<br>▪ Increase the percentage of eligible hospitals receiving Medicare and Medicaid EHR Incentive Programs payments<br>▪ Increase the percentage of hospitals that have adopted electronic health records | ▪ N/A Baseline TBD (FY 2011)<br>▪ 12% (CY 2009) | ▪ CMS Meaningful Use Registration and Attestation System<br>▪ American Hospital Association (AHA) Annual Survey of Hospitals, IT Supplement |
| | Better performance for physicians:<br>▪ Increase the percentage of eligible primary care professionals receiving meaningful use incentive payments<br>▪ Increase the percentage of Federally Qualified Health Centers (FQHCs) that are affiliated with providers that receive Medicare and Medicaid EHR Incentive Programs payments<br>▪ Increase the percentage of office-based physicians who have adopted electronic health records<br>▪ Increase the percentage of office-based primary care physicians who have adopted | ▪ N/A Baseline TBD (FY 2011)<br>▪ N/A Baseline TBD (FY 2011)<br>▪ 21% (CY 2009)<br>▪ 20% (CY 2009) | ▪ CMS Meaningful Use Registration and Attestation System<br>▪ TBD<br>▪ CDC National Ambulatory Medical Care Survey, IT Supplement<br>▪ Centers for Disease Control and Prevention (CDC), National Ambulatory Medical |

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 51 of 81

| Goal | Performance Measures | Most Recent Assessment of Performance | Data Sources |
|---|---|---|---|
| | electronic health records | | Care Survey, IT Supplement |
| | ▪ Increase the percentage of community pharmacies in the U.S. that are capable of exchanging health information electronically | ▪ 85% (CY 2009) | ▪ Surescripts National Progress Report on E-Prescribing |
| II. Improve Care, Improve Population Health, and Reduce Health Care Costs through the Use of Health IT | ▪ Proportion of eligible providers in Beacon Communities that receive Medicare and Medicaid EHR Incentive Programs payments | ▪ N/A Baseline TBD (FY 2011) | ▪ ONC Office of State and Community Programs, Beacon Division |
| | ▪ Number of providers participating in Beacon Community interventions | ▪ N/A Baseline TBD (FY 2011) | ▪ ONC Office of State and Community Programs, Beacon Division |
| III. Inspire Confidence and Trust in Health IT | ▪ Decrease the percentage of Americans who are very concerned about the security of electronic health records | ▪ N/A Baseline TBD (FY 2011) | ▪ ONC Privacy and Security Attitudes Survey |
| IV. Empower Individuals with Health IT to Improve their Health and the Health Care System | ▪ Increase the percentage of Americans who have been given electronic access to any part of their health care record | ▪ N/A Baseline TBD (FY 2011) | ▪ ONC Privacy and Security Attitudes Survey |
| V. Achieve Rapid Learning and Technological Advancement | ▪ Measure TBD | ▪ N/A Baseline TBD | ▪ Data Source TBD |

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 52 of 81

# Appendix B: Programs, Initiatives, and Federal Engagement

- **Department of Agriculture (USDA)** improves agricultural productivity and competitiveness and contributes to the national economy and the public health. The Recovery Act appropriated funds to the Department of Agriculture's Rural Utilities Service (RUS) and the Department of Commerce's National Telecommunications Information Administration (NTIA) to expand broadband access and adoption in communities across the U.S., to increase jobs, spur investments in technology and infrastructure, and provide long-term economic benefits.
- **Department of Commerce (DoC)** has cross-cutting responsibilities in the areas of trade, technology, entrepreneurship, economic development, environmental stewardship, statistical research, and analysis. Its involvement with health IT has been evident through one of its agencies, the National Institute for Standards and Technology.
  - **National Institute of Standards and Technology (NIST)** is a non-regulatory federal agency whose mission is to promote U.S. innovation and industrial competitiveness by advancing measurement science, standards, and technology in ways that enhance economic security and improve quality of life.
    - NIST collaborates with HHS/ONC in realizing the health IT goals of the Administration and Congress. This relationship allows ONC to draw upon NIST expertise in applying IT to health care through standards, conformance measurement, prototype implementation, security, and usability, and in consulting on the Nationwide Health Information Network, standards, and certification processes.
    - NIST has funded a grant on the "Relationship Between Health IT Usability and Patient Safety: A Human Factors Engineering Framework for Action." This grant will develop a framework explaining how the multiple facets of usability may be linked to different aspects of patient safety.
- **Department of Defense (DoD)** provides health care to all U.S. military personnel worldwide through the Military Health System (MHS) and is supported by a robust EHR system.
  - **Armed Forces Health Longitudinal Technology Application, (AHLTA)** the military's EHR, is an enterprise-wide medical and dental information management system that provides secure online access to Military Health System (MHS) beneficiaries' records. It is used by medical clinicians in all fixed and deployed Military Treatment Facilities (MTFs) worldwide. This centralized EHR allows health care personnel worldwide to access complete, accurate health data to make informed patient care decisions.
  - **Virtual Lifetime Electronic Record, (VLER)** will permit information vital to health care, benefits and services to be available to the DoD and the VA from the moment a service member enters the military until the death of the service member or veteran. Both the DoD and VA have begun to work together to define and build a seamless system of integration that will provide a framework to ensure that health care providers have all the information they need to deliver high-quality health care, while reducing medical errors. VLER is intended to be a lifetime, personal record that ensures a seamless continuum of care and benefits. VLER leverages the work of CONNECT and the Nationwide Health Information Network in service to military and veteran personnel.
  - **Electronic Health Record (EHR) Way Ahead** is a proposed Major Automated Information System (MAIS) program designed to replace/sunset the current portfolio of systems providing initial EHR capability, primarily AHLTA and Composite Health Care System (CHCS). EHR Way Ahead will

establish a comprehensive, longitudinal, electronic health record that is available anytime and anywhere for the lifetime of every patient. This longitudinal electronic health record will support a virtual lifetime electronic record (VLER) for a service member by being a source system for health care information to be shared via VLER.

- **"Blue Button"** is a web-based portal enabling individuals to download their personal health information and share this information with health care providers, caregivers, and others they trust. It provides consumers with a standardized and reusable copy of their health information through a simple download function on DoD, VA and CMS' websites.

- **Department of Health and Human Services (HHS)** is the principal agency responsible for protecting the health of all Americans and has many agencies and initiatives that work towards advancing health IT within the U.S. and implementing various aspects of the Affordable Care Act and the HITECH Act.
  - **Text4Baby** is a free mobile information service designed to promote maternal and child health by connecting women to prenatal and infant care services, as well as providing tips on what women need to know during pregnancy and the baby's first year. Text4baby is made possible through a broad, public-private partnership that includes government agencies, corporations, academic institutions, professional associations and non-profit organizations.
  - Section 2041 of the Affordable Care Act authorizes the Secretary of HHS to make grants to long-term care facilities for the purpose of assisting such entities in offsetting the costs related to the purchasing, leasing, developing, and implementing of certified EHR technology.
  - **Agency for Healthcare Research and Quality (AHRQ)** is the lead federal agency charged with improving the quality, safety, efficiency, and effectiveness of health care for all Americans. AHRQ supports health services research that seeks to continuously improve the quality of health care and promote evidence-based decision-making.
    - AHRQ's Health IT Portfolio has supported health services research grants and contracts that create new knowledge, synthesize and disseminate best evidence and provide tools for implementation addressing health IT's impact on the quality of health care since 2004. Current initiatives address clinical decision support, patient safety, patient centered care, quality measurement, and usability and workflow issues. Examples like treating chronic illness in an effective and efficient manner using telemedicine through Project ECHO in New Mexico, texting diabetic patients in Colorado to incorporate their blood sugar readings into an EHR, or using health IT to reduce the incidence and impact of pressure ulcers in long term care facilities in Utah, demonstrate the power of health IT to revolutionize the health care system. In this portfolio, AHRQ has developed a publically available web site, United States Health Information Knowledgebase (USHIK.ahrq.gov) where information (metadata: such as name, definition, how they are represented) about the data elements from the HHS Secretary's National Interoperability Standards (HIPAA transactions, Consolidated Health Informatics, Health Information Technology Standards Panel, and others) is related to the data elements' use cases and the standards from which they come. This site promotes understandable health information exchange and the uniformity of data used for health research and decision-making.
    - AHRQ's Patient-Centered Health Research/Effective Health Care Portfolio supports projects that develop the information infrastructure needed to conduct patient--centered health research and enable a learning health care system. Current initiatives are supporting infrastructure development projects, EHC distributed data research networks and enhanced clinical registries, and methods work to support them. The Portfolio includes efforts like the

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 54 of 81

Safe Surgery Project at the University of Washington, which has implemented a standardized surgical checklist statewide to improve safety.

– **Assistant Secretary for Preparedness and Response (ASPR)** serves as the Secretary's principal advisor on matters related to bioterrorism and other public heath emergencies.

  - ASPR is looking to health IT, EHRs, and Joint Patient Tracking Systems (JPTS) to assist in addressing various functions, including Identifying at Risk Individuals, Strategic National Stockpiling, City Readiness Initiative, Medical Reserve Corps coordination, Emergency System Management for Advance Registration of Volunteer Health Professionals, Hospital Preparedness, and National Disaster Medical Management.

– **Assistant Secretary for Planning and Evaluation (ASPE**) is the principal advisor to the HHS Secretary on policy development, and is responsible for major activities in policy coordination, legislation development, strategic planning, policy research, evaluation, and economic analysis and is currently building a multi-payer, multi-claim database to support patient-centered research using Medicare, Medicaid, and private payer claims data.

  - ASPE is leading the Department's research initiatives and focus on health IT adoption by post-acute and long-term care providers, including identifying health IT standards to advance interoperable health information by post-acute and long-term care providers, and producing the HITECH required Report to Congress in which the Secretary is to determine the extent to which and manner in which incentives and other funding for using certified EHRs should be made available to providers who are not eligible for incentives or other funding for such purposes.

– **Centers for Disease Control and Prevention (CDC)** collaborates to create the expertise, information, and tools that people and communities need to protect their health – through health promotion, prevention of disease, injury and disability, and preparedness for new health threats.

  - **The Public Health Information Network (PHIN)** is a national initiative to increase the capacity of public health to exchange data and information electronically across organizational and jurisdictional boundaries by promoting the use of standards and defining functional and technical requirements. PHIN strives to improve public health by enhancing research and practice through best practices related to efficient, effective, and interoperable public health information systems.

  - **The National Healthcare Safety Network (NHSN)** is a voluntary, secure, Internet-based surveillance system that integrates patient and health care personnel safety surveillance systems and has the capacity for health care facilities to share data in a timely manner between health care facilities and with other entities.

  - **The National Electronic Disease Surveillance System (NEDSS)**, a major component of PHIN, advances the transition to standards-based electronic data exchange for reportable disease surveillance to improve local/state/territorial capacity to detect and respond to reportable diseases and the nation's ability to support the revised International Health Regulations.

  - **BioSense** is a national program to improve capabilities for rapid disease detection, monitoring, and real-time situational awareness through access to existing data from health care organizations. BioSense enables local and state public health departments to share and access

data, providing a more complete picture of potential and actual health events both locally and across jurisdictional boundaries.

- **The National Environmental Public Health Tracking Network** integrates health, exposure, and hazard data from a variety of national, state, and city sources and offers a new understanding of how hazardous substances can contribute to illness.
- **National Center for Health Statistics,** as the Nation's principal health statistics agency, provides statistical information that will guide actions and policies to improve the health of the American people. NCHS collects data from birth and death records, medical records, interview surveys, and through direct physical exams and laboratory testing. NCHS is a key element of the national public health infrastructure, providing important surveillance information that helps identify and address critical health problems.
- **"Strengthening Public Health Infrastructure for Improved Health Outcomes"** is funded within the Prevention and Public Health Fund under the Affordable Care Act and is designed to advance any or all of the key areas for infrastructure investment and to help ensure successful implementation of the Affordable Care Act, specifically by: improving the public health workforce, developing information systems to support adoption and implementation of rules and regulations, reengineering of infrastructure to improve networking and coordination, implementing best health care practices and impact evaluation, improving information and data system capacity, and improving organizational capacity. The new program is seeking to increase the performance management capacity of public health departments and ensure that public health goals are being met.
- CDC's Public Health Informatics and Technology Program Office (PHITPO) at the Office of Surveillance, Epidemiology and Laboratory Services (OSELS) is leading the development of public health standards that align with certified EHR technology. As with clinical data, public health departments require public health standards and may benefit from certified public health information systems to effectively exchange information.

– **Centers for Medicare & Medicaid Services (CMS)** is the federal agency that oversees the Medicare and Medicaid EHR Incentive Programs, thus playing a key role in the overall direction of the health care system. The HITECH Act established the incentive programs to provide payments for the meaningful use of certified EHR technology. The Medicare and Medicaid EHR Incentive Programs provide payments to eligible professionals and hospitals who meet meaningful use requirements. These incentive programs are designed to instill the use of EHRs in a meaningful way to support the nation in improving care, efficiency, and population health.

- **The Center for Medicare and Medicaid Innovation (Center for Innovation or CMMI)** was established to test innovative payment and service delivery models to reduce program expenditures under the applicable titles while preserving or enhancing the quality of care.
- **My Personal Health Record South Carolina (MYPRSC)** is a Personal Health Record (PHR) pilot conducted by CMS that provides an online PHR to Medicare beneficiaries who reside in South Carolina and have original (fee-for-service) Medicare.
- **Medicare PHR Choice**, a PHR pilot conducted by CMS, for people with original (fee-for-service) Medicare residing in Utah and Arizona.
- Under the **Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA)**, CMS has awarded ten Quality Demonstration grants in a total of 18 States to

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 56 of 81

implement and evaluate provider performance measures, utilize health information technologies such as pediatric electronic health records, and test the effectiveness of provider delivery models such as medical homes.

- The Affordable Care Act also provides $300 million dollars for the development and implementation of a voluntary **Medicaid Adult Health Quality Measures Program** - including quality measures that can be collected via electronic health records.
- **"Blue Button"** is a web-based portal enabling individuals to manage their personal health information and provide access to health care providers, caregivers, and others they trust. The Blue Button feature allows individuals to access and download information into a text file (or an enhanced PDF) that can be read, printed, or saved on any computer. The download can be broken out by data class or data range. Blue Button allows control of information without special software – and enables individuals the ability to share data with their health care providers, caregivers, or people they trust. It provides consumers with a standardized and reusable copy of their health information through a simple download function on DoD, VA and CMS' websites.

– **Food and Drug Administration (FDA)** is the primary federal agency responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, and medical devices, and providing oversight of the nation's food supply, cosmetics, products that emit radiation, and tobacco products. FDA also promotes the public health by promptly and efficiently reviewing clinical research and taking timely and appropriate action on the marketing of regulated products. The agency's actions support innovations that make medical products more effective and safer. FDA also helps the public obtain the accurate, science-based information they need to use medical products and appropriately consume foods to improve their health. FDA's Center for Devices and Radiological Health (CDRH) is responsible for assuring the safety and effectiveness of medical devices. CDRH will continue to monitor health IT patient safety concerns using its existing programs and initiatives.

- **Medwatch-Plus** provides electronic capability for receiving adverse event data, processing, storing and analyzing adverse event reports and other safety information for human drugs, medical devices, vaccines and other biologics, dietary supplements, and cosmetics. Alerts issued based on this data contain useful information.
- **FDA Adverse Event Reporting System (FAERS)** is a program within MedWatch Plus. FAERS will provide a back-end database for processing, storing and analyzing post-market adverse event reports and other safety information for FDA-regulated drug, biologic, and medical device products.
- **The Sentinel Initiative** is building a national electronic system, the Sentinel System, to enhance FDA's ability to track the safety of drugs, vaccines, biologics, and medical devices once they reach the market. The Sentinel Initiative aims to develop and implement an active surveillance system that will augment existing systems that the FDA has in place to track reports of adverse events linked to the use of its regulated products.
- **Structured Product Labeling (SPL) is an** electronic document markup standard approved by Health Level Seven (HL7) and adopted by FDA as a mechanism for exchanging product information. SPL is also used by FDA and NLM DailyMed initiative, which provides information on human drugs and biologics **in electronic format in an** effort to improve patient safety.

– **Health Resources and Services Administration (HRSA)** is the primary federal agency for improving access to health care services for people who are uninsured, isolated or medically vulnerable. In an effort to use health IT to extend access to health care, HRSA is working to identify, disseminate and provide technical assistance to health centers and other HRSA grantees in adopting model practices and technologies. HRSA is also working collaboratively with foundations, national organizations, the private sector, and other government agencies to help HRSA grantees adopt health IT.

- **The HRSA Health Disparities Collaborative (HDC)** was created to assist in the transformation of primary health care practices to improve the health care provided to everyone and to eliminate health disparities. This initiative was originally funded by HRSA but now continues as a public-private endeavor.
- **HRSA's Telehealth Network Grant Program** supports established telehealth networks that are looking to expand the number of sites receiving clinical services.
- **HRSA's Telehealth Resource Program** funds Centers of Excellence that provide technical assistance on telehealth to any HRSA grantee in the country.
- **Telehealth Services for Children and Youth with Epilepsy grants** fund initiatives to demonstrate ways to improve the system of services for children and youth with epilepsy through the use of telehealth/telemedicine.
- **Health Center Controlled Networks (HCCNs)** improve operational effectiveness and clinical quality in health centers through the provision of management, financial, technology and clinical support services. An overwhelming number of community health centers who have signed on with an HCCN have successfully adopted an EHR system.
- **Health IT Toolboxes** provide a compilation of resources to help community health centers, safety net providers and ambulatory care providers implement health IT and better understand meaningful use.
- **The National Health Service Corps (NHSC),** through scholarship and loan repayment programs, helps Health Professional Shortage Areas (HPSAs) in the U.S. get the medical, dental, and mental health providers they need to meet their tremendous need for health care.
- **The Rural Health Network Development Planning Grant Program (Network Planning)** expands access to, coordinates and improves the quality of essential health care services and enhances the delivery of health care, in rural areas. The program provides one-year grants to rural entities to plan and develop a formal health care network.
- **HRSA Pediatric Primary Care Electronic Health Record (EHR) Network for Comparative Effectiveness Research (CER).** The CER study is testing, via a cluster randomized trial, a point-of-care clinical decision support system linked to electronic health records in improving the quality of care for a chronic pediatric condition.
- **The Community Health Applied Research Network (CHARN)** is a consortia of researchers based at community health centers funded under the 2009 Recovery Act. The CHARN will demonstrate that a well conceived and fully operational data infrastructure can be put in place to support patient-centered outcomes research (PCOR) on diverse populations and patient subgroups that are often underrepresented in health outcomes research. The CHARN will actively disseminate research results to patients and clinicians in safety net treatment settings.

- Integrating Child Health Information Systems through health information exchange funds allows states to develop an interoperable system of collecting and exchanging information including immunizations, vital statistics, and newborn screening. States and public health departments are implementing systems that enhance communication and facilitate the exchange of information between multiple partners including clinicians, laboratorians, public health agencies, researchers and various community support services.

– **Indian Health Service (IHS)** is responsible for providing federal health services to American Indians and Alaska Natives. The IHS is the principal federal health care provider and health advocate for Indian people and its goal is to raise their health status to the highest possible level. The IHS provides a comprehensive health service delivery system for approximately 1.9 million American Indians and Alaska Natives who belong to 564 federally recognized tribes in 35 states. The IHS has long leveraged health IT to serve its populations, some of whom are located in the most remote areas of the country. Indian Health Service, along with its Tribal and Urban Program partners, have developed and deployed a comprehensive suite of software applications to support the provision of quality services and the secure management of health information.

- **IHS Resource and Patient Management System (RPMS)** is the suite of health IT applications that support health care delivery throughout the IHS. The RPMS includes an EHR, population management tools, clinical decision support, quality reporting, integrated behavioral health, electronic dental record, practice management, patient registration and management, and other integrated applications. In April 2011, IHS became the first federal agency to have part of its health information system certified for stage one meaningful use. The IHS RPMS Suite is certified as a Complete EHR for both inpatient and ambulatory settings. Part of the EHR system development included creation of a personal health record (PHR) portal to support meaningful use requirements related to engaging patients and their families in their health care.

- **IHS Population Health Management (iCare)** is the IHS' population management tool that enables providers to easily identify groups of patients (populations) that share similar characteristics. It presents diverse patient data in a user-friendly view by retrieving patient information from the various underlying components of the RPMS database and bringing it together under a single interface. User-defined patient lists (panels) are easily created, sorted and filtered in a variety of ways to form the core functionality of iCare. The Care Management Event Tracking (CMET) electronically tracks and manages certain pre-defined events related to breast, cervical, colon, and skeletal health from screening through completion. "Anonymous Community Alerts" related to CDC Nationally Notifiable Diseases and Suicidal Behavior are mined on a nightly basis and displayed in a variety of locations to promote early awareness and allow for prompt intervention.

- **IHS Patient Wellness Handout (PWH)** is a paper-based report for patients that combines information from their medical records along with an explanation of their results. It can be used to provide patients with a listing of the recommended health maintenance services that are due, serve as a tool to promote health communication, or as a portable record of selected health information. The PWH can be generated on demand by anyone who is providing care services to the patient.

- **IHS National Patient Information Reporting System (NPIRS)** is the national data warehouse for the IHS. The NPIRS maintains historical data from RPMS and other sources to

provide information on health trends, cost and quality reporting, and individual data marts for specific chronic health care challenges, such as diabetes.

- **IHS Infrastructure, Office Automation, and Telecommunications (IOAT)** is the foundational network of hardware, software and services that support RPMS, NPIRS and the operations of the IHS. The IOAT enables information exchange for RPMS and security for all IHS operations.

– **The Office of Minority Health (OMH)** has developed and supports the National Health Information Technology (NHIT) Collaborative that works to bridge gaps between coordinating and implementing health IT within underserved communities, helping to educate health care providers and advocate within these communities concerning the use and application of health IT, and advising other federal, state and local agencies of how to best coordinate the use of health IT within underserved communities of color.

– **National Institutes of Health (NIH)** is the primary federal agency for the support and conduct of biomedical and behavioral research. Its mission is to seek fundamental knowledge about the nature and behavior of living systems and apply it to enhance health, lengthen life, and reduce the burdens of illness and disability. In terms of health IT, NIH supports and conducts research and standards development to advance the meaningful use of certified EHR technology in research and clinical practice. Given the unprecedented opportunities to answer new and important research questions using the information contained in EHRs, NIH is working assiduously to facilitate appropriate access and exchange of data for research purposes. Health IT is of interest and relevance to all of the NIH Institutes and Centers. A few examples of relevant NIH activities include the following:

- **The National Library of Medicine (NLM)** has a lead role in federal health IT policy as the central coordinating body for clinical terminology standards within HHS. NLM supports, develops, and disseminates key health data standards that are designated to enable certain users to achieve meaningful use of the certified EHRs. NLM supports and conducts research and development related to health IT, including clinical terminologies, clinical decision support, personally controlled EHRs, health information exchange, syndrome surveillance, anatomical image databases, natural language processing, information retrieval, advanced telecommunications, and information infrastructure for emergency response. NLM also manages the ClinicalTrials.gov databank which contains public information and data on clinical trials. NLM also supports the training of health IT professionals through academic biomedical informatics research training centers.

- **Cancer Biomedical Informatics Grid (caBIG®)** is an information network supported by the National Cancer Institute (NCI) enabling members of the cancer community – researchers, providers, and patients – to collect, manage, and analyze large volumes of biomedical and clinical data. The components of caBIG® are widely applicable beyond cancer as well.

- **The Electronic Medical Records and Genomics (eMERGE) Network**, an initiative of the National Human Genome Research Institute (NHGRI), is developing, disseminating, and applying approaches to research that combine DNA biorepositories with electronic medical record (EMR) systems for large-scale, high-throughput genetic research.

- NHGRI and NCI have collaborated with the Office of the Surgeon General and the Office of the Secretary to develop standards and tools for the collection, storage and dissemination of family history information. The U.S. Surgeon General's **My Family Health Portrait (MFHP)** has been a centerpiece of these activities to date. It is a free web-based tool for family history

Case 4:22-cv-00202-ADB Document 132-2 Filed 03/20/23 Page 60 of 81

collection that is standards-based and potentially interoperable with EHR systems. Recently an inter-agency NIH working group has been established to address future governance of MFHP. Future activities include the development of clinical decision support tools for common heritable conditions that are compatible with MFHP.

- **The National Institute of Biomedical Imaging and Bioengineering's Radiological Society of North America RadLex Ontology Project** provides uniform terms and concepts for indexing and retrieving imaging research databases, educational materials, and clinical imaging reports in an EHR. The project develops and deploys radiology reporting templates for EHR software.

- The NIH Clinical Center, in association with a number of NIH Institutes, developed the **Biomedical Translational Research Information System (BTRIS)**, a repository of clinical research data that facilitates the conduct of intramural clinical trials. BTRIS is also addressing important questions related to the standardization and aggregation of EHR data that will be relevant to other national efforts involving EHR data reuse.

– **Office for Civil Rights (OCR)** administers and enforces four key privacy and security laws: 1) the HIPAA Privacy Rule, which protects the privacy of individually identifiable health information; 2) the HIPAA Security Rule, which sets national standards for the security of electronic health information; and 3) the HIPAA Breach Notification Rule, which requires HIPAA covered entities to notify individuals, HHS, and in some cases the media of impermissible uses and disclosures of health information that compromise the privacy and security of such information; and 4) the confidentiality provisions of the Patient Safety Rule, which protect identifiable information being used to analyze patient safety events and improve patient safety. Together, ONC and OCR are the lead HHS offices for health-IT-related privacy and security policy.

- OCR also enforces federal civil rights laws protecting individuals from discrimination on the basis of race, color, national origin, gender, age, and disability and works with ONC to ensure that health information technology benefits all individuals, including those who are protected by these laws.

– **Office of the National Coordinator for Health IT (ONC)** is at the forefront of the administration's health IT efforts and is a resource to the entire health system to support the adoption of health IT and the promotion of nationwide health information exchange. ONC is the principal federal entity charged with coordinating nationwide efforts to implement and advance the use of health IT and promote the electronic exchange of health information.

- **The Health Information Technology Extension Program (Regional Extension Centers or RECs)** offers technical assistance, guidance and information on best practices to support and accelerate health care providers' efforts to become meaningful users of certified EHR technology.

- **The Health Information Technology Research Center (HITRC)** helps support the RECs by gathering information on effective practices and helping the RECs collaborate with one another and with relevant stakeholders to identify and share best practices in EHR adoption, meaningful use, and provider support.

- **The State Health Information Exchange Cooperative Agreement Program** supports states or state designated entities in building health information exchange capacity for exchanging health information electronically across the health care system both within and across states.

- **The Beacon Community Cooperative Agreement Program** supports communities at the cutting edge of EHR adoption and health information exchange to build and strengthen their health IT infrastructure and exchange capabilities to push them to achieve new levels of sustainable health care quality and efficiency. These communities will focus on demonstrating measurable improvements in care, efficiency, and population health.

- **The Health IT Workforce Development Program** focuses on several key resources needed to rapidly expand the availability of skilled health IT professionals who will support broad adoption and use of health IT in the provider community.

- **The Strategic Health IT Advanced Research Projects (SHARP) Program** funds research focused on achieving breakthrough advances to address well-documented problems that have impeded adoption of health IT. The knowledge generated from this program will help accelerate progress towards meaningful use of health IT and a high performing, adaptive, nationwide health care system.

- **The Nationwide Health Information Network** is a set of standards, services and policies that enable secure health information exchange over the Internet. The Nationwide Health Information Network will provide a foundation for the exchange of health information across diverse entities, within communities, and across the country.

- **The Federal Health Architecture (FHA)** is an E-Government Line of Business initiative managed by the Office of the National Coordinator for Health Information Technology. FHA was formed to coordinate health IT activities among federal agencies that provide health and health care services to citizens.

- **The CONNECT project** is an E-government initiative managed by ONC. CONNECT was formed as a consortium of interested federal agencies to develop software based on the Nationwide Health Information Network specifications to support standards-based exchange. The CONNECT software is available through an open source license and is used by both federal and private sector organizations.

– **Substance Abuse and Mental Health Services Administration (SAMHSA)** is the lead agency within the Department of Health and Human Services charged with Behavioral Health Services integration into community and existing provider-based prevention and treatment systems at community, State and national levels. The role of health IT in SAMHSA is incorporated into a broad range of activities that include but are not limited to:

- Working with the VA and DOD on Suicide Prevention National Lifeline activities to expand and strengthen use of the VA model for EHR with a "flag" protocol to identify and coordinate interventions and services for those at high risk of suicide, or with a past history of attempts.

- Working with the VA's Virtual Lifetime Electronic Record (VLER) initiative to demonstrate privacy protected exchange of sensitive clinical records between community-based behavioral health programs and VA health centers.

- Working with several State behavioral health and Medicaid agencies to develop open source EHRs and HIE services that integrate behavioral health within community-based health homes and State Health and Human Service programs.

- Testing the usability and feasibility of smartphone-based applications and patient links to clinical services, including, but not limited to a recovery tool called **Addiction Comprehensive Health Enhancement Support System (A-Chess)** – an online peer

Case 4:25-cv-40022-ADB Document 1-2 Filed 03/19/25 Page 32 of 81

support group and clinical counselors, a GPS feature that sends an alert when the user gets near an area of previous drug or alcohol activity, real-time video counseling, and a "panic button" that allows the user to place an immediate call for help with cravings or triggers.

- **Open Behavioral Health Information Technology Architecture (OBHITA)** supports the creation of a behavioral health EHR reference model information technology architecture. OBHITA will also build on privacy protection standards developed over the past five years.
- **The SAMHSA Health Information Network (SHIN)** includes the National Clearinghouse for Alcohol and Drug Information (NCADI) and the National Mental Health Information Center (NMHIC). SHIN connects the behavioral health workforce and the general public to the latest information on the prevention and treatment of mental and substance use disorders. The NMHIC was developed to provide information about organizations dedicated to treating and preventing medical illness, as well as information about federal grants, conferences, and events.
- Exploring the use of pharmacy and medical provider information from individual State Prescription Drug Monitoring Programs and the National All Schedules Prescription Electronic Reporting Act, or NASPER, to inform state and community treatment and prevention programs, including community coalitions that will be using the Strategic Planning Framework to identify and provide local, real time information regarding questionable prescription drug abuse.
- Providing Grants to Expand Substance Abuse Treatment in Targeted Areas of Need - Technology Assisted Care (TCE - TAC). The purpose of this program is to enhance and/or expand the capacity of substance abuse treatment providers to serve clients who have been underserved because of lack of access to treatment in their immediate community due to transportation concerns, an inadequate number of substance abuse treatment providers in their community, and/or financial constraints, through the use of therapeutic techniques that involve innovative, creative and cost-effective advanced technology. This approach includes the use of various technological modalities such as Internet, tele-behavioral health, chatlines, videocams, etc.
- Regulating 1230 opioid treatment programs that dispense the treatment medications methadone and buprenorphine to 288,824 patients nationwide. Through an interactive online "Extranet," providers extract patient health information from medical records, and submit an electronic form that is evaluated concurrently by Federal and State regulatory authorities. The system addresses exemptions from certain Federal and State regulatory requirements.
- Working with the field to develop a digital access to medication (DAT-M) system. This Web-based system would concentrate selected patient health information, including dose levels, into an interoperable data base that could be securely accessed by providers throughout the country. DAT-M is being developed to address opioid dependent patients to continue care after being displaced by various disasters.
- Providing U.S. public health statistics on the use of alcohol, illegal drugs, prescription drugs and mental health issues through the Center for Behavioral Health Statistics and Quality. This Center also provides information on substance use disorder treatment episodes. It also publishes brief reports based on the National Survey on Drug Use and Health, the Drug Abuse Warning Network, and the Treatment Episode Data set.

- Request for Application (RFA) for Supplemental Funds for Health IT Infrastructure Development. Two new RFAs were announced that are specifically designed for the following entities: 1) current Primary and Behavioral Health Care Integration (PBHCI) grantees ($11.2 million); and 2) State-Designated-Entities (SDEs), including for technical assistance to States and grantees ($3.8 million). The purpose of the PBHCI program is to improve the physical health status of people with serious mental illnesses, including individuals with co-occurring substance use disorders, by supporting communities to coordinate and integrate primary care services into publicly funded community mental health and other community-based behavioral health settings. The overarching goal for the supplemental funding for HIT is to integrate care across and among providers via the appropriate use of certified EHR technology.

- **Department of Veterans Affairs (VA)** provides Veterans with health benefits and uses EHR systems to better their service and accelerate consumer use.

  – **Veterans Health Information Systems and Technology Architecture (VistA)** is an enterprise-wide information system built around an EHR, used throughout the VA medical system which is known as the Veterans Health Administration (VHA). VistA is one of the most widely used EHRs in the world.

  – **Virtual Lifetime Electronic Record, (VLER)** will permit information vital to health care, benefits and services to be available to the DoD and the VA from the moment a service member enters the military until the service member or veteran's death. Both the DoD and VA have begun to work together to define and build a seamless system of integration that will provide a framework to ensure that health care providers have the information they need to deliver high-quality health care, while reducing medical errors. VLER is intended to be a lifetime, personal record that ensures a seamless continuum of care and benefits. VLER leverages the work of CONNECT and the Nationwide Health Information Network in service to military and veteran personnel.

  – **"Blue Button"** is a web-based portal enabling individuals to manage their personal health information and provide access to health care providers, caregivers, and others they trust. It provides consumers with a standardized and reusable copy of their health information through a simple download function on DoD, VA and CMS' websites.

  – **My Health*e*Vet** is VA's e–health website, which offers Veterans, active duty service members, their dependents, and caregivers access anywhere, anytime via the Internet to VA health care information and services. My Health*e*Vet is a free, online PHR that empowers Veterans to become informed partners in their health care by allowing access to trusted, secure, and current health and benefits information, as well as the ability to record, track and store important health and military history information.

  – **Care Coordination/Home Telehealth (CCHT)** is the national program the VHA uses to coordinate the care of veteran patients with chronic conditions. CCHT involves the systematic use of health informatics, e-care, and disease management technologies to avoid unnecessary admission to long-term institutional care facilities. Technologies include videophones, messaging devices, biometric devices, digital cameras, and remote monitoring devices. E-care is an appropriate and cost-effective way to manage chronic care patients in urban and rural settings and enables patients to live independently at home.

  – **Healthcare Associated Infection & Influenza Surveillance System, (HAIISS)** is a national VA IT initiative that will allow VA healthcare providers to detect the development of healthcare acquired infections in near real time; perform syndromic surveillance and track microbiological organisms of epidemiologic significance, including automated reporting of infectious diseases to local public health

agencies and CDC; and provide tools for tracking multidrug resistant organisms and monitoring antimicrobial utilization in VA medical centers to improve the quality of care for Veterans. VA and DoD are also working together to build a bi-directional biosurveillance system that will provide improved situational awareness for public health related events.

- **Federal advisory committees** are established or authorized by statute to provide advice or recommendations to federal officials on issues or policies that are within the purview of the federal government. These committees include groups from outside the federal government that afford an expertise or perspective not available within the Department of other federal agencies. They provide a mechanism for public input into health IT policy.
  - **National Committee on Vital and Health Statistics (NCVHS)** advises the HHS Secretary in the area of health data, statistics, and national health information policy and the Department's strategy to best address those issues.
  - **HIT Policy Committee (HITPC)** was created by the HITECH Act to make recommendations to the National Coordinator for Health IT on a policy framework for the development and adoption of a nationwide health information infrastructure, including standards for the electronic exchange and use of patient medical information.
  - **HIT Standards Committee (HITSC)** was created by the HITECH Act to make recommendations to the National Coordinator for Health IT on standards, implementation specifications, and certification criteria for the electronic exchange and use of health information.
- **Federal Communications Commission (FCC)** is the federal agency responsible for regulating interstate and international communications, and is actively involved in efforts to build the communications infrastructure necessary to facilitate information exchange. FCC's investments are helping to connect rural health communities and improve access to health IT for more Americans.
  - **The Rural Health Care Pilot Program** facilitated the creation of a nationwide broadband network dedicated to health care and connecting public and private non-profit health care providers in rural and urban locations.
  - The **Expanding Investment in Broadband Health Care Technology** program will invest $400 million annually to enable doctors, nurses, hospitals and clinics to deliver, through communications technology, world-class health care to patients no matter where they live. It is one of four programs in the Universal Service Fund administered by the FCC.
- **Federal Health IT Taskforce** serves as the overall government coordination body for policy development, coordination and implementation of federal health IT activities. This Taskforce also aims to improve transparency of federal government activities related to health IT and communication among federal agencies as they execute federal health IT policy. The Taskforce is chaired by the National Coordinator, with OMB's Health Program Associate Director and the federal government's Chief Information Officer and Chief Technology Officer serving as vice chairs. Agency participants include senior policy officials from HHS (and its relevant offices and operating divisions), DoD, VA, SSA, USDA, OPM, and Commerce.
- **Federal Trade Commission (FTC)** advances consumers' interests by sharing its expertise with federal and state legislatures and U.S. and international government agencies. The Commission has been actively involved in enforcing competition in health care markets. Alongside ONC and OCR, the FTC continues to analyze and update breach notification policies and procedures to ensure they protect individuals' rights and meet their needs.

Case 4:22-cv-00122-ADB Document 13-2 Filed 03/10/23 Page 55 of 81

- **Office of Personnel Management (OPM)** provides comprehensive human resource services to all federal agencies and employees. It continues to develop plans to encourage health insurance plans purchased by the government to support meaningful use among their network of providers.
- **Social Security Administration (SSA)** administers the Social Security Act, which provides benefits for retirement, disabilities, and survivors. SSA is an important partner and early adopter of the Nationwide Health Information Network. In partnership with MedVirginia, SSA uses the Nationwide Health Information Network to obtain electronic medical records in disability cases, and is working with ONC and other Nationwide Health Information Network cooperative members to expand this effort.
- **White House Office of Science and Technology Policy (OSTP)** leads interagency efforts to develop and implement sound science and technology policies and to work with the private sector, state and local governments, the science and higher education communities, and other nations toward this end.

Case 1:22-cv-01202-ADB Document 132-2 Filed 03/13/23 Page 66 of 81

# Appendix C: HIT Standards and HIT Policy Committees Information Flow




*The **HIT Policy Committee** was established "to make policy recommendations to the National Coordinator relating to the implementation of a nationwide health information technology infrastructure, including implementation of the strategic plan described in section 3001(c)(3)." *[Public Health Service Act Section 3002(a), as amended by the HITECH Act]*

**The **HIT Standards Committee** was established "to recommend to the National Coordinator standards, implementation specifications, and certification criteria for the electronic exchange and use of health information for purposes of adoption under section 3004, consistent with the implementation of the strategic plan described in section 3001(c)(3) and beginning with the areas listed in section 3002(b)(2)(B) in accordance with policies developed by the HIT Policy Committee." *[Public Health Service Act Section 3003(a), as amended by the HITECH Act]*

**Figure 2; Flow of recommendations through the HIT Policy and Standards Committees, ONC, and the HHS Secretary**

# Appendix D: Process Approach

In creating the Federal Health IT Strategic Plan, several methods and key sources were utilized and incorporated in order to achieve the final document. The process for obtaining input included working collaboratively with both the public and private sectors, as well as gathering input from current policy and regulations.

At its core, the plan leverages the work of the Strategic Plan workgroup of the HIT Policy Committee. Beginning in January 2010, the workgroup met regularly to devise a strategic plan framework that was submitted to the Health IT Policy Committee which in turn submitted its recommended approach for consideration to the National Coordinator. This framework served as a key input for consideration as ONC wrote the Federal Health IT Strategic Plan. The framework was developed by members of the Workgroup which included health IT leaders from across both the public and private sectors, and also incorporated feedback from the public gathered during public meetings and a listening session.

Due to the diverse scope and multi-agency nature of the plan, it was essential to engage the federal health community in various ways during the plan's development and refinement. ONC conducted interviews and conversations with representatives from key federal agencies and offices in order to create a cohesive and integrated health IT plan across the federal government. After the meetings and discussions were held, ONC looked to these federal agencies and leaders for valuable feedback on drafts of the plan, and intends to continue this collaboration as the plan advances in the future.

ONC actively sought public input into the plan via its Health IT Blog and hosted a consumer working group discussion with health IT leaders in the public and private sectors to gather input in developing its consumer strategy (Goal IV).

The Federal Health IT Strategic Plan was developed with the crucial understanding that several policies and regulations have critical implications pertaining to the current and future state of health IT *(See Appendix E)*. The Plan has also undergone a public comment period and has been updated to reflect input gathered from the public during this process.

# Appendix E: Statutes and Regulations

## Statutes

### American Recovery and Reinvestment Act of 2009 (The Recovery Act)

On February 17, 2009, the President signed the Recovery Act. This statute includes the Health Information Technology for Economic and Clinical Health Act (the HITECH Act) (see below) which establishes the Medicare and Medicaid EHR Incentive Programs that encourage meaningful use of certified EHRs and other health information technology (IT) to improve quality of care.

### Health Information Technology for Economic and Clinical Health Act of 2009 (The HITECH Act)

The Health Information Technology for Economic and Clinical Health (HITECH) Act, passed as part of the Recovery Act, allocated billions of dollars for the health care system to adopt and meaningfully use health IT to improve health. A number of provisions in the HITECH Act strengthen the privacy and security protections for health information established under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

### Health Insurance Portability and Accountability Act of 1996 (HIPAA)

HIPAA called for the establishment of standards and requirements for transmitting certain health information to improve the efficiency and effectiveness of the health care system while protecting patient privacy. The Administrative Simplification Regulations have been developed to implement the Administrative Simplification provisions of HIPAA.

### The Patient Protection and Affordable Care Act of 2010 (the Affordable Care Act)

On March 23, 2010, the President signed the Patient Protection and Affordable Care Act of 2010, later amended by the Health Care and Education Reconciliation Act of 2010 (collectively, the Affordable Care Act), which, among other things, is estimated to expand health care coverage to 32 million currently uninsured Americans by 2019. The Affordable Care Act builds on the HITECH Act and recognizes health IT as a critical enabler to broad transformations in health care.

## Regulations

### Medicare and Medicaid Programs: Electronic Health Record Incentive Programs Final Rule

This rule implements the Recovery Act provisions that provide incentive payments to eligible professionals and eligible hospitals that adopt and use certified EHR technology in a meaningful way. The programs seek to help improve care, efficiency, and population health. This rule also specifies the initial criteria that eligible providers must meet to qualify for the Medicare and Medicaid EHR incentive payments, and it includes other incentive programs participation requirements.

### Health Information Technology: Initial Set of Standards, Implementation Specifications, and Certification Criteria for Electronic Health Record Technology Interim Final and Final Rules

Under these rules, the Secretary has adopted the initial set of standards, implementation specifications and certification criteria that are required for the certification of EHR technology. These rules have been aligned to support the achievement of meaningful use stage one by eligible professionals, eligible hospitals, and critical access hospitals under the Medicare and Medicaid EHR Incentive Programs.

### Establishment of the Temporary Certification Program for Health Information Technology Final Rule

This final rule establishes a temporary certification program for the purposes of testing and certifying health IT, thereby ensuring the availability of Certified EHR Technology for eligible health care providers seeking incentive payments available under the Medicare and Medicaid EHR Incentive Programs. This final rule is issued under the authority granted to the National Coordinator by section 3001(c)(5) of the Public Health Service Act (PHSA), as added by the HITECH Act. Under the temporary certification program, the National Coordinator will authorize qualified organizations that meet specified requirements to conduct the testing and certification of Complete EHRs and/or EHR Modules.

### Establishment of the Permanent Certification Program for Health Information Technology Final Rule

This final rule establishes a permanent certification program for the purpose of certifying health IT. This final rule is issued pursuant to the authority granted to the National Coordinator for Health Information Technology (the National Coordinator) by section 3001(c)(5) of the PHSA, as added by the HITECH Act. The permanent certification program will eventually replace the temporary certification program that was previously established by a final rule. The National Coordinator will use the permanent certification program to authorize qualified organizations to certify certain types of EHR technology, such as Complete EHRs and/or EHR Modules. The permanent certification program could also be expanded to include the certification of other types of health IT.

### Breach Notification for Unsecured Protected Health Information Interim Final Rule

This rule implemented section 13402 of the HITECH Act by requiring HIPAA covered entities to provide notification following a breach of unsecured protected health information to individuals, HHS, and in some cases the media. This rule also requires business associates to notify covered entities following a breach of unsecured protected health information.

### HIPAA Privacy and Security Rules

The HIPAA Privacy Rule provides federal protections for individually identifiable health information held by covered entities and gives patients an array of rights with respect to that information. At the same time, the Privacy Rule is balanced so that it permits the disclosure of protected health information needed for patient care and other important purposes. The HIPAA Security Rule specifies a series of administrative, physical, and technical safeguards for covered entities to implement to assure the confidentiality, integrity, and availability of electronic protected health information.

### Modifications to the HIPAA Privacy, Security, and Enforcement Rules Under the HITECH Act Proposed Rule

This rule proposes a number of provisions that would implement certain parts of the HITECH Act that are designed to strengthen the privacy and security protections for health information established under HIPAA. In addition to seeking to implement these HITECH Act provisions, this rule proposes a number of modifications to improve the HIPAA Rules, which are not mandated in the HITECH Act. The Department issued this proposed rule in 2010 and expects to finalize it in 2011.

### HIPAA Privacy Rule Accounting of Disclosures Under the HITECH Act Proposed Rule

This rule proposes modifications to the HIPAA standard for accounting of disclosures of protected health information. The modifications in part would implement the statutory requirement under the HITECH Act to require covered entities and business associates to account for disclosures of protected health information to carry out treatment, payment, and health care operations if such disclosures are through an electronic health record. The

Case 5:22-cv-00122-AD Document 1-2 Filed 03/22/23 Page 79 of 81

rule also proposes to expand the accounting provision to provide individuals with the right to receive an access report indicating who has accessed electronic protected health information in a designated record set.

# Appendix F: Goals, Objectives, and Strategies

| Goal I: Achieve Adoption and Information Exchange through Meaningful Use of Health IT | |
|---|---|
| **Objectives** | **Strategies** |
| I.A. Accelerate adoption of electronic health records | I.A.1. Provide financial incentive payments for the adoption and meaningful use of certified EHR technology. |
| | I.A.2. Provide implementation support to health care providers to help them adopt, implement, and use certified EHR technology. |
| | I.A.3. Support the development of a trained workforce to implement and use health IT technologies. |
| | I.A.4. Encourage the inclusion of meaningful use in professional certification and medical education. |
| | I.A.5. Establish criteria and a process to certify EHR technology that can support meaningful use criteria. |
| | I.A.6. Communicate the value of EHRs and the benefits of achieving meaningful use. |
| | I.A.7. Align federal programs and services with the adoption and meaningful use of certified EHR technology. |
| | I.A.8. Work with private sector payers and provider groups to encourage providers to achieve meaningful use. |
| | I.A.9. Encourage and facilitate improved usability of EHR technology. |
| I.B. Facilitate information exchange to support meaningful use of electronic health records | I.B.1. Foster business models that create health information exchange. |
| | I.B.2. Monitor health information exchange options and fill the gaps for providers that do not have viable options. |
| | I.B.3. Ensure that health information exchange takes place across individual exchange models, and advance health systems and data interoperability. |
| I.C. Support health IT adoption and information exchange for public health and populations with unique needs. | I.C.1. Ensure public health agencies are able to receive and share information with providers using certified EHR technology. |
| | I.C.2. Track health disparities and promote health IT that reduces them. |
| | I.C.3. Support health IT adoption and information exchange in long-term/post-acute, behavioral health, and emergency care settings. |

| Goal II: Improve Care, Improve Population Health, and Reduce Health Care Costs through the Use of Health IT | |
|---|---|
| **Objectives** | **Strategies** |
| II.A. Support more sophisticated uses of EHRs and other health IT to improve health system performance | II.A.1. Identify and implement best practices that use EHRs and other health IT to improve care, efficiency, and population health. |
| | II.A.2. Create administrative efficiencies to reduce cost and burden for providers, payers, and government health programs. |
| II.B. Better manage care, efficiency, and population health through EHR-generated reporting measures | II.B.1. Identify specific measures that align with the National Quality Strategy. |
| | II.B.2. Establish standards, specifications, and certification criteria for collecting and reporting measures through certified EHR technology. |
| II.C. Demonstrate health IT-enabled reform of payment structures, clinical practices, and population health management | II.C.1. Fund and administer demonstration communities to show how the advanced use of health IT can achieve measurable improvements in care, efficiency, and population health. |
| | II.C.2. Align health IT initiatives and clinical and payment reform pilots and demonstrations. |
| II.D. Support new approaches to the use of health IT in research, public and population health, and national health security | II.D.1: Establish new approaches to and identify ways health IT can support national prevention, health promotion, public health, and national health security. |
| | II.D.2: Invest in health IT infrastructure to support the National Prevention and Health Promotion Strategy. |
| | II.D.3: Ensure a mechanism for information exchange in support of research and the translation of research findings back into clinical practice. |

Case 4:22-cv-00122-ADB Document 132-2 Filed 03/20/23 Page 73 of 81

| Goal III: Inspire Confidence and Trust in Health IT | |
|---|---|
| **Objectives** | **Strategies** |
| III.A. Protect confidentiality, integrity, and availability of health information | III.A.1. Promulgate appropriate and enforceable federal policies to protect the privacy and security of health information. |
| | III.A.2. Enforce existing federal privacy and security laws and maintain consistency with federal policy. |
| | III.A.3. Encourage the incorporation of privacy and security functionality into health IT. |
| | III.A.4. Assess technical solutions that could support more granular patient choice and data segmentation. |
| | III.A.5. Identify health IT system security vulnerabilities and develop strategic solutions. |
| | III.A.6. Identify health IT privacy and security requirements and best practices, and communicate them through health IT programs. |
| III.B. Inform individuals of their rights and increase transparency regarding the uses of protected health information | III.B.1. Inform individuals about their privacy and security rights and how their information may be used and shared. |
| | III.B.2. Increase transparency regarding the development of policies and standards related to uses and sharing of protected health information. |
| | III.B.3. Maintain strong breach notification requirements. |
| III.C. Improve safety and effectiveness of health IT | III.C.1. Provide implementation and best practice tools for the effective use of health IT. |
| | III.C.2. Evaluate safety concerns and update approach to health IT safety. |
| | III.C.3. Monitor patient safety issues related to health IT and address concerns. |

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 74 of 81

| Goal IV: Empower Individuals with Health IT to Improve their Health and the Health Care System | |
|---|---|
| **Objectives** | **Strategies** |
| IV.A. Engage individuals with health IT | IV.A.1. Listen to individuals and implement health IT policies and programs to meet their priorities. |
| | IV.A.2. Communicate with individuals openly and spread messages through existing communication networks and dialogues. |
| IV.B. Accelerate individual and caregiver access to their electronic health information in a format they can use and reuse | IV.B.1. Through Medicare and Medicaid EHR Incentive Programs, encourage providers to give patients access to their health information in an electronic format. |
| | IV.B.2. Through federal agencies that deliver or pay for health care, act as a model for sharing information with individuals and make available tools to do so. |
| | IV.B.3. Establish public policies that foster individual and caregiver access to their health information while protecting privacy and security. |
| IV.C. Integrate patient-generated health information and consumer health IT with clinical applications to support patient-centered care | IV.C.1. Support the development of standards and tools that make EHR technology capable of interacting with consumer health IT and build these requirements for the use of standards and tools into EHR certification. |
| | IV.C.2. Solicit and integrate patient-generated health information into EHRs and quality measurements. |
| | IV.C.3. Encourage the use of consumer health IT to move toward patient-centered care. |

| Goal V: Achieve Rapid Learning and Technological Advancement | |
|---|---|
| **Objectives** | **Strategies** |
| V.A. Lead the creation of a learning health system to support quality, research, and public and population health | V.A.1. Establish an initial group of learning health system participants. |
| | V.A.2. Develop standards, policies, and technologies to connect participants within the learning health system. |
| | V.A.3. Engage patients, providers, researchers, and institutions to exchange information through the learning health system. |
| | V.A.4. Grow the learning health system by adding more members and expanding policies and standards as needed. |
| V.B. Broaden the capacity of health IT through innovation and research | V.B.1. Liberate health data to enable health IT innovation. |
| | V.B.2. Make targeted investments in health IT research. |
| | V.B.3. Employ government programs and services as test beds for innovative health IT. |
| | V.B.4. Monitor and promote industry innovation. |
| | V.B.5. Provide clear direction to the health IT industry regarding government roles and policies for protecting individuals while not stifling innovation. |

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 75 of 81

# Appendix G: Acronyms

| Term/Acronym | Description |
|---|---|
| AHLTA | Armed Forces Health Longitudinal Technology Application |
| AHRQ | Agency for Healthcare Research and Quality |
| ASPE | Office of the Assistant Secretary for Planning and Evaluation (HHS) |
| ASPR | Office of the Assistant Secretary for Preparedness and Response (HHS) |
| caBIG® | The Cancer Biomedical Informatics Grid |
| caGrid | Infrastructure that supports caBIG |
| CDC | Centers for Disease Control and Prevention |
| CDS | Clinical Decision Support |
| CHDI | Community Health Data Initiative |
| CMS | Centers for Medicare & Medicaid Services |
| DHS | U.S. Department of Homeland Security |
| DoD | U.S. Department of Defense |
| DoEd | U.S. Department of Education |
| DoL | U.S. Department of Labor |
| DURSA | Data Use and Reciprocal Support Agreement |
| EHR | Electronic Health Record |
| FACA | Federal Advisory Committee Act |
| FCC | Federal Communications Commission |
| FDA | U.S. Food and Drug Administration |
| FHA | Federal Health Architecture |
| FTC | Federal Trade Commission |
| HDC | Health Disparities Collaborative (HRSA) |
| Health IT | Health Information Technology |
| HHS | U.S. Department of Health and Human Services |
| HHS/OS | U.S. Department of Health and Human Services, Office of the Secretary |
| HIE | Health Information Exchange |
| HIPAA | Health Insurance Portability and Accountability Act of 1996 |
| HITECH ACT | Health Information Technology for Economic and Clinical Health Act |
| HITPC | HIT Policy Committee |
| HITRC | Health Information Technology Research Center |

| Term/Acronym | Description |
|---|---|
| **HITSC** | HIT Standards Committee |
| **HITSP** | Healthcare Information Technology Standards Panel |
| **HRSA** | Health Resources and Services Administration |
| **IHS** | Indian Health Service |
| **IOM** | Institute of Medicine |
| **LTPAC** | Long-term and post-acute care |
| **mHealth** | Mobile health |
| **NAMS** | National Ambulatory Medical Survey |
| **NEDSS** | National Electronic Disease Surveillance System |
| **NIH** | National Institutes of Health |
| **NIST** | National Institute of Standards and Technology |
| **NITRD** | Networking and Information Technology Research and Development Program |
| **NLM** | National Library of Medicine |
| **NPRM** | Notice of Proposed Rulemaking |
| **NQF** | National Quality Forum |
| **NRC** | The National Resource Center for Health Information Technology |
| **OCR** | Office for Civil Rights |
| **OGC** | Office of the General Counsel |
| **OPM** | Office of Personnel Management |
| **ONC-ATCB** | Office of the National Coordinator for Health IT – Authorized Testing and Certification Body |
| **ONC** | Office of the National Coordinator for Health Information Technology |
| **OPP** | ONC's Office of Policy and Planning |
| **OSI** | ONC's Office of Standards and Interoperability |
| **OSTP** | The White House Office of Science and Technology Policy |
| **PCAST** | President's Council of Advisors on Science and Technology |
| **PHR** | Personal Health Record |
| **REC** | Regional Extension Center |
| **RPMS** | Resource and Patient Management System (Indian Health Service's Electronic Health Record) |
| **SAMHSA** | Substance Abuse and Mental Health Services Administration |
| **SDO** | Standards Development Organizations |
| **SSA** | U.S. Social Security Administration |

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 77 of 81

| Term/Acronym | Description |
|---|---|
| **State HIE** | State Health Information Exchange Cooperative Agreement Program |
| **SHARP** | Strategic Health IT Advanced Research Projects |
| **S&I** | Standards and Interoperability |
| **USDA** | U.S. Department of Agriculture |
| **VA** | U.S. Department of Veterans Affairs |
| **VHA** | Veterans Health Administration |
| **VistA** | Veterans Health Information Systems and Technology Architecture (VA's Electronic Health Record) |

Case 4:22-cv-00202-ADB Document 92-2 Filed 03/20/23 Page 79 of 81

# ONC

Office of the National Coordinator for Health Information Technology
200 Independence Avenue SW
Washington, DC 20201

# Acknowledgements

The Office of the National Coordinator is deeply grateful to the leaders and key staff from each federal agency involved with the development of this document.

Development of this plan was supported under contract HHSP23320095633WC by professional staff from Deloitte Consulting LLP. The Office of the National Coordinator gratefully acknowledges Deloitte's contributions to this document.

Case 4:22-cv-12022-ADB Document 92-2 Filed 03/20/23 Page 79 of 81

# Notes

[i] **The National Ambulatory Medical Care Survey (NAMCS).** American Hospital Association IT Supplement 2010. **http://www.hhs.gov/news/press/2011pres/01/20110113a.html**. These estimates refer to the proportion of office-based physicians and non-federal acute care hospitals that have achieved a "basic" level of electronic health record adoption. For more information about these measures, visit http://healthit.hhs.gov/budget and view the Online Performance Appendix to the Fiscal Year 2012 President's Budget Request to Congressional Appropriations Committees.

[ii] **Consumers and Health Information Technology: A National Survey**; April 2010, California HealthCare Foundation. http://www.chcf.org/publications/2010/04/consumers-and-health-information-technology-a-national-survey.

[iii] Friedman, Charles P., Adam K. Wong, and David Blumenthal. "Achieving a Nationwide Learning Health System." Science Translational Medicine, 10 Nov. 2010. Vol 2.

[iv] **The "Meaningful Use" Regulation of Electronic Health Records.** David Blumenthal and Marilyn Tavenner, August 5, 2010, New England Journal of Medicine. http://www.nejm.org/doi/full/10.1056/NEJMp1006114.

[v] **HHS Strategic Plan FY 2010-2015.** US Department of Health and Human Services. http://www.hhs.gov/secretary/about/priorities/priorities.html **and the National Strategy for Quality Improvement in Health Care.** US Department of Health and Human Services, May 2011. **http://www.healthcare.gov/center/reports/quality03212011a.html**

[vi] **Health IT Workforce Development Program.** http://healthit.hhs.gov/portal/server.pt?open=512&objID=1432&mode=2.

[vii] **HHS/OMB Memorandum: Federal Agency Coordination on Health Information Technology (HIT)**, February 19, 2010. http://www.whitehouse.gov/sites/default/files/omb/assets/memoranda_2010/m10-10.pdf.

[viii] **Stimulating the Adoption of Health Information Technology**. David Blumenthal, M.D., M.P.P. N Engl J Med 2009; 360:1477-1479. April 9, 2009. http://www.nejm.org/doi/full/10.1056/NEJMp0901592 .

**ix Medicare Shared Savings Program: Accountable Care Organizations Proposed Rule published in the Federal Register on April 7, 2011 (76 FR 19528, 19652)**

[x] **Sebelius Announces $42.5 Million for Public Health Improvement Programs through the Affordable Care Act.** http://www.cdc.gov/media/pressrel/2010/r100920.htm.

[xi] **Fair Information Practice Principles; Federal Trade Commission,** June 25, 2007. http://www.ftc.gov/reports/privacy3/fairinfo.shtm.

[xii] **Nationwide Privacy and Security Framework for Electronic Exchange of Individually Identifiable Health Information;** December 15, 2008. http://healthit.hhs.gov/portal/server.pt/community/healthit_hhs_gov__privacy___security_framework/1173.

[xiii] **Accelerating Health Care Innovation to Achieve System-Wide Impact**; Donald Berwick at the Brookings Institutions, October 18, 2010. http://www.brookings.edu/~/media/Files/events/2010/1018_health_innovation/20101018_health_innovation_keynote.pdf.

[xiv] **Consumers and Health Information Technology: A National Survey**; April 2010, California HealthCare Foundation. http://www.chcf.org/publications/2010/04/consumers-and-health-information-technology-a-national-survey.

xv **The Social Life of Health Information, 2011. Susannah** Fox. Pew Research Center, May 2011, http://www.pewinternet.org/Reports/2011/Social-Life-of-Health-Info.aspx

**xvi Consumers and Health Information Technology: A National Survey**; April 2010, California HealthCare Foundation. http://www.chcf.org/publications/2010/04/consumers-and-health-information-technology-a-national-survey.

[xvii] **Consumers and Health Information Technology: A National Survey,** California Healthcare Foundation, April 2010. http://www.chcf.org/publications/2010/04/consumers-and-health-information-technology-a-national-survey.

[xviii] **Achieving a Nationwide Learning Health System**; Charles Friedman, Adam Wong, and David Blumenthal, Science Translational Medicine, November 2010.

[xix] **The Digital Infrastructure for a Learning Health System: Foundation for Continuous Improvement in Health and Health Care - Workshop Summary,** Institute of Medicine, December 20, 2010.

[xx] Grossman Claudia, Powers, Brian and McGinnis J. Michael, *Digital Infrastructure for the Learning Health System the Foundation for Continuous Improvement in Health and Health Care Series Summary*, Roundtable on Values and Science-Driven Health Care, The Institute of Medicine's Board on Studies under the IOM Executive Office, Released May 23, 2011

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 80 of 81

---

[xxi] **The Digital Infrastructure for a Learning Health System: Foundation for Continuous Improvement in Health and Health Care - Workshop Summary,** Institute of Medicine, December 20, 2010.

[xxii] **Designing a Digital Future: Federally Funded Research and Development Networking and Information Technology,** President's Council of Advisors on Science and Technology, December 2010.

## "Spotlight on Health Outcomes" Citations

**Goal I: Use of EHRs provides information that can contribute to reducing heart attacks**

1. Persell SD, Kho AN, Thompson JA, Baker DW. Improving hypertension quality measurement using electronic health records. Med Care. 2009 Apr;47(4):388-94.
2. Persell SD, Dunne AP, Lloyd-Jones DM, Baker DW. Electronic health record-based cardiac risk assessment and identification of unmet preventive needs. Med Care. 2009 Apr;47(4):418-24.

**Goal I: Use of EHRs to perform medication reconciliation can contribute to reducing preventable hospitalizations**

1. Brownstein JS, Murphy SN, Goldfine AB, Grant RW, Sordo M, Gainer V, Colecchi JA, Dubey A, Nathan DM, Glaser JP, Kohane IS.Brownstein, et. al. Rapid Identification. Rapid identification of myocardial infarction risk associated with diabetes medications using electronic medical records. Diabetes Care. 2010 Mar;33(3):526-31. Epub 2009 Dec 15.

**Goal II: Health IT can help enable information sharing to contribute to improving care coordination and reducing heart attacks**

1. Persell SD, Kaiser D, Dolan NC, Andrews B, Levi S, Khandekar J, Gavagan T, Thompson JA, Friesema EM, Baker DW. Changes in Performance After Implementation of a Multifaceted Electronic-Health-Record-Based Quality Improvement System.Persell Article. Med Care. 2011 Feb;49(2):117-125.

**Goal II: Health IT can help provide information to enhance clinical decision making and can contribute to reducing preventable hospitalizations**

1. Bertoni AG, Bonds DE, Chen H, Hogan P, Crago L, Rosenberger E, Barham AH, Clinch CR, Goff DC Jr. Impact of a multifaceted intervention on cholesterol management in primary care practices: guideline adherence for heart health randomized trial. Arch Intern Med. 2009 Apr 13;169(7):678-86.
2. Amarasingham R, et al. An automated model to identify heart failure patients at risk for 30-day readmission or death using electronic medical record data. Med Care. 2010 Nov;48(11):981-8.

**Goal IV: Empowering patients with health IT can contribute to reducing heart attacks**

1. Scalvini S, Capomolla S, Zanelli E, Benigno M, Domenighini D, Paletta L, Glisenti F, Giordano A. Effect of home-based telecardiology on chronic heart failure: costs and outcomes. J Telemed Telecare. 2005;11 Suppl 1:16-8.

**Goal IV: Empowering patients with health IT can contribute to reducing preventable hospitalizations**

1. Scalvini S, Capomolla S, Zanelli E, Benigno M, Domenighini D, Paletta L, Glisenti F, Giordano A. Effect of home-based telecardiology on chronic heart failure: costs and outcomes. J Telemed Telecare. 2005;11 Suppl 1:16-8.
2. Crossley GH, Boyle A, Vitense H, Chang Y, Mead RH; CONNECT Investigators. The CONNECT (Clinical Evaluation of Remote Notification to Reduce Time to Clinical Decision) Trial The Value of Wireless Remote Monitoring With Automatic Clinician Alerts. J Am Coll Cardiol. 2011 Jan 14.

**Goal V: A "learning health system" can contribute to reducing heart attacks**

1. Coloma PM, Schuemie MJ, Trifirò G, Gini R, Herings R, Hippisley-Cox J, Mazzaglia G, Giaquinto C, Corrao G, Pedersen L, van der Lei J, Sturkenboom M; EU-ADR Consortium. Combining electronic healthcare databases in Europe to allow for large-scale drug safety monitoring: the EU-ADR Project. Pharmacoepidemiol Drug Saf. 2011 Jan;20(1):1-11. doi: 10.1002/pds.2053. Epub 2010 Nov 8.

**Goal V: A "learning health system" can contribute to reducing preventable hospitalizations**

1. Amarasingham R, et al. An automated model to identify heart failure patients at risk for 30-day readmission or death using electronic medical record data. Med Care. 2010 Nov;48(11):981-8.

Case 4:22-cv-12022-ADB Document 32-2 Filed 03/20/23 Page 81 of 81

2. Friedman, Charles P., Adam K. Wong, and David Blumenthal. "Achieving a Nationwide Learning Health System." Science Translational Medicine, 10 Nov. 2010. Vol 2.

Case 4:22-cv-12022-ADB Document 32-3 Filed 03/20/23 Page 1 of 14

# EXHIBIT C

The Office of the National Coordinator for
Health Information Technology

Connecting Health and Care for the Nation:

# A 10-Year Vision to Achieve an Interoperable Health IT Infrastructure

## Overview

The U.S. Department of Health and Human Services (HHS) has a critical responsibility to advance the connectivity of electronic health information and interoperability of health information technology (health IT). This is consistent with its mission to protect the health of all Americans and provide essential human services, especially for those who are least able to help themselves. This work has become particularly urgent with the need to address the national priority of better and more affordable health care, leading to better population health. Achieving this goal will only be possible with a strong, flexible health IT ecosystem that can appropriately support transparency and decision-making, reduce redundancy, inform payment reform, and help to transform care into a model that enhances access and truly addresses health beyond the confines of the health care system. Such an infrastructure will support more efficient and effective systems, scientific advancement, and lead to a continuously improving health system that empowers individuals, customizes treatment, and accelerates cure of disease.

In the past decade, there has been dramatic progress in building the foundation of a health IT infrastructure across the country that is resilient and flexible to accommodate many types of change. Through deliberate policy and programmatic action, the majority of meaningful use[1] eligible hospitals and professionals have adopted and are meaningfully using health IT. This progress has laid a strong base upon which we can build. However, there is much work to do to see that every individual and their care providers can get the health information they need in an electronic format when and how they need it to make care convenient and well-coordinated and allow for improvements in overall health. There is no better time than now to renew our focus on a nationwide, interoperable health IT infrastructure – one in which all individuals, their families, and their health care providers have appropriate access to health information that facilitates informed decision-making, supports

[1] Formally referred to as the Medicare and Medicaid EHR Incentive Programs

Case 4:22-cv-12202-ADB Document 32-3 Filed 03/08/23 Page 5 of 14

coordinated health management, allows patients to be active partners in their health and care, and improves the overall health of our population. This is not just a technology challenge.

Broad adoption of health IT will require that health information can be easily and appropriately shared to support multiple uses. For instance, the national priority of cost-effective care requires information about quality and use of services to be available to consumers, providers, payers, and employers. Further, physicians expect health IT to enable and support patient care. And finally, there is mounting interest by consumers and innovators in creating meaningful opportunities for individuals to partner in their own health care.

New technology and market changes have opened the door to creating a more integrated and flexible environment that will not only serve us better in the present day, but will allow for ongoing innovation in the future. This paper is an invitation to health IT stakeholders – clinicians, hospitals, public health, technology developers, payers, researchers, policymakers, individuals, and many others – to join ONC in figuring out how we can collectively achieve interoperability across the health IT ecosystem (Figure 1).

**Figure 1. Health IT Ecosystem**




# Vision for the Future

An interoperable health IT ecosystem makes the right data available to the right people at the right time across products and organizations in a way that can be relied upon and meaningfully used by recipients. By 2024, individuals, care providers, communities, and researchers should have an array of interoperable

health IT products and services that allow the health care system to continuously learn and advance the goal of improved health care. This "learning health system" should also enable lower health care costs, improved population health, truly empower consumers, and drive innovation. For example, all individuals, their families, and care providers should be able to send, receive, find, and use health information in a manner that is appropriate, secure, timely, and reliable.[2]

Individuals should be able to securely share electronic health information with care providers and make use of the information to support their own health and wellness through informed shared decision-making. An interoperable health IT ecosystem should support critical public health functions such as real-time disease surveillance and disaster response, and data aggregation for research and value-based payment that rewards higher *quality* care, not necessarily a higher *quantity* of care.

**Figure 2.**
**Hospitals and Professionals That Have Demonstrated Meaningful Use of Certified EHR Technology 2014**




## CONTEXT

The nation has made dramatic advancements in digitizing the care delivery system during the past decade:

- Over one-half of office-based professionals and more than 8 in 10 hospitals are meaningfully using electronic health records (EHRs), which will require them to electronically exchange standardized patient information to support safe care transitions (Figure 2).[3]
- One-half of hospitals are able to electronically search for patient information from sources beyond their organization or health system (Figure 3).[4]
- All 50 states have some form of health information exchange services available to support care.[5]

**Figure 3.**
**U.S. Hospitals' Capability to Electronically Query Patient Health Information from Outside Their Organization or System 2013**



2 The term "care providers" is broadly inclusive of the care continuum, reflecting primary care providers, specialists, nurses, pharmacists, physical therapists and other allied care providers, hospitals, mental health and substance abuse services, long- term and post-acute care facilities, home and community-based services, other support service providers, care managers, and other authorized individuals and institutions.

3 http://www.healthit.gov/facas/sites/faca/files/HITPC_Data_Analytics_Update_2014-04-08.pdf

4 Office of the National Coordinator for Health Information Technology. 'U.S. Hospitals' Capability to Electronically Query Patient Health Information from Outside Their Organization and System,' Health IT Quick-Stat, no. 25. April 2014

5 http://healthit.gov/policy-researchers-implementers/state-hie-implementation-status

- Through the Blue Button Initiative, more than half of individual consumers and patients are able to access at least some of their own health information electronically via the combined contributions of providers, health plans, pharmacies, and labs.[6] Technological innovations such as wearable devices, remote sensing devices, and telehealth support at-home and virtual care models and new roles for patients.

This significant progress has created a growing demand for interoperability that not only supports the care continuum, but supports health generally. Electronic health information needs to be available for appropriate use in solving major challenges such as providing more effective care and informing and accelerating scientific research. Despite significant progress in establishing standards and services to support health information exchange and interoperability, it is not the norm that electronic health information is shared beyond groups of health care providers who subscribe to specific services or organizations. This frequently means that patients' electronic health information is not shared across organizational, vendor and geographic boundaries. Electronic health information is also not sufficiently standardized to allow seamless interoperability, as it is still inconsistently expressed with vocabulary, structure, and format, thereby limiting the potential uses of the information to improve health and care. We must learn from the important lessons and local successes[7] of previous and current health information exchange infrastructure to improve interoperability in support of nationwide exchange and use of health information across the public and private sector.

# Guiding Principles

As we work toward this vision for the future interoperable health IT ecosystem, we will plan and execute our work to align with a set of guiding principles:

- **Build upon the existing health IT infrastructure.** Significant investments have been made in health IT across the care delivery system and in other relevant sectors that need to exchange information with individuals and care providers. To the extent possible, we will encourage stakeholders to build from existing health IT infrastructure, increasing interoperability and functionality as needed.

- **One size does not fit all.** Interoperability requires technical and policy conformance among networks, technical systems and their components. It also requires behavior and culture change on the part of users. We will strive for baseline interoperability across health IT infrastructure,

6 See http://bluebuttonconnector.healthit.gov/ to learn which data holders are offering electronic access to personal health data by consumers.

7 See http://www.healthit.gov/policy-researchers-implementers/hie-bright-spots for examples of lessons and successes from recent health information exchange efforts.

while allowing innovators and technologists to vary the user experience (the feel and function of tools) in order to best meet the user's needs based on the scenario at hand, technology available, workflow design, personal preferences, and other factors.

- **Empower individuals.** Members of the public are rapidly adopting technology to manage numerous aspects of their lives, including health and wellness. However, many of these tools do not yet integrate information from the health care delivery system. Health information from the care delivery system should be easily accessible to individuals and empower them to become more active partners in their health just as other kinds of data are empowering them in other aspects of their lives.

- **Leverage the market.** Demand for interoperability from health IT users is a powerful driver to advance our vision. As payment and care delivery reform increase demand for interoperability, we will work with and support these efforts.

- **Simplify.** Where possible, simpler solutions should be implemented first, with allowance for more complex methods in the future.

- **Maintain modularity.** Complex systems are more resilient to change when they are divided into independent components that can be connected together. Because medicine and technology will change over time, we must preserve systems' abilities to evolve and take advantage of the best of technology and health care delivery. Modularity creates flexibility that allows innovation and adoption of new, more efficient approaches over time without overhauling entire systems.

- **Consider the current environment and support multiple levels of advancement.** Not every clinical practice will incorporate health information technology into their work in the next 3-10 years, and not every practice will adopt health IT at the same level of sophistication. We must therefore account for a range of capabilities among information sources and information users, including EHR and non-EHR users, as we advance interoperability. Individuals and caregivers have an ongoing need to find, send, receive, and use their own health information both within and outside the care delivery system and interoperable infrastructure should enable this.

- **Focus on value.** We will strive to make sure our interoperability efforts yield the greatest value to individuals and care providers; improved health, health care, and lower costs should be measurable over time and at a minimum, offset the resource investment.

- **Protect privacy and security in all aspects of interoperability.** It is essential to maintain public trust that health information is safe and secure. To better establish and maintain that trust, we will strive to ensure that appropriate, strong, and effective safeguards for health information are in place as interoperability increases across the industry. We will also support greater transparency for individuals regarding the business practices of entities that use their data, particularly those that are not covered by the HIPAA Privacy and Security Rules.

# Three-Year Agenda:
## **Send, Receive, Find, and Use Health Information to Improve Health Care Quality**

We will develop an interoperability roadmap as articulated in HHS Principles and Strategy for Accelerating Health Information Exchange. Working with all stakeholders, we will fine-tune and use the health IT infrastructure enabled through implementation of the Health Information Technology for Economic and Clinical Health (HITECH) Act to support transformation of health care to a more patient-centered, less wasteful, and higher quality system. This near-term priority involves improving the interoperability of existing health information networks, and scaling existing approaches for fluidly exchanging health information across vendor platforms to support a broad array of transitions of care and public health. Ensuring that individuals and care providers send, receive, find, and use a basic set of essential health information[8] across the health care continuum will enhance care coordination and enable health system reform to improve care quality. This means focusing on query-based health information exchange, or the ability to appropriately search for and retrieve health information, in addition to point-to-point information sharing.

Through ONC's standards and certification processes, we will work to further standardize the vocabulary and structure of essential information. We will also address critical issues such as data provenance, data quality and reliability, and patient matching to improve the quality of interoperability, and therefore facilitate an increased quantity of information movement. Working with stakeholders, we will operationalize a common framework to enhance trust by addressing key privacy, security, and business policy and practice challenges to advance secure, authorized health information exchange across existing networks. Finally, we will work with federal and state entities to advance payment, policy, and programmatic levers that encourage use of this information in a manner that supports care delivery reform, improves quality, and lowers costs.

**Figure 4:**
### **Example three-year agenda use cases:***

Individuals look up their electronic immunization histories when needed.

Primary care providers share a basic set of patient information with specialists during referrals; specialists "close the information loop" by sending updated basic information back to the primary care provider.

Hospitals automatically send an electronic notification and care summary to primary care providers when their patients are discharged.

**These examples are meant as illustrations and are not meant to provide a comprehensive list.*

8 The basic set of essential health information builds from the common meaningful use (MU) data set incorporated into ONC's health IT certification program as part of the 2014 Edition EHR Certification Criteria and currently used to support three MU objectives included in the Medicare and Medicaid EHR Incentive Programs.

# Six-Year Agenda:
## Use Information to Improve Health Care Quality and Lower Cost

Over the next six years, the care delivery system will realize enhanced interoperability. Health IT will continue to enable individuals to be active participants in managing their care as an important contributor of information to the health record (e.g., patient experience, self-rated health, and self-generated data). Individuals, care providers, and public health departments will send, receive, find and use an expanded set of health information across the care continuum to support team-based care. Care providers, such as those in schools, ambulances, and prisons will be able to appropriately exchange and use relevant health information. Remote monitoring will be enabled through better interoperability between medical devices, home-monitoring tools, and health information technology, including EHRs. Multi-payer claims databases, clinical data registries, and other data aggregators will incrementally become more integrated as part of an interoperable technology ecosystem.

Health care providers will also be able to aggregate and trend information within and across groups of patients based on information from multiple data sources to monitor health disparities and quality improvement opportunities (population health management). As value-based payment gains traction across Medicare, Medicaid, and commercial payers and purchasers, there will be new methods of measuring clinical quality that represent the most important aspects of care delivery and health outcomes. We will work with stakeholders to refine standards, policies, and services to automate the continuous quality improvement process and deliver targeted clinical decision support that fits into a clinician's workflow to close care gaps and improve the quality and efficiency of care.

**Figure 5:**
### Example six-year agenda use cases:*

Individuals regularly contribute information to their electronic health records for use by members of their care team.

---

Individuals integrate data from their health records into apps and tools that enable them to better set and meet their own health goals.

---

Primary care providers and authorized researchers are able to understand how well controlled diabetic patient population's glucose levels (i.e., A1C values) are and how often those patients have been hospitalized based on standardized information from multiple sources.

---

Clinical settings and public health are connected through bi-directional interfaces that enable seamless reporting to public health departments and seamless feedback and decision support from public health to clinical providers.

**These examples are meant as illustrations and are not meant to provide a comprehensive list.*

# 10-Year Agenda: **The Learning Health System**

By year 10, the nation's health IT infrastructure will support better health for all through a more connected health care system and active individual health management. Information sharing will be improved at all levels of public health, and research will better generate evidence that is delivered to the point of care. Advanced, more functional technical tools will enable innovation and broader uses of health information to further support health research and public health.

The evolution of standards, policies, and data infrastructure over the next 10 years will enable more standardized data collection, sharing, and aggregation for patient-centered outcomes research. Continuous learning and improvement will be feasible through analysis of aggregated data from a variety of sources. Health IT systems will enable both analysis of aggregated data and use of local data at the point of care through targeted clinical decision support (CDS). CDS will improve care by taking into account information such as an individual's genetic profile, local trends in disease prevalence, antibiotic resistance, occupational hazards, and other factors.

The process of clinical trial recruitment, data collection, and analysis will be accelerated and automated. Retrospective analyses will allow for rapid inquiry around many aspects of public health, health care quality, outcomes, and efficiency. Public health surveillance will be dramatically improved through better outbreak detection and disease incidence and prevalence monitoring. Interoperable health IT will also help contain outbreaks and manage public health threats and disasters.

The nation's health IT infrastructure will facilitate health improvement through active individual health management, improved information sharing with public health, and the ability for research to generate evidence that is delivered to the point of care.

**Figure 6:**
**Example 10-year agenda use cases:***

Individuals manage information from their own electronic devices and share that information seamlessly across multiple electronic platforms as appropriate (health care providers, social service providers, consumer-facing apps and tools, etc).

Primary care providers can select effective medications for patients with certain conditions based on their genetic profiles and results of comparative effectiveness research.

Individuals, care providers, public health and researchers contribute information and learn from information shared across the health IT ecosystem, with rapid advancement in methods for deriving meaning from data without sharing PHI.

*These examples are meant as illustrations and are not meant to provide a comprehensive list.*

# How will we get there?

It will take a strategic and focused effort by the federal government, in collaboration with state, tribal, and local governments and the private sector. We will aim to develop a shared agenda that focuses on five critical building blocks for a nationwide interoperable health information infrastructure:

1. Core technical standards and functions
2. Certification to support adoption and optimization of health IT products and services
3. Privacy and security protections for health information
4. Supportive business, clinical, cultural, and regulatory environments
5. Rules of engagement and governance

These building blocks are interdependent and progress must be incremental across all of them over the next decade to realize this vision. We will develop a more comprehensive set of use cases and goals for three, six and ten-year timeframes that will guide work in each of the building blocks, including alignment and coordination of prioritized federal, state, tribal, local, and private sector actions.

## BUILDING BLOCK #1: CORE TECHNICAL STANDARDS AND FUNCTIONS

Through our Standards & Interoperability (S&I) Framework, ONC will continue to work with industry stakeholders and federal and state governments to advance core technical standards for terminology and vocabulary, content and format, transport, and security. These standards will enable, at a minimum, the following essential services for interoperability:

1. Methods to accurately match individuals, providers and their information across data sources
2. Directories of the technical and human readable end points for data sources so they and the respective data are discoverable
3. Methods for authorizing users to access data from the data sources
4. Methods for authenticating users when they want to access data from data sources
5. Methods for securing the data when it is stored or maintained in the data sources and in transit, i.e., when it moves between source and user
6. Methods for representing data at a granular level to enable reuse
7. Methods for handling information from varied information sources in both structured and unstructured formats

ONC will also work toward flexible and dynamic technical tools to support interoperability for primary and secondary use of health information, such as the architecture described in the JASON report prepared for the Agency for Healthcare Research and Quality, A Robust Health Data Infrastructure.

## BUILDING BLOCK #2: CERTIFICATION TO SUPPORT ADOPTION AND OPTIMIZATION OF HEALTH IT PRODUCTS AND SERVICES

ONC will leverage the ONC Health IT Certification Program to ensure that a broad spectrum of health IT conforms to the technical standards necessary for capturing and exchanging data to support care delivery. Certification will be used to test that health IT conforms to standards, and also to certify that the technology has the ability to interoperate with other data sources so that users can exchange and use information from other systems. To increase flexibility in our regulatory structure, ONC has proposed that content and transport functions of technology be tested for certification separately. ONC has also been responsive to a demand for expansion of the certification program's scope to include health IT used in a broader set of health care settings, such as long-term and post-acute care and behavioral health. Ensuring consistent adoption of standards and policies for health IT applications used across all settings of care will support interoperability and health information exchange.

## BUILDING BLOCK #3: PRIVACY AND SECURITY PROTECTIONS FOR HEALTH INFORMATION

ONC will strive to ensure that privacy and security-related policies, practices, and technology keep pace with the expanded electronic exchange of information for health system reform. We will continue to assess evolving models of health information exchange to identify and, with stakeholder input, develop solutions to address weaknesses and gaps in privacy protections. We will encourage the development and use of policy and technology and workflow practices to advance patients' rights to access, amend, and make informed choices about the disclosure of their electronic health information. We recognize that there are certain state and federal laws under which some patients must give affirmative consent to the disclosure of their health information (often related to a "sensitive" health condition such as behavioral health or genetic information), a privacy protection that is more stringent than the HIPAA Privacy Rule. ONC will endeavor to ensure that these patients will not be left on the wrong side of the digital divide. We will work to improve standards, technology, and workflow that enable the electronic collection and management of consent as well as the electronic exchange of related information within existing legal requirements (including notice of redisclosure restrictions). We will also invest in methods and approaches that support distributed analytics and open evidence sharing without sharing PHI. Continued coordination across federal and state governments is needed to develop, implement, and evolve appropriate privacy and security policies for various types of health information exchange.

Expanding interoperability and exchange may also pose new security challenges. We will work with the National Institute of Standards and Technology (NIST) and other stakeholders to expand the options for ensuring, at an appropriate level of certainty, that those who access health information electronically are who they represent themselves to be. We will continue to assess and improve policies and standards that help ensure health information is only accessed by authorized people

and is used in reasonable and transparent ways. We will also work with the private sector to address emerging cyber threats.

Given our support for electronic access by individuals to their own health information, we will also be mindful of the privacy and security risks created when information exits the realm of HIPAA covered entities. We will support developers creating health tools for consumers to encourage responsible privacy and security practices and greater transparency about how they use personal health information. In addition, we will collaborate with the Office for Civil Rights and other agencies to encourage greater consumer education about the benefits of health information exchange and the steps they can take to safeguard their own data.

As we expand health information exchange, it is important that all stakeholders (the government, health care providers and plans, vendors, developers, patients and their caregivers) recognize their responsibility in protecting health information. We intend to continue our outreach and technical assistance to help everyone reach this goal.

## BUILDING BLOCK #4: SUPPORTIVE BUSINESS, CLINICAL, CULTURAL, AND REGULATORY ENVIRONMENT

While the Medicare and Medicaid EHR Incentive Programs have been a primary motivator for the adoption and use of certified EHR technology, these programs alone are insufficient to overcome barriers to our vision of information sharing and interoperability as outlined above. Current policies and financial incentives often prevent such exchange, even when it is technically feasible. To ensure that individuals and care providers send, receive, find, and use a basic set of essential health information across the care continuum over the next three years, we need to migrate policy and funding levers to create the business and clinical imperative for interoperability and electronic health information exchange.

In collaboration with employers, federal agencies, and private payers, ONC will help define the role of health IT in new payment models that will remove the current disincentives to information exchange. Incremental steps to accelerate health information exchange will initially stem from Affordable Care Act (ACA) delivery reform programs and Medicare payment regulations. HHS will consider ways in which the adoption and use of ONC-certified health IT products can be aligned with and encouraged by Medicare and Medicaid payment policy, and other HHS programs funding health care delivery so that care delivery transformation and interoperability evolve in tandem.

With regard to individual access to health information and the engagement it enables, a significant barrier is a lack of knowledge among members of the public that access to health information is becoming increasingly available, and a cultural bias against taking advantage of it. Many patients are intimidated or embarrassed to ask for copies of their records or to ask health-related questions of their providers. To address these cultural barriers, we will encourage providers to proactively offer

Case 1:22-cv-00222-ADB Document 32-3 Filed 03/29/23 Page 13 of 14

access to health information for their own patients, and using consistent marketing and messaging via the Blue Button Initiative, encourage diverse stakeholders including data holders and consumer advocacy organizations to educate individuals about their rights and the benefits of access to and use of health information.

We will also work with states, employers, consumers, providers, technology developers, payers, and others to support efforts driving appropriate health information exchange for improvements in care and to see that any regulatory and business barriers preventing data flow are reduced and/or removed.

### BUILDING BLOCK #5: RULES OF ENGAGEMENT AND GOVERNANCE OF HEALTH INFORMATION EXCHANGE

The HITECH Act charged ONC with establishing a governance mechanism for the nationwide health information network.

We view the nationwide health information network as a continually expanding ecosystem of electronic exchange activities and network service providers across the nation that rely on a set of standards, policies, and services to meet electronic exchange needs including the privacy, security, and appropriate use of the information exchanged.

This market includes many forms of electronic exchange and network service providers, ranging from simple forms (such as direct electronic exchange of health information between two known providers) to more sophisticated forms (such as query and response techniques). Governance will facilitate trust and interoperability across all the diverse entities and networks that provide exchange services so that health information follows individuals regardless of where and when they access care.

## Looking forward

In 2014, ONC will build on our existing governance framework and principles to ensure individual access, privacy, transparency, responsible financial and business practices, and use of federal standards to support health information exchange. As needed, ONC will identify the "rules of the road" necessary for information to flow efficiently across networks and will transition to a governance approach for health information exchange that will likely involve both policy and collaboration across industry, government, and consumer representatives.

Experience has demonstrated that while trust can be established among specific, known groups of health information trading partners (providers, public health departments, payers, etc.) through local governance, data use agreements, and other contractual arrangements (constituting a trust community), scaling trust across communities requires assurance that each adheres to a minimum set of common security and business practices. Our governance approach must consider

Case 4:22-cv-12022-ADB Document 32-3 Filed 03/20/23 Page 14 of 14

a common framework for privacy, security, technology, data, and business practices, provide assurance to trust communities that each abides by that framework (including a process for dispute resolution and reconciliation), and maintain minimum technical tools where needed to make scaling trust easy.

We will seek input and collaboration with federal agencies to inform governance implementation and ensure broad participation across existing operating health information networks, including those focused at the vendor, enterprise, regional, and state levels. We seek to promote competition among network service providers in a way that avoids providers or individuals being "locked in" to one mechanism to exchange health information, limiting their ability to share health information and coordinate care efficiently.

It will take time to build a fully interoperable infrastructure of coordinated care and communication across health care providers, patients, and public health entities that improves health care quality, lowers health care costs, and improves population health. HHS is fully committed to ensuring ubiquitous, standards-based interoperability of health information across all care settings through a multi-year approach that is consistent, incremental, yet comprehensive. No one person, organization, or government agency alone can realize this vision of an interconnected health system. But together, we can achieve the promise and potential of health information technology to improve the health of all.

Case 4:22-cv-12022-ADB Document 32-4 Filed 03/20/23 Page 1 of 51

# EXHIBIT D

# FEDERAL HEALTH IT STRATEGIC PLAN



# 2015 – 2020

**Prepared by:**

The Office of the National Coordinator for Health Information Technology (ONC)
Office of the Secretary, United States Department of Health and Human Services
http://healthit.gov

# Table of Contents


LETTER FROM THE NATIONAL COORDINATOR .......... 4

EXECUTIVE SUMMARY .......... 5

FEDERAL HEALTH IT VISION AND MISSION .......... 7

FEDERAL HEALTH IT PRINCIPLES .......... 8

FEDERAL HEALTH IT GOALS .......... 9

INTRODUCTION .......... 10

IMPROVING HEALTH AND WELL-BEING .......... 10

- Alignment with Complementary Strategic Plans & Initiatives .......... 12

PROGRESSING TO A PERSON-CENTERED INFRASTRUCTURE .......... 13

HEALTH IT HELPS USERS MANAGE SYSTEMIC TRANSFORMATION .......... 15

- Current Health IT Landscape .......... 15
- Infrastructure to Support Person-Centeredness .......... 16
- Infrastructure to Support Care Delivery .......... 18
- Infrastructure to Support Community Health .......... 20
- Infrastructure to Support Research, Scientific Knowledge, and Innovation .......... 21

FEDERAL EFFORTS TO MODERNIZE THE NATION'S HEALTH IT INFRASTRUCTURE .......... 23

- Protect the privacy and security of health information .......... 24
- Identify, Prioritize, and Advance Technical Standards .......... 26
- Increasing User and Market Confidence in the Safety and Safe Use of Health IT .......... 26
- Advancing a National Communications Infrastructure .......... 27
- Collaborative Effort by All Stakeholders .......... 29

ABOUT THIS PLAN .......... 30

- Strategic Plan Development .......... 30
- How the Plan Evolved Since the Draft Release .......... 30
- Implementation .......... 30

MEASUREMENT & REPORTING .......... 32

GOAL 1: ADVANCE PERSON-CENTERED AND SELF-MANAGED HEALTH .......... 34

**Objective 1A:** Empower individual, family, and caregiver health management and engagement .......... 34

**Objective 1B:** Foster individual, provider, and community partnerships .......... 35

GOAL 2: TRANSFORM HEALTH CARE DELIVERY AND COMMUNITY HEALTH .......... 36

**Objective 2A:** Improve health care quality, access, and experience through safe, timely, effective, efficient, equitable, and person-centered care ........ 36

**Objective 2B:** Support the delivery of high-value health care ........ 37

**Objective 2C:** Protect and promote public health and healthy, resilient communities ........ 38

GOAL 3: FOSTER RESEARCH, SCIENTIFIC KNOWLEDGE, AND INNOVATION ........ 39

**Objective 3A:** Increase access to and usability of high-quality electronic health information and services ........ 39

**Objective 3B:** Accelerate the development and commercialization of innovative technologies and solutions ........ 40

**Objective 3C:** Invest in, disseminate, and translate research on how health IT can improve health and care delivery ........ 41

GOAL 4: ENHANCE NATION'S HEALTH IT INFRASTRUCTURE ........ 42

**Objective 4A:** Finalize and Implement the Nationwide Interoperability Roadmap ........ 42

**Objective 4B:** Protect the privacy and security of electronic health information ........ 43

**Objective 4C:** Identify, prioritize, and advance technical standards to support secure and interoperable health information and health IT ........ 44

**Objective 4D:** Increase user and market confidence in the safety and safe use of health IT products, systems, and services ........ 45

**Objective 4E:** Advance a national communications infrastructure that supports health, safety, and care delivery ........ 46

FEDERAL CONTRIBUTORS ........ 47

COMPLEMENTARY PLANS, STRATEGIES, & KEY EFFORTS ........ 48

NOTES ........ 49

# LETTER FROM THE NATIONAL COORDINATOR

Over the past five years, our nation's health information technology (health IT) landscape has experienced a remarkable transformation. Developing the *Federal Health IT Strategic Plan 2015-2020* (Plan) has given us a chance to reflect on our collective health IT journey. When we released the prior Plan in 2011, non-federal adoption of health IT was in its nascent stages, Affordable Care Act implementation was commencing, and the use of mobile health applications, especially by consumers, was far from ubiquitous.

Implementation of the prior Plan created a strong foundation for achieving this Plan's goals and objectives. Over 450,000 eligible professionals and 4,800 eligible hospitals received an incentive payment for participation in the Medicare and Medicaid Electronic Health Record (EHR) Incentive Programs. This incredible achievement was not easy. Hospitals and health care providers have invested capital, time, and hard work to convert their patient medical records from paper systems to EHRs, and to adapt workflow and culture to deliver care in this electronic environment. This has created a strong demand for the seamless sharing of information across technology systems, information platforms, location, provider, or other boundaries.

This Plan aims to remain flexible to evolving definitions of health, health care, and the technology developments that support them. We recognize that both clinical health care and other sources will generate valuable health information. Expectations for our information systems and for their users will increase. During the past decade's information age, innovation and technological advancements have been difficult to predict. This Plan accounts for how the federal government views our nation's current health IT landscape and articulates federal values and priorities and it also identifies government actions that we believe will be most impactful as we look to the future.

I am incredibly grateful for the participation of over thirty-five federal entities that worked in concert to develop this Plan. They demonstrate the extensive interest across the government to digitize the health experience for all individuals and facilitate the progress towards a learning health system that can improve health and care. I also especially appreciate the Health IT Policy Committee for providing us with recommendations that informed this final Plan, and to the hundreds of individuals and diverse stakeholders that offered input during our public comment period. The strong public interest validates the critical importance of our mission.

With this Plan, the federal government signals that, while we will continue to work towards widespread use of all forms of health IT, efforts will begin to include new sources of information and ways to disseminate knowledge quickly, securely, and efficiently. This Plan will help guide the nation's shift towards focusing on better health and delivery system reform. Federal authorities and investments will seek to implement this Plan's strategies. However, this is a shared undertaking. Efforts of state, territorial, local, and tribal governments, and of private stakeholders are vital to ensure that health information is available when and where it matters most to improve and protect people's health and well-being.



**Karen DeSalvo, MD, MPH, MSc**
National Coordinator for Health Information Technology

# EXECUTIVE SUMMARY

***THE ONLY WAY FOR HEALTH IT TO ACHIEVE ITS FULL POTENTIAL, IS WHEN IT UNOBTRUSIVELY SUPPORTS INDIVIDUALS AS THEY STRIVE TO REACH THEIR FULL POTENTIAL FOR HEALTH.***

The *Federal Health IT Strategic Plan 2015-2020* (Plan) explains how the federal government intends to apply the effective use of information[1] and technology to help the nation achieve high-quality care, lower costs, a healthy population, and engaged individuals. This Plan focuses on advancing health information technology (health IT) innovation and use for a variety of purposes; however, the use of health IT is not in itself an end goal. The work described in this Plan aims to modernize the U.S. health IT infrastructure so that individuals, their providers, and communities can use it to help achieve health and wellness goals. The infrastructure should support dynamic uses of electronic information: uses that facilitate and expedite the transformation of data to information, information to knowledge, and knowledge to informed action. Successful development and implementation of this infrastructure will fortify the cultural shifts necessary to strengthen the collaborative relationships for improving health, health care, research, and innovation.

**Evolution in Federal Strategy**

Federal agencies are purchasers, regulators, developers, and users of health IT. In their various roles, they set policy and insure, pay for care, or provide direct patient care for tens of millions of Americans. They also protect and promote population and community health by investing in health and human services and in infrastructure. Additionally, federal agencies develop and implement policies and regulations to advance innovation, support research, promote competition, and protect individual and community safety, privacy, and security.

The federal strategy for health IT has evolved. Through implementation of the Health Information Technology for Economic and Clinical Health (HITECH) Act of 2009, as well as long-term development and use of electronic health systems by Department of Defense and Department of Veterans Affairs, the federal government invested heavily in health IT adoption and electronic information. Efforts primarily concentrated on EHR adoption and foundational work to expand health information exchange. The successes of these initial efforts resulted in the accelerated maturation of the health IT market towards the widespread use of health IT and information exchange. This led to a clearer federal understanding of marketplace strengths and weaknesses, and of the particular needs and interests of individuals and communities. These lessons demonstrated a need within federal entities, whose policies and programs impact the health IT ecosystem, for a more integrated planning approach. Federal plans now benefit from engagement and coordination by a wider spectrum of government agencies and private sector stakeholders, a continual evaluation of areas that would require new policy or oversight considerations, and of those areas, where greater collaboration with the private sector would be advantageous. Substantial gains in EHR adoption, consumer technology innovation, and information demands across the care continuum helped inform the updated federal health IT approach.

This approach aims to provide clarity in federal policies, programs, and actions. It includes strategies to align program requirements, harmonize and simplify regulations, and aims to help health IT users to

advance the learning health system to achieve better health. As federal agencies implement the Plan's strategies and assess their effectiveness, they will strive towards flexibility. The Plan's partners will collaborate with one another, monitor market impact, and assess how their actions are working to accommodate and guide the evolution of health IT. This flexibility centers on a constant aim that federal actions lead towards promoting trustworthy, accessible, and readily available information and technology that helps individuals across the nation achieve their full health potential.

**Plan's Framework**

The Plan includes four overarching goals. These goals and their respective objectives and strategies should not be viewed as sequential, but as interdependent with a collective purpose of improving the health and well-being of individuals and communities.




The Plan identifies the federal government's health IT priorities. While this Plan focuses on federal strategies, achieving this Plan's vision requires collaboration from private stakeholders and state, territorial, local, and tribal governments. Efforts across the ecosystem - by individuals, families, caregivers, health care entities and providers, public health entities, payers, technology developers, community-based nonprofit organizations, home-based supports, and academic institutions - are also essential. Government action will be the main driver for certain strategies, and for others, federal action will either supplement existing stakeholder work or encourage additional activities to begin. The vision and goals articulated in this Plan are not exclusive to the federal government; their attainment will require collaborative engagement and commitment. The Plan seeks to illuminate issues where federal action will have less reach, and where state, territorial, regional, private, and individual actions will be more impactful.

Although this Plan has a broad scope, its implementation has a singular focus: improving the health and well-being of this nation through a resilient health IT infrastructure. Many strategies included in this Plan necessitate broad cultural changes. This Plan takes a holistic and long-range view of how the health IT infrastructure should evolve to advance person-centered health and wellness. Federal agencies will follow the Federal Health IT Principles described below during Plan implementation. This Plan pursues a flexible, dynamic approach, and the federal government will make necessary adjustments if needed. Achieving the Plan's vision will require collective responsibility and prioritization, and the federal government will continue to engage with all interested stakeholders to ensure that people, organizations, and communities can best take advantage of electronic health information and the health IT infrastructure.

# FEDERAL HEALTH IT VISION AND MISSION

## Vision

High-quality care, lower costs, healthy population and engaged people

## Mission

Improve the health and well-being of individuals and communities through the use of technology and health information that is accessible when and where it matters most

# FEDERAL HEALTH IT PRINCIPLES

**Federal agencies will collaborate with one another and with state, territorial, local, tribal, and private stakeholders to:**

- **Focus on value.** Federal health IT policy will continuously target solutions that improve health and care quality, efficiency, safety, affordability, equity, effectiveness, and access.
- **Be person-centered.** Federal policies and activities support the accessibility and use of electronic health information by individuals, caregivers, providers, and researchers across products and organizations, in a timely and reliable way that protects personal privacy and upholds individual autonomy.
- **Respect individual preferences.** Person-centered care embraces the values of the individual inside and outside the health system, where all entities honor individuals' personal health goals, needs, values, culture, and choices regarding their information, health, and care.
- **Build a culture of electronic health information access and use.** Federal actions will help establish an environment where secure universal health information exchange and use are expected and accepted so that everyone benefits from simple, timely, equitable, efficient, and appropriate electronic access to and sharing of health information.
- **Create an environment of continuous learning and improvement.** Federal policies and actions seek to strengthen feedback loops between scientific and health care communities to translate evidence into clinical practice and other settings, and learn how to perform better.
- **Encourage innovation and competition.** The government's policies, guidance, and programs will support continued innovation and competition in the health IT marketplace to foster highly useful health IT solutions that lead to better health and care.
- **Be a responsible steward of the country's money and trust.** The government seeks to use its resources judiciously. This means relying to the extent possible on private markets to accomplish important societal objectives, and acting to correct market failures when necessary. It also means developing health IT policies through open, transparent, and accountable processes.

# FEDERAL HEALTH IT GOALS



## Goal 1: Advance Person-Centered and Self-Managed Health

- **Objective A:** Empower individual, family, and caregiver health management and engagement
- **Objective B:** Foster individual, provider, and community partnerships



## Goal 2: Transform Health Care Delivery and Community Health

- **Objective A:** Improve health care quality, access, and experience through safe, timely, effective, efficient, equitable, and person-centered care
- **Objective B:** Support the delivery of high-value health care
- **Objective C:** Protect and promote public health and healthy, resilient communities



## Goal 3: Foster Research, Scientific Knowledge, and Innovation

- **Objective A:** Increase access to and usability of high-quality electronic health information and services
- **Objective B:** Accelerate the development and commercialization of innovative technologies and solutions
- **Objective C:** Invest, disseminate, and translate research on how health IT can improve health and care delivery



## Goal 4: Enhance Nation's Health IT Infrastructure

- **Objective A:** Finalize and implement the Nationwide Interoperability Roadmap
- **Objective B:** Protect the privacy and security of health information
- **Objective C:** Identify, prioritize, and advance technical standards to support secure and interoperable health information and health IT
- **Objective D:** Increase user and market confidence in the safety and safe use of health IT products, systems, and services
- **Objective E:** Advance a national communications infrastructure that supports health, safety, and care delivery

# INTRODUCTION

Modernizing and redesigning the U.S. health and wellness information, communications, and technology infrastructure is vital for advancing the health and well-being of individuals and communities across the nation. In today's connected society, a variety of sources, platforms, and settings generate electronic health information that can inform health goals, behaviors, and decisions. These information sources extend well beyond traditional health care services to create a more expansive, continual pool of salient information. These sources and information types include self-generated information collected through an individual's mobile device, and non-clinical information collected by communities, including air and water quality from work and physical environments, potential toxin exposure, and availability of transportation and social services. To unlock the full power of information to improve individual health and well-being, essential electronic health information must be available when and where it matters most.

Improving the secure availability and use of pertinent health information allows individuals to take ownership of their health, partner with their health care providers and others on care preferences and decisions, and reach their health and quality of life goals. It bolsters the delivery of health care and long-term services and supports, allows communities to reduce health disparities, and improves public health agencies' ability to detect, track, manage, and prevent illness outbreaks and individual harm. Information also fuels research and innovation, spurring advancements in scientific discovery. As the information and technology demands continue to evolve, opportunities for the federal government exist to create pathways for the private sector to innovate and to design programs and policies that do not impede the marketplace's progress. It is imperative for government to address this new electronic health information and health IT paradigm to improve the health of the nation.

# IMPROVING HEALTH AND WELL-BEING

Empowering individuals to make healthy choices can improve their quality and longevity of life. Information is central to setting and accomplishing individual and systemic goals and improvement plans; however, information alone – even when electronically generated and shared – cannot improve the nation's health. It will take the collective efforts of many stakeholders using electronic health information in meaningful and effective ways, alone and in partnership with one another, to help achieve the nation's full health potential.

An individual can take many steps to improve his or her health, including lifestyle and wellness choices, actively managing his or her health care, and receiving necessary immunizations, preventive care, and long-term services and supports. Engaged individuals are more likely to be proactive in practicing wellness, prevention, and disease management behaviors.[2] However, health care providers and health insurers offered fewer than three in ten individuals electronic or online access to their medical record in 2013.[3]

Individuals and caregivers often want to increase their care engagement and health management, but many challenges and deficiencies make it difficult for them to play a proactive role and respond to the information and resources available to them. Many providers are also struggling to engage effectively

with their patients and determine what, and how much, information would be beneficial, and how best to establish processes, tools, and methods to facilitate this engagement as mutually supportive partners. For example, health care providers sometimes find it difficult to build and maintain partnerships with their patients and their caregivers due to cost pressures, lack of pertinent patient information, time limitations, cultural differences, communication and language barriers, and dissatisfaction with the usability of their technology systems. High-participation partnerships may require real sacrifices from providers that can decrease productivity and reimbursement.

In turn, these partnerships require patients to be engaged and active in their own health and health care - an effort that takes time and resources that patients and their caregivers may not necessarily be able to commit - even when they understand the value it could provide. Individuals and their caregivers often seek care from multiple providers who have incomplete access to essential information about that person and limited financial incentives to coordinate care carefully. Individuals and caregivers often serve as care coordinators and information transporters, and frequently select providers based on limited knowledge of the care quality they offer. In the current fee-for-service payment environment, providers are reimbursed for each service provided rather than by the quality or value of care and its outcome. This focus on individual patient encounters may not motivate providers to seek additional information from outside sources, including individuals' non-clinical quality of life information. Partnering with individuals can help providers make decisions to better coordinate the patient's care, emphasize care quality, and accommodate patient preferences.

Better health and more personally meaningful health and care plans will further require recognition that individual well-being is impacted by many factors outside of traditional health care. Many health and social determinants outside of care delivery influence individuals' health and well-being, and the federal government can play an important role to guide the inclusion of these determinants into the electronic information stream for decision-making by individuals, providers, and communities, as well as the organizations and technology developers that support them. For example, economic, social, and physical environments have an extensive effect on an individual's health. Some individuals live in communities where healthy food is hard to find, air quality is poor, and access to affordable and quality health care, transportation, and social services are limited. Communities have a responsibility to help individuals lead healthy and productive lives, and protect them from harm. Home- and community-based organizations, as well as social and human service organizations can play an integral role in assisting individuals to achieve their health potential. Many individuals, however, do not receive the services they need or qualify for due to systemic deficits in communication and information systems between the health care community and social services community.

Integrating primary health care services and public health efforts, including linking to community prevention services, can promote efficiency, positively affect individual wellness, and improve population health. The Affordable Care Act of 2010 provides a unique opportunity to maximize the value of health investments by integrating population health approaches and health care service delivery. Together with other strategic initiatives, health IT can facilitate improved public health surveillance, collect more complete and accurate data, and link clinical care and supportive community-based services and policies. Applying innovative health IT in these efforts will improve the ability to reach high-risk populations and support the delivery of comprehensive, culturally and linguistically appropriate, and easily navigated services.

Public health entities also have a crucial role in keeping individuals and communities safe and healthy. Too often, there is asymmetry between the information public health entities have access to and the information required for conducting real-time public health surveillance, for developing comprehensive situational awareness, and for informing the allocation of limited resources. There is also a shortage of public health workers with the technological and data analytics skills necessary to analyze complex information from multiple and disparate sources, to inform strategic decision-making, and to apply health IT and clinical information to community needs assessments and other responsibilities.

Providers and researchers share a goal of having high quality, reliable data that is useful across organizations and databases. Currently, data quality and reliability are highly variable and could be enriched to enhance its use for research and to improve care. A focus on continuous quality improvement, for both the data and application tools, is necessary to enhance the existing and emergent data for routine use for many purposes, including improved care or research. An approach that embraces federal and private sector collaboration to determine how to improve data quality and utility for various health and research needs can help the learning health system fully integrate continuous quality improvement.

### ❖ Alignment with Complementary Strategic Plans & Initiatives

Although this Plan focuses on how the federal government will foster an interoperable[4] electronic health IT infrastructure to support the nation's efforts to achieve high-quality care, lower costs, and healthier and engaged people, the Plan aligns closely with other federal-directed plans that address health and social determinants that information and technology alone cannot solve. A list of many complementary plans and initiatives are included at the end of the document. The Plan purposefully includes interrelated strategies and objectives where health IT can help accomplish the vision of national goals highlighted in those plans and initiatives. These plans focus on health, quality, safety, prevention, health disparities, health literacy, interoperability, infrastructure, and security. Additionally, this Plan aligns with key initiatives that seek to advance a connected health IT infrastructure, or initiatives that require a strong health IT infrastructure to succeed. This Plan includes brief synopses of priority federal initiatives that include health IT as a component critical to their success. Future Plan progress reporting activities will assess how health IT has assisted in advancing these initiatives' goals.

The graphic below highlights primary accomplishments and results, tied to existing national priorities, which the U.S. health IT infrastructure should work to support. To be most effective, the health IT infrastructure also needs to support the specific goals of communities, providers, and individuals. For example, if a provider has the goal of improving medication adherence among her diabetic patients with hypertension, then health IT should support her ability to pull a report to identify patients who have not filled their prescriptions. Further, health IT can present information that signals whether certain individuals may have trouble paying for their medications, getting to the pharmacy, or are showing cognitive declines. If an individual sets a goal to lose weight, health IT solutions should assist with goal attainment by allowing him to monitor his daily steps and calorie consumption, and provide community resources to connect with nutritionists or wellness activities nearby.

**Figure 1. The vision and expected results that guide the Federal Health IT Strategic Plan 2015-2020**




## PROGRESSING TO A PERSON-CENTERED INFRASTRUCTURE

Evidence suggests that health care delivery systems account for only about 10–20 percent of health outcomes.[5] On a daily basis, most individuals do not encounter the health care delivery system even when managing their health and care. When individuals interact with the delivery system, they are often more a recipient of health care and long-term services and supports, than informed, active partners who collaboratively make decisions with their comprehensive care team. This dynamic limits the opportunities for individuals to manage their own health and to share in health care decisions.

A more person-centered vision is vital to improving health and health care, particularly since individuals' motivations and actions have a great impact on health behaviors and outcomes. A person-centered health system enables individuals to access wellness and health care services and information, enabled by user-centered technology that reflects their needs, values, and choices, and supports both self-care and meaningful interactions with their care providers with seamless transitions between these activities. In a person-centered model, the boundaries become more porous between what occurs inside and outside of the health care system, by promoting increased information flow and using technology that allows remote

interactions independent of physical location and time constraints. Individuals perform on their own some of the activities that traditionally occur only in formal health care settings (*e.g.*, monitoring blood pressure, tracking body mass index). An increasing number of individuals want the ability to use technology to track and improve upon their health goals, and want technology to be helpful and easy to use. Market innovations and policies that allow individuals to move and combine information from various sources – whether that information is stored in mobile applications, EHRs, or patient portals, into a single information source to improve health and wellness management – will greatly expand individuals' capability to engage in self-management and contribute to improvements in health care, research, and technology innovation.

Empowering and supporting individuals and their families and caregivers to manage their health and partner in their care can be a complex and time-consuming undertaking. Relationships and cultural expectations among providers and individuals will evolve as each learn and practice new ways to communicate, collaborate, assume changing roles as part of the care team, understand new responsibilities, and discover how best to take advantage of improved health IT and care options.

It will take the collective work of individuals, providers, and community organizations to build and maintain meaningful partnerships to improve health. Federal health IT strategies can help support this endeavor. Many individuals are ready and eager to use highly advanced technologies and interact regularly with providers and others to accomplish their health goals. The federal government has a dual responsibility to ensure that momentum supports this empowerment, and does not leave others behind, which could expand existing inequalities and resource scarcities. Collaboratively, stakeholders should follow practices supported by federal actions to prevent widening potential "digital divides" of health IT development, availability and adoption that could result in exacerbated socioeconomic challenges. Shared efforts among public and private entities should create an environment that fosters the availability of culturally, linguistically, and technically appropriate tools and materials, reflecting diverse preferences that can help advance individuals' ability to manage their health and partner in their care. As the capacity for health IT tools and electronic health information grows and becomes more commonplace, a concerted effort by government and private entities should ensure technology is designed for all usability levels, fully accessible to individuals with disabilities or other potential limitations.

For the health system to evolve its attention and actions towards stronger relationships that rely on technology to facilitate information exchange and use, the person-centered actions will require more than the critical step of welcoming individuals' health decision-making and self-management. Stakeholders and federal government polices need to reflect evolving expectations and effectively manage risks to meet new demands by information users for nimble technology and expanded information sources. In this way, the health IT infrastructure can support individualized care, independent health decisions, and improvements to population and public health. The federal government's role in this evolution anticipates implementing policies to integrate and sustain new approaches to health and social services and supports, approaches that are reinforced by alternative reimbursement models supporting better outcomes, wellness, and prevention. This person-centered infrastructure will require culture shifts and technological adaptations that strengthen and make clear the connection between health care providers and community supports and services.

A key foundation of a person-centered infrastructure is a strong trust environment, where individuals, and those acting on their behalf, contribute information with a clear understanding of the risks and rewards associated with sharing information. A strong trust environment will stimulate opportunities for individuals and their caregivers to define and update their preferences and values. Individuals require confidence that custodians of their health information take every necessary measure to keep their information appropriately private and secure. At the same time, individuals expect that health information about them will be available for their care when and where they need it, and they will derive benefits from the information shared.

In a person-centered infrastructure, the term "health IT" includes a wide range of continually emergent products, technologies, and services, including but not limited to modular EHRs, mobile and telehealth technology, cloud-based services, medical devices, integrated remote monitoring and virtual visits, risk-modeling and other predictive algorithms, assistive technologies, application program interfaces, and sensors. Health IT encompasses technologies that researchers can use for biomedical analysis, and tools and computational power for analyzing large and complex datasets.

## HEALTH IT HELPS USERS MANAGE SYSTEMIC TRANSFORMATION

Health IT is foundational to achieve a learning health system. The Institute of Medicine describes a learning health system as "one in which science, informatics, incentives, and culture are aligned for continuous improvement and innovation, with best practices seamlessly embedded in the care process, patients and families active participants in all elements, and new knowledge captured as an integral by-product of the care experience."[6] The speed with which we achieve a learning health system depends on relationships among all stakeholders, behavior and culture change among individuals, providers, and others, enhanced technology usability, redesigned workflows, and new models for accessing, contributing, sharing, and transforming information into actionable intelligence. Health IT can support and assist in applying the lessons and improvements discovered through the learning health system to achieve individual, local, and national health and wellness improvements.

### ❖ Current Health IT Landscape

Hospitals and physician offices across the nation have made great efforts in transitioning from paper to electronic systems and processes since the federal government released its prior health IT strategy in 2011. This has resulted in remarkable growth in health IT adoption and use among these provider types.[7,8] Additionally, hospitals across the country have achieved striking increases in electronic health information exchange.[9] However, many barriers still exist for the U.S. to realize the benefits of ubiquitous health IT use and widespread interoperable exchange of relevant, timely individual information across the care continuum. Lack of steady and consistent access to advanced broadband internet services can be one barrier for the health system to function properly. A health system where only some providers have health IT systems that provide them and their patients with access to consistently available and advanced broadband internet connections can lead to care gaps with consequences for patients that can be both burdensome and dangerous, such as medication errors or unavailable imaging studies. It can also lead to a misuse of resources among providers and public health entities.

A fully functional U.S. health system must be a technologically and culturally connected enterprise that facilitates the easy electronic movement of information. A solid health IT infrastructure will help to accelerate the interpersonal connections between each participant, and the information that moves between them. Health IT availability and use among providers that were not eligible for the Medicare and Medicaid EHR Incentive Programs lags behind those providers that were eligible for the programs. These providers, including behavioral health, emergency medical services (EMS), long-term and post-acute care, play an integral role in helping to keep individuals healthy and have numerous situations that necessitate collaboration and sharing of information with the greater health community. Often individuals who receive services and care from these providers are among the most vulnerable, and the rich information available from these providers can have significant impacts on individuals' health and their care decisions with others in the health enterprise.

For example, EMS practitioners provide stabilizing care and transportation services; having access to a patient's salient clinical information as a first responder can improve patient health and safety. Access to linked outcomes data from hospitals can help EMS systems measure performance, improve their provision of care, and provide timely feedback to providers. Behavioral health, long-term and post-acute care settings require access to a patient's information to ensure continuity in care services and prevent adverse events, such as medication allergies or errors, from occurring. Public health entities and clinical settings need bi-directional interfaces. These will enable unencumbered provider reporting to public health entities and allow seamless feedback and decision support from public health to clinical providers relevant to chronic health and emergent threats.

Improving the information flow will require improvements to health IT usability. Stakeholders have reported that many physicians find that current health IT systems are cumbersome, disruptive to workflow, decrease their efficiency, sometimes jeopardize patient safety, and have limited interoperability.[10] Claimed barriers to interoperability include the use of different technical standards, lack of business incentives that can lead vendors and providers to block the transmission of health information to other vendors and providers,[11] deficits in trust, and differences in state laws and regulations that make it difficult to share health information across state lines. The federal government seeks to work with stakeholders to pursue methods that improve health IT usability and reduce unnecessary impediments to information flow so that technology, policy, and business practices can effectively support health transformation.

### ❖ Infrastructure to Support Person-Centeredness

The movement toward person-centered health creates new demands on individuals, providers, community organizations, and on the health information and technology infrastructure. Existing and emerging technologies provide a path to make information and resources for health and health care management universal, integrated, equitable, accessible to all, and personally relevant. Health IT can help empower individuals, their families, and other caregivers to learn and communicate easily, engage in shared decision-making with their providers on their wellness and health goals, and manage their health in convenient and meaningful ways, resulting in better individual outcomes. However, only one in eight Americans track a health metric like blood pressure or weight using some form of electronic technology. Federal agencies seek to expand the ability of individuals to contribute electronic health information that

is personally relevant and usable to their care providers so that both can use it effectively in health planning.

In addition to changed actions and behaviors prompted by information and technology use, shared decision-making will elevate individuals' role as they partner in their care. To help individuals understand information more readily, an opportunity exists for technology and training to improve data visualization, which can lead to improved decision-making for both individuals and providers. This will benefit the design of effective decision support systems that improve shared decision-making and outcomes. Innovations that improve data presentation, through visual graphics and applications, can assist individuals with disabilities and help address the health and health IT literacy issues for diverse individual and caregiver populations.

***Blue Button Initiative***

Blue Button lets individuals go online and download their health records for improving health and facilitating greater access and control over personal health information. With origins in the Department of Veterans Affairs, the Blue Button initiative quickly expanded beyond the public sector. This effort encompasses more than 650 public and private organizations that have pledged to empower all individuals with electronic access to their health information, supported by outreach and education. Through standards, education, and outreach, this initiative has increased consumers' access to their health information from a variety of sources, including providers, health plans, laboratories, and pharmacies.

Well-designed health IT can propel a health care system based on trust, value, and quality improvement. Electronic health information and health IT can support care models that are best suited to complement and uphold individuals' choices and needs as they establish and achieve their health goals. Further, knowledge of how providers use information and technology and engage their patients with it will guide individuals to select high-quality providers that can support their health goals and improve overall health equity. Empowering individuals as valued care partners will shift what providers currently document and measure in their continuous quality improvement processes; this will entail moving beyond measuring patient experience and clinical processes, and driving towards more measures and emphasis on outcomes that matter similarly to individuals and providers. Federal actions within this Plan aim to support the shift toward monitoring and improving the performance of a national health information infrastructure to support this person-centered vision.

**Visit Page 34 to view strategies**

### ❖ Infrastructure to Support Care Delivery

Increasing use of health IT will help the nation achieve important health outcomes, including aiding in the prevention of chronic and debilitating disease, ensuring accessible and equitable care, making care safer and more person-centered, and advancing a culture of continuous quality improvement. Health IT will also play a crucial role in supporting alternative care models that are person-centered and value-driven. Seamless interoperability will facilitate better tracking of outcomes meaningful to providers and individuals, efficient resource use and cost analyses, particularly for care provided across multiple systems and settings.

The federal government plays a key role in care delivery, providing direct care and contracting to provide care in the private sector. The federal government is the nation's largest provider and payer of care. Department of Defense (DoD), Department of Veteran's Affairs (VA), Indian Health Services (IHS), and the Department of Justice's Bureau of Prisons (BOP) deliver direct patient care to tens of millions of individuals. The Health Resources and Services Administration (HRSA)-funded health centers provide quality-focused, comprehensive and preventative care in the nation's underserved communities to over 21 million individuals. The Centers for Medicare & Medicaid Services (CMS) is the largest purchaser of health care in the United States, as its programs pay almost one third of the nation's health expenditures. Through Medicare, Medicaid, and the Children's Health Insurance Program, CMS programs cover roughly 126 million beneficiaries. These federal health systems and payers must coordinate with providers both inside and outside the federal health sector.

Commercial payers often look toward federal programs as they develop their own models, thus expanding federal influence beyond its public care role. The Office of Personnel Management (OPM) contracts with commercial payers to provide care options for federal employees, and can require plans to include provider requirements and certain benefit structures for individuals. In similar ways, many companies in the private sector self-insure and can design plans that mirror federal alternative payment models to improve care. Through these roles, government policy and delivery practices can result in a collective effort that can establish best practices and a more uniform approach to using health IT and shared information to provide high-quality, well-coordinated care.

***Delivery System Transformation***

HHS Secretary Sylvia Burwell announced measurable goals and a timeline to move the Medicare program, and the health care system at large, toward paying providers based on the quality, rather than the quantity, of care they give patients. A key goal of this initiative is to have 85% of all Medicare fee-for-service payments tied to quality or value by 2016, and 90% by 2018.

Another key target is to have 30% of Medicare payments tied to alternative payment models by the end of 2016 and 50% of payments by the end of 2018.

The health IT infrastructure will need to enable the expansion of successful alternative payment models in a way that supports providers' ability to deliver high quality care to all their patients while reducing overall costs. Supportive health IT resources may include all-payer claims databases, registries, EHRs, health information exchanges, federal claims systems, and other data sources.

Systems, processes, and tools supported by health IT and health IT infrastructure can simplify and expedite care transformation. Building on efforts and tools initiated by the Affordable Care Act, HHS is augmenting reform in three important and interdependent ways to transform the health system. This transformed system will use incentives to motivate higher-value care by increasingly tying payment to value through alternative payment models; it will change how care is delivered by requiring greater teamwork and integration, more effective coordination of providers across settings, and greater attention by providers to population health; and it will harness the power of information to improve care for patients.[12] Furthermore, the increased number of individuals now covered by new insurance options has expanded the need to coordinate their services and for providers and communities to manage populations more efficiently. A solid health IT infrastructure will facilitate this coordination and population management.

The Medicare Access and Children's Health Insurance Program Reauthorization Act of 2015 (MACRA) requires the government to design programs that strongly emphasize high-value health care and unimpeded health information exchange. MACRA implementation will increase the widespread interest and business support for coordinating care, shifting care delivery and reimbursement from fee-for-service to value-based care. This will expedite the necessity and increased desire for better information and related management and decision systems. High-quality, accurate, and relevant electronic health information improves the ability of providers to manage and advance population health. Interoperable electronic health information provides a foundation to measure, report, and provide feedback on care quality for a number of public-facing and internal purposes.

Expanded use of health IT that combines beneficial decision supports and appropriate quality measures will help the nation to achieve continuous quality improvement and important health outcomes. For example, these efforts will help support clinicians in practice transformation efforts by making essential electronic health information readily available for care decisions and patient health management. The health IT infrastructure should support the creation and integration of evidence-based tools, persuasive health care provider incentives, alignment of payment and performance reforms that reward coordinated care, and augment an emphasis on achieving improved health and care among all individuals.

Health IT can also enhance routine medical care by delivering quality improvement services and prompts that are relevant to the providers' areas of expertise and specialty, reminding providers about the timing of appropriate preventive services for their patient's general well-being, and helping to efficiently coordinate care among providers. Providers can also use health IT to monitor and interact with their patients to track progress and outcomes. The market has already developed dynamic tools and delivery methods that are revolutionizing care delivery and individual self-management. Federal programs and policies aim to create an adaptive environment that stimulates market innovations that advance these transformational activities, while trying to prevent additional health and technical disparities.

Visit Page 36 to view strategies

### ❖ Infrastructure to Support Community Health

Having complete information about a person is critical to achieving population health goals, as comprehensive information helps providers easily identify and close care gaps, recognize and analyze patterns and anomalies, and perform localized research and engage in quality improvement initiatives. This requires health IT capable of receiving and integrating individual electronic health information from multiple sources to enable providers to aggregate and track information over time within and across groups. Collectively, these efforts can assist providers to improve their patient panels' health, and when this information is shared and pooled with other information sources, it can contribute to broader knowledge advancements at the local, regional, and national level.

Equally important as technological advances, improved care in settings such as home- and community-based organizations can augment an individual's care experience. Health IT can help connect individuals with community resources and behavioral, preventive, and social services to support their goals, their health and wellness, and improve their quality of life. A comprehensive health IT infrastructure can connect care for individuals who access services often considered at the periphery of traditional care delivery, including public health, and community-based organizations, such as hospice care, Medicaid managed care delivery systems, schools, and the criminal justice system. Each service provider has specific coordination needs and information uses that can be best served by native IT systems that integrate with the health care system when necessary to exchange information.

Technological tools, practices, and policies that are tested and distributed within the greater health infrastructure will establish methods to incorporate information from providers, community and social supports, and others that facilitate and enable personalized health within a connected health network. These improvements also will help the various organizations and individuals establish effective work streams that lead to better outcomes and resource use in each sector of the broadly inclusive health enterprise. Federal policies that reinforce these changes and continue the focus and attention on person-centered decisions can amplify the work already underway in this area.

#### *Addressing Opioid Drug-Related Overdose, Death, and Dependence*

HHS is focused on implementing evidence-based approaches to reduce: 1) opioid overdoses and overdose-related mortality; and 2) the prevalence of opioid use disorder. In March 2015, HHS announced a targeted initiative aimed at reducing prescription opioid and heroin related overdose, death, and dependence. Deaths from drug overdose have risen steadily over the past two decades and currently outnumber deaths from car accidents in the United States. The Secretary's efforts focus on three priority areas that tackle the opioid crisis, significantly impacting those struggling with substance use disorders and helping save lives. One key priority includes providing training and educational resources, including updated prescriber guidelines, to assist health professionals in making informed prescribing decisions and address the over-prescribing of opioids. Part of this priority includes supporting data sharing for safe prescribing by facilitating prescription drug monitoring programs (PDMP) and health IT integration and further adoption of electronic prescribing practices.

Public health entities require interoperable electronic health information to detect, track, and manage illness outbreaks. Improved and coordinated access to information from inside and outside the formal delivery system among public health entities and home- and community-based supports increases their ability to analyze population health trends, identify at-risk populations, address local social and health determinants, pursue proactive illness prevention and health promotion strategies, and promote healthy choices for all populations and diverse communities. It can also help protect communities during public health emergencies and increase the ability to conduct and contribute to medical product safety surveillance.

Through improved information sharing and facilitating strong relationships between clinical and non-clinical entities and providers, health IT can lead to faster, more efficient methods for public health departments and social services providers to protect and support community health and perform more effective needs assessments. These organizations need to build the technical, administrative, and workforce infrastructure to receive, manage, and make use of the increasing volume of electronic health-related information and technological facilitators.

Visit Page 38 to view strategies

### ❖ Infrastructure to Support Research, Scientific Knowledge, and Innovation

Research drives innovation and scientific discovery. As health IT use increases among individuals, providers, and public health entities, it creates a rich source of data. This affords exciting new opportunities to use health IT and new data to enhance clinical decision support, deepen quality improvement, reduce health disparities, improve post-marketing surveillance of the effects of medical drugs and medical devices, enhance care transitions, and enable research on prevention, diagnosis, and treatment of disease and disability. The federal government plays a central role in funding and performing original research, training researchers, and maintaining literature databases and other resources, and has a responsibility to identify methods and resources, such as health IT, that can improve upon this role.

Individuals will benefit from scientific and technological change in their self-care and community. Their effective interactions with the care delivery system and increased involvement in system improvements and research will help determine how the system is redesigned and deployed. However, information from care encounters provides a partial picture of an individual's health. Increasingly, individuals will have the ability to contribute information through mobile apps, sensors, social media, and medical devices. A learning health system will promote improved care that is individualized and delivered in a collaborative and respectful manner. It should also leverage electronic health information from multiple sources. An integrated system will facilitate analysis of real-world variations in tests and treatments, identifying the best outcomes, and help accelerate dissemination of this information to providers, individuals and the public in appropriate formats.

Interoperable electronic health information collected as a byproduct of care can allow care teams to develop solutions to improve the health of the individuals receiving care and services and measure the effectiveness of their actions. This can create a continuous feedback loop that not only leads to quality improvement, but also supports more rapid translation of research findings into better care and health.

Disseminating these results can inform the delivery system, influence guidelines and protocols, and significantly curb the time between discovery and action.

A learning health system should also facilitate the expedited translation of science and evidence into treatment paths that match individual preferences, assisting individuals and their care team with understanding the risks and benefits from competing therapeutic options. Care teams and researchers can leverage this information to provide person-centered care and design research studies likely to produce higher quality results, particularly in precision medicine, and in high-impact health challenges, such as heart disease, diabetes, and other chronic illnesses. Approaches such as human-factors engineering can help stakeholders learn how to best use or develop new health IT to improve health and health care, and identify which kinds of electronic health tools and their applications are most effective in reaching personal, population, and public health goals.

***Precision Medicine Initiative***

The Precision Medicine Initiative is a new research effort to revolutionize how we improve health and treat disease. The initiative will pioneer a new model of patient-powered research that promises to accelerate biomedical discoveries and provide health care providers with new tools, knowledge, and therapies, augmenting the ability to choose which treatments will work best for which patients.

Near-term goals of the Precision Medicine Initiative are to intensify efforts to apply precision medicine to cancer through innovative clinical trials of targeted drugs for adult and pediatric cancers; use of combination therapies; and increase knowledge to overcome drug resistance.

A longer-term goal of this initiative is to create a research cohort of more than one million American volunteers who will share genetic data, biological samples, and diet and lifestyle information, all linked to their EHRs if they choose.

Research can also lead to improved workflows and better and safer use of health IT. Many health IT studies focus on whether health IT improves health care and health outcomes; however, not as many studies consider how to implement health IT solutions in ways that ensure that it meets its full potential. Federal science and research play an important role in advancing evidence on how health IT can improve health outcomes, reduce health disparities, and improve care delivery, as well as how to make these systems easier and safer for people of all abilities to use. Achieving these objectives requires significant collaboration between the private and public sector.

**Visit Page 39 to view strategies**

# FEDERAL EFFORTS TO MODERNIZE THE NATION'S HEALTH IT INFRASTRUCTURE

This Plan envisions the establishment of a responsive infrastructure that will enable person-centered health and health care goals, transform health care delivery and community health, and foster research, scientific knowledge, and innovation. These objectives set the purpose for improving the nation's health IT infrastructure to make it more inclusive, and to leverage both public and market-based solutions to make this infrastructure adaptable, so that it can both stimulate and keep pace with innovation.

To implement this Plan, the federal government has identified strategies that apply its most effective levers to drive change in the health environment and allow the government to prepare for emergent change from market and social sectors. Below are key federal initiatives that encompass multiple strategies to meet this Plan's mission and goals.

***Defense Healthcare Management System Modernization Program (DHMSM)***

DoD's military health system purchases or provides care to almost 10 million beneficiaries. The mission of the DHMSM program is to competitively acquire, test, deliver, and successfully transition to a state-of-the-market EHR system. Key to this modernization program is to engage the larger health IT marketplace to identify and implement a solution that provides best value and meets operational requirements. This approach allows the DoD to leverage the latest commercial technologies, improve usability, and save on costs.

In July 2015, DoD awarded a contract to modernize their EHR system. A key goal of the contract is to improve interoperability among the DoD, the VA and private sector health-care providers and enable each to access and update health records. Civilian health care organizations provide nearly 60 percent of health care for service members and their families. In addition to this contract, the VA and DoD spearhead numerous interagency data sharing activities and deliver IT solutions that improve the sharing of electronic health information. These IT solutions improve interoperability, improving care continuity and enhancing health care delivery to beneficiaries.

**Finalize and Implement the Interoperability Roadmap**

Secure, interoperable, and necessary health information technology is paramount to achieving this Plan's mission and vision. The significant progress achieved in health IT adoption has increased the demand to securely share health information electronically and use it to improve health and health care. Yet despite this progress, and for varied and complex reasons, significant challenges continue to limit the widespread and effective sharing of electronic health information across the care continuum.[11]

Interoperable health information and health IT solutions will lead to more efficient and effective health systems, better clinical decision support, scientific advancement, and a continuously learning health system. Interoperable electronic exchange of health information allows individuals, providers, public

health departments, researchers, and payers to securely find and use vital health information, enhancing care delivery, public health, and research, and empowering individuals to make informed choices regarding their health. Federal strategies center on creating an infrastructure that encourages interoperable health IT regardless of technology developer, platform, location, provider, policy, or other boundaries.

The *Shared Nationwide Interoperability Roadmap, Draft Version 1.0* (Draft Roadmap) is a complementary planning document that proposes critical actions for both public and private stakeholders that will advance our nation towards an interoperable health IT ecosystem, advance research, and ultimately achieve a learning health system that efficiently and collectively improves health. Whereas this Plan outlines federal efforts to focus on health IT beyond EHRs and health beyond health care, the *Draft Roadmap* details the interoperable infrastructure needed to support appropriate sharing and use of electronic health information toward achieving a learning health system. The *Draft Roadmap* is organized around five building blocks for a nationwide interoperable health information technology infrastructure:

- Core technical standards and functions
- Certification to support adoption and optimization of health IT products and services
- Privacy and security protections for health information
- Supportive business, clinical, cultural, and regulatory environments
- Rules of engagement and governance

***10-Year Overarching Goals and Objectives for Expanding Interoperable Health IT Infrastructure***




This *Draft Roadmap* proposes critical actions that the public and private sector need to take to advance the country towards an interoperable health IT ecosystem over the next 10 years, identifying a path to achieving the vision in the three-, six- and ten-year time frames and a vision to catalyze collaboration and action across government, communities, and the private sector.

Visit Page 42 to view strategies

❖ **Protect the privacy and security of health information**

As more health information transitions to electronic formats that are shared commonly, it is important that all stakeholders recognize their responsibility in protecting health information.[13] The federal government plays a key role in promoting transparency in how health care organizations, companies, technology developers, and other entities obtain, manage, and retain such health information. The government will provide oversight and guidance to encourage adherence to laws that protect the privacy and security of

health information. The government's guidance should also help reduce misunderstanding and confusion of privacy and security laws that may dissuade parties from appropriate health information exchange.

It is important for individuals to understand what kinds of data are collected about them, who collects it, and how data will be used, shared, and disclosed, consistent with Fair Information Practice Principles.[14] The federal government is committed to stimulating the development and use of policy, standards, and technology to advance individuals' rights to securely access, amend, and make choices for the disclosure of their electronic health information.

The federal government supports these developments to achieve two ends. First, the government should facilitate patients' ability to control the exchange of specific health information that many consider to be "sensitive" (which includes information related to substance use disorder treatment, reproductive health, mental health, domestic abuse, or HIV), in an electronic environment. For example, using technology to document applicable permissions to access, use or disclose health information saves time and resources, and can build trust and confidence in the system overall.[15] Second, such developments should support the availability of health information about individuals when and where they need it for treatment.

***Federal Efforts on Cybersecurity***

Recognizing that the national and economic security of the United States depends on the reliable functioning of critical infrastructure, in 2013, President Barack Obama issued Executive Order 13636, Improving Critical Infrastructure Cybersecurity. It directed the National Institute of Standards and Technology (NIST) to work with stakeholders to develop a voluntary framework – based on existing standards, guidelines, and practices – for reducing cyber risks to critical infrastructure. This includes the integrated health IT infrastructure and the information and communications technology (ICT) infrastructure, necessary for health information interoperability, the advancement of a learning health system, and the Internet of Things (IoT). Further, in response to the Cybersecurity Enhancement Act of 2014, federal agencies are developing an updated federal cybersecurity research and development strategic plan. The strategic plan will be used to guide and coordinate federally funded cybersecurity research.

Additionally, the government will provide privacy and security (including health information breach prevention) educational material, based on federal or advisory group recommendations, to key stakeholders, including individuals. Security and the intrinsic value of health and other data are continually evolving, placing systems at increasing risk. Maintaining and improving security of technology and information requires constant vigilance from all stakeholders. The federal government will continue to work internally and with external groups to help ensure that the nation's health IT infrastructure and information is secure.

The privacy and security of health information is important to the federal government, and the government will continue to pursue policies, levers, and enforcement mechanisms that engender confidence and trust for individuals and their families, caregivers, providers, and others.

Visit Page 43 to view strategies

## ❖ Identify, Prioritize, and Advance Technical Standards

Health information is useful only if the end user can access and understand the information. Standards are the medium for individuals, health care entities, and public health agencies, health IT solutions, and medical devices to find, organize, exchange, secure, and share information. They must be maintained and progressively enhanced, based on feedback from real use, and need to accommodate emerging areas, such as using genomic data to achieve precision medicine and allowing integration of non-laboratory data into health records and research.

Use of common technical standards and specifications are necessary for electronic health information to move seamlessly and securely. Much of the content of clinical records – including laboratory test results, clinical measurements (*e.g.*, blood pressure), test orders, medical problems, and drug names – is structured and susceptible to standardization. However, some of the content – such as provider notes and other notations – may be more helpful as free text; health IT should aim to identify methods to capture and present this nonstandard information in more helpful ways that can improve the patient-provider encounter. Using data elements consistently and reliably will allow for collecting information for individual health needs as well as for reuse of that information to drive decision support, quality measurement and reporting, population health management, public health, and research. Focusing on the highest priority standards can help accelerate their widespread adoption, allowing health IT to be more usable and efficient.

The ONC HIT Certification Program serves as a valuable mechanism for promoting the use of common standards for interoperability; however, significant work remains. To promote consistent standards implementation and reduce implementation variability, the federal government will continue to work with standards development organizations and industry stakeholders to assure users that newer versions of standards and implementation specifications more clearly describe discrete, germane requirements that are regularly evaluated and updated. Initially, federal efforts will focus on efficiently addressing prioritized standards that enable sending, receiving, finding, and using a basic set of essential health information. ONC will continue to assess the ONC HIT Certification Program to ensure it can address and reinforce health IT applications and requirements that support federal value-based and alternative payment models.

Visit Page 44 to view strategies

## ❖ Increasing User and Market Confidence in the Safety and Safe Use of Health IT

The technological marketplace has evolved, as providers and facilities become increasingly invested in the safety and safe use of a broad set of emergent technologies and solutions. Stakeholders are demanding ways to improve existing EHRs, use personal technology, such as smartphones and tablets, and integrate information from other technologies such as bedside infusion pumps, monitors, and ultrasound, so that technology and information safety and safe use is more seamless, user-friendly, and comprehensive. Evidence suggests health IT improves patient safety; however, poor implementation or improper use of otherwise safe systems can lead to adverse outcomes.[16] For the nation to collectively move to an expansive electronic health information environment, individuals, health care providers, and organizations need confidence that health IT solutions are secure, safe, and useful.

***Food and Drug Administration's (FDA) Sentinel Initiative***

Launched in 2008 by the Food and Drug Administration (FDA), the Sentinel Initiative aims to develop and implement a proactive system that will complement existing systems that the agency has in place to track reports of adverse events linked to the use of its regulated products. A national electronic system that will transform FDA's ability to track the safety of drugs, biologics, and medical devices once they reach the market is now being implemented. Monitoring the safety of its regulated products is a major part of FDA's mission to protect public health. The Sentinel System enables FDA to actively query diverse automated healthcare data holders—like EHRs, administrative and insurance claims databases, and registries—to evaluate possible medical product safety issues quickly and securely.

Individuals and providers must also have the ability to change health IT products, systems, or services without undue financial burden or the loss of valuable information. The implementation of this Plan, as well as the 2013 HHS Health IT Patient Safety Action and Surveillance Plan, will build and maintain confidence in the safety of the health IT solutions and support a competitive and innovative market. Additionally, as part of the federal government's responsibility to protect the public's health and safety, a collaborative effort to design an appropriate, risk-based framework to assess regulation of medical devices and health IT resulted in a draft report as part of the 2012 Food and Drug Administration Safety and Innovation Act (FDASIA). This framework will be applied as necessary as health IT progresses.

**Visit Page 45 to view strategies**

### ❖ Advancing a National Communications Infrastructure

Telehealth is the use of electronic information and telecommunications technologies to support long-distance clinical health care, patient and professional health-related education, public health and health administration, and to promote individual self-management and well-being. Technologies include videoconferencing, social media and mobile applications, store-and-forward imaging, streaming media, and terrestrial and wireless communications.

A learning health system also incorporates advanced health models that increasingly leverage technology, such as telecommunications technology, to deliver health and clinical services remotely, and improve access to care across clinical and non-clinical community settings. For example, remote monitoring can allow a care team to monitor an individual's health status while she is in the comfort of her home, improving the individual's care experience, or allow a rural hospital to expand its intensive care unit capacity through virtual providers. Mobile health apps can remind individuals to take medication or to access and contribute electronic health information to their health record, clinical registry, or other repositories. Telehealth can also expand access to care, allowing individuals to receive specialty care and improve convenience, such as for off-shore workers or home-bound care.

A strong national communications infrastructure is a prerequisite for sharing electronic health information among providers, individuals, and national emergency first responders, delivering telehealth and remote monitoring solutions, using mobile health applications, and performing highly complex research, business intelligence analyses, and other actions to transform clinical practice and improve health and community resilience.

Significant efforts are underway in both the public and private sectors to bring broadband internet services to all Americans. Maximizing availability of broadband services to all – including low income Americans, those in rural areas and tribal lands, and individuals with disabilities is a key national objective.[17] Nevertheless, data shows that 55 million Americans – 17 percent of the population – lack access to advanced broadband services. There are also significant disparities in broadband access and use. More than half of the population in rural areas, and nearly two-thirds of the population in tribal areas lack access to advanced broadband services. Even in areas where broadband services are available, approximately 100 million Americans still do not subscribe.[18] The inability among many to maintain a strong internet connection inhibits the sharing of high-quality data and graphics, such as medical images, and the ability to leverage video telecommunications needed for telehealth. As the government improves the communication infrastructure, it must retain sensitivity and responsiveness to individuals' technology literacy as well.

***Broadband that Works***

Building on the Federal Communications Commission's (FCC's) net neutrality plan, in 2015 the White House announced its plan to promote "Broadband that Works," a public-private effort to help more Americans, in more communities around the country, get access to fast and affordable broadband internet services. Efforts include (1) calling to end laws that harm broadband service competition; (2) expanding the National Movement of Local Leaders for Better Broadband; (3) launching a new initiative through the Department of Commerce, BroadbandUSA, to support community broadband services projects; (4) unveiling new grant and loan opportunities for rural providers through the Department of Agriculture; and (5) establishing a Broadband Opportunity Council to remove regulatory barriers and improve investment incentives.

Expanded, secure, and affordable high-speed wireless and broadband services, choice, and spectrum availability will support electronic health information sharing and use, support the communication required for care delivery, and support the continuity of health care and public health services during disasters and public health emergencies.

**Visit Page 46 to view strategies**

## ❖ Collaborative Effort by All Stakeholders

The federal government plays three roles in coordinating its work with the private sector: contributor, beneficiary, and collaborator.[19] By navigating the right balance among these three roles, federal agencies will promote a fertile and competitive marketplace ripe for innovation that advances this Plan's mission.

While protecting privacy, security, and confidentiality, the federal government is publishing new open data sources, converting existing data to electronic formats, requiring public access to data resulting from federally funded research, and making data easier to use via downloading, application programming interfaces, and access in the cloud. The federal government aims to encourage private-sector innovators and entrepreneurs, as well as researchers, to use government and government-funded data to create useful applications, products, services, and features that help improve health and health care.

***Patient-Centered Outcomes Research***

Patient-centered outcomes research can help stakeholders make informed health decisions by increasing the quality and relevance of the evidence upon which those decisions are made. However, the time and expense of conducting high-quality research that produces definitive results present a key barrier to conducting needed research. Health IT can serve as a vehicle to facilitate more efficient research processes—particularly around the collection and use of research data.

HHS' Office of the Secretary receives funds transferred from the Patient-Centered Outcomes Research Trust Fund annually between 2011 and 2019 to build data capacity for patient-centered outcomes research, with a cumulative estimated total of over $140 million. The goal for these investments is to enable a comprehensive, interoperable, and sustainable data network infrastructure to collect, link, and analyze data from multiple sources to facilitate patient-centered outcomes research.

Federal efforts will also focus on improving accessibility, technical standards, services, policies, federal data, and governance structures that support person-centered outcomes research. This work will facilitate the progressive sophistication of a purposeful learning health system that allows providers, communities, and researchers to continuously learn and advance the goal of improved health and health care. New capabilities will emerge that increasingly enhance research, allowing researchers to search and contribute data in new ways. Open data helps create opportunities for innovators to leverage the information to build, deploy, and scale solutions that help individuals, providers, and others improve health and care.

Beyond releasing data sets, the federal government funds innovative research for health IT products and solutions. The government also collaborates with standards development organizations to ensure that health IT products and solutions can use standards necessary to integrate and share clinical and person-generated health data across platforms and resources, ensuring interoperability and smooth information flow. Further, federal health systems can contribute organizational learning that leads to innovations in health IT usability and improved care delivery.

# ABOUT THIS PLAN

❖ **Strategic Plan Development**

To update the federal health IT Plan and implementation approach, ONC convened the Federal Health IT Advisory Council, an internal forum to discuss program alignments for existing and emerging health and health IT matters, to prioritize objectives and define implementation accountabilities within the Plan, and to coordinate federal health IT policy decisions. ONC drafted the Plan in consultation with over thirty-five entities and departments participating on the Council. These federal partners encompass broad departmental missions with regulatory, health care provider, payer, human services, and privacy and security responsibilities. Collectively, the Council conveyed a diverse understanding of the unique needs and concerns of their stakeholders to ensure the Plan's direction would allow for varied approaches and methods to improve individuals' well-being and advance health IT's capacity to achieve broad health and care goals. Representative entities currently comprising the Federal Health IT Advisory Council as Plan developers are listed at the conclusion of this Plan.

❖ **How the Plan Evolved Since the Draft Release**

Through a framework established for ONC's federal advisory groups, particularly the Health IT Policy Committee, ONC obtained public input to develop the Plan's content. Additionally, ONC accepted formal public comments on the Plan from December 2014 through February 2015, where ONC received roughly 400 comments from a wide array of stakeholders, including individuals, providers, health care organizations, technology developers, public health entities, EMS practitioners, and advocacy groups.

Most commenters expressed general support for the Plan's vision of better health and using electronic health information to provide better care, aid research, and improve public health. However, the Draft Plan's emphasis on "data" and "systems" resonated less than an overarching desire for the government to demonstrate how individuals, communities, providers, developers, and researchers can work together, supported by more useful information and more integrated health IT, to achieve the Plan's vision and mission. While continuing to expand health IT adoption, this revised Plan focuses primarily on how systems and individuals, organizations, and communities will use the information that flows through them. The Plan revision has an expanded narrative to show the interdependencies of the various goals, objectives, and strategies: the federal government will pursue strategies that aim to accomplish many interrelated objectives, rather than seeking progress in one area before addressing others. The Plan's strategies and outcomes show how the federal government's actions will firmly establish the supporting health IT infrastructure necessary for expanding the use of interoperable electronic health information to improve health and wellness.

❖ **Implementation**

Federal partners, in coordination with federal advisory committees, including the Health IT Policy and Standards Committees, interagency groups, and ONC, will work to implement the Plan and review and publicly report progress for its goals. A public annual progress report will link where this Plan's strategies connect to other federal strategic initiatives for additional detail and context. ONC, in its role as

coordinator, will maintain primary responsibility for the Plan's implementation, but each federal contributor has committed to specific strategies, as well as the Plan's overall success.

There is already significant work underway. Federal agencies have begun implementing certain activities and strategies included in the Plan. This work ranges from detailed and more specific action plans to significant federal initiatives. The *Draft Nationwide Interoperability Roadmap*, the *HHS Health IT Patient Safety Action and Surveillance Plan*, and the *Draft FDASIA Health IT Report* respectively provide more granular information on actions related to interoperability, patient safety, and the health IT regulatory framework. Another component of Plan implementation involves DoD's efforts to efficiently improve health care for the active duty military, veterans, and beneficiaries by modernizing the EHR for the Military Health System and establishing seamless medical data sharing between DoD and VA, and with the private sector.

Implementation also encompasses federal initiatives such as HHS' goals to shift Medicare and Medicaid payment from volume to value, and the creation of a Health Care Payment Learning and Action Network, an initiative where HHS will work with private payers, employers, individuals, providers, states and state Medicaid programs, and other partners to expand alternative payment models into their programs. It also includes transformative research efforts, such as the Precision Medicine Initiative and using the Patient-Centered Outcomes Research Trust Fund. Efforts to streamline and align programs were included in the Stage 3 notice of proposed rulemaking for the Medicare and Medicaid EHR Incentive Programs and the notice of proposed rulemaking for the 2015 Edition Health IT Certification Criteria. Additional alignment will occur through implementation of MACRA and other key legislative and executive authorities.

Furthermore, continued outreach to stakeholders by all the federal partners involved in the Plan's development and implementation will allow the Plan to evolve as the health IT marketplace matures, subsequently requiring new or modified approaches to policies and federal activities. This engagement will also seek to provide the public with a better understanding of the federal government's direction to improve health care, individual and community health, and research, supported by the use of interoperable health information, and to receive feedback on what remains to be improved.

# MEASUREMENT & REPORTING

By design, this federal strategy is broad in scope and includes actions initiated by numerous federal departments, agencies, and offices. Although each federal entity has its own respective mission, levers, programs, and activities, the federal government's collective mission for health IT is to improve the health and well-being of individuals and communities through health information that is available when and where it matters most. Because this Plan is linked to key national plans and initiatives addressing strategies and initiatives that rely on health IT to achieve their goals, our measurement and reporting will focus largely on whether this Plan's implementation of a health IT infrastructure allows those plans to accomplish their visions. These plans include detailed measurement sections on key outcomes related to strategies highlighted across the Plan. The federal government will aim to be flexible in modifying strategies and correcting course to support the nation's ability to meet the vision, mission, and goals of an applied health IT infrastructure. Along with direct monitoring of the key initiatives and plans, the federal partners committed to this Plan's achievement will separately track progress in their respective areas. As the infrastructure and strategies evolve during the Plan's life-cycle, so, too, will the selected proxies, to ensure the government remains accountable to the public and to the principles established in the Plan.

These proxy indicators will provide insight on whether the nation is progressing towards realizing part of the Plan's mission; however, these indicators are limited in their ability to provide a comprehensive understanding of whether federal actions described in this Plan are on track and whether these actions are achieving their desired impact. Beginning in 2016, HHS will use its annual congressional report on the Adoption of Health IT and Related Efforts to Facilitate the Electronic Use and Exchange of Health Information to publish a more nuanced analysis and understanding of the health IT landscape and progress towards goals and objectives described in this Plan. The report will also provide detailed information on the progress of key health IT-related initiatives, and identify gaps and barriers.

Data included in that report currently rely on self-reported data from national surveys and federal reporting requirements. The national surveys include data from office-based physicians, hospitals, individuals and a subset of providers in long-term care settings. Participants of the Medicare and Medicaid EHR Incentive Programs provide data for federal reporting requirements. In the near-term, this report will likely continue to use self-reported data to measure progress. However, this Plan's federal contributors recognize that measures assessing health IT adoption, interoperable exchange, and use are not sufficient to monitor progress. Long-term measurement will need to assess the impacts of federal actions related to health IT, and how these actions influence the Plan's goals of advancing person-centered health and self-management, transforming health care delivery and community health, and fostering research, scientific knowledge, and innovation.

During implementation of this Plan, federal contributors will work continuously to refine the type of data collected and reported to increase transparency and accountability. ONC will also work with the Health IT Policy and Standards Committees for guidance on measurement concepts and domains. Further, ONC will regularly update the Health IT Dashboard to display progress across a number of health IT domains. Additionally, this Plan's federal contributors will look for ways to include health IT measurement concepts in complementary strategic plans and initiatives.

The federal government will begin to measure the Plan's success by monitoring the following set of proxy indicators that ONC will collect and report publicly on an annual basis:

- Percent of office-based physicians that treat patients seen by providers outside medical organization that have clinical information from those outside encounters electronically available at the point of care (*Data Source: National Center for Health Statistics (NCHS) National EHR Survey*)
- Percent of non-federal acute care hospitals that routinely have necessary clinical information available electronically from outside providers or sources when treating a patient seen by another health care provider or setting (*Data Source: American Hospital Association's Annual Survey Information Technology Supplement)*
- Percent of individuals who experienced one or more gaps in health information when seeking care (*Data Source: ONC Consumer Survey of Attitudes Toward the Privacy and Security Aspects of Electronic Health Records and Health Information Exchange)*

# GOAL 1: ADVANCE PERSON-CENTERED AND SELF-MANAGED HEALTH

## Objective 1A: Empower individual, family, and caregiver health management and engagement

**Strategies:**

1. Disseminate educational resources and explore policy options that allow individuals choice and convenience in using apps and tools to securely compile, aggregate, and use health information to achieve health and wellness goals

2. Support the development of policies, standards, technology, guidance, and solutions to facilitate individuals' ability to securely access, manage, control, and authorize the disclosure of specific electronic health information and incorporate this information into their health IT tools

3. Develop and disseminate tools and educational resources for individuals that are designed to help them understand their health information, costs, and care options, and become advocates for their own health

4. Promote health IT that allows providers, individuals, and caregivers to use evidence-based health information resources, logistical supports, decision aids, and risk calculators

5. Increase the use of telehealth, virtual medicine, and innovative technologies (*e.g.*, sensors, mobile technology, medical devices, assistive technologies, *e*Visits) in federal care delivery systems and programs

6. Advance providers' ability to address the health and health IT literacy issues for diverse individual and caregiver populations so that the technology matches and empowers their health management and engagement, utilizing culturally and linguistically appropriate tools

**Federal Contributors**

ACL, CDC, CMS, DoD, FDA, FTC, HRSA, IHS, OCR, ONC, SAMHSA, VA

# GOAL 1: ADVANCE PERSON-CENTERED AND SELF-MANAGED HEALTH

## Objective 1B: Foster individual, provider, and community partnerships

**Strategies:**

1. Support health IT policies that make available products that securely integrate self-generated health information, self-reported outcomes, and genomic information into an individual's longitudinal care records and self-care and wellness technologies
2. Improve care providers' and individuals' understanding of risks and responsibilities of care options that lead to informed, shared decision-making
3. Expand ability for individuals to safely and securely contribute relevant and usable electronic health information and define preferences and values to their clinicians
4. Improve access to health care, community resources, human and social services, and health education programs through health IT products and innovative use of services
5. Leverage technology to share salient research findings that inform decision-making for individuals, providers, and community organizations

**Federal Contributors**

ACF, ACL, AHRQ, CDC, CMS, DoD, FDA, HHS OASH, HRSA, IHS, NIH, ONC, SAMHSA, VA

# GOAL 2: TRANSFORM HEALTH CARE DELIVERY AND COMMUNITY HEALTH

## Objective 2A: Improve health care quality, access, and experience through safe, timely, effective, efficient, equitable, and person-centered care

**Strategies:**

1. Increase the adoption and effective use of certified health IT across the care continuum
2. Improve health IT usability and clinician workflow by fostering innovation through policies and methods (*e.g.*, workshops, development and validation test beds), that promote the well-designed incorporation of usable electronic information, clinical quality measurement, safety and adverse event information, human factor research findings, and clinical decision support
3. Incorporate telehealth and mobile health technologies and services within federal programs providing or paying for health care
4. Develop and encourage the increased use of health IT that support providers' and patients' capturing and reporting quality measures, patient experience, adherence to evidence-based guidelines, and improved person-centered health outcomes
5. Promote data collection, clinical decision support, and analytic capabilities that help lead to precision medicine
6. Promote data collection, continuous quality improvement and analytic capabilities that identify underserved or at risk individuals and communities to target timely health interventions
7. Develop health IT solutions that allow federal regulatory agencies to receive and evaluate pharmaceutical, biologic, medical and other product risks more efficiently and promote the safe use of these products

**Federal Contributors**

AHRQ, CMS, DoD, FDA, HRSA, IHS, NIH, NIST, ONC, VA

# GOAL 2: TRANSFORM HEALTH CARE DELIVERY AND COMMUNITY HEALTH

## Objective 2B: Support the delivery of high-value health care

**Strategies:**

1. Reward providers that coordinate care within alternative payment models and merit-based payment systems
2. Encourage collaboration between public and private providers and payers to facilitate interoperability and comprehensive and coordinated care delivery
3. Expand the capacity of the clinical, community supports, and analytic workforce to use health IT and data analytics
4. Provide technical assistance to providers to develop the skills, workflows, and tools needed to improve care delivery and transition to alternative payment models
5. Standardize and expand regional multi-payer claims and clinical data infrastructure to facilitate clinical performance reporting and timely feedback to providers
6. Identify and increase administrative efficiencies that reduce cost, improve provider and patient experiences, and support transparent, meaningful feedback on aligned quality measures that providers, patients, and caregivers can use for quality improvement and decision making
7. Improve linkages among health and human services databases, registries, or other sources to measure system effectiveness and improve clinical outcomes while applying appropriate privacy and security protections
8. Increase use of health IT systems to provide evidence-based guidance to individuals, providers, and community organizations on appropriate use of screening and prevention services
9. Work with communities on demonstrations and pilots to explore ways for using health IT to expedite enrollment, facilitate coordination and implement complementary health strategies among clinical, behavioral, preventive services, and social services with appropriate privacy and security protections

**Federal Contributors**

ACF, ACL, AHRQ, ASPE, CMS, DoD, DOT, FDA, HRSA, IHS, ONC, OCR, SAMHSA, SSA, VA

# GOAL 2: TRANSFORM HEALTH CARE DELIVERY AND COMMUNITY HEALTH

## Objective 2C: Protect and promote public health and healthy, resilient communities

**Strategies:**

1. Expand the capacity of the public health and community supports workforce to use health IT and predictive analytics for early detection and mediation of emerging hazards, public health threats, and to promote community well-being and resilience

2. Increase public health entities' ability to use, benefit from, and manage advances in real-time electronic health information for public health surveillance, situational awareness, and targeted alerting

3. Enhance or, if necessary, develop and maintain standards for the unique health IT needs associated with emergency care, public health emergencies, and disasters to include rapid transfers of care, unidentified individuals, and patient tracking, movement, and evacuation

4. Increase public health entities' ability to manage electronic health information to inform planning and decision making to ensure continuity of appropriate care during disasters and public health emergencies

5. Support the use of health IT that can help communities conduct needs and assets assessments and protect high-risk individuals

6. Promote collaborations among public and private healthcare providers, and public health agencies to improve individual, family and community health outcomes; and promote health IT data use in community efforts to coordinate and implement social programs for population health care

7. Expand the capacity of health IT to integrate, share, and use data on social determinants of health to foster the health and improve the management of care in diverse, underserved communities

**Federal Contributors**

ACF, ACL, ASPR, CDC, DoD, DOT, FDA, HHS OASH, HRSA, IHS, ONC, SAMHSA, VA

# GOAL 3: FOSTER RESEARCH, SCIENTIFIC KNOWLEDGE, AND INNOVATION

## Objective 3A: Increase access to and usability of high-quality electronic health information and services

**Strategies:**

1. Increase the number, timeliness, quality, and usability of federal health and other relevant data sets available for public use, consistent with HIPAA, Fair Information Practice Principles, the Privacy Act, 42 CFR Part 2, and other applicable laws
2. Collaborate with researchers, innovators, and users on strategic dataset releases, appropriate data dissemination, data discovery and location mechanisms, and education to support innovative data use
3. Pioneer a new scientific model that emphasizes engaged participants, responsible data sharing, and privacy protection through a research cohort of volunteers who share genetic data, biological samples, and diet and lifestyle information, connected through health IT
4. Encourage electronic access to clinical trial and registry data from domestic and international sources to expand person-centered outcomes research
5. Promote innovation in clinical trials and other clinical studies through strategic leveraging of validated clinical and person-generated health data and health IT systems in study design and execution
6. Expand the capacity and design of collaborative data networks and invest in health IT infrastructure and standards to support coordinated precision medicine, person-centered outcomes, and health services research development and findings dissemination

**Federal Contributors**

AHRQ, ASPE, CDC, CMS, DoD, FDA, HHS CIO, HHS CTO, HRSA, NIH, NIST, NSF, OCR, ONC, SAMHSA, VA

# GOAL 3: FOSTER RESEARCH, SCIENTIFIC KNOWLEDGE, AND INNOVATION

## Objective 3B: Accelerate the development and commercialization of innovative technologies and solutions

**Strategies:**

1. Encourage the application of human factors, health literacy, and user-centered design and incorporate consumer testing in the development and use of health IT products, systems, and services
2. Encourage innovative solutions that simplify individual, family, and caregiver access and use of their comprehensive health information from disparate sources
3. Fund and disseminate organizational learning and research, promote innovation, and remove impediments for secure new health IT products and solutions to help resolve challenging health problems, including mobile applications, wearable technologies, advances in big data, computation and analytic methods, and other scientific discoveries
4. Intensify efforts to apply precision medicine through innovative clinical trials, evaluate the ability of health IT to integrate research data, and build a comprehensive scientific knowledge base to move the concept of precision medicine into clinical practice
5. Promote transparency in communication about what information devices are collecting and how it is being used, shared, or retained
6. Identify methods for private and secure bidirectional integration of electronic health information from mobile health technologies and related social networking platforms to more effectively reach individuals and families, health care professionals, and diverse communities while protecting the privacy and security of the information

**Federal Contributors**

AHRQ, ASPE, FDA, FTC, HHS CIO, NIH, NSF, OCR, ONC, SAMHSA

# GOAL 3: FOSTER RESEARCH, SCIENTIFIC KNOWLEDGE, AND INNOVATION

## Objective 3C: Invest in, disseminate, and translate research on how health IT can improve health and care delivery

**Strategies:**

1. Promote, fund, and disseminate health services research and organizational learning that assesses the impact of health IT use and value-based purchasing incentives on improving health outcomes and reducing health disparities
2. Fund and distribute research to provide evidence and proven practices on use of health IT to improve the quality, safety, and value in care settings, among populations, and among human services organizations
3. Collect, analyze, and interpret data to assess the impact of health IT use to reduce health and health IT disparities in the quality, accessibility, and safety of health care and long-term supports and services
4. Explore the use of technology that enables enhanced information sharing for increased situational awareness, operational efficiency, and scene safety among EMS community and other care providers
5. Promote approaches to continuously monitor and update changes in evidence-based guidelines that are used in clinical decision support

**Federal Contributors**

AHRQ, ASPE, DoD, DOT, FDA, NIH, NSF, VA

# GOAL 4: ENHANCE NATION'S HEALTH IT INFRASTRUCTURE

## Objective 4A: Finalize and Implement the Nationwide Interoperability Roadmap

**Strategies:**

1. Collaborate with industry and public stakeholders to advance core technical standards for terminology and vocabulary, content and format, transport, and security
2. Leverage the ONC HIT Certification Program to ensure that a broad spectrum of health IT conforms to the technical standards necessary for capturing and exchanging information
3. Aim toward privacy and security-related policies, practices, and technology that keep pace with the expanded electronic exchange of information
4. Foster a supportive business, clinical, cultural, and regulatory environment that encourages interoperability
5. Publish guidance that defines high-level principles for policies and business practices that advance trust and interoperability

**Federal Contributors**

ACL, ASPR, CDC, CMS, DoD, DOJ, FCC, FDA, FTC, HRSA, IHS, NIH, NIST, OCR, ONC, SAMHSA, SSA, VA

# GOAL 4: ENHANCE NATION'S HEALTH IT INFRASTRUCTURE

## Objective 4B: Protect the privacy and security of electronic health information

**Strategies:**

1. Clarify requirements and expectations for secure and trusted exchange of electronic health information, consistent with applicable legal privacy protections and individuals' preferences, across states, networks, and entities
2. Continue development, administration, and enforcement of HIPAA privacy and security regulations for HIPAA covered entities and business associates
3. Continue enforcement of and guidance on applicable legal privacy and security requirements for entities not covered by HIPAA[20]
4. Test certified health IT products to ensure they incorporate privacy and security safeguards required for certification under ONC's Health IT Certification Program
5. Develop and implement policies, practices, and educational tools that advance interoperability while giving stakeholders confidence that privacy and security are maintained
6. Address cybersecurity risks in developing technologies and their use
7. Support, promote, and enhance information sharing capabilities within the health and public health sector for bi-directional information sharing about cyber threats and vulnerabilities between the private health care industry and the federal government
8. Work towards uniform policy and technical approaches to electronically document individuals' privacy choices, when those choices are required, in a computable format that is accessible to individuals and available in culturally and linguistically appropriate language

**Federal Contributors**

ASPR, CMS, CDC, DoD, FDA, FTC, HHS CIO, HHS OASH, IHS, NIH, NIST, NSF, OCR, ONC, SAMHSA, VA

# GOAL 4: ENHANCE NATION'S HEALTH IT INFRASTRUCTURE

## Objective 4C: Identify, prioritize, and advance technical standards to support secure and interoperable health information and health IT

**Strategies:**

1. Increase use of common standards among federal agencies, private industry, and the biomedical research community
2. Improve the capability of health IT to securely manage information from varied sources in both structured and unstructured formats
3. Encourage consistent standards implementation, reduce implementation variability, and improve modularity in health data standards for terminology and vocabulary, coding, data content and format, transport, and security
4. Advance standards for common data elements to enable capture and use for clinical decision support, clinical quality measures, research, and reporting
5. Encourage the adoption and use of prioritized sets of common standards through health IT certification, federal regulations and programs, and funding mechanisms

**Federal Contributors**

ASPR, CDC, CMS, DoD, DOJ, DOT, FCC, FDA, HRSA, IHS, NIH, NIST, ONC, SAMHSA, SSA, VA

# GOAL 4: ENHANCE NATION'S HEALTH IT INFRASTRUCTURE

## Objective 4D: Increase user and market confidence in the safety and safe use of health IT products, systems, and services

**Strategies:**

1. Increase the quantity and quality of data and knowledge on the safe use of health IT, and integrate this evidence into health IT certification
2. Support the identification, monitoring, and reporting of complete, precise, and accurate challenges and hazards of health IT design and use
3. Encourage use of certified health IT technology and qualified clinical data registries for reporting quality measures
4. Implement a balanced, transparent, and risk-based approach to health IT oversight
5. Develop, select, promote, and implement health IT standards in transparent ways that promote competition, foster innovation, and minimize barriers to market entry for developers and users
6. Advance standards that support interoperability between medical devices and certified health IT products and systems, including standards for documentation of medical device use by unique device identifier and methods for adverse event reporting
7. Assess and identify methods, best practices, and partnerships to improve data management, quality, and utility

**Federal Contributors**

AHRQ, DoD, FCC, FDA, FTC, NIST, ONC, VA

# GOAL 4: ENHANCE NATION'S HEALTH IT INFRASTRUCTURE

## Objective 4E: Advance a national communications infrastructure that supports health, safety, and care delivery

**Strategies:**

1. Expand access to and choice of broadly available networks with comparable upload and download speeds for individuals and providers in rural and other underserved communities
2. Increase access to broadband connectivity for health IT applications, such as high-resolution imaging, telehealth, and mobile health
3. Ensure health IT networks and communication infrastructure can manage future growth in health data volume and velocity to promote advanced analytics and information sharing
4. Ensure that the national health IT and telecommunications infrastructure are secure, resilient, and operational during disasters and public health emergencies
5. Collaborate with industry and other public stakeholders to promote the ability of consumers to fully access broadband-enabled health resources when and where needed

**Federal Contributors**

ASPR, DoD, DOT, FCC, FDA, USDA, VA

# Federal Contributors

**Department of Health and Human Services**

- Administration for Children & Families (ACF)
- Administration for Community Living (ACL)
- Agency for Healthcare Research and Quality (AHRQ)
- Centers for Disease Control and Prevention (CDC)
- Centers for Medicare & Medicaid Services (CMS)
- Food and Drug Administration (FDA)
- Health Resources and Services Administration (HRSA)
- Assistant Secretary for Financial Resources (ASFR)
- Assistant Secretary for Health (OASH)
- Assistant Secretary for Legislation (ASL)
- Assistant Secretary for Planning and Evaluation (ASPE)
- Assistant Secretary for Preparedness and Response (ASPR)
- Office of the National Coordinator for Health Information Technology (ONC)
- Office for Civil Rights (OCR)
- Office of the Chief Information Officer (OCIO)
- Office of the Chief Technology Officer (CTO)
- Office of the General Counsel (OGC)
- Office of Minority Health (OMH)
- Office of the Secretary (OS)
- Indian Health Service (IHS)
- National Institutes of Health (NIH)
- Substance Abuse and Mental Health Services Administration (SAMHSA)

**Other Federal Contributors**

- Department of Agriculture (USDA)
- Department of Defense (DoD)
- Department of Defense/Department of Veterans Affairs Interagency Program Office (DoD/VA IPO)
- Department of Education (DOE)
- Department of Justice (DOJ) and Bureau of Prisons (BOP)
- Department of Labor (DOL)
- Department of Transportation (DoT)
- Department of Veterans Affairs (VA)
- Federal Communications Commission (FCC)
- Federal Health Architecture (FHA)
- Federal Trade Commission (FTC)
- National Aeronautics and Space Administration (NASA)
- National Institute of Standards and Technology (NIST)
- National Science Foundation (NSF)
- Networking and Information Technology Research and Development (NITRD)
- Office of Personnel Management (OPM)
- Social Security Administration (SSA)

# COMPLEMENTARY PLANS, STRATEGIES, & KEY EFFORTS

- U.S. of Department Health and Human Services' (HHS) Strategic Plan FY 2014-2018
- Healthy People 2020
- National Prevention Strategy
- National Quality Strategy
- National Health Security Strategy
- Centers for Medicare & Medicaid Services (CMS) Quality Strategy
- HHS Action Plan to Reduce Racial and Ethnic Health Disparities
- National Action Plan to Improve Health Literacy
- National Standards for Culturally and Linguistically Appropriate Services in Health and Health Care
- National Broadband Plan
- Shared Nationwide Interoperability Roadmap, Draft Version 1.0
- HHS Health IT Patient Safety Action and Surveillance Plan
- Draft FDASIA Health IT Report
- Precision Medicine Initiative
- FDA's Sentinel Initiative
- Patient-Centered Outcomes Research Trust Fund
- Blue Button Initiative
- Delivery System Transformation
- Department of Defense Healthcare Management Systems Modernization Program
- HHS' Opioid Abuse Initiative
- Federal Interagency Committee on EMS (FICEMS) Strategic Plan
- EMS Compass

# NOTES

[1] Health information within the scope of this Plan includes that which is governed by HIPAA as well as that known as "sensitive information" and that governed by other applicable laws outside of HIPAA. The health information can be sourced electronically from medical devices, user-generated information, government datasets, and many other bits of information that inform health-related decision-making (both inside and outside the care delivery system). Electronic health information must also be connected in interoperable ways and supported by health IT that is useful and suitable for each authorized user.

[2] Mosen DM, Schmittdiel J, Hibbard J, Sobel D, Remmers C, Bellows J. Is patient activation associated with outcomes of care for adults with chronic conditions? J Ambul Care Manage. 2007;30(1):21–9.

[3] Patel V, Barker W, Siminerio E. Individuals' access and use of their online medical record nationwide. ONC Data Brief, no.20. 2014. Office of the National Coordinator for Health Information Technology: Washington DC. Available at: http://www.healthit.gov/sites/default/files/consumeraccessdatabrief_9_10_14.pdf

[4] In the context of this Plan, interoperability is defined as the ability of a system to exchange electronic health information with and use electronic health information from other systems without special effort on the part of the user. Interoperability is made possible by the implementation of standards. Available at: http://www.ieee.org/education_careers/education/standards/standards_glossary.html

[5] Booske BC, Athens JK, Kindig DA, Park H, Remington PL. Different perspectives for assigning weights to determinants of health. county health rankings working paper, 2010. Available at: http://uwphi.pophealth.wisc.edu/publications/other/different-perspectives-for-assigning-weights-to-determinants-of-health.pdf

[6] National Research Council. The learning health system and its innovation collaboratives (IOM roundtable on value and science-driven health care). Accessed from: http://www.iom.edu/Activities/Quality/~/media/Files/Activity%20Files/Quality/VSRT/Core%20Documents/ForEDistrib.pdf

[7] Charles, D, Gabriel, M, Searcy T. Adoption of electronic health record systems among U.S. non-federal acute care hospitals: 2008-2014. ONC Data Brief, no.23. 2015; Office of the National Coordinator for Health Information Technology: Washington DC. Available at: http://healthit.gov/sites/default/files/data-brief/2014HospitalAdoptionDataBrief.pdf

[8] Hsiao C, Hing E. Use and characteristics of electronic health record systems among office-based physician practices: United States, 2001–2013. NCHS Data Brief, no.143.2014; National Center for Health Statistics: Hyattsville MD. Available at: http://www.cdc.gov/nchs/data/databriefs/db143.htm

[9] Swain M, Charles D, Patel V, Searcy T. Health Information Exchange among U.S. Non-federal Acute Care Hospitals: 2008-2014. ONC Data Brief, no.24. 2015; Office of the National Coordinator for Health Information Technology: Washington DC. Available at: http://healthit.gov/sites/default/files/data-brief/ONC_DataBrief24_HIE_Final.pdf

[10] American Medical Association. Blueprint for stage 3 of the meaningful use program and the recommendations for improving Stages 1 and 2. Available at: https://download.ama-assn.org/resources/doc/washington/x-pub/2014-10-14-meaningful-use.pdf

[11] U.S. Department of Health and Human Services. Report to Congress: Report on health information blocking. 2015. Available at: www healthit.gov/sites/default/files/reports/info_blocking_040915.pdf

[12] Burwell SM. Setting value-based payment goals--HHS efforts to improve U.S. health care. N Engl J Med. 2015;372(10):897-9. Available at: http://www nejm.org/doi/full/10.1056/NEJMp1500445

[13] Office of the National Coordinator for Health IT. Everyone has a role in protecting and securing health information. Available at: http://www healthit.gov/policy-researchers-implementers/everyone-has-role-protecting-and-securing-health-information

[14]For more information, see The Department of Health, Education and Welfare's (HEW) Code of Fair Information Practices, also known as fair information practice principles (FIPPS), 1973. Available at: http://www.justice.gov/opcl/docs/rec-com-rights.pdf

[15] For further discussion, see, Draft Nationwide Interoperability Roadmap: Available at: http://www healthit.gov/policy-researchers-implementers/interoperability

[16] Jones SS, Rudin RS, Shekelle PG, Shanman R, Timmer M, Motala A, Perry TR. Health information technology: An updated systematic review with a focus on meaningful use functionalities (Prepared by Southern California Evidence Based Practice Center under Contract No. HHSP23337020T) Washington, D.C. February 2014. Available at: http://www.healthit.gov/sites/default/files/systematic_review_final_report_508_compliant.pdf

[17] Federal Communications Commission Strategic Plan 2015-2018. Available at: https://apps.fcc.gov/edocs_public/attachmatch/DOC-331866A1.pdf

[18] Federal Communications Commission. 2015 Broadband progress report. Available at: https://www.fcc.gov/reports/2015-broadband-progress-report

[19] Chopra A. Innovative State: How new technologies can transform government. New York: Atlantic Monthly Press, 2015. Print.

[20] Federal Trade Commission Guidance, Complying with the FTC's health breach notification rule. April 2010. Available at: https://www.ftc.gov/tips-advice/business-center/guidance/complying-ftcs-health-breach-notification-rule

# EXHIBIT E

The Office of the National Coordinator for
Health Information Technology

**Prepared by:**

The Office of the National Coordinator for Health Information Technology
Office of the Secretary, United States Department of Health and Human Services
HealthIT.gov

# 2020-2025 Federal Health IT Strategic Plan

**October 2020**

# Table of Contents

**Letter from the National Coordinator** 1

**Federal Health IT Vision and Mission** 3

**Federal Health Principles** 4

**Strategic Plan Framework** 5

**Introduction** 6

- How Health IT is Used 6
- The Federal Government's Role in Health IT 8

**Challenges in Healthcare** 9

- Increasing Healthcare Spending 10
- Poor Health Outcomes 10
- Increasing Rates of Mental Illness and Substance Use Disorders 10
- Access to Care 11
- Access to Technology 11
- Access to Electronic Health Information 12

**Opportunities in a Digital Health System** 13
Empowering Patients 14
Moving to Value-Based Care 15
Advancing Interoperability 15
Promoting New Technologies 17
Reducing Regulatory and Administrative Burden 18
Protecting Privacy of Health Information 19
Securing Health Information 19

**Goals, Objectives, and Strategies** 20
Goal 1: Promote Health and Wellness 21
Goal 2: Enhance the Delivery and Experience of Care 24
Goal 3: Build a Secure, Data-Driven Ecosystem to Accelerate Research and Innovation 29
Goal 4: Connect Healthcare with Health Data 32

**Appendix A. About this Strategic Plan** 37

**Appendix B. Measuring and Communicating Progress** 39

**Appendix C. Federal Contributors** 41

**Appendix D. List of Acronyms** 42

**References** 43



The Office of the National Coordinator for Health Information Technology

LETTER FROM THE

# National Coordinator

In our everyday routines, we rely on technology to do a lot for us. Many of us have access to an abundance of data and technologies that allow us to interact with information in many ways. From shopping for groceries, to requesting transportation, to managing our finances, we have come a long way since the dawn of the internet and mobile devices. However, when it comes to accessing our information when and where we need it, healthcare has just not quite caught up. In today’s digital world, the right to control our health must include the right to access and control our health information. While most healthcare providers now use electronic health record (EHR) systems, information captured in these systems is often difficult to access by patients, caregivers, and healthcare providers across different settings of care. All healthcare stakeholders will benefit from a fully connected healthcare system that empowers patients, caregivers, and their healthcare providers to access, exchange, and use electronic health information (EHI).

> In today’s digital world, patients’ right to control their health must include the right to access and control their health information.

The digitization of the nation’s healthcare system has resulted in greater electronic documentation of health information for patients. Yet, the system’s transformation is hindered by status quo bias that tends to limit information sharing. Thanks to provisions passed by Congress, the United States government is working to bring more robust health information to patients and ensure that technology and mobile applications (apps) will help them better manage their health and enable them to shop for care. We in the Office of the National Coordinator for Health Information Technology (ONC), with our partners across the federal government, strive to increase transparency, competition, and consumer choice in healthcare and seek to protect the privacy and security of individuals’ EHI.

The aim of this *2020-2025 Federal Health IT Strategic Plan* (Plan) is to outline concrete steps federal partners can take to improve health through health IT. The goals, objectives, and strategies within this Plan highlight the importance not only of EHI,

# An Outcomes Driven Plan

**FOCUSED ON MEETING THE NEEDS OF**




This Plan is outcomes-driven, with goals focused on meeting the needs of individuals, populations, caregivers, healthcare providers, payers, public health professionals, researchers, developers, and innovators.

but also of the capabilities enabled by health IT, including public health surveillance, telehealth, and remote monitoring. The coronavirus disease 2019 (COVID-19) pandemic caused by the novel coronavirus (SARS-CoV-2) has highlighted the importance of IT-enabled tools in supporting our healthcare infrastructure.

Federal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare. Yet, much work remains to ensure patients and caregivers have access to valuable, usable information. With this Plan, the federal government demonstrates its ongoing coordinated focus on the interoperability of EHI and the reduction of provider burden. It emphasizes product and price transparency, allowing individuals to select the technology they wish to use to access and control their information, while opening up entirely new business models for the health app economy. This Plan is outcomes-driven, with goals focused on meeting the needs of individuals, populations, caregivers, healthcare providers, payers, public health professionals, researchers, developers, and innovators. We would like to thank our federal partners, committees, and members of the public who helped shape the goals, objectives, and strategies in this Plan. ONC, the Department of Health and Human Services (HHS), and our federal partners will continue to take major strides to make healthcare more transparent, accountable, and accessible, while strengthening the patient-provider relationship.

From mobile apps to automation to machine learning—the future of healthcare is promising.

Donald W. Rucker, M.D.
***National Coordinator for Health Information Technology***

AT THE FOREFRONT OF

# Health IT

## Federal Health IT Vision and Mission

**FEDERAL HEALTH IT**

### VISION

A health system that uses information to engage individuals, lower costs, deliver high quality care, and improve individual and population health.

**FEDERAL HEALTH IT**

### MISSION

Improve the health and well-being of individuals and communities using technology and health information that is accessible when and where it matters most.

## Federal Health Principles

Through this Federal Health IT Strategic Plan, the government will work collaboratively to:

| | |
|---|---|
| **Put individuals first.** | Embrace person-centered care that values the whole individual, including their goals, values, culture, and privacy. |
| **Focus on value.** | Promote and pursue activities that improve health and care quality, efficiency, safety, affordability, equity, effectiveness, and access. |
| **Build a culture of secure access to health information.** | Support secure health information access, exchange, and use by individuals, caregivers, healthcare providers, public health professionals, and other stakeholders. |
| **Put research into action.** | Strengthen feedback loops between scientific, public health, and healthcare communities to efficiently translate evidence into clinical practice and improvement. |
| **Encourage innovation and competition.** | Support and protect innovation and competition in health IT that result in new solutions and business models for better care and improved outcomes. |
| **Be a responsible steward.** | Develop health IT policies through open, transparent, and accountable processes; use federal resources judiciously; and leverage the expertise of the private sector to provide technology and services to execute on these policies, as appropriate. |

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 9 of 51



## Strategic Plan Framework

This Plan includes four goals, each of which includes specific objectives and strategies. Taken together, these should not be viewed as sequential, but as interdependent with the collective purpose of improving the health of individuals, families, and communities.

### GOAL 1 Promote Health and Wellness

**Objective 1a:** Improve individual access to usable health information

**Objective 1b:** Advance healthy and safe practices through health IT

**Objective 1c:** Integrate health and human services information

### GOAL 2 Enhance the Delivery and Experience of Care

**Objective 2a:** Leverage health IT to improve clinical practice and promote safe, high-quality care

**Objective 2b:** Use health IT to expand access and connect patients to care

**Objective 2c:** Foster competition, transparency, and affordability in healthcare

**Objective 2d:** Reduce regulatory and administrative burden on providers

**Objective 2e:** Enable efficient management of health IT resources and a nationwide workforce confidently using health IT

### GOAL 3 Build a Secure, Data-Driven Ecosystem to Accelerate Research and Innovation

**Objective 3a:** Advance individual- and population-level transfer of health data

**Objective 3b:** Support research and analysis using health IT and data at the individual and population levels

### GOAL 4 Connect Healthcare with Health Data

**Objective 4a:** Advance the development and use of health IT capabilities

**Objective 4b:** Establish expectations for data sharing

**Objective 4c:** Enhance technology and communications infrastructure

**Objective 4d:** Promote secure health information practices that protect individual privacy

# Introduction

Health information technology (health IT) refers to the use of information and communication technologies in caring for patients, tracking diseases, protecting public health, conducting research, and improving the health of individuals and populations.[1] Health IT has evolved from being one tool in the healthcare toolbox to being an integral component of healthcare delivery, and it is critical to improving our nation's health system. As of 2017, 80 percent of physician offices and 96 percent of acute care hospitals use ONC-certified health IT.[2] Information exchange among healthcare providers, patients, and public health and research organizations is increasing rapidly.

## How Health IT is Used



Health IT is used in a variety of ways. Not only does it help to deliver care, treat illness, and improve health outcomes, but it also helps to address the social, economic, and environmental factors that influence the health of individuals and communities.

Individual patients—as well as their caregivers—use information technologies such as patient portals and patient-facing apps, and communication technologies like secure messaging and email, to access their health information, manage treatment of their

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 11 of 51



health conditions, and interact with healthcare providers. When it is available, patients can assess quality and cost information through health IT to make informed decisions about where to seek care. In addition to accessing information, patients and caregivers can use remote services (e.g., telehealth) to remain connected to care when they are unable to physically travel to an office or clinic, such as during a national public health emergency, when they are unable to use transportation, or if they live in an area with limited access to certain health services.

Healthcare providers[i] and healthcare organizations use health IT to input and reference patients' health information, make or adjust a diagnosis, make clinical decisions, and create care plans. In addition, providers use health IT to better engage (virtually or in person) with their patients and patients' caregivers to address patients' needs more quickly and enhance their experience of care.

Public health professionals, researchers, and community-based organizations increasingly use health IT outside of the traditional care setting to collect and assess health and human services data across individuals and populations. This includes using technology to exchange information and track public health[ii] activities (e.g., collecting data on reportable conditions) to address health and related social disparities, lower costs, and improve outcomes, particularly for racial and ethnic minorities, individuals of less privileged socioeconomic status, underserved

i Throughout this document, we use the terms "healthcare providers" and "providers" to mean "health care provider" as defined in section 3000(3) of the Public Health Service Act (42 U.S.C. 300jj): a hospital, skilled nursing facility, nursing facility, home health entity or other long term care facility, health care clinic, community mental health center (as defined in section 300x–2(b) (1) of this title), renal dialysis facility, blood center, ambulatory surgical center described in section 1395l(i) of this title, emergency medical services provider, Federally qualified health center, group practice, a pharmacist, a pharmacy, a laboratory, a physician (as defined in section 1395x(r) of this title), a practitioner (as described in section 1395u(b)(18)(C) of this title), a provider operated by, or under contract with, the Indian Health Service or by an Indian tribe (as defined in the Indian Self-Determination and Education Assistance Act [25 U.S.C. 450 et seq.]), Tribal organization, or urban Indian organization (as defined in section 1603 of title 25), a rural health clinic, a covered entity under section 256b of this title, an ambulatory surgical center described in section 1395l(i) of this title, a therapist (as defined in section 1395w–4(k)(3)(B)(iii) of this title), and any other category of health care facility, entity, practitioner, or clinician determined appropriate by the Secretary.

ii Throughout this Plan, "population health" refers to "the health outcomes of a group of individuals, including the distribution of such outcomes within the group" (Kindig and Stoddard, 2003; American Journal of Public Health). "Public health" refers to "the science and art of preventing disease, prolonging life, and promoting health through the organized efforts and informed choices of society, organizations, public and private, communities, and individuals" (Winslow, 1920).

rural populations, and sexual and gender minorities. Health IT also supports these stakeholders' roles in performing disease surveillance, case reporting and management, laboratory testing, and clinical data collection, as well as reporting outcomes during public health emergencies.

While also engaging in the above activities, payers use health IT to understand member health status, analyze cost data, and engage in care management activities. Life sciences and medical device companies use health IT to support research on new therapies and technologies, engage consumers, and coordinate the safe use of their products.

## The Federal Government's Role in Health IT



The federal government plays a far-reaching role in supporting the advancement of health IT and interoperability. Federal agencies are purchasers, developers, and regulators of health IT. They fund and contribute to health IT research, health IT development, and health IT deployment at the local, Tribal, state, and national levels. Federal agencies also facilitate coordination across the public and private sectors to align standards, encourage innovation, share best practices, and promote competition. In addition, they have the responsibility of developing regulations that impact health IT and providing oversight for its use.

Beyond actions aimed at strengthening the health IT infrastructure and lowering barriers to access, exchange, and use of EHI, federal agencies use health IT to achieve their missions and serve the nation every day. For example, agencies use EHRs, data systems, and other health IT to conduct public health surveillance and research, provide healthcare services to patients, and administer government benefit programs such as Medicare and Medicaid. The federal government, through implementing the strategies outlined in this Plan, will continue to play an essential role in the advancement of health IT in the U.S.

# Challenges in Healthcare

The goals, objectives, and strategies detailed in this Plan support the federal government's broader aim to mitigate many of the healthcare challenges that exist in the U.S. These challenges include increased healthcare spending, poor health outcomes, increased rates of mental illness and substance use disorders, and inconsistent access to care, technology, and information. Social determinants of health (SDOH)—the conditions in which people live, learn, work, and play[3] – can contribute to disparities. As federal agencies and other partners work together toward a more interoperable healthcare system, they should consider the ways in which health IT can address these challenges equitably and in ways that do not exacerbate existing disparities associated with SDOH.



Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 14 of 51



## Increasing Healthcare Spending

National health expenditures were about $3.6 trillion in 2018 and are projected to reach nearly $6.0 trillion by 2027, with annual increases averaging about 5.5 percent.[4] As in previous years, this increase is projected to significantly outpace growth in the overall economy, and healthcare will continue to account for a larger and larger portion of gross domestic product.[5]

Population growth, an aging population, changing disease prevalence and incidence, increasing utilization of health services, and increases in prices and intensity of services all contribute to increased healthcare spending.[6] Notably, treatment of chronic disease and mental health conditions account for 90 percent of the nation's annual healthcare expenditures.[7]

## Poor Health Outcomes

The U.S. health system can improve in managing chronic disease and assuring equity in access and health outcomes. The country's high disease burden and mortality rates are due in part to a greater prevalence of chronic conditions such as diabetes and heart disease.[8] Further, the U.S. continues to have racial and ethnic disparities in health outcomes and in access to and use of preventative care.[9]

## Increasing Rates of Mental Illness and Substance Use Disorders

Increasing rates of mental illness and substance use disorders are major contributors to decreased life expectancy in the U.S. Rates of depression and suicide are increasing, and overdoses from opioids and other drugs and alcohol-related deaths continue to rise.[10] Rural communities, which lack access to services due to fewer resources (including mental/behavioral health and other specialty providers) or means of transportation, are especially affected by mental illness and substance use.[11]

## Access to Care

Health insurance coverage is a significant determinant of access to healthcare.[12] As health insurance premiums rise, the number of uninsured also rises.[13,14] Being uninsured or underinsured increases the likelihood that people will avoid care and face financial hardships when care is received.[15] Being uninsured can also lead to higher uncompensated spending as healthcare providers take on costs to treat uninsured patients who are unable to pay for their care.[16]

The high cost of health services can hinder access to care, even among Americans with health insurance.[17] The insured may face significant out-of-pocket spending from deductibles, co-pays, and inadvertent use of out-of-network healthcare providers. Access to care can be limited by a lack of available healthcare providers within an insurer's network or within geographic reach of individuals and their families. Barriers to entry and competition in healthcare can exacerbate issues of access by increasing prices associated with products and services.[18,19]

## Access to Technology

The U.S. has made significant strides to increase broadband access in recent years. More than 94 percent of the population now live in an area with access to both high-speed internet and Long Term Evolution (LTE) mobile service, and 90 percent of Americans use the internet. However, access to technology remains a challenge across the U.S., as more than one-quarter of Americans do not use broadband internet access at home.[20]

Low income, Tribal, and rural populations are less likely to have access to broadband internet service, and these groups, along with racial and ethnic minority populations, are therefore less likely to use broadband internet service than other demographic groups.[21] Lack of access to broadband can exacerbate existing health disparities by creating a barrier to the range of technologies that support cost-effective and high-quality care.[22]

Furthermore, people without access to smartphones cannot experience the

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 16 of 51



benefits of personalized health apps that can enable users to manage their health. Available technology may not be made in ways that are accessible for people with disabilities.

## Access to Electronic Health Information

Application programming interfaces (APIs) enable phones, computers, and other technologies to connect and share information in real-time. Industries like banking, retail, and education use APIs to allow individuals to manage their finances, track packages, and even complete online courses from the convenience of their smartphones. Healthcare is one of the only industries where many individuals do not have easy access to their electronic information using mobile apps.

In addition, while most hospitals and provider practices use technology that would allow patients and caregivers to view and download health information, a nationally representative survey indicated that only 51 percent of individuals were offered access to their online medical records by their providers or payers in 2018. This percentage is even lower among people who have no insurance and lower-income and education levels.[23]

Even when patients have electronic access to their EHI, they are not always able to use it effectively—a critical barrier to improving health through increased access to information is poor health literacy. Too often, patients and caregivers are unable to realize the full benefits of access to EHI because they may not understand what the information means or have the tools to display information in a way that enables them to make informed decisions. This issue is especially important as individuals are increasingly expected to take a larger role in managing their own health and care. As health IT expands, individuals must be empowered with new health literacy competencies, including an understanding of data sharing, consent, and how privacy, security, and access standards apply to an individual's EHI.

# Opportunities in a Digital Health System

The healthcare system is rapidly advancing in a direction that amplifies patient voices, improves value, drives interconnectedness of EHI and new technologies, reduces provider burden, and protects patient privacy and data security. The strategies in this Plan reflect the ways in which federal partners and collaborators can leverage health IT to bolster efforts across each of these areas of opportunity, which are detailed below.

## Opportunities in a Digital Health System

- Empowering Patients
- Moving to Value-Based Care
- Advancing Interoperability
- Promoting New Technologies
- Reducing Regulatory and Administrative Burden
- Protecting Privacy of Health Information
- Securing Health Information

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 18 of 51



## Empowering Patients

Healthcare continues to move toward person-centered care. Individuals can take a more active role in their care by improving their health behaviors, self-managing chronic conditions, engaging in shared decision-making, and using bi-directional exchange of data to communicate with healthcare providers. Providing patients and caregivers with more robust health information, including quality and cost information, can further help them manage their health and exercise control and choice in their care.

Policies promoting use of secure, standards-based APIs,[iii] including regulations established to implement the 21st Century Cures Act, will encourage the development of health apps that provide access to and use of data in EHRs to better support person-centered care and patient empowerment. Additional examples of federal activities to encourage these efforts include:

- HHS encouraging payers and healthcare organizations to make price information available through regulations and policies;
- The Federal Trade Commission ensuring that health IT companies comply with antitrust and consumer protection laws to promote and protect competition and safeguard the privacy and security of consumers' EHI; and
- The HHS Office for Civil Rights (OCR) announcing that it has settled its eighth enforcement action in its Health Insurance Portability and Accountability Act (HIPAA) Right of Access Initiative (OCR announced this initiative as an enforcement priority in 2019 to support individuals' right to timely access to their health records at a reasonable cost under the HIPAA Privacy Rule).[24]

iii Published to the Federal Register on May 1, 2020, the API certification criterion in ONC's 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program final rule will require the use of the Health Level 7 (HL7®) Fast Healthcare Interoperability Resources (FHIR®) standard Release 4 and references several standards and implementation specifications adopted in § 170.213 and § 170.215 to support standardization and interoperability. This certification criterion will help align industry efforts around FHIR Release 4 and advance interoperability of API-enabled "read" services for single and multiple patients. Also published to the Federal Register on May 1, 2020, the CMS Interoperability and Patient Access final rule requires CMS-regulated payers to implement and maintain a secure, standards-based (HL7 FHIR®) Patient Access API.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 19 of 51



## Moving to Value-Based Care

In addition to patient empowerment, the U.S. healthcare system is continuing progress toward value-based care, in which payment is linked to measures of provider performance and patient outcomes and is based on evidence-based practices and guidelines. In 2018, approximately 61 percent of public and private healthcare spending was part of a value-based payment or pay-for-performance model, up from 23 percent in 2015.[25,26] This movement is likely to continue and perhaps accelerate due to projected increases in healthcare spending.

The shift to value-based care has created new incentives for providers in a variety of settings to improve quality and patient outcomes. These incentives place greater importance on addressing SDOH and patient health behaviors and engaging in preventive care, population health management, and disease management.

Success in value-based payment models is contingent in part on healthcare provider and payer access to and exchange of robust population-level data that allows them to better understand the needs of their patients, stratify patients by risk, engage in patient outreach, and track outcomes over time. Health IT — such as registries and other data systems—plays a fundamental role in the collection, reporting, and analysis of data needed to support value-based care.

## Advancing Interoperability

EHRs are widely used in physician practices, hospitals, and health systems across the U.S. As a result, the federal government and the private sector have increased their focus on improving interoperability—the secure exchange of EHI with, and use of EHI from, other health IT without special effort on the part of the user.[27]

The federal government promotes interoperability of EHI through several programs and policies. For example, the Centers for Medicare & Medicaid Services (CMS) includes health IT-focused incentives in programs like Medicare's

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 20 of 51



Promoting Interoperability Program (formerly the Medicare and Medicaid EHR Incentive Programs, or Meaningful Use) and the Merit-Based Incentive Payment System. In 2020, CMS finalized a rule to advance interoperability by increasing the seamless flow of EHI; reducing burden on patients, caregivers, and healthcare providers; and fostering innovation by unleashing data for researchers and innovators.[28]

Also, in 2020, ONC finalized a regulation (Cures Act Final Rule) designed to drive interoperability of EHI by supporting the use of Health Level Seven's (HL7®) Fast Healthcare Interoperability Resources (FHIR®) standard for APIs.[29] The use of FHIR®, which was also encouraged by federal agencies like the Agency for Healthcare Research and Quality, ONC, CMS, Centers for Disease Control and Prevention, and the National Institutes of Health, fosters increased data sharing between patients, healthcare providers, payers, researchers, and other healthcare entities. As required in the 21st Century Cures Act, ONC's Cures Act Final Rule addresses information blocking, which is generally described as a practice that is likely to interfere with the access, exchange, or use of EHI.[30]

While programs like Promoting Interoperability focus on a subset of the healthcare community, the federal government recognizes the need for investment in and adoption of interoperable health IT by researchers and providers in all care settings (e.g., primary care, long-term and post-acute care, physical therapy, behavioral health, emergency medical services, and hospitals) so they can fully participate in robust EHI exchange.

The private sector recognizes the value of interoperable EHI. Spurred by ONC and CMS regulations, private entities are increasingly using standards-based APIs to develop tools that provide patients, caregivers, and providers with data to promote information sharing. Additionally, participation in health information exchanges (HIEs) and health information networks (HINs) continues to grow. This signifies continued investment in information sharing and collaboration among stakeholders in this sector.

The public and private sectors play a key role in refining existing IT functionalities and creating entirely new kinds of data exchange strengthened by interoperability. While much progress has been made, the ongoing process of improving interoperability will demand continued investigation and advancements in the ways health IT systems interact, and how they access, exchange, and use data.

## Promoting New Technologies

The public and private sectors are continuously developing new technologies to improve access to care and health information. Increased computing power and innovation are propelling new algorithms, analytic capabilities, and machine learning (ML) capabilities from what were once limited, conceptual uses to more everyday uses. Remote monitoring technologies such as wearables and web-enabled medical devices also continue to advance as healthcare providers and patients become more comfortable using such technologies.

Improved broadband access is another driver of adoption and use of new technologies in healthcare. Telehealth, for example, expands services to populations, such as those in rural areas with a shortage of healthcare providers, or to urban residents who lack the transportation or job flexibility needed to visit providers during the traditional workday.

In response to the COVID-19 pandemic, efforts to remotely deliver care and perform research accelerated. Clinical researchers collecting data for studies and providers caring for patients adapted to the pandemic through health IT-enabled telehealth and remote engagement tools. The trend toward greater virtualization in healthcare is likely to continue beyond the pandemic, and this demand will likely heighten the call for greater infrastructural changes to support health IT use and for continued care innovation.

These new technologies, along with existing claims and EHR data, mean the volume of health-related data being generated has never been greater. Volumes of data can now be processed, analyzed, and exchanged almost

instantaneously, and live, high-resolution video can be sent and received without interruption. Where appropriate, the ability to leverage this "big data" for research, discovery, and clinical validation at the point of care through collection, organization, analysis, and interpretation represents both a challenge and a significant opportunity for healthcare.

## Reducing Regulatory and Administrative Burden

Congress emphasized in the 21st Century Cures Act the importance of easing regulatory and administrative burden associated with the use of health IT and directed ONC and CMS to develop strategies for reducing this burden. While interoperable health IT has the potential to improve patient care and outcomes, current system designs can be burdensome to users—including both providers and administrative staff—in healthcare settings. Much of the burden on healthcare providers is a result of EHRs being originally designed primarily to support reimbursement and financial processes, rather than patient care. For example, activities such as prior authorization and clinical documentation, which in many instances have not been built into EHR workflows, can cost providers time that could otherwise be spent with patients.[31]

Health IT has the potential to help minimize burden on healthcare practices by increasing automation of administrative transactions (e.g., prior authorizations) and easing quality measure reporting and other data submission requirements. Providers' return on investment in health IT can be maximized when it is adequately incorporated into workflows and when it automates manual administrative processes. The return on investment can incentivize providers to make the necessary resource allocations to adopt and sustain these systems.[32]

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 23 of 51



## Protecting Privacy of Health Information

The most sensitive information about a person is often their health information. Government agencies, healthcare providers, health IT developers, researchers, and other stakeholders have been working together to implement mechanisms for strengthening health information privacy as more data are generated and exchanged through interoperable health IT.

Despite implementation and use of robust privacy practices in healthcare as required by federal and state regulations, EHI can still be misused or inappropriately disclosed in ways that may harm consumers. Federal partners and providers play an important role in educating individuals and their caregivers on data practices and safety risks associated with uses of electronic data. They can also educate patients on how to meaningfully consent to the use of their data[iv].

## Securing Health Information

The confidentiality, integrity, and security of EHI that is created, transmitted, and stored using health IT is a priority for all stakeholders. This is especially true considering the healthcare industry's move toward cloud-based storage, where data on large populations of patients is held in one place. The strategies included throughout this Plan are predicated on implementation of robust mechanisms for securing information from ransomware and other cybersecurity risks, while ensuring that information is accessible and usable when and where it is needed.

iv Meaningful consent, or consent, in this document is defined as an informed decision made by a patient (or caregiver as a proxy) that allows them to determine if their health information will be released, under what circumstances the release will take place, and by whom. More information on what defines consent can be found here: https://www.healthit.gov/topic/meaningful-consent-overview

# Goals, Objectives, and Strategies

This section describes the 2020-2025 strategic goals and objectives, and lists strategies for meeting each objective. Appendix B describes how federal agencies can benchmark progress and measure success over time.

| | |
|---|---|
| GOAL 1 | Promote Health and Wellness |
| GOAL 2 | Enhance the Delivery and Experience of Care |
| GOAL 3 | Build a Secure, Data-Driven Ecosystem to Accelerate Research and Innovation |
| GOAL 4 | Connect Healthcare with Health Data |

GOAL 1:

# Promote Health and Wellness

The use of health IT must go beyond the sharing of EHI between healthcare providers and the enabling of administrative tasks. Health IT should be leveraged to empower individuals, address patients' full range of health needs, promote healthy behaviors, and facilitate better health outcomes for individuals, families, and communities.

## Objective 1a:
## Improve individual access to usable health information

A key aspect of person-centered care is empowering individuals by providing them access to their health information. Health information access allows patients to become more engaged in their care and management of their conditions, and it alleviates strain on caregivers who manage the care of their loved ones.[33] Improving access to EHI—especially for populations in rural areas, persons with disabilities, racial and ethnic minorities, and those with low socioeconomic status—should be prioritized if we are to achieve equitable care outcomes for all. In addition, patients and caregivers should have access to resources that allow for improved health IT literacy so they understand how their health data may be used, how to choose safe and secure health apps, and how to set their privacy preferences.

### Strategies

- **Enable individuals to access their health information** by ensuring that they can view and interact with their data via secure mobile apps, patient portals, and other technologies.
- **Promote greater portability of EHI** through standards-based APIs and other interoperable health IT that permit individuals to readily send and receive their EHI across various platforms.

- **Improve access to smartphones and other technologies** needed to attain and use EHI, especially among at-risk, minority, rural, disabled, and Tribal populations.
- **Build the evidence base on the use of EHI,** including the types of information that will benefit individuals most and the best ways to present information to patients and caregivers.
- **Improve consumer health IT literacy** by developing educational resources related to choosing and using secure available technologies that incorporate privacy protections.

## Objective 1b: Advance healthy and safe practices through health IT

A new ecosystem of wearable technologies, patient-facing applications, and other digital tools promises to expand access to services and infuse the care of individuals and populations with new health insights.[34] When successfully integrated into clinician workflows, these tools can help providers address the needs of individual patients during the course of care, as well as the needs of populations during public health emergencies and other disasters.

### Strategies

- **Promote healthy behaviors and self-management** through patient-facing apps and wearable technology to allow individuals to track physical activity, share and compare health and fitness data, collaborate with care team members, adhere to care plans, and make informed lifestyle choices.
- **Leverage individual- and population-level data** to prepare for, respond to, and recover from disasters; inform and monitor public health activities; improve quality of life; and address disease occurrence and preventable deaths.
- **Advance the use of validated evidence-based digital therapeutics**[v] to help prevent, manage, and treat conditions through the help of smartphones, tablets, and other personal devices.

v Digital therapeutics are a subset of digital health tools that deliver evidence-based therapeutic interventions to patients that are driven by high quality software programs.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 27 of 51



## Objective 1c:
## Integrate health and human services information

Integrated health and human services data are necessary for providing person-centered healthcare and human services, and for understanding and addressing SDOH at the individual and population levels. Moreover, a health IT infrastructure that can facilitate secure, bi-directional exchange of data at the population level is key to improving outcomes and effectively administering social programs. Today, there is a lack of standardization of human services data, making integration of health and human services data between the various federal, state, territorial, regional, and local agencies and tribes a challenge.[35] Standardization and integration of data will enable agencies to more efficiently collaborate and implement community programs.

**Strategies**

- **Advance standardization and interoperability of SDOH and social service data** across federal programs through the use of standard health IT terminologies, definitions, and methods for data collection and exchange.
- **Capture and integrate SDOH data into EHRs and clinical decision support** to inform care delivery (including referrals and integration of medical and social care) and to address health disparities in a manner that is ethical and consistent with routine patient care.
- **Promote engagement between providers** across the care continuum, state, Tribal, territorial, and local agencies, and community-based programs to leverage existing health IT infrastructure and develop communities' data and health IT capacity.
- **Modernize and strengthen communities' health IT infrastructure** to improve care and effectively administer social programs by facilitating bi-directional communication and secure exchange of data across healthcare, public health, and human services settings.
- **Foster greater understanding of how to use health IT**, and assess available health IT solutions, to address unmet health and social needs for individuals and communities.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 28 of 51



GOAL 2:

# Enhance the Delivery and Experience of Care

Federal partners and other stakeholders should continue to leverage innovative health IT solutions to enhance the delivery and experience of care for patients and providers. Programs and activities should be designed in ways that ensure organizations are exchanging interoperable data in a useful way, that data is available in real-time and is valuable to the requestor (e.g., data is accurate, usable by the recipient, and sent with context), and that health IT appropriately aids in the overall patient healthcare experience.

## Objective 2a:
## Leverage health IT to improve clinical practice and promote safe, high-quality care

When built on a broad definition of patient safety—one that includes privacy, security, and equity—and on data that is accurate and connected across the care journey of each individual, health IT tools can support high-quality care. For example, such technologies can be leveraged to improve safety by reducing unintended care variability between patients. They can also support care transformation at the population level through quality measurement and value-based care. Effectively leveraging data to transform clinical practice involves integration between important data systems (e.g., prescription drug monitoring programs) and continued development of advanced capabilities for patient matching.

**Strategies**

- **Promote interoperability and data sharing through widely-accepted standards** to ensure health information is available across care settings for use in patient care,

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 29 of 51



public health, research, and emergency and disaster preparedness, response, and recovery.

- **Continue efforts to establish identity solutions** within and across data systems that improve patient matching.
- **Optimize care delivery by developing and applying advanced capabilities that leverage modern computing tools to support** evidence-based practices and principles of safe software development and use.
- **Support expanded use of health IT for safer clinical practices** to prevent and address adverse events by building automated patient safety and rapid reporting features into the health IT infrastructure.
- **Reduce diagnostic error and tailor care through precision medicine** to assist in the diagnosis of disease and targeting of treatment to individual patients using real-time data.
- **Use electronic clinical quality measure (eCQM) data** to optimize healthcare providers' and researchers' abilities to assess quality and outcomes.

## Objective 2b:
## Use health IT to expand access and connect patients to care

Leveraging existing standards and developing new health IT capabilities, methods, and approaches to improve usability and understandability of health information to expand access to care and real-time health information are important to ensuring all patients can be connected to care when and where they need it. This access can help reduce health disparities that are currently exacerbated due, in part, to resource shortages and inequitable access to services, and can also support public health preparedness. The recent COVID-19 pandemic highlighted the importance of real-time surveillance and a strong health IT infrastructure for connecting researchers, providers, and patients in times of emergency.[vi]

vi Public health emergencies or natural disasters can potentially harm health IT infrastructure, though this risk can be mitigated through the use of emergency preparedness tools.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 30 of 51



### Strategies

- **Expand care beyond traditional clinical settings** by bolstering access to remote monitoring, surveillance software, telehealth, and other IT-enabled mobile services.
- **Use digital engagement technologies beyond portals** to connect patients more easily with their providers, enabling real-time collaboration and self-scheduling.
- **Sustain collaborative activities** necessary to ensure public health surveillance, preparedness, and response.

## Objective 2c: Foster competition, transparency, and affordability in healthcare

Affordability of healthcare services and treatment remains a key barrier to accessing high-quality care for many individuals. Price and quality transparency—including the availability of this information to patients and providers in real-time—improves patient decision-making, reduces barriers to entry for health IT developers, encourages competition in healthcare, and helps drive down costs.[36] Furthermore, competition promotes consumers' ability to choose from a variety of health products and services based on which best meet their needs.

### Strategies

- **Encourage pro-competitive business practices** that allow individuals to easily choose from and use health apps and other health IT tools without special effort.
- **Support efforts to merge administrative and clinical data streams** to enable access to real-time financial data at the point of care.
- **Make care quality and price information available** to individuals in an accessible, easily understandable format.
- **Educate consumers on the availability of quality and price information** and how to use this information to shop for care based on value.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 31 of 51



## Objective 2d:
## Reduce regulatory and administrative burden on providers

Clinicians spend a significant amount of time entering patient data and other documentation in EHRs for the purposes of reimbursement; quality measure, public health, and clinical registry reporting; and prior authorization and referral submission. The paperwork and box-checking that can be associated with these activities is a hindrance to the delivery of high-quality care; it leaves healthcare providers feeling burned out and reduces the amount of time they have to interact with patients.[37] Health IT developers play an important role in reducing health IT-related burdens on providers and administrative and IT staff.

**Strategies**

- **Simplify and streamline documentation** required of healthcare providers using health IT at the point of care while ensuring that quality standards are upheld.
- **Promote the use of evidence-based automated tools** to streamline provider workflows, encourage electronic provider-to-provider data exchange, and improve efficiency.
- **Monitor and seek to optimize the impact of health IT on provider workflows** to better understand the role of health IT in the provision of care and the minimization of unnecessary data entry and other administrative steps.
- **Promote greater understanding of applicable regulations and practices** to improve compliance by providing educational resources and tools to healthcare providers and health IT developers.
- **Harmonize provider data collection and reporting requirements** across federal agencies.
- **Streamline processes to reduce the effort required by healthcare providers and health systems** to generate, input, and share EHI.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 32 of 51



## Objective 2e:
## Enable efficient management of health IT resources and a nationwide workforce confidently using health IT

Health IT requires a significant amount of resources to adopt and maintain, which can place an extra burden on providers and other healthcare staff.[38] As health IT systems evolve, stakeholders should focus on expanding current—or creating new—training programs to develop a capable health IT workforce (e.g., information technology professionals, providers, public health professionals, informaticians, researchers, and others) with knowledge of EHRs, data sharing, informatics, and other health IT topics.

### Strategies

- **Implement education and training programs** to build a strong, cross-functional health IT workforce that can support IT across healthcare settings, especially in rural areas.
- **Continue to invest in the health IT workforce** by allocating greater resources to train, recruit, and retain workers and to support adequate job opportunities.
- **Engage clinicians and staff in development and usability testing** of health IT products to ensure products and tools support clinical workflow and care delivery.
- **Leverage health IT expertise** across professionals and care settings by promoting use of collaborative models and networks.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 33 of 51



GOAL 3:

# Build a Secure, Data-Driven Ecosystem to Accelerate Research and Innovation

An integrated ecosystem that respects individual privacy and securely collects information from multiple sources is critical to unlocking the power of data. With access to data, technology and analytic advancements like ML and forecasting have the potential to transform care and improve health. Further, by providing access to data stored in EHRs and apps, secure, standards-based APIs can empower individuals, healthcare providers, payers, public health professionals, researchers, and technology companies working together to advance research and management of health for patients and populations.

## Objective 3a: Advance individual- and population-level transfer of health data

Vast amounts of individual- and population-level health and human services data are collected every day. Examples include individuals using mobile phones and wearable devices to track their personal health data; public health professionals and government agencies collecting data about SDOH to inform public programs; and researchers collecting study data to better understand how to treat disease. Enabling researchers, individuals, providers, and payers to safely provide data for the purpose of research and healthcare improvement through secure, standards-based APIs will spur collaboration and innovative uses of data and technology.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 34 of 51



**Strategies**

- **Improve harmonization of data elements and standards** in collaboration with nationally-recognized standard setting organizations by leveraging existing—or creating new—common vocabulary sets and by improving the consistency, integrity, and quality of data.
- **Bolster secure access to large datasets** containing health information for use in research.
- **Enable individuals to securely provide data via apps and other health IT for research** using a consent process that is consistent with individuals' preferences to participate in research.
- **Assess availability of health and human services data and streamline the appropriate collection, submission, and sharing of this data** between federal, state, Tribal, and local systems to enable population health planning; analysis of quality and patient outcomes across settings and programs; and clinical research.
- **Foster data governance that reinforces privacy protections and a secure, unified platform** supporting innovative uses of shared data.

## Objective 3b:
## Support research and analysis using health IT and data at the individual and population levels

EHI can be leveraged to support research and innovation for disease prevention and quality improvement. Partners should continue to work together to support research and innovations like artificial intelligence (AI)/ML, which can advance value and care delivery across the care continuum. Developers, health researchers, public health professionals, and informaticians should collaborate with the security research community to ensure innovations in health IT align with standards of individual privacy, safety, efficacy, and equity.

**Strategies**

- **Investigate the impact of use of health IT,** including ML and other non-EHR technologies, on patient care, safety, and outcomes.
- **Broaden use of new technologies and analytic approaches** like ML and predictive modeling to harness the power of integrated data for improving quality and decision making.
- **Increase use of health IT capabilities** to conduct research and integrate into other data sources remotely or virtually, as appropriate.
- **Advance research into targeted therapies** through real-time data and ML intelligence informed through public health principles, data, and research.
- **Identify and implement health IT capabilities** that support rapid sharing of disease surveillance data.
- **Ensure that research conducted reflects the diversity of the U.S.** so that findings can be applied across populations.

GOAL 4:

# Connect Healthcare with Health Data

Health IT that connects healthcare with health data using standards-based APIs will support strategies to meet the goals and objectives in this Plan. The federal government and other stakeholders can advance interoperability and support transparent, trusted, and seamless connectivity of EHI by continuing to champion the use of standards-based APIs, fostering partnerships to align standards and activities, and reducing burden on providers. Moreover, by supporting and streamlining policies, the government can establish greater consistency across the federal regulatory landscape and improve how the private sector can share in advancing the country's interoperability goals.

## Objective 4a: Advance the development and use of health IT capabilities

One of the ways federal agencies can support the advancement of health IT capabilities is by reducing barriers to entry for health IT developers. With rapid innovation and as more products become available, healthcare providers need clear and easy ways to stay abreast of the continually evolving digital health landscape. Similarly, wider use of new capabilities among all stakeholders depends on their confidence and trust in health IT.

**Strategies**

- **Promote a digital economy** that leverages research and development and that can lead to the development of new business models in healthcare while protecting individual privacy.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 37 of 51



- **Reduce financial and regulatory barriers** that prevent new health IT developers from entering and competing in the health IT marketplace.
- **Promote trustworthiness of health IT** by enforcing information blocking, privacy, and security laws when applicable.
- **Encourage transparency on health IT product usability** via industry reporting programs, consumer reviews, and other reports.
- **Promote provider adoption and use of health IT** by encouraging its use in federal programs, increasing investments in health IT, and making resources available to support health IT adoption and use.
- **Enable portability of EHI and competition in the health IT sector** to help reduce costs associated with transitioning to new EHR systems and other health IT.
- **Continue collaboration across public and private sectors** to adopt and advance nationally-supported standards, implementation specifications, and certification criteria, including the United States Core Data for Interoperability (USCDI), Interoperability Standards Advisory (ISA), and FHIR®.
- **Follow safety and user-centered design principles in the development of health IT** to help ensure tools are safe, accessible, usable, and that solutions address the needs of the users for whom they are developed.
- **Implement mechanisms of data governance and provenance** to promote individual privacy, safety, security, and accountability for patient records, and to improve data quality through all stages of care and uses of health IT.

## Objective 4b: Establish expectations for data sharing

The information blocking provision in the 21st Century Cures Act, as well as the information blocking section in ONC's Cures Act Final Rule, have provided a means for addressing anti-competitive practices that could impact the access, exchange, or use of EHI. The combination of the current state of health IT and the structure and conditions of healthcare markets creates incentives to limit access to EHI in ways that significantly limit its value to patients and providers. The federal government, through implementation of this Plan, seeks to continue enabling individuals to have seamless

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 38 of 51



and secure access to their EHI, which will allow them to more fully participate in the mobile app economy.

Healthcare providers, administrative and IT staff, researchers, and health IT developers may not understand what is required for compliance with federal and state privacy laws. Federal agencies can support transparency and a better understanding of health IT regulations by sharing user-friendly compliance resources, and by collaborating with experts to implement existing best practices to assure privacy and security.

**Strategies**

- **Address information blocking practices** taken by healthcare providers, developers of certified health IT, and HIEs/HINs.
- **Develop educational resources** for providers and others to improve understanding of complex topics regarding information exchange (e.g., information blocking and patient consent management) and how to comply with regulations.
- **Support a common agreement for nationwide exchange of health information** that drives interoperability, supports federal agencies' strategies, and promotes effective governance.
- **Eliminate unnecessarily restrictive data sharing practices** and use nationally-supported standards, implementation specifications, and certification criteria to promote data liquidity.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 35 of 51



## Objective 4c: Enhance technology and communications infrastructure

The health IT and communications infrastructures in the U.S. vary by location. While access to smartphones and broadband is increasing overall, gaps remain for some populations and regions. Disparities in health IT capabilities and access separate rural and underserved areas from those with greater connectivity and service options. Small practices and rural healthcare providers are often unable to adopt the advanced health IT used by larger health systems, due to constrained resources. To address these disparities, stakeholders should continue to improve the health IT and communications infrastructure across the U.S.

**Strategies**

- **Assess current and expected health IT and broadband infrastructure** needs and gaps.
- **Harmonize and streamline federal activities to enhance and expand broadband access and communication infrastructure** for all providers, especially those in rural and underserved areas that are less likely to have access to high speed internet.
- **Deploy secure, cloud-based services** that comply with federal standards to modernize and streamline the way EHI is stored and exchanged when held by a federal agency.
- **Support adoption of infrastructure needed for telehealth** to reach patients outside traditional care settings.
- **Advance equitable access to technology and broadband** for individuals, families, and communities.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 40 of 51



## Objective 4d:
## Promote secure health information practices that protect individual privacy

As capabilities for EHI access, exchange, and use continue to expand, federal partners should prioritize protecting individuals' health data from misuse and threats like cybersecurity attacks and fraud. Patients and caregivers must understand how health data may be used and how to specify their privacy preferences. Keeping EHI secure, preventing breaches and fraud, and curtailing other harms is crucial for maintaining patients' trust of their healthcare providers and in health IT.

### Strategies

- **Integrate privacy and security considerations into the design and use of health IT, including AI/ML,** to promote a culture of privacy and security and protect individual- and population-level data from cybersecurity attacks, fraud, misuse, and other harms.
- **Mitigate patient data security risks by developing guidance** for API and app developers on securely sharing patient data via standards-based APIs.
- **Implement privacy and security mechanisms as appropriate to the sensitivity of the information** to protect individuals' health data, including multi-factor authentication and encryption embedded in APIs, tools that enhance patient matching accuracy, and other technologies that enhance privacy and security.
- **Provide guidance and technical assistance on policies and regulations** at the federal, state, and Tribal level that pertain to the security and privacy of EHI and enforce such rules.
- **Promote equitable access to tools and resources** that protect patients from discrimination, stigma, and exploitation based on their health information.
- **Increase patient understanding of and control over their data** including building awareness of potential secondary uses of data and how to safely and effectively access and use their EHI and make informed decisions concerning consent and data exchange.

APPENDIX A.

# About this Strategic Plan

In developing this Plan, ONC collaborated with more than 25 federal organizations involved in health IT. ONC also conducted research and considered feedback from its Health IT Advisory Committee. Following a public comment period, ONC, in collaboration with its federal partners, considered all comments received and incorporated this input into the final version of this Plan.

This Plan considers the current state of health IT and the ideal future state for individuals, populations, caregivers, healthcare providers, public health professionals, payers, researchers, developers, and innovators. It also considers challenges in defining and implementing strategies. The broad scope of this Plan reflects the diverse roles federal government agencies play in health IT.

**This Plan is motivated by:**

- the constant evolution of healthcare technologies such as mobile and web apps and medical devices;
- the movement toward improved access, exchange, and use of health information to inform healthcare decisions at the individual and population levels and to advance patient-centered care;
- the public and private sectors' increasing reliance on interoperable health IT and EHI;
- the progress and lessons learned from investments in health IT and its use by federal agencies and federally-run care delivery organizations; and
- the need to improve health IT equity and to reduce disparities in access and use of health IT.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 42 of 51



**This Plan is intended to serve as a roadmap for federal health IT initiatives and activities, and as a catalyst for activities in the private sector.**

## The Plan may be used to:

| | |
|---|---|
| **Prioritize Resources** | Within an agency, the Plan is a valuable tool to assess and prioritize potential initiatives, programs, and investments. Using the Plan to prioritize activities can help ensure efficient use of agency resources. |
| **Align and Coordinate Efforts** | The Plan is intended to drive alignment and organization of priorities and activities across different agencies. It may help agencies identify opportunities to coordinate and collaborate with public and private partners. |
| **Signal Priorities to the Private Sector** | Though the Plan only applies to the actions of federal agencies, the Plan can provide signals to the private sector on the direction of the federal government, which may guide coordination and investment decisions. |
| **Benchmark and Assess Progress** | The Plan includes indicators of success that can be used to benchmark and assess progress towards meeting the Plan's mission. These indicators may be used to provide the public with a better understanding of the federal government's efforts to improve healthcare using interoperable EHI. |

APPENDIX B.

# Measuring and Communicating Progress

By design, this Plan is broad in scope. It includes strategies that span many federal departments, agencies, and offices. Federal organizations' actions to implement the *2020-2025 Federal Health IT Strategic Plan* will focus on meeting the EHI needs of individuals, populations, caregivers, healthcare providers, public health professionals, payers, researchers, developers, and innovators.

ONC, in collaboration with federal partners, will measure progress in the following areas. These cross-cutting areas aim to promote modern health IT for all stakeholders and to address barriers to the access, exchange, and use of EHI.

## Areas Measured for Federal and Industry-Wide Progress

- Use secure, standards-based APIs to provide electronic access to health information
- Promote Fast Healthcare Interoperability Resources (FHIR®) across federal organizations and the populations they serve for a variety of use cases
- Implement and expand United States Core Data for Interoperability (USCDI) data classes and elements for a variety of federal use cases and the populations they serve
- Deter information blocking practices through federal authorities and investments
- Encourage data exchange across networks at national and community levels

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 44 of 51



Work in these areas will occur primarily at an organizational level, whereby agency actions align to this federal health IT strategy. Federal actions can include, but are not limited to, standards alignment, regulations, oversight, health IT deployment, and industry coordination.

During the implementation of this Plan, ONC will report on health IT progress measures, actions taken, and describe barriers to connect healthcare with health data. ONC will communicate federal and industry-wide progress in its annual report to Congress on health IT adoption and use.

Individuals, populations, caregivers, healthcare providers, payers, public health professionals, researchers, developers, and innovators increasingly rely on the access, exchange, and use of EHI to connect healthcare with health data. They can use health IT as a catalyst to further support:

- Health and wellness;
- The delivery and experience of care; and
- A secure, data-driven ecosystem to accelerate research and innovation.

Collaboration across federal organizations, private industry, and other stakeholders can accelerate progress in support of the Plan's goals and objectives. Federal partners, in collaboration with other stakeholders, will work to operationalize the Plan's strategies and related activities through an equitable and sustainable lens.

## Appendix C. Federal Contributors

ONC collaborated with the federal organizations below, which included various components within federal departments and agencies. More than 25 federal organizations contributed to the development of this Plan.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 46 of 51



# Appendix D. List of Acronyms

| Acronym | Description |
|---|---|
| **AI** | Artificial intelligence |
| **API** | Application programming interface |
| **CMS** | Centers for Medicare & Medicaid Services |
| **EHI** | Electronic health information |
| **EHR** | Electronic health record |
| **FHIR®** | Fast Healthcare Interoperability Resources |
| **HHS** | Department of Health and Human Services |
| **HIEs** | Health information exchanges |
| **HINs** | Health information networks |
| **Health IT** | Health Information Technology |
| **HIPAA** | Health Insurance Portability and Accountability Act of 1996 |
| **HL7** | Health Level Seven International |
| **ISA** | Interoperability Standards Advisory |
| **ML** | Machine learning |
| **OCR** | Office for Civil Rights |
| **ONC** | Office of the National Coordinator for Health Information Technology |
| **SDOH** | Social determinants of health |
| **USCDI** | United States Core Data for Interoperability |

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 47 of 51



# References


1 "WHO Fact Sheet." *WHO.int*, World Health Organization, Jun. 2015, https://www.who.int/tb/publications/ehealth_TB.pdf?ua=1.

2 "Health IT Quick Stats." *HealthIT.gov*, The Office of the National Coordinator for Health Information Technology. June 17, 2019. dashboard.healthit.gov/quickstats/quickstats.php.

3 "Social Determinants of Health: Know What Affects Health." *CDC.gov*, Centers for Disease Control and Prevention. Jan. 2019. https://www.cdc.gov/socialdeterminants/index.htm.

4 Keehan SP, Cuckler GA, et al. "National Health Expenditure Projections, 2019-28: Expected Rebound In Prices Drives Rising Spending Growth." Health Affairs. March 24, 2020. https://doi.org/10.1377/hlthaff.2020.00094.

5 "NHE Fact Sheet." *CMS.gov*, Centers for Medicare & Medicaid Services. April 26, 2019. www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html.

6 Dieleman JL, Squires E, Bui AL, et al. "Factors Associated With Increases in US Healthcare Spending, 1996-2013." JAMA. 2017;318(17):1668–1678. doi:10.1001/jama.2017.15927. https://jamanetwork.com/journals/jama/fullarticle/2661579.

7 Buttorff C, Ruder T, & Bauman M, "Multiple Chronic Conditions in the United States." https://www.rand.org/pubs/tools/TL221.html.

8 Sawyer B & McDermott D. "How Does the Quality of the U.S. Healthcare System Compare to Other Countries?" *Peterson-Kaiser Health System Tracker*, Kaiser Family Foundation. March 28, 2019. www.healthsystemtracker.org/chart-collection/quality-u-s-healthcare-system-compare-countries/.

9 Thorpe KE, et al. "The United States Can Reduce Socioeconomic Disparities by Focusing on Chronic Diseases." Health Affairs Blog. Aug 17, 2017. https://www.healthaffairs.org/do/10.1377/hblog20170817.061561/full/.

10 Arias E, et al. "United States Life Tables, 2017." National Vital Statistics Report Volume 68, Number 7. June 2019. https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_07-508.pdf.

11 "Families in Crisis: The Human Service Implications of Rural Opioid Misuse." Policy Brief by the National Advisory Committee on Rural Health and Human Services. July 2016. https://www.hrsa.gov/sites/default/files/hrsa/advisory-committees/rural/publications/2016-opioid-abuse.pdf.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 48 of 51




12 Garfield R, et al. "The Uninsured and the ACA: A Primer - Key Facts about Health Insurance and the Uninsured amidst Changes to the Affordable Care Act." *The Henry J. Kaiser Family Foundation*. Jan. 25, 2019. https://www.kff.org/report-section/the-uninsured-and-the-aca-a-primer-key-facts-about-health-insurance-and-the-uninsured-amidst-changes-to-the-affordable-care-act-how-does-lack-of-insurance-affect-access-to-care/.

13 Claxton G, et al. "2018 Employer Health Benefits Survey." *The Henry J. Kaiser Family Foundation*. March 18, 2019. www.kff.org/health-costs/report/2018-employer-health-benefits-survey/.

14 Witters D. "U.S. Uninsured Rate Rises to Four-Year High." *Gallup.com*, Gallup. Jan. 23, 2019. news.gallup.com/poll/246134/uninsured-rate-rises-four-year-high.aspx.

15 Garfield R, et al. "The Uninsured and the ACA: A Primer - Key Facts about Health Insurance and the Uninsured amidst Changes to the Affordable Care Act." *The Henry J. Kaiser Family Foundation*. Jan. 25, 2019. https://www.kff.org/report-section/the-uninsured-and-the-aca-a-primer-key-facts-about-health-insurance-and-the-uninsured-amidst-changes-to-the-affordable-care-act-how-does-lack-of-insurance-affect-access-to-care/.

16 Coughlin T, et al. "Uncompensated Care for the Uninsured in 2013: A Detailed Examination." *The Henry J. Kaiser Family Foundation*. May 2014. https://www.kff.org/uninsured/report/uncompensated-care-for-the-uninsured-in-2013-a-detailed-examination/.

17 Collins SR, et al. "Americans' Confidence in Their Ability to Pay for Healthcare Is Falling." *To the Point*. The Commonwealth Fund. May 10, 2018. www.commonwealthfund.org/blog/2018/americans-confidence-their-ability-pay-health-care-falling.

18 Baker, L., et al. "Physician Practice Competition and Prices Paid by Private Insurers for Office Visits." JAMA. Oct. 2014. https://jamanetwork.com/journals/jama/fullarticle/1917436.

19 U.S. Department of Health and Human Services, U.S. Department of the Treasury, U.S. Department of Labor. "Reforming America's Healthcare System Through Choice and Competition." 2018. https://www.hhs.gov/sites/default/files/Reforming-Americas-Healthcare-System-Through-Choice-and-Competition.pdf.

20 "2020 Broadband Deployment Report." Federal Communications Commission. April 24, 2020. https://docs.fcc.gov/public/attachments/FCC-20-50A1.pdf.

21 2020 Broadband Deployment Report." Federal Communications Commission. April 24, 2020. https://docs.fcc.gov/public/attachments/FCC-20-50A1.pdf.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 49 of 51




22 Closing the Rural Health Connectivity Gap: How Broadband Funding Can Better Improve Care." Health Affairs Blog. April 1, 2015. doi: 10.1377/hblog20150401.045856. https://www.healthaffairs.org/do/10.1377/hblog20150401.045856/full/.

23 Patel V & Johnson C. "Trends in Individuals' Access, Viewing and Use of Online Medical Records and Other Technology for Health Needs: 2017-2018." ONC Data Brief, no. 48. Office of the National Coordinator for Health Information Technology: Washington DC. May 2019. https://www.healthit.gov/sites/default/files/page/2019-05/Trends-in-Individuals-Access-Viewing-and-Use-of-Online-Medical-Records-and-Other-Technology-for-Health-Needs-2017-2018.pdf.

24 HHS Press Office. "OCR Settles Eighth Investigation in HIPAA Right of Access Initiative." October 7, 2020. https://www.hhs.gov/about/news/2020/10/07/ocr-settles-eighth-investigation-hipaa-right-access-initiative.html.

25 Healthcare Payment Learning & Action Network. "APM Measurement: Progress of Alternative Payment Models 2019 Methodology and Results Report," 2019. http://hcp-lan.org/workproducts/apm-methodology-2019.pdf.

26 Healthcare Payment Learning & Action Network. "Measuring Progress: Adoption of Alternative Payment Models in Commercial, Medicare Advantage, and State Medicaid Programs," 2016. https://hcp-lan.org/workproducts/apm-measurement-final.pdf.

27 Public Law 114-255, 21st Century Cures Act. Enacted: December 13, 2016. https://www.congress.gov/114/bills/hr34/BILLS-114hr34enr.pdf.

28 Centers for Medicare & Medicaid Services. "CMS Interoperability and Patient Access final rule." May 1, 2020. https://www.cms.gov/Regulations-and-Guidance/Guidance/Interoperability/index.

29 U.S. Department of Health and Human Services, Office of the National Coordinator for Health IT. "ONC's Cures Act Final Rule." May 1, 2020. https://www.healthit.gov/curesrule/.

30 Information Blocking, 45 CFR § 171.103 (2020). https://www.law.cornell.edu/cfr/text/45/171.103.

31 "Strategy on Reducing Regulatory and Administrative Burden Relating to the Use of Health IT and EHRs". ONC.gov. ONC HIT Report. Feb. 2020. https://www.healthit.gov/sites/default/files/page/2020-02/BurdenReport_0.pdf.

32 "Strategy on Reducing Regulatory and Administrative Burden Relating to the Use of Health IT and EHRs". ONC.gov. ONC HIT Report. Feb. 2020. https://www.healthit.gov/sites/default/files/page/2020-02/BurdenReport_0.pdf.

Case 4:22-cv-12022-ADB Document 32-5 Filed 03/20/23 Page 50 of 51



33 "Understanding the Patient Experience to Improve Patient Access to Medical Records." *Health IT Buzz Blog*. Office of the National Coordinator for Health Information Technology. https://www.healthit.gov/buzz-blog/consumer/understanding-patient-experience-improvepatient-access-medical-records.

34 "Conceptualizing a Data Infrastructure for the Capture, Use, and Sharing of Patient-Generated Health Data in Care Delivery and Research through 2024". Draft White Paper for a PGHD Policy Framework. HealthIT.gov. 2017. https://www.healthit.gov/sites/default/files/Draft_White_Paper_PGHD_Policy_Framework.pdf.

35 U.S. Department of Health and Human Services, Office of the Chief Technology Officer. "The State of Data Sharing at the U.S. Department of Health and Human Services." Sep. 2018. https://www.hhs.gov/sites/default/files/HHS_StateofDataSharing_0915.pdf.

36 U.S. Department of Health and Human Services, U.S. Department of the Treasury, U.S. Department of Labor. "Reforming America's Healthcare System Through Choice and Competition." 2018. https://www.hhs.gov/sites/default/files/Reforming-Americas-Healthcare-System-Through-Choice-and-Competition.pdf.

37 "Regulatory Overload: Assessing the Regulatory Burden on Health Systems, Hospitals and Post-acute Care Providers". AHA. 2017. https://www.aha.org/sites/default/files/regulatory-overload-report.pdf.

38 "Strategy on Reducing Regulatory and Administrative Burden Relating to the Use of Health IT and EHRs" ONC.gov. ONC HIT Report. Feb. 2020. https://www.healthit.gov/sites/default/files/page/2020-02/BurdenReport_0.pdf.

The Office of the National Coordinator for
Health Information Technology

HealthIT.gov

Case 4:22-cv-12022-ADB Document 33 Filed 04/12/23 Page 1 of 5

23

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

2384CV02448-BLS1

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 1:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: CLERK

**PLAINTIFF JOHN DOE'S SUPPLEMENTAL REPLY IN SUPPORT OF MOTION TO REMAND**

In accordance with ECF Nos. 24–25, Plaintiff John Doe submits this supplemental reply addressing an issue specific to Plaintiff John Doe's lawsuit against UMass.

The Health Insurance Portability and Accounting Act ("HIPAA") presents no colorable defense to any claim Plaintiff has pleaded, including any of the Massachusetts common law claims alleged. *Contra* Defs.' Omnibus Opp. Pls.' Mot. Remand, ECF No. 17 ("Resp.") 21. Plaintiff does not allege that UMass violated HIPAA. *See* generally ECF No. 1-1 ("Compl.").[1] And no claim Plaintiff has alleged requires him to prove that "protected health information" under HIPAA was misused.

For example, Massachusetts's privacy statute provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." G.L. c 214, § 1B. Violations of the statute do not turn on whether there was an improper disclosure of protected

[1] All plaintiffs jointly explain why there is no federal colorable defense to the Massachusetts Wiretap Act claim. *See* Plaintiffs' Omnibus Reply Supporting their Motions to Remand at Part C.

health information. *See id.* Neither do Plaintiff's breach of fiduciary duty, breach of contract, or unjust enrichment claims require a showing that HIPAA protected information was disclosed by UMass. *See Hanover Ins. Co. v. Sutton*, 46 Mass. App. Ct. 153, 164 (1999) (fiduciary duty claim elements); *Stewart Title Guar. Co. v. Kelly*, 97 Mass. App. Ct. 325, 335 (2020) (unjust enrichment claim elements); *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690 (2016) (breach of contract elements). In short, whether UMass violated HIPAA has nothing to do with Plaintiff's burden. A defense that does not have any tendency to make a fact of consequence more or less probable is by definition irrelevant. *See* MASS. R. EVID. 401. In other words, HIPAA provides no defense at all here.

Nor does HIPAA preempt any claim pleaded against UMass.[2] *Contra* Resp. 22. HIPAA has an express preemption provision that sets ***the floor*** for protecting personal health information. *Hidalgo-Semlek v. Hansa Med., Inc.*, 498 F. Supp. 3d 236, 258, n. 40 (D.N.H. 2020). But "a state law [is] not [] preempted [where] there is no conflict with the analogous federal requirement; in such a situation, both laws can, and must, be complied with." 65 Fed. Reg. 82462, 82581 (Dec. 28, 2000); *see also* 45 C.F.R. § 160.202 ("[c]ontrary . . . . means . . . [a] covered entity or business associate would find it impossible to comply with both the State and Federal requirements; or . . . [t]he provision of State law stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of certain HIPAA and Health Information Technology for Economic and Clinical Health Act provisions). For just this reason, it is well-established that HIPAA does not preempt state law privacy claims that are commensurate or ***more stringent*** regarding the protections offered patients. *See R.K. v. St. Mary's Med. Ctr., Inc.*, 735 S.E.2d 715, 724 (W. Va. 2012) (collecting and analyzing cases and holding that "[c]ommon law tort claims based upon the

[2] UMass does not actually articulate in its response what statute allegedly preempts state law. *See* Resp. 22.

Case 4:22-cv-12022-ADB Document 33 Filed 04/19/23 Page 3 of 3

wrongful disclosure of medical or personal health information are not preempted by [HIPAA]"); *Turk v. Oiler*, 732 F. Supp. 2d 758, 771 (N.D. Ohio 2010) (state law more "stringent than HIPAA" was "not preempted, because it prohibits use or disclosure of health information when such use or disclosure would be allowed under HIPAA"); *Harmon v. Maury Cnty.*, No. 1:05-CV-0026, 2005 WL 2133697, at *4 (M.D. Tenn. Aug. 31, 2005) ("HIPAA does not completely preempt state law."). There is no conflict between any of the claims Plaintiff John Doe has pleaded and HIPAA, which means that there is no preemption.

Accordingly, the Court should order remand because UMass has failed to demonstrate that it has a "colorable defense" against any of Plaintiff's claims. *Rhode Island v. Shell Oil Prod. Co.*, 979 F.3d 50, 59 (1st Cir. 2020), *cert. granted, judgment vacated*, 210 L. Ed. 2d 830, 141 S. Ct. 2666 (2021) ("To succeed in their argument that federal-officer removal is proper" defendant must "assert a colorable federal defense to the suit.").

Dated: April 19, 2023

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**SWEENEY MERRIGAN LAW**
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**AHMAD, ZAVITSANOS & MENSING, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone

I HEREBY ATTEST AND CERTIFY ON
March 7, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Case 4:22-cv-12022-ADB Document 33 Filed 04/13/23 Page 4 of 5

(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for Plaintiff and Class Members***

Case 4:22-cv-12022-ADB Document 33 Filed 04/19/23 Page 5 of 5

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 19, 2023, copies of the foregoing reply were served on counsel of record via ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

24

2384CV02448-BLS1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
JUL 21 2023
ATTEST: [signature] CLERK

| | |
|---|---|
| JOHN DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022 |
| LISA COLLETON, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-40154 |
| JANICE PROGIN, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., et al.,<br><br>Defendants. | Case No.: 4:23-cv-10113-ADB |

**OMNIBUS REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO REMAND**

Despite the growing consensus across the country rejecting UMass's theory of federal officer jurisdiction, UMass insists that all those other cases—including a decision from the District of Massachusetts—got it wrong. UMass says that a private party who voluntarily complies with a regulatory scheme assists the government with its stated goals and should therefore enjoy the privilege of litigating state law claims in federal court. That argument is even less persuasive now than when UMass improvidently removed these cases just a few months ago.

UMass's argument for federal officer jurisdiction suffers from three fundamental defects. First, UMass performed no basic governmental task. That is, by facilitating the interception of communications between UMass and Facebook, Google, and other third parties through tracking pixels, it was not performing a task the federal government would have had to do in UMass's absence. Participating in regulatory programs does not count as "acting under" a federal officer. Moreover, UMass fails to point to a single regulatory direction that required UMass to install the Meta Pixel or to keep the installation of Meta Pixel and similar tracking technologies secret from website users.[1] Second, because no federal officer directed UMass to install the Meta Pixel or similar tracking technologies, the misconduct Plaintiffs allege does not "relate to" any official authority. Finally, UMass identifies no colorable federal defense to any state-law claims it faces, and it cites ***no*** authority whatsoever providing for any federal defense to any of Plaintiffs' claims.

In short, UMass fails to establish any of the three requirements under First Circuit precedent, which are each required to permit this Court to assert jurisdiction over the parties' disputes.[2] The Court should remand the three cases.

---

[1] For simplicity, Plaintiffs refer to the secret interceptions enabled by the Meta Pixel, but that does not change the discussion or analysis of the removal issues for Google Analytics and other tracking technologies implicated by Plaintiffs' complaints.

[2] On the very first page of its argument, UMass rewrites the First Circuit's test for whether a private party acts under a federal officer to support jurisdiction. Defs.' Omnibus Opp. Plas.' Mot. Remand ("Resp.") 9. The First Circuit does not follow the multi-factor test used by the Ninth Circuit, or any variation of it, as UMass impliedly argues throughout

Case 4:22-cv-12022-ADB Document 34 Filed 04/13/23 Page 3 of 28

**A. UMass was not "acting under" a federal officer's authority when it secretly installed the Meta Pixel.**

**1. Developing UMass's website for UMass's patients is not a basic governmental task that a federal officer would have done if UMass had not.**

UMass argues that it assisted the federal government to carry out the duties or tasks of a federal superior. Resp. 10. But it never identifies any basic governmental task that it completes as a substitute for the government. *See* Resp. 9–13. This omission is dispositive. To prevail on its federal officer jurisdiction theory, it is not enough that a private company be subject to some "subjection, guidance, or control" ***in general.*** Were that enough, practically all companies would be federal officers, given the breadth of federal regulations, which touch nearly all companies in some fashion. *See, e.g.*, *Doe v. Cape Cod Healthcare, Inc.*, No. 1:23-CV-10080, Elec. Order at ECF No. 10 (D. Mass. Jan. 25, 2023). Instead, to support federal officer jurisdiction, a company must "go[] beyond simple compliance with the law and help[] [federal] officers fulfill other basic governmental tasks." *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 153 (2007). That is, the relevant federal "subjection, guidance, or control" must relate to the private company's performance of a "basic governmental task"—a task that the federal officer would have been bound to do himself had such a task not been delegated to the private company. *See id.* at 153–54 ("Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war. Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform").

*Watson* draws the critical distinction between "regulation" and "delegation." *Id.* at 157 (finding removal improper where federal direction at issue "sounds to us like regulation, not

---

its response. Instead, the First Circuit requires ***each*** of the three elements be met. *Compare Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022) (three burdens for private party seeking removal), *with Cnty. San Mateo v. Chevron Corp.*, 32 F.4th 733, 759 (9th Cir. 2022) (laying out multi-factor analysis).

delegation"). The former does ***not*** support federal jurisdiction, while the latter ***may*** support jurisdiction if the other requirements of the removal statute are met.

Here, the "tasks" UMass attempts to identify reflect broad, aspirational, regulatory goals; they do not reflect the federal government's delegation to UMass of any truly basic governmental task. UMass argues that it is helping the government "build a culture of electronic health information" and "help[ing] digitize health information and healthcare." Resp. 11. These quotes—taken from sub-regulatory strategic plans rather than legislation or regulation—reflect classic ***regulatory*** goals; they do not explain how UMass's development of its website or digitization of medical records fulfill any basic governmental task. Moreover, UMass ignores the specific acts giving rise to liability here—the secret deployment of Meta Pixel and other tracking technologies on the UMass website. There is no suggestion that any federal officer had any duty to perform any action Plaintiffs describe in their complaints. Even Executive Order 13335, which UMass cites repeatedly throughout its response, does not include such obligations. *See* Resp. 12, 16 (Office of the National Coordinator of Health Information "***shall***, to the extent permitted by law, ***develop***, ***maintain***, and ***direct*** the ***implementation of a strategic plan to guide*** the nationwide implementation of interoperable health information technology") (emphasis added).

UMass tells the Court the government would have to build an electronic records system without UMass but then includes no citations that prove this conclusory remark. *See* Resp. 15–16 (citing Executive Order 13335, a Fifth Circuit opinion about a manufacturer of Agent Orange, and misquoting a strategic plan about "thirty-five federal entities that worked in concert to develop this [Strategic] Plan"). Similarly, it claims that the "development of a nationwide electronic health records infrastructure" is a "specific obligation or responsibility that would traditionally fall to the federal government, or that the government had otherwise assumed by statute," but never points

Case 4:22-cv-12022-ADB Document 34 Filed 04/13/23 Page 5 of 18

to any evidence that setting up such databases is a traditional responsibility of the government or something assumed by statute. Resp. 13 (quoting and comparing to *Quinto v. Regs. Univ. Cal.*, No. 3:22-cv-04429-JD, 2023 WL 1448050, at *3 (N.D. Cal. Feb. 1, 2023)). Without such evidence, the suggestion that the federal government traditionally creates databases of private health information borders on the absurd. More to the point, Plaintiffs' claims do not concern the development of "health records infrastructure"; instead, they relate to the secret deployment of tracking technologies on the UMass website. UMass offers nothing to show that the conduct at issue reflects any basic governmental task. UMass cannot show that it is doing something that the federal government must do in UMass's absence.

As a result, UMass is engaging in no more than the "voluntary and unilateral adoption of a practice that may be consistent in some respects with a nonbinding federal policy." *Cape Cod*, No. 1:23-CV-10080, Elec. Order at ECF No. 10. The Supreme Court is clear that this type of "help" or "assistance" is not at all what the removal statute encompasses. *Watson*, 551 U.S. at 152 ("the help or assistance necessary to bring a private person within the scope of the statute does ***not*** include simply ***complying*** with the law") (emphasis added).

In this regard, UMass's failure to meaningfully distinguish *Ohio State Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 622–23 (6th Cir. 2016) is glaring. Resp. 16. There, Humana was administering private health-insurance benefits to Medicare-eligible patients under contract with the Centers for Medicare & Medicaid Services ("CMS") in accordance with the Medicare Advantage program—otherwise known as Medicare Part C. *Humana Health Plan, Inc.*, 647 Fed. App'x at 620–21. UMass remarkably states that *Humana* "has nothing to do with the federal government using healthcare entities to fulfill the federal goal of a nationwide internet healthcare system." Resp. 16. The case, however, stands for the proposition that even when the

Case 4:22-cv-12022-ADB Document 34 Filed 04/19/23 Page 8 of 18

federal government contracts with a private party to fulfill the federal goal of ***administering Medicare, that was still not enough*** to be "acting under" a federal superior. Critical to this holding was the Sixth Circuit's answer to the question, "[D]o [Medicare Advantage Organizations] perform a job that the government would have to perform itself if it did not contract with private firms?" *Id.* at 624.

> We think not. If no health insurer chose to contract with CMS as an MAO, it is doubtful that the government would get into the business of offering its own MA plans. It certainly doesn't ***have*** to. More likely, it would fall back on traditional fee-for-service Medicare—which it must provide regardless.

*Id.* (bold added). Does UMass perform a job that the government would have to perform itself if it did not provide incentive payments to UMass? No. If UMass chose not to submit applications for incentive payments under the Meaningful Use Program, it is doubtful that the government would (or could) get into the business of creating and maintaining electronic health records for UMass's patients. It is even more doubtful that the government would secretly inject hidden code into a website causing the unauthorized disclosure of healthcare consumers' communications with social media and technology companies. UMass has pointed to no legal requirements suggesting the government would do so.

UMass is a regulated entity responding to federal incentives to make more money. It is not performing any basic governmental function that federal agents would perform in UMass's absence.

**2. Voluntary participation with regulatory programs is no different than complying with regulations.**

UMass repeats throughout its response that it is subject to detailed regulations and submits detailed reports for the federal government's alleged monitoring as if this were material. Resp. 9, 11, 15. This is entirely irrelevant and likely driven by a misreading of controlling authority. There is a clear distinction between federal contractors subject to detailed commands in connection with

Case 4:22-cv-12022-ADB Document 34 Filed 04/13/23 Page 7 of 18

performing some basic governmental task (who are "acting under" federal authorities) and private actors complying with detailed regulations in their industry (who are not).

*Watson* notes that certain federal ***contractors*** may be "acting under" a federal authority where the contracts provide detailed regulation, monitoring, or supervision. *Watson*, 551 U.S. at 153 ("[g]overnment contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the government is an unusually close one involving detailed regulation, monitoring, or supervision"). First Circuit precedent for certain federal contractors is the same. *See, e.g.*, *Moore*, 25 F.4th at 35–36 ("The Navy oversaw ***every aspect of the design, construction, maintenance, and modernization*** of the submarine, including the use of asbestos in the construction of the submarine. The undisputed record demonstrates that Moore's claims clearly 'relate to' Electric Boat's contracted work while 'acting under' the Navy.") (emphasis added); *see also Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129, 136 (D. Mass. 2009) ("Private military contractors sued in state court for design defects have also been brought within the ambit of the federal officer removal statute, ***but only under certain circumstances***.") (emphasis added).

*Watson* could not be clearer. No matter how detailed or demanding regulations imposed on a private entity are, in contrast to a federal contractor, a regulated entity is not "acting under" a federal superior when it follows regulations:

> The upshot is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

*Watson*, 551 U.S. at 153.

UMass points to no contract with the federal government to secretly install Meta Pixel without the consent of healthcare consumers visiting its website, or even set up its website in general or to digitize records. *See generally* Resp. Much less does UMass point to a contract that spells out "every aspect of the design, construction, [and] maintenance" of such activities. *See Moore*, 25 F.4th at 35–36. Its reliance on *UPMC* is misplaced because the relationship here is not "akin to a government-contractor relationship" without such a contract. Resp. 16–17 (citing *Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020)). The district court in *UPMC* failed to ask the question the *Humana* court answered negatively—whether the regulated party was performing a governmental function that federal agents would have otherwise had to perform. That failure explains —in part— why most courts have since declined to follow *UPMC*.

Ultimately, UMass's voluntary compliance with regulations to get incentive payments is still just compliance with regulations. Such compliance cannot support federal officer jurisdiction.

**3. UMass also failed to establish that it was subject to relevant guidance or control when installing the Meta Pixel on its website.**

Just as UMass's citations to sub-regulatory strategic plans do not support its argument that it performed a basic governmental function, UMass cites no authority to establish that the federal government told UMass to secretly install the Meta Pixel or other tracking technologies or to permit Facebook, Google, and other third parties secretly to intercept communications between healthcare consumers and UMass.

Unsurprisingly, no legislation or regulation requires UMass to install the Meta Pixel; there is certainly no regulation that requires it to do so secretly and without healthcare consumers' consent. UMass does not even attempt to argue that the government told them to install the Meta Pixel tool. *See* Resp. 9–22. UMass says the Meaningful Use Program "prescribes a specific framework and guidelines for providers to follow." Resp. 15. What do those "specific framework

Case 4:22-cv-12022-ADB Document 34 Filed 04/13/23 Page 9 of 18

and guidelines" direct a provider like UMass to do? UMass does not say. *Id.* Surely they do not indicate that UMass should inject hidden code into their website that forwards healthcare consumers' data to Facebook without their consent. *See id.*

The absence of any evidence of relevant direction or control makes UMass nothing like the contractor in *Moore*. *Contra* Resp. 10, 13–15, 17 (UMass comparing itself favorably to a manufacturer of submarines for the U.S. Navy). In *Moore*, the "Navy supervised Electric Boat's operations, had designated officials present at the Electric Boat shipyard to oversee Electric Boat's employees, and maintained a substantial presence at the shipyard, including offices, sleeping quarters, training centers, and other facilities." 25 F.4th at 33. What is more, the defendant there supported removal with the affidavit of a retired Rear Admiral who attested that the Navy "directed, controlled and approved any warnings relating to health or safety to its servicepersons such as [the plaintiff]." *Id.* In that failure to warn, negligence, and strict product liability lawsuit, the parties did not even dispute that the defendant was acting under a federal officer's authority. *Id.* at 34. Here, in contrast, UMass cannot point to any legislation, regulation, or other command that provides specific instructions for setting up and operating UMass's website, to say nothing of secretly installing the Meta Pixel.

UMass cannot be "acting under" a federal superior when it installed the Meta Pixel unless UMass establishes any relevant "subjection, guidance, or control" required UMass to secretly install the Meta Pixel. No such "subjection, guidance, or control" exists.

**4. Instead, UMass focuses on non-dispositive conduct in the First Circuit.**

1. *Payment from the government is not sufficient to establish UMass was "acting under" a federal officer.*

Rather than focus on anything material, UMass spends much of its response highlighting irrelevant aspects of its choice to comply with a voluntary regulatory program. For example,

Case 4:22-cv-12022-ADB Document 34 Filed 04/19/23 Page 10 of 18

UMass argues that receipt of an incentive payment is important in establishing that it was "acting under" a federal authority. Resp. 9–10, 13. This focus on payment stretches dicta from *Watson* much too far. *Compare Watson*, 551 U.S. at 156 ("[W]e have found no evidence of any delegation of legal authority from the FTC to the industry association to undertake testing on the Government agency's behalf. Nor is there evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement"), *with* Resp. 10 (incentives to UMass "reflect[] the 'payment' relationship *Watson* specifically identified as one that can satisfy the 'acting under' requirement").

*Watson* recognizes there may be contractor arrangements—that is, when the private party receives payments from the federal government—that may not support federal officer jurisdiction. *Watson*, 551 U.S. at 153 ("[g]overnment contractors fall within the terms of the federal officer removal statute, at least when the relationship between the contractor and the government is an unusually close one involving detailed regulation, monitoring, or supervision"). Courts in the First Circuit have recognized this too. *See Shell Oil,* 979 F. 3d at 59–60 (rejecting that oil companies were acting under a federal officer even though they had contracts to provide oil to government); *see also Holdren*, 614 F. Supp. 2d at 136 ("Private military contractors sued in state court for design defects have also been brought within the ambit of the federal officer removal statute, but only under certain circumstances.") (citation omitted).

The receipt of a payment, however, does not make one a contractor or even comparable to a contractor. Regulations often incentivize compliance either by imposing a monetary penalty on regulatory noncompliance or a monetary reward on regulatory compliance. Regulatory penalties and payments are two sides of the same coin. Indeed, as UMass's own authorities describe, the monetary incentives to which UMass cites will, over time, transition to monetary penalties,

underscoring the equivalence of regulatory incentives and penalties. *See also* C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health* (HITECH) Act, at p. 2 (CONG. RES. SERV. Apr. 27, 2009) ("Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified [electronic health records]."). In any event, payment is neither necessary nor sufficient to establish that a private party is "acting under" a federal authority for purposes of the statute. If it were, the federal government could not create financial incentives for various industries without simultaneously conferring federal jurisdiction over vast swaths of commercial conduct.

2. *Complying with "general auspices" of published regulation is not "acting under" a federal officer.*

UMass twice claims that the federal government "model[s] for providers" the use of third-party marketers like Facebook. Resp. 11, 15. UMass's passing references to such "modeled" behavior reflect a concession that the government did not tell UMass how to set up its website. "It is not enough to prove only that the 'relevant acts occurred under the general auspices of a federal office or officer' . . . ." *Hilbert v. Aeroquip, Inc.*, 486 F. Supp. 2d 135, 146 (D. Mass. 2007) (quoting *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F. Supp. 2d 1144, 1152 (D. Colo. 2002)). Imitating perceived government behavior does not demonstrate that the government directed UMass to secretly facilitate the interception of communications between UMass and healthcare consumers.

**5. UMass fails to distinguish the growing consensus among federal courts considering federal officer jurisdiction in similar data privacy cases.**

UMass relies heavily on *UPMC* and *Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). Resp. 10–12, 14–22. It is increasingly becoming clear that these cases are outliers and wrongly decided.

Case 4:22-cv-12022-ADB Document 34 Filed 04/19/23 Page 12 of 18

In addition to the recent Meta Pixel case Plaintiffs have already cited, which UMass fails to distinguish, just last month (and one week before UMass filed its response), yet another district court rejected a medical center's attempt to gain access to the federal courts based on voluntary compliance with the Meaningful Use Program. *Heard v. Torrance Mem. Medical Ctr.*, No. CV 22-09466 DSF, 2023 WL 2475544, *3 (C.D. Cal. March 13, 2023). There, the court held that the Meaningful Use Program "directions [defendant] points to are general regulations and public directives regarding the development of health information technology and an electronic health records infrastructure. Therefore removal is not justified by federal officer jurisdiction." *Id.*

Just last week, the Central District of California again remanded a Meta Pixel case to state court for the same reasons. *See Doe v. Torrance Memorial Medical Ctr.*, No. 2:23-cv-01237, 2023 WL 2916548 (C.D. Cal. Apr. 12, 2023). The exact same conclusion applies here, as the District of Massachusetts, the Eastern District of Missouri, and the Northern District of California have each concluded. *See Doe* ECF No. 29.

**B. UMass does not show that secretly embedding the Meta Pixel on its website "relates to" any official authority.**

No federal official authorized UMass to secretly install the Meta Pixel. *Supra* Part A. Since UMass did not perform this actionable conduct under color of ***any*** federal office, no matter how "broadly" one reads the words "relating to," none of the three cases filed against UMass is "for or relating to any act under color of ***such*** office." 28 U.S.C. 1442(a)(1) (emphasis added).

UMass tries to avoid this inescapable fact by relying on *UPMC* and *ProMedica*. Resp. 19–20. These cases are misguided. *Supra* Part A. Without them, UMass can point to no other federal superior it allegedly acted under to secretly install the Meta Pixel. As a result, the actionable conduct does not "relate to" any act under color of federal office.

For a related reason, UMass's unsuccessful attempt to distinguish *Shell* is illuminating. Resp. 20. Again touting *UPMC*, UMass argues that the actionable conduct in the Plaintiffs' cases is website management and marketing strategies, which it says relates to the Meaningful Use Program. *Id.* But none of the plaintiffs seeks to hold UMass liable for website management and marketing strategies. They seek to hold UMass liable for secretly installing the Meta Pixel. This is just like the state of Rhode Island not seeking to hold Shell liable for distribution or marketing on the Naval bases, but rather for damaging the environment and engaging through a misinformation campaign. *Shell Oil*, 979 F.3d at 60. UMass fails to acknowledge that if *UPMC* had been decided in the First Circuit after *Shell*, it would have misapplied controlling authority.

Similarly, UMass seeks removal by aggressively recasting Plaintiffs' claims as challenging the use of tracking technologies like Meta Pixel generally rather than the ***secret*** use of such technologies. UMass ignores and fails to distinguish two decisions from this District that Plaintiffs cite, which draw this precise distinction in the context of the federal removal statute. *See Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020) (rejecting defense attempt to convert claim arising from deception concerning fossil fuels into a claim challenging the sale fossil fuels ***in general***, similar to how UMass ignores that Plaintiffs' claims arise from the ***secret*** use of tracking technologies); *Holdren*, 614 F. Supp. 2d at 140, 143, 150 (rejecting federal officer removal where the defendant attempted to recast plaintiff's asbestos failure to warn claims as claims challenging asbestos manufacture generally). This Court should likewise reject UMass's efforts to obtain removal by mischaracterizing Plaintiffs' claims.

**C. UMass fails to assert any colorable federal defense.**

UMass agrees that it ***must*** have a colorable federal defense to the Plaintiffs' state law claims. *See* Resp. at 21. UMass also agrees that a purported federal defense is not colorable if it is "immaterial and made solely for the purpose of obtaining jurisdiction or wholly insubstantial and

Case 4:22-cv-12022-ADB Document 34 Filed 04/19/23 Page 14 of 18

frivolous." *Id.* at 21. Here, UMass asserts that HIPAA provides them a federal defense solely to obtain jurisdiction; the purported defense is wholly insubstantial and frivolous.

1. **Plaintiffs do not have to prove that any secretly intercepted information was protected health information under HIPAA.**

The ***only*** purported colorable federal defense UMass asserts in its Notices of Removal in *Progin* and *Colleton* is that "the information purportedly disclosed . . . is outside the purview of protected health information as defined by the Health Information Portability and Accountability Act [HIPAA]." *Progin* Notice at ¶ 41, and *Colleton* Notice at ¶ 39. UMass makes this same assertion in the *Doe* Notice at ¶ 39.[3] This is no defense at all.

The Complaints in the three removed cases allege UMass violated the Massachusetts Wiretap Act, G.L. c. 272 § 99. Violation of the Massachusetts Wiretap Act is the only claim made in the single-count Complaints in *Progin* and *Colleton.* That statute expressly prohibits the secret interception of "***any*** wire or oral communication." *Id.* § 99(B)(4) (emphasis added). As stated in the Complaint in *Progin*: "***Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Act applies to all interceptions, regardless of the nature or the substance of the communications intercepted.***" *Progin* Complaint ¶ 6 (emphasis added). Plaintiffs simply do not have to prove secretly intercepted communications concerned protected health information to prevail on the Massachusetts Wiretap Act claim.

Tellingly, UMass fails to cite ***any*** authority—from this circuit or elsewhere—holding that HIPAA confers a defense (either direct or affirmative) to any of the claims Plaintiffs assert here. *See* Resp. 21–22. UMass cites without elaboration to *Smith v. Facebook, Inc.,* 262 F. Supp. 3d 943

[3] UMass also asserts in *Doe* a purported federal defense of preemption of one common law claim asserted in Doe. *See* ECF No. 1 at ¶ 40. No common law claims are asserted in *Progin* or *Colleton.*

Case 4:22-cv-12022-ADB Document 34 Filed 01/19/23 Page 15 of 18

(N.D. Cal. 2017), but does not address Plaintiffs' discussion of *Smith*, in which they explain that HIPAA was potentially relevant in *Smith* because the plaintiffs there took the position that Facebook had to meet a stricter disclosure standard under HIPAA. *Compare Smith*, 262 F. Supp. 3d at 954–56, *with* Resp. 21–22. In contrast, here, no Plaintiff invokes HIPAA either as part of their proof for their claims or to respond to any defense UMass could raise. *See, e.g.*, *Doe* ECF No. 1-1 at ¶¶ 162–244; *Progin* ECF No. 15 at 7–8. HIPAA could not exist and Plaintiffs' claims would still be viable. Compliance with HIPAA is therefore hardly material to any of the claims.

**2. HIPAA does not preempt any of the Plaintiffs' claims.**

UMass pays lip service to preemption in the very last paragraph of their memorandum without even identifying what federal statute they claim preempts any state law claims here and without citing ***any*** case law that would support a "colorable" argument for preemption. *See* Resp. 22 (citing case about claim for fraudulent misrepresentation to the Food and Drug Administration being preempted by the Food, Drug, and Cosmetic Act). UMass also ignores that it never asserted preemption as a purported federal defense to the Massachusetts Wiretap Act claims in any of their three Notices of Removal.[4] Indeed, UMass's Notices of Removal in *Progin* and *Colleton* do not mention preemption at all.

Finally, UMass essentially ignores Judge Stearns' decision in *Cape Cod*, in which he emphatically rejected the notion that federal law preempts state law claims like those here. As Judge Stearns held:

> The touchtone of preemption of a state common-law or statutory claim is a clear indication of Congressional intent. *Mendes v. Medtronic, Inc.*, 18 F, 3d 13, 16 (1st Cir. 1994). This is especially true when federal law or policy is said to entrench on matters historically

[4] UMass asserts in the Notice of Removal in *Doe* a purported federal defense of preemption, but only of the common-law claim of invasion of privacy asserted in *Doe*, none of which are asserted in *Progin* or *Colleton*. The Plaintiff Doe will respond to UMass's purported preemption federal defense in that case in the *Doe* case specific reply memorandum authorized by the Court. *Doe* ECF Nos. 24–25.

Case 4:22-cv-12022-ADB Document 34 Filed 04/19/23 Page 16 of 18

> committed to the police powers of the state. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S, 218, 230 (1947). Here, Congress has given no whiff of a suggestion that the 'Meaningful Use Program' was created to displace the Massachusetts Wiretap Statute, the Massachusetts Privacy Act, or state common-law claims . . . .

No. 1:23-cv-10080, slip op. at ECF No. 10; *see also Doe* ECF No. 29-2; *Progin* ECF No. 15-1. UMass utterly fails to set forth a colorable federal defense of preemption. It is proffered here "solely for the purpose of obtaining jurisdiction" and is "wholly insubstantial and frivolous." Resp. 21.

UMass's curt treatment of the federal colorable defense requirement is notable. "It is only the assertion of a colorable federal defense that justifies the federal court's limited Article III jurisdiction in these cases." *Holdren*, 614 F. Supp. 2d at 140. That UMass could barely be bothered to engage with this Constitutional requirement reflects how far afield it is from securing access to the federal courts. The Court should send these lawsuits back to the state courts where they belong.

## CONCLUSION

UMass alternatively misapplies or ignores First Circuit caselaw and champions two unpublished out-of-circuit district court decisions in its response which are incompatible with controlling authority. Ultimately, UMass's decision to secretly install and use the Meta Pixel was a private commercial decision, not the performance of a basic governmental task. The claims in the underlying complaints relate to UMass's private decision, and there is no federal defense for UMass's misconduct. Plaintiffs jointly ask for all cases to be remanded.

Case 4:22-cv-12022-ADB Document 34 Filed 04/19/23 Page 17 of 18

Dated: April 19, 2023

Respectfully submitted,

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
**Sweeney Merrigan Law**
268 Summer St. LL Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
**Ahmad, Zavitsanos & Mensing, PLLC**
1221 McKinney, Suite 2500
Houston, Texas 77010
(713) 655-1101 -Phone
(713) 655-0062 – Fax
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
**Keller Postman LLC**
150 N. Riverside Plaza Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

***Attorneys for John Doe***

*/s/ William P. Doyle III*
William Patrick Doyle III, BBO #556999
**COLONNA, DOYLE AND SIMEOLOA**
26 Main St, 3rd Floor
Lynnfield, MA 01940
(781) 245-1127
bill@colonna-doyle.com

Nicholas A. Coulson

Lance Spitzig
**LIDDLE SHEETS COULSON P.C.**
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
ncoulson@lsccounsel.com
lspitzig@lsccounsel.com

***Counsel for Lisa Colleton***
*/s/ Edward F. Haber*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
**SHAPIRO HABER & URMY LLP**
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Janice Progin***

**CERTIFICATE OF SERVICE**

I hereby certify that, on April 19, 2023, a copy of this reply was filed electronically and served on all counsel of record via ECF:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Case 4:22-cv-12022-ADB Document 35 Filed 05/15/23 Page 1 of 3

25

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

~~2285CV01205-D~~
2384CV02448-BLS

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**MOTION FOR ADMISSION PRO HAC VICE OF SARA AGUINIGA**

The undersigned moves this Court, pursuant to Local Rule 83.5.3 of the Rules of this Court, for the *pro hac vice* admission of Attorney Sara Aguiniga of Keller Postman LLC as co-counsel for Plaintiffs in this matter. This motion is supported by the certification of Ms. Aguiniga. In support of this motion, the undersigned attorney states as follows:

1. Ms. Aguiniga is a reputable member in good standing for the jurisdiction in which she has been admitted to practice.
2. Ms. Aguiniga has a business address of 1100 Vermont Avenue, N.W., 12th Floor, Washington, District of Columbia, 20005. Her telephone number is (202) 918-1123.
3. Ms. Aguiniga is a member in good standing of the Bar of the District of Columbia. *See* Declaration of Sara Aguiniga.
4. Ms. Aguiniga is familiar with the applicable provisions of the Local Rules of the United States District Court for the District of Massachusetts. *See* Aguiniga Decl. Ms. Aguiniga will comply with all applicable rules of this Court including Local Rules.

Case 4:22-cv-12022-ADB Document 35 Filed 05/15/23 Page 2 of 3

5. Pursuant to Rule 83.5.3 of the Local Rules of the United States District Court for the District of Massachusetts, I am a member of this Court's bar in good standing and I have also filed an appearance in this action.

6. Attorney Jonathan T. Merrigan is actively associated with Ms. Aguiniga in the representation of Plaintiffs, and it is anticipated that upon her admission *pro hac vice*, Ms. Aguiniga will serve as co-counsel in the above-captioned action.

Plaintiffs respectfully request that Sara Aguiniga be admitted to practice before this Court *pro hac vice* for the purpose of serving as co-counsel for Plaintiffs in the above-captioned matter.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: May 15, 2023

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Case 4:22-cv-12022-ADB Document 35 Filed 05/15/23 Page 3 of 3

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)**

Counsel for Plaintiff certifies that they conferred with counsel for Defendant on May 15, 2023, regarding this motion and no attorneys indicated an objection.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 15th day of May 2023, a true and correct copy of the foregoing document has been served upon all counsel of record via CM/ECF.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

2384CV02448-BLS1
~~2285CV01205-D~~

| | |
|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | Case No.: 4:22-cv-12022<br><br>[Trial Court of Massachusetts, The Superior Court, Worcester County, Docket No. 2285CV01205D] |

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**DECLARATION OF SARA AGUINIGA**

I, Sara Aguiniga declare as follows:

1. I am an attorney at Keller Postman, 1100 Vermont Avenue, N.W., 12th Floor, Washington, District of Columbia 20005. My telephone number is (202) 918-1123. I am over 21 years of age and am competent to testify on my own behalf.

2. I am a member of good standing of the Bar of the District of Columbia.

3. I have never been suspended or disbarred in the Bar of the District of Columbia, and there are no disciplinary actions pending against me in any court.

4. I am familiar with the Local Rules of the United States District Court for the District of Massachusetts.

5. If the Court allows the instant Motion for me to appear *pro hac vice* in the above-captioned matter, I will serve as co-counsel to Plaintiffs in this proceeding, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and to the disciplinary action and the civil jurisdiction of this Court in all respects as if I were regularly admitted.

6. A member of the bar in this Court is advancing the present motion and has filed a notice of appearance in this case.

Respectfully Submitted:

Sara Aguiniga
**Keller Postman LLC**
1100 Vermont Avenue, N.W., 12th Floor
Washington, District of Columbia, 20005
Tel.: (202) 918-1123

Dated: May 9, 2023

Case 4:22-cv-12022-ADB Document 38 Filed 07/13/23 Page 1 of 10

26

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS 2384CV02448-BLS1

JOHN DOE, individually and on behalf of himself and all others similarly situated,

Plaintiff,

v.

UMASS MEMORIAL HEALTH CARE, INC.,

Defendant.

Civil Action No. 22-cv-12022-ADB

*Related Cases:*

Civil Action No. 22-cv-40154-ADB
Civil Action No. 23-cv-10113-ADB

FILED
JUL 21 2023
ATTEST: [signature] CLERK

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

John Doe ("Plaintiff") filed this putative class action in Massachusetts Superior Court against UMass Memorial Health Care, Inc. ("Defendant") on October 24, 2022. [ECF No. 1-1 ("Compl.")]. Plaintiff alleges that Defendant shared communications about his private medical information with Facebook without Plaintiff's knowledge or consent, and raises a claim under the Massachusetts Wiretap Act, Mass. Gen. Laws ch. 272, § 99, as well as claims for invasion of privacy, Mass. Gen. Laws ch. 214, § 1B, breach of fiduciary duty of confidentiality, breach of express contract, breach of implied contract, and unjust enrichment. [Id. ¶¶ 162–244].

Defendant removed the case to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). [ECF No. 1 ("Notice of Removal")]. Presently before the Court is Plaintiff's motion to remand back to state court pursuant to 28 U.S.C. § 1447. [ECF No. 13]. Two related putative class actions were filed against Defendant, also in Massachusetts Superior Court, which Defendant also removed to this Court pursuant to 28 U.S.C. § 1442(a)(1). See

[Colleton v. UMass Mem'l Health Care, Inc., No. 22-cv-40154 (D. Mass.) ("Colleton Action"); Colleton Action, ECF No. 1 ("Colleton Notice of Removal"); Colleton Action, ECF No. 1-1 ("Colleton Compl."); Progin v. UMass Mem'l Health Care, Inc., No. 23-cv-10113 (D. Mass.) ("Progin Action"); Progin Action, ECF No. 1 ("Progin Notice of Removal"); Progin Action, ECF No. 1-3 ("Progin Compl.")].

Plaintiffs in the other actions also filed motions to remand. [Colleton Action, ECF No. 13; Progin Action, ECF No. 14]. Defendant filed an omnibus response to the three motions to remand, [ECF No. 31], and Plaintiffs, in turn, filed an omnibus reply in further support of their motions, [ECF No. 34].

For the reasons set forth below, Plaintiff's motion to remand, [ECF No. 9], is GRANTED.

## I. BACKGROUND[1]

Defendant is a healthcare service provider that developed, owns, and/or operates a website, www.ummhealth.org (the "Website"), which offers a wide range of healthcare services and a patient portal. [Compl. ¶¶ 16–17; Colleton Compl. ¶¶ 2, 14; Progin Compl. ¶ 19]. Plaintiff is a patient of Defendant's and a user of the Website. [Compl. ¶¶ 11, 86]. The Website collects various types of information about its users, including the type of medical treatment an individual is seeking, health conditions, diagnoses, and procedures. [Compl. ¶¶ 76–77]; see also [Colleton Compl. ¶ 17 (describing information Website allegedly collects, including type of medical treatment and the names of physicians with whom individuals schedule appointments);

[1] For purposes of this Order, the relevant facts are drawn from the three Complaints, the three Notices of Removal, and Defendant's briefing, [ECF No. 31]. Additionally, the Court takes judicial notice of various public documents relating to the Meaningful Use Program, further discussed infra. See Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir. 2008).

Progin Compl. ¶ 46 (describing information Website allegedly collects, including individuals' medical conditions and the doctors they may be seeing)]. The Website uses a code analytics tool called "Facebook Pixel,"[2] [Compl. ¶ 76; Colleton Compl. ¶ 24; Progin Compl. ¶ 60], which tracks the actions of Website users and sends users' Website communications to Facebook, [Compl. ¶ 77; Colleton Compl. ¶ 27; Progin Compl. ¶¶ 70–74]. Website users like Plaintiff did not know of or consent to the sharing of their communications to a third-party. [Compl. ¶¶ 88, 90; Colleton Compl. ¶¶ 40, 45; Progin Compl. ¶ 32].

In its Notice of Removal, Defendant asserts that it optimizes and increases traffic to its Website in compliance with the Meaningful Use Program[3] ("Meaningful Use Program" or "Program"). [Notice of Removal ¶ 26; Colleton Notice of Removal ¶ 26; Progin Notice of Removal ¶ 28]. The Meaningful Use Program implements provisions of the American Recovery and Reinvestment Act of 2009. Medicare and Medicaid Programs; Elec. Health Rec. Incentive Program, 75 Fed. Reg. 144, 44,314 (July 28, 2010). The Program was established in 2010 by the Department of Health and Human Services ("HHS") to promote the use of certified electronic health record technology in a meaningful way as "one piece of a broader [health IT] infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." [ECF No. 31 at 10 (quoting Medicare and Medicaid Programs; Elec. Health Rec. Incentive Program, 75 Fed. Reg. at 44,321)].

Also in the American Recovery and Reinvestment Act of 2009, Congress established the Office of the National Coordinator ("ONC") within HHS, and charged the ONC with various

[2] Facebook Pixel is now called Meta Pixel.

[3] Although the Meaningful Use Program was renamed the Promoting Interoperability Program in 2018, the parties all use the Program's original name. For consistency, the Court does the same.

Case 4:22-cv-12022-ADB Document 38 Filed 07/13/23 Page 4 of 10

obligations, including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect to each of the following: "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(c)(3)(A). The ONC provides guidance for complying with the Program, including a model website that uses third-party marketers such as Facebook and Google. [Notice of Removal ¶¶ 20–21; Colleton Notice of Removal ¶¶ 20–21; Progin Notice of Removal ¶¶ 22–23]. The Program provides for incentive payments of up to two percent for providers who reach certain levels of engagement with electronic health record use through providers' patient portals. [Notice of Removal ¶ 18; Colleton Notice of Removal ¶ 18; Progin Notice of Removal ¶ 20]. In the future, these payments will phase out and transition into penalties for providers that do not comply. [ECF No. 31 at 10]. Defendant submits reports to the Center for Medicare and Medicaid Services ("CMS") on its involvement in the Program, specifically related to the patient portal and patients' use of the portal. [Id. at 12].

Defendant asserts that in maintaining the Website, it is acting under the authority of the federal government. [Notice of Removal ¶¶ 26–31; Colleton Notice of Removal ¶¶ 26–31; Progin Notice of Removal ¶¶ 28–33]. Specifically, Defendant claims that through the Meaningful Use program the federal government "incentiviz[es], regulat[es], monitor[s], and supervis[es]" Defendant's use and promotion of its Website "in order to meet the federal

government's national priority of interoperable health information technology." [Notice of Removal ¶ 26; Colleton Notice of Removal ¶ 26; Progin Notice of Removal ¶ 28].

## II. LEGAL STANDARD

Federal courts are courts of limited jurisdiction, "possess[ing] only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). If the Court lacks subject-matter jurisdiction over a removed action, the action must be remanded to state court. 28 U.S.C. § 1447(c).

As pertinent here, a case filed in state court may be removed to federal court pursuant to 28 U.S.C. § 1442(a)(1), which confers jurisdiction to federal courts over actions against the "United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." As the Supreme Court has explained:

> Historically, removal under § 1442(a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties. The act of removal permits a trial upon the merits of the state-law question free from local interests or prejudice.

Arizona v. Manypenny, 451 U.S. 232, 241–42 (1981) (citations omitted).

Under § 1442(a)(1), Defendant bears the burden of establishing that (1) it is "acting under" the authority of a federal officer; (2) the charged conduct was carried out "for or relating to" the asserted official authority; and (3) Defendant has a "colorable federal defense." Moore v. Elec. Boat Corp., 25 F.4th 30, 34 (1st Cir. 2022).

Generally, "[b]ecause removal to federal court deprives the state court of jurisdiction, 'removal statutes are to be narrowly construed.'" Massachusetts v. Libertad, No. 22-cv-10131, 2022 WL 479799, at *1 (D. Mass. Feb. 16, 2022) (quoting Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 76 (1st Cir. 2009)). Conversely, the Supreme Court held that the "acting under" the

authority of a federal officer language in § 1442(a)(1) should be "liberally construed," while also cautioning that this "broad language is not limitless." Watson v. Philip Morris Cos., 551 U.S. 142, 147 (2007) (quoting Colorado v. Symes, 286 U.S. 510, 517 (1932)).

## III. DISCUSSION

Plaintiff argues that the Court must remand this case back to state court because Defendant has failed to show that the Court has subject-matter jurisdiction pursuant to the federal officer removal statute. [ECF No. 10]. While Plaintiff concedes that Defendant is a "person" under the statute, Plaintiff contends that Defendant (1) was not "acting under" any federal authority with regard to the charged conduct and (2) that its conduct was not "related to" a federal office. [Id. at 11, 22]. Defendant asserts that each of these elements is satisfied and that this Court therefore has subject-matter jurisdiction. [ECF Nos. 1, 31].

"'Acting under' [the authority or direction of a federal officer] connotes 'subjection, guidance, or control' and involves 'an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" Rhode Island v. Shell Oil Prod. Co., 979 F.3d 50, 59 (1st Cir. 2020) (quoting Watson, 551 U.S. at 152), summarily vacated on other grounds, 141 S. Ct. 2666 (2021) (Mem.). Such help or assistance "does not include simply complying with the law." Watson, 551 U.S. at 152 (emphasis omitted) (noting that taxpayers who fill out complex tax forms or airline passengers who obey federal regulations may be assisting federal authorities but would not fall within the scope of the statute). A private firm's compliance with federal regulations does not alone constitute "acting under" a federal authority, even if the firm's activities are "highly supervised and monitored." Id. at 153 (noting that, if the rule were otherwise, the scope of the statute would be expanded considerably to include, potentially, "state-court actions filed against private firms in many highly regulated industries"); see also Mennonite Gen. Hosp., Inc.

Case 4:22-cv-12022-ADB Document 38 Filed 07/13/23 Page 7 of 10

v. Molina Healthcare of P.R., 319 F. Supp. 3d 587, 595 (D.P.R. 2018) (finding that "Defendants have not established that they were in any way acting under the direction of a federal superior" because although "Defendants are certainly subject to detailed federal regulations and . . . may even be 'highly supervised and monitored[,]' . . . Defendants have not shown anything to indicate that they 'assist, or . . . help carry out, the duties or tasks of the federal superior' with respect to the Medicaid program." (emphasis omitted) (quoting Watson, 551 U.S. at 153)).

Delegated duties do fall under the statute, but "neither Congress nor federal agencies normally delegate legal authority to private entities without saying that they are doing so." Watson, 551 U.S. at 157. As relevant here, government contractors may be found to be "acting under" federal officers' authority when contractors go "beyond simple compliance with the law and help[] officers fulfill other basic government tasks," id. at 153, such as producing items that the government needs, like products used to fight a war, id. at 153–54 (citing Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387 (5th Cir. 1998), holding modified by Latiolais v. Huntington Ingalls, Inc., 951 F.3d 286 (5th Cir. 2020)). These tasks are obligations that "the [g]overnment itself would have had to perform" if the contractors did not. Id. at 154. As in, if the government did not contract for items used in a war effort, it would be required to make those items itself. In contrast, "receiving incentive payments for acting in a way that promotes a broad federal interest—in an area outside the traditional responsibility of the federal government—is not the same as being contracted to carry out, or assist with, a basic governmental duty." Quinto v. Regents of Univ. of Cal., No. 22-cv-04429, 2023 WL 1448050, at *2 (N.D. Cal. Feb. 1, 2023).

Defendant asserts that it is assisting the federal government in its goal of building a nationwide electronic health records system. [ECF No. 31 at 14]. Defendant further contends

Case 4:22-cv-12022-ADB Document 38 Filed 07/13/23 Page 8 of 20

that the federal government has delegated duties to it in line with a contractor relationship. [Id. at 22]. In support of these contentions, Defendant points to the fact that it receives incentive payments, makes efforts to increase the use of the patient portal and Website, and reports user metrics to CMS, all in furtherance of its compliance with the Meaningful Use Program. [Id. at 15–16 (citing Doe I v. UPMC, No. 20-cv-00359, 2020 WL 4381675 (W.D. Pa. July 31, 2020))]. The Court disagrees.

To begin, the fact that the federal government provides incentive payments to Defendant for its participation in the Program does not create a contractor relationship in and of itself. If that were the case, "the federal officer removal statute would sweep into the federal courts" countless cases involving private entities' receipt of incentive payments or incorporation of practices "consistent with a policy promoted by the federal government as socially desirable." Doe v. Cape Cod Healthcare, Inc., No. 23-cv-10080, ECF No. 10 (D. Mass. Jan. 25, 2023). Moreover, the fact that incentive payments will, in the future, shift to penalty payments if a provider fails to comply with the Meaningful Use Program further suggests that this is a regulation rather than a government contract.

Defendant does not produce a product that the government needs, nor is it otherwise fulfilling a basic government task. Although the ONC has an obligation to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology," [ECF No. 31 at 8], participation in the Meaningful Use Program serves broad federal goals, not basic government functions, see Doe v. Hoag Mem'l Presbyterian Hosp., No. 23-cv-00444, 2023 WL 3197716, at *3 (C.D. Cal. May 2, 2023); Crouch v. Saint Agnes Med. Ctr., No. 22-cv-01527, 2023 WL 3007408, at *5 (E.D. Cal. Apr. 19, 2023); Quinto, 2023 WL 1448050, at *2. The federal government does not have an obligation to

create a health information infrastructure and, if hospital systems like Defendant chose not to maintain patient portals, like the Website, the government would not be required to create its own. See Watson, 551 U.S. at 154; Doe, I v. BJC Health Sys., No. 22-cv-00919, 2023 WL 369427, at *4 (E.D. Mo. Jan. 10, 2023).

Additionally, although Defendant submits reports to CMS and relied on guidance from the ONC in creating the Website, Defendant has not shown that the federal government exercised the type of tight control that would bring Defendant's conduct within the scope of the statute. Cf. Moore, 25 F.4th at 35–36 (finding that a contractor was "acting under" a federal authority in building a submarine because "[t]he Navy oversaw every aspect of the design, construction, maintenance, and modernization of the submarine"). Further, the Court finds there has been no formal delegation of any of the federal government's duties to Defendant. Compare Watson, 551 U.S. at 156 (finding that the FTC's provision of testing specifications, inspection and supervision of the testing laboratories, and prohibition of statements in advertising were merely regulations that did not constitute formal delegation), with Camacho v. Autoridad de Telefonos de P.R., 868 F.2d 482, 486 (1st Cir. 1989) (finding that defendants were acting under the authority of the federal government because they "were acting under express orders, control and directions of federal officers" when wiretapping).

In sum, although Defendant's conduct may assist the federal government in achieving a broad goal, the Court finds that its participation in the Meaningful Use Program is merely compliance with federal law and is not sufficient to bring it within the scope of the federal officer statute. See Watson, 551 U.S. at 153. The Court recognizes, as Defendant points out, that some courts have found removal appropriate in similar Meaningful Use Program cases. See generally UPMC, 2020 WL 4381675; Doe v. ProMedica Health Sys., Inc., No. 20-cv-01581,

2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). The Court nonetheless joins the number of other courts that have declined to adopt this broad interpretation of the statute in this context. See generally Cape Cod Healthcare, Inc., No. 23-cv-10080, ECF No. 10; BJC Health Sys., 2023 WL 369427; Hoag Mem'l Presbyterian Hosp., 2023 WL 3197716; Crouch, 2023 WL 3007408; Quinto, 2023 WL 1448050.

The Court therefore finds that Defendant has failed to establish that it was "acting under" any federal authority when it engaged in the charged conduct, and, as such, has failed to establish that this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1442(a)(1).[4] In the absence of any other basis for subject-matter jurisdiction, this case must be remanded to state court.

## IV. CONCLUSION

Accordingly, Plaintiff's motion to remand, [ECF No. 9], is GRANTED and this matter is remanded to state court for further proceedings.

**SO ORDERED.**

July 13, 2023

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ________
Assistant Clerk

[4] Because Defendant has failed to meet its burden on the "acting under" element of the analysis, the Court need not address the remaining elements.

27

~~2385CV01305-D~~

2384CV02448-BLS1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED

JUL 21 2023

ATTEST: [signature] CLERK

John Doe
*individually and on behalf of all others similarly situated*
Plaintiff

v.

Civil Action No. 4:22-cv-12022

UMass Memorial Health Care, Inc.
Defendant

**ORDER OF REMAND**

Burroughs, DJ

In accordance with this Court's Memorandum and Order dated July 13, 2023, GRANTING the Plaintiffs' Motion to Remand, it is hereby ordered that this case be REMANDED to Worcester County Superior Court for further proceedings.

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

BY THE COURT,

/s/ Caetlin McManus

Deputy Clerk

DATED: July 13, 2023

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

Certified to be a true and correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts
By: [signature]
Deputy Clerk

Date: 07/13/2023

28

CLOSED

2384CR02448-BLS1

# United States District Court
# District of Massachusetts (Worcester)
# CIVIL DOCKET FOR CASE #: 4:22-cv-12022-ADB

Doe v. UMass Memorial Health Care Inc.
Assigned to: Judge Allison D. Burroughs
Case in other court: Worcester Superior Court, 2285CV01205
Cause: 28:1441 Notice of Removal

Date Filed: 11/28/2022
Date Terminated: 07/13/2023
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**John Doe**
*individually and on behalf of all others similarly situated*

represented by

**Jonathan Tucker Merrigan**
Sweeney Merrigan Law
268 Summer Street, LL
Boston, MA 02210
617-391-9001
Email: tucker@sweeneymerrigan.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Seth A. Meyer**
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
312-741-5220
Email: sam@kellerlenkner.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David Edward Warden**
Ahmad Zavitsanos & Mensing, PLLC
1221 McKinney St.
Suite 2500
Houston, Suite 2500
Houston, TX 77010
713-655-1101
Fax: 713-655-0062
Email: dwarden@azalaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Foster Calhoun Johnson**
Ahmad, Zavitsanos & Mensing, PLLC

FILED
JUL 21 2023
ATTEST: CLERK

1221 McKinney St.
Suite 2500
Houston, TX 77010
713-655-1101
Fax: 713-655-0062
Email: fjohnson@azalaw.com
*ATTORNEY TO BE NOTICED*

**Nathan Campbell**
Ahmad, Zavitsanos & Mensing PLLC
1221 McKinney
Ste 2500
Houston, TX 77010
713-655-1101
Fax: 713-655-0062
Email: ncampbell@azalaw.com
*ATTORNEY TO BE NOTICED*

**Sara Aguiniga**
Keller Postman
1100 Vermont Avenue, N.W.
Ste 12th Floor
Washington, DC 20005
202-918-1123
Email: sara.aguiniga@kellerpostman.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UMass Memorial Health Care Inc.** represented by

**Paul G. Karlsgodt**
Baker & Hostetler LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
303-861-0600
Fax: 303-861-7805
Email: pkarlsgodt@bakerlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James H. Rollinson**
Baker & Hostetler LLP
1900 East 9th Street
Cleveland, OH 44114
216-861-7075
Fax: 216-696-0740
Email: jrollinson@bakerlaw.com
*ATTORNEY TO BE NOTICED*

**Stephen T. Paterniti**
Jackson Lewis PC
75 Park Plaza
4th Floor
Boston, MA 02116
617-367-0025
Fax: 617-367-2155
Email:
stephen.paterniti@jacksonlewis.com
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 11/28/2022 | 1 | NOTICE OF REMOVAL by UMass Memorial Health Care Inc. ( Filing fee: $ 402, receipt number AMADC-9604532 Fee Status: Filing Fee paid) (Attachments: # 1 Exhibit Complaint, # 2 Civil Cover Sheet and Category Form)(Rollinson, James) (Entered: 11/28/2022) |
| 11/28/2022 | 2 | Case transferred to Central Division (Worcester). (Pacho, Arnold) (Entered: 11/28/2022) |
| 11/28/2022 | 3 | Case transferred in from Eastern Division (Boston) on 11/28/2022 Case Number 1:22-cv-12022. (Alba, Robert) (Entered: 11/28/2022) |
| 11/28/2022 | 4 | ELECTRONIC NOTICE of Case Assignment. Judge Allison D. Burroughs assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge David H. Hennessy. (Finn, Mary) (Entered: 11/28/2022) |
| 11/29/2022 | 5 | CORPORATE DISCLOSURE STATEMENT by UMass Memorial Health Care Inc.. (Rollinson, James) (Entered: 11/29/2022) |
| 11/30/2022 | 6 | Certified Copy of Notice of Removal Provided to Defense Counsel by Email (Barrows, Jennifer) (Entered: 11/30/2022) |
| 12/02/2022 | 7 | MOTION for Extension of Time to 30 days after Decision on Plaintiff's Motion to Remand to Respond to Complaint by UMass Memorial Health Care Inc..(Rollinson, James) (Entered: 12/02/2022) |
| 12/05/2022 | 8 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 7 Motion for Extension of Time to 30 days after Decision on Plaintiff's Motion to Remand to Respond to Complaint. (Folan, Karen) (Entered: 12/05/2022) |
| 01/06/2023 | 9 | First MOTION to Remand by John Doe.(Merrigan, Jonathan) (Entered: 01/06/2023) |
| 01/06/2023 | 10 | MEMORANDUM in Support re 9 First MOTION to Remand filed by John Doe. (Attachments: # 1 Text of Proposed Order)(Merrigan, Jonathan) (Entered: 01/06/2023) |

| | | |
|---|---|---|
| 01/08/2023 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Paul G. Karlsgodt Filing fee: $ 125, receipt number AMADC-9657882 by UMass Memorial Health Care Inc.. (Attachments: # 1 Exhibit CERTIFICATION OF PAUL G. KARLSGODT)(Rollinson, James) (Entered: 01/08/2023) |
| 01/09/2023 | 12 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 11 Motion for Leave to Appear Pro Hac Vice Added Paul G. Karlsgodt.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McManus, Caetlin) (Entered: 01/09/2023) |
| 01/18/2023 | 13 | Assented to MOTION for Extension of Time to 02/10/23 to File Response/Reply *to Plaintiff's Opposition for Remand* by UMass Memorial Health Care Inc..(Paterniti, Stephen) (Entered: 01/18/2023) |
| 01/19/2023 | 14 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 13 Assented to MOTION for Extension of Time to 02/10/23 to File Response to , 9 First MOTION to Remand . (Folan, Karen) (Entered: 01/19/2023) |
| 01/20/2023 | 15 | First MOTION for Leave to Appear Pro Hac Vice for admission of Seth Meyer Filing fee: $ 125, receipt number AMADC-9679290 by John Doe. (Attachments: # 1 Affidavit Declaration of Seth Meyer)(Merrigan, Jonathan) (Entered: 01/20/2023) |
| 01/20/2023 | 16 | First MOTION for Leave to Appear Pro Hac Vice for admission of Nathan Campbell Filing fee: $ 125, receipt number AMADC-9679292 by John Doe. (Attachments: # 1 Affidavit Declaration of Nathan Campbell)(Merrigan, Jonathan) (Entered: 01/20/2023) |
| 01/20/2023 | 17 | First MOTION for Leave to Appear Pro Hac Vice for admission of Foster C. Johnson Filing fee: $ 125, receipt number AMADC-9679293 by John Doe. (Attachments: # 1 Affidavit Declaration of Foster C. Johnson)(Merrigan, Jonathan) (Entered: 01/20/2023) |
| 01/20/2023 | 18 | First MOTION for Leave to Appear Pro Hac Vice for admission of David Warden Filing fee: $ 125, receipt number AMADC-9679294 by John Doe. (Attachments: # 1 Affidavit Declaration of David Warden)(Merrigan, Jonathan) (Entered: 01/20/2023) |
| 01/20/2023 | 19 | First MOTION for Leave to Appear Pro Hac Vice for admission of Alex Dravillas Filing fee: $ 125, receipt number AMADC-9679295 by John Doe. (Attachments: # 1 Affidavit Declaration of Alex Dravillas)(Merrigan, Jonathan) (Entered: 01/20/2023) |

| | | |
|---|---|---|
| 01/23/2023 | 20 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 15 Motion for Leave to Appear Pro Hac Vice Added Seth Meyer.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McManus, Caetlin) (Entered: 01/23/2023) |
| 01/23/2023 | 21 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 16 , 17 , 18 and 19 , Motions for Leave to Appear Pro Hac Vice of Nathan Campbell, Foster C. Johnson, David Warden, and Alex Dravillas.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov /caseinfo/nextgen-pro-hac-vice.htm.<br><br>Notices of Appearance must be entered on the docket by the newly admitted attorneys.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McManus, Caetlin) (Entered: 01/23/2023) |
| 01/24/2023 | 22 | NOTICE of Appearance by Foster Calhoun Johnson on behalf of John Doe (Johnson, Foster) (Entered: 01/24/2023) |
| 01/24/2023 | 23 | NOTICE of Appearance by Nathan Campbell on behalf of John Doe (Campbell, Nathan) (Entered: 01/24/2023) |
| 02/02/2023 | 24 | Joint MOTION for Schedule Regarding Motions to Remand and to Extend Time for Defendants to Respond to the Complaints by John Doe.(Merrigan, Jonathan) (Entered: 02/02/2023) |
| 02/03/2023 | 25 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 24 Motion for Entry of Schedule Regarding Motions to Remand and Extension of Time to Respond to Complaints. (Folan, Karen) (Entered: 02/03/2023) |

| | | |
|---|---|---|
| 02/08/2023 | 26 | MOTION for Leave to File *Notice of Supplemental Authority* by John Doe.(Merrigan, Jonathan) (Entered: 02/08/2023) |
| 02/08/2023 | 27 | Notice of Supplemental Authorities re 9 First MOTION to Remand filed by John Doe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Merrigan, Jonathan) (Entered: 02/08/2023) |
| 02/09/2023 | 28 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 26 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Folan, Karen) (Entered: 02/09/2023) |
| 02/09/2023 | 29 | Notice of Supplemental Authorities re 26 MOTION for Leave to File *Notice of Supplemental Authority* filed by John Doe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Merrigan, Jonathan) (Entered: 02/09/2023) |
| 02/16/2023 | 30 | NOTICE of Appearance by David Edward Warden on behalf of John Doe (Warden, David) (Entered: 02/16/2023) |
| 03/20/2023 | 31 | Opposition re 9 First MOTION to Remand filed by UMass Memorial Health Care Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Affidavit in support of opposition)(Paterniti, Stephen) (Entered: 03/20/2023) |
| 03/20/2023 | 32 | Request for Judicial Notice *in support of defendants opposition to plaintiffs motions to remand* by UMass Memorial Health Care Inc.. (Paterniti, Stephen) (Main Document 32 replaced on 3/21/2023) (McManus, Caetlin). (Additional attachment(s) added on 3/21/2023: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (McManus, Caetlin). Modified on 3/21/2023 to separate exhibits from main document (McManus, Caetlin). (Entered: 03/20/2023) |
| 04/19/2023 | 33 | REPLY to Response to 9 First MOTION to Remand filed by John Doe. (Merrigan, Jonathan) (Entered: 04/19/2023) |
| 04/19/2023 | 34 | REPLY to Response to 9 First MOTION to Remand filed by John Doe. (Merrigan, Jonathan) (Entered: 04/19/2023) |
| 05/15/2023 | 35 | First MOTION for Leave to Appear Pro Hac Vice for admission of Sara Aguiniga Filing fee: $ 125, receipt number AMADC-9854914 by John Doe. (Attachments: # 1 Affidavit Declaration of Sara Aguiniga)(Merrigan, Jonathan) (Entered: 05/15/2023) |
| 05/15/2023 | 36 | Judge Allison D. Burroughs: ELECTRONIC ORDER entered granting 35 Motion for Leave to Appear Pro Hac Vice of Sara Aguiniga.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov /caseinfo/nextgen-pro-hac-vice.htm. |

| | | |
|---|---|---|
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>**Pursuant to Local Rule 83.5.3, local counsel shall also file an appearance in this matter. Further, local counsel shall review all filings and shall personally appear in Court for any hearings or conferences, unless expressly excused by the Court for good cause.** (McManus, Caetlin) (Entered: 05/15/2023) |
| 05/19/2023 | 37 | NOTICE of Appearance by Sara Aguiniga on behalf of John Doe (Aguiniga, Sara) (Entered: 05/19/2023) |
| 07/13/2023 | 38 | Judge Allison D. Burroughs: MEMORANDUM AND ORDER entered. Plaintiff's motion to remand, [ECF No. 9 ], is GRANTED and this matter is remanded to state court for further proceedings.<br><br>**SO ORDERED.**<br><br>(McManus, Caetlin) (Entered: 07/13/2023) |
| 07/13/2023 | 39 | Judge Allison D. Burroughs: ORDER entered. ORDER OF REMAND to the State Court. (McManus, Caetlin) (Entered: 07/13/2023) |

I HEREBY ATTEST AND CERTIFY ON
March 7, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

29

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. ~~2285CV01205D~~
2384CV02448-BLS

Allowed. J.B.C. 1/31/23

Notices Mailed 2/17/23

## MOTION FOR ADMISSION PRO HAC VICE

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of David Warden, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of David Warden to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Warden is a member in good standing in the Bars of the State of Texas, the US District Court for the Southern District of Texas, the US District Court for the Southern District of New York, the Patent & Trademark Appeal Board, the Federal Circuit Court of Appeals, and the US Court of Appeals for the Fifth Circuit. He is familiar with the local rules of this Court.

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for David Warden to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: January 6, 2023

I HEREBY ATTEST AND CERTIFY ON
March 7, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. ~~2285CV01205D~~ 2384CV02448-BLS1 [redacted] |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

**AFFIDAVIT OF DAVID WARDEN**

I, David Warden, state and depose as follows:

1. I am an attorney licensed to practice in the state of Texas.

2. I am an attorney at Ahmad, Zavitsanos & Mensing, located at 1221 McKinney, Suite 2500, Houston, Texas 77010. The phone number is (713) 600-4915.

3. I was admitted to practice law in the following bars:
   a. Texas in 1982;
   b. US District Court, Southern District of Texas in 1985;
   c. Patent & Trademark Appeal Board in 1986;
   d. US Court of Appeals for Fifth Circuit in 1986;
   e. Federal Circuit Court of Appeals in 1990; and
   f. US District Court, Southern District of New York in 2012.

4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.

5. I have never been suspended or disbarred in my jurisdictions.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject

to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 14th day of November, 2022.

David Warden, Esq.

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **David E. Warden**
Email address: **dwarden@azalaw.com**
Complete Business/Mailing Address:

**David E. Warden**
**Ahmad, Zavitsanos & Mensing, P.C.**
**1221 McKinney, Suite 2500**
**Houston, Texas 77010**

Board of Bar Overseers
Administrative Use Only

Date Received: 12-02-22
Amount Paid: $355.00
Date confirmation mailed: 12-02-22

Business phone: **(713) 655-1101**

Court in which pro hac vice admission is sought: **Worcester Superior Court**

Contact number for court: **(508) 831-2300**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2285CV01205**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **Texas** | **20856750** |
| **Federal** | **US District Court, Southern District of Texas** | |
| **Federal** | **US District Court, Southern District of New York** | |
| **Federal** | **Patent & Trademark Appeal Board** | |
| **Federal** | **Federal Circuit Court of Appeals** | |
| **Federal** | **US Court of Appeals for Fifth Circuit** | |

RECEIVED
DEC 2 - 2022
MASSACHUSETTS BOARD OF BAR OVERSEERS

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

Signature (Please sign inside box above.)  Date:

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

Jurisdictions continued:

**David E. Warden**

| Type | Jurisdiction | License number |
|---|---|---|

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

30

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiff
v.
UMASS MEMORIAL HEALTH CARE, INC, Defendant.

C.A. No. ~~2285CV01205D~~ 2384CV02448-BLS1

ALLOWED 1/31/23 JBurn
Notices Mailed 2/17/23

**MOTION FOR ADMISSION PRO HAC VICE**

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Seth Meyer, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Seth Meyer to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Meyer is a member in good standing in the Bars of the State of Illinois, the State of Michigan, the State of New York, the State of Texas, the State of Utah, and the State of Wyoming. He is familiar with the local rules of this Court.

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Seth Meyer to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: January 6, 2023

I HEREBY ATTEST AND CERTIFY ON
March 7, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______________
Assistant Clerk

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. ~~2285CV01205D~~
2384CV02448-BLS1

[redacted]

**AFFIDAVIT OF SETH MEYER**

I, Seth Meyer, state and depose as follows:

1. I am an attorney licensed to practice in the states of Illinois, Michigan, New York, Texas, Utah, and Wyoming.

2. I am a Partner at Keller Postman LLC, located at 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. The phone number is (312) 741-5220.

3. I was admitted to practice law in the state of:
   a. New York in 2014;
   b. Illinois in 2016;
   c. Michigan in 2018;
   d. Texas in 2020;
   e. Utah in 2021; and
   f. Wyoming in 2021.

4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.

5. I have never been suspended or disbarred in my jurisdictions.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and

with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 14th day of November, 2022.

*/s/ Seth Meyer*

Seth Meyer, Esq.

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Seth A. Meyer**
Email address: **sam@kellerpostman.com**
Complete Business/Mailing Address:

**Seth A. Meyer**
**Keller Postman LLC**
**150 N. Riverside Plaza, Suite 4100**
**Chicago, Illinois 60606**

Board of Bar Overseers
Administrative Use Only

Date Received: 12-02-22

Amount Paid: $355.00

Date confirmation mailed: 12-02-22

Business phone: **(312) 741-5220**

Court in which pro hac vice admission is sought: **Worcester Superior Court**

Contact number for court: **(508) 831-2300**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2285CV01205**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | New York | 5191283 |
| State | Illinois | 6324349 |
| State | Michigan | P83182 |
| State | Texas | 24121979 |
| State | Utah | 17626 |
| State | Wyoming | 86588 |

RECEIVED
Dec 2 - 2022

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

Seth Meyer

Signature (Please sign inside box above.)

Date: November 14, 2022

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

Jurisdictions continued:

**Seth A. Meyer**

| Type | Jurisdiction | License number |
|---|---|---|

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

31

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. ~~2285CV01205D~~ 2384CV02448-BLS1 |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

1/31/23 JBurn

ALLOWED 2/17/23

Notices Mailed

## MOTION FOR ADMISSION PRO HAC VICE

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Foster Johnson, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Foster Johnson to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Johnson is a member in good standing in the Bars of The State of Texas, The State of California, The US District Court for the Central District of California, the US District Court for the Eastern District of Texas, the US District Court for the Southern District of Texas, and the US District Court for the Northern District of Texas. He is familiar with the local rules of this Court.

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Foster Johnson to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: January 6, 2023

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. ~~2285CV01205~~D
2384CV 02448-BLS1

10.1@

## AFFIDAVIT OF FOSTER JOHNSON

I, Foster Johnson, state and depose as follows:

1. I am an attorney licensed to practice in the states of Texas and California.

2. I am an attorney at Ahmad, Zavitsanos & Mensing, located at 1221 McKinney, Suite 2500, Houston, Texas 77010. The phone number is (713) 600-4915.

3. I was admitted to practice law in the state of:
   a. Texas in 2011;
   b. California in 2013;
   c. US District Court, Eastern District of Texas in 2011;
   d. US District Court, Southern District of Texas in 2019;
   e. US District Court, Northern District of Texas in 2019; and
   f. US District Court, Central District of California in 2022.

4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.

5. I have never been suspended or disbarred in my jurisdictions.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject

to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 14th day of November, 2022.

Foster Johnson, Esq.

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Foster C. Johnson**
Email address: **fjohnson@azalaw.com**
Complete Business/Mailing Address:

**Foster C. Johnson**
**Ahmad, Zavitsanos & Mensing, P.C.**
**1221 McKinney, Suite 2500**
**Houston, Texas 77010**

Board of Bar Overseers
Administrative Use Only

Date Received: 12-02-22

Amount Paid: $355.00

Date confirmation mailed: 12-02-22

Business phone: **(713) 655-1101**

Court in which pro hac vice admission is sought: **Worcester Superior Court**

Contact number for court: **(508) 831-2300**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2285CV01205**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **Texas** | **24076463** |
| **State** | **California** | **289055** |
| **Federal** | **US District Court, Central District of California** | |
| **Federal** | **US District Court, Eastern District of Texas** | |
| **Federal** | **US District Court, Southern District of Texas** | |
| **Federal** | **US District Court, Northern District of Texas** | |

RECEIVED
DEC 2 - 2022
MASSACHUSETTS BOARD OF BAR OVERSEERS

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

Signature (Please sign inside box above.) **Date: 11/14/2022**

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205



Jurisdictions continued:

**Foster C. Johnson**

| Type | Jurisdiction | License number |
|---|---|---|

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

32

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. ~~2285CV01205D~~ 2384CV02448-BLS1 |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

ALLOWED. JBurn 1/31/23

Notices Mailed 2/17/23

**MOTION FOR ADMISSION PRO HAC VICE**

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Alex Dravillas, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Alex Dravillas to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Dravillas is a member in good standing in the Bar of The State of Illinois. He is familiar with the local rules of this Court.

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Alex Dravillas to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: January 6, 2023

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______________
Assistant Clerk

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, § C.A. No. ~~2285CV01205D~~ 2384CV02448-BLS1

Plaintiff §

[redacted]

v. §

UMASS MEMORIAL HEALTH CARE, INC, §

Defendant. §

**AFFIDAVIT OF ALEX DRAVILLAS**

I, Alex Dravillas, state and depose as follows:

1. I am an attorney licensed to practice in the state of Illinois.

2. I am an attorney at Keller Postman LLC, located at 150 N. Riverside Plaza, Suite 4100, Chicago, Illinois 60606. The phone number is (312) 741-5220.

3. I was admitted to practice law in the state of Illinois in 2009.

4. I am a member of good standing and duly licensed and admitted to practice in Illinois.

5. I have never been suspended or disbarred in Illinois.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 14 day of November, 2022.

DocuSigned by:
Alex T. Dravillas
28A46A0B7459497...

Alex Dravillas, Esq.

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Alex J. Dravillas**
Email address: **ajd@kellerpostman.com**
Complete Business/Mailing Address:

**Alex J. Dravillas**
**Keller Postman LLC**
**150 N. Riverside Plaza, Suite 4100**
**Chicago, Illinois 60606**

Board of Bar Overseers
Administrative Use Only

Date Received: 12-02-22

Amount Paid: $355.00

Date confirmation mailed: 12-02-22

Business phone: **(312) 741-5220**

Court in which pro hac vice admission is sought: **Worcester Superior Court**

Contact number for court: **(508) 831-2300**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2285CV01205**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **Illinois** | **6299686** |

RECEIVED
DEC 2 - 2022
MASSACHUSETTS BOARD OF BAR OVERSEERS
REGISTRATION DEPT.

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

DocuSigned by:
Alex J. Dravillas
28A46A0B7459497...

Signature (Please sign inside box above.) Date: 11/14/2022

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

Jurisdictions continued:

**Alex J. Dravillas**

| Type | Jurisdiction | License number |
|---|---|---|

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

33
EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC, Defendant.

C.A. No. ~~2285CV01205D~~ 2384CV02448 BLS1

Allowed 1/31/23 [illegible]

Notices Mailed 2/7/23

## MOTION FOR ADMISSION PRO HAC VICE

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Nathan Campbell, for the purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Nathan Campbell to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Campbell is a member in good standing in the Bars of The State of Texas, The Supreme Court of Texas, The US District Court for the Eastern District of Texas, The US District Court for the Southern District of Texas, and the Fifth Circuit Court of Appeals. He is familiar with the local rules of this Court.

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Nathan Campbell to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

Respectfully Submitted
By Plaintiffs' Counsel:

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Dated: January 6, 2023

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. ~~2285CV01205D~~ 2384CV02448-BLS1 |
| Plaintiff | § | [redacted] |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

**AFFIDAVIT OF NATHAN CAMPBELL**

I, Nathan Campbell, state and depose as follows:

1. I am an attorney licensed to practice in the state of Texas.

2. I am an attorney at Ahmad, Zavitsanos & Mensing, located at 1221 McKinney, Suite 2500, Houston, Texas 77010. The phone number is (713) 600-4915.

3. I was admitted to practice law in the state of:
   a. Texas in 2015;
   b. The Supreme Court of Texas in 2015;
   c. US District Court, Eastern District of Texas in 2016;
   d. US District Court, Southern District of Texas in 2016;
   e. Fifth Circuit Court of Appeals in 2016.

4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.

5. I have never been suspended or disbarred in my jurisdictions.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject

to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 14th day of November, 2022.

Nathan Campbell, Esq.

Date Filed 1/25/2023 11:12 AM
Superior Court - Worcester
Docket Number 2285CV01205

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned.

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Nathan B. Campbell**
Email address: **ncampbell@azalaw.com**
Complete Business/Mailing Address:

**Nathan B. Campbell**
**Ahmad, Zavitsanos & Mensing, P.C.**
**1221 McKinney, Suite 2500**
**Houston, Texas 77010**

Board of Bar Overseers
Administrative Use Only

Date Received: 12-02-22
Amount Paid: $355.00
Date confirmation mailed: 12-02-22

Business phone: **(713) 655-1101**

Court in which pro hac vice admission is sought: **Worcester Superior Court**

Contact number for court: **(508) 831-2300**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similarly Situated**

Docket number of case (if available): **2285CV01205**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| State | Texas | 24097455 |
| Federal | US District Court, Eastern District of Texas | |
| Federal | Fifth Circuit Court of Appeals | |
| Federal | US District Court, Southern District of Texas | |
| State | Supreme Court of Texas | |

RECEIVED
DEC 2 - 2022
MASSACHUSETTS BOARD OF BAR OVERSEERS

I certify that (check one): ( ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or (✓) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

Signature (Please sign inside box above.) Date:

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

PHC-125

Jurisdictions continued:

**Nathan B. Campbell**

| Type | Jurisdiction | License number |
|---|---|---|

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Date Filed 8/14/2023 3:56 PM
Superior Court - Worcester
Docket Number 2285CV01205

E-FILED

34

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. ~~2285CV01205~~<br>2384CV02448-BLS1 |

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| LISA COLLETON,<br>ON BEHALF OF HERSELF<br>AND ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | ~~C.A. No. 2285CV01293D~~ [redacted]<br>2384CV02450-BLS1 |

**JOINT MOTION TO CONSOLIDATE**

Pursuant to Mass R. Civ. P. 42(a), now come the parties and jointly move to consolidate the above-referenced cases, *Doe v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the



Allowed Goh J
8/17/23

Notices Mailed 8/18/23

Date Filed 8/14/2023 3:56 PM
Superior Court - Worcester
Docket Number 2285CV01205

"Doe Action") and *Colleton v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "Colleton Action"), currently pending in Worcester Superior Court. As detailed below, the cases should be consolidated because they raise common questions of law and fact and involve a common party and because interests of judicial economy will be served by consolidation.

**BACKGROUND**

On October 24, 2022, Plaintiff Doe filed his original complaint. On November 14, 2022, Plaintiff Colleton filed her action. Defendant removed both actions to federal court. On July 13, 2023, the United States District Court for the District of Massachusetts remanded them. Now that both these related actions have been remanded to this Court, they are ripe to be consolidated.

**ARGUMENT**

There is no question that the *Doe* and *Colleton* cases are appropriate for consolidation. "Superior Court judges have broad authority to consolidate civil actions that arise from the same transaction or event, even if the actions were brought in different counties and one must be transferred." Morris v. Mass Veterinary Specialty Servs., LLC, 2020 Mass. Super. LEXIS 10, *4 (Jan. 30, 2020); see also Mass. R. Civ. Proc. 42(a) (permitting consolidation of actions in the same or different counties when they involve "a common question of law or fact"). Both cases involve a common Defendant, UMass Memorial. Both cases are based on the same alleged facts, that UMass Memorial aided in the interception of communications relating to patient health between patients and Defendants' website. And both cases allege violation of the Massachusetts Wiretap Act. Consolidation of the cases, therefore, would serve the interests of judicial economy.

Defendant consents to consolidation of these matters. Defendant, however, expressly reserves all their rights, remedies, defenses, objections, and arguments, and has not waived any rights. Defendant denies Plaintiffs' allegations and does not believe that certification of the

putative class or classes is proper. Defendant specifically reserves its rights to move to dismiss under Mass. R. Civ. P. 12 and to oppose class certification and assert defenses on all available grounds.

The parties further move that the Defendant's deadlines to file any response, including a motion to dismiss, to the pending complaints filed by John Doe and Lisa Colleton, shall be adjourned in light of the Plaintiffs' intention to file an Amended Consolidated Complaint and to seek to have these matters transferred to the Business Litigation Session (the "BLS") once the matters are consolidated. Once the Plaintiffs file their Amended Consolidated Complaint the Defendant shall have thirty days from the docketing of the Amended Consolidate Complaint in the BLS to file its response thereto.

Accordingly, the parties jointly request that the above-captioned actions be consolidated.

Dated: August 14, 2023

Respectfully submitted jointly,

*<u>/s/ J. Tucker Merrigan</u>*
J. Tucker Merrigan
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com

Warren Postman (pro hac pending)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
ajd@kellerpostman.com

William P. Doyle (556999)
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
T: (781) 245-1127
F: (781) 245-1148
E: bill@colonna-doyle.com

Nicholas A. Coulson (pro hac pending)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
E: ncoulson@lsccounsel.com

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

Date Filed 8/14/2023 3:56 PM
Superior Court - Worcester
Docket Number 2285CV01205

/s/ Stephen T. Paterniti
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

**COUNSEL FOR DEFENDANT**

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

| CLERK'S NOTICE | DOCKET NUMBER<br>2285CV01205 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>**John Doe, Ind. And ON Behalf Of All Others vs. Umass Memorial Health Care, Inc.** | | Dennis P. McManus, Clerk of Courts<br>Worcester County |
| TO: File Copy | | COURT NAME & ADDRESS<br>Worcester County Superior Court<br>225 Main Street<br>Worcester, MA 01608 |

You are hereby notified that on 08/17/2023 the following entry was made on the above referenced docket:

**Endorsement on Motion to Consolidate (#13.0): ALLOWED**
**Notices mailed 8/18/23**

**Judge: Goodwin, Hon. Karen**

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| 08/18/2023 | Hon. Karen Goodwin | (508)831-2350 |

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

EFILED 35

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. ~~2285CV01205~~ D
2384CV02448-BLS1

---

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

LISA COLLETON, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. ~~2285CV01293D~~
2384CV02450-BLS1

---

8/28/23 Withdrawn (Hogden) by moving counsel. See Paper #18. Attest: Daniel [illegible] Asst. Clerk 8/28/23

Notices Mailed 8/28/23

## MOTION TO APPOINT INTERIM CLASS COUNSEL

Pursuant to Massachusetts Rule of Civil Procedure Rule 23(d), Plaintiffs John Doe (C.A. No. 2285CV01205) and Lisa Colleton (C.A. No. 2285CV01293D), individually and on behalf of

all others similarly situated ("Plaintiffs"), respectfully submits this Motion to Appoint Interim Class Counsel. In support of the Motion to Appoint Interim Class Counsel, Plaintiffs file the accompanying memorandum of law.

*(Space left intentionally blank)*

Dated: August 4, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Warran Postman *(pro hac vice pending)*
Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza , Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com
wdp@kellerpostman.com

William P. Doyle, BBO# 556999
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
(781) 245-1127
bill@colonna-doyle.com

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

Nicholas A. Coulson (*pro hac vice pending*)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
(313) 392-0015
ncoulson@lsccounsel.com

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on August 4, 2023 in accordance with Superior Court Rule 9A, I served the following documents:

- Motion to Appoint Interim Class Counsel;
- Memorandum of Law in Support of Plaintiffs' Motion to Appoint Interim Class Counsel;
- Declaration of J. Tucker Merrigan in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel;
- Declaration of Seth Meyer in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel;
- Declaration of Foster C. Johnson in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel;
- Declaration of Nicholas A. Coulson in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel; and
- [Proposed] Order Appointing Interim Class Counsel;

on all counsel of record, via electronic mail to the following parties of interest:

James H. Rollinson, Esq.
Elizabeth Scully, Esq.
Paul Karlsgodt, Esq.
BAKER & HOSTETLER, LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
jrollinson@bakerlaw.com
escully@bakerlaw.com
pkarlsgodt@bakerlaw.com

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2285CV01205 D |

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| LISA COLLETON,<br>ON BEHALF OF HERSELF<br>AND ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2285CV01293D |

**[PROPOSED] ORDER APPOINTING INTERIM CLASS COUNSEL**

On this day, the Court heard the Motion to Appoint Interim Class Counsel of Plaintiffs John Doe and Lisa Colleton seeking an order appointing J. Tucker Merrigan of Sweeney Merrigan

Law, LLP; Warren Postman of Keller Postman LLC; Foster Johnson of Ahmad Zavitsanos & Mensing, PLLC, and Nicholas Coulson of Liddle Sheets Coulson, P.C. as Co-Lead Interim Class Counsel (the "Motion").

Having considered the Motion, the Court finds good cause to **GRANT** the Motion.

IT IS HEREBY ORDERED:

1. J. Tucker Merrigan, Foster Johnson, Nicholas Coulson, and Warren Postman are hereby appointed Co-Lead Interim Class Counsel.

2. The above firms (collectively, "Interim Counsel") are appointed based on the firms': (a) work in identifying or investigating potential claims in the action; (b) experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (c) knowledge of the applicable law; and (d) resources the firms will commit to representing the putative Class.

3. Interim Counsel, collectively and not individually, shall have responsibility for, and authority over, the following matters for this case and any related cases against Defendant UMass Memorial Health Care, Inc. regardless of whether such related cases include defendants in addition to Defendant or were filed after entry of this Order:

a. Determining and presenting in pleadings, motions, briefs, oral argument or such other fashion as may be appropriate, the position of all of the Plaintiffs as to all matters arising during all pretrial and trial proceedings;

b. Conducting discovery on behalf of the Plaintiffs;

c. Communicating with the Court;

d. Communicating with Defense Counsel;

e. Assigning work assignments to all Plaintiffs' Counsel;

f. Ensuring that work assignments to all Plaintiffs' Counsel are made in the best interests of the Plaintiffs and the proposed Class and are made on the basis of the qualifications and expertise of the person assigned particular tasks or responsibilities, counsel's knowledge of the law, facts and issues, efficiency, and costs-effectiveness;

g. Directing, supervising, and monitoring the activities of additional Plaintiffs' Counsel, if any, and implementing procedures to ensure that schedules are met and unnecessary expenditures of time and funds by counsel are avoided;

h. Employing and consulting with experts;

i. Calling meetings of all Plaintiffs' Counsel when appropriate;

j. Conducting settlement discussions with Defense Counsel on behalf of the Plaintiffs and the putative Class and the related authority to resolve this litigation as Interim Counsel deem appropriate and subject to approval of this Court where required;

k. Informing all Plaintiffs and Plaintiffs' Counsel of the progress of this litigation as necessary;

l. Assessing litigation costs as appropriate and to collect such assessments;

m. Reviewing time, lodestar, and expense reports from each Plaintiffs' Counsel, including paralegals and any other staff members, as frequently as Interim Counsel see fit;

n. Allocating attorneys' fees and costs among Plaintiffs' Counsel;

o. Overseeing the conduct of the litigation so that it proceeds smoothly and efficiently and performing such other duties as necessary or as authorized by further order of the Court.

**IT IS SO ORDERED.**

SIGNED this ____ ________ day of ________ , ________, 2023.

________________________________

JUDGE PRESIDING

 36

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. ~~2285CV01205~~ D
2384CV02448-BLS1

---

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

LISA COLLETON,
ON BEHALF OF HERSELF
AND ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. ~~2285CV01293D~~
2384CV02450-BLS1

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO APPOINT INTERIM CLASS COUNSEL

Plaintiffs John Doe (C.A. No. 2285CV01205) and Lisa Colleton (C.A. No. 2285CV01293D), individually and on behalf of all others similarly situated ("Plaintiffs"), bring

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

this Motion to Appoint Interim Class Counsel under Massachusetts Rule of Civil Procedure Rule 23(d).

To promote the efficient and orderly prosecution of their claims, Plaintiffs request, on behalf of themselves and the putative class ("Class Members"), the appointment of interim class counsel. Specifically, Plaintiffs request that the Court appoint J. Tucker Merrigan from of the law firm Sweeney Merrigan Law, LLP, ("Sweeney Merrigan"), Nicholas Coulson from the law firm Liddle Sheets Coulson P.C. ("LSC"), Warren Postman from the law firm Keller Postman LLC ("KP") and Foster Johnson from the law firm Ahmad Zavitsanos & Mensing, PLLC ("AZA") as Co-Lead Interim Class Counsel ("Proposed Interim Class Counsel") in this case.

Sweeney Merrigan is a Boston firm specializing in plaintiff class and mass action litigation. LSC is a class and complex litigation firm that has represented certified plaintiff classes in well over 100 cases across more than two decades. KP is one of the nation's leading class action firms and stands at the forefront of prosecuting data privacy claims against some of the nation's largest companies, including Meta Platforms and Amazon. AZA is a successful commercial litigation firm with an expertise in sophisticated intellectual property matters that currently represents plaintiffs and putative class members in more than two dozen class actions in state and federal court around the country against defendant hospitals based on the same privacy violations at issue in this case.

Mr. Coulson from LSC, Mr. Postman from KP, Mr. Merrigan from Sweeney Merrigan, and Mr. Johnson from AZA are qualified, and their appointment as interim class counsel will serve to protect the interests of the putative Class Members before the class is certified, promote judicial efficiencies, and advance the litigation to resolution.

## BACKGROUND

On October 24, 2022, Plaintiff Doe filed his original complaint. On November 14, 2022, Plaintiff Colleton filed her action. Defendant removed both actions (and a third action pending in a different court). On July 13, 2023, the United States District Court for the District of Massachusetts remanded them as improvidently removed.

In general, Plaintiffs allege that Defendant violated their privacy rights by selling and/or bartering their personal health information to Facebook in exchange for access to Facebook's Meta Pixel tool. Doe Compl. ¶¶ 11-87. Plaintiffs allege that Defendant installed the Meta Pixel tool to run surreptitiously on its websites in order to intercept and disclose patient communications to Facebook for marketing purposes. *Id.* Plaintiffs allege multiple state law claims on behalf of themselves and the proposed class. *Id.* ¶¶ 142-244.

Before filing the Original Complaint, Proposed Interim Class Counsel researched publicly available sources regarding hospitals' use of Facebook's Meta Pixel tool. Proposed Interim Class Counsel also studied the technical aspects of the Meta Pixel and interviewed potential class representatives.

In the last 12 months, Proposed Interim Class Counsel have drafted and filed multiple putative class action lawsuits in Massachusetts and elsewhere arising from hospitals' alleged surreptitious use of the Meta Pixel tool to intercept and disclose their patients' private health information to Facebook, Google, and other third parties. As part of their continuing investigation, counsel has already retained consulting experts to assist with the litigation.

## ARGUMENT

### I. Legal standard for appointing interim class counsel.

Massachusetts law requires courts to ensure that both class representatives and class counsel are capable of adequately representing and protecting the interests of all class members. Mass. R. Civ. P. 23(d). As such, the Court may "impose such terms as shall fairly and adequately protect the interests of the class in whose behalf the action is brought or defended." *Id.*

"[Massachusetts] Rule 23 was written in the light of Fed. R. Civ. P. 23," and "case law construing the Federal rule is analogous and extremely useful." *Kingara v. Secure Home Health Care Inc.*, 489 Mass. 393, 394–95 (2022); *Chambers v. RDI Logistics, Inc.*, 476 Mass. 95, 111 (2016). In the federal system, Rule 23 "authorizes the court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class." Advisory Committee Notes to Rule 23(g)(2)(A). Furthermore, the *Manual of Complex Litigation* instructs that courts ensure that lawyers seeking appointment as class counsel will fairly and adequately represent the interests of the class. § 21.27 (4th ed.); *see Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 410 (2015); *Gov't Employees Hosp. Ass'n v. Serono Intern., S.A.*, 246 F.R.D. 93, 96 (D. Mass. 2007).

Federal courts regularly appoint interim class counsel before certifying a class to ensure the interests of all putative class members are adequately represented. *See Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 867 (E.D. Mich. 2019); *Ekin v. Amazon Servs., LLC, No.* 14-CV-0244, 2014 WL 12028588, at *3 (W.D. Wash. May 23, 2014).

The attorneys designated by the court "assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel." Fed. R. Civ. P. 23(g); *In re Municipal Derivatives Antitrust Litig.*, 252 F.R.D. 184, 185

(S.D.N.Y. 2008) (internal citations committed) (Implementing an organization structure early in a consolidated case is helpful because it "clarifies responsibility for protecting the interests of the class during precertification activities."). "[D]esignation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement." *Manual for Complex Litigation* § 21.11 (4th ed.); *accord* Advisory Committee Notes to Rule 23(g)(2)(A) (Rule 23 "authorizes [a] court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class.").

Likewise, Massachusetts Rule of Civil Procedure 23 permits courts to impose terms to "fairly and adequately protect the interests of the class." Under the analogous Federal Rule 23(g)(1)(A), courts consider the four factors in determining the appropriateness of class counsel, along with interim class counsel. *See Ark. Teacher Ret. Sys. v. State St. Corp.*, No. 11-CV-10230, 2012 WL 13118446, at *2 (D. Mass. Jan. 12, 2012); *In re Air Cargo Shipping Serv. Antitrust Litig.*, 240 F.R.D. 56, 57 (E.D.N.Y. 2006); *Kingara*, 489 Mass. at 394–95 (in evaluating Massachusetts Rule 23, "case law construing the Federal rule is analogous and extremely useful").

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). "In evaluating prospective class counsel, the court should weigh all pertinent factors. No single factor should necessarily be determinative in a given case." Advisory Committee Notes to the 2003 Amendments to Fed. R. Civ. P. 23(g). Each of these factors supports Proposed Interim Class Counsel's application for appointment as counsel for the class.

The Court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

## II. The Court should appoint Proposed Interim Class Counsel.

### A. Proposed Interim Class Counsel have done extensive work investigating and prosecuting Plaintiffs' claims.

Proposed Interim Class Counsel have already spent significant time and energy investigating the merits and vetting the potential claims in this case. Ex. A ¶ 4 (Merrigan Decl.); Ex. B ¶ 12 (Coulson Decl.); Ex. C ¶ 4 (Postman Decl.); Ex. D ¶ 4 (Johnson Decl.). Proposed Interim Class Counsel have interviewed class representatives, conferred with proposed Class Members, conducted significant factual and legal research, and retained a consulting expert to assist with vetting Plaintiffs' and Class Members' claims. Ex. D ¶ 5 (Johnson Decl.). These investigations are informed by Proposed Interim Class Counsel's extensive experience in class action litigation. *See* Ex. A ¶ 6 (Merrigan Dec.); Ex. B ¶ 4 (Coulson Decl.); Ex. C ¶¶ 6-7 (Postman Decl.); Ex. D ¶ 6 (Johnson Decl.). The voluminous complaints filed on behalf of Plaintiffs (along with the substantial effort required to have the cases properly remanded) are a testament to the time and resources counsel have expended thus in this litigation on behalf of the Class Members.

Courts have commented that the effort put in by the attorneys and the skill required to investigate and draft a thorough complaint is an important consideration in deciding who to appoint as interim class counsel. "'All other things being equal,' if an attorney has performed the investigatory and analytical tasks necessary to draft the complaint, unless that attorney has merely copied a complaint from another action, 'he or she is in a better position to represent the class fairly and adequately than attorneys who have not undertaken those tasks.'" *In re iPhone 4S Consumer Litig.*, No. 12-CV-1127, 2012 WL 12960637, at *1 (N.D. Cal. July 5, 2012) (quoting 5 Moore's Federal Practice § 23.120[3][a]). That test is more than satisfied here.

**B. The Class Members will benefit from the appointment of interim class counsel.**

The Court should appoint interim class counsel in order to protect the interests of the class. Appointing Proposed Interim Class Counsel facilitates a cooperative and organized prosecution and protects the putative Class Members' interests. For example, appointing interim class counsel is necessary to avoid the complications that arise from duplicative suits asserting the same claims, or even the risk of such filings. Multiple identical or similar actions prevent efficient prosecution of claims, result in disjointed legal strategy, and cause prejudice to both defendants, plaintiffs, and putative class members. *See Gamboa*, 381 F. Supp. 3d at 867 ("Designation of interim counsel is particularly appropriate when a number of lawyers have filed related 'copycat' actions."); *Ekin*, 2014 WL 12028588, at *3 ("[D]esignation of interim counsel clarifies responsibility for protecting the interests of the class during precertification activities, such as making and responding to motions, conducting any necessary discovery, moving for class certification, and negotiating settlement.") (quoting Manual of Complex Litigation § 21.11 (4th ed.)).

These concerns are not unfounded. Well after the two subject actions were filed, another functionally identical case was filed in the Business Law Section, and more could yet be filed. Ex. D ¶ 10 (Johnson Decl.). Even if no other cases are filed, however, courts regularly consider the risk or likelihood of such filings as counseling in favor of appointing interim class counsel. *See, e.g., Tolmasoff v. General Motors, LLC*, No. 16-11747, 2016 WL 3548219, at *9 (E.D. Mich. June 30, 2016) (appointing two law firms as interim class counsel where "other[] [similar cases] may follow.").

Appointing Proposed Interim Class Counsel will also benefit the Class Members by allowing the firms to pool their resources, coordinate litigation efforts, and remove redundancies. For example, Proposed Interim Class Counsel will allocate resources for briefing, attending

hearings, reviewing documents, taking and defending depositions, and coordinating with expert witnesses. Proposed Interim Class Counsel have already started this process by drafting discovery and conferring with opposing counsel on case management. Ex. B ¶ 13 (Postman Decl.); Ex. D ¶ 15 (Johnson Decl.). In short, appointing interim class counsel will streamline the prosecution of this case by allowing the plaintiff's attorneys to work towards one coordinated class certification strategy.

**C. Mr. Coulson, Mr. Postman, Mr. Merrigan, and Mr. Johnson are eminently qualified to be Co-Lead Interim Class Counsel.**

**1. Mr. Merrigan is the co-managing partner of Boston-based law firm Sweeney Merrigan.**

Sweeney Merrigan is a Boston-based law firm that has extensive experience handling complex litigation and class actions, including class action and consolidated mass tort litigation. Ex. A ¶ 6 (Merrigan Decl.) For instance, it served as local counsel litigating on behalf of 123 Massachusetts cities and towns against manufacturers and distributors of prescription opioid medications for alleged consumer protection violations. *Id.; In re National Prescription Opiate Litigation*, Master Docket Number 1:17-MD-2804 (N.D. Ohio). It successfully prosecuted these claims and obtained settlements of more than $500 million for Massachusetts and its municipal entities. Ex. A ¶ 6 (Merrigan Decl.). Likewise, Sweeney Merrigan is prosecuting a class action for residents of Westminster, Massachusetts per- and polyfluorinated substance (PFAS) contamination. Ex. A ¶ 6 (Merrigan Decl.); *see Ryan et al. v. Greif et al.*, No. 22-cv-40089 (D. Mass.).

Lawyers at Sweeney Merrigan have also served on attorney leadership committees and as liaison counsel in mass and class actions in Massachusetts federal court and state court. Ex. A ¶ 7 (Merrigan Decl.); *In re Shield Health Care Group, Inc.*, No. 1-22-cv-10901-PBS (D. Mass.)

(Executive Committee); *In re Columbia Gas*, Civil Action No. 1877CV01343G (Mass. Super. Ct.) (Liaison Counsel). Finally, Sweeney Merrigan has experience in data breach security class actions, *In re Shield Health Care Group, Inc.*, No.: 1-22-cv-10901 (D. Mass.) (case impacting over two million patients' private data and information), and currently represents other putative classes in Massachusetts state and federal court against hospitals for state law violations arising from their use of the Meta Pixel tool to intercept and disclose patient health information, including the four pending in Massachusetts. Ex. A ¶ 8 (Merrigan Decl.).

Mr. Merrigan has extensive experience in class and mass action litigation. Ex. A ¶ 9 (Merrigan Decl.). He is co-managing partner at Sweeney Merrigan and is currently a member a member of the American Association for Justice, Massachusetts Academy of Trial Attorneys, the Boston Bar Association, and Massachusetts Bar Association. *Id.* Mr. Merrigan graduated from New England School of Law and earned his bachelor's degree in Political Science at Tufts University. *Id.*

**2. Mr. Coulson is a partner of Liddle Sheets Coulson P.C. and has extensive experience litigating class actions.**

Liddle Sheets Coulson P.C. has more than two decades of class action experience Ex. B ¶4 (Coulson Decl.) Mr. Coulson specifically has served as class counsel in dozens of cases involving certified classes. (*See Id.* ¶¶6-9). He has litigated and resolved class actions in state, federal district, and federal bankruptcy courts, and has successfully prosecuted state and federal appeals in class actions. (*Id.*). He has authored publications on complex substantive and procedural law, and he has been appointed as interim or final class counsel in cases involving environmental contamination, consumer fraud and/or deception, and securities fraud. (*See Id.* ¶4 at Ex. 1).

Mr. Coulson and LSC are presently prosecuting numerous class actions involving the use of Meta Pixel technology, including several which, like the instant cases, name hospital or healthcare

defendants. (*Id.* ¶11). Mr. Coulson's recent results include the resolution of *McKnight v. Uber Technologies, LLC* (Case No. 3:14- cv-05615-JST) (ND. Cal. 2020) ($32.5 million for nationwide class of Uber customers), *Dykehouse v. 3M Company*, Case No. 1:19-cv-01225 (W.D. Mich. 2021) (groundbreaking $11.9 million PFAS contamination settlement); and *Nellis et al v. Vivid Seats LLC*, Case No. 1:20-cv-02486 (N.D. Ill.) ($7.5 million settlement for nationwide class of ticket purchasers). Mr. Coulson's extensive class action experience also includes the resolution of class claims in bankruptcy court (*In re Cachet Financial Services*, Bankr. Case No. 2:20-bk-10654-VZ (Bankr. C.D. Cal., Los Angeles Div., 2022). Mr. Coulson is a graduate of the University of Minnesota Law School, and a member of the American Association for Justice, Michigan Association for Justice, the Federal Bar Association (E.D. Michigan Chapter). (Ex. B¶4, Ex. 1).

**3. Warren Postman is the Co-Founder of KP with Extensive Class Action Experience**

KP is one of the nation's preeminent firms specializing in complex civil litigation. Ex. C ¶ 5 (Postman Decl.). Its practice includes numerous high-profile privacy, antitrust, and consumer protection class actions. It has also been at the forefront of complex litigation related to data breach issues. *Id.*

In the class action arena, KP has litigated several significant matters, including the following:

- *West et al v. Amazon.com Inc.*, No. 2:21-cv-00694, United States District Court for the Western District of Washington
- *C.O., a minor, v. Amazon.com Inc. et al*, No. 2:19-cv-00910, United States District Court for the Western District of Washington
- *Fishon et al v. Peloton Interactive, Inc.*, No. 1:19-cv-11711, United States District Court for the Southern District of New York
- *Richard A. Ross and Fieldstone Ventures, LLC v. EQT Corporation et al.*, No. GD-21-011948, Fifth Judicial District of Pennsylvania, County of Allegheny

- *Hestrup & Peiss v. DuPage Medical Group. Ltd. d/b/a DuPage Medical Group*, Case No. 2021L000937, 18th Judicial Court, DuPage County, Illinois

- *Gilbert v. AFTRA Retirement Fund et al*, Case No. 1:20-cv-10834, United States District Court for the Southern District of New York

- *Hall, et al v. AspenPointe, Inc., et al*, Case No. 2020CV32175, 4th District Court, County of El Paso, Texas

- *Hackerott v. Central Kansas Orthopedic Group, Inc.*, et al, Case No. 2020-cv-000120, District Court of Barton County, Kansas

Ex. C ¶ 7 (Postman Decl.). Lawyers at KP recently served as counsel for a putative class and secured a favorable settlement in Massachusetts federal court. *Barr et al. v. Drizly*, No. 1:20-cv-11492 (D. Mass.). *Id.*

In 2021, KP's innovative approach and successful outcomes led it to be named Trial Strategy Innovation Law Firm of the Year by the National Law Journal and American Lawyer Media at the Elite Trial Lawyers Awards. More recently, KP was named the National Law Journal's 2022 Privacy & Data Breach Law Firm of the Year. Ex. C ¶ 6 (Postman Decl.).

Mr. Postman has been appointed as class counsel for numerous certified and putative classes of individuals whose information has been compromised through one or more data breaches. Ex. C ¶ 8 (Postman Decl.). Mr. Postman has over 14 years of experience litigating complex, high-stakes litigation, like the instant case. Ex. C ¶ 9 (Postman Decl.). He received his J.D. from Harvard Law School, where he graduated *magna cum laude*, and was the Articles Editor on the Harvard Law Review. *Id.* After law school, he clerked for the Honorable Justice David H. Souter of the Supreme Court of the United States, and Judge William A. Fletcher at the U.S. Court of Appeals for the Ninth Circuit. *Id.*

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

**4. Foster Johnson and AZA have extensive experience handling complex commercial cases and class actions.**

AZA is a fifty-lawyer firm specializing in commercial and patent technology litigation with extensive experience handling complex litigation and class actions. Ex. D ¶ 6 (Johnson Decl.). Chambers USA, the independent and prestigious legal guide, has consistently ranked AZA among the top Texas law firms for both commercial litigation and intellectual property work. *Id.* AZA's attorneys have litigated and tried all types of breach of contract and business tort cases in federal and state courts and arbitration panels across the country. *Id.* Major corporations and senior executives regularly hire AZA to prosecute and defend their high-profile, difficult, and complex cases. *Id.* For instance, last year, AZA won a $62.65 million verdict after a seven-week trial from a Nevada jury in a nationally watched case for emergency room physician group clients who were underpaid by United Healthcare, the largest insurer in the nation. In 2019, AZA defended a midstream oil and gas company against a claim for $250 million related to the building of an oil refining unit. *Id.*

AZA has similar experience in intellectual property litigation and is consistently ranked by Chambers USA in this area. Ex. D ¶ 7 (Johnson Decl.). For example, AZA's attorneys have successfully prosecuted patent infringement cases involving complex technology against some of the biggest technology companies in the world, including Apple, Samsung, Motorola, and Garmin. *Id.*

AZA also routinely handles mass and class actions from both the plaintiff and defense side. Ex. D ¶ 8 (Johnson Decl.). For instance, lawyers at the firm have recovered nearly $1 billion on behalf of nationwide class of homeowners whose homes had defective plumbing systems. *Id.* Lawyers at AZA have also recovered more than $450 million on behalf of nationwide class of investors in the Courtyard, Fairfield Inn and Residence Inn limited partnerships and more than

$425 million in a mass action on behalf of individuals who underwent unnecessary heart valve surgeries. *Id.* AZA is also representing more than 120 clients whose homes were flooded during Hurricane Harvey because of government action at the Addicks Barker dams. *In re Upstream Addicks and Barker (Texas Flood Control Reservoirs*, Sub-Master Docket No. 17-9001 (Fed. Cl. 2021).

In the data privacy space, AZA is currently prosecuting more than two dozen data privacy class actions in multiple states on behalf of patients whose personal health information was shared with Facebook in violation of state and federal law. Ex. D ¶ 9 (Johnson Decl.). These include multiple class actions in Massachusetts:

- *Jane Doe, Ind an on Behalf of All Others Similarly Situated v. Atrius Health, Inc.;* C.A. No. 2282CV00982; Norfolk Superior Court
- *John Doe, Ind an on Behalf of All Others Similarly Situated v. Emerson Hospital;* C.A. No. 2277CV01000; Essex Superior Court
- *John Doe v. Ind an on Behalf of All Others Similarly Situated v. UMass Memorial Health Care*; C.A. No. 2285CV01205; Worcester Superior Court
- *John Doe v. Cape Cod Healthcare, Inc.* No. 1:23-cv-10080, United States District Court for the District of Massachusetts (removed from the Barnstable Superior Court, 2272CV00493)

*Id.*

Mr. Johnson is a partner at AZA and has extensive experience in class action litigation as counsel for both plaintiffs and defendants. Ex. D ¶¶ 1, 11 (Johnson Decl.). He is a charter member of AZA's Class Action Group, and currently spearheads more than two dozen of class action cases filed against hospitals for state law violations arising from their use of the Meta Pixel tool to intercept and disclose patient health information, including the four pending in Massachusetts. Ex. D ¶ 11 (Johnson Decl.).

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

Mr. Johnson received his J.D. and undergraduate degrees from Stanford University. Ex. D ¶ 12 (Johnson Decl.). After law school, Mr. Johnson clerked for the Honorable Priscilla Owen of the United States Court of Appeals for the 5th Circuit. *Id.*

**C. Proposed Interim Class Counsel have a deep understanding of the applicable law.**

Proposed Interim Class Counsel have strong backgrounds in complex commercial and class action litigation. They have a demonstrated ability to manage intensive and complex fact and expert discovery in all types of commercial cases, including ones involving the technology at issue. Accordingly, they have requisite knowledge of the applicable facts and law necessary to navigate the challenges that will arise in these types of litigation. *See* Fed. R. Civ. P. 23(g)(1)(A)(iii).

**D. Proposed Interim Class Counsel are committed to and will jointly expend all necessary efforts and resources to vigorously pursue litigation.**

LSC, KP, Sweeney Merrigan, and AZA have the resources necessary to lead this litigation and have extensive experience successfully managing complex, resource-intensive cases of all sorts. Ex. A ¶ 10 (Merrigan Decl.); Ex. B ¶ 12 (Coulson Decl.); Ex. C ¶ 10 (Postman Decl.); Ex. D ¶ 13 (Johnson Decl.). For instance, the firms have the necessary technology to handle voluminous discovery, including the types of discovery anticipated in this case. Ex. A ¶ 10 (Merrigan Decl.); Ex. B ¶ 13 (Coulson Decl.); Ex. C ¶ 10 (Postman Decl.); Ex. D ¶ 13 (Johnson Decl.). Furthermore, they have the experienced attorneys and support professionals to staff the case. Ex. A ¶ 10 (Merrigan Decl.); Ex. B ¶ 14 (Coulson Decl.); Ex. C ¶ 10 (Postman Decl.); Ex. D ¶ 13 (Johnson Decl.). Each firm has designated a list of attorneys who will bring their unique skills and experience to representing the Class. Ex. A ¶ 10 (Merrigan Decl.); Ex. B ¶ 14 (Coulson Decl.); Ex. C ¶ 10 (Postman Decl.); Ex. D ¶ 13 (Johnson Decl.).

Proposed Interim Class Counsel regularly advance the costs of litigation and are committed to dedicating substantial resources to vigorously prosecute the claims in this case for the potential class. Ex. A ¶ 11 (Merrigan Decl.); Ex. B ¶ 12 (Coulson Decl.); Ex. C ¶ 11 (Postman Decl.); Ex. D ¶ 14 (Johnson Decl.). Proposed Interim Class Counsel will also strive to avoid waste and duplication in favor of efficiency. Ex. A ¶ 11 (Merrigan Decl.); Ex. B ¶ 12 (Coulson Decl.); Ex. C ¶ 11 (Postman Decl.); Ex. D ¶ 15 (Johnson Decl.).

Proposed Interim Class Counsel fully understand the substantial investment of time and resources necessary to properly pursue and lead such litigations and are committed to devoting the necessary resources to this case. Ex. A ¶ 12 (Merrigan Decl.); Ex. B ¶ 12 (Coulson Decl.); Ex. C ¶ 12 (Postman Decl.); Ex. D ¶ 15 (Johnson Decl.). Proposed Interim Class Counsel are committed to prosecuting this action in the best interests of the Class Members and vindicating their rights. Ex. A ¶ 12 (Merrigan Decl.); Ex. B ¶ 15 (Coulson Decl.); Ex. C ¶ 12 (Postman Decl.); Ex. D ¶ 15 (Johnson Decl.).

## CONCLUSION

Proposed Interim Class Counsel are the attorneys who have already done the "heavy lifting" with respect to investigating and crafting the claims at issue. The Proposed Interim Class Counsel and their respective law firms bring the decades of experience dealing with complex and class action cases to successfully prosecute and resolve this suit. In short, Proposed Interim Class Counsel represents the best choice to lead this case and protect the interests of the Class Members.

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

Dated: August 14, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Warran Postman *(pro hac vice pending)*
Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza , Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com
wdp@kellerpostman.com

William P. Doyle, BBO# 556999
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
(781) 245-1127
bill@colonna-doyle.com

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

Nicholas A. Coulson (*pro hac vice pending*)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
(313) 392-0015
ncoulson@lsccounsel.com

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

37

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. ~~2285CV01205~~ D)<br>2384CV02448-BLS1<br><br>[redacted] N |

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| LISA COLLETON,<br>ON BEHALF OF HERSELF<br>AND ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2285CV01293D<br>2384CV02450-BLS1 |

**DECLARATION OF J. TUCKER MERRIGAN IN SUPPORT OF PLAINTIFFS' MOTION FOR APPOINTMENT OF INTERIM CLASS COUNSEL**

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

I, J. Tucker Merrigan, hereby declare as follows:

1. I am an attorney and co-managing partner at Sweeney Merrigan Law, LLP ("Sweeney Merrigan") and counsel for Plaintiff John Doe, and similarly situated class members ("Plaintiffs") in the above-captioned case.

2. I am fully familiar with the facts and circumstances surrounding this matter, and I have prepared this Declaration in Support of Plaintiffs' Motion to Appoint Interim Class Counsel.

3. The following statements are based on my personal knowledge and review of the facts and, if called on to do so, I could and would testify competently thereto.

4. Sweeney Merrigan has spent significant amounts of time and energy investigating the merits and vetting the potential claims in this case. Sweeney Merrigan first researched the complex Meta Pixel tools that hospitals are using and then investigated whether Defendant's websites were using them and to what extent. Sweeney Merrigan then conducted extensive research regarding Defendant's potential liability, including claims for wiretapping, breach of fiduciary duty, and invasion of privacy arising from Defendant's alleged disclosure of its patients' personal health information to third parties, including Facebook and Google.

5. Sweeney Merrigan has interviewed potential fact witnesses concerning evidence and conferred with proposed Class Members.

6. Sweeney Merrigan is a Boston-based law firm that has extensive experience handling complex litigation and class actions, including class action and consolidated mass tort litigation. For instance, it served as local counsel litigating on behalf of 123 Massachusetts cities and towns against manufacturers and distributors of prescription opioid medications for alleged consumer protection violations. *In re National Prescription Opiate Litigation*, Master Docket Number 1:17-MD-2804 (N.D. Ohio). In that case, it successfully prosecuted these claims and

obtained settlements of more than $500 million for Massachusetts and its municipal entities. Sweeney Merrigan is also prosecuting a class action for residents of Westminster, Massachusetts per- and polyfluorinated substance (PFAS) contamination. Ex. A ¶ 6 (Merrigan Decl.); *see Ryan et al. v. Greif et al.,* No. 22-cv-40089 (D. Mass.).

7. Lawyers at Sweeney Merrigan have also served on attorney leadership committees and liaison counsel in mass and class actions, in Massachusetts federal court and state court. *In re Shield Health Care Group, Inc.*, No. 1-22-cv-10901 (D. Mass.) (Executive Committee); *In re Columbia Gas*, Civil Action No. 1877CV01343G (Mass. Super. Ct.) (Liaison Counsel).

8. Sweeney Merrigan has experience in data breach security class actions, *In re Shield Health Care Group, Inc.*, No.: 1-22-cv-10901 (D. Mass.) (case impacting over 2 million patients' private data and information), and currently represents other putative classes in Massachusetts state and federal court against hospitals for state law violations arising from their alleged use of the Meta Pixel tool to intercept and disclose patient health information:

- *Jane Doe, Ind an on Behalf of All Others Similarly Situated v. Atrius Health, Inc.;* C.A. No. 2282CV00982; Norfolk Superior Court
- *John Doe, Ind an on Behalf of All Others Similarly Situated v. Emerson Hospital*; C.A. No. 2277CV01000; Essex Superior Court
- *John Doe v. Ind an on Behalf of All Others Similarly Situated v. UMass Memorial Health Care*; C.A. No. 2285CV01205; Worcester Superior Court
- *John Doe v. Cape Cod Healthcare, Inc.* No. 1:23-cv-10080, United States District Court for the District of Massachusetts (removed from the Barnstable Superior Court, 2272CV00493)

9. I have extensive experience in class and mass action litigation. I am the co-managing partner at Sweeney Merrigan and am currently a member a member of the American Association for Justice, Massachusetts Academy of Trial Attorneys, the Boston Bar Association,

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

and Massachusetts Bar Association. I graduated from New England School of Law and earned his bachelor's degree in Political Science at Tufts University.

10. Sweeney Merrigan has the resources necessary to lead this litigation and has extensive experience successfully managing complex, resource-intensive cases of all sorts. Sweeney Merrigan has the necessary technology to handle voluminous and complex discovery, including the types of discovery anticipated in this case. Furthermore, we have experienced attorneys and support professionals to staff the case. We have designated a list of primary of attorneys who will bring their unique skills and experience to representing the Class.

11. Sweeney Merrigan regularly advances the costs of litigation and is committed to dedicate substantial resources to vigorously prosecute the claims in this case for the potential class.

12. If appointed Interim Class Counsel, I will strive to avoid waste and duplication in favor of efficiency. I fully understand the substantial investment of time and resources necessary to properly pursue and lead such litigations and are committed to devoting the necessary resources to this case. I and Sweeney Merrigan are absolutely committed to prosecuting this action in the best interests of the proposed class and indicating their rights.

13. A copy of Sweeney Merrigan's firm resume is attached hereto as Exhibit A.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 14th day of August 2023, in Boston, Massachusetts.

/s/ Tucker Merrigan
J. TUCKER MERRIGAN

I HEREBY ATTEST AND CERTIFY ON
March 7, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

# EXHIBIT A – SWEENEY MERRIGAN FIRM RESUME

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

38

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, §
Plaintiff §
v. §
UMASS MEMORIAL HEALTH CARE, INC, §
Defendant. §

C.A. No. ~~2285CV01205~~ D
2384CV02448-BLS1

[redacted]

---

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

LISA COLLETON, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, §
Plaintiff §
v. §
UMASS MEMORIAL HEALTH CARE, INC, §
Defendant. §

C.A. No. ~~2285CV01293D~~
2384CV02450-BLS1

---

**DECLARATION OF WARREN POSTMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR APPOINTMENT OF INTERIM CLASS COUNSEL**

I, Warren Postman, hereby declare as follows:

1. I am an attorney and partner at Keller Postman LLC ("KP") and counsel for Plaintiff John Doe, and other similarly situated class members ("Plaintiffs") in the above-captioned case.

2. I am fully familiar with the facts and circumstances surrounding this matter, and I have prepared this Declaration in Support of Plaintiffs' Motion to Appoint Interim Class Counsel.

3. The following statements are based on my personal knowledge and review of the facts and, if called on to do so, I could and would testify competently thereto.

4. KP has spent significant amounts of time and energy investigating the merits and vetting the potential claims in this case. KP first researched the complex Meta Pixel tools that hospitals are using and then investigated whether Defendant's websites were using them and to what extent. KP then conducted extensive research regarding Defendant's potential liability, including claims for wiretapping, breach of fiduciary duty, and invasion of privacy arising from Defendant's alleged disclosure of its patients' personal health information to third parties, including Facebook and Google.

5. KP is one of the nation's preeminent firms specializing in complex civil litigation. Its practice includes numerous high-profile privacy, antitrust, and consumer protection class actions. It has been at the forefront of complex litigation related to data breach issues.

6. In 2021, KP was named Trial Strategy Innovation Law Firm of the Year by the National Law Journal and American Lawyer Media at the Elite Trial Lawyers Awards. More recently, KP was named the National Law Journal's 2022 Privacy & Data Breach Law Firm of the Year.

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

7. Lawyers at KP recently served as counsel for a putative class and secured a favorable settlement in Massachusetts federal court. *Barr et al. v. Drizly*, No. 1:20-cv-11492 (D. Mass.). KP and my significant class action experience includes the following:

- *West et al v. Amazon.com Inc.*, No. 2:21-cv-00694, United States District Court for the Western District of Washington
- *C.O., a minor, v. Amazon.com Inc. et al*, No. 2:19-cv-00910, United States District Court for the Western District of Washington
- *Fishon et al v. Peloton Interactive, Inc.*, No. 1:19-cv-11711, United States District Court for the Southern District of New York
- *Richard A. Ross and Fieldstone Ventures, LLC v. EQT Corporation et al.*, No. GD-21-011948, Fifth Judicial District of Pennsylvania, County of Allegheny
- *Hestrup & Peiss v. DuPage Medical Group. Ltd. d/b/a DuPage Medical Group*, Case No. 2021L000937, 18th Judicial Court, DuPage County, Illinois
- *Gilbert v. AFTRA Retirement Fund et al*, Case No. 1:20-cv-10834, United States District Court for the Southern District of New York
- *Hall, et al v. AspenPointe, Inc., et al*, Case No. 2020CV32175, 4th District Court, County of El Paso, Texas
- *Hackerott v. Central Kansas Orthopedic Group, Inc.*, et al, Case No. 2020-cv-000120, District Court of Barton County, Kansas.

8. I have been appointed class counsel for numerous certified and putative classes of individuals whose information has been compromised by one or more data breaches.

9. I have over 14 years of experience litigating complex, high-stakes cases like the instant case. I received my J.D. from Harvard Law School where I graduated *magna cum laude*, and was the Articles Editor of the Harvard Law Review. After law school, I clerked for the Honorable Justice David H. Souter of the Supreme Court of the United States, and Judge William A. Fletcher at the U.S. Court of Appeals for the Ninth Circuit.

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

10. KP has the resources necessary to lead this litigation and has extensive experience successfully managing complex, resource-intensive cases of all sorts. KP has the necessary technology to handle voluminous and complex discovery, including the types of discovery anticipated in this case. Furthermore, we have experienced attorneys and support professionals to staff the case. KP has also designated a list of attorneys who will bring their unique skills and experience to representing the Class.

11. KP regularly advances the costs of litigation and is committed to dedicating substantial resources to vigorously prosecute the claims in this case for the class members.

12. If appointed Interim Class Counsel, I will strive to avoid waste and duplication in favor of efficiency. I fully understand the substantial investment of time and resources necessary to pursue and lead such litigations, and my firm is committed to devoting the necessary resources to this case and prosecuting this action in the best interests of the proposed class.

13. A copy of KP's firm resume is attached hereto as Exhibit C.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 14th day of August 2023, in Washington, D.C.

*/s/ Warren Postman*
WARREN D. POSTMAN

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

# EXHIBIT C – KP FIRM RESUME

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

39

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 228~~5CV01205~~ D<br>2384CV02448-BLS1<br><br>[redacted] N |

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| LISA COLLETON,<br>ON BEHALF OF HERSELF<br>AND ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. ~~2285CV01293D~~<br>2384CV 02450-BLS1 |

**DECLARATION OF FOSTER JOHNSON IN SUPPORT OF PLAINTIFFS' MOTION FOR APPOINTMENT OF INTERIM CLASS COUNSEL**

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

I, Foster Johnson, hereby declare as follows:

1. I am an attorney and partner at Ahmad Zavitsanos & Mensing PLLC ("AZA") and counsel for Plaintiff John Doe, and others similarly situated class members ("Plaintiffs") in the above-captioned case.

2. I am fully familiar with the facts and circumstances surrounding this matter, and I have prepared this Declaration in Support of Plaintiffs' Motion to Appoint Interim Class Counsel.

3. The following statements are based on my personal knowledge and review of the facts and, if called on to do so, I could and would testify competently thereto.

4. AZA has spent significant amounts of time and energy investigating the merits and vetting the potential claims in this case. AZA first researched the complex Meta Pixel tools that hospitals are using and then investigated whether Defendant's websites were using them and to what extent. AZA then conducted extensive research regarding Defendant's potential liability, including claims for wiretapping, breach of fiduciary duty, and invasion of privacy arising from Defendant's alleged disclosure of its patients' personal health information to third parties, including Facebook and Google.

5. AZA has interviewed potential fact witnesses concerning evidence and conferred with proposed Class Members. AZA has also retained a consulting expert to assist with vetting and prosecuting Plaintiffs' and Class Members' claims.

6. AZA is a fifty-lawyer firm specializing in commercial and patent technology litigation with extensive experience handling complex litigation and class actions. Chambers USA, the independent and prestigious legal guide, has consistently ranked AZA among the top Texas law firms for both commercial litigation and intellectual property work. AZA's attorneys have litigated and tried all types of breach of contract and business tort cases in federal and state courts

and arbitration panels across the country. Major corporations and senior executives regularly hire AZA to prosecute and defend their high-profile, difficult, and complex cases. For instance, last year, AZA won a $62.65 million verdict after a seven-week trial from a Nevada jury in a nationally watched case for emergency room physician group clients who were underpaid by United Healthcare, the largest insurer in the nation. In 2019, AZA defended a midstream oil and gas company against a claim for $250 million related to the building of an oil refining unit. KP is one of the nation's preeminent firms specializing in complex civil litigation. Its practice includes numerous high-profile privacy, antitrust, and consumer protection class actions. It has been at the forefront of complex litigation related to data breach issues.

7. AZA has similar experience in intellectual property litigation and is consistently ranked by Chambers USA in this area. For example, AZA's attorneys have successfully prosecuted patent infringement cases involving complex technology against some of the biggest technology companies in the world, including Apple, Samsung, Motorola, and Garmin.

8. AZA also routinely handles mass and class actions from both the plaintiff and defense side. For instance, lawyers at the firm have recovered nearly $1 billion on behalf of nationwide class of homeowners whose homes had defective plumbing systems. *McDonald, et al v. Shell Oil Co, et al*, No. 89-28469, in the 334th District Court of Harris County, Texas. .Lawyers at AZA have also recovered $450+ million on behalf of nationwide class of investors in the Courtyard, Fairfield Inn and Residence Inn limited partnerships, *Milkes v. Marriott International, et al*, Case No. 96-CI-08327, 285th District Court of Bexar County, Texas, and $425+ million in a mass action on behalf of individuals who underwent unnecessary heart valve surgeries. *Tenet Healthcare Cases III*, Judicial Council Coordination Proceeding No. 4301, in Shasta County, California. AZA is also representing more than 120 clients whose homes were flooded during

Hurricane Harvey because of government action at the Addicks Barker dams. *In re. Upstream Addicks and Barker (Texas) Flood-Control Reservoirs*, Sub-Master Docket No. 17-9001, in the United States Court of Federal Claims.

9. In the data privacy space, AZA is currently prosecuting more than two dozen data privacy class actions in multiple states on behalf of patients whose personal health information was shared with Facebook in violation of state and federal law. These include multiple class actions in Massachusetts:

- *Jane Doe, Ind an on Behalf of All Others Similarly Situated v. Atrius Health, Inc.;* C.A. No. 2282CV00982; Norfolk Superior Court
- *John Doe, Ind an on Behalf of All Others Similarly Situated v. Emerson Hospital*; C.A. No. 2277CV01000; Essex Superior Court
- *John Doe v. Ind an on Behalf of All Others Similarly Situated v. UMass Memorial Health Care*; C.A. No. 2285CV01205; Worcester Superior Court
- *John Doe v. Cape Cod Healthcare, Inc.* No. 1:23-cv-10080, United States District Court for the District of Massachusetts (removed from the Barnstable Superior Court, 2272CV00493)

10. I have experience in class action litigation as counsel for both plaintiffs and defendants. I am a charter member of AZA's Class Action Group. I currently spearhead more than two dozen of class action cases filed against hospitals for state law violations arising from their alleged use of the Meta Pixel tool to intercept and disclose patient health information, including the four pending in Massachusetts. Since filing those class actions in the fall, AZA and Keller Postman have seen multiple copycat filings in the related Massachusetts class action cases. Those include a copycat filing related to this case, which was filed in the Business Litigation Section almost two months after Plaintiff John Doe's original complaint was filed in this Court.

11. I received my J.D. and undergraduate degrees from Stanford University. After law school, I clerked for the Honorable Priscilla Owen of the United States Court of Appeals for the 5th Circuit.

12. AZA has the resources necessary to lead this litigation and has extensive experience successfully managing complex, resource-intensive cases of all sorts. AZA has the necessary technology to handle voluminous and complex discovery, including the types of discovery anticipated in this case. Furthermore, we have experienced attorneys and support professionals to staff the case. We have designated a list of primary of attorneys who will bring their unique skills and experience to representing the Class.

13. AZA regularly advances the costs of litigation and is committed to dedicate substantial resources to vigorously prosecute the claims in this case for the potential class.

14. If appointed Interim Class Counsel, I will strive to avoid waste and duplication in favor of efficiency. I fully understand the substantial investment of time and resources necessary to properly pursue and lead such litigations and are committed to devoting the necessary resources to this case. I and AZA are absolutely committed to prosecuting this action in the best interests of the proposed class and indicating their rights.

15. A copy of AZA firm resume is attached hereto as Exhibit D.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 14th day of August 2023, in Houston, Texas.

/s/ Foster C. Johnson
FOSTER C. JOHNSON

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

# EXHIBIT D – AZA FIRM RESUME

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

40

EFILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. ~~2285CV01205~~ D<br>2384CV02448-BLS1<br><br>[redacted] |

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| LISA COLLETON,<br>ON BEHALF OF HERSELF<br>AND ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. ~~2285CV01293D~~<br>2384CV02450-BLS1 |

**DECLARATION OF NICHOLAS A. COULSON IN SUPPORT OF PLAINTIFFS' <u>MOTION FOR APPOINTMENT OF INTERIM CLASS COUNSEL</u>**

I, Nicholas A. Coulson, declare as follows:

1. I am an attorney licensed to practice in the State of Michigan with a State Bar of Michigan Identification No. 78001. I have been licensed to practice law in the State of Michigan since 2013. Since that time, I have been continually licensed to practice. I have never been disciplined, suspended, or disbarred. I am also licensed to practice in the United States District Courts for the Eastern District of Michigan, the Western District of Michigan, the Western District of New York, the Eastern District of Wisconsin, the Western District of Wisconsin, and the District of Colorado, in addition to the United States Courts of Appeals for the Third Circuit, the United States Courts of Appeals for the Fifth Circuit, and the United States Court of Appeals for the Ninth Circuit.

2. Except as otherwise stated, I have personal knowledge of the facts stated below and, if called as a witness at the time of any proceeding, could and would testify thereto. I make this Declaration in support of Plaintiffs' Motion for Appointment of Interim Class Counsel.

3. I am a partner at the law firm of Liddle Sheets Coulson P.C. ("LSC") in Detroit, Michigan. My practice, and that of my law firm, is devoted almost exclusively to the prosecution of class actions and other complex litigation.

4. I believe that I and my firm possess the experience, knowledge, expertise, and resources to represent the Class in this case. LSC practices exclusively in complex class litigation and has litigated and successfully resolved well in excess of 100 class action cases. A copy of LSC's firm resume is attached as Exhibit A.

5. I have been appointed as class counsel in dozens of cases by courts in various jurisdictions. I and my firm have decades of experience litigating complex class litigation and class actions, including nationwide cases arising from unlawful business practices claims on behalf of consumers.

6. In *McKnight v. Uber Techs., Inc.*, No. 14-cv-05615-JST, 2017 U.S. Dist. LEXIS 124534, at *23 (N.D. Cal. Aug. 7, 2017), I was appointed by the United States District Court for the Northern District of California to represent a nationwide class of millions of Uber passengers. That case resulted in a $32.5 million settlement.

7. In *Dykehouse v. 3M Company*, Case No. 1:19-cv-01225 (W.D. Mich. 2021), I was appointed by the court to represent a certified class whose claims were successfully resolved in a groundbreaking $11.9 million PFAS contamination settlement, the first known class action settlement with the chemicals' inventor.

8. In *Nellis v. Vivid Seats*, Case No. 1:20-cv-01486 (N.D. Ill.), I was appointed by the United States District Court for the Northern District of Illinois to represent a nationwide class of thousands of Vivid Seats customers in a ticket refund case similarly fashioned to this Action. The settlement I and my firm obtained for the class in that case was preliminarily and finally approved.

9. Other cases in which I have been appointed to represent certified classes include, without limitation: *Clark-Floyd Landfill, LLC v. Gonzalez*, No. 19A-CT-2680, 2020 Ind. App. LEXIS 257, at *21 (Ct. App. June 18, 2020) (certification affirmed on appeal); *Ross, et al. v. USX Company*, Case No. G.D. 17-008663 (Allegheny Cty., PA Ct. of Common Pleas); *Bright et al v. Wake County Disposal, LLC*, Case No. 18-cvs-10976 (Wake Cty. NC Superior Ct.); *Michaely v. Browning-Ferris Industries of California, Inc.* (California Superior- Los Angeles Case No. BC497125 2019); *Batties v. Waste Management of Pennsylvania, LLC*, No. 14-7013, 2016 U.S. Dist. LEXIS 186335, at *47 (E.D. Pa. May 11, 2016); *Beck v. Stony Hollow Landfill, Inc.*, No. 3:16-cv-455, 2018 U.S. Dist. LEXIS 199221, (S.D. Ohio Nov. 26, 2018); *Johnston, et al. v. Deffenbaugh Disposal, Inc.*, Case No: 2:16-cv-02648-JTM-KGG (D. Kan.) (thousands of residents near landfill); *Brown v. Rhode Island Resource Recovery Corporation*, C.A. NO. PC 2015-0947

(Rhode Island Superior 2018); *McCarty v. Okla. City Landfill, LLC,* No. CIV-12-1152-C (W.D. Okla. April 11, 2016); *Ng. v. International Disposal Corp. of California*, Case No. 112CV228591 (Santa Clara CA Superior Court Aug. 1, 2016); *Connors v. AmeriTies West, LLC,* (Wasco County Oregon Case No. 16-CV-25390, 2018); *Gingrasso, et al. v. Cedar Grove Composting Facility, Inc.*, (King County (WA) Superior Court Case No: 13-2-05334-9 KNT, 2018); *Bundy, et al. v. Cedar Grove Composting Facility, Inc.*, Snohomish County (WA) Superior Court Case No: 13-2-02778-8, 2018) (thousands of residents near composting facility); *Averett v. Metalworking Lubricants Co.*, No. 1:15-cv-01509-JMS-MPB, 2017 U.S. Dist. LEXIS 158184, at *1 (S.D. Ind. Sep. 27, 2017); *Dabney v. Taminco US, Inc.*, Case No. 3:15-cv-533/MCR/EMT (N.D. FL); *Maroz v. Arcelormittal Monessen, LLC,* No. 15-cv-00771-AJS (W.D. PA Nov. 14, 2016); *Fritz v. City of Ecorse*, Case No. 13-000371-NZ (Wayne County MI Circuit Ct.); *Ray v. City of Lansing*, Case No. 13-124242-NZ (Ingham County MI Circuit Ct.); *Laprarie v. City of Warren*, Case No. 11-0044560NZ (Macomb County MI Circuit Ct.); *Baynai v. City of Riverview,* Case No. 12-0072979 (Wayne County MI Circuit Ct.); *Domino v. City of Livonia*, Case No. 11-010285-NZ (Wayne County MI Circuit Ct.).

10. My law firm, Liddle Sheets Coulson P.C. has successfully litigated appeals in class actions and obtained numerous favorable published decisions, including the following:

> *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214 (3d Cir. 2020); *Clark-Floyd Landfill, LLC v. Gonzalez*, No. 19A-CT-2680, 2020 Ind. App. LEXIS 257, at *21 (Ct. App. June 18, 2020) (unanimously affirming grant of class certification on defendant's interlocutory appeal); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013) (circuit-wide issue of first impression holding that claims of plaintiffs and class were not preempted by federal statutory scheme, now adopted by several federal circuits and states); *Olden v. Lafarge Corp.*, 383 F.3d 495, 497 (6th Cir. 2004) (overruling prior precedent that prohibited aggregating class damage for jurisdictional purposes and affirming district court's grant of class certification).

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

11. I and my firm are presently litigating numerous cases involving allegations that defendants used Meta Pixel to unlawfully disclose website users' private information, including several cases that name healthcare provider entities as defendants.

12. I and my firm have thoroughly investigated the facts and circumstances surrounding this case and the claims herein. We have committed to devote the necessary resources (as we do in each of our cases, regularly advancing hundreds of thousands of dollars or more in case costs) to ensure zealous representation of the class. We have also committed to work collaboratively with proposed co-lead counsel to ensure that our efforts are efficient, effective, and not needlessly duplicative.

13. LSC has in place an extensive technology infrastructure which, among other things, will allow us to efficiently process the sort of voluminous discovery anticipated in this case.

14. LSC also has designated experienced personnel to participate in the efficient prosecution of this matter as necessary, including partners Nicholas A. Coulson and Steven D. Liddle, associates Matthew Z. Robb and D. Reed Solt, and support staff Mark Declerck and Jeff DeLaunay.

15. If appointed to represent the class in this case, I and my firm will continue to zealously advocate for the interests of the class and use our substantial experience to bring to bear the best result possible.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this August 14 at Detroit, Michigan.

Dated: August 14, 2023

Respectfully submitted,

/s/ Nicholas A. Coulson
Nicholas A. Coulson

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____
Assistant Clerk

# EXHIBIT B – LSC FIRM RESUME

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

# LIDDLE | SHEETS | COULSON

CLASS ACTION AND COMPLEX LITIGATION

975 E. Jefferson Avenue
Detroit, MI 48207-3101
www.LSCCounsel.com

## FIRM RESUME

Liddle Sheets Coulson P.C. is Detroit, Michigan law firm that has concentrated its practice on representing individuals in class action and multi-plaintiff litigation for more than 20 years. The firm's attorneys have been appointed class counsel in over 100 cases, including in state, federal, and bankruptcy courts in states across the country. The firm has obtained numerous groundbreaking settlements, litigated numerous successful appeals, and contributed to scholarship in the areas of environmental and class action law.

Representative cases include:

*Dykehouse v. 3M Company*, Case No. 1:19-cv-01225 (W.D. Mich.) wherein the firm obtained an $11.9 million settlement for the residents of Parchment, Michigan after their municipal drinking water was found to be contaminated with PFAS chemicals. Class members received significant individual payments despite substantial hurdles, including the potential limitation of damages because the contamination was only known for 30 days before the city's water source was changed. Believed to be the first PFAS water contamination anywhere to which 3M, the inventor and major producer of the chemicals, has been a party.

*McKnight v. Uber* (Case No. 3:14- cv-05615-JST) (ND. Cal.) co-lead class counsel in a a $32,500,000 class action settlement of claims regarding Uber's widely reported "Safe Rides Fee," safety measures, and background check process for potential drivers.

*Michaely, et al v. Browning-Ferris Industries of California, Inc.* Case No. BC 497125 (Superior Court of the State of California, County of Los Angeles- Central Division), firm reached a total settlement of $9.5 million for residents of a neighborhood afflicted by ongoing air pollution from a landfill. Believed to be one of the largest ever landfill emissions class action settlements that did not involve personal injury claims.

*Etheridge v City of Grosse Pointe Park*, Case No. 95-527115NZ (Wayne County, MI Third Circuit Court) where, in 1998, partner Steven Liddle was able to end Grosse Pointe Park's 60-year practice of dumping untreated sewage into a canal system that bordered the plaintiffs' property. The defendant had to pay $3.8 million in monetary damages to the plaintiffs. This was the first instance where we successfully used the class action mechanism to address localized environmental concerns.

*In Re: Lessard*, Case No. 00-74306 (E.D. Mich) - Extensively litigated the issue of governmental immunity for sewage invasions, including a certified question to the Michigan Supreme Court. While we prevailed on behalf of our thousands of clients under

a traditional trespass/nuisance theory, the supreme court utilized prospective application to limit the holding in future cases, depriving future victims of redress. Rather than accept this outcome, we led a grassroots campaign that led to the enactment of Public Act 222 of 2001 (MCL 691.1416 et seq.). The act created one of the few exceptions to governmental immunity in Michigan, allowing a homeowner to seek damages arising from a sewage backup. The enactment of this law has enabled thousands of Michigan homeowners to receive reimbursement for property loss occasioned by a sewage backup and has incentivized numerous municipalities to upgrade their sewer infrastructure to prevent future events.

Notable appellate decisions of the firm include *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214 (3d Cir. 2020); *Clark-Floyd Landfill, LLC v. Gonzalez*, No. 19A-CT-2680, 2020 Ind. App. LEXIS 257, at *21 (Ct. App. June 18, 2020) (unanimously affirming grant of class certification on defendant's interlocutory appeal); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 190 (3d Cir. 2013) (circuit-wide issue of first impression holding that claims of plaintiffs and class were not preempted by federal statutory scheme, now adopted by several federal circuits and states); *Olden v. Lafarge Corp.*, 383 F.3d 495, 497 (6th Cir. 2004) (overruling prior precedent that prohibited aggregating class damage for jurisdictional purposes and affirming district court's grant of class certification).

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

**Steven D. Liddle, Managing Partner**

Steven D. Liddle has been litigating complex civil cases, predominantly class actions, since 1991. He is a recipient of Michigan Lawyers Weekly's "Lawyers of the Year" award for his representation of thousands of homeowners impacted by environmental contamination. He was named to Crain's Detroit Business 2003 "40 Under 40". In the *Fox Creek* litigation, he resolved a 60-year-old ongoing environmental problem for residents of the lower east side of Detroit. For decades, sewage had been discharged into a canal system that bordered their homes. Mr. Liddle resolved the case for $3.8 million in damages and the installation of a new $25 million sewage system to eliminate future discharges. Since that time, Mr. Liddle has successfully represented hundreds of thousands of individuals in environmental claims against corporate and municipal entities, recovering many millions of dollars. He has also served as an adjunct professor at Michigan State University Detroit College of Law, where he taught complex litigation.

Steve uses his decades of experience in the class action space to oversee the firm's rapid growth into new, important areas of practice. Under his direction, the firm has expanded into consumer, securities, data protection, and other litigation, as well as mass torts and mass arbitrations.

Mr. Liddle is a member of the bar of the State of Michigan and is admitted to the bars of the United States District Courts for the Eastern District of Michigan, the Western District of Michigan, the Western District of New York, and the Eastern District of Wisconsin. Mr. Liddle is also admitted to the United States Court of Appeals for the Sixth Circuit and the Supreme Court of the United States.

Steve Liddle graduated from Michigan State University in 1987 and received his Juris Doctor in 1991 from the University of Detroit Mercy Law School.

**Laura L. Sheets, Partner**

Laura L. Sheets has successfully litigated environmental tort cases in Michigan and elsewhere since 2001. Her efforts have resulted in many millions of dollars in monetary recoveries and improvements to the quality of life in dozens of neighborhoods. She served as interim co-lead and class counsel in *Holder, et al v. Enbridge Energy L.P.*, et al, Case No. 1:10-cv-752 (W.D. Mich. 2010), the class action litigation that arose from the 2010 Kalamazoo River oil spill. She has successfully resolved dozens of cases against a variety of industrial polluters in numerous jurisdictions, both in state and federal courts. In 2013, Attorney at Law magazine profiled her efforts on behalf of homeowners in environmental cases. She presently represents residents impacted by environmental contamination in at least seven states.

Ms. Sheets is a member of the Bar of Michigan and is admitted to the United States District Courts for the Eastern District of Michigan and Western District of Michigan.

Ms. Sheets graduated from Wayne State University with honors in 1998 and received her Juris Doctor from Wayne State University Law School in 2001.

**Nicholas A. Coulson, Partner**

Courts throughout the country have appointed Mr. Coulson to represent millions of people in dozens of class actions, including in the fields of environmental, securities, and consumer protection litigation. He is proud to have worked to recover many millions of dollars for his clients, and to improve the lives of those impacted by industrial emissions, contamination, and corporate greed. He has successfully litigated numerous appeals in class actions in both state and federal courts, and his publications include topics related to class actions, civil procedure, and environmental law.

Some of Nick's recent achievements include the litigation and resolution of *Dykehouse v. 3M Company*, Case No. 1:19-cv-01225 (W.D. Mich.), wherein he obtained an $11.9 million settlement for the residents of Parchment, Michigan after their municipal drinking water was found to be contaminated with PFAS chemicals; *McKnight v. Uber* (Case No. 3:14- cv-05615-JST) (ND. Cal.) in which he, along with class counsel from two other firms obtained a $32,500,000 class action settlement of claims regarding Uber's "Safe Rides Fee," safety measures, and background check process for potential drivers; *Nellis et al v. Vivid Seats LLC*, Case No. 1:20-cv-02486 (N.D. Ill.), a nationwide consumer class action he resolved for $7.5 million; *and Michaely, et al v. Browning-Ferris Industries of California, Inc.* Case No. BC 497125 (Superior Court of the State of California, County of Los Angeles- Central Division), wherein he worked to obtain a total settlement of $9.5 million for residents of a neighborhood afflicted by ongoing air pollution from a landfill. He is currently serving as co-lead counsel in the securities class action *In re Robinhood Order Flow Litigation*, Case No. 4:20-cv-09328-YGR (N.D. Cal.).

Nick graduated from Oakland University in 2008 with a Bachelor of Arts in Political Science and received his law degree from the University of Minnesota Law School in 2013. He was admitted to the State Bar of Michigan in 2013. His other bar memberships include the United States District Courts for the Eastern District of Michigan, Western District of Michigan, Northern District of Illinois, Eastern District of Wisconsin, Western District of Wisconsin, Western District of New York, District of Colorado, and the Middle District of Tennessee, as well as the United States Courts of Appeals for the Third, Fifth and Ninth Circuits. He is a member of the State Bar of Michigan, the Federal Bar Association (E.D. Mich. Chapter), the Michigan Association for Justice, the American Association for Justice, and has been named a Super Lawyers Rising Star (2021-23). His writings include: "Don't 'Fix' Misrepresentation Class Claim Pleading Standards"

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

(Law360 Dec. 3, 2021); and "PFAS in the Courts: What's happened? What's Next?" (Michigan Bar Journal, June 2022) (with Kyle Konwinski).

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

**Matthew Z. Robb, Associate**

Matthew Z. Robb is an associate attorney at Liddle & Dubin, P.C. He specializes primarily in environmental class actions including air pollution, groundwater contamination, and sewage backups. Matt is a former clerk for the Honorable Damon J. Keith on the United States Court of Appeals for the Sixth Circuit, the longest serving African American federal judge in American history. He authored a book about his father Dean's remarkable life as a groundbreaking attorney, entitled "Dean Robb: An Unlikely Radical," which won the 2011 Indie Excellence Award for Best Historical Biography.

Mr. Robb is a member of the Bar of the State of Michigan and is admitted to the United States District Court for the Eastern District of Michigan as well as the United States Court of Appeals for the Sixth Circuit.

Mr. Robb graduated with honors from Michigan State University in 2009 and received his Juris Doctor *cum laude* in 2016 from Wayne State University Law School. Before law school, Matt worked as a high school teacher in Detroit Public Schools.

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

**D. Reed Solt, Associate**

Dustin "Reed" Solt graduated *cum laude* from the University of Tennesee – Knoxville in 2019 and Michigan State University College of Law in 2022. Beginning as a law clerk with the firm, Reed has initiated and worked on various complex civil litigation involving environmental contamination, consumer protection, and data privacy in both state and federal court.

Reed is an *Editor Emeritus* of The Citing Slavery Project, created by Professor Justin Simard to study and disclose the legacy of the law of slavery in American law. He is admitted to practice in Michigan, the United States District Court for the Eastern District of Michigan, and the United States District Court for the District of Colorado.

Firm Billing Rates (as of June, 2023)

| Attorney | Title | Class Year | Hourly Rate |
|---|---|---|---|
| Steven D. Liddle | Managing Partner | 1991 | $900 |
| Laura L. Sheets | Partner | 2001 | $800 |
| Nicholas A. Coulson | Partner | 2013 | $725 |
| Matthew Z. Robb | Associate | 2016 | $550 |
| D. Reed Solt | Associate | 2022 | $325 |
| Various | Support Staff | | $115-225 |

Date Filed 8/24/2023 1:24 PM
Superior Court - Worcester
Docket Number 2285CV01205

41

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. ~~2285CV01205~~ |
| | § | 2384CV02448-BLS1 |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

---

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT [redacted]

| | | |
|---|---|---|
| LISA COLLETON, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. ~~2285CV01293D~~ |
| | § | 2384CV02450-BLS1 |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

---

**ASSENTED-TO MOTION TO TRANSFER**
**<u>TO THE BUSINESS LITIGATION SECTION</u>**

Plaintiffs, with the assent of Defendant UMass Memorial Health Care, Inc., respectfully move this Court to transfer this action to the Suffolk County Superior Court pursuant to



Allowed contingent on acceptance by the BLS in accordance with S.Ct. Ad. Directive 17-1. Mark J
8/29/23

Notices Mailed 8/31/23

Administrative Directive No. 17-1, for consideration by the Business Litigation Session Administrative Justice for acceptance into the Business Litigation Session (the "BLS"). In support of this motion, Plaintiffs state as follows:

Plaintiff filed this case on behalf of themselves and all other patients of Defendant, alleging that Defendant has used digital marketing tools on its website that redirected website users' protected health information to third parties without the putative class members' knowledge or consent. Defendant denies Plaintiffs' allegations and denies that it has engaged in any action that would result in liability to Plaintiffs or the putative class.

As explained more fully in the accompanying memorandum of law, which Plaintiffs incorporate herein by reference, this complex, putative class action is precisely the type of case that will require substantial case management and would thus benefit from the structure and procedures provided for in the BLS. This case falls squarely within at least three of the categories of cases deemed eligible for BLS jurisdiction in Administrative Directive No. 17-1. Moreover, the BLS is already overseeing several other putative class actions that are based upon similar allegations regarding healthcare institutions' alleged use of digital marketing tools on their websites. This fact further demonstrates that this is the type of case that is appropriate for BLS jurisdiction.

WHEREFORE, for the reasons set forth above and in the accompanying Memorandum in Support of Assented-to Motion to Transfer to the Business Litigation Session, Plaintiffs move, with Defendant's assent, that this case be transferred to Suffolk County for consideration for acceptance into the Business Litigation Session.

Date Filed 8/24/2023 1:24 PM
Superior Court - Worcester
Docket Number 2285CV01205

Respectfully submitted,

*<u>/s/ J. Tucker Merrigan</u>*
J. Tucker Merrigan
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com

Warren Postman (pro hac pending)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
ajd@kellerpostman.com

William P. Doyle (556999)
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
T: (781) 245-1127
F: (781) 245-1148
E: bill@colonna-doyle.com

Nicholas A. Coulson (pro hac pending)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
E: ncoulson@lsccounsel.com

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

Assented to by:

UMASS MEMORIAL HEALTH CARE, INC.

*By its attorneys,*

*<u>/s/ Stephen T. Paterniti</u>*
Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

James H. Rollinson (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______________
Assistant Clerk

**SUPERIOR COURT RULE 9C CERTIFICATE OF CONFERENCE**

I, J. Tucker Merrigan, certify that on August 14, 2023 (and on multiple dates prior to and thereafter) I conferred with Elizabeth A. Scully, counsel for Defendant, with respect to this motion and that Defendant assents to the relief requested herein.

*<u>/s/ J. Tucker Merrigan</u>*
J. Tucker Merrigan

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on August 24, 2023, a copy of the foregoing Assented-To Motion to Transfer to the Business Litigation Section was filed electronically and served on all counsel of record via email.

Respectfully Submitted,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

Date Filed 3/24/2023 1:24 PM
Superior Court - Worcester
Docket Number 2285CV01205
E-FILED

42

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. ~~2285CV01205~~ 2384CV02448-BLS1 |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

[redacted]

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| LISA COLLETON, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. ~~2285CV01293D~~ 2384CV02450-BLS1 |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO**
**<u>TRANSFER CASES TO THE BUSINESS LITIGATION SECTION</u>**

Pursuant to Administrative Directive No. 17-1 of the Superior Court, Plaintiffs, with assent of the Defendant UMass Memorial Health Care, Inc., respectfully move this Court to transfer this action

to the Business Litigation Session ("BLS") in Suffolk County.

## BACKGROUND

On October 24, 2022, Plaintiff Doe filed his original complaint. On November 14, 2022, Plaintiff Colleton filed her action. Defendant removed both actions to federal court. On July 13, 2023, the United States District Court for the District of Massachusetts remanded them to state court. On August 17, 2023, these cases were consolidated. See *Doe v UMASS Memorial Health Care, Inc.*, 2285CV01205, Motion to Consolidate allowed August 17, 2023.

Plaintiffs allege that Defendant used digital marketing tools on its website that redirected website users' protected health information to third parties, such as Facebook, without the users' knowledge or consent. Plaintiffs further allege that Defendant's actions violated website users' reasonable expectations of privacy. Plaintiffs have brought multiple counts against Defendant, including (1) interception of wire communications in violation of G.L. c. 272, § 99; (2) invasion of privacy in violation of G.L. c. 214, § 1B; (3) breach of fiduciary duty and/or common law duty of confidentiality; and (4) unjust enrichment. Defendant denies Plaintiffs' allegations and denies that it has engaged in any action would result in liability to Plaintiffs or the putative class.

## ARGUMENT

Plaintiff alleges multiple claims on behalf of herself and a massive, putative class. The substance of the highly-technical allegations relate to alleged digital marketing tools that Plaintiff claims were used to disclose "protected health information" to third parties. Discovery is likely to be significant. In addition, the highly technical nature of this matter will require significant involvement of expert witnesses. These complexities, considered together with the need to address significant matters like class certification and dispositive motions, make clear that this case will require substantial case management and other assistance from the Court. Accordingly, this is precisely the kind of matter

that would benefit from the structure and procedures provided in the Business Litigation Session for complex cases.

This case falls within at least three categories of BLS-eligible matters, as defined in Superior Court Administrative Directive 17-1:

> e.1 claims involving breaches of contract or fiduciary duties, fraud, isrepresentation, business torts or other violations involving business relationships;
>
> h.2 claims of unfair trade practices involving complex issues, including class actions that do not involve personal injury;
>
> k.1 other claims involving complex issues or that require close case management, including but not limited to insurance coverage or reinsurance, construction, commercial lease disputes, real estate and consumer matters.

The eligibility under multiple categories underscores that this is the kind of case intended to fall within the jurisdiction of the BLS.

The BLS is already overseeing several other putative class actions that are based upon similar allegations regarding healthcare institutions' alleged use of digital marketing tools on their websites. *See Doe v. The Children's Hospital Corporation*, No. 2384CV00411 (BLS1); *Vita v. Beth Israel Deaconess Medical Center, Inc.*, No. 2384CV00480 (BLS1); *Vita v. Blue Cross and Blue Shield of Massachusetts*, No. 2384CV00542 (BLS1); *Doe v. Lawrence General Hospital*, No. 2384CV00728 (BLS1); *Vita v. New England Baptist Hospital*, No. 2384CV00857 (BLS1). The acceptance of these cases into the BLS further confirms that transfer of this case would be appropriate. Although Plaintiff filed this matter in Worcester County, venue is not a bar to transfer because Plaintiffs assent to the relief requested herein. *See* Superior Court Administrative Directive 17-1 (discussing transfer to the BLS "from a Superior Court Session Outside of Suffolk County").

Defendant consents to consolidation and transfer of the matters to the Superior Court Business Litigation Section (BLS 1). Defendant, however, expressly reserves all its rights,

remedies, defenses, objections, and arguments, and has not waived any rights. Defendant denies Plaintiffs' allegations and does not believe that certification of the putative class or classes is proper. Defendant specifically reserves its rights to move to dismiss under Mass. R. Civ. P. 12 and to oppose class certification and assert defenses on all available grounds.

The parties further move that the Defendant's deadlines to file any response, including a motion to dismiss, to the pending complaints filed by John Doe and Lisa Colleton, shall be adjourned in light of the Plaintiffs' intention to file an Amended Consolidated Complaint. Once the Plaintiffs file their Amended Consolidated Complaint the Defendant shall have thirty days from the docketing of the Amended Consolidate Complaint in the BLS to file its response thereto.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs, with the assent of Defendant, respectfully request that this action be transferred to Suffolk Superior Court for consideration by the BLS Administrative Justice, for acceptance into the Business Litigation Session.

*(Section left intentionally blank)*

Date Filed 8/24/2023 1:24 PM
Superior Court - Worcester
Docket Number 2285CV01205

Respectfully submitted,

*<u>/s/ J. Tucker Merrigan</u>*
J. Tucker Merrigan
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com

Warren Postman (pro hac pending)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
ajd@kellerpostman.com

William P. Doyle (556999)
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
T: (781) 245-1127
F: (781) 245-1148
E: bill@colonna-doyle.com

Nicholas A. Coulson (pro hac pending)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
E: ncoulson@lsccounsel.com

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on August 24, 2023, a copy of the foregoing Assented-To Motion to Transfer to the Business Litigation Section was filed electronically and served on all counsel of record via email.

Respectfully Submitted,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

| CLERK'S NOTICE | DOCKET NUMBER<br>2285CV01205 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>**John Doe, Ind. And ON Behalf Of All Others vs. Umass Memorial Health Care, Inc.** | | Dennis P. McManus, Clerk of Courts<br>Worcester County |
| TO: File Copy | | COURT NAME & ADDRESS<br>Worcester County Superior Court<br>225 Main Street<br>Worcester, MA 01608 |

You are hereby notified that on 08/29/2023 the following entry was made on the above referenced docket:

**Endorsement on Motion to Transfer to the Business Litigation Section (#15.0): ALLOWED**
**Allowed contingent on acceptance by the BLS in accordance with S.Ct. Ad. Directive 17-1. Notices mailed 8/31/23**

**Judge: Goodwin, Hon. Karen**

| DATE ISSUED | ASSOCIATE JUSTICE/ ASSISTANT CLERK | SESSION PHONE# |
|---|---|---|
| 08/31/2023 | Hon. Karen Goodwin | (508)831-2350 |

Date/Time Printed: 08-31-2023 15:12:21

SCR016\ 02/2023

FILED 43

AUG 24 2023

ATTEST CLERK

COMMONWEALTH OF MASSACHUSETTS

**Worcester, ss.**

| | |
|---|---|
| JOHN DOE,<br>Individually and on behalf of all others similarly situated,<br>v.<br>UMASS MEMORIAL HEALTHCARE, INC.,<br>Defendant. | **SUPERIOR COURT DEPARTMENT**<br>Civil Action No. ~~2285cv01205~~<br>2384CV02448-BLS1 |
| LISA COLLETON,<br>On behalf of herself and all others similarly situated<br>v.<br>UMASS MEMORIAL HEALTHCARE, INC.,<br>Defendant. | **SUPERIOR COURT DEPARTMENT**<br>Civil Action No. ~~2285cv01293D~~<br>2384CV02450-BLS1 |

**JANICE PROGIN'S OPPOSITION**
**TO MOTION TO APPOINT INTERIM CLASS COUNSEL**

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place, Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**Counsel for Janice Progin, Plaintiff in *Progin v. UMass Memorial Healthcare, Inc.*, C.A. No. 2284cv02889 (Suffolk Superior Ct., Business Litigation Session)**

## I. INTRODUCTION

This opposition is submitted by Janice Progin, a plaintiff with a putative class claim pending against UMass Memorial Healthcare, Inc. ("UMass Memorial") in the Business Litigation Session ("BLS")[1] that overlaps in substance with the claims asserted by plaintiffs John Doe and Lisa Colleton (the "Worcester Plaintiffs"), whose claims are pending in this Court.

The pending motion for appointment of lead counsel filed by the Worcester Plaintiffs is curious. After obtaining consolidation of their two actions pending in this Court against UMass Memorial Healthcare, Inc. ("UMass Memorial"), those plaintiffs seek to appoint **all** counsel from those two cases as **lead** counsel for their consolidated case. If the Worcester Plaintiffs' claim were to remain in this Court, this order would serve no practical purpose, as counsel for the Worcester Plaintiffs already have control over their own consolidated class claims. The true, undisclosed purpose of the motion is quite different.

The reality is that the Worcester Plaintiffs' claims will likely not be litigated in this Court. Although their motion makes no mention of it, the Worcester Plaintiffs and UMass Memorial have already agreed that their claims should be transferred to the Business Litigation Session ("BLS," incorrectly referred to by the Worcester Plaintiffs as the "Business Law Section"). And, although their motion makes no mention of it, Ms. Progin ("the BLS Plaintiff") has already served pursuant to Superior Court Rule 9A a motion that, if granted, would consolidate her claims and case and the Worcester Plaintiffs' claims and case with the BLS Plaintiff's claims and case and transfer all the claims and cases to the BLS. A copy of that motion and memorandum are attached to the Declaration of Edward F. Haber as Exhibit B.[2]

While concealing their agreement to such transfer, the Worcester Plaintiffs ask **this Court** to make one final order before transfer: to appoint their counsel as "lead counsel," notwithstanding that this Court, pursuant to the agreement of all the parties to all the cases, will not likely preside over a

[1] *Progin v. UMass Memorial Healthcare, Inc.*, Case No. 2285CV01205 (Suffolk Super. Ct., Business Litigation Session). The Complaint in *Progin* is attached to the Declaration of Edward F. Haber ("Haber Decl.") as Exhibit A.

[2] Exhibit B does not include the exhibits attached to that motion, as the exhibits are somewhat voluminous, but they are available upon request.

consolidated action. The Worcester Plaintiffs' motion raises obvious questions—why do the Worcester Plaintiffs want this Court to appoint leadership when these cases will likely be litigated not here but in the BLS? Why not have the BLS decide lead counsel issues, given it will be presiding over all three cases? Why did the Worcester Plaintiffs rush to file this motion in flagrant disregard for Superior Court Rule 9A, while, as explained below, concealing their motion from the BLS Plaintiff in an attempt to have this Court resolve the motion without hearing from the BLS Plaintiff?

The answer to each of these questions is the same: the Worcester Plaintiffs, through this motion, attempt to hoodwink the Court into entering an order that they can then invoke in the BLS to argue that control over the litigation has already been decided, precluding Ms. Progin not only from exercising control over her own case but even **being heard** on that precise issue.

The Court should deny the motion to appoint interim counsel for the two Worcester cases for three independent reasons: (i) the Worcester Plaintiffs violated Massachusetts Superior Court Rule 9A; (ii) no decision on leadership should be made until this Court and the BLS Court have decided the BLS Plaintiff's attached motion to consolidate her case and the Worcester Plaintiffs' case and transfer the Worcester cases to the BLS. As discussed herein, all plaintiffs and defendants have agreed with the relief sought by that motion. The judge in the BLS should resolve any case leadership issues once the BLS judge is presiding over all three cases; and (iii) the Worcester Plaintiffs' counsels' conduct in this regard, as described herein, should at a minimum provide strong reason to defer resolution of case organization issues.

## II. BACKGROUND

### A. *Litigation and Press Relating to Tracking Technologies: the Partners Case, The Markup, and In re Meta Pixel.*

In recent years, significant litigation has emerged nationwide regarding healthcare providers' surreptitious use of so-called tracking technologies on healthcare provider websites. These tracking technologies, including Meta Pixel, Google Analytics, and several others, operate through hidden website code executed in website users' browsers, permitting third parties such as Facebook and Google to

intercept communications between healthcare providers and website users. The third parties can then use the contents of those intercepted communications for their own commercial purposes. The Worcester Plaintiffs' and the BLS Plaintiff's Complaints each assert claims against UMass Memorial Healthcare ("UMass Memorial") arising from the secret use of these tracking technologies.

Although *Doe* is the first-filed case against UMass Memorial, its claims are not new; it follows similar cases that have been filed and litigated in the Commonwealth and nationally. Within Massachusetts, the true first-filed case asserting these types of claims was *Doe v. Partners Healthcare System, Inc.* (Super. Ct. Case No. 1984CV01651-BLS1), filed in the BLS on May 23, 2019 (by counsel not involved in any of the UMass Memorial Cases). The plaintiffs in *Partners Healthcare* asserted wiretap and other claims arising from the same tracking technologies at issue in the UMass Memorial Cases, based on substantially the same factual and legal theories as in *Doe*, *Colleton*, and *Progin*. The *Doe* complaint closely tracks the substance of the *Partners Healthcare* complaint. After the Suffolk Superior Court, Business Litigation Session (Davis, J.) denied a motion to dismiss in *Partners Healthcare* case on December 7, 2020, the case settled on a class basis, and the court finally approved that settlement on January 24, 2022.

Recently, a new wave of litigation relating to healthcare providers' use of Meta Pixel and similar tracking technologies was sparked by a June 16, 2022 report by online privacy magazine The Markup that reported on the widespread use of Meta Pixel on hospital websites, implemented in a manner that posed significant concerns to patient privacy.[3] Congressional investigations and further press quickly followed in the summer of 2022,[4] bringing the serious privacy issues raised by Meta Pixel and similar tracking technologies to the forefront.

---

[3] "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medicalinformation-from-hospital-websites.

[4] See "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-overmetas-healthcare-data-collection-policies.

In late June 2022, the undersigned counsel for Janice Progin began investigating potential claims relating to Massachusetts healthcare providers' use of Meta Pixel. Haber Decl. ¶ 4. Later that same month and over the next several months, numerous lawsuits were filed directly against Facebook relating to the use of Meta Pixel on healthcare provider websites; those cases were consolidated in the Northern District of California. *In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, 2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022). Many other cases directly against various healthcare providers, including the UMass Memorial Cases, have followed.

B. *The UMass Memorial Cases Are Filed, Removed, and Remanded.*

The three UMass Memorial cases were each filed in late 2022, all within two months of each other:

(i) *Doe* was filed on October 24, 2022. After service on November 7, 2022, UMass Memorial removed *Doe* on November 28, 2022. The plaintiff in *Doe* did not file a motion to remand until January 6, 2023.

(ii) *Colleton* was filed in this Court on November 28, 2022; UMass Memorial removed *Colleton* on December 28, 2022. The plaintiff in *Colleton* filed a timely motion to remand on January 27, 2023.

(iii) *Progin* was filed in the BLS on December 20, 2022. UMass Memorial removed *Progin* on January 17, 2023, and Progin filed a timely motion to remand on February 16, 2023.

After UMass Memorial filed separate removal papers for each of the three related cases, and the plaintiffs in each case filed their own motion to remand, counsel for Progin spearheaded the successful effort to efficiently litigate the three remand motions, including negotiating for UMass Memorial to file a consolidated opposition and for the plaintiffs in the three related cases to submit a joint reply. Thereafter, the United States District Court (Burroughs, J.) remanded each of the three cases on July 13, 2023 (*Doe* and *Colleton* to this Court; *Progin* to the BLS).

C. *The Worcester Plaintiffs' Conduct Leading Up to this Motion*

After the federal court ordered the remand of the three UMass Memorial cases, the plaintiffs and defendants discussed the next procedural steps. UMass Memorial advised that it wanted the Worcester cases to be transferred to and consolidated with *Progin* in the BLS. Haber Decl. ¶ 6.

The plaintiffs in each of the UMass Memorial Cases agreed that the cases should be transferred to and consolidated in the BLS, and plaintiffs' counsel discussed amongst themselves how to organize a consolidated case over several meetings and telephone calls in late July and early August 2023. *Id.* ¶ 7. Those discussions, although productive, did not result in any agreement among the plaintiffs in the UMass Memorial Cases. Counsel for *Progin* (i.e., the undersigned counsel) understood that those discussions regarding case organization were ongoing; counsel for *Progin* discussed case organization issues with UMass Memorial's counsel, Elizabeth Scully, on August 8. *Id.* ¶¶ 8–9.

Before learning of the filing of the instant lead counsel motion, Ms. Progin's counsel prepared and served on all parties to the three UMass Memorial cases, pursuant to Superior Court Rule 9A, a motion to consolidate the three UMass Memorial Cases and transfer the Worcester cases to the BLS. *Id.* ¶ 11 & Haber Decl. Ex. B. This motion reflected what all parties had already agreed to and provided a procedural path forward to centralize and consolidate the cases. That motion has not yet been filed in this Court and in the BLS because the time for responses to it has not yet passed.[5] The BLS Plaintiff's motion is silent on the question of leadership, as the BLS should resolve such issues after the transfer of the Worcester Plaintiffs' cases to the BLS. *Id.*

The BLS Plaintiff provided copies of these motion papers to counsel to the Worcester Plaintiffs and UMass Memorial on August 14, 2023, seeking their assent to the motion. Tucker Merrigan, an attorney in *Doe*, indicated via email that the Worcester Plaintiffs intended to soon file a joint motion to transfer, which he indicated would make the BLS Plaintiff's motion "duplicative." Haber Decl. Ex. C. However, no such motion to transfer has been filed. The Worcester Plaintiffs have instead opted to file first the present leadership motion **on that same day as Attorney Merrigan's email saying they would be filing a motion to transfer**. Attorney Merrigan did not disclose to the BLS Plaintiff their intent to file such a motion. Attorney Merrigan's email hid from BLS Plaintiff's counsel the Worcester plaintiffs'

[5] Counsel for all defendants in all of the cases has advised that she agrees with the relief sought by Progin's motion. Counsel for the plaintiffs in the Worcester actions have also said they agree that all three cases should be consolidated in the BLS.

plan to delay seeking transfer until this Court appointed leadership without the BLS Plaintiff and her counsel knowing about or being heard on the matter. *Id.* ¶ 12. Only by checking the online docket for *Doe* and *Colleton* did the undersigned counsel discover the Worcester Plaintiffs' filing. *Id.*

Pursuant to Rule 9A, the BLS Plaintiff served the motion to consolidate and transfer the next day, August 15, 2023. Responses are due August 25, 2023. Pursuant to Rule 9A, the BLS Plaintiff's motion to consolidate and transfer has not yet been filed.

The Worcester Plaintiffs lack of candor extends to the motion submitted to this Court. They make only a passing reference to the *Progin* case without naming it, suggesting via that *Progin* is a "copycat" case filed "well after" the Worcester Plaintiffs' cases (*see* Mem. Law at 7). As an initial matter, *Progin* was filed only a few weeks after *Colleton* and fewer than two months after *Doe*. In any event, it is in no way a "copycat" case. Even a brief perusal of the *Progin* complaint (Haber Decl. Ex. A) confirms this. The complaint was drafted from scratch based on counsel's independent investigation, which began long before *Doe* was filed. Haber Decl. ¶ 13. *Progin* is no more a "copycat" of *Doe* than *Doe* is a copycat of *Partners Healthcare* or *In re Meta Pixel Healthcare.*

## III. ARGUMENT

The Court should deny the Worcester Plaintiffs' motion to appoint lead counsel for three independent reasons: (i) the Worcester Plaintiffs violated Massachusetts Superior Court Rule 9A; (ii) no decision on leadership should be made until this Court and the BLS Court have decided the BLS Plaintiff's attached motion to consolidate her case and the Worcester Plaintiffs' case with the BLS Plaintiff's case and transfer the Worcester cases to the BLS. As discussed herein, all plaintiffs and defendants have agreed with the relief sought by that motion. The judge in the BLS should resolve any case leadership issues once the BLS judge is presiding over all three cases; and (iii) the Worcester Plaintiffs' counsels' conduct in this regard, as described herein, should at a minimum provide strong reason to defer resolution of case organization issues.

A. *The Worcester Plaintiffs Failed to Comply with Superior Court Rule 9A in Multiple Respects.*

Superior Court Rule 9A is not a mere formality; it serves the important substantive purpose of limiting unnecessary motion practice, encouraging the parties to resolve their disputes amicably without court intervention, and ensuring all interested parties are notified and offered the opportunity to present their views to the Court.

As a simple matter, Superior Court Rule 9A requires the parties to ***serve*** motion papers, including an initial motion and memorandum and responsive briefs, before filing them. *See* Super. Ct. R. 9A(b). Only after a motion is fully briefed by all interested parties may it be filed. *Id.* Critically, Rule 9A requires that the moving party must serve motions not only on the named parties to the case in which they are filed but also other parties, including where "the Motion seeks an order or other relief against the non-party" **or "the issues" raised in the Motion "affect…interests of the non-party**." *Id.* (b)(ii) ("When service on non-parties is required.") (emphasis added). Both of those circumstances exist here.

*First*, although the motion purports to appoint "lead counsel" only in the two consolidated cases, the clear import of the motion, together with the Worcester Plaintiffs' agreement (not disclosed in the motion) to transfer their cases to the BLS, reflects a scheme to have this Court to determine a leadership structure without considering the viewpoints of all affected parties. That is, the motion and the agreed imminent transfer to the BLS seek an order "affect[ing]…the interests of" the current BLS Plaintiff that would impact their participation in the contemplated consolidated litigation in BLS.

Second, for the same reasons, the proposed relief plainly affects the BLS Plaintiff's interests. Presumptively relegating her to a nonparticipatory role in a consolidated case in the BLS affects her interest in prosecuting class litigation that may affect her rights. The potential impact of being forced to forego participation in litigation is exacerbated because Rule 23 of the Massachusetts Rules of Civil Procedure, unlike its federal counterpart, does not permit class members to opt out from participation in class litigation, *see* Mass. R. Civ. Proc. 23; *Fletcher v. Cape Cod Gas Co.*, 394 Mass. 595, 602 (1985) ("There

are no provisions in our rule 23…which would permit a judge to allow individual parties to 'opt out' of a class action.").

Notably, although the motion references a proposed order, the Worcester Plaintiffs chose not to file it publicly, preventing the BLS Plaintiff from fully responding to what precise "relief" the Worcester Plaintiffs seek, including any restrictions the proposed order would place on the BLS Plaintiff's ability to litigate her own claims or be heard on leadership. Counsel for the BLS Plaintiff has explicitly asked counsel for the Worcester Plaintiffs for all motion papers filed (including the proposed order), a request their counsel simply ignored, suggesting a lack of good faith in bringing this motion and an improper attempt to prevent the BLS Plaintiff from being heard.

B. *The BLS Should Decide Case Leadership as the Court that Will Hear the Consolidated Cases.*

The Court should deny the motion or, at a minimum, defer its resolution until it first decides whether to transfer *Doe* and *Colleton* to the BLS (which, to repeat, all parties have agreed). If the Court transfers *Doe* and *Colleton* to the BLS, then, respectfully, the BLS, not this Court, should resolve any disputes over how to organize the consolidated cases. It makes practical sense for the Court before which consolidated claims will be litigated to resolve such issues, particularly given its specialized experience as a court in complex and class action litigation, which frequently involve consolidation of multiple, overlapping cases and attendant case management issues arising from consolidation. *See Italian Colors Rest. v. Am. Express Co.,* No. C 03-3719 SI, 2003 U.S. Dist. LEXIS 20338, at *20 (N.D. Cal. Nov. 7, 2003) (denying motion to appoint lead counsel as "premature" where transfer of venue pending); *Wang v. OCZ Tech. Grp., Inc.*, No. C 11-01415 PSG, 2011 U.S. Dist. LEXIS 69803, at *4 (N.D. Cal. June 29, 2011) (appointment of interim lead counsel "premature" and "would undermine principles of judicial efficiency" before "another case is consolidated with [the] action").

Moreover, assuming the parties are unable to agree on how to organize and prosecute the consolidated cases, deferring resolution of the instant motion or denying it without prejudice for refiling in the BLS would permit Ms. Progin and her counsel an opportunity to be heard on a motion that directly

affects them. Ms. Progin and her counsel do not, through this opposition, submit a competing application for the appointment of lead counsel but would and will do so given the opportunity in the appropriate forum.

C. *The Worcester Plaintiffs' Counsel's Conduct Provides Additional Reason to Deny or Defer Their Motion*

As detailed above, counsel for the Worcester Plaintiffs have engaged in deceptive conduct directed to both the undersigned counsel and this Court in an attempt to trick the Court into resolving a dispute that should properly be resolved by the BLS after considering the views of all interested parties, including Ms. Progin. That deceptive conduct includes (i) concealing their intention to file this motion; (ii) refusing to provide Ms. Progin copies of their motion papers and the proposed order for this motion as required by Rule 9A; (iii) omitting from their motion any reference to their agreement and plan to transfer *Doe* and *Colleton* to BLS; and (iv) preemptively disparaging Ms. Progin and her counsel through several deceptive statements, without providing any record supporting their allegations that would permit the Court to investigate such disparaging statements.

This conduct provides an additional reason for this Court to deny or defer the resolution of this motion, resolve the transfer issue first, and then permit an appropriate Court to resolve any case management disputes, including permitting all interested parties an opportunity to be heard.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny the motion to appoint interim lead counsel or, at a minimum, defer its resolution until after the Court first decides Progin's attached but not-yet-filed motion to consolidate the three cases against UMass and transfer them to the BLS, which all parties have indicated they agree should be done.

Dated: August 23, 2023

Respectfully submitted,

*/s/ Edward F. Haber*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**Counsel for Janice Progin, Plaintiff in *Progin v. UMass Memorial Healthcare, Inc.*, C.A. No. 2284cv02889 (Suffolk Superior Ct., Business Litigation Session)**

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served by email upon counsel of record for all parties to the captioned actions on August 23, 2023.

*/s/ Edward F. Haber*
Edward F. Haber

8/84

FILED 44

AUG 24 2023

ATTEST [signature] CLERK

COMMONWEALTH OF MASSACHUSETTS

Worcester, ss.

| | |
|---|---|
| JOHN DOE,<br><br>Individually and on behalf of all others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTHCARE, INC.,<br><br>Defendant. | SUPERIOR COURT DEPARTMENT<br><br>Civil Action No. ~~2285cv01205~~ ✓<br>2384CV02448-BLS1 |
| LISA COLLETON,<br><br>On behalf of herself and all others similarly similarly situated<br><br>v.<br><br>UMASS MEMORIAL HEALTHCARE, INC.,<br><br>Defendant. | SUPERIOR COURT DEPARTMENT<br><br>Civil Action No. ~~2285cv01293D~~<br>2384CV02450-BLS1 |

## DECLARATION OF EDWARD F. HABER REGARDING JANICE PROGIN'S OPPOSITION TO MOTION TO APPOINT INTERIM CLASS COUNSEL

1. I am a partner at the law firm Shapiro Haber & Urmy LLP and am counsel of record for plaintiff Janice Progin, pending against UMass Memorial Healthcare, Inc. and related entities in the Suffolk Superior Court, Business Litigation Session. *Progin v. UMass Memorial Healthcare, Inc.*, Case No. 2285CV01205 (Suffolk Super. Ct., Business Litigation Session). I submit this declaration in connection with Janie Progin's Opposition to the Motion to Appoint Interim Lead Counsel. I have personal knowledge of the facts stated below. If called on to do so, I could and would competently testify to those facts.

2. A true and accurate copy of the complaint from *Progin* is attached as **Exhibit A** hereto.

3. My law firm had for years considered potential claims against technology companies arising under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, relating to such companies' abuses in connection with consumer privacy.

4. My law firm began investigating claims against healthcare providers relating to tracking technologies such as Meta Pixel and Google Analytics in late June 2022, shortly after the online privacy magazine The Markup published an expose concerning how hospitals were surreptitiously sharing patient communications on their websites with third parties such as Google and Facebook.

5. *Doe v. Partners Healthcare System, Inc.*, No. 1984cv01651-BLS1 (Mass. Super. Ct. BLS) filed in May 2019 and ultimately settled in early 2022—provided a precedent that supported a claim under the Massachusetts Wiretap Act arising from healthcare providers' secret use of tracking technologies on their websites.

6. After the federal court ordered the remand of the three UMass Memorial cases on July 13, 2023, UMass Memorial advised that it wanted the Worcester cases to be transferred to and consolidated with Progin in the BLS.

7. The plaintiffs in each of the UMass Memorial Cases agreed that the cases should be transferred to and consolidated in the BLS, and plaintiffs' counsel discussed amongst themselves how to organize a consolidated case in the BLS over several meetings and telephone calls in late July and early August 2023.

8. Those discussions, although productive, did not result in any agreement among the plaintiffs in the UMass Memorial Cases. I understood that those discussions regarding case organization were ongoing.

9. I discussed case organization issues with UMass Memorial's counsel, Elizabeth Scully, on August 8, in which telephone call she confirmed that UMass Memorial wanted all three cases consolidated and litigated in the BLS.

10. Before I learned of the filing of the instant lead counsel motion in the above actions, my firm prepared and served on all parties to all three of the UMass Memorial actions, pursuant to Superior Court Rule 9A, a motion to consolidate the three UMass Memorial Cases and transfer the Worcester cases to the BLS. A true and accurate copy of the motion and supporting memorandum is attached as **Exhibit B** hereto.[1] The motion reflected what all parties had already agreed to and provided a procedural path forward to centralize and consolidate the cases. That motion has not yet been filed in this Court and in the BLS because the time for responses to it has not yet passed. The motion is silent on the question of leadership.

11. I provided copies of these motion papers to counsel to the Worcester Plaintiffs and UMass Memorial on August 14, 2023, seeking their assent to the motion. Tucker Merrigan, an attorney in Doe, indicated via email that the Worcester Plaintiffs intended to file a joint motion to transfer, which he indicated would make the BLS Plaintiff's motion "duplicative." A true and accurate copy of our email exchange is attached as **Exhibit C** hereto.

12. Attorney Merrigan did not disclose to me the Worcester Plaintiffs' intent to file a motion to appoint lead counsel. Attorney Merrigan's email hid from me the Worcester Plaintiffs' plan to delay seeking transfer until this Court appointed leadership without the BLS Plaintiff and her counsel knowing about or being heard on the matter. My firm discovered the Worcester Plaintiffs' filing only by checking the online docket for Doe and Colleton.

13. Although my firm's complaint in *Progin* was filed a few weeks after *Colleton* and a little under two months later than *Doe*, my firm drafted the *Progin* complaint from scratch and did not copy it from any case (including *Doe, Colleton*, *Partners*, or the various other cases that preceded all of the cases against UMass Memorial). The complaint is the product of my firm's independent investigation, which began long before *Doe* or *Colleton* were filed.

I declare under penalty of perjury that the foregoing is true and correct.

[1] I exclude from Exhibit B the exhibits to the motion, but they are available upon request.

Executed this 23rd day of August 2023.

/s/ Edward F. Haber
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
One Boston Place
Suite 2600
Boston, MA 02108
ehaber@shulaw.com

*Counsel for Janice Progin*

I HEREBY ATTEST AND CERTIFY ON
March 7, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served by email upon counsel of record for all parties to the captioned actions on August 23, 2023.

*/s/ Edward F. Haber*
Edward F. Haber

Exhibit A

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

1

po

## COMMONWEALTH OF MASSACHUSETTS

**Suffolk, ss.**

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. ______________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Janice Progin, on behalf of herself and the proposed Class (defined below), alleges as follows:

### Preliminary Statement

1. Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and certain healthcare providers. Specifically, the Defendants (defined below) aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by UMass Memorial Medical Center and other medical facilities in central Massachusetts (the "UMass Memorial Website"). These communications were intercepted by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called

"tracking software." Class Members' communications with the UMass Memorial Website were secretly and contemporaneously monitored, recorded, and retransmitted to these third parties without their knowledge or consent whenever Plaintiff or other Class Members visited the UMass Memorial Website or any page within that website.

2. Defendants actively aided this secret interception of healthcare consumers' communications with their website. Defendants aided the interceptions by injecting hidden code into their websites to permit Google, Facebook, and others to intercept the communications.

3. Defendants do not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the UMass Memorial Website, nor do they seek their content for such disclosure. On the contrary, Defendants **falsely** tell healthcare consumers, through their published online policies and terms of service, that they do **not** share such information.

4. The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." "Wire" communications include communications between websites and website users. The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party to the communication secretly records the communication or aids another in recording the communication. It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted; instead, an unlawful interception occurs when (i) the identity of the parties to the communication; (ii) the existence of the communication; **or** (iii) any part of the contents, substance, purport, or meaning of the communication is intercepted or recorded.

5. The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G.L. c. 272 § 99(A) (preamble). Although the internet did not exist at the time of the Act's passage, internet communications fall comfortably within the Act's express terms, and, if anything, the purposes of which the Massachusetts Wiretap Act were enacted are only more significant today, as technology companies have continually chipped away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6. Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Act applies to all interceptions, regardless of the nature or substance of the communications intercepted.

7. The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **and** any party that aids such an interception.

8. Defendants aided interceptions completed by Google, Facebook, and other third parties of healthcare consumers' communications with the UMass Memorial Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the UMass Memorial Website.

## PARTIES

9. Plaintiff Janice Progin is a resident of Gardner, Massachusetts. Plaintiff is a patient at the UMass Memorial Medical Center and regularly uses the UMass Memorial Website to (i) obtain information about UMass Memorial Medical Center doctors (including their credentials and

backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review her personal medical records through the website's patient portal.

10. Defendant UMass Memorial Health Care, Inc. is a corporation that operates in Worcester, MA. It is the parent company for defendants UMass Memorial Hospitals, Inc. and UMass Memorial Medical Center, Inc. Together with and through its subsidiaries, UMass Memorial Health Care, Inc. operates hospitals and other healthcare facilities in central Massachusetts that use the UMass Memorial Website.

11. Defendant UMass Memorail Hospitals, Inc., is a corporation that operates in Worcester, MA. It is a subsidiary of Umass Memorial Health Care, Inc. According to filings with the Secretary of the Commonwealth of Massachusetts, its function is to coordinate the provision of healthcare services among healthcare facilities affiliated with UMass Memorial Health Care, Inc., including the healthcare facilities that share the UMass Memorial Website. It also "provide[s]...information systems" to those healthcare facilities. Based on this filing and upon information and belief, Umass Memorial Hospitals, Inc. is responsible for maintaining the UMass Memorial Website.

12. Defendant UMass Memorial Medical Center, Inc. is a corporation located in Worcester, MA. It operates and maintains UMass Memorial Medical Center, a hospital with multiple campuses in Worcester, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

13. Defendant UMass Memorial Healthalliance-Clinton Hospital, Inc. is a corporation located in Clinton, MA. It operates and maintains UMass Memorial Health – HealthAllicance-Clinton Hospital, a group of hospitals with campuses in Clinton, MA; Fitchburg, MA; and

Leominster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

14. Defendant Marlborough Hospital is a corporation located in Marlborough, MA. It operates and maintains Marlborough Hospital, a hospital in Marlborough, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

15. Defendant Harrington Memorial Hospital, Inc. is a corporation located in Southbridge, MA. It operates and maintains Harrington Memorial Hospital, a hospital with campuses in Southbridge, MA and Webster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

16. In this complaint, Plaintiff refers collectively to the defendants described in this section as "Defendants."

## JURISDICTION

17. The exercise of personal jurisdiction over the Defendants is proper according to M.G.L. c. 223 § 3 because, among other things, Defendants are located in Massachusetts, and Plaintiff's claim arises out of Defendants' transacting business in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### The UMass Memorial Facilities and Their Website

18. Defendants operate hospitals and other healthcare facilities in Worcester and surrounding communities (the "UMass Health Facilities"). The UMass Health Facilities offer inpatient and outpatient care to residents near Worcester and surrounding communities in central Massachusetts. The facilities provide healthcare across various specialties, including heart and vascular care, orthopedics, cancer, diabetes, surgery, pregnancy and newborn care, children's services, women's services, and trauma care.

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

19. Defendants maintain a common website for their hospitals and other healthcare facilities, found at https://www.ummhealth.org/ (the "UMass Memorial Website"). Through that website, healthcare consumers can obtain information about the services UMass Memorial provides, including information about doctors, services and treatments provided by Defendants, and particular medical conditions.

20. The UMass Memorial Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The website provides general information about the UMass Memorial Facilities.

(b) The website provides information about healthcare services provided at the UMass Memorial Facilities, communicated through service-specific pages for a range of services such as "Birthing/Maternity Center," "Pediatrics," "Cancer Care," and "Women's Health," among others.

(c) The website provides substantive information about specific health conditions through the website's "Health Library," including numerous interactive "Risk Assessments" individuals can take to determine whether they need healthcare services for a range of conditions, including highly personal conditions such as drug addiction, alcohol abuse, and sexually transmitted diseases.

(d) The website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by specialty, gender, language, and location.

(e) The website permits healthcare consumers to book an appointment online through the website.

(f) The website permits healthcare consumers to access and pay bills online.

(g) The website lets healthcare consumers access their private medical information online through the MyCharts portal. MyCharts is a third-party provider of online access to healthcare records.

21. Because the UMass Memorial Website provides an interactive experience through which a healthcare consumer can obtain information about particular conditions, doctors, specialties, and, indeed, the individual's own healthcare records, a website user's interaction with the website reveals private health information about the individual.

**Reasonable Expectations of Users of the UMass Memorial Website**

22. Healthcare consumers in Massachusetts have a valid interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the UMass Memorial Website.

23. Users of healthcare-related websites such as the UMass Memorial Website have a legitimate expectation and understanding that their communications with the website will be private. They also have a legitimate expectation that healthcare providers such as Defendants will not share their private health information—including their communications with the website—with third parties, without their consent.

24. The expectations and understandings of website users are supported by the Health Insurance Portability and Accountability Act ("HIPAA"), which prohibits healthcare providers such as Defendants from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

25. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared contemporaneously with third parties such as Google and Facebook for marketing purposes.

26. The expectations and understanding of the UMass Memorial Website users are informed by what Defendants tell them about how Defendants handle their personal information.

27. The UMass Memorial Website terms of service state:

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

> UMass Memorial Health Care is committed to protecting your privacy. We have designed our website to allow you to visit most areas without identifying yourself or providing personal information. For those UMass Memorial areas where you elect to provide identifiable information, we assure you that we will make every effort to protect your privacy.

This is false. As explained more fully below, the website tracks the user's IP address and connects its IP address to the user's browsing activity. More troublingly, those communications and associated IP addresses are contemporaneously shared with third parties such as Google and Facebook, which then can use that information to connect the user's activity on the website with the individual's Google and Facebook profiles. The tracking technologies reveal private health information about particular individuals to Google and Facebook. Google and Facebook can then use to serve personalized advertising to those individuals.

28. The UMass Memorial Website terms of service also tell users: "UMass Memorial does not disclose your information to third parties except as described below, when we believe in good faith that the law requires disclosure, or to protect the property rights of UMass Memorial." The terms "below," however, do not disclose that Defendants share the internet communications with Facebook, Google, and other companies between the users and Defendants. Accordingly, the terms are utterly false and foster an incorrect understanding among healthcare consumers that Defendants do not share personal information about their them when they do.

29. The UMass Memorial Website's terms of service also tell users: "UMass Memorial may on occasion send you information concerning the health, development and well-being of children and families, and on other topics that might be of interest. Only UMass Memorial (or those working on the behalf of UMass Memorial) will send you this information." Again, this is utterly false. By sharing healthcare consumers' communications with Google and Facebook, Defendants enable Google and Facebook to send directly to specific users advertising based on their communications with the website.

30. The UMass Memorial Website terms of service also describe to healthcare consumers the website's use of "cookies" in a deceptive manner. The terms state:

> A cookie is a piece of data stored on your hard drive that contains information about you. Use of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site. UMass Memorial only uses cookies to identify you while you are logged into the UMass Memorial site. Upon exiting the site, the cookie terminates with no retained record of your use of the site.

As explained below, the technologies Defendants use to transmit healthcare consumers' communications contemporaneously to Google, Facebook, and other companies are not limited to "cookies." But, in any event, the above passage and the other passages quoted above foster a strong impression that a user's activities on the website will not be linked to personally identifiable information. This is false. As described below, Defendants use Google, Facebook, and other tracking technologies specifically designed to associate the users' activities on the website with their profiles with Google, Facebook, and elsewhere.

31. Moreoever, it is utterly false to state that "[u]pon exiting the site, the cookie terminates with no retained record of your use of the site." On the contrary, Facebook, Google, and other third parties retain precise records of website users' activities on the UMass Memorial Website.

32. In short, reasonable healthcare consumers expect that the personal health information reflected in their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced strongly by Defendants' false statements on their website. The interceptions of website users' communications with Defendants were, therefore, truly secret and made without any consent from the website users.

**Third-Parties Offering Tracking Technologies**

33. Plaintiff describes in this complaint various tracking technologies implemented on the UMass Memorial Website that cause the secret interception, recording, and retransmission of

the contents of Class Members' internet communications with Defendants. The technological aspects of those technologies are described in the next section. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Defendants and the purposes for which interceptions are made.

34. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

35. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

36. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

37. Among the ways Facebook tracks users on websites not owned by Facebook in order to create detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook incentivizes websites to use Meta Pixel by advertising that it allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

[1] Facebook rebranded its parent company as "Meta" in October 2021.

38. Facebook explains on its own website: "The Meta Pixel is a snipper of JavaSript code that allows [companies] to track visitor activity on your website."

39. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website.... The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

40. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."

41. Google LLC is a multinational technology conglomerate, a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

42. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals whether or not they have a Google account.

43. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

44. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its

website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Notwithstanding its availability as a free service to website owners, Google can profit from Google Analytics by using the data obtained about individual users to build such individuals' profiles further. This information can then be used to serve upon such individuals better-targeted individualized advertisements.

**Website Tracking Technologies on the UMass Memorial Website**

45. Defendants have injected hidden code into the UMass Memorial Website that tracks healthcare consumers' communications with the website. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with the UMass Memorial Website with the website user's Facebook profile.

46. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Defendants, the contents of communications between Class Members and Defendants and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website. This information reflects individuals' personal health information as defined by the Health Information Portability and Accountability Act ("HIPAA").

47. Defendants use several tracking technologies on their website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

48. Before describing the techniques such technologies use, it is important to define some basic technological terms.

49. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

50. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the UMass Memorial Website, as of the time of this complaint, is 162.249.110.234. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

51. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the UMass Memorial Website is http://www.ummhealth.org. Numerous URLs also point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For example, the UMass Memorial Website has a page specifically about the UMass Memorial Health Cancer Center; that page's URL is https://www.ummhealth.org/umass-memorial-health-cancer-center.

52. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. Cookies can, for example, confirm to Google and Facebook that

a particular individual accessing the UMass Memorial Website is the same individual who also accesses a particular Google or Facebook account from the same device.

53. **"Javascript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The Javascript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the Javascript code itself is not visible. The execution of Javascript code may or may not result in the presentation of visible components of the website.

54. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Defendants) inserts into its website code that causes an individual's web browser, when loading the website, to also load a Javascript file from a third-party server (such as Google or Facebook). That Javascript code is executed automatically within the individual's web browser.

55. The execution of the Javascript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a single-pixel image from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology). That image or other small file is not displayed or visible to the website user; the loading and execution of the Javascript code and the subsequent loading of an image or another small file occurs entirely in the background, invisible to the website user.

56. Critically, when the Javascript code causes the user's web browser to retrieve a file from the third-party's website, the Javascript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website user is visiting (that is, the website address, such as http://www.ummhealth.org); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

57. When the Javascript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google and Facebook can then add the content of the user's communications with the UMass Memorial Website to its collection of information it has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's Javascript code causes a "pixel" to be loaded from Facebook's servers, Facebook can record and associate the content of the communications it has intercepted with an individual's Facebook profile, which includes the individual's real name and other information about them.

58. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not actually displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity the third party such as Google or Facebook.

59. The tracking technologies described in this complaint intercept and retransmit to third parties the contents of communications between healthcare consumers and the UMass Memorial Website contemporaneously with those communications. The tracking technologies intercept and retransmit the contents of those communications to third parties before the webpage has even completed loading.

**<u>Defendants' Use of Tracking Technologies on the UMass Memorial Website</u>**

60. Defendants use various tracking technologies across the numerous web pages on the UMass Memorial Website. Many of those tracking technologies are embedded in the code of all or almost all of the pages within the Umass Memorial Website. For example, on the main landing page of the UMass Memorial Website, Defendants have injected secret code that loads Google Analytics, Meta Pixel, and various other tracking technologies.

61. The code is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode." Google's Developer Mode displays hidden components of websites and records the network activity generated by website components (including the loading and execution of Javascript code and the text that the Javascript code causes to be transmitted to third-party web servers when it loads a small file or image).

62. Below is an image of the main landing page for the UMass Memorial Website:




63. When a user loads the main landing page for the UMass Memorial Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the Javascript code for Google Analytics. The website then causes the user's web browser to execute the Javascript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics Javascript code causes the user's web browser to intercept and transmit certain information to Google.

64. The image below depicts the landing page for the UMass Memorial Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number




65. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and retransmitted to Google, is presented below (with highlighting added). The "Payload" refers to information transmitted to a web server when a file is retrieved from that server. In this case, the "Payload" reflects the information that Google Analytics causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view decoded

v: 1
_v: j97
a: 530489752
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.ummhealth.org%2F
dr: https%3A%2F%2Fwww.google.com%2F
ul: en-us
de: UTF-8
dt: UMass%20Memorial%20Health
sd: 24-bit
sr: 1920x1080
vp: 1002x926
je: 0
_u: QCCACEABRAAAAC~
jid: 1767544177
gjid: 455434716
cid: 102320041.1664411294
tid: UA-48961693-1
_gid: 1962499786.1664411294
_r: 1
gtm: 2wg9q0TPSLSLQ
z: 1301636959

66. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the UMass Memorial Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.umasshealth.org"[2]);

(b) The URL of the prior webpage the user had visited before arriving at the UMass Memorial Website landing page (www.google.com); and

[2] The characters "%3A" and "%2F" are comptuer codes that replace the ":" and "/" characters.

(c) The title of the webpage (after the letters "dt," which includes "UMass Memorial Health").[3]

67. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, viewport resolution, and other browser settings), identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, UMass Health) and the website's account with Google AdSense, a website monetization program offered by Google. The information transmitted also contains a unique identifier for the particular user visiting the website, enabling Google to track that individual across the website.

68. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Defendants' website and retransmits those contents to Google, the Javascript code also causes the user's web browser to reveal the user's IP address to Google. This permits Google to associate the content of the user's communications with the website with any other information Google has on the individual, including the individual's real identity. Google can then use the contents of communications that it has secretly intercepted for commercial purposes, including serving personalized advertisements in the future to the particular website user browsing the UMass Memorial Website.

69. Moreover, by communicating information about the website user's browser configuration (such as screen and portal resolution and other browser configuration settings), Google can further confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This allows Google to confirm further that a particular individual using Google's services (for example, a Gmail account) and an individual visiting the

[3] The characters "%20" are comuter code that reflect a space.

UMass Memorial Website is the same individual, particularly when combined with the user's IP address, which is also a unique identifier.

70. The same landing page on the UMass Memorial Website also loads Javascript code for Meta Pixel, called "fbevents.js." That javascript code, in turn, causes the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the UMass Memorial Website. The network activity intercepted and retransmitted to Facebook when loading the UMass Memorial Website's landing page is below:

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

id: 362069588546911
ev: PageView
dl: https://www.ummhealth.org/
rl:
if: false
ts: 1667852243703
sw: 1920
sh: 1080
v: 2.9.89
r: stable
ec: 0
o: 28
fbp: fb.1.1664411293998.360887419
it: 1667852243663
coo: false
rqm: GET
dt: pvtwa5g22qp40t1kc012sh9pf061srm4

71. Similar to Google Analytics, Meta Pixel causes the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Defendants' website, including the URL of the webpage visited. The transmission to Facebook

also includes information about the user's browser configuration and various codes to associate the communications with Defendants' advertising account with Facebook.

72. Also, similar to Google Analytics, the Javascript code for Meta Pixel causes the user's web browser to reveal the user's IP address to Facebook. This permits Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can serve personalized advertising to the website user in the future.

73. Moreover, similar to Google Analytics, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

74. The text fields communicated to Facebook by the Meta Pixel code include a persistent identifier for each particular user, which permits Facebook to track that individual across the UMass Health Website and further confirm that individual's real-world identity.

75. Defendants have configured the UMass Memorial Website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the UMass Memorial Website, which in turn may reveal private health information about the healthcare consumer.

76. The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes.

77. The UMass Memorial Website contains a page entitled "Women's Health: Maternity Center," designed to provide information to the website user about pregnancy and the

services Defendants offer in connection with pregnancy. A user, by visiting this web page, necessarily reveals to Defendants that the user has some interest in maternity services (for example, the user might be pregnant or know someone who is). When the user communicates with Defendants by visiting this particular webpage, Defendants cause the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Maternity Center webpage:




78. The graphic below presents the contents of the communication between the website user and Defendants that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics javascript code that Defendants secretly inject into the website (the blue highlighting is added):

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

```
id: 247143013759083
ev: PageView
dl: https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/maternity-center
rl: https://www.ummhealth.org/services-treatments?_ga=2.131274511.1059841755.1664411875-1880997322.1664411875
if: false
ts: 1664412113322
sw: 1920
sh: 1080
v: 2.9.84
r: stable
ec: 0
o: 30
fbp: fb.1.1664411293998.360887419
it: 1664412112865
coo: false
rqm: GET
dt: u8gc9rdrkgppw0n48qyfw2aitdsgxtgy
```

79. As reflected in the above screenshot, Defendants contemporaneously intercept and retransmit to Google the fact that the website user is visiting a "maternity-center" webpage—information that Google then stores and can use for its own commercial purposes (and which could be accessible via subpoena by third parties, such as states who may be interested in such information for political or legal reasons).[4]

80. The same webpage also contains hidden code that intercepts the user's communication with the website and retransmits that same information to Facebook. The data transmitted to Facebook is depicted below:

[4] *See, e.g.*, NRP, "Privacy advocates fear Google will be used to prosecute abortion seekers," https://www.npr.org/2022/07/11/1110391316/google-data-abortion-prosecutions.

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Query String Parameters** view source view URL-encoded

id: 362069588546911

ev: PageView

dl: https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/maternity-center

rl: https://www.ummhealth.org/

if: false

ts: 1668123242798

sw: 1920

sh: 1080

v: 2.9.89

r: stable

ec: 0

o: 28

fbp: fb.1.1664411293998.360887419

it: 1668123242777

coo: false

rqm: GET

81. Similar to Google Analytics, Defendants cause the secret interception and transmission to Facebook of the contents of the communication between the website user and Defendants, including that the user is visiting a "maternity-center" webpage, which Facebook can then use for commercial purposes (and which data it retains, and can then be accessed by third parties, such as by way of subpoena).

82. The UMass Memorial Website contains dozens of similar pages on particular medical specialties and practices that the Defendants' healthcare facilities offer. The UMass Memorial Website, for each of such page, aids in Google and Facebook's secret interception of the contents of communications with the webpages, similar to the above Maternity Center example.

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

83. The UMass Memorial Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Defendants. When an individual uses the search function, Defendants aid in the secret interception of the contents of that search and retransmission of those contents to Google, Facebook, and other third parties.

84. For example, the screenshot below depicts the search results page when a user enters the phrase "I'm pregnant"[5] into the search bar on the UMass Memorial Website:




[5] This is an example and does not reflect Plaintiff's personal activity on the website.

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

85. Depicted below are the contents of the communication that are intercepted and retransmitted to Google via hidden Google Analytics Code (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

v: 2
tid: G-04YJCL6W7W
gtm: 2oeb90
_p: 1900279729
cid: 1880997322.1664411875
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Google%20Chrome;107.0.5304.106|Chromium;107.0.5304.106|Not%3DA%3FBrand;24.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1668123203
sct: 19
seg: 1
dl: https://www.ummhealth.org/umass-memorial-medical-center/search-results?search_block_form=I%27m+pregnant&form_build_id=form-NW-Iov5m3eeoUl4WvjOS1Ay6lqVwQ6aJbNxrIbSYFbw&form_id=search_block_form
dr: https://www.ummhealth.org/umass-memorial-medical-center
dt: Search Results - UMass Memorial Medical Center - UMass Memorial Health
en: page_view

86. The above screenshot reflects that when an individual enters a search on the website, Google intercepts the contents of the search. Google then associates those search terms with the individual's real-world identity and then uses that information for commercial purposes (and retains them for potential use by other parties in the future).

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

87. Defendants also aid in Facebook's secret interception of the same sensitive communication. Below is a screenshot of the information intercepted and transmitted to Facebook:

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view URL-encoded

id: 362069588546911
ev: PageView
dl: https://www.ummhealth.org/umass-memorial-medical-center/search-results?search_block_form=_removed_&form_build_id=form-NW-Iov5m3eecU14NvjOS1Ay61qVwQ6a3bNxrIbSYFbw&form_id=search_block_form&_filteredParams=%7B%22unwantedParams%22%3A%5B%5D%2C%22sensitiveParams%22%3A%5B%224f5044badb6767ad742dc945137f520213bbeb130b6ea306cbcb53aae5357d58%22%5D%7D#gsc.tab=0&gsc.q=I'm%20pregnant&gsc.page=1
rl: https://www.ummhealth.org/umass-memorial-medical-center?_filteredParams=%7B%22unwantedParams%22%3A%5B%5D%2C%22sensitiveParams%22%3A%5B%5D%7D
if: false
ts: 1668124020275
sw: 1920
sh: 1080
v: 2.9.89
r: stable
ec: 0
o: 28
fbp: fb.1.1664411293998.360887419
it: 1668124020264
coo: false
rqm: GET
dt: bsa8ed5a382mjclxgc26vm8iyxlbdy34

88. The UMass Memorial Website also includes a "Find a Doctor" function that allows healthcare consumers to find a doctor based on search criteria provided by the individual. That webpage permits individuals to search by hospital affiliation, zip code, specialties, gender, and languages. When an individual uses the drop-down menus and forms to indicate the individual's preferences for doctors, this causes the page to reload. The results page lists doctors that match the

criteria specified by the user. The page below depicts part of the results for a search for a female doctor in Obstetrics & Gynecology within five miles of Worcester[6]:




89. Hidden Google Analytics code in this results page causes the secret interception of the facts that the individual is using the find-a-doctor function and the specific criteria the individual has inputted. The contents of the communication that are secretly intercepted and transmitted to Google are captured below:

[6] Again, this is not a search Plaintiff performed but is instead presented to illustrate the types of communications that tracking technologies intercept and retrainsmit to third parties.

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-HDYC9M7247
gtm: 2oeb90
_p: 1829352063
cid: 1880997322.1664411675
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Google%20Chrome;107.0.5304.107|Chromium;107.0.5304.107|Not%3DA%3FBrand;24.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1668449031
sct: 4
seg: 1
dl: https://physicians.umassmemorial.org/results?Affiliations=60&SubSpecialties=1636%2c1635&address=Worcester%2c+MA+01601%2c+USA&distance=5&latlng=42.26%2c-71.8&sortDirection=asc&sortby=distance&Gender=Female
dr: https://physicians.umassmemorial.org/results?Affiliations=60&Gender=Male%2CFemale&SubSpecialties=1636%2C1635&sortby=distance&sortDirection=asc&address=Worcester%2C+MA+01601%2C+USA&distance=5&latlng=42.26%2C-71.8
dt: Search Results - UMass Memorial Health
en: page_view

90. The highlighted portion above uses numeric codes for the affiliations and specialties criterion ("Affiliations=6" references UMass Memorial Medical Center, and "SubSpecialties=163" references Obstetrics & Gynecology), and the preferred geographic location ("Worcester") and doctor gender ("Female"), plus the permissible distance from Worcester ("5"

miles). Each of these inputs are intercepted by Google. Although a couple of fields use numeric codes, the meaning of those codes can easily be discerned by loading the full URL, including the parameters highlighted in blue above, to reveal the substance of the individual's search.

91. The UMass Memorial Website also features numerous "Risk Assessments," through which individuals can relate information about themselves to receive an instant assessment. Those assessments include, among others, an Alcohol Use Assessment, a Breast Cancer Risk Assessment, a Depression Risk Assessment, and a Substance Abuse Assessment. The screen capture below, for example, depicts the Substance Abuse Assessment (the selected answers do not reflect any particular individual's responses but are provided by way of example):



Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

92. When a website user first loads a risk assessment, that communication is intercepted via Google Analytics code, and communication contents are transmitted to Google. The graphic below depicts the information intercepted and transmitted to Google upload loading of the Substance Abuse Assessment:

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view decoded

v: 1
_v: j98
a: 1736156123
t: pageview
_s: 1
dl: https%3A%2F%2Fmyhealth.umassmemorial.org%2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE
dp: %2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE
ul: en-us
de: UTF-8
dt: Substance%20Abuse%20Assessment
sd: 24-bit
sr: 1920x1080
vp: 1231x979
je: 0
_u: AACAAEABAAAAACAAI~
jid:
gjid:
cid: 1972491336.1664909972
tid: UA-17264146-13
_gid: 2122976964.1664909972
_slc: 1
z: 2014474095

93. As highlighted above, the fact that a user is taking a Substance Abuse Assessment is communicated to Google via Google Analytics.

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

94. When a user completes and submits the assessment form, a new webpage is loaded with the user's results. That page is depicted below:




95. When the results page loads for the risk assessment, that communication is secretly intercepted via the Google Analytics code, and parts of the communication are sent to Google. The information sent to Google is depicted below:

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view decoded

v: 1
_v: j98
a: 1049796374
t: pageview
_s: 1
dl: https%3A%2F%2Fmyhealth.umassmemorial.org%2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE%3FSubstanceAbuseMRA_Parameters%3DN%2CN%2CY%2CY%2C2
dp: %2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE%3FSubstanceAbuseMRA_Parameters%3DN%2CN%2CY%2CY%2C2
ul: en-us
de: UTF-8
dt: Substance%20Abuse%20Assessment
sd: 24-bit
sr: 1920x1080
vp: 1231x979
je: 0
_u: AACAAEABAAAAACAAI~
jid: 1267990952
gjid: 2074061852
cid: 1972491336.1664909972
tid: UA-17264146-13
_gid: 2122976964.1664909972
_r: 1
_slc: 1
z: 1530351163

96. The user's responses to each question in the risk assessment are highlighted in the screen capture above. Those responses are intercepted and transmitted to Google. Although the parameters are communicated in code (after the word "Parameters"), that code can easily be used to identify the user's response to each question by loading the full highlighted URL.

97. The above examples are just that—examples. Defendants use similar Google Analytics and Meta Pixel code throughout nearly all parts of the UMass Memorial Website, closely tracking individuals' communications with the UMass Memorial Website.

98. In addition to Google and Facebook, the communications between healthcare consumers and UMass Health are intercepted and retransmitted to various companies without the individual's consent. These additional third parties include:

(d) **Bing Ads.** Bing Ads is an internet advertising platform owned by Microsoft. Similar to Google Analytics and Meta Pixel, Defendants insert code into their website that causes communications between the user and the website to be intercepted by and transmitted to Microsoft's Bing Ads servers. The contents intercepted include the URL and title of each website visited and the user's IP address. Microsoft can then monetize that information through advertisements.

(e) **Doubleclick.** Google Doubleclick is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Defendants insert code into their website that causes communications between the user and the website to be intercepted by and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(f) **Sharethis.** Sharethis is a company that tracks the behavior of users of websites. Similar to Google Analytics and Meta Pixel, Defendants insert code on their website that causes the contents of the user's communications with the website, including pages viewed, the contents of searches, and other information, to be sent to the sharethis.com server. The code also causes the user's IP address to be revealed to Sharethis.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

99. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the UMass Health Website's operation. The UMass Health Website can and would operate just the same from the perspective of healthcare consumers without the tracking technologies described in this complaint.

100. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For

example, a website can contain links to its Facebook profile or invite website users to interact with Defendants via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a simple link to a Facebook profile; any website can have one without the other.

101. Moreover, even if a company wishes to use tracking technologies to optimize its website or its marketing or advertising for a website, there is no legitimate business reason for any company to keep secret from website users the use of these tracking technologies. Indeed, disclosure of such tracking technologies is possible and, if implemented properly, would avoid the secret interception of internet communications. Some websites, for example, disclose tracking technologies through a pop-up displayed to the user when the user first accesses the website. The quality and legal validity of these kinds of disclosures vary depending on how they are presented and their substance, but a disclosure could, in principle, disclose the use of tracking technologies and their impact on confidentiality.

102. A healthcare consumer visiting the UMass Memorial Website is presented with no pop-up disclosure informing them that their communications with the website are intercepted or tracked. Even if the UMass Memorial Website were to feature such a pop-up that links to the UMass Memorial Website terms of service or privacy policy, those policies do **not**, as described above in paragraphs 26 to 31, disclose the tracking technologies described in this complaint. To the contrary, those terms of service mislead website users by telling them that such sharing of communications between Class Members and Defendants is **not** taking place.

## Class Action Allegations

103. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.ummhealth.org within three years prior to the date of the original complaint in this action.

104. This action is properly maintainable as a class action.

105. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

106. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Defendants, through the UMass Memorial Website, were wire communications under the Massachusetts Wiretap Act.

(b) Whether Defendants inserted tracking technologies into the hidden code of the UMass Memorial Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the UMass Memorial Website are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3);

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others, enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Defendants and users of the UMass Memorial Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether, by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and Defendants;

(g) Whether Class Members' communications with Defendants were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent;

(h) Whether Class Members' privacy interests were violated by the interceptions of their communications with Defendants' website;

(i) If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements.

107. Plainitff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the UMass Memorial Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

108. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

109. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, the damage that any individual Class member has suffered is not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

110. Defendants have acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seek for the Class as a whole.

**<u>COUNT I</u>**

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

111. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

112. The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C). The Act

provides a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C).

113. An individual's communications with a website constitute "wire communications" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(1). The communications between Plaintiff and other Class Members and Defendants, through the UMass Memorial Website, were therefore wire communications under the Massachusetts Wiretap Act.

114. The tracking technologies inserted into the hidden code of the UMass Memorial Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3). "Intercepting devices" also include (i) any devices Class Members used to access the UMass Memorial Website; (ii) Class Members' web browsers used to access the UMass Memorial Website; (iii) Defendants' own computer servers; and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class Members' communications with the UMass Memorial Website.

115. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others, enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Defendants and users of the UMass Memorial Website, including, but not limited to, the identity of the parties to the communication, the existence of the communication, and the communication's content, substance, purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

116. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants installed an intercepting device on their website with the intent

to aid Google, Facebook, and other companies to secretly hear and record communications between the Class Members and Defendants.

117. Class Members' communications between the Class Members and Defendants were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

118. Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of violation or $1,000, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

**Prayers for Relief**

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 20, 2022

Respectfully submitted,

*/s/ Michelle H. Blauner*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

Exhibit B

**COMMONWEALTH OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff, on behalf of himself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. 2285CV01205 |

| | |
|---|---|
| LISA COLLETON,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. 2285CV01293 |

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889 |

**PLAINTIFF JANICE PROGIN'S MOTION TO CONSOLIDATE AND TRANSFER CASES TO THE BUSINESS LITIGATION SESSION**

Plaintiff Janice Progin hereby moves, pursuant to Mass. R. Civ. P. 42(a), Mass. Super. Ct. R. 31, and Superior Court Administrative Directive No. 17-1, to consolidate *Doe v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "*Doe* Action") and *Colleton v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "*Colleton* Action"), currently pending in Worcester Superior Court, with *Progin v. UMass Memorial Healthcare, Inc.*, No. 2284CV02889 (the "*Progin* Action"), currently pending in the Business Litigaiton Session ("BLS") of Suffolk Superior Court, and transfer the *Doe* and *Colleton* Actions to the BLS to be consolidated with the *Progin* Action.

As detailed in the accompanying Memorandum, the cases should be consolidated in the BLS because they raise common questions of law and fact and involve a common party, because interests of judicial economy will be served by consolidation and transfer to the BLS and because no party to any of the cases will be prejudiced as a result. The propriety of transferring the cases to the BLS is confirmed by the fact that the BLS is already handling not only the *Progin* Action, but also a significant number of similar class actions alleging violations of the Massachusetts Wiretap Act by other defendants.

Accordingly, Plaintiff Janice Progin respectfully requests that the Courts order the the three above captioned Actions consolidated and order the *Doe* and *Colleton* Actions transferred to the Business Litigation Session.

Dated: August 15, 2023

Respectfully submitted,

/s/Edward F. Haber
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**RULE 9C CERTIFICATE OF COMPLIANCE**

I, Edward F. Haber, hereby certify that on August 14, 2023, I provided counsel for the plaintiffs in the *Doe* and *Colleton* Actions, and counsel for Defendants in all three actions, with a copy of this motion and the supporting memorandum and asked if they would assent to or not oppose the motion. I received an e-mail reply from attorney Tucker Merrigan, one of the counsel for plaintiff in the *Doe* action, that he agreed that the *Doe* and *Colleton* cases should be transferred to the Business Litigation Session. But he did not agree to assent or not oppose this motion. I did not get any response from counsel for the defendants, Elizabeth Scully, regarding her position on this motion. However, in previous email and telephone conversations she had advised me that the defendants agreed that the three cases should be consolidated in the BLS.

/s/Edward F. Haber
Edward F. Haber

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2023, I caused a true copy of the foregoing to be served by email upon counsel of record for Defendants in all of the Actions, as well as upon counsel for the Plaintiffs in the *Doe v. UMass Memorial Healthcare, Inc.* and *Colleton v. UMass Memorial Healthcare, Inc.* actions.

/s/Edward F. Haber
Edward F. Haber

**COMMONWEALTH OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff, on behalf of himself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. 2285CV01205 |

| | |
|---|---|
| LISA COLLETON,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. 2285CV01293 |

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889 |

**MEMORANDUM IN SUPPORT OF PLAINTIFF JANICE PROGIN'S MOTION TO CONSOLIDATE AND TRANSFER CASES TO THE BUSINESS LITIGATION SESSION**

Plaintiff Janice Progin hereby moves, pursuant to Mass. R. Civ. P. 42(a), Mass. Super. Ct. R. 31, and Superior Court Administrative Directive No. 17-1, to consolidate *Doe v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "*Doe* Action") and *Colleton v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "*Colleton* Action"), currently pending in Worcester Superior Court, with *Progin v. UMass Memorial Healthcare, Inc.*, No. 2284CV02889 (the "*Progin* Action"), currently pending in the Business Litigaiton Session ("BLS") of Suffolk Superior Court, and transfer the *Doe* and *Colleton* Actions to the BLS to be consolidated with the *Progin* Action.

As detailed below, the cases should be consolidated in the BLS because they raise common questions of law and fact and involve a common party, because interests of judicial economy will be served by consolidation and transfer to the BLS and because no party to any of the cases will be prejudiced as a result. The propriety of transferring the cases to the BLS is confirmed by the fact that the BLS is already handling not only the *Progin* Action, but also a significant number of similar class actions alleging violations of the Massachusetts Wiretap Act by other defendants.

**Procedural History**

On October 24, 2022, Plaintiff John Doe filed the above-captioned *Doe* Action against Defendant UMass Memorial in Worcester Superior Court.. The *Doe* Action complaint alleges that Defendant disclosed Plaintiff Doe's and other patients' health information to third parties such as Facebook and Google without the patients' knowledge or consent. The complaint alleges that UMass Memorial did so by deploying digital marketing and automatic rerouting tools embedded on UMass Memorial's websites that redirect patients' health information to third parties such as Facebook and Google, which exploit that information for advertising purposes. The *Doe* Action

claims that UMass Memorial violated Massachusetts law, including the Massachsuetts Wiretap Act, M.G.L. c. 272, § 99, as a result. A copy of the Complaint in the *Doe* Action is attached hereto as Exhibit A.

On November 14, 2022, Plaintiff Lisa Colleton filed the similar *Colleton* Action against Defendant UMass Memorial in Worcester Superior Court. The *Colleton* complaint, like the *Doe* complaint, alleges that UMass Memorial disclosed her and other patients' private medical information without their knowledge or consent by sharing such information, collected through the patients' use of UMass Memorial's website, with Facebook and Google. Like the *Doe* Action complaint, the *Colleton* Action complaint claims that UMass Memorial violated the Massachusetts Wiretap Act. A copy of the Complaint in the *Colleton* Action is attached hereto as Exhibit B.

On December 20, 2022, Plaintiff Janice Progin filed the *Progin* Action against Defendant UMass Memorial and its affiliates in the Business Litigation Session of Suffolk Superior Court,. The *Progin* Action was accepted by Judge Salinger into the BLS on December 22, 2022. The *Progin* Action complaint, like the *Doe* and *Colleton* Actions' complaints, alleges that UMass Memorial aided in the interception of communications between Plaintiff Progin and other patients, on the one hand, and a website maintained by Defendants, on the other hand. The *Progin* Action complaint alleges that these communications were intercepted by Google, Facebook and other companies that provide so-called "tracking software," without patients' knowledge or consent. Like the *Doe* and *Colleton* Actions' complaints, the *Progin* Action complaint allegs that UMass Memorial (and its affiliates) violated the Massachusetts Wiretap Act. A copy of the Complaint in the *Progin* Action is attached hereto as Exhibit C.

Defendants removed the *Doe* Action, *Colleton* Action and *Progin* Actions (the "Actions") to the United States District Court for the District of Massachusetts. Plaintiffs in all three cases

moved to remand. After consolidated briefing, Judge Burroughs ordered all three cases to be remanded to Superior Court. In her orders, Judge Burroughs expressly acknowledged that the Actions were "related." *See, e.g.*, Memorandum and Order dated July 13, 2023 in *Progin v. UMass Memorial Healthcare, Inc.*, Civil Action No. 23-cv-10113-ADB (ECF No. 20) at 1-2, attached as Exhibit D hereto.

Now that all three of these related Actions have been remanded to Superior Court, they are ripe to be consolidated and transferred to the Business Litigation Session.

**Argument**

There is no question that the *Doe*, *Colleton* and *Progin* Actions are appropriate for consolidation. "Superior Court judges have broad authority to consolidate civil actions that arise from the same transaction or event, even if the actions were brought in different counties and one must be transferred." *Morris v. Mass Veterinary Specialty Servs., LLC*, 2020 Mass. Super. LEXIS 10, *4 (Jan. 30, 2020); *see also* Mass. R. Civ. Proc. 42(a) (permitting consolidation of actions in the same or different counties when they involve "a common question of law or fact"); Mass. Super. Ct. R. 31 (outlining procedure for consolidation and transfer of cases); Super. Ct. Admin. Dir. No. 17-1 (governing Business Litigation Session, including acceptance and transfer of cases into the BLS); *Karrasch v. Case*, 2013 Mass. Super. LEXIS 528 *4 (Apr. 4, 2013) (ordering the transfer and consolidation of cases in the BLS).

All three of the Actions involve a common Defendant, UMass Memorial. All three Actions are based on the same facts, that UMass Memorial aided in the interception of communications relating to patient health between patients and Defendants' website, by Google, Facebook and other companies that provide tracking software, without patients' knowledge or consent. And all three Actions allege the violation of the Massachusetts Wiretap Act. Consolidation of the Actions,

all of which are presently in the identical procedural posture having just been remanded to Superior Court, would serve the interests of judicial economy and that judicial economy would be best served by consolidation in the BLS.

The *Doe* and *Colleton* Actions should be consolidated in and transferred to the Business Litigation Session where the *Progin* Action is already pending. The BLS has accepted and overseen, and developed and continues to develop significant experience and expertise in, a significant number of similar consumer class actions alleging violation of the Massachusetts Wiretap Act due to the use of Facebook and/or Google tracking software to intercept communications on the defendants' websites. Those BLS cases include:

- *Doe v. Partners Healthcare, Inc.*, No. 1984CV01651 (motion to dismiss denied and case settled);
- *Doe v. Cape Cod Healthcare, Inc.*, Nos. 2272CV00493 and 2384CV01236 (originally filed in Barnstable County, then transferred to Business Litigation Session on May 24, 2023, where case is proceeding following defendant's Answer);
- *Doe v. Boston Medical Center Corp.*, No. 2384CV00326 (motion to dismiss briefed, argued and under advisement);
- *Doe v. The Children's Hospital Corp.*, No. 2384CV00411 (motion to dismiss briefed, argued and under advisement);
- *Vita v. Beth Israel Deaconess Med. Ctr.*, No. 2384CV00480 (motion to dismiss fully briefed and filed and pending);
- *Vita v. New England Baptist Hospital*, No. 2384CV00857 (motion to dismiss fully briefed and and filed and pending);
- *Nova v. Boston Medical Center Corp.*, No. 2384CV01086 (motion to dismiss briefing occurring now)
- *Doe v. Lawrence General Hospital*, No. 2384CV00728 (motion to dismiss briefing occurring now);
- *Vita v. Blue Cross and Blue Shield of Mass., Inc.*, No. 2384CV00542 (motion to dismiss 9A package scheduled to be filed in September 2023);

- *McManus v. Tufts Med. Ctr.*, No. 2384CV00930 (removed to District of Mass and remanded to BLS in July 2023);
- *Doe v. Atrius Health, Inc.*, No. 2384CV00597 (removed to District of Mass., where motion to remand is currently pending); and
- *Doe v. Steward Health Care System LLC*, No. 2384CV00174 (removed to District of Mass., where motion to remand is currently pending).

Judge Salinger, the BLS Administrative Judge, has accepted all of the foregoing cases, as well as the *Progin* Action, into the BLS. It is therefore apparent that *Doe* and *Colleton* Actions would also be accepted into the BLS. Consolidation of all three Actions in the BLS would manifestly serve the interest of judicial economy in light of the BLS's existing and developing experience and expertise presiding over these Massachusetts Wiretap Act class actions.

Accordingly, Plaintiff Janice Progin respectfully requests that the Courts order the the three above captioned Actions consolidated and order the *Doe* and *Colleton* Actions transferred to the Business Litigation Session.

Dated: August 15, 2023

Respectfully submitted,

*/s/Edward F. Haber*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2023, I caused a true copy of the foregoing to be served by email upon counsel of record for Defendants in all of the Actions, as well as upon counsel for the Plaintiffs in the *Doe v. UMass Memorial Healthcare, Inc.* and *Colleton v. UMass Memorial Healthcare, Inc.* actions.

*/s/Edward F. Haber*

Edward F. Haber

Exhibit C

**Patrick Vallely**

**From:** Tucker Merrigan <tucker@sweeneymerrigan.com>
**Sent:** Monday, August 14, 2023 11:47 AM
**To:** Ed Haber; Scully, Elizabeth; Michelle Blauner; Patrick Vallely; Victoria M. Santoro; Erin McHugh; fjohnson@azalaw.com; dwarden@azalaw.com; ncampbell@azalaw.com; sam@kellerpostman.com; adj@kellerpostman.com; bill@colonna-doyle.com; NCoulson@lsccounsel.com; lspitzig@lsccounsel.com
**Cc:** Karlsgodt, Paul; Patrick Vallely; Ian McLoughlin; Kristen Field; Tom Merrigan
**Subject:** RE: Progin v. UMass Memorial Healthcare; Doe v. UMass Memorial Healthcare; Colleton v. UMass Memorial Healthcare

Ed,

We are already in the process of filing a joint motion to transfer Colleton/Doe and expect to do so very soon – which we can agree on. Therefore your filing would be duplicative. I can have a 9C to discuss further if necessary, but this issue should be resolved. I just confirmed the same with Elizabeth Scully -- we are all on the same page to go to the BLS.

Please contact me on email or cell (413-824-9512) if you have any questions.

Thanks

Tucker

---

**From:** Ed Haber <ehaber@shulaw.com>
**Sent:** Monday, August 14, 2023 9:30 AM
**To:** Scully, Elizabeth <EScully@bakerlaw.com>; Michelle Blauner <mblauner@shulaw.com>; Patrick Vallely <pvallely@shulaw.com>; Tucker Merrigan <tucker@sweeneymerrigan.com>; Victoria M. Santoro <victoria@sweeneymerrigan.com>; Erin McHugh <EMcHugh@sweeneymerrigan.com>; fjohnson@azalaw.com; dwarden@azalaw.com; ncampbell@azalaw.com; sam@kellerpostman.com; adj@kellerpostman.com; bill@colonna-doyle.com; NCoulson@lsccounsel.com; lspitzig@lsccounsel.com
**Cc:** Karlsgodt, Paul <PKarlsgodt@bakerlaw.com>; Ed Haber <ehaber@shulaw.com>; Patrick Vallely <pvallely@shulaw.com>; Ian McLoughlin <imcloughlin@shulaw.com>
**Subject:** RE: Progin v. UMass Memorial Healthcare; Doe v. UMass Memorial Healthcare; Colleton v. UMass Memorial Healthcare

Counsel:

Attached please find the motion we plan to serve today, pursuant to Rule 9A, which seeks the consolidation of the three referenced UMass Memorial cases (Doe, Colleton and Progin) and the transfer of Doe and Colleton to the Business Litigation Session where Progin is pending. I also attach the memorandum of law in support which we also plan to serve today.

It is my understanding, per Elizabeth Scully's email below and subsequent conversations with her, that defendants also seek the relief sought by our motion. Elizabeth: Please confirm that we can indicate that the defendants assent to the allowance of the motion.

It is also my understanding from conversations with counsel for Doe that they and counsel for Colleton also agree that the three cases should be consolidated and that Doe and Colleton should be transferred to the BLS. Please advise if we can indicate that the plaintiffs Doe and Colleton assent to the allowance of the motion.

If all parties advise us that they assent to, or do not oppose, the motion, we will reflect that the motion is assented to or unopposed by all parties and file it in each of the three cases.

Of course, we are happy to discuss this with any of you today. I could do so anytime except between noon and 1 pm EDT. I can best be reached at 617-901-3739.

Thank you.

**Edward F. Haber**
**Shapiro Haber & Urmy LLP**
**One Boston Place**
**Suite 2600**
**Boston, MA 02108**
Tel: 617-439-3939
ehaber@shulaw.com
www.shulaw.com

**From:** Scully, Elizabeth <EScully@bakerlaw.com>
**Sent:** Wednesday, July 19, 2023 10:22 AM
**To:** Ed Haber <ehaber@shulaw.com>; Michelle Blauner <mblauner@shulaw.com>; Patrick Vallely <pvallely@shulaw.com>; tucker@sweeneymerrigan.com; victoria@sweeneymerrigan.com; emchugh@sweeneymerrigan.com; fjohnson@azalaw.com; dwarden@azalaw.com; ncampbell@azalaw.com; sam@kellerpostman.com; adi@kellerpostman.com; bill@colonna-doyle.com; NCoulson@lsccounsel.com; lspitzig@lsccounsel.com
**Cc:** Karlsgodt, Paul <PKarlsgodt@bakerlaw.com>
**Subject:** Progin v. UMass Memorial Healthcare; Doe v. UMass Memorial Healthcare; Colleton v. UMass Memorial Healthcare

Counsel,

I am writing regarding the Court's recent Remand Order in the above referred matters, and to propose a potential agreement for the orderly movement forward of these matters. UMass Memorial Healthcare is prepared to forego its right to appeal the Remand Order in exchange for the parties reaching agreement to have the three matters consolidated and proceed in BLS 1, and agreeing to a schedule for the filing of a consolidated complaint and UMass's response thereto (avoiding the filing of separate motions to the three pending separate complaints). Please let me know if you would like to arrange a call to discuss.

Sincerely,

Elizabeth

**Elizabeth Scully**
She | Her | Hers
Partner

BakerHostetler
Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1698

escully@bakerlaw.com
bakerlaw.com

---

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

Date Filed 8/24/2023 2:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

E-FILED

45

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. ~~2285CV01205~~<br>2384CV02448-BLS1 |

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| LISA COLLETON,<br>ON BEHALF OF HERSELF<br>AND ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. ~~2285CV01293D~~ [redacted]<br>2384CV02450-BLS1 |

**WITHDRAWAL OF MOTION TO APPOINT INTERIM CLASS COUNSEL**

Date Filed 3/24/2023 2:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

Now come the plaintiffs in these consolidated cases and Withdraws its Motion to Appoint Interim Class Counsel. See Dkt. # 14.[1] Plaintiffs reserve their right to refile such a motion at a later date.

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

Respectfully submitted,


/s/ J. Tucker Merrigan
J. Tucker Merrigan
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com

Warren Postman (pro hac pending)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
ajd@kellerpostman.com


[1] Plaintiffs have been served with an Opposition to the Motion to Appoint Interim Class Counsel on behalf of the plaintiff in *Progin v. UMass Memorial Healthcare, Inc.*, Case No. 2285CV01205 (Suffolk Super. Ct., Business Litigation Session). Progin's Opposition to the Motion to Appoint Interim Class Counsel filed in this case has not yet been docketed as of this filing. The plaintiffs in this case and plaintiff's counsel J. Tucker Merrigan categorically dispute Progin's description of the communications, factual allegations and legal argument as articulated in Attorney Haber's filing. The plaintiffs in this case and plaintiff's counsel J. Tucker Merrigan reserve all rights to challenge one-sided misrepresentations concerning this matter.

Date Filed 8/24/2023 2:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

William P. Doyle (556999)
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
T: (781) 245-1127
F: (781) 245-1148
E: bill@colonna-doyle.com

Nicholas A. Coulson (pro hac pending)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
E: ncoulson@lsccounsel.com

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on August 24, 2023, a copy of the foregoing Notice of Withdrawal of Motion to Appoint Interim Class Counsel was filed electronically and served on all counsel of record via email.

Respectfully Submitted,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

Date Filed 8/24/2023 2:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

46

COMMONWEALTH OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff, on behalf of himself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>2384CV02448-BLS1<br>CIVIL ACTION NO. ~~2285CV01205~~<br><br>FILED<br>AUG 31 2023<br>ATTEST [signature] CLERK |
| LISA COLLETON,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. ~~2285CV01293~~<br>2384CV02450-BLS1 |
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889<br><br>Notices Mailed 9/12/23 |

**ALLOWED** to the extent this is constructed as a motion to transfer Civil Action No. 2285cv1293 to the Business Litigation Session (BLS). The transfer will not take place, however, unless and until the BLS accepts the case. This court previously allowed the motion to transfer Civil Action No. 2285cv01205 to the Business Litigation Session, similarly, is subject to acceptance by the BLS. No action taken on the motion to consolidate in the BLS because that decision will be made in the BLS if it accepts transfer. M Rodwin J 9.6.23

**PLAINTIFF JANICE PROGIN'S MOTION TO CONSOLIDATE AND TRANSFER CASES TO THE BUSINESS LITIGATION SESSION**

Plaintiff Janice Progin hereby moves, pursuant to Mass. R. Civ. P. 42(a), Mass. Super. Ct. R. 31, and Superior Court Administrative Directive No. 17-1, to consolidate *Doe v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "*Doe* Action") and *Colleton v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "*Colleton* Action"), currently pending in Worcester Superior Court, with *Progin v. UMass Memorial Healthcare, Inc.*, No. 2284CV02889 (the "*Progin* Action"), currently pending in the Business Litigaiton Session ("BLS") of Suffolk Superior Court, and transfer the *Doe* and *Colleton* Actions to the BLS to be consolidated with the *Progin* Action.

As detailed in the accompanying Memorandum, the cases should be consolidated in the BLS because they raise common questions of law and fact and involve a common party, because interests of judicial economy will be served by consolidation and transfer to the BLS and because no party to any of the cases will be prejudiced as a result. The propriety of transferring the cases to the BLS is confirmed by the fact that the BLS is already handling not only the *Progin* Action, but also a significant number of similar class actions alleging violations of the Massachusetts Wiretap Act by other defendants.

Accordingly, Plaintiff Janice Progin respectfully requests that the Courts order the the three above captioned Actions consolidated and order the *Doe* and *Colleton* Actions transferred to the Business Litigation Session.

Dated: August 15, 2023

Respectfully submitted,

*/s/Edward F. Haber*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

## RULE 9C CERTIFICATE OF COMPLIANCE

I, Edward F. Haber, hereby certify that on August 14, 2023, I provided counsel for the plaintiffs in the *Doe* and *Colleton* Actions, and counsel for Defendants in all three actions, with a copy of this motion and the supporting memorandum and asked if they would assent to or not oppose the motion. I received an e-mail reply from attorney Tucker Merrigan, one of the counsel for plaintiff in the *Doe* action, that he agreed that the *Doe* and *Colleton* cases should be transferred to the Business Litigation Session. But he did not agree to assent or not oppose this motion. I did not get any response from counsel for the defendants, Elizabeth Scully, regarding her position on this motion. However, in previous email and telephone conversations she had advised me that the defendants agreed that the three cases should be consolidated in the BLS.

*/s/Edward F. Haber*
Edward F. Haber

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2023, I caused a true copy of the foregoing to be served by email upon counsel of record for Defendants in all of the Actions, as well as upon counsel for the Plaintiffs in the *Doe v. UMass Memorial Healthcare, Inc.* and *Colleton v. UMass Memorial Healthcare, Inc.* actions.

*/s/Edward F. Haber*
Edward F. Haber

8/31

FILED

47

AUG 31 2023

COMMONWEALTH OF MASSACHUSETTS

ATTEST [signature] CLERK

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff, on behalf of himself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. ~~2285CV01205~~ 2384CV02448BLS1 |
| LISA COLLETON,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. ~~2285CV01293~~ 2384CV02450BLS1 |
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889 |

**MEMORANDUM IN SUPPORT OF PLAINTIFF JANICE PROGIN'S MOTION TO CONSOLIDATE AND TRANSFER CASES TO THE BUSINESS LITIGATION SESSION**

Plaintiff Janice Progin hereby moves, pursuant to Mass. R. Civ. P. 42(a), Mass. Super. Ct. R. 31, and Superior Court Administrative Directive No. 17-1, to consolidate *Doe v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "*Doe* Action") and *Colleton v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 (the "*Colleton* Action"), currently pending in Worcester Superior Court, with *Progin v. UMass Memorial Healthcare, Inc.*, No. 2284CV02889 (the "*Progin* Action"), currently pending in the Business Litigaiton Session ("BLS") of Suffolk Superior Court, and transfer the *Doe* and *Colleton* Actions to the BLS to be consolidated with the *Progin* Action.

As detailed below, the cases should be consolidated in the BLS because they raise common questions of law and fact and involve a common party, because interests of judicial economy will be served by consolidation and transfer to the BLS and because no party to any of the cases will be prejudiced as a result. The propriety of transferring the cases to the BLS is confirmed by the fact that the BLS is already handling not only the *Progin* Action, but also a significant number of similar class actions alleging violations of the Massachusetts Wiretap Act by other defendants.

**Procedural History**

On October 24, 2022, Plaintiff John Doe filed the above-captioned *Doe* Action against Defendant UMass Memorial in Worcester Superior Court.. The *Doe* Action complaint alleges that Defendant disclosed Plaintiff Doe's and other patients' health information to third parties such as Facebook and Google without the patients' knowledge or consent. The complaint alleges that UMass Memorial did so by deploying digital marketing and automatic rerouting tools embedded on UMass Memorial's websites that redirect patients' health information to third parties such as Facebook and Google, which exploit that information for advertising purposes. The *Doe* Action

claims that UMass Memorial violated Massachusetts law, including the Massachsuetts Wiretap Act, M.G.L. c. 272, § 99, as a result. A copy of the Complaint in the *Doe* Action is attached hereto as Exhibit A.

On November 14, 2022, Plaintiff Lisa Colleton filed the similar *Colleton* Action against Defendant UMass Memorial in Worcester Superior Court. The *Colleton* complaint, like the *Doe* complaint, alleges that UMass Memorial disclosed her and other patients' private medical information without their knowledge or consent by sharing such information, collected through the patients' use of UMass Memorial's website, with Facebook and Google. Like the *Doe* Action complaint, the *Colleton* Action complaint claims that UMass Memorial violated the Massachusetts Wiretap Act. A copy of the Complaint in the *Colleton* Action is attached hereto as Exhibit B.

On December 20, 2022, Plaintiff Janice Progin filed the *Progin* Action against Defendant UMass Memorial and its affiliates in the Business Litigation Session of Suffolk Superior Court,. The *Progin* Action was accepted by Judge Salinger into the BLS on December 22, 2022. The *Progin* Action complaint, like the *Doe* and *Colleton* Actions' complaints, alleges that UMass Memorial aided in the interception of communications between Plaintiff Progin and other patients, on the one hand, and a website maintained by Defendants, on the other hand. The *Progin* Action complaint alleges that these communications were intercepted by Google, Facebook and other companies that provide so-called "tracking software," without patients' knowledge or consent. Like the *Doe* and *Colleton* Actions' complaints, the *Progin* Action complaint allegs that UMass Memorial (and its affiliates) violated the Massachusetts Wiretap Act. A copy of the Complaint in the *Progin* Action is attached hereto as Exhibit C.

Defendants removed the *Doe* Action, *Colleton* Action and *Progin* Actions (the "Actions") to the United States District Court for the District of Massachusetts. Plaintiffs in all three cases

moved to remand. After consolidated briefing, Judge Burroughs ordered all three cases to be remanded to Superior Court. In her orders, Judge Burroughs expressly acknowledged that the Actions were "related." *See, e.g.*, Memorandum and Order dated July 13, 2023 in *Progin v. UMass Memorial Healthcare, Inc.*, Civil Action No. 23-cv-10113-ADB (ECF No. 20) at 1-2, attached as Exhibit D hereto.

Now that all three of these related Actions have been remanded to Superior Court, they are ripe to be consolidated and transferred to the Business Litigation Session.

**Argument**

There is no question that the *Doe*, *Colleton* and *Progin* Actions are appropriate for consolidation. "Superior Court judges have broad authority to consolidate civil actions that arise from the same transaction or event, even if the actions were brought in different counties and one must be transferred." *Morris v. Mass Veterinary Specialty Servs., LLC*, 2020 Mass. Super. LEXIS 10, *4 (Jan. 30, 2020); *see also* Mass. R. Civ. Proc. 42(a) (permitting consolidation of actions in the same or different counties when they involve "a common question of law or fact"); Mass. Super. Ct. R. 31 (outlining procedure for consolidation and transfer of cases); Super. Ct. Admin. Dir. No. 17-1 (governing Business Litigation Session, including acceptance and transfer of cases into the BLS); *Karrasch v. Case*, 2013 Mass. Super. LEXIS 528 *4 (Apr. 4, 2013) (ordering the transfer and consolidation of cases in the BLS).

All three of the Actions involve a common Defendant, UMass Memorial. All three Actions are based on the same facts, that UMass Memorial aided in the interception of communications relating to patient health between patients and Defendants' website, by Google, Facebook and other companies that provide tracking software, without patients' knowledge or consent. And all three Actions allege the violation of the Massachusetts Wiretap Act. Consolidation of the Actions,

all of which are presently in the identical procedural posture having just been remanded to Superior Court, would serve the interests of judicial economy and that judicial economy would be best served by consolidation in the BLS.

The *Doe* and *Colleton* Actions should be consolidated in and transferred to the Business Litigation Session where the *Progin* Action is already pending. The BLS has accepted and overseen, and developed and continues to develop significant experience and expertise in, a significant number of similar consumer class actions alleging violation of the Massachusetts Wiretap Act due to the use of Facebook and/or Google tracking software to intercept communications on the defendants' websites. Those BLS cases include:

- *Doe v. Partners Healthcare, Inc.*, No. 1984CV01651 (motion to dismiss denied and case settled);
- *Doe v. Cape Cod Healthcare, Inc.*, Nos. 2272CV00493 and 2384CV01236 (originally filed in Barnstable County, then transferred to Business Litigation Session on May 24, 2023, where case is proceeding following defendant's Answer);
- *Doe v. Boston Medical Center Corp.*, No. 2384CV00326 (motion to dismiss briefed, argued and under advisement);
- *Doe v. The Children's Hospital Corp.*, No. 2384CV00411 (motion to dismiss briefed, argued and under advisement);
- *Vita v. Beth Israel Deaconess Med. Ctr.*, No. 2384CV00480 (motion to dismiss fully briefed and filed and pending);
- *Vita v. New England Baptist Hospital*, No. 2384CV00857 (motion to dismiss fully briefed and filed and pending);
- *Nova v. Boston Medical Center Corp.*, No. 2384CV01086 (motion to dismiss briefing occurring now)
- *Doe v. Lawrence General Hospital*, No. 2384CV00728 (motion to dismiss briefing occurring now);
- *Vita v. Blue Cross and Blue Shield of Mass., Inc.*, No. 2384CV00542 (motion to dismiss 9A package scheduled to be filed in September 2023);

- *McManus v. Tufts Med. Ctr.*, No. 2384CV00930 (removed to District of Mass and remanded to BLS in July 2023);

- *Doe v. Atrius Health, Inc.*, No. 2384CV00597 (removed to District of Mass., where motion to remand is currently pending); and

- *Doe v. Steward Health Care System LLC*, No. 2384CV00174 (removed to District of Mass., where motion to remand is currently pending).

Judge Salinger, the BLS Administrative Judge, has accepted all of the foregoing cases, as well as the *Progin* Action, into the BLS. It is therefore apparent that *Doe* and *Colleton* Actions would also be accepted into the BLS. Consolidation of all three Actions in the BLS would manifestly serve the interest of judicial economy in light of the BLS's existing and developing experience and expertise presiding over these Massachusetts Wiretap Act class actions.

Accordingly, Plaintiff Janice Progin respectfully requests that the Courts order the the three above captioned Actions consolidated and order the *Doe* and *Colleton* Actions transferred to the Business Litigation Session.

Dated: August 15, 2023

Respectfully submitted,

*/s/Edward F. Haber*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2023, I caused a true copy of the foregoing to be served by email upon counsel of record for Defendants in all of the Actions, as well as upon counsel for the Plaintiffs in the *Doe v. UMass Memorial Healthcare, Inc.* and *Colleton v. UMass Memorial Healthcare, Inc.* actions.

*/s/Edward F. Haber*
Edward F. Haber

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______________
Assistant Clerk

# Exhibit A

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| WORCESTER, S.S. | | SUPERIOR COURT |
| JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2285CV01205 |
| Plaintiff | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff John Doe ("Plaintiff"), individually and on behalf of all other Citizens of the Commonwealth of Massachusetts similarly situated ("Class Members"), brings suit against Defendant UMass Memorial Health Care, Inc. ("Defendant"), and upon personal knowledge as to Plaintiff's own conduct and on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendant assures visitors to its website that it is "committed to protecting your privacy" and that "We have designed our website to allow you to visit most areas without

identifying yourself or providing personal information."[1] Contrary to these assurances, however, Defendant does not follow these policies, nor the law prohibiting such disclosures.

3. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook and other third parties without their patients' knowledge, authorization, or consent.

4. Defendant discloses this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these rerouting tools causes its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

5. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

6. On behalf of themselves and all similarly situated citizens in the Commonwealth of Massachusetts, Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of his personal information; awarding liquidated damages in the amount of $1,000 per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

[1] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

## PARTIES TO THE ACTION

7. Defendant UMass Memorial Health Care, Inc. is a Massachusetts corporation with its principal office at One Biotech Park, 365 Plantation Street, Worcester, MA 01605. Defendant is the largest health care system in Central Massachusetts.[2] Defendant owns and manages numerous healthcare facilities in Massachusetts, including UMass Memorial Medical Center, UMass Memorial Health Harrington Hospital, UMass Memorial Health Marlborough Hospital, Community Healthlink Behavioral Health Services, and UMass Memorial Health Clinton Hospital. [3]

8. Plaintiff, John Doe, is a Massachusetts citizen residing in Worcester County, Massachusetts, has been treated by Defendant's physicians, and has been a patient UMass Memorial Medical Center,[4] and thus also a patient of Defendant.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 365 Plantation Street, Worcester, MA 01605. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

10. Venue is appropriate in this venue because Defendant's principal place of business is in Worcester County and the acts or conduct giving rise to the cause of action asserted herein took place in Worcester County. G.L. c. 223, § 1. Venue is also appropriate in this Court because Plaintiff, John Doe, resides in Worcester County. G.L. c. 223, § 8(4).

---

[2] https://www.ummhealth.org/umass-memorial-health/about-us
[3] https://www.ummhealth.org/locations
[4] https://www.ummhealth.org/umass-memorial-medical-center

## FACTUAL BACKGROUND

**A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

11. Plaintiff John Doe is a patient of Defendant who has received treatment from UMass Memorial Medical Center.[5]

12. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

13. Medical patients in Massachusetts such as John Doe have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

14. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

15. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

16. Defendant operates websites for patients, including www.ummhealth.org and www.harringtonhospital.org.

17. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

18. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses

[5] https://www.ummhealth.org/umass-memorial-medical-center

the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

19. Defendant's disclosures of patients' personal healthcare information occur because Defendant intentionally deploys source code on the websites it operates, including https://www.ummhealth.org/ and https://www.harringtonhospital.org/provider/, that cause patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

20. By design, third parties receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

21. Websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

22. The basic command that web browsers use to exchange data and user communications is called a GET request.[6] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

[6] https://www.w3schools.com/tags/ref_httpmethods.asp

23. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

24. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

25. Unbeknownst to most users, however, the website's server may also redirect the user's communications to third parties. Typically, users are provided no notice that these disclosures are being made. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

26. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

27. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

28. These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

29. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

30. Tracking pixels are lines of source code embedded in websites such as Defendant's. Tracking pixels are particularly pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

31. For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[7]

32. Because of their uniquely identifying characteristics, IP address are considered personally identifiable information. Tracking pixels can (and typically do) collect website visitors' IP addresses.

[7] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

33. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

34. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

35. Cookies are considered personal identifiers, and tracking pixels can collect cookies from website visitors.

36. A third type of personally identifying information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

37. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across

websites."[8] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[9] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[10]

38. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[11]

39. Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

40. A fourth kind of personally identifying information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is an identifying number string that is connected to a user's Facebook profile.[12] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[13]

41. Unique personal identifiers such as a person's Facebook are likewise capable of collection through pixel trackers.

**D. Facebook**

42. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

[8] https://www.blog.google/products/chrome/building-a-more-private-web/
[9] https://pixelprivacy.com/resources/browser-fingerprinting/
[10] https://www.blog.google/products/chrome/building-a-more-private-web/
[11] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/
[12] https://www.facebook.com/help/211813265517027
[13] https://smallseotools.com/find-facebook-id/

43. Facebook describes itself as a "real identity" platform.[14] This means that users are permitted only one account and must share "the name they go by in everyday life."[15] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[16]

44. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[17] Facebook has since evolved into one of the largest advertising companies in the world.[18] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[19] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[20]

45. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[21]

46. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

47. Facebook offers several advertising options based on the type of audience that an

---

[14] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[15] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[16] https://www.facebook.com/help/406644739431633
[17] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[18] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[19] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[20] https://www.facebook.com/business/ads/ad-targeting
[21] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

48. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[22] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

49. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

---

[22] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

50. One of Facebook's most powerful tools is called the "Meta Pixel."

51. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[23] Once activated, the Meta Pixel "tracks the people and type of actions they take."[24] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[25]

52. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook collects identifying information like IP addresses, Facebook IDs, and other data that allow Facebook to identify the user. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences.

53. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

54. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[26] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[27]

55. Facebook warns web developers that its Pixel is a personal identifier because it

[23] https://developers.facebook.com/docs/meta-pixel/
[24] https://www.facebook.com/business/goals/retargeting
[25] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[26] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[27] https://www.oviond.com/understanding-the-facebook-pixel

enables Facebook "to match your website visitors to their respective Facebook User accounts."[28]

56. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[29]

57. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[30] Meta Pixel tracks this data regardless of whether a user is logged into Facebook.[31]

58. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifying data such as a user's IP address.

59. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[32] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[33] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[34]

60. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and

[28] https://developers.facebook.com/docs/meta-pixel/get-started
[29] https://developers.facebook.com/docs/meta-pixel/get-started
[30] https://developers.facebook.com/docs/meta-pixel/
[31] https://themarkup.org/pixel-hunt/2022/06/15/facebook-and-anti-abortion-clinics-are-collecting-highly-sensitive-info-on-would-be-patients
[32] https://developers.facebook.com/docs/meta-pixel/
[33] https://developers.facebook.com/docs/meta-pixel/
[34] https://developers.facebook.com/docs/meta-pixel/

specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[35]

61. Facebook has a number of ways to uniquely identify the individuals whose data is being forwarded from third-party websites through the Meta Pixel.

62. If a user has a Facebook account, the user data collected is linked to the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

63. Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[36] The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[37]

64. Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." Thise are two forms of Advanced Matching: manual matching and automatic matching.[38] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

[35] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[36] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/
[37] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/
[38] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

65. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[39] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[40]

66. Facebook also receives personally identifying information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

67. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

68. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

69. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act,"

---

[39] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[40] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

"presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[41] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[42]

70. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like https://www.ummhealth.org/ and target users with advertising based on their web activity.

**D. Defendant has discretely embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

71. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

72. Facebook's intrusion into the personal data of the visitors to third-party websites

---

[41] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[42] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[43] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

73. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads.[44] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[45] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

74. Meta Pixel is wildly popular and embedded on millions of websites. Shockingly, Meta Pixel is incorporated on many websites that are used to store and convey sensitive medical information, that by law must be kept private. Recently, investigative journalists have determined that Meta Pixel is embedded on the websites of many of the top hospitals in the United States and on the password-protected patient portals of many healthcare systems.[46] This results in sensitive medical information being collected and then sent to Facebook when a user interacts with these hospital websites. For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text

[43] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[44] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[45] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/
[46] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

75. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

76. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. When a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is transmitted to Facebook via the Meta Pixel. The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

77. This data, which can include health conditions (e.g., addiction, Alzheimer's, heart disease), diagnoses, procedures, test results, the treating physician, medications, and other personally identifying information ("Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

78. For example, a patient searching for a doctor on Defendant's website located at www.harringtonhospital.org is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the

patient's hometown, the patient's language preference, and other information that the patient provides:




79. All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

80. Defendant discloses such personally identifying information and sensitive medical information even when patients are searching for doctors on its websites to assist with them conditions such as substance abuse and addiction:




81. Likewise, a patient who desires an appointment at a specific hospital using Defendant's websites also has that information forwarded to Facebook via the Meta Pixel contemporaneously with its transmission by patients:




82. In other words, Facebook learns not just that patients are seeking treatment, but

where and typically when they are seeking treatment.

83. Defendant also discloses patient information from other sections of its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, and communications made when patients are researching specific medical conditions such as COVID-19.

84. By compelling visitors to its websites to disclose personally identifying data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal Health Information to their private identities and target them with advertising.

85. Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the websites that Defendant maintains. Plaintiff continued to have his privacy violated when Defendant permitted Facebook and other companies to send him targeted advertising related to his medical condition.

86. For example, Plaintiff John Doe visited Defendant's website in 2021 and 2022 at www.ummhealth.org and entered data, including sensitive medical information, such as details about his medical condition and doctor. The information that Plaintiff John Doe transmitted included queries about treatment for his medical condition.

87. Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it was permitting Facebook to collect, use, and share Plaintiff's and the Class Members' Personal Health Information, including sensitive medical information and personally identifying data.

### F. Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.

88. Plaintiff and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

89. For example, when Plaintiff John Doe visited Defendant's website in 2022 at www.ummhealth.org there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.

90. Plaintiff and his fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

91. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Terms of Use" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:



92. While disclosing that its website contains "cookies," Defendant's "Terms of Use" falsely promises patients that the "[u]se of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site."[47] Contrary to that promise, Defendant's website automatically transmits personally identifiable information to Facebook using multiple cookies, including c_user, datr, fr, and xs cookies.

93. To locate Defendant's "Privacy Policy," a patient is required to scroll through the "UMass Memorial Health Care Website Terms of Use Statement" to find a link entitled "Read Our Privacy Policy" that is buried in the website's general terms and conditions statement.[48]

94. Defendant's "Privacy Policy" gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises in its "Privacy Policy"[49] that protecting patients' health information is a priority:

> **JOINT NOTICE OF INFORMATION PRACTICES**
>
> At UMass Memorial Health Care, your privacy is a priority. We follow strict federal and state guidelines to maintain the confidentiality of your medical (protected health) information. We also follow state guidelines regarding how long we must store your medical records and the requirements for proper disposal.

95. Even if a patient stumbled upon Defendant's carefully hidden "Privacy Policy," nothing in that notice would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook to capture and exploit patients' Personal Health Information.

---

[47] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement
[48] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement
[49] https://www.ummhealth.org/patients-visitors/joint-notice-information-practices

96. Defendant does not have a legal right to share Plaintiff's and Class Members' Protected Health Information without their written consent to third parties, because this information is protected from such disclosure by law. *E.g.* GL c. 214, §1B; 45 C.F.R. § 164.508. Much less is Defendant permitted to disclose patients' Protected Health Information to advertising and marketing companies like Facebook without express written authorization from patients. *E.g.* 940 Mass. Code Regs. 4.08(12).

97. Defendant failed to obtain a valid written authorization from Plaintiff or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications for marketing purposes.

98. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Such "Browser-Wrap" statements do not create an enforceable contract against consumers. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

99. Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiff and Class Members' Personal Health Information to Facebook or aid in the same.

**G. The disclosures of personal patient data to Facebook are unnecessary.**

100. There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain its healthcare website.

101. For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook.

102. Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**H. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

103. Patient confidentiality "is a cardinal rule of the medical profession, faithfully adhered to in most instances, and thus has come to be justifiably relied upon by patients seeking advice and treatment." *Alberts v. Devine*, 395 Mass. 59, 65 (1985).

104. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiff and Class Member's privacy interests.

105. Patient Personal Health Information is specifically protected by law. *E.g.* G.L. 111, §70E(b); G.L. 214, §1B. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifying information such patient names, IP addresses, and other unique characteristics or codes. *E.g.* 105 Mass. Code Regs. 300.120; 45 C.F.R. § 164.514.

106. Massachusetts courts have long recognized that physicians owe a duty of confidentiality to patients, which prohibits them from disclosing patients' health information without patients' written consent. *Alberts v. Devine*, 395 Mass. 59, 68 (1985). And Massachusetts law subjects medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

107. Given the public policy expressed by these laws, Plaintiff and the Members of the Class had a reasonable expectation of privacy in their protected health information.

108. Several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

109. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

110. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[50]

111. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users

[50] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

chose not to share data when prompted.[51]

112. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[52]

113. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**I. Plaintiff's Personal Health Data that Defendant collected, disclosed, and used is Plaintiff's property, has economic value, and its illicit disclosure has caused Plaintiff harm.**

114. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiff and Class Members.

115. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and

[51] https://www.wired.co.uk/article/apple-ios14-facebook
[52] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

location information" were being sold for approximately "$0.50 per 1,000 people."[53]

116. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[54] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[55]

117. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[56] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[57]

118. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[58]

119. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[59] and has paid

[53] https://ig.ft.com/how-much-is-your-personal-data-worth/
[54] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[55] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[56] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[57] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[58] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[59] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app

teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[60]

120. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[61]

121. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiff and the Class Member's property.

**J. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

122. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions.

123. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

124. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar

---

[60] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[61] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* *https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

advertising can be accomplished via disclosures to other third-party advertisers and marketers.

125. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

126. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**K. Facebook's history of egregious privacy violations.**

127. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

128. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

129. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

130. Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

131. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[62]

132. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[63]

133. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices, resulting in a record-breaking five-billion-dollar settlement.

134. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[64] Some companies were even able to read users' private messages.

135. In June 2020, after promising users that app developers would not have access to

[62] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[63] A similar case is pending in Texas.
[64] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html

data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[65] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

136. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[66]

137. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[67] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies

---

[65] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[66] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf
[67] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

could do with users' information."[68]

138. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[69]

139. These revelations were confirmed by an article published by the Markup in 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[70]

140. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

## TOLLING, CONCEALMENT, AND ESTOPPEL

141. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

142. Defendant seamlessly incorporated Meta Pixel and other trackers into its

[68] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[69] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[70] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiff and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

143. Plaintiff and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

144. The earliest that Plaintiff and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

145. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of the filing of Plaintiff's Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

146. Defendant's conduct violates the law and breaches its express and implied privacy promises.

147. Defendant's unlawful conduct has injured Plaintiff and Class Members.

148. Defendant's conduct is ongoing.

149. Plaintiff brings this action individually and as a class action against Defendant.

150. Plaintiff seeks class certification for the following proposed Class:

> **The UMass Memorial Health Class:** During the fullest period allowed by law, all Massachusetts citizens who are, or were, patients of UMass Memorial Health, Inc. or any of its affiliates and who exchanged communications at Defendant's websites, including www.ummhealth.org, www.harringtonhospital.org, and any other UMass Memorial Health affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to) Facebook.

151. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiff's counsel and Defendant's counsel.

152. Plaintiff reserves the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

153. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

154. **Numerosity:** While the exact number of Class Members is unknown to Plaintiff at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

155. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiff and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate G.L. c. 272, § 99;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiff and Class Members' Personal Health Information to Facebook;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiff and Class Members and, if so, the extent of that injury;

j. Whether Plaintiff and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiff and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

156. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

157. **Typicality:** Plaintiff's claims are typical of the claims of other Class Members and Plaintiff have substantially the same interest in this matter as other Class Members. Plaintiff has no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiff's claims arise out of the same set of facts and conduct as all other Class Members. Plaintiff and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiff and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

158. **Adequacy of Representation:** Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are coincident with, and not antagonistic to, those of other Class Members he seeks to represent. Plaintiff has no disabling conflicts with Class Members. Accordingly, Plaintiff is an adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

159. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

160. Plaintiff anticipates no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

161. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiff and the Class)

162. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

163. Plaintiff brings this claim on behalf of themselves and all members of the Class.

164. All conditions precedent to this action have been performed or have occurred.

165. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

166. Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

167. Defendant qualifies as a person under the statute.

168. All alleged communications between Plaintiff or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

169. An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire … communication

through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

170. Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiff's and Class Members' wire communications.

171. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire … communication." G.L. c. 272, § 99B(3).

172. The "intercepting devices" used in this case include, but are not limited to:

a. Plaintiff and Class Members' personal computing devices;

b. Plaintiff and Class Members' web browsers;

c. Plaintiff and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

h. Computer servers of third parties (including Facebook) to which Plaintiff and Class Members' communications were disclosed.

173. Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

174. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that

were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

175. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

k. The precise dates and times when patients visit Defendant's websites;

l. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

176. Plaintiff and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

177. Neither Plaintiff nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiff or Class Members' consent.

178. Plaintiff and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

179. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

180. In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiff and the Class)**

181. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

182. Plaintiff bring this claim on behalf of herself and all members of the Class.

183. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

184. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

185. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

186. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

187. Plaintiff and Class Members are patients of Defendant.

188. Defendant owes Plaintiff and Class Members a duty of confidentiality.

189. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiff and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

190. The information disclosed included personally identifiable information, Plaintiff and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiff and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

191. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiff and Class Members' rights to privacy.

192. Plaintiff and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiff and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

193. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiff and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

194. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of

the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

195. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e. "Alzheimer's"), the condition selected from dropdown menus (i.e. "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

196. Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

197. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

198. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

199. Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiff and Class Members' privacy.

200. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

201. Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiff and the Class)**

202. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

203. Plaintiff brings this claim on behalf of themselves and all members of the Class.

204. All conditions precedent to this action have been performed or occurred.

205. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

206. As medical provider for Plaintiff and Class Members, Defendant owes Plaintiff and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiff or Class Members.

207. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiff and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

208. Defendant's breach caused Plaintiff and Class Members the following damages:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

**COUNT IV**
**Breach of Express Contract**
**(On Behalf of Plaintiff and the Class)**

209. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

210. Plaintiff bring this claim on behalf of herself and all members of the Class.

211. Plaintiff and Class Members entered into written agreements with Defendant as part of the medical services Defendant provided to Plaintiff and Class Members. The agreements involved a mutual exchange of consideration whereby Defendant provided these services in exchange for payment from Class Members, Class Members' insurance carriers, and/or government programs remitting payment on Class Members' behalf.

212. Plaintiff and Class Members and/or their insurance carriers paid Defendant for its services and performed under these agreements.

213. Defendant's disclosure of Plaintiff and Class Members' Private Health Information without their consent constitutes a material breach of the terms of these agreements by Defendant.

214. As a direct and proximate result of Defendant's breach of contract with Plaintiff and Class Members, Plaintiff and Class Members have been irreparably harmed.

215. Accordingly, Plaintiff, individually and on behalf of the Class, respectfully request this Court award all available damages for Defendant's breach of express contract.

**COUNT V**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

216. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

217. Plaintiff brings this claim on behalf of herself and all members of the Class.

218. Through their course of conduct, Defendant, Plaintiff, and Class Members entered into implied contracts for the provision of medical care and treatment, as well as implied contracts for the Defendant to retain and protect the privacy of Plaintiff's and Class Members' Private Health Information.

219. Specifically, Plaintiff and the Class Members entered into valid and enforceable implied contracts with Defendant when they first went for medical treatment at one of Defendant's facilities.

220. The valid and enforceable implied contracts to provide medical healthcare services that Plaintiff and Class Members entered into with Defendant included Defendant's promise to not disclose nonpublic Private Health Information given to Defendant without their consent. Plaintiff and Class Members provided this Private Health Information in reliance of that promise.

221. Defendant solicited and invited Plaintiff and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services.

222. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's complied with relevant laws and regulations and would not allow third parties to collect or exploit their communications with Defendant without their consent.

223. Plaintiff and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of

surreptitious collection and exploitation of communications between the parties. Defendant failed to do so.

224. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members; and (b) protect Plaintiff and the Class Members' Private Health Information provided to obtain such healthcare. In exchange, Plaintiff and Class Members agreed to pay money for these services, and to turn over their Private Health Information through the use of Defendant's websites.

225. Both the provision of medical services healthcare and the protection of Plaintiff and Class Members' Private Health Information were material aspects of these implied contracts.

226. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

227. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiff and Class Members' Private Health Information without consent.

228. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiff and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiff and Class Members

would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

229. A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

230. Plaintiff and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

231. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiff and Class Members' consent.

232. As a result of Defendant's failure to fulfill the data privacy promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare with data privacy they paid for and the healthcare they received.

233. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff and Class Members' Private Health Information without consent, neither the Plaintiff,

the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

234. As a direct and proximate result of these failures, Plaintiff and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

235. Plaintiff and the Class Members are entitled to compensatory and consequential damages suffered as a result.

236. Plaintiff and the Class Members are also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

237. Plaintiff re-alleges and incorporates by reference all paragraphs above as if fully set forth herein.

238. Plaintiff hereby pleads this Count in the alternative to Counts IV and V.

239. Plaintiff brings this claim on behalf of herself and all members of the Class.

240. Plaintiff and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade

for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

241. Plaintiff and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

242. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

243. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

244. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of themselves and all others similarly situated, ask for judgment in his favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiff as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, and Ahmad, Zavitsanos, & Mensing P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiff or Class Members' communications to third parties without the Plaintiff or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $1,000 per Plaintiff and Class Members pursuant to G.L. c. 272, § 99;

f. Imposing a constructive trust against Defendant through which Plaintiff and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiff and Class Members' right to privacy;

h. Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiff and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiff and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiff and Class Members may be entitled.

**RESPECTFULLY SUBMITTED,
COUNSEL FOR PLAINTIFF JOHN DOE,
INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED**

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan, BBO# 681627
Victoria Santoro Mair, BBO# 679120
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice forthcoming*)
David Warden (*pro hac vice forthcoming*)
Nathan Campbell (*pro hac vice forthcoming*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Seth Meyer (*pro hac vice forthcoming*)
Alex Dravillas (*pro hac vice forthcoming*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
adj@kellerpostman.com

Dated: October 24, 2022

**COMMONWEALTH OF MASSACHUSETTS**

**NORFOLK, ss.**

**NOLFOLK SUPERIOR COURT**
**CIVIL ACTION NO. 2082CV00259**

---

**JOHN BEADES**

**Plaintiff,**

**v.**

**P. GIOIOSO & SONS, INC., and VERIZON NEW ENGLAND, I.N.C.**

**Defendants.**

---

**<u>MOTION TO STAY DISCOVERY AND ALL PENDING TIMELINES</u>**

Now comes plaintiff's counsel in the above matter and moves to stay discovery and all pending timelines for a period of 60 days. As reason, plaintiff's counsel has filed a Motion to Withdraw. An additional 60 days will allow the plaintiff to obtain new counsel if the Motion to Withdraw is allowed.

For these reasons, plaintiff's counsel respectfully request that the Court allow the Motion to Stay Discovery and All Pending Timelines, and for such other relief to which the plaintiff may be entitled.

Respectfully Submitted,
Plaintiff
By his Attorneys

/s/ Matthieu J. Parenteau

Matthieu J. Parenteau
BBO# 679941
Dylan T. Hixson
BBO# 705456
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL

Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
Matthieu@SweeneyMerrigan.com
Dylan@SweeneyMerrigan.com

**CERTIFICATE OF SERVICE**

I, Matthieu J. Parenteau do hereby certify that on October 27, 2022, I served a copy of the Motion to Withdraw by mailing a copy first-class mail postage prepaid to Defendants Counsel of Record, and by mailing a copy by first-class mail postage prepaid and certified mail to Mr. John Beades at 19 Birch Street, Dedham, Massachusetts, and via Email to beadesjohn3@gmail.com

/s/ Matthieu J. Parenteau

---

**Matthieu J. Parenteau**

# Exhibit B

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number

8275

EFILED

**COMMONWEALTH OF MASSACHUSETTS**

WORCESTER, ss.

SUPERIOR COURT
CIVIL ACTION NO.: 2285CV1293-D

LISA COLLETON, on behalf of herself and all others similarly situated,

Plaintiff

vs

UMASS MEMORIAL HEALTH CARE, INC.

Defendant

**CLASS ACTION COMPLANT AND DEMAND FOR TRIAL BY JURY**

## INTRODUCTION

1N

1. Plaintiff, on behalf of herself and all others similarly situated, brings this class action in relation to Defendant disclosing communications about Plaintiff's private medical information without Plaintiff's knowledge or consent.

2. Plaintiff is a user of Defendant's website, www.ummhealth.org (the "**Website**"), which offers a wide range of healthcare services.

3. When Plaintiff used Defendant's Website, communications about her private medical information were shared with Facebook and Google without first notifying Plaintiff and without her consent.

4. As a result of such disclosures, communications about Plaintiff's medical information were used for purposes that Plaintiff was not aware of and did not authorize.

5. Defendant violated the Massachusetts Wiretap Act, Mass. Gen. Laws ch 272 § 99 (the "**Act**") each time it disclosed Plaintiff's communications without consent.

6. Pursuant to section 99(Q)(1) of the Act, Defendant is liable to Plaintiff for statutory damages in the amount of $100 per day for each day of violation or $1,000, whichever is greater.

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number

7. Pursuant to sections 99(Q)(2) and (3) of the Act, Defendant is also liable to Plaintiff for punitive damages, attorneys' fees, and costs.

## PARTIES

8. Plaintiff Lisa Colleton is an individual that is over 18 years old and resides in Marlborough, Massachusetts. Plaintiff is a user of Defendant's Website.

9. Defendant UMass Memorial Health Care, Inc. is a Massachusetts corporation with its principal place of business at One Biotech Park, 365 Plantation Street, Worcester, Massachusetts. Defendant developed, owns, and/or operates the Website.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction over this action pursuant to Mass. Gen. Laws ch 212 §§ 3, 3A, and 4 because the amount in controversy is greater than $50,000.

11. This Court has subject matter jurisdiction over this action because the claims arise under the laws of Massachusetts.

12. This Court has personal jurisdiction over the Defendant because Defendant conducts regular and substantial business in Worcester County.

13. The Worcester County Superior Court is the proper venue because the Defendant conducts business in this County, and the unlawful conduct alleged herein occurred in this County and caused harm in this County. Further, many of the Putative Class Members are residents of this County.

## GENERAL ALLEGATIONS

### Defendant's Website and Users

14. Defendant is a healthcare service provider that developed, owns, and/or operates the Website.

15. Thousands of individuals visit Defendant's Website each year.

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number

16. Individuals use Defendant's Website to search for medical information, services and physicians, schedule appointments, and pay for medical services.

17. Defendant's Website collects various information about its users including, but not limited to:

a) The type of medical treatment an individual is seeking;

b) The name, gender, and specialty of physicians with whom individuals schedule appointments;

c) The locations where individuals seek treatment; and

d) When individuals call physicians and schedule appointments.

18. Inquiries about medical services and physicians, the medical treatment an individual receives, details about an individual's physician, scheduling medical appointments, locations where treatment is received, and data about payment for medical services each constitute private medical information.

19. Accordingly, individuals communicate private medical information to Defendant by using its Website.

**Facebook and Facebook Pixel**

20. Facebook "require[s] people to connect on Facebook using the name that they go by in everyday life",[1] such that a person can be personally identified by their Facebook account.

21. When someone creates a Facebook account, a corresponding Facebook ID ("**FID**") is also created.

22. FIDs are uniquely associated with particular Facebook accounts, such that an FID can be used to identify and view the associated Facebook profile.

[1] https://transparency.fb.com/en-gb/policies/community-standards/account-integrity-and-authentic-identity/ (accessed Oct. 21, 2022).

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number

23. Defendant monetizes its Website by knowingly and willfully collecting and disclosing Website users' online activity and communications about their medical information to Facebook.

24. Defendant's Website uses a code analytics tool called "Facebook Pixel", which was implemented at the discretion of Defendant.

25. Facebook Pixel tracks the actions of Website users, such as the information they input on the Website, the pages they view, the physicians they view, the physicians they contact, the appointments they schedule, and the locations of those physicians/appointments.

26. Each of these items are communications between a Website user and Defendant.

27. When someone uses the Website, the user's FID and these communications about their medical information are simultaneously sent to Facebook via Facebook Pixel.

28. For example, when someone visits Defendant's Website to schedule an appointment, they select "Services & Treatments" on the homepage:



29. On the Services & Treatments page, a Website user can search for a service or select from a list:




30. Once a service is selected, the Website user can make an appointment:



31. When "Make an Appointment" is selected, the user's FID, which is represented by the "c_user" cookie, is sent to Facebook via Facebook Pixel:




32. Facebook Pixel simultaneously discloses to Facebook the URL that the viewer has accessed (e.g. "www.ummhealth.org"), that an appointment was made (e.g. "make-appointment"), and the service or treatment searched for and selected (e.g. "cancer-care"; "breast-cancer").

33. The "c_user" cookie that is transmitted by Facebook Pixel contains a viewer's unencrypted FID.

34. A Facebook profile can be identified and viewed by appending an FID to the end of "Facebook.com", such that a person can be identified by their FID.

35. When a URL, physician name and specialty, location, and FID are simultaneously disclosed, communications about a specific individual's medical information can be read and learned.

36. Similarly, when an individual inputs any information into the search bar on the Website's homepage, that communication and the user's FID are simultaneously disclosed to Facebook by Facebook Pixel:

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number







37. Each of these communications about Website users' medical information are willfully disclosed by Defendant to Facebook without user consent or authorization.

38. Defendant knew that these communications and user FIDs are simultaneously disclosed by Facebook Pixel when individuals use Defendant's Website.

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number

39. Defendant also knew that such data may be used together to identify individuals and communications about their medical information.

40. Website users did not know that the communications between them and Defendant would be shared with a third party, such as Facebook.

41. Defendant did not obtain the consent or authorization of Website users to disclose communications about their medical information.

42. The surreptitious disclosure of medical communications is an outrageous invasion of privacy and would be offensive to a reasonable person.

**Google and Google Analytics**

43. Defendant's Website also uses a code analytics tool called "Google Analytics", which was implemented at the discretion of Defendant.

44. Defendant uses Google Analytics to collect the IP addresses of Website users and track their activity on the Website, including communications about private medical information.

45. Defendant discloses this information to Google via Google Analytics without Website users' knowledge or consent.

46. An IP address is a unique number that identifies a specific device and its geolocation.

47. Pursuant to the Health Insurance Portability and Accountability Act (HIPAA), 45 C.F.R. § 164.514(b)(2)(i)(0), IP addresses are individually identifiable health information.

48. Google Analytics has an IP address anonymization feature, however, Defendant did not enable that feature when it implemented Google Analytics on its Website.

49. Accordingly, when Defendant discloses the IP addresses of Website users to Google via Google Analytics, it is disclosing individually identifiable health information.

50. Defendant simultaneously discloses communications about Website users' private medical information.

51. For example, when someone visits Defendant's Website to search for a physician, they may select "Find a Doctor":




52. This takes the Website user to Defendant's webpage, https://physicians.umassmemorial.org/AdvancedSearch.

53. On the "Find a Doctor" page, individuals can search by physician name, specialty, zip code, language, gender, and/or facility:

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number







54. Physicians meeting the specified criteria are listed on the results page:

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number




55. The profile of a physician may be selected to view additional information:




56. When a physician is selected, the Website user's IP address and the information they input/viewed is simultaneously sent to Google via Google Analytics:

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number



(magnified below)







57. Google Analytics discloses to Google the URL that the viewer has accessed (e.g. "physicians.umassmemorial.org"), the name and specialty of the physician searched for and viewed (e.g. "alina-adeel-infectious_diseases"; "HIV" and "AIDS"), physician gender ("Female"), and location ("worcester").

58. Similarly, when an individual uses the "click to call" or "directions" features of Defendant's Website, their communications are disclosed to Google by Google Analytics, whereby it can be determined which physician an individual contacted:




59. When a Website user clicks on the telephone number, Google Analytics simultaneously discloses to Google the information the user input/viewed, their IP address, and that a phone call was made:




(magnified below)

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number




60. Google Analytics discloses to Google the URL that the viewer has accessed (e.g. "physicians.umassmemorial.org"), the name and specialty of the physician searched for and viewed (e.g. "alina-adeel-infectious_diseases"; "HIV" and "AIDS"), physician gender ("Female"), location ("worcester"), and that a phone call was made ("phone%20call").

61. When a Website user clicks on "Get Directions", Google Analytics simultaneously discloses to Google the information the user input/viewed, their IP address, and that they obtained directions to a particular location:




(magnified below)



Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number

62. Google Analytics discloses to Google the URL that the viewer has accessed (e.g. "physicians.umassmemorial.org"), the name and specialty of the physician searched for and viewed (e.g. "alina-adeel-infectious_diseases"; "HIV" and "AIDS"), physician gender ("Female"), location ("worcester"), and driving directions to a specific place ("driving%20directions"; "UMass%20Memorial%20Medical%20Center%20-%20University%20Campus").

63. Individuals can also volunteer for clinical trials through Defendant's Website:




64. When a Website user clicks on "Clinical Trials", they are taken to Defendant's webpage, https://www.conqueringdiseases.org.

65. On this page, they can search for clinical trials or select a category:

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number






66. Upon inputting search options, Website users are directed to the results page where they can select a clinical trial:




67. When a Website user selects a clinical trial, that communication and their IP address are simultaneously disclosed to Google via Google Analytics:




68. The Website user can then indicate, "I'm Interested":




69. When a Website user clicks "I'm Interested", that communication and their IP address are simultaneously disclosed to Google via Google Analytics:




70. The Website user then fills out a form to volunteer for the clinical trial:



Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number

71. Once this information is submitted, that communication and the Website user's IP address are simultaneously disclosed to Google via Google Analytics:




72. Similarly, when an individual inputs any information into the search bar on the Website's homepage, that communication and the user's IP address are simultaneously disclosed to Google by Google Analytics:



Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number




73. Inputting information, conducting searches, and interacting with Defendant's Website is a communication between a Website user and Defendant.

74. Defendant knew that these communications and users' IP addresses are simultaneously disclosed by Google Analytics when individuals use Defendant's Website.

75. Defendant also knew that such data may be used together to identify individuals and communications about their medical information.

76. Website users did not know that the communications between them and Defendant would be shared with a third party, such as Google.

77. Defendant did not obtain the consent or authorization of Website users to disclose communications about their private medical information.

78. The surreptitious disclosure of medical communications is an outrageous invasion of privacy and would be offensive to a reasonable person.

**Massachusetts Wiretap Act**

79. The Act prohibits, *inter alia*, intercepting, disclosing, and/or using communications without the knowledge and consent of all parties to the communication.

80. The Act also prohibits procuring, aiding, or permitting a third party to intercept or use communications without the knowledge and consent of all parties to the communication.

81. Interacting with a website, such as inputting and viewing information, is a communication between the website user and website developer, owner, and/or operator.

82. Such communications are transmitted by wire, cable, or other like connection.

83. Accordingly, communications through a website are wire communications under the Act.

84. When someone uses a website and enters information on that website, the sole parties to that communication are the website user and the website developer, owner, or operator.

85. It is a violation of the Act to disclose to someone other than the website user or website developer, owner, or operator the contents of communications between those parties without the knowledge and consent of all parties.

86. It is a violation of the Act to procure, aid, or permit a third party to intercept communications between a website user and website developer, owner, or operator without the knowledge and consent of all parties.

87. It is a violation of the Act to use communications between a website user and website developer, owner, or operator without the knowledge and consent of all parties.

88. When someone violates the Act, the aggrieved party may bring a civil action for $100 per day for each day of violation or $1,000, whichever is greater, pursuant to section 99(Q)(1) of the Act.

89. Pursuant to sections 99(Q)(2) and (3) of the Act, the aggrieved party may also seek punitive damages and attorneys' fees and costs.

90. Massachusetts General Law ch 214 § 1B allows the Court to enforce privacy rights through injunctive relief.

91. Massachusetts General Law ch 214 § 1B also allows the Court to award damages for interference with privacy.

**Plaintiff's Use of Defendant's Website**

92. Plaintiff is a patient, enrollee, and/or subscriber of Defendant.

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number

93. Plaintiff has used Defendant's Website on numerous occasions to search for medical information, services and physicians, and to pay for medical services.

94. Plaintiff used Defendant's Website at least once in each month of April, May, June, July, August, and September 2021.

95. This included searching for a physician, whom Plaintiff scheduled appointments with, and paying for medical services rendered by that physician.

96. Plaintiff's use of the Website constitutes communications between Plaintiff and Defendant.

97. Those communications were transmitted and passed over a wire, cable, or other like connection.

98. Plaintiff has had a Facebook account at all times while using Defendant's Website, which she is perpetually logged into.

99. Plaintiff's Facebook profile contains her name, whereby she can be personally identified by that information.

100. Facebook is not a party to the communications between Plaintiff and Defendant.

101. Each time Plaintiff used Defendant's Website, Defendant willfully disclosed Plaintiff's FID, the information she entered on the Website, the pages she viewed, the physicians she viewed, the physicians she called, the appointments she scheduled, and the locations of those physicians/appointments to Facebook via Facebook Pixel.

102. This simultaneous disclosure of information allowed Facebook to read or learn the contents of communications between Plaintiff and Defendant.

103. Google is not a party to the communications between Plaintiff and Defendant.

104. Each time Plaintiff used Defendant's Website, Defendant willfully disclosed Plaintiff's IP address, the information she entered on the Website, the pages she viewed, the

physicians she viewed, the physicians she called, the appointments she scheduled, and the locations of those physicians/appointments to Google via Google Analytics.

105. This simultaneous disclosure of information allowed Google to read or learn the contents of communications between Plaintiff and Defendant.

106. Defendant willfully disclosed and used communications about Plaintiff's private medical information.

107. Defendant allowed Facebook and Google to secretly intercept communications between Plaintiff and Defendant about Plaintiff's private medical information.

108. Plaintiff did not know that communications between her and Defendant would be disclosed to, or intercepted by, Facebook and Google.

109. Plaintiff did not know that her medical information would be used by Defendant for any purpose other than providing medical services.

110. Plaintiff did not consent to communications between her and Defendant being disclosed to Facebook or Google.

111. Plaintiff did not authorize the sharing, selling, or use of her medical information.

112. Defendant intentionally, willfully, and surreptitiously disclosed communications between Plaintiff and Defendant to third parties, Facebook and Google, for profit.

## CLASS ALLEGATIONS

### A. Definition of the Class

113. Plaintiff brings this action individually and on behalf of all persons that the Court may determine appropriate for class certification, pursuant to Mass. R. Civ. P. 23 (the "Class" or "Class Members"). Plaintiff seeks to represent a Class of persons preliminarily defined as:

> **All persons who used Defendant's Website, www.ummhealth.org, to search for medical information, services and physicians, schedule appointments, or pay for medical services.**

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number

This definition is subject to modification as discovery discloses further information. Plaintiff reserves the right to propose one or more sub-classes if discovery reveals that such subclasses are appropriate.

114. This case is properly maintainable as a class action pursuant to and in accordance with Mass. R. Civ. P. 23 in that:

a) The Class, which includes thousands of members, is so numerous that joinder of all Class Members is impracticable;

b) There are substantial questions of law and fact common to the Class, including those set forth in greater particularity herein;

c) Questions of law and fact, such as those enumerated herein, which are common to the Class, predominate over any questions of law or fact affecting only individual members of the Class;

d) The claims of the representative party are typical of the claims of the Class;

e) A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

f) The relief sought in this class action will effectively and efficiently provide relief to all members of the Class;

g) There are no unusual difficulties foreseen in the management of this class action; and

h) Plaintiff, whose claims are typical of those of the Class, through her experienced counsel, will zealously and adequately represent the Class.

**B. Numerosity**

115. There are thousands of individuals who have used the Website and to search for medical information, services and physicians, schedule appointments, and pay for medical services. Accordingly, the Class Members are so numerous that joinder of all parties is clearly impracticable.

116. The prosecution of separate lawsuits by Class Members would risk inconsistent or varying adjudications. Class-wide adjudication of these claims is, therefore, appropriate.

**C. Commonality**

117. Numerous common questions of law and fact predominate over any questions affecting individual Class Members including, but not limited to, the following:

a) Whether Defendant collected information about Class Members who used its Website;

b) Whether interactions with the Website are communications under the Act;

c) Whether Defendant disclosed communications between Defendant and Class Members via Facebook Pixel;

d) Whether Defendant disclosed communications between Defendant and Class Members via Google Analytics;

e) Whether such disclosure was willful;

f) How Class Members' communications and medical information were disclosed and to whom;

g) How Class Members' communications and medical information was used; and

h) Whether Defendant obtained consent or authorization before disclosing Class Members' communications and medical information.

**D. Typicality**

118. Plaintiff has the same interests in this matter as all other members of the Class and her claims are typical of the claims of all members of the Class. If brought and prosecuted individually, the claims of each Class Member would require proof of substantially the same material and substantive facts, utilize the same complex evidence (e.g. expert testimony), rely upon the same legal theories, and seek the same type of relief.

119. The claims of the Plaintiff and other Class Members have a common cause and their damages are of the same type. Their claims originate from the synonymous disclosure of communications by Defendant without consent.

120. All Class Members have been aggrieved by Defendant's disclosure of their communications without consent and are entitled to, *inter alia*, statutory damages.

**E. Adequacy of Representation**

121. Plaintiff's claims are sufficiently aligned with the interests of the absent Class Members to ensure that the Class' claims will be prosecuted with diligence and care by Plaintiff as representative of the Class. Plaintiff will fairly and adequately represent the interests of the Class and she does not have interests adverse to the Class.

122. Plaintiff has retained the services of counsel who are experienced in complex class action litigation. Plaintiff's counsel will vigorously prosecute this action and will otherwise protect and fairly and adequately represent the Plaintiff and all absent Class Members.

**F. Class Treatment is the Superior Method of Adjudication**

123. A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

a) Individual claims by the Class Members would be impracticable as the costs of pursuit would far exceed what any one Class Member has at stake;

b) Individual claims by Class Members would create a risk of inconsistent or varying adjudications, which would present the Defendant with incompatible standards of conduct;

c) Individual claims by individual Class Members would create a risk of adjudications which would, as a practical matter, be dispositive of the interests of other individuals who are not parties to the adjudications, or substantially impair or impede their ability to protect and pursue their interests;

d) Little or no individual litigation has been commenced over the controversies alleged in this Complaint and individual Class Members are unlikely to have an interest in separately prosecuting and controlling individual actions;

e) In view of the complexity of the issues and the expenses of litigation, the separate claims of individual Class Members are likely insufficient in amount to support the costs of filing and litigating separate actions;

f) The Plaintiff seeks relief relating to the Defendant's common actions and the equitable relief sought would commonly benefit the Class as a whole;

g) The concentration of litigation of these claims in one action will achieve efficiency and promote judicial economy; and

h) The proposed class action is manageable.

## CAUSE OF ACTION I

## VIOLATION OF THE MASSACHUSSETS WIRETAP ACT

124. Plaintiff restates all allegations of this Complaint as if fully restated herein.

125. Defendant, through its Website, is engaged in the business of providing medical services to the Plaintiff and Class.

126. The Plaintiff and Class used Defendant's Website to search for medical information, services and physicians, schedule appointments, and pay for medical services.

127. When the Plaintiff and Class used Defendant's Website, they were communicating with Defendant.

128. Those communications were transmitted by a wire, cable, or other like connection.

129. Defendant willfully disclosed the communications to Facebook via Facebook Pixel.

130. Defendant willfully disclosed the communications to Google via Google Analytics.

131. Defendant willfully procured, aided, and permitted third parties, Facebook and Google, to intercept communications between the Plaintiff/Class and Defendant.

132. The Plaintiff and Class were not aware Defendant was disclosing their communications to Facebook or Google.

133. The Plaintiff and Class did not consent to Defendant disclosing their communications to Facebook or Google.

134. Communications about the Plaintiff's and Class' medical information were used without their knowledge or consent.

135. Defendant is liable to the Plaintiff and Class for statutory damages of $100 per day for each day of violation of the Act or $1,000, whichever is greater, in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, individually and on behalf of the proposed Class, prays for judgment as follows:

A. Certification of the proposed Class by order pursuant to Mass. R. Civ. P. 23;

B. Designation of the Plaintiff as representative of the proposed Class and designation of her counsel as Class counsel;

C. Judgment in favor of the Plaintiff and Class Members as against Defendant;

D. An award to each Plaintiff and Class Member for statutory damages pursuant to section 99(Q)(1) Massachusetts Wiretap Act;

E. An award of injunctive relief prohibiting Defendant from disclosing communications of Website users without their knowledge and consent, in accordance with the Massachusetts Wiretap Act;

F. An award of punitive damages, attorneys' fees, and costs, pursuant to sections 99(Q)(2) and (3) of the Massachusetts Wiretap Act, including pre- and post-judgement interest;

G. An Order holding that Defendant's disclosure of the Plaintiff's and Class' communications was in violation of the Massachusetts Wiretap Act;

H. Such further relief that this Honorable Court deems just and proper.

Date Filed 11/14/2022 8:01 PM
Superior Court - Worcester
Docket Number

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury.

Date: November 14, 2022

Respectfully submitted,

/s/ William P. Doyle, III
William P. Doyle (556999)
**COLONNA, DOYLE & SIMEOLA**
26 Main Street, 3rd Floor
Lynnfield, MA 01940
(781) 245-1127
bill@colonna-doyle.com

Nicholas A. Coulson*
Lance Spitzig*
*Pro hac vice* applications forthcoming
**LIDDLE SHEETS COULSON P.C.**
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
E: ncoulson@lsccounsel.com
E: lspitzig@lsccounsel.com

*Attorneys for Plaintiff and the Putative Class*

# Exhibit C

po

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. ____________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Janice Progin, on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1. Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and certain healthcare providers. Specifically, the Defendants (defined below) aided in the interception of communications between Plaintiff and other Class Members (defined below) and a website maintained by UMass Memorial Medical Center and other medical facilities in central Massachusetts (the "UMass Memorial Website"). These communications were intercepted by Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies that provide so-called

"tracking software." Class Members' communications with the UMass Memorial Website were secretly and contemporaneously monitored, recorded, and retransmitted to these third parties without their knowledge or consent whenever Plaintiff or other Class Members visited the UMass Memorial Website or any page within that website.

2. Defendants actively aided this secret interception of healthcare consumers' communications with their website. Defendants aided the interceptions by injecting hidden code into their websites to permit Google, Facebook, and others to intercept the communications.

3. Defendants do not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with the UMass Memorial Website, nor do they seek their content for such disclosure. On the contrary, Defendants **falsely** tell healthcare consumers, through their published online policies and terms of service, that they do **not** share such information.

4. The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." "Wire" communications include communications between websites and website users. The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party to the communication secretly records the communication or aids another in recording the communication. It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted; instead, an unlawful interception occurs when (i) the identity of the parties to the communication; (ii) the existence of the communication; **or** (iii) any part of the contents, substance, purport, or meaning of the communication is intercepted or recorded.

5. The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G.L. c. 272 § 99(A) (preamble). Although the internet did not exist at the time of the Act's passage, internet communications fall comfortably within the Act's express terms, and, if anything, the purposes of which the Massachusetts Wiretap Act were enacted are only more significant today, as technology companies have continually chipped away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6. Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Act applies to all interceptions, regardless of the nature or substance of the communications intercepted.

7. The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **and** any party that aids such an interception.

8. Defendants aided interceptions completed by Google, Facebook, and other third parties of healthcare consumers' communications with the UMass Memorial Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the UMass Memorial Website.

## PARTIES

9. Plaintiff Janice Progin is a resident of Gardner, Massachusetts. Plaintiff is a patient at the UMass Memorial Medical Center and regularly uses the UMass Memorial Website to (i) obtain information about UMass Memorial Medical Center doctors (including their credentials and

backgrounds); (ii) search for information on particular symptoms, conditions, and medical procedures; and (iii) obtain and review her personal medical records through the website's patient portal.

10. Defendant UMass Memorial Health Care, Inc. is a corporation that operates in Worcester, MA. It is the parent company for defendants UMass Memorial Hospitals, Inc. and UMass Memorial Medical Center, Inc. Together with and through its subsidiaries, UMass Memorial Health Care, Inc. operates hospitals and other healthcare facilities in central Massachusetts that use the UMass Memorial Website.

11. Defendant UMass Memorail Hospitals, Inc., is a corporation that operates in Worcester, MA. It is a subsidiary of Umass Memorial Health Care, Inc. According to filings with the Secretary of the Commonwealth of Massachusetts, its function is to coordinate the provision of healthcare services among healthcare facilities affiliated with UMass Memorial Health Care, Inc., including the healthcare facilities that share the UMass Memorial Website. It also "provide[s]...information systems" to those healthcare facilities. Based on this filing and upon information and belief, Umass Memorial Hospitals, Inc. is responsible for maintaining the UMass Memorial Website.

12. Defendant UMass Memorial Medical Center, Inc. is a corporation located in Worcester, MA. It operates and maintains UMass Memorial Medical Center, a hospital with multiple campuses in Worcester, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

13. Defendant UMass Memorial Healthalliance-Clinton Hospital, Inc. is a corporation located in Clinton, MA. It operates and maintains UMass Memorial Health – HealthAllicance-Clinton Hospital, a group of hospitals with campuses in Clinton, MA; Fitchburg, MA; and

Leominster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

14. Defendant Marlborough Hospital is a corporation located in Marlborough, MA. It operates and maintains Marlborough Hospital, a hospital in Marlborough, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

15. Defendant Harrington Memorial Hospital, Inc. is a corporation located in Southbridge, MA. It operates and maintains Harrington Memorial Hospital, a hospital with campuses in Southbridge, MA and Webster, MA. It uses the UMass Memorial Website to communicate with healthcare consumers.

16. In this complaint, Plaintiff refers collectively to the defendants described in this section as "Defendants."

## JURISDICTION

17. The exercise of personal jurisdiction over the Defendants is proper according to M.G.L. c. 223 § 3 because, among other things, Defendants are located in Massachusetts, and Plaintiff's claim arises out of Defendants' transacting business in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### The UMass Memorial Facilities and Their Website

18. Defendants operate hospitals and other healthcare facilities in Worcester and surrounding communities (the "UMass Health Facilities"). The UMass Health Facilities offer inpatient and outpatient care to residents near Worcester and surrounding communities in central Massachusetts. The facilities provide healthcare across various specialties, including heart and vascular care, orthopedics, cancer, diabetes, surgery, pregnancy and newborn care, children's services, women's services, and trauma care.

19. Defendants maintain a common website for their hospitals and other healthcare facilities, found at https://www.ummhealth.org/ (the "UMass Memorial Website"). Through that website, healthcare consumers can obtain information about the services UMass Memorial provides, including information about doctors, services and treatments provided by Defendants, and particular medical conditions.

20. The UMass Memorial Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The website provides general information about the UMass Memorial Facilities.

(b) The website provides information about healthcare services provided at the UMass Memorial Facilities, communicated through service-specific pages for a range of services such as "Birthing/Maternity Center," "Pediatrics," "Cancer Care," and "Women's Health," among others.

(c) The website provides substantive information about specific health conditions through the website's "Health Library," including numerous interactive "Risk Assessments" individuals can take to determine whether they need healthcare services for a range of conditions, including highly personal conditions such as drug addiction, alcohol abuse, and sexually transmitted diseases.

(d) The website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by specialty, gender, language, and location.

(e) The website permits healthcare consumers to book an appointment online through the website.

(f) The website permits healthcare consumers to access and pay bills online.

(g) The website lets healthcare consumers access their private medical information online through the MyCharts portal. MyCharts is a third-party provider of online access to healthcare records.

21. Because the UMass Memorial Website provides an interactive experience through which a healthcare consumer can obtain information about particular conditions, doctors, specialties, and, indeed, the individual's own healthcare records, a website user's interaction with the website reveals private health information about the individual.

**Reasonable Expectations of Users of the UMass Memorial Website**

22. Healthcare consumers in Massachusetts have a valid interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the UMass Memorial Website.

23. Users of healthcare-related websites such as the UMass Memorial Website have a legitimate expectation and understanding that their communications with the website will be private. They also have a legitimate expectation that healthcare providers such as Defendants will not share their private health information—including their communications with the website—with third parties, without their consent.

24. The expectations and understandings of website users are supported by the Health Insurance Portability and Accountability Act ("HIPAA"), which prohibits healthcare providers such as Defendants from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

25. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared contemporaneously with third parties such as Google and Facebook for marketing purposes.

26. The expectations and understanding of the UMass Memorial Website users are informed by what Defendants tell them about how Defendants handle their personal information.

27. The UMass Memorial Website terms of service state:

> UMass Memorial Health Care is committed to protecting your privacy. We have designed our website to allow you to visit most areas without identifying yourself or providing personal information. For those UMass Memorial areas where you elect to provide identifiable information, we assure you that we will make every effort to protect your privacy.

This is false. As explained more fully below, the website tracks the user's IP address and connects its IP address to the user's browsing activity. More troublingly, those communications and associated IP addresses are contemporaneously shared with third parties such as Google and Facebook, which then can use that information to connect the user's activity on the website with the individual's Google and Facebook profiles. The tracking technologies reveal private health information about particular individuals to Google and Facebook. Google and Facebook can then use to serve personalized advertising to those individuals.

28. The UMass Memorial Website terms of service also tell users: "UMass Memorial does not disclose your information to third parties except as described below, when we believe in good faith that the law requires disclosure, or to protect the property rights of UMass Memorial." The terms "below," however, do not disclose that Defendants share the internet communications with Facebook, Google, and other companies between the users and Defendants. Accordingly, the terms are utterly false and foster an incorrect understanding among healthcare consumers that Defendants do not share personal information about their them when they do.

29. The UMass Memorial Website's terms of service also tell users: "UMass Memorial may on occasion send you information concerning the health, development and well-being of children and families, and on other topics that might be of interest. Only UMass Memorial (or those working on the behalf of UMass Memorial) will send you this information." Again, this is utterly false. By sharing healthcare consumers' communications with Google and Facebook, Defendants enable Google and Facebook to send directly to specific users advertising based on their communications with the website.

30. The UMass Memorial Website terms of service also describe to healthcare consumers the website's use of "cookies" in a deceptive manner. The terms state:

> A cookie is a piece of data stored on your hard drive that contains information about you. Use of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site. UMass Memorial only uses cookies to identify you while you are logged into the UMass Memorial site. Upon exiting the site, the cookie terminates with no retained record of your use of the site.

As explained below, the technologies Defendants use to transmit healthcare consumers' communications contemporaneously to Google, Facebook, and other companies are not limited to "cookies." But, in any event, the above passage and the other passages quoted above foster a strong impression that a user's activities on the website will not be linked to personally identifiable information. This is false. As described below, Defendants use Google, Facebook, and other tracking technologies specifically designed to associate the users' activities on the website with their profiles with Google, Facebook, and elsewhere.

31. Moreoever, it is utterly false to state that "[u]pon exiting the site, the cookie terminates with no retained record of your use of the site." On the contrary, Facebook, Google, and other third parties retain precise records of website users' activities on the UMass Memorial Website.

32. In short, reasonable healthcare consumers expect that the personal health information reflected in their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced strongly by Defendants' false statements on their website. The interceptions of website users' communications with Defendants were, therefore, truly secret and made without any consent from the website users.

**<u>Third-Parties Offering Tracking Technologies</u>**

33. Plaintiff describes in this complaint various tracking technologies implemented on the UMass Memorial Website that cause the secret interception, recording, and retransmission of

the contents of Class Members' internet communications with Defendants. The technological aspects of those technologies are described in the next section. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with Defendants and the purposes for which interceptions are made.

34. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

35. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

36. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

37. Among the ways Facebook tracks users on websites not owned by Facebook in order to create detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook incentivizes websites to use Meta Pixel by advertising that it allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

[1] Facebook rebranded its parent company as "Meta" in October 2021.

38. Facebook explains on its own website: "The Meta Pixel is a snipper of JavaSript code that allows [companies] to track visitor activity on your website."

39. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website.... The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

40. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."

41. Google LLC is a multinational technology conglomerate, a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

42. Google maintains detailed profiles on individuals that include information such as their real names, dates of birth, email addresses, phone numbers, and details on interactions such individuals have with Google's services, such as Gmail. Google maintains detailed profiles on individuals whether or not they have a Google account.

43. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

44. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its

website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Notwithstanding its availability as a free service to website owners, Google can profit from Google Analytics by using the data obtained about individual users to build such individuals' profiles further. This information can then be used to serve upon such individuals better-targeted individualized advertisements.

**Website Tracking Technologies on the UMass Memorial Website**

45. Defendants have injected hidden code into the UMass Memorial Website that tracks healthcare consumers' communications with the website. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with the UMass Memorial Website with the website user's Facebook profile.

46. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and Defendants, the contents of communications between Class Members and Defendants and identifying information about the Class Members. The contents intercepted include private health information, including the individual's medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website. This information reflects individuals' personal health information as defined by the Health Information Portability and Accountability Act ("HIPAA").

47. Defendants use several tracking technologies on their website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

48. Before describing the techniques such technologies use, it is important to define some basic technological terms.

49. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

50. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the UMass Memorial Website, as of the time of this complaint, is 162.249.110.234. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

51. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the UMass Memorial Website is http://www.ummhealth.org. Numerous URLs also point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For example, the UMass Memorial Website has a page specifically about the UMass Memorial Health Cancer Center; that page's URL is https://www.ummhealth.org/umass-memorial-health-cancer-center.

52. A **"cookie"** is a file saved on a website user's device that helps track the user across different web pages or websites. Cookies can, for example, confirm to Google and Facebook that

a particular individual accessing the UMass Memorial Website is the same individual who also accesses a particular Google or Facebook account from the same device.

53. **"Javascript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The Javascript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the Javascript code itself is not visible. The execution of Javascript code may or may not result in the presentation of visible components of the website.

54. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, Defendants) inserts into its website code that causes an individual's web browser, when loading the website, to also load a Javascript file from a third-party server (such as Google or Facebook). That Javascript code is executed automatically within the individual's web browser.

55. The execution of the Javascript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a single-pixel image from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology). That image or other small file is not displayed or visible to the website user; the loading and execution of the Javascript code and the subsequent loading of an image or another small file occurs entirely in the background, invisible to the website user.

56. Critically, when the Javascript code causes the user's web browser to retrieve a file from the third-party's website, the Javascript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website user is visiting (that is, the website address, such as http://www.ummhealth.org); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

57. When the Javascript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google and Facebook can then add the content of the user's communications with the UMass Memorial Website to its collection of information it has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's Javascript code causes a "pixel" to be loaded from Facebook's servers, Facebook can record and associate the content of the communications it has intercepted with an individual's Facebook profile, which includes the individual's real name and other information about them.

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

58. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not actually displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity the third party such as Google or Facebook.

59. The tracking technologies described in this complaint intercept and retransmit to third parties the contents of communications between healthcare consumers and the UMass Memorial Website contemporaneously with those communications. The tracking technologies intercept and retransmit the contents of those communications to third parties before the webpage has even completed loading.

**Defendants' Use of Tracking Technologies on the UMass Memorial Website**

60. Defendants use various tracking technologies across the numerous web pages on the UMass Memorial Website. Many of those tracking technologies are embedded in the code of all or almost all of the pages within the Umass Memorial Website. For example, on the main landing page of the UMass Memorial Website, Defendants have injected secret code that loads Google Analytics, Meta Pixel, and various other tracking technologies.

61. The code is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode." Google's Developer Mode displays hidden components of websites and records the network activity generated by website components (including the loading and execution of Javascript code and the text that the Javascript code causes to be transmitted to third-party web servers when it loads a small file or image).

62. Below is an image of the main landing page for the UMass Memorial Website:




63. When a user loads the main landing page for the UMass Memorial Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the Javascript code for Google Analytics. The website then causes the user's web browser to execute the Javascript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics Javascript code causes the user's web browser to intercept and transmit certain information to Google.

64. The image below depicts the landing page for the UMass Memorial Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




65. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and retransmitted to Google, is presented below (with highlighting added). The "Payload" refers to information transmitted to a web server when a file is retrieved from that server. In this case, the "Payload" reflects the information that Google Analytics causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator Timing
▾ Query String Parameters view source view decoded
v: 1
_v: j97
a: 530489752
t: pageview
_s: 1
dl: https%3A%2F%2Fwww.ummhealth.org%2F
dr: https%3A%2F%2Fwww.google.com%2F
ul: en-us
de: UTF-8
dt: UMass%20Memorial%20Health
sd: 24-bit
sr: 1920x1080
vp: 1002x926
je: 0
_u: QCCACEABRAAAAC~
jid: 1767544177
gjid: 455434716
cid: 102320041.1664411294
tid: UA-48961693-1
_gid: 1962499786.1664411294
_r: 1
gtm: 2wg9q0TPSLSLQ
z: 1301636959

66. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the UMass Memorial Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.umasshealth.org"[2]);

(b) The URL of the prior webpage the user had visited before arriving at the UMass Memorial Website landing page (www.google.com); and

[2] The characters "%3A" and "%2F" are comptuer codes that replace the ":" and "/" characters.

(c) The title of the webpage (after the letters "dt," which includes "UMass Memorial Health").[3]

67. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, viewport resolution, and other browser settings), identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, UMass Health) and the website's account with Google AdSense, a website monetization program offered by Google. The information transmitted also contains a unique identifier for the particular user visiting the website, enabling Google to track that individual across the website.

68. Notably, when the website user's web browser intercepts the contents of communications between the website user and the Defendants' website and retransmits those contents to Google, the Javascript code also causes the user's web browser to reveal the user's IP address to Google. This permits Google to associate the content of the user's communications with the website with any other information Google has on the individual, including the individual's real identity. Google can then use the contents of communications that it has secretly intercepted for commercial purposes, including serving personalized advertisements in the future to the particular website user browsing the UMass Memorial Website.

69. Moreover, by communicating information about the website user's browser configuration (such as screen and portal resolution and other browser configuration settings), Google can further confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This allows Google to confirm further that a particular individual using Google's services (for example, a Gmail account) and an individual visiting the

[3] The characters "%20" are comuter code that reflect a space.

UMass Memorial Website is the same individual, particularly when combined with the user's IP address, which is also a unique identifier.

70. The same landing page on the UMass Memorial Website also loads Javascript code for Meta Pixel, called "fbevents.js." That javascript code, in turn, causes the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the UMass Memorial Website. The network activity intercepted and retransmitted to Facebook when loading the UMass Memorial Website's landing page is below:

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

id: 362069588546911
ev: PageView
dl: https://www.ummhealth.org/
rl:
if: false
ts: 1667852243703
sw: 1920
sh: 1080
v: 2.9.89
r: stable
ec: 0
o: 28
fbp: fb.1.1664411293998.360887419
it: 1667852243663
coo: false
rqm: GET
dt: pvtwa5g22qp40t1kc012sh9pf061srm4

71. Similar to Google Analytics, Meta Pixel causes the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and the Defendants' website, including the URL of the webpage visited. The transmission to Facebook

also includes information about the user's browser configuration and various codes to associate the communications with Defendants' advertising account with Facebook.

72. Also, similar to Google Analytics, the Javascript code for Meta Pixel causes the user's web browser to reveal the user's IP address to Facebook. This permits Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can serve personalized advertising to the website user in the future.

73. Moreover, similar to Google Analytics, the transmission to Facebook of the user's browser configuration permits Facebook to confirm the user's identity through browser fingerprinting (that is, comparing the unique combination of browser settings revealed to Facebook via the Meta Pixel Code to Facebook's own records of the same browser configuration when the same individual visits Facebook, Instagram, and other Facebook-owned websites).

74. The text fields communicated to Facebook by the Meta Pixel code include a persistent identifier for each particular user, which permits Facebook to track that individual across the UMass Health Website and further confirm that individual's real-world identity.

75. Defendants have configured the UMass Memorial Website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the UMass Memorial Website, which in turn may reveal private health information about the healthcare consumer.

76. The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes.

77. The UMass Memorial Website contains a page entitled "Women's Health: Maternity Center," designed to provide information to the website user about pregnancy and the

services Defendants offer in connection with pregnancy. A user, by visiting this web page, necessarily reveals to Defendants that the user has some interest in maternity services (for example, the user might be pregnant or know someone who is). When the user communicates with Defendants by visiting this particular webpage, Defendants cause the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Maternity Center webpage:




78. The graphic below presents the contents of the communication between the website user and Defendants that are secretly intercepted and transmitted to Google when the above page loads as a result of the Google Analytics javascript code that Defendants secretly inject into the website (the blue highlighting is added):

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number


× Headers Payload Preview Response Initiator Timing

▼ Query String Parameters view source view URL-encoded

id: 247143013759083

ev: PageView

dl: https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/maternity-center

rl: https://www.ummhealth.org/services-treatments?_ga=2.131274511.1059841755.1664411875-1880997322.1664411875

if: false

ts: 1664412113322

sw: 1920

sh: 1080

v: 2.9.84

r: stable

ec: 0

o: 30

fbp: fb.1.1664411293998.360887419

it: 1664412112865

coo: false

rqm: GET

dt: u8gc9rdrkgppw0n48qyfw2aitdsgxtgy

79. As reflected in the above screenshot, Defendants contemporaneously intercept and retransmit to Google the fact that the website user is visiting a "maternity-center" webpage—information that Google then stores and can use for its own commercial purposes (and which could be accessible via subpoena by third parties, such as states who may be interested in such information for political or legal reasons).[4]

80. The same webpage also contains hidden code that intercepts the user's communication with the website and retransmits that same information to Facebook. The data transmitted to Facebook is depicted below:

[4] *See, e.g.*, NRP, "Privacy advocates fear Google will be used to prosecute abortion seekers," https://www.npr.org/2022/07/11/1110391316/google-data-abortion-prosecutions.

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Query String Parameters** view source view URL-encoded

id: 362069588546911
ev: PageView
dl: https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/maternity-center
rl: https://www.ummhealth.org/
if: false
ts: 1668123242798
sw: 1920
sh: 1080
v: 2.9.89
r: stable
ec: 0
o: 28
fbp: fb.1.1664411293998.360887419
it: 1668123242777
coo: false
rqm: GET

81. Similar to Google Analytics, Defendants cause the secret interception and transmission to Facebook of the contents of the communication between the website user and Defendants, including that the user is visiting a "maternity-center" webpage, which Facebook can then use for commercial purposes (and which data it retains, and can then be accessed by third parties, such as by way of subpoena).

82. The UMass Memorial Website contains dozens of similar pages on particular medical specialties and practices that the Defendants' healthcare facilities offer. The UMass Memorial Website, for each of such page, aids in Google and Facebook's secret interception of the contents of communications with the webpages, similar to the above Maternity Center example.

83. The UMass Memorial Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by Defendants. When an individual uses the search function, Defendants aid in the secret interception of the contents of that search and retransmission of those contents to Google, Facebook, and other third parties.

84. For example, the screenshot below depicts the search results page when a user enters the phrase "I'm pregnant"[5] into the search bar on the UMass Memorial Website:




[5] This is an example and does not reflect Plaintiff's personal activity on the website.

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

85. Depicted below are the contents of the communication that are intercepted and retransmitted to Google via hidden Google Analytics Code (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-04YJCL6W7W
gtm: 2oeb90
_p: 1900279729
cid: 1880997322.1664411875
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Google%20Chrome;107.0.5304.106|Chromium;107.0.5304.106|Not%3DA%3FBrand;24.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1668123203
sct: 19
seg: 1
dl: https://www.ummhealth.org/umass-memorial-medical-center/search-results?search_block_form=I%27m-pregnant&form_build_id=form-NW-Iov5m3eeoU14WvjOS1Ay6lqVwQ6aJbNxrIbSYFbw&form_id=search_block_form
dr: https://www.ummhealth.org/umass-memorial-medical-center
dt: Search Results - UMass Memorial Medical Center - UMass Memorial Health
en: page_view

86. The above screenshot reflects that when an individual enters a search on the website, Google intercepts the contents of the search. Google then associates those search terms with the individual's real-world identity and then uses that information for commercial purposes (and retains them for potential use by other parties in the future).

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

87. Defendants also aid in Facebook's secret interception of the same sensitive communication. Below is a screenshot of the information intercepted and transmitted to Facebook:

× Headers Payload Preview Response Initiator Timing

▼ Query String Parameters view source view URL-encoded

id: 362069588546911

ev: PageView

dl: https://www.ummhealth.org/umass-memorial-medical-center/search-results?search_block_form=_removed_&form_build_id=form-NW-Iov5m3eeoU14WvjOS1Ay61qVwQ6aJbNxrIbSYFbw&form_id=search_block_form&_filteredParams=%7B%22unwantedParams%22%3A%5B%5D%2C%22sensitiveParams%22%3A%5B%224f5044badb6767ad742dc945137f520213bbeb130b6ea306cbcb53aae5357d58%22%5D%7D#gsc.tab=0&gsc.q=I'm%20pregnant&gsc.page=1

rl: https://www.ummhealth.org/umass-memorial-medical-center?_filteredParams=%7B%22unwantedParams%22%3A%5B%5D%2C%22sensitiveParams%22%3A%5B%5D%7D

if: false

ts: 1668124020275

sw: 1920

sh: 1080

v: 2.9.89

r: stable

ec: 0

o: 28

fbp: fb.1.1664411293998.360887419

it: 1668124020264

coo: false

rqm: GET

dt: bsa8ed5a382mjclxgc26vm8iyxlbdy34

88. The UMass Memorial Website also includes a "Find a Doctor" function that allows healthcare consumers to find a doctor based on search criteria provided by the individual. That webpage permits individuals to search by hospital affiliation, zip code, specialties, gender, and languages. When an individual uses the drop-down menus and forms to indicate the individual's preferences for doctors, this causes the page to reload. The results page lists doctors that match the

criteria specified by the user. The page below depicts part of the results for a search for a female doctor in Obstetrics & Gynecology within five miles of Worcester[6]:




89. Hidden Google Analytics code in this results page causes the secret interception of the facts that the individual is using the find-a-doctor function and the specific criteria the individual has inputted. The contents of the communication that are secretly intercepted and transmitted to Google are captured below:

[6] Again, this is not a search Plaintiff performed but is instead presented to illustrate the types of communications that tracking technologies intercept and retrainsmit to third parties.

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-HDYC9M7247
gtm: 2oeb90
_p: 1829352063
cid: 1880997322.1664411875
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Google%20Chrome;107.0.5304.107|Chromium;107.0.5304.107|Not%3DA%3FBrand;24.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1668449031
sct: 4
seg: 1
dl: https://physicians.umassmemorial.org/results?Affiliations=60&SubSpecialties=1636%2c1635&address=Worcester%2c+MA+01601%2c+USA&distance=5&latlng=42.26%2c-71.8&sortDirection=asc&sortby=distance&Gender=Female
dr: https://physicians.umassmemorial.org/results?Affiliations=60&Gender=Male%2CFemale&SubSpecialties=1636%2C1635&sortby=distance&sortDirection=asc&address=Worcester%2C+MA+01601%2C+USA&distance=5&latlng=42.26%2C-71.8
dt: Search Results - UMass Memorial Health
en: page_view

90. The highlighted portion above uses numeric codes for the affiliations and specialties criterion ("Affiliations=6" references UMass Memorial Medical Center, and "SubSpecialties=163" references Obstetrics & Gynecology), and the preferred geographic location ("Worcester") and doctor gender ("Female"), plus the permissible distance from Worcester ("5"

miles). Each of these inputs are intercepted by Google. Although a couple of fields use numeric codes, the meaning of those codes can easily be discerned by loading the full URL, including the parameters highlighted in blue above, to reveal the substance of the individual's search.

91. The UMass Memorial Website also features numerous "Risk Assessments," through which individuals can relate information about themselves to receive an instant assessment. Those assessments include, among others, an Alcohol Use Assessment, a Breast Cancer Risk Assessment, a Depression Risk Assessment, and a Substance Abuse Assessment. The screen capture below, for example, depicts the Substance Abuse Assessment (the selected answers do not reflect any particular individual's responses but are provided by way of example):



92. When a website user first loads a risk assessment, that communication is intercepted via Google Analytics code, and communication contents are transmitted to Google. The graphic below depicts the information intercepted and transmitted to Google upload loading of the Substance Abuse Assessment:

× Headers Payload Preview Response Initiator Timing

▾ Query String Parameters view source view decoded

v: 1
_v: j98
a: 1736156123
t: pageview
_s: 1
dl: https%3A%2F%2Fmyhealth.umassmemorial.org%2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE
dp: %2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE
ul: en-us
de: UTF-8
dt: Substance%20Abuse%20Assessment
sd: 24-bit
sr: 1920x1080
vp: 1231x979
je: 0
_u: AACAAEABAAAAACAAI~
jid:
gjid:
cid: 1972491336.1664909972
tid: UA-17264146-13
_gid: 2122976964.1664909972
_slc: 1
z: 2014474095

93. As highlighted above, the fact that a user is taking a Substance Abuse Assessment is communicated to Google via Google Analytics.

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

94. When a user completes and submits the assessment form, a new webpage is loaded with the user's results. That page is depicted below:



Turning Down the Summer Heat →

Conditions & Treatments | Health Centers | Drugs, Herbs & Supplements | Nutrition & General Wellness | Your Family | News Center | Healthy Living | Tools & Multimedia | Contenido en Español

Home / Tools & Multimedia / Risk Assessments

RISK ASSESSMENTS

Search Our Health Library

FIND A DOCTOR

MAKE AN APPOINTMENT

BOOK ONLINE

Do You Have a Substance Abuse Problem?

Return to Assessment

Your results

A "yes" answer to any of the questions in this assessment should make you think about the role that drugs may play in your life. Could you be in denial about a problem with drugs? If you have concerns about drug addiction, talk with your healthcare provider. This is true no matter what your results are on this assessment.

About drug addiction and drug abuse

Both drug abuse and drug addiction can lead to many health problems. These problems vary, depending on the type of drug abused. In general, these are the effects:

- Drug abuse weakens your immune system. This makes it harder to fight off infection.
- People who abuse drugs often engage in risky behaviors. These include unsafe sex and sharing of needles. This makes them more likely to get sexually transmitted infections such as HIV and hepatitis.
- Abusing drugs can affect the way your heart works. It can raise your risk for heart attack.
- Certain drugs can harm the kidneys. Other drugs can harm the liver. These include heroin, inhalants, and steroids.
- All drugs that are abused affect the brain. This is because they cause a pleasurable or euphoric effect. Some drugs damage the brain or cause strokes or seizures. Drug abuse can affect memory and attention and can affect decision-making. Over time, the damage to the brain can result in paranoia, depression, and aggression.
- People who abuse steroids for bodybuilding or athletic performance develop problems related to sex hormones. For men, infertility and shrinking of the testicles occur. Women's bodies become more masculine.

Follow Us

Learn more about our email newsletters and blogs.

Related Services

SPECIALTIES

Addiction Medicine

Related Items

DISEASES AND CONDITIONS

Substance Abuse or Chemical Dependence

The Risks of Drug Use in Pregnancy

PEDIATRIC DISEASES AND CONDITIONS

95. When the results page loads for the risk assessment, that communication is secretly intercepted via the Google Analytics code, and parts of the communication are sent to Google. The information sent to Google is depicted below:

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator Timing

▼ **Query String Parameters** view source view decoded

```
v: 1
_v: j98
a: 1049796374
t: pageview
_s: 1
dl: https%3A%2F%2Fmyhealth.umassmemorial.org%2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE%3FSubstanceAbuseMRA_Parameters%3DN%2CN%2CY%2CY%2C2
dp: %2FInteractiveTools%2FRiskAssessments%2F42%2CSubstanceAbuseCAGE%3FSubstanceAbuseMRA_Parameters%3DN%2CN%2CY%2CY%2C2
ul: en-us
de: UTF-8
dt: Substance%20Abuse%20Assessment
sd: 24-bit
sr: 1920x1080
vp: 1231x979
je: 0
_u: AACAAEABAAAAACAAI~
jid: 1267990952
gjid: 2074061852
cid: 1972491336.1664909972
tid: UA-17264146-13
_gid: 2122976964.1664909972
_r: 1
_slc: 1
z: 1530351183
```

96. The user's responses to each question in the risk assessment are highlighted in the screen capture above. Those responses are intercepted and transmitted to Google. Although the parameters are communicated in code (after the word "Parameters"), that code can easily be used to identify the user's response to each question by loading the full highlighted URL.

97. The above examples are just that—examples. Defendants use similar Google Analytics and Meta Pixel code throughout nearly all parts of the UMass Memorial Website, closely tracking individuals' communications with the UMass Memorial Website.

98. In addition to Google and Facebook, the communications between healthcare consumers and UMass Health are intercepted and retransmitted to various companies without the individual's consent. These additional third parties include:

(d) **Bing Ads.** Bing Ads is an internet advertising platform owned by Microsoft. Similar to Google Analytics and Meta Pixel, Defendants insert code into their website that causes communications between the user and the website to be intercepted by and transmitted to Microsoft's Bing Ads servers. The contents intercepted include the URL and title of each website visited and the user's IP address. Microsoft can then monetize that information through advertisements.

(e) **Doubleclick.** Google Doubleclick is an internet advertising platform. Similar to Google Analytics and Meta Pixel, Defendants insert code into their website that causes communications between the user and the website to be intercepted by and transmitted to Google. The contents intercepted include the URL and title of each website visited and the user's IP address. Google can then monetize that information through advertisements.

(f) **Sharethis.** Sharethis is a company that tracks the behavior of users of websites. Similar to Google Analytics and Meta Pixel, Defendants insert code on their website that causes the contents of the user's communications with the website, including pages viewed, the contents of searches, and other information, to be sent to the sharethis.com server. The code also causes the user's IP address to be revealed to Sharethis.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

99. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the UMass Health Website's operation. The UMass Health Website can and would operate just the same from the perspective of healthcare consumers without the tracking technologies described in this complaint.

100. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For

example, a website can contain links to its Facebook profile or invite website users to interact with Defendants via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a simple link to a Facebook profile; any website can have one without the other.

101. Moreover, even if a company wishes to use tracking technologies to optimize its website or its marketing or advertising for a website, there is no legitimate business reason for any company to keep secret from website users the use of these tracking technologies. Indeed, disclosure of such tracking technologies is possible and, if implemented properly, would avoid the secret interception of internet communications. Some websites, for example, disclose tracking technologies through a pop-up displayed to the user when the user first accesses the website. The quality and legal validity of these kinds of disclosures vary depending on how they are presented and their substance, but a disclosure could, in principle, disclose the use of tracking technologies and their impact on confidentiality.

102. A healthcare consumer visiting the UMass Memorial Website is presented with no pop-up disclosure informing them that their communications with the website are intercepted or tracked. Even if the UMass Memorial Website were to feature such a pop-up that links to the UMass Memorial Website terms of service or privacy policy, those policies do **not**, as described above in paragraphs 26 to 31, disclose the tracking technologies described in this complaint. To the contrary, those terms of service mislead website users by telling them that such sharing of communications between Class Members and Defendants is **not** taking place.

**Class Action Allegations**

103. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.ummhealth.org within three years prior to the date of the original complaint in this action.

104. This action is properly maintainable as a class action.

105. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

106. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and Defendants, through the UMass Memorial Website, were wire communications under the Massachusetts Wiretap Act.

(b) Whether Defendants inserted tracking technologies into the hidden code of the UMass Memorial Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the UMass Memorial Website are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3);

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others, enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Defendants and users of the UMass Memorial Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether, by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and Defendants;

(g) Whether Class Members' communications with Defendants were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent;

(h) Whether Class Members' privacy interests were violated by the interceptions of their communications with Defendants' website;

(i) If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements.

107. Plainitff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the UMass Memorial Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

108. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

109. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, the damage that any individual Class member has suffered is not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

110. Defendants have acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seek for the Class as a whole.

**COUNT I**

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

111. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

112. The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C). The Act

provides a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C).

113. An individual's communications with a website constitute "wire communications" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(1). The communications between Plaintiff and other Class Members and Defendants, through the UMass Memorial Website, were therefore wire communications under the Massachusetts Wiretap Act.

114. The tracking technologies inserted into the hidden code of the UMass Memorial Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3). "Intercepting devices" also include (i) any devices Class Members used to access the UMass Memorial Website; (ii) Class Members' web browsers used to access the UMass Memorial Website; (iii) Defendants' own computer servers; and (iv) the computer servers of third-parties such as Google and Facebook which intercepted Class Members' communications with the UMass Memorial Website.

115. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others, enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between Defendants and users of the UMass Memorial Website, including, but not limited to, the identity of the parties to the communication, the existence of the communication, and the communication's content, substance, purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

116. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, Defendants installed an intercepting device on their website with the intent

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

to aid Google, Facebook, and other companies to secretly hear and record communications between the Class Members and Defendants.

117. Class Members' communications between the Class Members and Defendants were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

118. Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of violation or $1,000, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

Date Filed 12/20/2022 4:49 PM
Superior Court - Suffolk
Docket Number

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 20, 2022

Respectfully submitted,

*/s/ Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

# Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JANICE PROGIN, on behalf of herself and all others similarly situated, Plaintiff, | * | |
| v. | * | Civil Action No. 23-cv-10113-ADB |
| UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC., Defendants. | * | *Related Cases:* Civil Action No. 22-cv-12022-ADB Civil Action No. 22-cv-40154-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Janice Progin ("Plaintiff") filed this putative class action in Massachusetts Superior Court against UMass Memorial Health Care, Inc., UMass Memorial Hospitals, Inc., UMass Memorial Medical Center, Inc., UMass Memorial HealthAlliance-Clinton Hospital, Inc., Marlborough Hospital, and Harrington Memorial Hospital, Inc. (collectively, "Defendant")[1] on December 20, 2022. [ECF No. 1-3 ("Compl.")]. Plaintiff alleges that Defendant shared communications about

[1] Defendant UMass Memorial Health Care, Inc. avers that (1) UMass Memorial Hospitals, Inc. has been erroneously named as a defendant, because that entity is now known as UMass Memorial Community Hospitals, Inc., and (2) UMass Memorial Health Care, Inc. is the ultimate parent company of all other named defendants, including UMass Memorial Community Hospitals, Inc. [ECF Nos. 2, 17]. As such, Defendant UMass Memorial Health Care, Inc. asserts that it is the sole properly named defendant. For purposes of this Order, the Court refers to all named defendants as "Defendant."

her private medical information with Facebook and Google without Plaintiff's knowledge or consent, in violation of the Massachusetts Wiretap Act, Mass. Gen. Laws ch. 272, § 99. [Id. ¶¶ 111–118].

Defendant removed the case to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). [ECF No. 1 ("Notice of Removal")]. Presently before the Court is Plaintiff's motion to remand back to state court pursuant to 28 U.S.C. § 1447. [ECF No. 14]. Two related putative class actions were filed against Defendant, also in Massachusetts Superior Court, which Defendant also removed to this Court pursuant to 28 U.S.C. § 1442(a)(1). See [Colleton v. UMass Mem'l Health Care, Inc., No. 22-cv-40154 (D. Mass.) ("Colleton Action"); Colleton Action, ECF No. 1 ("Colleton Notice of Removal"); Colleton Action, ECF No. 1-1 ("Colleton Compl."); Doe v. UMass Mem'l Health Care, Inc., No. 22-cv-12022 (D. Mass.) ("Doe Action"); Doe Action, ECF No. 1 ("Doe Notice of Removal"); Doe Action, ECF No. 1-1 ("Doe Compl.")].[2]

Plaintiffs in the other actions also filed motions to remand. [Colleton Action, ECF No. 13; Doe Action, ECF No. 9]. Defendant filed an omnibus response to the three motions to remand, [ECF No. 17], and Plaintiffs, in turn, filed an omnibus reply in further support of their motions, [ECF No. 19].

For the reasons set forth below, Plaintiff's motion to remand, [ECF No. 14], is GRANTED.

[2] The other two actions named UMass Memorial Health Care, Inc. as the sole defendant. See [Colleton Compl.; Doe Compl.].

## I. BACKGROUND[3]

Defendant is a healthcare service provider that developed, owns, and/or operates a website, www.ummhealth.org (the "Website"), which offers a wide range of healthcare services and a patient portal. [Compl. ¶ 19; Colleton Compl. ¶¶ 2, 14; Doe Compl. ¶¶ 16–17]. Plaintiff has previously accessed the Website. [Compl. ¶ 107]. The Website collects various types of information about its users, including individuals' medical conditions and the doctors they may be seeing. [Compl. ¶ 46]; see also [Colleton Compl. ¶ 17 (describing information Website allegedly collects, including type of medical treatment and the names of physicians with whom individuals schedule appointments); Doe Compl. ¶¶ 76–77 (describing information Website allegedly collects, including type of medical treatment, diagnoses, and procedures)]. The Website uses a code analytics tool called "Facebook Pixel,"[4] [Compl. ¶ 60; Colleton Compl. ¶ 24; Doe Compl. ¶ 76], which tracks the actions of Website users and sends users' Website communications to Facebook, [Compl. ¶¶ 70–74; Colleton Compl. ¶ 27; Doe Compl. ¶ 77]. The Website also uses a code analytics tool called "Google Analytics," which communicates similar information to Google.[5] [Compl. ¶¶ 60, 63–67; Colleton Compl. ¶¶ 43–44]. Website users like

---

[3] For purposes of this Order, the relevant facts are drawn from the three Complaints, the three Notices of Removal, and Defendant's briefing, [ECF No. 17]. Additionally, the Court takes judicial notice of various public documents relating to the Meaningful Use Program, further discussed infra. See Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir. 2008).

[4] Facebook Pixel is now called Meta Pixel.

[5] Unlike Plaintiffs Progin and Colleton, Plaintiff Doe does not address the Google analytics tool in his Complaint.

Plaintiff did not know of or consent to the sharing of their communications to a third-party. [Compl. ¶ 32; Colleton Compl. ¶¶ 40, 45; Doe Compl. ¶¶ 88, 90].

In its Notice of Removal, Defendant asserts that it optimizes and increases traffic to its Website in compliance with the Meaningful Use Program[6] ("Meaningful Use Program" or "Program"). [Notice of Removal ¶ 28; Colleton Notice of Removal ¶ 26; Doe Notice of Removal ¶ 26]. The Meaningful Use Program implements provisions of the American Recovery and Reinvestment Act of 2009. Medicare and Medicaid Programs; Elec. Health Rec. Incentive Program, 75 Fed. Reg. 144, 44,314 (July 28, 2010). The Program was established in 2010 by the Department of Health and Human Services ("HHS") to promote the use of certified electronic health record technology in a meaningful way as "one piece of a broader [health IT] infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." [ECF No. 17 at 10 (quoting Medicare and Medicaid Programs; Elec. Health Rec. Incentive Program, 75 Fed. Reg. at 44,321)].

Also in the American Recovery and Reinvestment Act of 2009, Congress established the Office of the National Coordinator ("ONC") within HHS, and charged the ONC with various obligations, including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect to each of the following: "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(c)(3)(A). The ONC provides guidance for complying with the Program, including a model website that

[6] Although the Meaningful Use Program was renamed the Promoting Interoperability Program in 2018, the parties all use the Program's original name. For consistency, the Court does the same.

uses third-party marketers such as Facebook and Google. [Notice of Removal ¶¶ 22–23; Colleton Notice of Removal ¶¶ 20–21; Doe Notice of Removal ¶¶ 20–21]. The Program provides for incentive payments of up to two percent for providers who reach certain levels of engagement with electronic health record use through providers' patient portals. [Notice of Removal ¶ 20; Colleton Notice of Removal ¶ 18; Doe Notice of Removal ¶ 18]. In the future, these payments will phase out and transition into penalties for providers that do not comply. [ECF No. 17 at 10]. Defendant submits reports to the Center for Medicare and Medicaid Services ("CMS") on its involvement in the Program, specifically related to the patient portal and patients' use of the portal. [Id. at 12].

Defendant asserts that in maintaining the Website, it is acting under the authority of the federal government. [Notice of Removal ¶¶ 28–33; Colleton Notice of Removal ¶¶ 26–31; Doe Notice of Removal ¶¶ 26–31]. Specifically, Defendant claims that through the Meaningful Use program the federal government "incentiviz[es], regulat[es], monitor[s], and supervis[es]" Defendant's use and promotion of its Website "in order to meet the federal government's national priority of interoperable health information technology." [Notice of Removal ¶ 28; Colleton Notice of Removal ¶ 26; Doe Notice of Removal ¶ 26].

## II. LEGAL STANDARD

Federal courts are courts of limited jurisdiction, "possess[ing] only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). If the Court lacks subject-matter jurisdiction over a removed action, the action must be remanded to state court. 28 U.S.C. § 1447(c).

As pertinent here, a case filed in state court may be removed to federal court pursuant to 28 U.S.C. § 1442(a)(1), which confers jurisdiction to federal courts over actions against the

"United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." As the Supreme Court has explained:

> Historically, removal under § 1442(a)(1) and its predecessor statutes was meant to ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties. The act of removal permits a trial upon the merits of the state-law question free from local interests or prejudice.

Arizona v. Manypenny, 451 U.S. 232, 241–42 (1981) (citations omitted).

Under § 1442(a)(1), Defendant bears the burden of establishing that (1) it is "acting under" the authority of a federal officer; (2) the charged conduct was carried out "for or relating to" the asserted official authority; and (3) Defendant has a "colorable federal defense." Moore v. Elec. Boat Corp., 25 F.4th 30, 34 (1st Cir. 2022).

Generally, "[b]ecause removal to federal court deprives the state court of jurisdiction, 'removal statutes are to be narrowly construed.'" Massachusetts v. Libertad, No. 22-cv-10131, 2022 WL 479799, at *1 (D. Mass. Feb. 16, 2022) (quoting Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 76 (1st Cir. 2009)). Conversely, the Supreme Court held that the "acting under" the authority of a federal officer language in § 1442(a)(1) should be "liberally construed," while also cautioning that this "broad language is not limitless." Watson v. Philip Morris Cos., 551 U.S. 142, 147 (2007) (quoting Colorado v. Symes, 286 U.S. 510, 517 (1932)).

## III. DISCUSSION

Plaintiff argues that the Court must remand this case back to state court because Defendant has failed to show that the Court has subject-matter jurisdiction pursuant to the federal officer removal statute. [ECF No. 15]. While Plaintiff concedes that Defendant is a "person" under the statute, Plaintiff contends that Defendant (1) was not "acting under" any federal authority with regard to the charged conduct, (2) that its conduct was not "related to" a federal

office, and (3) that Defendant cannot raise a colorable federal defense. [Id. at 6–7]. Defendant asserts that each of these elements is satisfied and that this Court therefore has subject-matter jurisdiction. [ECF Nos. 1, 17].

"'Acting under' [the authority or direction of a federal officer] connotes 'subjection, guidance, or control' and involves 'an effort to assist, or to help carry out, the duties or tasks of the federal superior.'" Rhode Island v. Shell Oil Prod. Co., 979 F.3d 50, 59 (1st Cir. 2020) (quoting Watson, 551 U.S. at 152), summarily vacated on other grounds, 141 S. Ct. 2666 (2021) (Mem.). Such help or assistance "does not include simply complying with the law." Watson, 551 U.S. at 152 (emphasis omitted) (noting that taxpayers who fill out complex tax forms or airline passengers who obey federal regulations may be assisting federal authorities but would not fall within the scope of the statute). A private firm's compliance with federal regulations does not alone constitute "acting under" a federal authority, even if the firm's activities are "highly supervised and monitored." Id. at 153 (noting that, if the rule were otherwise, the scope of the statute would be expanded considerably to include, potentially, "state-court actions filed against private firms in many highly regulated industries"); see also Mennonite Gen. Hosp., Inc. v. Molina Healthcare of P.R., 319 F. Supp. 3d 587, 595 (D.P.R. 2018) (finding that "Defendants have not established that they were in any way acting under the direction of a federal superior" because although "Defendants are certainly subject to detailed federal regulations and . . . may even be 'highly supervised and monitored[,]' . . . Defendants have not shown anything to indicate that they 'assist, or . . . help carry out, the duties or tasks of the federal superior' with respect to the Medicaid program." (emphasis omitted) (quoting Watson, 551 U.S. at 153)).

Delegated duties do fall under the statute, but "neither Congress nor federal agencies normally delegate legal authority to private entities without saying that they are doing so."

Watson, 551 U.S. at 157. As relevant here, government contractors may be found to be "acting under" federal officers' authority when contractors go "beyond simple compliance with the law and help[] officers fulfill other basic government tasks," id. at 153, such as producing items that the government needs, like products used to fight a war, id. at 153–54 (citing Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387 (5th Cir. 1998), holding modified by Latiolais v. Huntington Ingalls, Inc., 951 F.3d 286 (5th Cir. 2020)). These tasks are obligations that "the [g]overnment itself would have had to perform" if the contractors did not. Id. at 154. As in, if the government did not contract for items used in a war effort, it would be required to make those items itself. In contrast, "receiving incentive payments for acting in a way that promotes a broad federal interest—in an area outside the traditional responsibility of the federal government—is not the same as being contracted to carry out, or assist with, a basic governmental duty." Quinto v. Regents of Univ. of Cal., No. 22-cv-04429, 2023 WL 1448050, at *2 (N.D. Cal. Feb. 1, 2023).

Defendant asserts that it is assisting the federal government in its goal of building a nationwide electronic health records system. [ECF No. 17 at 14]. Defendant further contends that the federal government has delegated duties to it in line with a contractor relationship. [Id. at 22]. In support of these contentions, Defendant points to the fact that it receives incentive payments, makes efforts to increase the use of the patient portal and Website, and reports user metrics to CMS, all in furtherance of its compliance with the Meaningful Use Program. [Id. at 15–16 (citing Doe I v. UPMC, No. 20-cv-00359, 2020 WL 4381675 (W.D. Pa. July 31, 2020))]. The Court disagrees.

To begin, the fact that the federal government provides incentive payments to Defendant for its participation in the Program does not create a contractor relationship in and of itself. If

that were the case, "the federal officer removal statute would sweep into the federal courts" countless cases involving private entities' receipt of incentive payments or incorporation of practices "consistent with a policy promoted by the federal government as socially desirable." Doe v. Cape Cod Healthcare, Inc., No. 23-cv-10080, ECF No. 10 (D. Mass. Jan. 25, 2023). Moreover, the fact that incentive payments will, in the future, shift to penalty payments if a provider fails to comply with the Meaningful Use Program further suggests that this is a regulation rather than a government contract.

Defendant does not produce a product that the government needs, nor is it otherwise fulfilling a basic government task. Although the ONC has an obligation to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology," [ECF No. 17 at 8], participation in the Meaningful Use Program serves broad federal goals, not basic government functions, see Doe v. Hoag Mem'l Presbyterian Hosp., No. 23-cv-00444, 2023 WL 3197716, at *3 (C.D. Cal. May 2, 2023); Crouch v. Saint Agnes Med. Ctr., No. 22-cv-01527, 2023 WL 3007408, at *5 (E.D. Cal. Apr. 19, 2023); Quinto, 2023 WL 1448050, at *2. The federal government does not have an obligation to create a health information infrastructure and, if hospital systems like Defendant chose not to maintain patient portals, like the Website, the government would not be required to create its own. See Watson, 551 U.S. at 154; Doe, I v. BJC Health Sys., No. 22-cv-00919, 2023 WL 369427, at *4 (E.D. Mo. Jan. 10, 2023).

Additionally, although Defendant submits reports to CMS and relied on guidance from the ONC in creating the Website, Defendant has not shown that the federal government exercised the type of tight control that would bring Defendant's conduct within the scope of the statute. Cf. Moore, 25 F.4th at 35–36 (finding that a contractor was "acting under" a federal

authority in building a submarine because "[t]he Navy oversaw every aspect of the design, construction, maintenance, and modernization of the submarine"). Further, the Court finds there has been no formal delegation of any of the federal government's duties to Defendant. Compare Watson, 551 U.S. at 156 (finding that the FTC's provision of testing specifications, inspection and supervision of the testing laboratories, and prohibition of statements in advertising were merely regulations that did not constitute formal delegation), with Camacho v. Autoridad de Telefonos de P.R., 868 F.2d 482, 486 (1st Cir. 1989) (finding that defendants were acting under the authority of the federal government because they "were acting under express orders, control and directions of federal officers" when wiretapping).

In sum, although Defendant's conduct may assist the federal government in achieving a broad goal, the Court finds that its participation in the Meaningful Use Program is merely compliance with federal law and is not sufficient to bring it within the scope of the federal officer statute. See Watson, 551 U.S. at 153. The Court recognizes, as Defendant points out, that some courts have found removal appropriate in similar Meaningful Use Program cases. See generally UPMC, 2020 WL 4381675; Doe v. ProMedica Health Sys., Inc., No. 20-cv-01581, 2020 WL 7705627 (N.D. Ohio Oct. 30, 2020). The Court nonetheless joins the number of other courts that have declined to adopt this broad interpretation of the statute in this context. See generally Cape Cod Healthcare, Inc., No. 23-cv-10080, ECF No. 10; BJC Health Sys., 2023 WL 369427; Hoag Mem'l Presbyterian Hosp., 2023 WL 3197716; Crouch, 2023 WL 3007408; Quinto, 2023 WL 1448050.

The Court therefore finds that Defendant has failed to establish that it was "acting under" any federal authority when it engaged in the charged conduct, and, as such, has failed to establish

that this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1442(a)(1).[7] In the absence of any other basis for subject-matter jurisdiction, this case must be remanded to state court.

## IV. CONCLUSION

Accordingly, Plaintiff's motion to remand, [ECF No. 14], is GRANTED and this matter is remanded to state court for further proceedings.

**SO ORDERED.**

July 13, 2023

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

[7] Because Defendant has failed to meet its burden on the "acting under" element of the analysis, the Court need not address the remaining elements.

FILED 48 8/31

AUG 31 2023

ATTEST [signature] CLERK

**COMMONWEALTH OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff, on behalf of himself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. ~~2285CV01205~~<br>2384CV02448-BLS1 |
| LISA COLLETON,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. ~~2285CV01293~~<br>2384CV02450-BLS1 |
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889 |

**OPPOSITION TO PLAINTIFF JANICE PROGIN'S MOTION TO CONSOLIDATE AND TRANSFER CASES TO THE BUSINESS LITIGATION SESSION**

Without leave of the Worcester Superior Court, Janice Progin, a plaintiff whose case is pending in the Business Litigation Session of the Superior Court in Suffolk County, has filed a motion in the Worcester Superior Court to consolidate two pending Worcester cases, *Doe v. UMass Memorial Healthcare, Inc.*, No. 2285CV01205, filed on October 24, 2022, and *Colleton v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293, filed on November 14, 2022, with *Progin v. UMass Memorial Healthcare, Inc.*, No. 2284CV02889, filed on December 20, 2022 in the Suffolk Business Litigation Session ("BLS") and transfer the *Doe* and *Colleton* Actions to the BLS to be consolidated with the *Progin* case.

For several reasons, *Doe* and *Colleton* oppose Progin's motion.

1. Progin, a plaintiff in the BLS and not a party in the Worcester Superior Court, has no standing to bring her motion. Progin misreads Mass. R. Civ. P. 42(a), Mass. Super. Ct. R. 31, and Superior Court Administrative Directive No. 17-1, and her reliance is in error, i.e., standing is not conferred on a Suffolk County Superior Court plaintiff to arbitrarily interlope in pending Worcester cases without prior leave of court.

2. Progin's motion to consolidate and transfer to the BLS, even if legally tenable, is moot. On August 17, 2023, by action of the Worcester Superior Court, *Doe v. UMass Memorial Healthcare, Inc.*, No. 2285CV01205 and *Colleton v. UMass Memorial Healthcare, Inc.*, No. 2285CV01293 are now consolidated. See Dkt.14. And, *Progin*'s motion inappropriately attempts to pre-empt the BLS from consolidating its own case with inbound BLS cases from Worcester. But more troubling is *Progin*'s attempt to get the Worcester court to derogate from Superior Court Rule 31: *Consolidation of Superior Court cases*. Rule 31 provides that upon consolidation,

the earliest filed case is the lead case, i.e., the *Doe* case. Instead, *Progin* requests (without justification) that *Progin*, the most recently filed case, be the lead case.

3. Finally, *Progin*'s counsel 9C certificate does not make sense. He suggests because *Doe*'s counsel advised him of *Doe*'s and *Colleton*'s intent to consolidate and transfer to the BLS that there is no opposition to *Progin*'s efforts to interpose in the Worcester Superior Court. *Progin*'s counsel is correct that Doe's counsel did not indicate assent or opposition to his unserved hypothetical motion. Instead, *Doe*'s counsel proposed a 9C call to which Progin's counsel did not respond, proceeding otherwise to serve his motion.

For these reasons, *Doe* requests that *Progin*'s Motion be denied without prejudice to be re-filed in the BLS once the already consolidated *Doe* and *Colleton* cases are transferred to the BLS.

Dated: August 25, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (admitted pro hac vice)
David Warden (admitted pro hac vice)
Nathan Campbell (admitted pro hac vice)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010

(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Warren Postman (pro hac vice pending)
Seth Meyer (admitted pro hac vice)
Alex Dravillas (admitted pro hac vice)
KELLER POSTMAN LLC
150 N. Riverside Plaza , Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com
wdp@kellerpostman.com

William P. Doyle, BBO# 556999
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
(781) 245-1127
bill@colonna-doyle.com

Nicholas A. Coulson (pro hac vice pending)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
(313) 392-0015
ncoulson@lsccounsel.com

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on August 25, 2023 in accordance with Superior Court Rule 9A, I served the following documents:

- Opposition to Plaintiff Janice Progin's Motion to Consolidate and Transfer Cases to the Business Litigation Session;

on all counsel of record, via electronic mail to the following parties of interest:

Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
SHAPIRO HABER & URMY LLP
One Boston Place, Suite 2600
Boston, MA 02108
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

FILED 49

AUG 31 2023

ATTEST CLERK

**COMMONWEALTH OF MASSACHUSETTS**

| | |
|---|---|
| JOHN DOE,<br><br>Plaintiff, on behalf of himself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. ~~2285CV01205~~ 2384CV02448-BLS1 |
| LISA COLLETON,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT WORCESTER**<br><br>CIVIL ACTION NO. ~~2285CV01293~~ 2384CV02450-BLS1 |
| JANICE PROGIN,<br><br>Plaintiff, on behalf of herself and others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC., UMASS MEMORIAL HOSPITALS, INC., UMASS MEMORIAL MEDICAL CENTER, INC., UMASS MEMORIAL HEALTHALLIANCE-CLINTON HOSPITAL, INC., MARLBOROUGH HOSPITAL, and HARRINGTON MEMORIAL HOSPITAL, INC.,<br><br>Defendants. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2284CV02889 |

## REPLY IN SUPPORT OF PLAINTIFF JANICE PROGIN'S MOTION TO CONSOLIDATE AND TRANSFER CASES TO THE BUSINESS LITIGATION SESSION

Plaintiff Janice Progin has moved to consolidate three related cases, the *Doe* and *Colleton* Actions pending and consolidated in the Worcester Superior Court and the *Progin* Action[1] pending in the Business Litigation of the Suffolk Superior Court, and to transfer the consolidated *Doe* and *Colleton* cases to the BLS in accordance with all local rules and directives.

Plaintiff Progin's motion is governed by Massachusetts Superior Court Rule 31, which provides, in relevant part, as follows:

> A motion to consolidate cases under Mass. R. Civ. P. 42(a) shall be served, in accordance with Superior Court Rule 9A, upon all parties in the cases proposed to be consolidated. The original motion, opposition(s), and other related documents shall be filed and the motion decided in the earliest filed case. Notice of such filing, together with a copy of the documents filed, shall be filed in the later filed case(s).

In accordance with Rule 31, Plaintiff Progin served her motion papers on all parties in all cases to be consolidated, and she filed the motion papers in the earliest filed case (*Doe*) and is also filing a notice of such filing, together with a copy of the documents filed, in the later filed cases, *Colleton* and *Progin*. Once the Court issues an order to consolidate, under Mass. Super. Ct. R. 31, that "order of consolidation is also an order of transfer."

Plaintiff's motion is also governed by Super. Ct. Admin. Dir. No. 17-1, which governs requests to transfer into the BLS from a session outside of Suffolk County, and which states: "If a plaintiff files an action outside of Suffolk County, any party may file in the session to which the case is assigned a motion requesting a transfer to the BLS." Thus, Plaintiff Progin appropriately seeks consolidation of the three actions under Mass. Super. Ct. Rule 31, and transfer of the cases to the BLS under Super. Ct. Admin. Dir. No. 17-1.

[1] Defined terms have the same meanings as in Plaintiff Progin's Memorandum in Support of her Motion to Consolidate and Transfer (the "Motion").

The *Doe* and *Colleton* parties (collectively, the "Worcester Parties") "oppose" (the "Opposition") this motion for three reasons. As an initial matter, it is far from clear that the Worcester Parties actually oppose the relief Plaintiff Progin seeks in the Motion—the consolidation and transfer of the three Actions to the BLS. They have already obtained consolidation of their two actions and have filed a motion to transfer those cases to the BLS. In any event, none of the Worcester Parties' arguments warrant denial of the Motion.

First, the Worcester Parties argue that Progin does not have standing to bring this Motion because she is not a party to the Worcester Actions. This is categorically incorrect. As noted, Mass. Super. Ct. Rule 31 expressly provides Progin with standing to move to consolidate all three Actions, and Super. Ct. Admin. Dir. No. 17-1 allows "*any* party [to] file in the session to which the case is assigned a motion requesting a transfer to the BLS," even in cases where "a plaintiff files an action outside of Suffolk County." That is precisely what Progin has done and what Superior Courts have allowed in prior cases. *See, e.g.*, *Fiorillo v. Arcuri*, 2019 Mass. Super. LEXIS 1679, *6-7 (July 12, 2019) (consolidating a 2018 Plymouth Superior Court case with a 2014 Worcester Superior Court case and transferring both to Worcester); *Alvarado v. Commonwealth*, 2016 Mass. Super. LEXIS 2696, *1 (Oct. 19, 2016) (ordering that "all pleadings filed [in the "Worcester Superior Court case"], together with an attested copy of the docket entries be transferred to the Suffolk County Superior Court[.]"); *Olson v. Energy N.*, 1999 Mass. Super. LEXIS 45, *7-9, 9 Mass. L. Rep. 494, 1999 WL 1332362 (Jan. 14, 1999) (holding that "[c]onsolidation is also appropriate here because, with the addition of the two plaintiffs in the Middlesex case to the Norfolk case and the certification of the class as to all but the fraud and deceit claim in the Norfolk case[,] the Middlesex case becomes mostly redundant except as to

certain allegations and claims not found in the Norfolk case.").[2] This approach is also consistent with Mass. R. Civ. Proc. 42(a), which expressly contemplates consolidation of cases "involving a common question[s] of law or fact [] pending [] in the same county *or different counties*[.]"

Second, the Worcester Parties claim this motion is moot because the Worcester Actions have already been consolidated (in Worcester). This argument makes no sense. While the two Worcester Actions have been consolidated in Worcester, Plaintiff Progin seeks to consolidate her third related Action pending in the BLS with those two cases and to have all three cases transferred and consolidated in the BLS in Suffolk Superior Court, which has not yet happened.

Finally, the Worcester Parties erroneously claim Progin's counsel's 9C certificate "does not make sense," Opposition at ¶ 3, but it is the Worcester Parties' position in response to Plaintiff Progin's Motion, both during the Rule 9C process and now having seen their Opposition, which does not make sense. It is entirely unclear from the Opposition whether the Worcester Parties oppose consolidation and transfer of the three related Actions to the BLS. It appears they may wish to have their two cases transferred to the BLS on their own initiative rather than as a result of Plaintiff Progin's Motion, in a misguided effort to secure a leadership role over the three Actions once they are consolidated and transferred to the BLS. Their conduct leading up to the filing of the Motion suggests such a motivation.

When Plaintiff Progin's counsel reached out to counsel for the Worcester Parties to ask whether they would assent to the Motion, counsel for the Worcester Parties indicated as follows:

> We are already in the process of filing a joint motion to transfer Colleton/Doe and expect to do so very soon – which we can agree on. Therefore your filing would be duplicative. I can have a 9C to discuss further if necessary, but this issue should be resolved. I just confirmed the same with Elizabeth Scully -- we are all on the same page to go to the BLS.

---

[2] *See also* the case law cited on p. 4 of Plaintiff Progin's opening memorandum.

E-mail from Tucker Merrigan to Edward Haber dated August 14, 2023 (Ex. A). The Worcester Parties apparently were trying to lull counsel for Plaintiff Progin into a false sense of security that she did not need to move to consolidate and transfer the cases to the BLS because all parties to all cases were in agreement and "on the same page." The very next day, however, without notifying or serving Plaintiff Progin, the Worcester Plaintiffs moved to consolidate their two cases in Worcester and filed a motion to be appointed lead counsel in those cases. When Plaintiff Progin filed an opposition to that motion for appointment of lead counsel, the Worcester Plaintiffs promptly withdrew it.[3]

There is no question that the three Actions are related, nor is there any reason why they should not be transferred to the BLS, given its undisputed experience and expertise in these cases regarding the Massachusetts Wiretap Act. This Court should consolidate and transfer the cases to the BLS and, assuming the BLS accepts the cases, the BLS should resolve the issues surrounding leadership and management of the cases.

For these reasons, Progin's Motion should be granted, and the three above-captioned cases consolidated and transferred to the Business Litigation Session in Suffolk County.

[3] *See* Motion, Opposition and Withdrawal Papers relating to Worcester Plaintiffs' Motion for Appointment as Lead Counsel (Ex. B).

Dated: August 31, 2023

Respectfully submitted,

/s/Edward. F Haber

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2023, I caused a true copy of the foregoing to be served by email upon counsel of record for Defendants in all of the Actions, as well as upon counsel for the Plaintiffs in the *Doe v. UMass Memorial Healthcare, Inc.* and *Colleton v. UMass Memorial Healthcare, Inc.* actions.

/s/Edward F. Haber
Edward F. Haber

I HEREBY ATTEST AND CERTIFY ON March 7, 2024, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____
Assistant Clerk

# Exhibit A

**Patrick Vallely**

**From:** Tucker Merrigan <tucker@sweeneymerrigan.com>
**Sent:** Monday, August 14, 2023 11:47 AM
**To:** Ed Haber; Scully, Elizabeth; Michelle Blauner; Patrick Vallely; Victoria M. Santoro; Erin McHugh; fjohnson@azalaw.com; dwarden@azalaw.com; ncampbell@azalaw.com; sam@kellerpostman.com; adj@kellerpostman.com; bill@colonna-doyle.com; NCoulson@lsccounsel.com; lspitzig@lsccounsel.com
**Cc:** Karlsgodt, Paul; Patrick Vallely; Ian McLoughlin; Kristen Field; Tom Merrigan
**Subject:** RE: Progin v. UMass Memorial Healthcare; Doe v. UMass Memorial Healthcare; Colleton v. UMass Memorial Healthcare

Ed,

We are already in the process of filing a joint motion to transfer Colleton/Doe and expect to do so very soon – which we can agree on. Therefore your filing would be duplicative. I can have a 9C to discuss further if necessary, but this issue should be resolved. I just confirmed the same with Elizabeth Scully -- we are all on the same page to go to the BLS.

Please contact me on email or cell (413-824-9512) if you have any questions.

Thanks

Tucker

**From:** Ed Haber <ehaber@shulaw.com>
**Sent:** Monday, August 14, 2023 9:30 AM
**To:** Scully, Elizabeth <EScully@bakerlaw.com>; Michelle Blauner <mblauner@shulaw.com>; Patrick Vallely <pvallely@shulaw.com>; Tucker Merrigan <tucker@sweeneymerrigan.com>; Victoria M. Santoro <victoria@sweeneymerrigan.com>; Erin McHugh <EMcHugh@sweeneymerrigan.com>; fjohnson@azalaw.com; dwarden@azalaw.com; ncampbell@azalaw.com; sam@kellerpostman.com; adj@kellerpostman.com; bill@colonna-doyle.com; NCoulson@lsccounsel.com; lspitzig@lsccounsel.com
**Cc:** Karlsgodt, Paul <PKarlsgodt@bakerlaw.com>; Ed Haber <ehaber@shulaw.com>; Patrick Vallely <pvallely@shulaw.com>; Ian McLoughlin <imcloughlin@shulaw.com>
**Subject:** RE: Progin v. UMass Memorial Healthcare; Doe v. UMass Memorial Healthcare; Colleton v. UMass Memorial Healthcare

Counsel:

Attached please find the motion we plan to serve today, pursuant to Rule 9A, which seeks the consolidation of the three referenced UMass Memorial cases (Doe, Colleton and Progin) and the transfer of Doe and Colleton to the Business Litigation Session where Progin is pending. I also attach the memorandum of law in support which we also plan to serve today.

It is my understanding, per Elizabeth Scully's email below and subsequent conversations with her, that defendants also seek the relief sought by our motion. Elizabeth: Please confirm that we can indicate that the defendants assent to the allowance of the motion.

It is also my understanding from conversations with counsel for Doe that they and counsel for Colleton also agree that the three cases should be consolidated and that Doe and Colleton should be transferred to the BLS. Please advise if we can indicate that the plaintiffs Doe and Colleton assent to the allowance of the motion.

If all parties advise us that they assent to, or do not oppose, the motion, we will reflect that the motion is assented to or unopposed by all parties and file it in each of the three cases.

Of course, we are happy to discuss this with any of you today. I could do so anytime except between noon and 1 pm EDT. I can best be reached at 617-901-3739.

Thank you.

**Edward F. Haber**
**SHAPIRO HABER & URMY LLP**
**One Boston Place**
**Suite 2600**
**Boston, MA 02108**
Tel: 617-439-3939
ehaber@shulaw.com
www.shulaw.com

**From:** Scully, Elizabeth <EScully@bakerlaw.com>
**Sent:** Wednesday, July 19, 2023 10:22 AM
**To:** Ed Haber <ehaber@shulaw.com>; Michelle Blauner <mblauner@shulaw.com>; Patrick Vallely <pvallely@shulaw.com>; tucker@sweeneymerrigan.com; victoria@sweeneymerrigan.com; emchugh@sweeneymerrigan.com; fjohnson@azalaw.com; dwarden@azalaw.com; ncampbell@azalaw.com; sam@kellerpostman.com; adj@kellerpostman.com; bill@colonna-doyle.com; NCoulson@lsccounsel.com; lspitzig@lsccounsel.com
**Cc:** Karlsgodt, Paul <PKarlsgodt@bakerlaw.com>
**Subject:** Progin v. UMass Memorial Healthcare; Doe v. UMass Memorial Healthcare; Colleton v. UMass Memorial Healthcare

Counsel,

I am writing regarding the Court's recent Remand Order in the above referred matters, and to propose a potential agreement for the orderly movement forward of these matters. UMass Memorial Healthcare is prepared to forego its right to appeal the Remand Order in exchange for the parties reaching agreement to have the three matters consolidated and proceed in BLS 1, and agreeing to a schedule for the filing of a consolidated complaint and UMass's response thereto (avoiding the filing of separate motions to the three pending separate complaints). Please let me know if you would like to arrange a call to discuss.

Sincerely,

Elizabeth

**Elizabeth Scully**
She | Her | Hers
Partner

BakerHostetler
Washington Square
1050 Connecticut Ave, N.W. | Suite 1100
Washington, DC 20036-5403
T +1.202.861.1698

escully@bakerlaw.com
bakerlaw.com

---

This email is intended only for the use of the party to which it is addressed and may contain information that is privileged, confidential, or protected by law. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this email or its contents is strictly prohibited. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer.

Any tax advice in this email is for information purposes only. The content of this email is limited to the matters specifically addressed herein and may not contain a full description of all relevant facts or a complete analysis of all relevant issues or authorities.

Internet communications are not assured to be secure or clear of inaccuracies as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this email, or any attachment, that have arisen as a result of e-mail transmission.

# Exhibit B

Date Filed 8/15/2023 3:52 PM
Superior Court - Worcester
Docket Number 2285CV01205

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. 2285CV01205

---

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

LISA COLLETON, ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. 2285CV01293D

---

**MOTION TO APPOINT INTERIM CLASS COUNSEL**

Pursuant to Massachusetts Rule of Civil Procedure Rule 23(d), Plaintiffs John Doe (C.A. No. 2285CV01205) and Lisa Colleton (C.A. No. 2285CV01293D), individually and on behalf of

all others similarly situated ("Plaintiffs"), respectfully submits this Motion to Appoint Interim Class Counsel. In support of the Motion to Appoint Interim Class Counsel, Plaintiffs file the accompanying memorandum of law.

*(Space left intentionally blank)*

Dated: August 4, 2023

Respectfully submitted,

*/s/ J. Tucker Merrigan*

J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
SWEENEY MERRIGAN LAW
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
David Warden (*admitted pro hac vice*)
Nathan Campbell (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Warran Postman *(pro hac vice pending)*
Seth Meyer (*admitted pro hac vice*)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza , Suite 4100
Chicago, Illinois 60606
(312) 741-5220
sam@kellerpostman.com
ajd@kellerpostman.com
wdp@kellerpostman.com

William P. Doyle, BBO# 556999
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
(781) 245-1127
bill@colonna-doyle.com

Nicholas A. Coulson (*pro hac vice pending*)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
(313) 392-0015
ncoulson@lsccounsel.com

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

## CERTIFICATE OF SERVICE

I, J. Tucker Merrigan, hereby certify that on August 4, 2023 in accordance with Superior Court Rule 9A, I served the following documents:

- Motion to Appoint Interim Class Counsel;
- Memorandum of Law in Support of Plaintiffs' Motion to Appoint Interim Class Counsel;
- Declaration of J. Tucker Merrigan in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel;
- Declaration of Seth Meyer in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel;
- Declaration of Foster C. Johnson in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel;
- Declaration of Nicholas A. Coulson in Support of Plaintiffs' Motion for Appointment of Interim Class Counsel; and
- [Proposed] Order Appointing Interim Class Counsel;

on all counsel of record, via electronic mail to the following parties of interest:

James H. Rollinson, Esq.
Elizabeth Scully, Esq.
Paul Karlsgodt, Esq.
BAKER & HOSTETLER, LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
jrollinson@bakerlaw.com
escully@bakerlaw.com
pkarlsgodt@bakerlaw.com

*/s/ Johnathan T. Merrigan*
J. Tucker Merrigan

COMMONWEALTH OF MASSACHUSETTS

**Worcester, ss.**

| | |
|---|---|
| JOHN DOE,<br><br>Individually and on behalf of all others similarly situated,<br><br>v.<br><br>UMASS MEMORIAL HEALTHCARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT**<br><br>Civil Action No. 2285cv01205 |
| LISA COLLETON,<br><br>On behalf of herself and all others similarly situated<br><br>v.<br><br>UMASS MEMORIAL HEALTHCARE, INC.,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT**<br><br>Civil Action No. 2285cv01293D |

# JANICE PROGIN'S OPPOSITION TO MOTION TO APPOINT INTERIM CLASS COUNSEL

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place, Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**Counsel for Janice Progin, Plaintiff in *Progin v. UMass Memorial Healthcare, Inc.*, C.A. No. 2284cv02889 (Suffolk Superior Ct., Business Litigation Session)**

## I. INTRODUCTION

This opposition is submitted by Janice Progin, a plaintiff with a putative class claim pending against UMass Memorial Healthcare, Inc. ("UMass Memorial") in the Business Litigation Session ("BLS")[1] that overlaps in substance with the claims asserted by plaintiffs John Doe and Lisa Colleton (the "Worcester Plaintiffs"), whose claims are pending in this Court.

The pending motion for appointment of lead counsel filed by the Worcester Plaintiffs is curious. After obtaining consolidation of their two actions pending in this Court against UMass Memorial Healthcare, Inc. ("UMass Memorial"), those plaintiffs seek to appoint **all** counsel from those two cases as **lead** counsel for their consolidated case. If the Worcester Plaintiffs' claim were to remain in this Court, this order would serve no practical purpose, as counsel for the Worcester Plaintiffs already have control over their own consolidated class claims. The true, undisclosed purpose of the motion is quite different.

The reality is that the Worcester Plaintiffs' claims will likely not be litigated in this Court. Although their motion makes no mention of it, the Worcester Plaintiffs and UMass Memorial have already agreed that their claims should be transferred to the Business Litigation Session ("BLS," incorrectly referred to by the Worcester Plaintiffs as the "Business Law Section"). And, although their motion makes no mention of it, Ms. Progin ("the BLS Plaintiff") has already served pursuant to Superior Court Rule 9A a motion that, if granted, would consolidate her claims and case and the Worcester Plaintiffs' claims and case with the BLS Plaintiff's claims and case and transfer all the claims and cases to the BLS. A copy of that motion and memorandum are attached to the Declaration of Edward F. Haber as Exhibit B.[2]

While concealing their agreement to such transfer, the Worcester Plaintiffs ask **this Court** to make one final order before transfer: to appoint their counsel as "lead counsel," notwithstanding that this Court, pursuant to the agreement of all the parties to all the cases, will not likely preside over a

[1] *Progin v. UMass Memorial Healthcare, Inc.*, Case No. 2285CV01205 (Suffolk Super. Ct., Business Litigation Session). The Complaint in *Progin* is attached to the Declaration of Edward F. Haber ("Haber Decl.") as Exhibit A.

[2] Exhibit B does not include the exhibits attached to that motion, as the exhibits are somewhat voluminous, but they are available upon request.

consolidated action. The Worcester Plaintiffs' motion raises obvious questions—why do the Worcester Plaintiffs want this Court to appoint leadership when these cases will likely be litigated not here but in the BLS? Why not have the BLS decide lead counsel issues, given it will be presiding over all three cases? Why did the Worcester Plaintiffs rush to file this motion in flagrant disregard for Superior Court Rule 9A, while, as explained below, concealing their motion from the BLS Plaintiff in an attempt to have this Court resolve the motion without hearing from the BLS Plaintiff?

The answer to each of these questions is the same: the Worcester Plaintiffs, through this motion, attempt to hoodwink the Court into entering an order that they can then invoke in the BLS to argue that control over the litigation has already been decided, precluding Ms. Progin not only from exercising control over her own case but even **being heard** on that precise issue.

The Court should deny the motion to appoint interim counsel for the two Worcester cases for three independent reasons: (i) the Worcester Plaintiffs violated Massachusetts Superior Court Rule 9A; (ii) no decision on leadership should be made until this Court and the BLS Court have decided the BLS Plaintiff's attached motion to consolidate her case and the Worcester Plaintiffs' case and transfer the Worcester cases to the BLS. As discussed herein, all plaintiffs and defendants have agreed with the relief sought by that motion. The judge in the BLS should resolve any case leadership issues once the BLS judge is presiding over all three cases; and (iii) the Worcester Plaintiffs' counsels' conduct in this regard, as described herein, should at a minimum provide strong reason to defer resolution of case organization issues.

## II. BACKGROUND

### A. *Litigation and Press Relating to Tracking Technologies: the Partners Case, The Markup, and In re Meta Pixel.*

In recent years, significant litigation has emerged nationwide regarding healthcare providers' surreptitious use of so-called tracking technologies on healthcare provider websites. These tracking technologies, including Meta Pixel, Google Analytics, and several others, operate through hidden website code executed in website users' browsers, permitting third parties such as Facebook and Google to

intercept communications between healthcare providers and website users. The third parties can then use the contents of those intercepted communications for their own commercial purposes. The Worcester Plaintiffs' and the BLS Plaintiff's Complaints each assert claims against UMass Memorial Healthcare ("UMass Memorial") arising from the secret use of these tracking technologies.

Although *Doe* is the first-filed case against UMass Memorial, its claims are not new; it follows similar cases that have been filed and litigated in the Commonwealth and nationally. Within Massachusetts, the true first-filed case asserting these types of claims was *Doe v. Partners Healthcare System, Inc.* (Super. Ct. Case No. 1984CV01651-BLS1), filed in the BLS on May 23, 2019 (by counsel not involved in any of the UMass Memorial Cases). The plaintiffs in *Partners Healthcare* asserted wiretap and other claims arising from the same tracking technologies at issue in the UMass Memorial Cases, based on substantially the same factual and legal theories as in *Doe*, *Colleton*, and *Progin*. The *Doe* complaint closely tracks the substance of the *Partners Healthcare* complaint. After the Suffolk Superior Court, Business Litigation Session (Davis, J.) denied a motion to dismiss in *Partners Healthcare* case on December 7, 2020, the case settled on a class basis, and the court finally approved that settlement on January 24, 2022.

Recently, a new wave of litigation relating to healthcare providers' use of Meta Pixel and similar tracking technologies was sparked by a June 16, 2022 report by online privacy magazine The Markup that reported on the widespread use of Meta Pixel on hospital websites, implemented in a manner that posed significant concerns to patient privacy.[3] Congressional investigations and further press quickly followed in the summer of 2022,[4] bringing the serious privacy issues raised by Meta Pixel and similar tracking technologies to the forefront.

[3] "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medicalinformation-from-hospital-websites.

[4] See "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-overmetas-healthcare-data-collection-policies.

In late June 2022, the undersigned counsel for Janice Progin began investigating potential claims relating to Massachusetts healthcare providers' use of Meta Pixel. Haber Decl. ¶ 4. Later that same month and over the next several months, numerous lawsuits were filed directly against Facebook relating to the use of Meta Pixel on healthcare provider websites; those cases were consolidated in the Northern District of California. *In re Meta Pixel Healthcare Litig.*, No. 22-cv-03580-WHO, 2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022). Many other cases directly against various healthcare providers, including the UMass Memorial Cases, have followed.

B. *The UMass Memorial Cases Are Filed, Removed, and Remanded.*

The three UMass Memorial cases were each filed in late 2022, all within two months of each other:

(i) *Doe* was filed on October 24, 2022. After service on November 7, 2022, UMass Memorial removed *Doe* on November 28, 2022. The plaintiff in *Doe* did not file a motion to remand until January 6, 2023.

(ii) *Colleton* was filed in this Court on November 28, 2022; UMass Memorial removed *Colleton* on December 28, 2022. The plaintiff in *Colleton* filed a timely motion to remand on January 27, 2023.

(iii) *Progin* was filed in the BLS on December 20, 2022. UMass Memorial removed *Progin* on January 17, 2023, and Progin filed a timely motion to remand on February 16, 2023.

After UMass Memorial filed separate removal papers for each of the three related cases, and the plaintiffs in each case filed their own motion to remand, counsel for Progin spearheaded the successful effort to efficiently litigate the three remand motions, including negotiating for UMass Memorial to file a consolidated opposition and for the plaintiffs in the three related cases to submit a joint reply. Thereafter, the United States District Court (Burroughs, J.) remanded each of the three cases on July 13, 2023 (*Doe* and *Colleton* to this Court; *Progin* to the BLS).

C. *The Worcester Plaintiffs' Conduct Leading Up to this Motion*

After the federal court ordered the remand of the three UMass Memorial cases, the plaintiffs and defendants discussed the next procedural steps. UMass Memorial advised that it wanted the Worcester cases to be transferred to and consolidated with *Progin* in the BLS. Haber Decl. ¶ 6.

The plaintiffs in each of the UMass Memorial Cases agreed that the cases should be transferred to and consolidated in the BLS, and plaintiffs' counsel discussed amongst themselves how to organize a consolidated case over several meetings and telephone calls in late July and early August 2023. *Id.* ¶ 7. Those discussions, although productive, did not result in any agreement among the plaintiffs in the UMass Memorial Cases. Counsel for *Progin* (i.e., the undersigned counsel) understood that those discussions regarding case organization were ongoing; counsel for *Progin* discussed case organization issues with UMass Memorial's counsel, Elizabeth Scully, on August 8. *Id.* ¶¶ 8–9.

Before learning of the filing of the instant lead counsel motion, Ms. Progin's counsel prepared and served on all parties to the three UMass Memorial cases, pursuant to Superior Court Rule 9A, a motion to consolidate the three UMass Memorial Cases and transfer the Worcester cases to the BLS. *Id.* ¶ 11 & Haber Decl. Ex. B. This motion reflected what all parties had already agreed to and provided a procedural path forward to centralize and consolidate the cases. That motion has not yet been filed in this Court and in the BLS because the time for responses to it has not yet passed.[5] The BLS Plaintiff's motion is silent on the question of leadership, as the BLS should resolve such issues after the transfer of the Worcester Plaintiffs' cases to the BLS. *Id.*

The BLS Plaintiff provided copies of these motion papers to counsel to the Worcester Plaintiffs and UMass Memorial on August 14, 2023, seeking their assent to the motion. Tucker Merrigan, an attorney in *Doe,* indicated via email that the Worcester Plaintiffs intended to soon file a joint motion to transfer, which he indicated would make the BLS Plaintiff's motion "duplicative." Haber Decl. Ex. C. However, no such motion to transfer has been filed. The Worcester Plaintiffs have instead opted to file first the present leadership motion **on that same day as Attorney Merrigan's email saying they would be filing a motion to transfer**. Attorney Merrigan did not disclose to the BLS Plaintiff their intent to file such a motion. Attorney Merrigan's email hid from BLS Plaintiff's counsel the Worcester plaintiffs'

[5] Counsel for all defendants in all of the cases has advised that she agrees with the relief sought by Progin's motion. Counsel for the plaintiffs in the Worcester actions have also said they agree that all three cases should be consolidated in the BLS.

plan to delay seeking transfer until this Court appointed leadership without the BLS Plaintiff and her counsel knowing about or being heard on the matter. *Id.* ¶ 12. Only by checking the online docket for *Doe* and *Colleton* did the undersigned counsel discover the Worcester Plaintiffs' filing. *Id.*

Pursuant to Rule 9A, the BLS Plaintiff served the motion to consolidate and transfer the next day, August 15, 2023. Responses are due August 25, 2023. Pursuant to Rule 9A, the BLS Plaintiff's motion to consolidate and transfer has not yet been filed.

The Worcester Plaintiffs lack of candor extends to the motion submitted to this Court. They make only a passing reference to the *Progin* case without naming it, suggesting via that *Progin* is a "copycat" case filed "well after" the Worcester Plaintiffs' cases (*see* Mem. Law at 7). As an initial matter, *Progin* was filed only a few weeks after *Colleton* and fewer than two months after *Doe.* In any event, it is in no way a "copycat" case. Even a brief perusal of the *Progin* complaint (Haber Decl. Ex. A) confirms this. The complaint was drafted from scratch based on counsel's independent investigation, which began long before *Doe* was filed. Haber Decl. ¶ 13. *Progin* is no more a "copycat" of *Doe* than *Doe* is a copycat of *Partners Healthcare* or *In re Meta Pixel Healthcare.*

## III. ARGUMENT

The Court should deny the Worcester Plaintiffs' motion to appoint lead counsel for three independent reasons: (i) the Worcester Plaintiffs violated Massachusetts Superior Court Rule 9A; (ii) no decision on leadership should be made until this Court and the BLS Court have decided the BLS Plaintiff's attached motion to consolidate her case and the Worcester Plaintiffs' case with the BLS Plaintiff's case and transfer the Worcester cases to the BLS. As discussed herein, all plaintiffs and defendants have agreed with the relief sought by that motion. The judge in the BLS should resolve any case leadership issues once the BLS judge is presiding over all three cases; and (iii) the Worcester Plaintiffs' counsels' conduct in this regard, as described herein, should at a minimum provide strong reason to defer resolution of case organization issues.

A. *The Worcester Plaintiffs Failed to Comply with Superior Court Rule 9A in Multiple Respects.*

Superior Court Rule 9A is not a mere formality; it serves the important substantive purpose of limiting unnecessary motion practice, encouraging the parties to resolve their disputes amicably without court intervention, and ensuring all interested parties are notified and offered the opportunity to present their views to the Court.

As a simple matter, Superior Court Rule 9A requires the parties to ***serve*** motion papers, including an initial motion and memorandum and responsive briefs, before filing them. *See* Super. Ct. R. 9A(b). Only after a motion is fully briefed by all interested parties may it be filed. *Id.* Critically, Rule 9A requires that the moving party must serve motions not only on the named parties to the case in which they are filed but also other parties, including where "the Motion seeks an order or other relief against the non-party" **or** "**the issues" raised in the Motion "affect…interests of the non-party**." *Id.* (b)(ii) ("When service on non-parties is required.") (emphasis added). Both of those circumstances exist here.

*First*, although the motion purports to appoint "lead counsel" only in the two consolidated cases, the clear import of the motion, together with the Worcester Plaintiffs' agreement (not disclosed in the motion) to transfer their cases to the BLS, reflects a scheme to have this Court to determine a leadership structure without considering the viewpoints of all affected parties. That is, the motion and the agreed imminent transfer to the BLS seek an order "affect[ing]…the interests of" the current BLS Plaintiff that would impact their participation in the contemplated consolidated litigation in BLS.

Second, for the same reasons, the proposed relief plainly affects the BLS Plaintiff's interests. Presumptively relegating her to a nonparticipatory role in a consolidated case in the BLS affects her interest in prosecuting class litigation that may affect her rights. The potential impact of being forced to forego participation in litigation is exacerbated because Rule 23 of the Massachusetts Rules of Civil Procedure, unlike its federal counterpart, does not permit class members to opt out from participation in class litigation, *see* Mass. R. Civ. Proc. 23; *Fletcher v. Cape Cod Gas Co.*, 394 Mass. 595, 602 (1985) ("There

are no provisions in our rule 23...which would permit a judge to allow individual parties to 'opt out' of a class action.").

Notably, although the motion references a proposed order, the Worcester Plaintiffs chose not to file it publicly, preventing the BLS Plaintiff from fully responding to what precise "relief" the Worcester Plaintiffs seek, including any restrictions the proposed order would place on the BLS Plaintiff's ability to litigate her own claims or be heard on leadership. Counsel for the BLS Plaintiff has explicitly asked counsel for the Worcester Plaintiffs for all motion papers filed (including the proposed order), a request their counsel simply ignored, suggesting a lack of good faith in bringing this motion and an improper attempt to prevent the BLS Plaintiff from being heard.

B. *The BLS Should Decide Case Leadership as the Court that Will Hear the Consolidated Cases.*

The Court should deny the motion or, at a minimum, defer its resolution until it first decides whether to transfer *Doe* and *Colleton* to the BLS (which, to repeat, all parties have agreed). If the Court transfers *Doe* and *Colleton* to the BLS, then, respectfully, the BLS, not this Court, should resolve any disputes over how to organize the consolidated cases. It makes practical sense for the Court before which consolidated claims will be litigated to resolve such issues, particularly given its specialized experience as a court in complex and class action litigation, which frequently involve consolidation of multiple, overlapping cases and attendant case management issues arising from consolidation. *See Italian Colors Rest. v. Am. Express Co.*, No. C 03-3719 SI, 2003 U.S. Dist. LEXIS 20338, at *20 (N.D. Cal. Nov. 7, 2003) (denying motion to appoint lead counsel as "premature" where transfer of venue pending); *Wang v. OCZ Tech. Grp., Inc.*, No. C 11-01415 PSG, 2011 U.S. Dist. LEXIS 69803, at *4 (N.D. Cal. June 29, 2011) (appointment of interim lead counsel "premature" and "would undermine principles of judicial efficiency" before "another case is consolidated with [the] action").

Moreover, assuming the parties are unable to agree on how to organize and prosecute the consolidated cases, deferring resolution of the instant motion or denying it without prejudice for refiling in the BLS would permit Ms. Progin and her counsel an opportunity to be heard on a motion that directly

affects them. Ms. Progin and her counsel do not, through this opposition, submit a competing application for the appointment of lead counsel but would and will do so given the opportunity in the appropriate forum.

C. *The Worcester Plaintiffs' Counsel's Conduct Provides Additional Reason to Deny or Defer Their Motion*

As detailed above, counsel for the Worcester Plaintiffs have engaged in deceptive conduct directed to both the undersigned counsel and this Court in an attempt to trick the Court into resolving a dispute that should properly be resolved by the BLS after considering the views of all interested parties, including Ms. Progin. That deceptive conduct includes (i) concealing their intention to file this motion; (ii) refusing to provide Ms. Progin copies of their motion papers and the proposed order for this motion as required by Rule 9A; (iii) omitting from their motion any reference to their agreement and plan to transfer *Doe* and *Colleton* to BLS; and (iv) preemptively disparaging Ms. Progin and her counsel through several deceptive statements, without providing any record supporting their allegations that would permit the Court to investigate such disparaging statements.

This conduct provides an additional reason for this Court to deny or defer the resolution of this motion, resolve the transfer issue first, and then permit an appropriate Court to resolve any case management disputes, including permitting all interested parties an opportunity to be heard.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny the motion to appoint interim lead counsel or, at a minimum, defer its resolution until after the Court first decides Progin's attached but not-yet-filed motion to consolidate the three cases against UMass and transfer them to the BLS, which all parties have indicated they agree should be done.

Dated: August 23, 2023

Respectfully submitted,

*/s/ Edward F. Haber*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

**Counsel for Janice Progin, Plaintiff in *Progin v. UMass Memorial Healthcare, Inc.*, C.A. No. 2284cv02889 (Suffolk Superior Ct., Business Litigation Session)**

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served by email upon counsel of record for all parties to the captioned actions on August 23, 2023.

*/s/ Edward F. Haber*
Edward F. Haber

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| WORCESTER, S.S. | | SUPERIOR COURT |
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2285CV01205 |

---

COMMONWEALTH OF MASSACHUSETTS

| | | |
|---|---|---|
| WORCESTER, S.S. | | SUPERIOR COURT |
| LISA COLLETON,<br>ON BEHALF OF HERSELF<br>AND ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. 2285CV01293D |

---

**WITHDRAWAL OF MOTION TO APPOINT INTERIM CLASS COUNSEL**

Now come the plaintiffs in these consolidated cases and Withdraws its Motion to Appoint Interim Class Counsel. See Dkt. # 14.[1] Plaintiffs reserve their right to refile such a motion at a later date.

**COUNSEL FOR PLAINTIFFS AND THE PUTATIVE CLASS**

Respectfully submitted,

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
(413) 774-5300
tucker@sweeneymerrigan.com

Foster C. Johnson (*admitted pro hac vice*)
AHMAD ZAVITSANOS & MENSING PLLC
1221 McKinney Street, Suite 2500
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com

Warren Postman (pro hac pending)
Alex Dravillas (*admitted pro hac vice*)
KELLER POSTMAN LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
ajd@kellerpostman.com

[1] Plaintiffs have been served with an Opposition to the Motion to Appoint Interim Class Counsel on behalf of the plaintiff in *Progin v. UMass Memorial Healthcare, Inc.*, Case No. 2285CV01205 (Suffolk Super. Ct., Business Litigation Session). Progin's Opposition to the Motion to Appoint Interim Class Counsel filed in this case has not yet been docketed as of this filing. The plaintiffs in this case and plaintiff's counsel J. Tucker Merrigan categorically dispute Progin's description of the communications, factual allegations and legal argument as articulated in Attorney Haber's filing. The plaintiffs in this case and plaintiff's counsel J. Tucker Merrigan reserve all rights to challenge one-sided misrepresentations concerning this matter.

William P. Doyle (556999)
LAW OFFICES OF COLONNA & DOYLE
26 Main Street
Lynnfield, MA 01940
T: (781) 245-1127
F: (781) 245-1148
E: bill@colonna-doyle.com

Nicholas A. Coulson (pro hac pending)
LIDDLE SHEETS COULSON P.C.
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
E: ncoulson@lsccounsel.com

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on August 24, 2023, a copy of the foregoing Notice of Withdrawal of Motion to Appoint Interim Class Counsel was filed electronically and served on all counsel of record via email.

Respectfully Submitted,

*_/s/ J. Tucker Merrigan_*
J. Tucker Merrigan, BBO# 681627
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, MA 02210
Phone: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

E-FILED

50

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

JOHN DOE,
INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. ~~2285CV01205D~~ 23-2448-BLS1

10/13/23

10-4-23

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

LISA COLLETON,
ON BEHALF OF HERSELF
AND ALL OTHERS SIMILARLY
SITUATED,

Plaintiff

v.

UMASS MEMORIAL HEALTH CARE, INC,

Defendant.

C.A. No. ~~2285CV01293D~~ 23-2450-BLS1

## MOTION FOR ADMISSION PRO HAC VICE

Jonathan Tucker Merrigan, a member in good standing in the bar of this Court, as provided in the Local Rules, respectfully moves for the admission *pro hac vice* of Carl J. Gustafson, for the

purposes of entering an appearance on behalf of John Doe individually and on behalf of all others similarly situated. In support of this motion, the undersign counsel states as follows:

1. I am a member in good standing of the bar of this Court and have filed an appearance in the above-captioned action.
2. I move for the admission *pro hac vice* of Carl J. Gustafson to appear before this Court as co-counsel for the plaintiffs in the above captioned case.
3. As evidenced by his Affidavit attached, Mr. Gustafson is licensed to practice law in the State of Texas and Southern District of Texas. He is familiar with the local rules of this Court.

WHEREFORE, Johnathan Tucker Merrigan respectfully requests that this Honorable Court grant leave for Carl J. Gustafson to be admitted *pro hac vice* to appear on behalf of John Doe and all other similarly situated plaintiffs in this action.

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

Dated: September 11, 2023

Respectfully Submitted
By Plaintiffs' Counsel:

/s/ Jonathan T. Merrigan
J. Tucker Merrigan, BBO #681627
**Sweeney Merrigan Law, LLP**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, hereby certify that on September 11, 2023, in accordance with Superior Court Rule 9A, I served the within document(s):

- Motion for Admission Pro Hac Vice of Carl J. Gustafson, with accompanying Affidavit;

on all counsel of record, via electronic mail to the following parties of interest:

James H. Rollinson, Esq.
Elizabeth Scully, Esq.
Paul Karlsgodt, Esq.
BAKER & HOSTETLER, LLP
127 Public Square, Suite 2000
Cleveland, OH 44114
jrollinson@bakerlaw.com
escully@bakerlaw.com
pkarlsgodt@bakerlaw.com

*/s/ Jonathan T. Merrigan*
J. Tucker Merrigan

E-FILED

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| JOHN DOE,<br>INDIVIDUALLY AND ON<br>BEHALF OF ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A.No.~~2285CV01205D~~<br>23-2448-BLS1 |

---

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, S.S. SUPERIOR COURT

| | | |
|---|---|---|
| LISA COLLETON,<br>ON BEHALF OF HERSELF<br>AND ALL OTHERS SIMILARLY<br>SITUATED,<br><br>Plaintiff<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | C.A. No. ~~2285CV01293D~~<br>23-2450-BLS1 |

---

**AFFIDAVIT OF CARL J. GUSTAFSON**

I, Carl J. Gustafson, state and depose as follows:

1. I am an attorney licensed to practice in the state of Texas.

2. I am an attorney at Ahmad, Zavitsanos & Mensing, located at 1221 McKinney, Suite 2500, Houston, Texas 77010. The phone number is (713) 600-4924.

3. I was admitted to practice law in the following bars:
   a. Texas on October 8, 2021; and
   b. US District Court, Southern District of Texas on August 23, 2022.

4. I am a member of good standing and duly licensed and admitted to practice in each of the jurisdictions listed above.

5. I have never been suspended or disbarred in my jurisdictions.

6. I am familiar with the Local Rules in Massachusetts.

7. If the Court allows the Motion for me to appear *pro hac vice* in this matter, I will represent the Plaintiffs in this proceeding until the final determination thereof, and with reference to all matters, incidents, or proceedings, I agree that I shall be subject to the orders and the disciplinary action and the civil jurisdiction of this Court in all respects as if I were admitted.

Signed under the pains and penalties of perjury this 11th day of September, 2023.

Carl J. Gustafson, Esq.

Please note that ONLY THIS FORM, FILLED OUT ON THE WEBSITE, WILL BE ACCEPTED. Handwritten, annotated, copied, scanned or modified forms will be returned

# BOARD OF BAR OVERSEERS

## REGISTRATION STATEMENT FOR *PRO HAC VICE* ATTORNEYS

Attorney name (first MI last, suffix): **Carl J. Gustafson**
Email address: **cgustafson@azalaw.com**
Complete Business/Mailing Address:

**Carl J. Gustafson**
**Ahmad, Zavitsanos & Mensing**
**1221 McKinney, Suite 2500**
**Houston, Texas 77010**

Board of Bar Overseers
Administrative Use Only

Date Received: 09-19-23

Amount Paid: $355.00

Date confirmation mailed: 09-19-23

Business phone: **(713) 600-4924**

Court in which pro hac vice admission is sought: **Worcester Superior Court**

Contact number for court: **(508) 770-1899**

Party to be represented: **John Doe, Individually and on Behalf of All Others Similary Situated**

Docket number of case (if available): **2285CV01205D**

Jurisdictions to which you have been admitted: (Use second page for additional jurisdictions.)

| Type | Jurisdiction | License number |
|---|---|---|
| **State** | **Texas** | **24125261** |
| **Federal** | **US District Court, Southern District of Texas** | **3783499** |

RECEIVED
SEP 19 2023
Massachusetts Board of Bar Overseers Registration Dept.

I certify that (check one): ( ☐ ) the party I am representing in the case for which I am seeking pro hac vice admission is an indigent client, and I understand that no pro hac vice fee is due, or ( ☑ ) I have included the required pro hac vice fee.

Further, I certify, under the pains and penalties of perjury, that I am admitted to practice and in good standing in every jurisdiction where I am admitted, and I acknowledge that I am subject to discipline by the Massachusetts Supreme Judicial Court and the Board of Bar Overseers. I understand I am limited in my legal practice in Massachusetts to the case identified above.

I certify the information I have supplied the Board of Bar Overseers is true and complete.

[signature]

**Signature** (Please sign inside box above.)

**Date:** 9/5/2023

Sign, print and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

Jurisdictions continued:

**Carl J. Gustafson**

| Type | Jurisdiction | License number |
|---|---|---|
| | | |

Please remember to sign and date first page and mail original form to: Board of Bar Overseers, 99 High Street, 2nd Floor, Boston, MA 02110-2320

10/13

51

FILED

OCT 13 2023

ATTEST: [signature] CLERK

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: ~~2285CV01205~~ -D
2384CV02448-BLS1

Case: Doe v. UMass Memorial Health Care, Inc.

**NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION**

The court has previously allowed a Motion to Transfer this case to the Business Litigation Session in Suffolk County. After review of that Motion and the relevant pleadings, this case has been accepted into the Suffolk Business Litigation Session and will be assigned to **BLS1**. As soon as the original papers are received from the Clerk's Office in the county that is transferring the case (Worcester), this case will be given a new Suffolk County docket number. The parties will be notified accordingly.

Counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Discovery Project (counsel are directed to www.mass.gov/superior-court-business-litigation-session for more information on the Project). Counsel may indicate their respective client's participation by completing, filing and serving the attached form.

Dated: September 11, 2023

/s/ Kenneth W. Salinger

Kenneth W. Salinger
Justice of the Superior Court &
Administrative Justice of the Business Litigation Session

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Assistant Clerk

ORIG. MAILED TO WORCESTER COUNTY ON 09.12.23
RESENT ON 10.11.23

**Commonwealth of Massachusetts**
**County of Suffolk**
**The Superior Court – Business Litigation Session**

CIVIL DOCKET#: ______________________

Case: ____________________________________________

As you may know, the Business Litigation Session began implementing a Discovery Project in January, 2010. This project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the project with the Court at the initial case management conference. For a detailed copy of the BLS Discovery Project, counsel are directed to the Trial Court home page at: www.mass.gov/superior-court-business-litigation-session)

If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

___ (Check) Yes, _______________ is willing to participate in the Discovery Project.
(Party's Name)

Case Name ____________________________________________

Docket Number CIVIL DOCKET#: ____________________________

Counsel For ____________________ Date ______________

Firm Name and Address:

______________________________

______________________________

______________________________

Please complete this form and return it to:

Assistant Clerk - BLS1
BLS1, Room 1309
3 Pemberton Square
Boston, MA 02108

**OR**

Assistant Clerk - BLS2
BLS2, Room 1017
3 Pemberton Square
Boston, MA 02108

Commonwealth of Massachusetts
County of Worcester
The Superior Court

52

CIVIL DOCKET# ~~2285CV1205-D~~
2384CV02448-BLS1

RE: **Doe vs. UMass Memorial Health Care, Inc.**

TO: **Superior Court Business Litigation Session**
**Suffolk County Superior Court**
**3 Pemberton Square, Suite 13**
**Boston, Massachusetts 02108**

## ORDER TO TRANSFER

This action came on before the Court, **Karen Goodwin**, **Justice**, upon **Motion to Consolidate and Transfer to Business Litigation Session**, which was filed, allowed, and accepted by **Kenneth W. Salinger**, **Justice** of the Superior Court & Administrative Justice of the Business Litigation Session, and it appearing to the Court therefrom that a Transfer is indicated, upon consideration thereof,

It is ORDERED and ADJUDGED:

That the above-entitled action be transferred to **Superior Court Business Litigation Session.**

Dated at Worcester, Massachusetts this **23rd day of October 2023.**

**I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.**
**John E. Powers, III**
**Clerk Magistrate**
**SUFFOLK SUPERIOR CIVIL COURT**
**DEPARTMENT OF THE TRIAL COURT**
**BY:** ______________
Assistant Clerk

Dennis P. McManus,
Clerk of the Courts

BY: ______________
Assistant Clerk

smr/

Entered and Copies Mailed 10/23/23

2384CV02448BLS1

CourtView Justice Solutions — Worcester County

# Civil Case Summary

**2285CV01205 Doe, Ind. And ON Behalf Of All Others, John vs. Umass Memorial Health Care, Inc.**

## Case Information

File Date 10/24/2022
Case Disposition Transferred to another Court
Category
Track F - Fast Track
Case Status Closed
Case Disposition Date 10/23/2023
Action Other Tortious Action
SCR Elapsed Days 365
Case Status Date 07/26/2023
Case Judge
Session Civil D

## Party Information: 5

| Party Name<br>Party Alias(es) | Party Type | Party Role | Attorney(s) |
|---|---|---|---|
| Doe, Ind. And ON Behalf Of All Others, John | Plaintiff | | Gustafson, Carl J<br>Aguiniga, Esq., Sara<br>Johnson, Foster C<br>Warden, David E<br>Campbell, Nathan B<br>McHugh, Esq., Erin E<br>Santoro, Esq., Victoria M<br>Merrigan, Esq., Jonathan Tucker |
| Umass Memorial Health Care, Inc. | Defendant | | Paterniti, Esq., Stephen<br>Rollinson, Esq., James Hefferan |
| Meyer, Seth | Other interested party | | |
| Dravillas, Alex | Other interested party | | |
| Progin, Janice | Other interested party | | Haber, Esq., Edward F |

## Alert(s) 0

## Case Schedule: 0 Displaying 0 Records

## Subsequent Actions/Subject: 0

## Service Summary: 0

## Fee Generating: 0

## Linked Case(s): 1

| Link Group | Case Number | Case Caption | Linked Reason | Linked Role | Site |
|---|---|---|---|---|---|

A true copy by photostatic process
Attest: Asst. Clerk

| Link Group | Case Number | Case Caption | Linked Reason | Linked Role | Site |
|---|---|---|---|---|---|
| 2285CV01205 | 2285CV01293 | Colleton, Lisa vs. Umass Memorial Health Care, Inc. | Related Cases | Related Case | Worcester County |

**Financial: 1 Displaying 1 Records Amount Due: .00 A/R Amount Due: .00 Holding Money Balance On-Hand: .00**

| Receipt Number | Date | Received From | Amount Paid |
|---|---|---|---|
| 33954 | 10/25/2022 | | 280.00 |

**Ticklers: 0**

**DCM: 1**

| DCM Track | Effective Date | Tickler | Due Date | Completion Date | Entered By |
|---|---|---|---|---|---|
| F - Fast Track | 10/24/2022 | Service | 01/23/2023 | 03/23/2023 | CLAMOTHE |
| | | Answer | 02/21/2023 | 03/23/2023 | CLAMOTHE |
| | | Rule 12/19/20 Served By | 02/21/2023 | 03/23/2023 | CLAMOTHE |
| | | Rule 12/19/20 Filed By | 03/23/2023 | 03/23/2023 | CLAMOTHE |
| | | Rule 12/19/20 Heard By | 04/24/2023 | 03/23/2023 | CLAMOTHE |
| | | Rule 15 Served By | 02/21/2023 | 03/23/2023 | CLAMOTHE |
| | | Rule 15 Filed By | 03/23/2023 | 03/23/2023 | CLAMOTHE |
| | | Rule 15 Heard By | 04/24/2023 | 03/23/2023 | CLAMOTHE |
| | | Discovery | 08/21/2023 | 03/23/2023 | CLAMOTHE |
| | | Rule 56 Served By | 09/19/2023 | 03/23/2023 | CLAMOTHE |
| | | Rule 56 Filed By | 10/19/2023 | 03/23/2023 | CLAMOTHE |
| | | Final Pre-Trial Conference | 02/16/2024 | 03/23/2023 | CLAMOTHE |
| | | Judgment | 10/23/2024 | 03/23/2023 | CLAMOTHE |

**Case Disposition(s): 1**

| STATUS | Status Date | Disposition | Disposition Date | Action Code |
|---|---|---|---|---|
| Closed | 07/26/2023 | Transferred to another Court | 10/23/2023 | Other Tortious Action |

**Docket Entries: 97 Displaying 40 Records**

| Date | File Ref Nbr | Journal Book | Docket Text | Judge | Amount Due | Image |
|---|---|---|---|---|---|---|
| 10/23/2023 | 22 | | ORDER: TO TRANSFER It is ORDERED and ADJUDGED: That the above-entitled action be transferred to Superior Court Business Litigation Session. See Order Entered and Copies mailed 10/23/23 | Goodwin, Hon. Karen | | |
| 10/13/2023 | 21 | | ORDER: /NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION Counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Discovery Project (counsel are directed to www.mass.gov/superior-court-business-litigation-session for more information on the Project). Counsel may indicate their respective client's participation by completing, filing and servicing the attached form. (see notice) Copy mailed on 10/23/2023. | Salinger, Hon. Kenneth W | | |
| 10/13/2023 | | | Attorney appearance On this date Carl J Gustafson added for Plaintiff John Doe, Ind. And ON Behalf Of All Others | | | |
| 10/13/2023 | | | EDocument sent: Clerk's Notice (eDoc) Sent On: 10/13/2023 10:44:33 Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com Notice | | | |

A true copy by photostatic process
Attest:
Asst. Clerk

| Date | File Ref Nbr | Journal Book | | Docket Text | Judge | Amount Due | Image |
|---|---|---|---|---|---|---|---|
| | | | | Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005 Notice Sent To: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com Notice Sent To: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com Notice Sent To: Edward F Haber, Esq. ehaber@shulaw.com | | | |
| 10/04/2023 | | | | Endorsement on Motion for Admission Pro Hac Vice (#20.0): ALLOWED Notices mailed 10/13/23 Judge: Wrenn, Hon. Daniel M | Wrenn, Hon. Daniel M | | |
| 10/02/2023 | | | | General correspondence regarding mail returned/unable to forward Applies To: Aguiniga, Esq., Sara (Attorney) on behalf of Doe, Ind. And ON Behalf Of All Others, John (Plaintiff) | | | |
| 09/26/2023 | 20.4 | | | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Certificate of service (E-FILED) | | | |
| 09/26/2023 | 20.3 | | | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Notice of filing and listing of documents (E-FILED) | | | |
| 09/26/2023 | 20.2 | | | Affidavit in compliance with Superior Court Rule 9A (E-FILED) | | | |
| 09/26/2023 | 20.1 | | | Affidavit of Carl J. Gustafson (E-FILED) | | | |
| 09/26/2023 | 20 | | | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Motion for admission pro hac vice (E-FILED) | | | |
| 09/18/2023 | | | | General correspondence regarding mail returned/unable to forward Applies To: Aguiniga, Esq., Sara (Attorney) on behalf of Doe, Ind. And ON Behalf Of All Others, John (Plaintiff) | | | |
| 09/14/2023 | | | | General correspondence regarding mail returned/unable to forward Applies To: Aguiniga, Esq., Sara (Attorney) on behalf of Doe, Ind. And ON Behalf Of All Others, John (Plaintiff) | | | |
| 09/12/2023 | | | | EDocument sent: Clerk's Notice (eDoc) Sent On: 09/12/2023 10:45:18 Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005 Notice Sent To: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com Notice Sent To: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com Notice Sent To: Edward F Haber, Esq. ehaber@shulaw.com | | | |
| 09/06/2023 | | | | Endorsement on Motion to Consolidate and Transfer Cases to the Business Litigation Session (#19.0): ALLOWED Allowed to the extend this is constructed as a motion to transfer Civil Action No. 2285cv1293 to the Business Litigation Session (BLS). The transfer will not take place, however, unless and until the BLS accepts the case. This court previously allowed the motion to transfer Civil Action No. 2285cv1205 to the Business Litigation Session, similarly, is subject to | Goodwin, Hon. Karen | | |

A true copy by photostatic process
Attest: Asst. Clerk

| Date | File Ref Nbr | Journal Book | | Docket Text | Judge | Amount Due | Image | |
|---|---|---|---|---|---|---|---|---|
| | | | | acceptance by the BLS. No action taken on the motion to consolidate in the BLS because that decision will be made in the BLS if it accepts transfer. Notices mailed 9/12/23 Judge: Goodwin, Hon. Karen | | | | |
| 08/31/2023 | 19.4 | | | Rule 9A notice of filing | | | | |
| 08/31/2023 | 19.3 | | | Reply/Sur-reply Reply in support of Janice Progin's motion to consolidate and transfer cases to the business litigation session | | | | |
| 08/31/2023 | 19.2 | | | Opposition to to Janice Progin's motion to consolidate and transfer cases to the business litigation session (p#19) filed by Umass Memorial Health Care, Inc. | | | | |
| 08/31/2023 | 19.1 | | | Janice Progin's Memorandum in support of motion to consolidate and transfer cases to the business litigation session | | | | |
| 08/31/2023 | 19 | | | Other Interested Party Janice Progin's Motion to consolidate and transfer cases to the Business Litigation session | | | | |
| 08/31/2023 | | | | EDocument sent: Clerk's Notice (eDoc) Sent On: 08/31/2023 15:11:41 Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005 Notice Sent To: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com Notice Sent To: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com Notice Sent To: Edward F Haber, Esq. ehaber@shulaw.com | | | | |
| 08/29/2023 | | | | Endorsement on Motion to Transfer to the Business Litigation Section (#15.0): ALLOWED Allowed contingent on acceptance by the BLS in accordance with S.Ct. Ad. Directive 17-1. Notices mailed 8/31/23 Judge: Goodwin, Hon. Karen | Goodwin, Hon. Karen | | | |
| 08/28/2023 | | | | EDocument sent: Clerk's Notice (eDoc) Sent On: 08/28/2023 14:52:25 Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005 Notice Sent To: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com Notice Sent To: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com Notice Sent To: Edward F Haber, Esq. ehaber@shulaw.com | | | | |
| 08/28/2023 | | | | | | | | |

A true copy by photostatic process
Attest:
Asst. Clerk

| Date | File Ref Nbr | Journal Book | | Docket Text | Judge | Amount Due | Image | |
|---|---|---|---|---|---|---|---|---|
| | | | | Endorsement on Motion to Appoint Interim Class Counsel (#14.0): Withdrawn Withdrawn by moving counsel. See pleading #18. Notices mailed 8/28/23 Judge: Goodwin, Hon. Karen | Goodwin, Hon. Karen | | | |
| 08/24/2023 | 18 | | | Plaintiffs John Doe, Ind. And ON Behalf Of All Others's Submission of Withdrawal of Motion to Appoint Interim Class Counsel (E-FILED) | | | | |
| 08/24/2023 | 17.1 | | | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Declaration of Edward F. Haber regarding Janice Progin's opposition to motion to appoint interim class counsel | | | | |
| 08/24/2023 | 17 | | | Opposition to to motion to appoint interim class counsel (p#14) filed by Janice Progin | | | | |
| 08/24/2023 | 16 | | | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Notice of appearance of Edward F. Haber on behalf of interested party Janice Progin | | | | |
| 08/24/2023 | 15.1 | | | John Doe, Ind. And ON Behalf Of All Others's Memorandum in Support of Plaintiffs' Motion to Transfer Cases to the Business Litigation Section (E-FILED) | | | | |
| 08/24/2023 | 15 | | | Plaintiff, Defendant John Doe, Ind. And ON Behalf Of All Others's Assented to Motion to Transfer to the Business Litigation Section (E-FILED) | | | | |
| 08/18/2023 | | | | EDocument sent: Clerk's Notice (eDoc) Sent On: 08/18/2023 11:22:58 Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010 Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005 Notice Sent To: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com Notice Sent To: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com | | | | |
| 08/17/2023 | | | | Endorsement on Motion to Consolidate (#13.0): ALLOWED Notices mailed 8/18/23 Judge: Goodwin, Hon. Karen | Goodwin, Hon. Karen | | | |
| 08/15/2023 | 14.8 | | | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Certificate of Service [E-FILED] | | | | |
| 08/15/2023 | 14.7 | | | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Submission of Rule 9A Notice of Filing and Listing of Documents [E-FILED] | | | | |
| 08/15/2023 | 14.6 | | | Affidavit of Compliance with Superior Court Rule 9A [E-FILED] | | | | |
| 08/15/2023 | 14.5 | | | Declaration of Nicholas Coulson in Support of Plaintiffs' Motion to Appoint Interim Class Counsel [E-FILED] | | | | |
| 08/15/2023 | 14.4 | | | Declaration of Foster Johnson in Support of Plaintiffs' Motion to Appoint Interim Class Counsel [E-FILED] | | | | |
| 08/15/2023 | 14.3 | | | | | | | |

A true copy by photostatic process
Attest:
Asst. Clerk

| Date | File Ref Nbr | Journal Book | | Docket Text | Judge | Amount Due | Image | |
|---|---|---|---|---|---|---|---|---|
| | | | | Declaration of Warren Postman in Support of Plaintiffs' Motion to Appoint Interim Class Counsel [E-FILED] | | | | |
| 08/15/2023 | 14.2 | | | Declaration of J. Tucker Merrigan in Support of Plaintiffs' Motion to Appoint Interim Class Counsel [E-FILED] | | | | |
| 08/15/2023 | 14.1 | | | John Doe, Ind. And ON Behalf Of All Others's Memorandum in support of Motion to Appoint Interim Class Counsel [E-FILED] | | | | |

Case Notes : 0

Copyright © 2023 CourtView Justice Solutions, Inc., an equivant company

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY:
Assistant Clerk

A true copy by photostatic process
Attest:
Asst. Clerk

COMMONWEALTH OF MASSACHUSETTS
WORCESTER COUNTY
Docket Report

2384CV02448-BLS1

**2285CV01205 Doe, Ind. And ON Behalf Of All Others, John vs. Umass Memorial Health Care, Inc.**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Torts | **FILE DATE:** | 10/24/2022 |
| **ACTION CODE:** | B99 | **CASE TRACK:** | F - Fast Track |
| **DESCRIPTION:** | Other Tortious Action | | |
| **CASE DISPOSITION DATE:** | 10/23/2023 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 07/26/2023 |
| **CASE JUDGE:** | | **CASE SESSION:** | Civil D |

**PARTIES**

COMMONWEALTH OF MASSACHUSETTS
WORCESTER COUNTY
Docket Report

| Plaintiff | Attorney |
| --- | --- |
| Doe, Ind. And ON Behalf Of All Others, John | **Attorney** 679120<br>Victoria M Santoro<br>Sweeney Merrigan Law<br>Sweeney Merrigan Law<br>268 Summer St LL<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 10/24/2022<br>**Attorney** 681627<br>Jonathan Tucker Merrigan<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 10/24/2022<br>**Attorney** 703701<br>Erin E McHugh<br>Sweeney Merrigan Law, LLP<br>Sweeney Merrigan Law, LLP<br>268 Summer St<br>Boston, MA 02210<br>Work Phone (617) 391-9001<br>Added Date: 10/24/2022<br>**Attorney** HV24097455TX<br>Nathan B Campbell<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 07/21/2023<br>**Attorney** HV24076463TX<br>Foster C Johnson<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 07/21/2023<br>**Attorney** HV20856750TX<br>David E Warden<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Added Date: 07/21/2023<br>**Attorney** PHV1029692DC<br>Sara Aguiniga<br>Keller Postman LLC<br>1100 Vermon Avenue, N.W.<br>12th Floor<br>Washington, DC 20005<br>Work Phone (209) 918-1123 |

**COMMONWEALTH OF MASSACHUSETTS**
**WORCESTER COUNTY**
**Docket Report**

| | |
|---|---|
| | Added Date: 07/21/2023 |
| | **Attorney** HV24125261TX<br>Carl J Gustafson<br>Ahmad, Zavitsanos & Mensing, P.C.<br>1221 McKinney<br>Suite 2500<br>Houston, TX 77010<br>Work Phone (713) 600-4924<br>Added Date: 10/13/2023 |
| **Defendant**<br>Umass Memorial Health Care, Inc.<br>365 Plantation Street<br>Worcester, MA 01605 | **Attorney** 649407<br>James Hefferan Rollinson<br>Baker and Hostetler LLP<br>Baker and Hostetler LLP<br>Key Tower<br>127 Public Square Suite 2000<br>Cleveland, OH 44114-1214<br>Work Phone (216) 621-0200<br>Added Date: 11/28/2022<br>**Attorney** 564860<br>Stephen Paterniti<br>Jackson Lewis PC<br>Jackson Lewis PC<br>75 Park Plaza 4th Floor<br>Boston, MA 02116<br>Work Phone (617) 367-0025<br>Added Date: 07/21/2023 |
| **Other interested party**<br>Dravillas, Alex | |
| **Other interested party**<br>Meyer, Seth<br>Keller Postman LLC<br>150 N. Riverside Plaza<br>Suite 4100<br>Chicago, IL 60606 | |
| **Other interested party**<br>Progin, Janice | **Attorney** 215620<br>Edward F Haber<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 08/24/2023 |

COMMONWEALTH OF MASSACHUSETTS
WORCESTER COUNTY
Docket Report

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 10/24/2022 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 33954 Date: 10/25/2022<br><br>(Mailed 1 Summons to Attorney Merrigan on 10/25/2022) | 5.00 | 5.00 | 0.00 | 0.00 |
| 10/25/2022 | Civil Filing Fee (per Plaintiff) Receipt: 33954 Date: 10/25/2022 | 240.00 | 240.00 | 0.00 | 0.00 |
| 10/25/2022 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 33954 Date: 10/25/2022 | 20.00 | 20.00 | 0.00 | 0.00 |
| 10/25/2022 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 33954 Date: 10/25/2022 | 15.00 | 15.00 | 0.00 | 0.00 |
| 12/30/2022 | Fee for attested copies of court documents and records assessed, G.L. c. 262 § 4b.<br><br>Dismissed Type: Assessment removed - entered as clerical error<br>Dismissed Date: 12/30/2022<br>Dismissed Amount: 182.50<br>Dismissing Clerk / Judge: Unassigned<br>Dismissed By: LMBOOK85 | 182.50 | 0.00 | 182.50 | 0.00 |
| | **Total** | **462.50** | **280.00** | **182.50** | **0.00** |

COMMONWEALTH OF MASSACHUSETTS
WORCESTER COUNTY
Docket Report

INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|---|---|---|---|
| 10/24/2022 | 1 | Complaint electronically filed. | |
| 10/24/2022 | 2 | Civil action cover sheet filed. | |
| 10/24/2022 | | Class action filed under Mass. R. Civ. P. 23 | |
| 10/24/2022 | | Attorney appearance<br>On this date Victoria M Mair, Esq. added for Plaintiff John Doe, Ind. And ON Behalf Of All Others | |
| 10/24/2022 | | Attorney appearance<br>On this date Erin E McHugh, Esq. added for Plaintiff John Doe, Ind. And ON Behalf Of All Others | |
| 10/25/2022 | | Case assigned to:<br>DCM Track F - Fast Track was added on 10/25/2022 | |
| 10/25/2022 | | EDocument sent:<br>A Tracking Order was generated and sent to:<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com | |
| 10/25/2022 | 3 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Motion for impoundment of personal identifying information<br>(E-FILED) | |
| 10/25/2022 | 3.1 | Affidavit of attorney J. Tucker Merrigan in support of Plaintiff's motion for impoundment of personal identifying information<br>(E-FILED) | |
| 10/31/2022 | | Endorsement on Motion for Impoundment of Personal Identifying Information (#3.0): DENIED<br>Denied at this time. The defendant has not yet filed an answer to the complaint. This motion has not been served pursuant to Rule 9A and thus there is no identifying information in the court file. Notices mailed 11/3/22<br><br>Judge: Reardon, Jr., Hon. James G | Reardon |
| 11/03/2022 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Mair, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com | |
| 11/18/2022 | 4 | Service Returned for UMass Memorial Healthcare, Inc. by email to Judy Anti, agent, person in charge at the time of service at July.Anti@UMassMemorial.org (working remotely) on 11/7/2022<br>(E-FILED)<br><br>Applies To: Umass Memorial Health Care, Inc. (Defendant) | |
| 11/28/2022 | | Attorney appearance<br>On this date James Hefferan Rollinson, Esq. added for Defendant Umass Memorial Health Care, Inc. | |

| | | |
|---|---|---|
| 11/28/2022 | 5 | Defendant Umass Memorial Health Care, Inc.'s Notice of Filing of Notice of Removal<br>(E-FILED)<br><br>Applies To: Umass Memorial Health Care, Inc. (Defendant) |
| 12/07/2022 | 6 | Notice of Removal to the United States District Court filed by<br><br>Applies To: Umass Memorial Health Care, Inc. (Defendant) |
| 12/30/2022 | 7 | General correspondence regarding copies of removal mailed 12/30/22 |
| 01/25/2023 | 8 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Motion for admission pro hac vice<br>(E-FILED)<br><br>Applies To: Warden, David (Other interested party) |
| 01/25/2023 | 8.1 | Affidavit of David Warden<br>(E-FILED) |
| 01/25/2023 | 9 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Motion for admission pro hac vice<br>(E-FILED)<br><br>Applies To: Meyer, Seth (Other interested party) |
| 01/25/2023 | 9.1 | Affidavit of Seth Meyer<br>(E-FILED) |
| 01/25/2023 | 10 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Motion for admission pro hac vice<br>(E-FILED)<br><br>Applies To: Johnson, Foster (Other interested party) |
| 01/25/2023 | 10.1 | Affidavit of Foster Johnson<br>(E-FILED) |
| 01/25/2023 | 11 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Motion for admission pro hac vice<br>(E-FILED)<br><br>Applies To: Dravillas, Alex (Other interested party) |
| 01/25/2023 | 11.1 | Affidavit of Alex Dravillas<br>(E-FILED) |
| 01/25/2023 | 12 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Motion for admission pro hac vice<br>(E-FILED)<br><br>Applies To: Campbell, Nathan (Other interested party) |
| 01/25/2023 | 12.1 | Affidavit of Nathan Campbell<br>(E-FILED) |

| | | | |
|---|---|---|---|
| 01/25/2023 | 12.2 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Notice of filing and list of documents<br>(pertains to paper #8-12)<br>(E-FILED) | |
| 01/25/2023 | 12.3 | Affidavit of compliance with Superior Court Rule 9A<br>(pertains to paper #8-12)<br>(E-FILED) | |
| 01/25/2023 | 12.4 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Certificate of service (of motions)<br>(pertains to paper #8-12)<br>(E-FILED) | |
| 01/25/2023 | 12.5 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Certificate of service (of 9A documents)<br>(E-FILED) | |
| 01/31/2023 | | Endorsement on Motion for pro hac vice of David Warden (#8.0): ALLOWED<br>Notice Sent 2/17/23<br><br>Judge: Bucci, Hon. Jeremy C | Bucci |
| 01/31/2023 | | Endorsement on Motion for admission pro hac vice of Foster Johnson (#10.0): ALLOWED<br>Notice Sent 2/17/23<br><br>Judge: Bucci, Hon. Jeremy C | Bucci |
| 01/31/2023 | | Endorsement on Motion for admission pro hac vice of Seth Meyer (#9.0): ALLOWED<br>Notice Sent 2/17/23 | Bucci |
| 01/31/2023 | | Endorsement on Motion for admission pro hac vice of Alex Dravillas (#11.0): ALLOWED<br>Notice Sent 2/17/23<br><br>Judge: Bucci, Hon. Jeremy C | Bucci |
| 01/31/2023 | | Endorsement on Motion for admission pro hac vice of Nathan Campbell (#12.0): ALLOWED<br>Notice Sent 2/17/23<br><br>Judge: Bucci, Hon. Jeremy C | Bucci |
| 02/17/2023 | | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Mair, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Other interested party: David Warden Ahmad, Zavitsanos & Mensing 1221 McKinney Suite 2500, Houston, TX 77010 | |

| | |
|---|---|
| 02/17/2023 | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Mair, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Other interested party: Seth Meyer sam@kellerpostman.com |
| 02/17/2023 | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Mair, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Other interested party: Foster Johnson fjohnson@azalaw.com |
| 02/17/2023 | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Mair, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Other interested party: Alex Dravillas ajd@kellerpostman.com |
| 02/17/2023 | EDocument sent:<br>A Clerk's Notice (eDoc) was generated and sent to:<br>Plaintiff, Attorney: Victoria M Mair, Esq. victoria@sweeneymerrigan.com<br>Plaintiff, Attorney: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Plaintiff, Attorney: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Defendant, Attorney: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Other interested party: Nathan Campbell ncampbell@azalaw.com |
| 03/23/2023 | Case transferred to another court. |
| 07/21/2023 | Attorney appearance<br>On this date Seth A Meyer added for Plaintiff John Doe, Ind. And ON Behalf Of All Others |
| 07/21/2023 | Attorney appearance<br>On this date David E Warden added for Plaintiff John Doe, Ind. And ON Behalf Of All Others |
| 07/21/2023 | Attorney appearance<br>On this date Foster C Johnson added for Plaintiff John Doe, Ind. And ON Behalf Of All Others |
| 07/21/2023 | Attorney appearance<br>On this date Nathan B Campbell added for Plaintiff John Doe, Ind. And ON Behalf Of All Others |

| | | |
|---|---|---|
| 07/21/2023 | | Attorney appearance<br>On this date Sara Aguiniga, Esq. added for Plaintiff John Doe, Ind. And ON Behalf Of All Others |
| 07/21/2023 | | Attorney appearance<br>On this date Stephen Paterniti, Esq. added for Defendant Umass Memorial Health Care, Inc. |
| 07/21/2023 | | Remanded to the Superior Court from the U.S. District Court.<br><br>ORDER OF REMAND:<br>In accordance with this court's memorandum and order dated July 13, 2023, granting the plaintiffs' motion to remand, it is hereby ordered that this case be remanded to Worcester County Superior Court for further proceedings.<br><br>(see order)<br><br>(Burroughs, DJ.) |
| 07/26/2023 | | Case transferred to another court. |
| 08/08/2023 | | Attorney withdrawal of appearance electronically filed.<br><br>Applies To: Meyer, Seth A (Attorney) on behalf of Doe, Ind. And ON Behalf Of All Others, John (Plaintiff) |
| 08/14/2023 | 13 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Joint Motion to Consolidate [with Colleton vs. UMass Memorial Healthcare, Inc., No. 2285CV01293D]<br>(E-FILED) |
| 08/15/2023 | 14 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Motion to Appoint Interim Class Counsel<br>[E-FILED] |
| 08/15/2023 | 14.1 | John Doe, Ind. And ON Behalf Of All Others's Memorandum in support of Motion to Appoint Interim Class Counsel<br>[E-FILED] |
| 08/15/2023 | 14.2 | Declaration of J. Tucker Merrigan in Support of Plaintiffs' Motion to Appoint Interim Class Counsel<br>[E-FILED] |
| 08/15/2023 | 14.3 | Declaration of Warren Postman in Support of Plaintiffs' Motion to Appoint Interim Class Counsel<br>[E-FILED] |
| 08/15/2023 | 14.4 | Declaration of Foster Johnson in Support of Plaintiffs' Motion to Appoint Interim Class Counsel<br>[E-FILED] |
| 08/15/2023 | 14.5 | Declaration of Nicholas Coulson in Support of Plaintiffs' Motion to Appoint Interim Class Counsel<br>[E-FILED] |
| 08/15/2023 | 14.6 | Affidavit of Compliance with Superior Court Rule 9A<br>[E-FILED] |

| | | | |
|---|---|---|---|
| 08/15/2023 | 14.7 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Submission of Rule 9A Notice of Filing and Listing of Documents [E-FILED] | |
| 08/15/2023 | 14.8 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Certificate of Service [E-FILED] | |
| 08/17/2023 | | Endorsement on Motion to Consolidate (#13.0): ALLOWED<br>Notices mailed 8/18/23<br><br>Judge: Goodwin, Hon. Karen | Goodwin |
| 08/18/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 08/18/2023 11:22:58<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Notice Sent To: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com | |
| 08/24/2023 | 15 | Plaintiff, Defendant John Doe, Ind. And ON Behalf Of All Others's Assented to Motion to<br>Transfer to the Business Litigation Section<br>(E-FILED) | |
| 08/24/2023 | 15.1 | John Doe, Ind. And ON Behalf Of All Others's Memorandum<br>in Support of Plaintiffs' Motion to Transfer Cases to the Business Litigation Section<br>(E-FILED) | |
| 08/24/2023 | 16 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Notice of appearance of Edward F. Haber on behalf of interested party Janice Progin | |
| 08/24/2023 | 17 | Opposition to to motion to appoint interim class counsel (p#14) filed by Janice Progin | |
| 08/24/2023 | 17.1 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Declaration of Edward F. Haber regarding Janice Progin's opposition to motion to appoint interim class counsel | |
| 08/24/2023 | 18 | Plaintiffs John Doe, Ind. And ON Behalf Of All Others's Submission of Withdrawal of Motion to Appoint Interim Class Counsel<br>(E-FILED) | |

| | | | |
|---|---|---|---|
| 08/28/2023 | | Endorsement on Motion to Appoint Interim Class Counsel (#14.0): Withdrawn<br>Withdrawn by moving counsel. See pleading #18. Notices mailed 8/28/23<br><br>Judge: Goodwin, Hon. Karen | Goodwin |
| 08/28/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 08/28/2023 14:52:25<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Notice Sent To: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com<br>Notice Sent To: Edward F Haber, Esq. ehaber@shulaw.com | |
| 08/29/2023 | | Endorsement on Motion to Transfer to the Business Litigation Section (#15.0): ALLOWED<br>Allowed contingent on acceptance by the BLS in accordance with S.Ct. Ad. Directive 17-1. Notices mailed 8/31/23<br><br>Judge: Goodwin, Hon. Karen | Goodwin |
| 08/31/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 08/31/2023 15:11:41<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Notice Sent To: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com<br>Notice Sent To: Edward F Haber, Esq. ehaber@shulaw.com | |
| 08/31/2023 | 19 | Other Interested Party Janice Progin's Motion to consolidate and transfer cases to the Business Litigation session | |

| | | | |
|---|---|---|---|
| 08/31/2023 | 19.1 | Janice Progin's Memorandum in support of<br>motion to consolidate and transfer cases to the business litigation session | |
| 08/31/2023 | 19.2 | Opposition to to Janice Progin's motion to consolidate and transfer cases to the business litigation session (p#19) filed by Umass Memorial Health Care, Inc. | |
| 08/31/2023 | 19.3 | Reply/Sur-reply<br><br>Reply in support of Janice Progrin's motion to consolidate and transfer cases to the business litigation session | |
| 08/31/2023 | 19.4 | Rule 9A notice of filing | |
| 09/06/2023 | | Endorsement on Motion to Consolidate and Transfer Cases to the Business Litigation Session (#19.0): ALLOWED<br>Allowed to the extend this is constructed as a motion to transfer Civil Action No. 2285cv1293 to the Business Litigation Session (BLS). The transfer will not take place, however, unless and until the BLS accepts the case. This court previously allowed the motion to transfer Civil Action No. 2285cv1205 to the Business Litigation Session, similarly, is subject to acceptance by the BLS. No action taken on the motion to consolidate in the BLS because that decision will be made in the BLS if it accepts transfer. Notices mailed 9/12/23<br><br>Judge: Goodwin, Hon. Karen | Goodwin |
| 09/12/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 09/12/2023 10:45:18<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Notice Sent To: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com<br>Notice Sent To: Edward F Haber, Esq. ehaber@shulaw.com | |
| 09/14/2023 | | General correspondence regarding mail returned/unable to forward<br><br>Applies To: Aguiniga, Esq., Sara (Attorney) on behalf of Doe, Ind. And ON Behalf Of All Others, John (Plaintiff) | |
| 09/18/2023 | | General correspondence regarding mail returned/unable to forward<br><br>Applies To: Aguiniga, Esq., Sara (Attorney) on behalf of Doe, Ind. And ON Behalf Of All Others, John (Plaintiff) | |

| | | | |
|---|---|---|---|
| 09/26/2023 | 20 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Motion for admission pro hac vice<br>(E-FILED) | |
| 09/26/2023 | 20.1 | Affidavit of Carl J. Gustafson<br>(E-FILED) | |
| 09/26/2023 | 20.2 | Affidavit in compliance with Superior Court Rule 9A<br>(E-FILED) | |
| 09/26/2023 | 20.3 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Notice of filing and listing of documents<br>(E-FILED) | |
| 09/26/2023 | 20.4 | Plaintiff John Doe, Ind. And ON Behalf Of All Others's Certificate of service<br>(E-FILED) | |
| 10/02/2023 | | General correspondence regarding mail returned/unable to forward<br><br>Applies To: Aguiniga, Esq., Sara (Attorney) on behalf of Doe, Ind. And ON Behalf Of All Others, John (Plaintiff) | |
| 10/04/2023 | | Endorsement on Motion for Admission Pro Hac Vice (#20.0): ALLOWED<br>Notices mailed 10/13/23<br><br>Judge: Wrenn, Hon. Daniel M | Wrenn |
| 10/13/2023 | | EDocument sent:<br><br>Clerk's Notice (eDoc)<br>Sent On: 10/13/2023 10:44:33<br>Notice Sent To: Victoria M Santoro, Esq. victoria@sweeneymerrigan.com<br>Notice Sent To: Jonathan Tucker Merrigan, Esq. tucker@sweeneymerrigan.com<br>Notice Sent To: Erin E McHugh, Esq. emchugh@sweeneymerrigan.com<br>Notice Sent To: Nathan B Campbell 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Foster C Johnson 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: David E Warden 1221 McKinney Suite 2500, Houston, TX 77010<br>Notice Sent To: Sara Aguiniga, Esq. 1100 Vermon Avenue, N.W. 12th Floor, Washington, DC 20005<br>Notice Sent To: James Hefferan Rollinson, Esq. jrollinson@bakerlaw.com<br>Notice Sent To: Stephen Paterniti, Esq. stephen.paterniti@jacksonlewis.com<br>Notice Sent To: Edward F Haber, Esq. ehaber@shulaw.com | |
| 10/13/2023 | | Attorney appearance<br>On this date Carl J Gustafson added for Plaintiff John Doe, Ind. And ON Behalf Of All Others | |

| | | | |
|---|---|---|---|
| 10/13/2023 | 21 | ORDER: /NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION<br>Counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Discovery Project (counsel are directed to www.mass.gov/superior-court-business-litigation-session for more information on the Project). Counsel may indicate their respective client's participation by completing, filing and servicing the attached form.<br>(see notice)<br><br>Copy mailed on 10/23/2023. | Salinger |
| 10/23/2023 | 22 | ORDER: TO TRANSFER<br>It is ORDERED and ADJUDGED:<br><br>That the above-entitled action be transferred to Superior Court Business Litigation Session.<br><br>See Order<br><br>Entered and Copies mailed 10/23/23 | Goodwin |

BC

55

Insert text here

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, S.S. — SUPERIOR COURT BUSINESS LITIGATION SESSION

| | | |
|---|---|---|
| JOHN DOE, LISA COLLETON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2384CV02448-BLS1 |
| Plaintiffs, | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs John Doe and Lisa Colleton ("Plaintiffs"), individually and on behalf of all other Citizens of the Commonwealth of Massachusetts similarly situated ("Class Members"), bring suit against Defendant UMass Memorial Health Care, Inc. ("Defendant"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendant assures visitors to its website that it is "committed to protecting your privacy" and that "We have designed our website to allow you to visit most areas without

identifying yourself or providing personal information."[1] Contrary to these assurances, Defendant did not follow this policy, nor the law prohibiting such disclosures.

3. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook, Google, and other third parties without their patients' knowledge, authorization, or consent.

4. Defendant disclosed this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these tools caused its patients' personally identifiable information and the contents of its patients' communications exchanged with Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

5. Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences including, but certainly not limited to, discrimination in the workplace or denial of insurance coverage.

6. Simply put, if people do not trust that their sensitive private information will be kept private and secure, they may be less likely to seek medical treatment, which can lead to much more serious health consequences down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to any unauthorized entities is vitally necessary to maintain public trust in the healthcare system as a whole.

[1] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

7. Protected and highly sensitive medical information collected by healthcare entities includes many categories, from intimate details of an individual's treatment to any unique identifying code which can connect the individual to the collecting entity.

8. Recognizing this, and in order to implement the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") in 2001, which require that healthcare providers safeguard and protect their patients' health data and associated individually identifying information ("Personal Health Information") from unauthorized disclosure to third parties.[2] Under HIPAA, healthcare providers are prohibited from disclosing patients and prospective patients' Personal Health Information without express written authorization.

9. In violation of Massachusetts law, Defendant disclosed its patients' personal health information to Facebook, Google, and other third parties to improve its return on marketing dollars and, ultimately, increase its profits.

10. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates Massachusetts law, including G.L. c. 272, § 99 (Interception of Wire and Oral Communications), G.L. c.214, § 1B (Right to Privacy), and G.L. c. 111, § 70E (Patients' and Residents' Rights).

11. On behalf of themselves and all similarly situated citizens in the Commonwealth of Massachusetts, Plaintiffs seek an order enjoining Defendant from further unauthorized disclosures of their personal information; awarding liquidated damages in the amount of $1,000

[2]https://aspe.hhs.gov/standards-privacy-individually-identifiable-health-information#:~:text=The%20Privacy%20Rule%20establishes%20a%20federal%20requirement%20that%20most%20doctors,health%20care%20operations%20(TPO).

per violation, attorney's fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

## PARTIES TO THE ACTION

12. Defendant UMass Memorial Health Care, Inc. is a Massachusetts corporation with its principal office at One Biotech Park, 365 Plantation Street, Worcester, MA 01605. Defendant is the largest health care system in Central Massachusetts.[3] Defendant owns and manages many healthcare facilities in Massachusetts, including UMass Memorial Medical Center, UMass Memorial Health Harrington Hospital, UMass Memorial Health Marlborough Hospital, Community Healthlink Behavioral Health Services, and UMass Memorial Health Clinton Hospital.[4]

13. Plaintiff John Doe is a Massachusetts citizen residing in Worcester County, Massachusetts, has been treated by Defendant's physicians, and has been a patient of UMass Memorial Medical Center,[5] and thus also a patient of Defendant. John Doe is a user of Defendant's website at www.ummhealth.org.

14. Plaintiff Lisa Colleton is an individual who is over 18 years and resides in Marlborough, Massachusetts. Plaintiff is also a patient of Defendant and a user of Defendant's website at www.ummhealth.org.

## JURISDICTION AND VENUE

15. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 365 Plantation Street, Worcester, MA 01605. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

---

[3] https://www.ummhealth.org/umass-memorial-health/about-us
[4] https://www.ummhealth.org/locations
[5] https://www.ummhealth.org/umass-memorial-medical-center

16. Venue is appropriate in the Business Litigation Session per the Order to Transfer dated October 23, 2023.

## FACTUAL BACKGROUND

**A. Defendant routinely discloses the protected health information of its patients to third parties including Facebook.**

17. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

18. Medical patients in Massachusetts such as Plaintiffs have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

19. As a health care provider, Defendant has fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

20. Patients are aware of the promises of confidentiality contained within the Hippocratic Oath and are protected against unauthorized disclosures of their private medical information by statutory, regulatory, and common law protections afforded them under the law.

21. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of personally identifiable patient information and communications.

22. Patients rely on these promises, obligations, and protections when seeking medical care.

23. Patients also have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

24. Defendant operates websites for patients, including www.ummhealth.org and www.harringtonhospital.org.

25. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

26. Defendant encourages patients to use digital tools on its website to seek and receive health services. The home page of Defendant's website is designed for use by patients, and provides patients with tools to seek treatment, such as buttons that patients can click to find a doctor, research treatments, and learn about Defendant's services.

27. Defendant also maintains a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers. Collectively herein, Defendant's website and patient portal are defined as Defendant's "Web Properties."

28. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

29. One of the world's most prevalent tracking codes is called the Meta Pixel, and it is provided by Facebook. Tracking pixels such as the Meta Pixel tool allow Defendant and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendant's website. While Defendant intentionally incorporated the Meta Pixel into its website, Defendant never disclosed to Plaintiffs or Class Members that it shared their sensitive and

confidential communications with Facebook, Google, and others. As a result, Plaintiffs and Class Members were unaware that their private information was being surreptitiously transmitted to third parties when they visited Defendant's website.

30. By design, none of the tracking mechanisms employed by Defendant are visible to patients visiting Defendant's website.

31. Defendant did not warn or otherwise disclose to Plaintiffs and Class Members that Defendant bartered their confidential medical communications to Facebook, Google, and other third parties for marketing purposes.

32. Plaintiffs and Class Members never consented, agreed, or otherwise authorized Defendant to disclose their confidential medical communications, particularly not beyond the limits of Defendant's express promises to protect the confidentiality of Plaintiffs' and Class Members' private information from disclosure to third parties.

33. Simply put, by installing tracking pixels on its Web Properties, Defendant effectively planted a bug on Plaintiffs and Class Members' web browsers and compelled them to unknowingly disclose their confidential and extremely sensitive communications to Facebook, Google, and others.

34. The information sent to third parties as a result of Defendant's use of tracking technologies included the Personal Health Information that Plaintiffs and Class Members submitted to Defendant's Web Properties related to their past, present, or future health conditions, including, for example, the type and date of a medical appointment and physician.

35. Such Personal Health Information would allow the third party (*e.g.*, Facebook or Google) to know that a specific patient was seeking confidential medical care and the type of medical care being sought. This disclosure would also allow a third party to reasonably infer that

a specific patient was being treated for a specific type of medical condition such as cancer, pregnancy, or HIV.

36. Healthcare patients simply do not anticipate that their trusted healthcare provider will send PHI or other confidential medical information to an unauthorized third party—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without patients' informed consent.

37. Neither Plaintiffs nor any other Class Member signed a written authorization permitting Defendant to send their Personal Health Information to Facebook or Google.

38. Plaintiffs and Class Members exchanged numerous communications with Defendant. Plaintiffs' and Class Members' communications included logging in and out of patient portals, exchanging communications about doctors and health conditions, and using button functionality from Defendant's websites.

39. Notwithstanding prospective and current patients' reasonable expectations of privacy and Defendant's legal duties of confidentiality, Defendant disclosed—and continues to disclose—the contents of Plaintiffs' and Class Members' communications and protected healthcare information via automatic mechanisms embedded in the websites operated by Defendant without users' knowledge, authorization, or consent.

40. In doing so, Defendant systematically violated the medical privacy rights of Plaintiffs and Class Members.

41. The private information provided by Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties.

42. Upon information and belief, Defendant intercepted and disclosed the following non-public private information to Facebook and Google:

a. Plaintiffs' and Class Members' status as patients;

b. Plaintiffs' and Class Members' communications with Defendant via its website;

c. Plaintiffs' and Class Members' use of Defendant's patient portal;

d. Plaintiffs' and Class Members' searches for information regarding specific medical conditions and treatments, their medical providers, and their physical location.

43. Defendant also breached its obligations to Plaintiffs and Class Members in multiple other ways, including (1) failing to obtain their consent to disclose their private information to Facebook and other third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its website was safe and secure, (3) failing to remove or disengage software code that was known and designed to share patients' private information with third parties, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' private information to Facebook and other third-party advertising companies, (5) failing to warn Plaintiffs and Class Members that Defendant was routinely bartering their private information to Facebook via the Meta Pixel, and (6) otherwise ignoring Defendant's common law and statutory obligations to protect the confidentiality of patient's protected health information.

44. Plaintiffs and Class Members have suffered injury because of Defendant's conduct. Their injuries include invasion of privacy and the continued and ongoing risk of irreparable harm from the disclosure of their most sensitive and personal information.

**B. The nature of Defendant's unauthorized disclosure of patients' health care information.**

45. Defendant's disclosures of patients' personal healthcare information occur because Defendant intentionally deploys source code on the websites it operates that causes

patients' personally identifiable information (as well as the exact contents of their communications) to be transmitted to third parties.

46. By design, third parties receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

47. To elaborate, websites like those maintained by Defendant are hosted by a computer server through which the business in charge of the website exchanges and communicates with internet users via their web browsers.

48. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

49. Web browsers are software applications that allow users to exchange electronic communications over the internet.

50. Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

51. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

52. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

53. A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

54. For example, typing https://www.ummhealth.org/ into a browser sends an HTTP request to Defendant's website, which returns a HTTP response in the form of the home page of Defendant's website:




55. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web

browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendant's website, to third parties via pixels.

56. In addition to controlling a website's Markup, Source Code executes a host of other programmatic instructions and can command a website visitor's browser to send data transmissions to third parties via pixels or web bugs,[6] effectively open a spying window through which the webpage can funnel the visitor's data, actions, and communications to third parties, along with patients' personally identifiable information like their Facebook IDs.

57. For example, Defendant's website includes software code that transmits patients' HTTP requests to Facebook, including patients' private health information, every time a patient interacts with a page on its website.

58. In essence, Defendant encourages their patients to use a tapped device, and once the Webpage is loaded into a patient's browser, the software-based wiretap is quietly waiting for private communications on the Webpage to trigger the tap, which intercepts those communications intended only for Defendant and transmits those communications to third parties, including Facebook and Google.

59. The basic command that web browsers use to exchange data and user communications is called a GET request.[7] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

60. When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a user enters

[6] These pixels or web bugs are tiny image files that are invisible to website users. They are purposefully designed in this manner, or camouflaged, so that users remain unaware of them.
[7] https://www.w3schools.com/tags/ref_httpmethods.asp

Date Filed 1/25/2024 10:30 AM
Superior Court - Suffolk
Docket Number 2384CV02448

"respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

61. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

62. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

63. Once the initial connection is made between a user and a website, the communications commence and continue between the parties in a bilateral fashion until the user leaves the website.

64. Unbeknownst to users, however, the website's server may also transmit the user's communications to third parties via third-party tracking tools. Indeed, Google warns website developers and publishers that installing its ad-tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google. [8]

65. Worse, the Personal Health Information that Defendant's Meta Pixel sent to Facebook was sent alongside Colleton's and Class Members' Facebook IDs (c_user cookie or "FID") thereby allowing individual patients' communications with Defendants, and the Personal

[8] https://support.google.com/platformspolicy/answer/6156630?hl=en

Health Information contained in those communications, to be linked to their unique Facebook accounts.

66. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

67. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

68. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

69. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more efficiently and to further obscure the third parties to whom users' personally identifiable data and communications are transmitted without their knowledge or consent.

70. Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web-properties with just the click of a few buttons.

71. While the information captured and disclosed without permission may vary depending on the pixel(s) embedded, these "data packets" can be extensive, sending, for example, not just the name of a physician and field of medicine, but also the first name, the last

name, email address, phone number and zip code and city of residence entered into the booking form. In addition, that data is linked to a specific internet protocol ("IP") address.

72. The Meta Pixel, for example, sends information to Facebook via scripts running in a person's internet browser so each data packet comes labeled with an IP address that can be used in combination with other data to identify an individual or household.

73. The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they surreptitiously installed. Instead, these pixels lie in wait until they are triggered by an event, at which time they effectively open a channel through the website funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

74. For example, a patient can trigger an HTTP request by interacting with the search bar on Defendant's website by typing a term such as "breast cancer" into the search bar and then hitting enter. Defendant's server in turn sends an HTTP response, which results in the search results being displayed.

75. This is not the only HTTP request, however, that is created by a patient's interaction with Defendant's website. In fact, at the very same time the web page is instructed to send an HTTP request to Defendant requesting search results, the embedded Meta Pixel, acting as a tap, is triggered, such that the patient's HTTP request is shared with Facebook and Google, informing them of the patient's exact search and the patient's personally identifiable information.

76. In addition, if the person is (or recently has) logged into Facebook when they visit a particular website when a Meta Pixel is installed, some browsers will attach third-party

cookies—another tracking mechanism—that allow Meta to link pixel data to specific Facebook accounts.

77. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

78. With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Personal Health Information, like Facebook, implement workarounds that cannot be evaded by savvy users. Facebook's workaround, for example, is called Conversions API (CAPI).

79. CAPI is an effective workaround because it does not intercept data communicated from the user's browser. Instead, Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]."

80. Thus, the communications between patients and Defendants, which are necessary to use Defendants' website, are actually received by Defendants and stored on its server before CAPI collects and sends the Personal Health Information contained in those communications directly from Defendants to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

81. Companies like Facebook instruct companies to use the CAPI in addition to the Pixel and share the same events using both tools because such a redundant event setup allows website owners to share website events with Facebook that the pixel may lose. Thus, it is reasonable to infer that Facebook's customers who implement the Meta Pixel in accordance with Facebook's documentation will also implement the CAPI workaround.

82. The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner.

83. Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer a user's computing device, causing the device to contemporaneously and invisibly share the users' communications to third parties.

84. When a patient uses their healthcare provider's website or application where the Meta Pixel is present, the Meta Pixel transmits the content of their communications to Facebook, including but not limited to (1) signing up for a patient portal, (2) signing-in and -out of a patient portal, (3) taking actions inside a patient portal, (4) making or scheduling appointments, (5) exchanging communications related to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions, (6) conduct a search on a Facebook partner website, and (7) other information that qualifies as personal health information under state and federal laws. Once a third-party like Defendant installs the Meta Pixel on its website, by default it begins sending user information to Facebook automatically.[9]

85. For example, when Plaintiffs or a Class Member accessed Defendant's website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers. The information that Defendant sent to Facebook included the private information that Plaintiffs and Class Members communicated to Defendant's website, such as the type of medical appointment the patient made, the date, and the specific doctor the patient was seeing.

[9] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

86. Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

87. Defendant deploys Google Tag Manager on its website through an "iframe," a nested "frame" that exists within the Defendant's website that is, in reality, an invisible window through which Defendant funnels tracking pixels for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

88. Defendant's Google Tag Manager source code is designed to be invisible. The source code employed by Defendant specifies an "iframe" with a height of 0, width of 0, display of none, and visibility hidden.

89. Defendant then funnels invisible 1x1 tracking pixels or web-bugs through this purposely invisible iframe to help third parties track, acquire, and record patient data and communications.

90. By design, none of the tracking is visible to patients visiting Defendant's website.

91. These tracking pixels can collect dozens of data points about individual website users who interact with a website. For example, when a patient clicked through Defendant's website to the page describing Defendant's "Reproductive Endocrinology and Infertility" services at https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/reproductive-endocrinology-and-infertility, the source code deployed on Defendant's website caused personally identifiable data

and the content of patient communications to be transmitted to third parties like Facebook and Google:




92. By design, the transmission of patient data to third parties occurs before Defendant's responsive communications about "Reproductive Endocrinology and Infertility" have been delivered in full to the patient.

93. In addition to the Google Tag Manager, other source code is also placed on Defendant's website, resulting in the interception and transmission of patient personal health information to multiple third parties.

**C. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

94. Tracking pixels are especially pernicious because they result in the disclosure of a variety of personally identifiable information.

95. For example, an IP address is a numerical identifier that identifies each computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses

also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[10]

96. Because of their uniquely identifying characteristics, IP address are considered personally identifiable information. 45 CFR § 164.514. Tracking pixels can (and typically do) collect website visitors' IP addresses.

97. HIPAA further provides that information is personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

98. Consequently, Defendant's disclosure of Plaintiffs' and Class Members' IP addresses violated HIPAA and industry-wide privacy standards.

99. Likewise, internet cookies also provide personally identifiable information. 45 CFR § 164.514.

100. In the early years of the internet, advertising on websites followed the same model as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed.

101. Computer programmers eventually developed 'cookies'—small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Eventually some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

102. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and

[10] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

103. Cookies are considered personal identifiers. 45 CFR § 164.514. Tracking pixels can collect cookies from website visitors.

104. There are two types of cookies classified by duration.

105. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

106. "Persistent cookies" are designed to survive beyond a single internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites. Persistent cookies are also called "tracking cookies."

107. Cookies are also classified by the party that uses the collected data.

108. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

109. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits Defendant's website will also have cookies on their device from third parties, such as Facebook and Google. Unlike first-party cookies, third-party cookies are not typically

helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

110. Data companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits. To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

111. Traditionally, first-party and third-party cookies were kept separate. An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendant can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendant is not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendant. But Big Data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

112. JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Defendant can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie syncing," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie syncing operation is completed, the two websites can exchange any information that they have collected and recorded about a user

that is associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

113. In effect, cookie syncing is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

114. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

115. The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

116. Defendant requires patients using its patient portal to have enabled first-party cookies to gain access to its patient portal.

117. The _fbp cookie is used as a unique identifier for patients by Facebook.

118. If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendant with Facebook users.

119. Defendant engages in cookie syncing with Facebook, Google, and other third parties.

120. Defendant's cookie disclosures include the deployment of cookie syncing techniques that cause the disclosure of the first-party cookie values that Defendant assigns to patients to also be made to third parties.

121. Defendant uses and causes the disclosure of patient cookie identifiers with each communication described herein, including patient communications concerning individual providers, conditions, and treatments.

122. A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

123. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[11] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[12] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[13]

124. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[14]

[11] https://www.blog.google/products/chrome/building-a-more-private-web/
[12] https://pixelprivacy.com/resources/browser-fingerprinting/
[13] https://www.blog.google/products/chrome/building-a-more-private-web/
[14] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

125. Browser-fingerprints are considered personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

126. Defendant uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each intercepted communication described herein, including patient communications concerning individual providers, conditions, and treatments.

127. A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is an identifiable number string that is connected to a user's Facebook profile.[15] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[16]

128. Unique personally identifiable information such as a person's Facebook ID are likewise capable of collection through pixel trackers.

129. Each of the individual data elements described above is personally identifiable on their own. However, Defendant's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**D. Facebook's Business Model: Exploiting users' personal data to sell advertising.**

130. Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

[15] https://www.facebook.com/help/211813265517027
[16] https://smallseotools.com/find-facebook-id/

131. Facebook describes itself as a "real identity" platform.[17] This means that users are permitted only one account and must share "the name they go by in everyday life."[18] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[19]

132. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[20] Facebook has since evolved into one of the largest advertising companies in the world.[21] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[22] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[23]

133. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[24]

134. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook employs algorithms, powered by machine learning tools, to determine what advertisements to

---

[17] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[18] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[19] https://www.facebook.com/help/406644739431633
[20] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[21] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[22] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[23] https://www.facebook.com/business/ads/ad-targeting
[24] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

135. Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers. Facebook uses plug-ins and cookies to track users' browsing histories when they visit third-party websites. Facebook then compiles these browsing histories into personal profiles which are sold to advertisers to generate profits.

136. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

137. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[25] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising

[25] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

138. The analytics provided by the Meta Pixel tool allow website developers to improve "website operability" by giving developers insight into how customers use and interact with companies' websites.[26]

139. In many circumstances, Facebook also obtains information from health care providers that identify a Facebook user's status as a patient and other health information that is protected by state and federal law. This occurs through tools that Facebook encourages health care providers to use to upload customer (i.e., patient) lists for use in its advertising systems.

140. When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[27] This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

141. The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

142. The transmission is invisible.

143. The transmission is made without any affirmative action taken by the patient.

144. The transmission occurs without any notice to the patient that it is occurring.

---

[26] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

[27] *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

145. Facebook collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing Facebook to target ads to a person who, for example, has used a patient portal and has exchanged communications about a specific condition, such as cancer. Moreover, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[28]

146. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information such as IP addresses, Facebook IDs, user agent information, device identifiers, and other data. All this personally identifiable data is available to be included each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

147. In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[29] The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[30]

148. Facebook can then share analytic metrics with the website host, while at the same

[28] *In re Facebook*, 956 F.3d at 596.
[29] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[30] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

149. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[31] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[32]

150. Facebook warns web developers that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[33]

151. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[34]

152. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website. Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

153. Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains

[31] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[32] https://www.oviond.com/understanding-the-facebook-pixel
[33] https://developers.facebook.com/docs/meta-pixel/get-started
[34] https://developers.facebook.com/docs/meta-pixel/get-started

"shadow profiles" on nonusers of Facebook.[35]

154. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information. The information is sent in data packets, which include personally identifiable data. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[36]

155. Facebook can also link user data to Facebook accounts through information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching.[37] Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data. Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

156. While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[38] In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[39]

157. Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-

[35] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/
[36] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[37] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[38] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[39] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

158. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like https://www.ummhealth.org/ and target users with advertising based on their web activity.

159. Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website. This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections." Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising. Indeed, Facebook utilizes precisely the type of Personal Health Information that Defendant bartered to Facebook so that Facebook can identify, target, and market products and services to individuals.

**D. Defendant embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' protected health information to Facebook.**

160. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertisement efforts.

161. Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent,

Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[40] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

162. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads. For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria. Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

163. Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[41] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[42]

164. For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

165. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a

[40] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[41] https://instapage.com/blog/meta-pixel
[42] https://instapage.com/blog/meta-pixel

patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, logout, or to create an appointment—Facebook code embedded on that page transmits the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

166. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. Via its use of the Meta Pixel, Defendant intercepted and disclosed the contents of Plaintiffs' and Class Members' communications with Defendant, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, and buttons clicked to Search, Find a Provider, connect, Login, Logout, or Enroll in Defendant's patient portal, summaries of Defendant's responsive communications, the parties to the communications, and the existence of communications at Defendant's websites.

167. When patients like Plaintiffs and the Class Members visited the homepage of Defendant's website, the source code employed by Defendant caused their personally identifiable information (such as Facebook IDs, their IP address, and their browser fingerprints) to be transmitted to Facebook along information identifying the specific pages on Defendant's website that they viewed. In other words, *every time* that Defendant's patients like Plaintiffs visited its website, Defendant disclosed not only *who* those patients were, but also *what* medical treatments they reviewed on the website, *what* doctors they reviewed on the website, *what* search terms they typed into online forms, and whether they had logged into the Defendant patient portal.

168. For example, a patient searching for a doctor on Defendant's website located at www.harringtonhospital.org is asked to provide a variety of information to filter the various

physicians available to treat various medical conditions, including the doctor's specialty, the patient's hometown, the patient's language preference, and other information that the patient provides:




169. All this data is disclosed to Facebook in real time as patients transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

170. Defendant discloses such Personal Health Information even when patients are searching for doctors on its websites to assist with them conditions such as substance abuse and addiction:

Date Filed 1/25/2024 10:30 AM
Superior Court - Suffolk
Docket Number 2384CV02448




171. Likewise, a patient who desires an appointment at a specific hospital using Defendant's websites also has that information forwarded to Facebook via the Meta Pixel contemporaneously with its transmission by patients:




172. All this data about patients' interactions with Defendant's website is disclosed to Facebook simultaneously in real time as visitors transmit their information, including information such as the doctor they choose for treatment, the doctor's specialty, the patient's location, the patient's language and gender preferences, and the full-string URLs generated by patient's searches. Along with other data, Defendant also discloses patients' unique Facebook IDs, which are captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient and user IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

173. A patient searching for information about cancer treatment or pregnancy, however, not only shares their Personal Health Information with Defendant, but also unknowingly shares their Personal Health Information with Facebook and Google, such as the fact that the patient is pregnant.

174. All these communications were acquired by Defendant and forwarded to third parties like Facebook and Google via tracking technologies that Defendant installed on its

website.

175. In other words, Facebook and Google learned not just that patients were seeking treatment, but where and typically when they were seeking treatment, along with other information that patients would reasonably assume that Defendant was not sharing with third party marketing companies.

176. Defendant discloses patient information from across its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services" offered by Defendant, communications made by patients using the website's Bill Pay/Financials function, communications made when patients access Defendant's patient portal, and communications made when patients are researching specific medical conditions such as COVID-19.

177. As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendant's website allows Meta Pixel to capture that search term and tell Facebook that the patient is likely pregnant. Indeed, Facebook might learn that the patient is pregnant before the patient's close family and friends. But there is nothing visible on Defendant's website that would indicate to patients that, when they use Defendant's search function, their personally identifiable data and the precise content of their communications with Defendant are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

178. The amount of data collected is significant. Via the Meta Pixel, when patients interact with its website, Defendant discloses a full-string, detailed URL to Facebook, which

contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested. For example, when a patient types a search term into the search bar on Defendant's website, the website returns links to information relevant to the search term. When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

179. Facebook's Meta Pixel collects and forwards this data to Facebook, including the full-string referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

180. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's website. The path identifies where a file can be found on a website. For example, take https://physicians.umassmemorial.org/details/5019/edward-appelbaum-orthopedics-southbridge. Here, the "path" is details/5019/edward-appelbaum-orthopedics-southbridge. Similarly, a patient reviewing information about "Services" that Defendant offers patients such as "Pediatrics" will generate a URL with the path https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/childrens-medical-centerpediatrics.

181. Likewise, a query string provides a list of parameters. A query string includes fields added to a base URL by a user's web browser or other client application. To illustrate, an

example of a full-string URL that provides a query string is https://www.ummhealth.org/search-results?search_block_form=cancer&form_build_id=form-LTYWYGzK9G3Apqp3zsv-6B9rFLxKRNgPOSZTLxkXC6k&form_id=search_block_form#gsc.tab=0&gsc.q=cancer&gsc.page=1. The query string parameters in this search indicate that a search was done at Defendant's website for information about cancer. In other words, the Meta Pixel captures information that connects a particular user with a particular health condition to a particular healthcare provider.

182. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) both the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website and the provision of health care to those patients. Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the full-string URL generated by patient searches is acquired by Facebook along with personally identifiable information.

183. Defendant also provides Facebook and Google with details about online forms that patients fill out in the form of POST requests. This results in information that patients provide when filling out these forms also being disclosed to Facebook and Google. For example, when Plaintiffs filled out the online forms that Defendant provides to assist patients in finding treating physicians, Defendant shared every detail that Plaintiffs entered into those forms, including the kind of doctor they searched for, their preferred treatment location, and their preferred gender of the treating physician. All those details from Plaintiffs' communications with Defendant were simultaneously shared with Facebook and Google without Plaintiffs' knowledge or consent, via source code that Defendant had installed on its website.

184. The nature of the collected data is also important. Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual

patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

185. Defendant also disclosed the same kind of patient data described above to other third parties, including Google, Twitter, New Relic, Acquia, and ShareThis.com via tracking software that Defendant installed on its website. As with the Facebook Meta Pixel, Defendant provides patients and prospective patients with no notice that Defendant is disclosing the contents of their communications to these third parties. Likewise, Defendant does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

186. These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[43] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely discloses patients' personal health information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

187. Google cookies provide personally identifiable data about patients who visit Defendant's website to Google. Defendant transmits personally identifiable Google cookie data to Google.

188. Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a

[43] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

189. Defendant deploys Google tracking tools on nearly every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google. These transmissions occur simultaneously with patients' communications with Defendant and include communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, bill payments, and registrations and logins to Defendant's patient portal.

190. By compelling visitors to its websites to disclose personally identifiable data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' Personal Health Information to their private identities and target them with advertising. Defendant intentionally shares the personal health information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

191. Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health information, including sensitive medical information, to Facebook without his consent or authorization when he entered information on the websites that Defendant maintains.

192. For example, Plaintiff John Doe visited Defendant's website in 2021 and 2022 at www.ummhealth.org and entered data, including sensitive medical information, such as details about his medical condition and treating physicians. The information that Plaintiff John Doe transmitted included queries about treatment for a spinal injury. He also used Defendant's website to find a doctor, to schedule appointments, and to pay for treatment.

193. Unbeknownst to Plaintiff John Doe, Defendant shared the contents of the full-

string URL containing Plaintiffs' specific search terms with Facebook and Google. In other words, Defendant disclosed the specific contents of the communications that Plaintiff John Doe sent Defendant when he requested that Defendant provide information about medical treatment.

194. Indeed, the source code that Defendant installed on its website resulted in Defendant transmitting to Facebook and Google the full-string URLs of every search for medical information that Plaintiff John Doe ran using Defendant's website search function, including the contents of his specific searches for information. Along with the full-string URLs containing the search terms that Plaintiff communicated to Defendant, Defendant also shared Plaintiff John Doe's personally identifying information for every search he conducted with Facebook and Google, including his device identifiers, his IP address, and his browser fingerprint, which allowed Facebook and Google to personally identify him and learn about his medical conditions.

195. When interacting with Defendant's website and patient portal, Plaintiff John Doe also communicated such specific details as his name, his patient status, his treating physician, and the specific medical conditions that he was seeking treatment for and information about. All this information was also shared with Facebook and Google.

196. Plaintiff Lisa Colleton has used Defendant's website on many occasions to search for medical information, services and physicians, and to pay for medical services.

197. Lisa Colleton used Defendant's website at least once in each of April, May, June, July, August, and September 2021.

198. When using Defendant's website, Plaintiff Colleton entered data, including sensitive medical information, such as details about her particular medical condition(s) and treating physicians. The information that Plaintiff Colleton transmitted included queries about treatment for a particular diagnosis. She also used Defendant's website to locate a doctor, to

schedule appointments, and to pay for treatment. Lisa Colleton has had a Facebook account at all times while using Defendant's website, which she is perpetually logged into.

199. The kind of information that Defendant shared about Plaintiffs' interactions with its website and patient portal could be combined with other information in Facebook's possession, like Plaintiff's name, date of birth, and phone numbers, to target Plaintiff more effectively with advertisements or sell Plaintiff's data to third parties. Facebook is not a party to the communications between Plaintiffs and Defendant. Neither is Google.

200. Because Defendant embedded the Meta Pixel on its website, Defendant disclosed intimate details about Plaintiff's interactions with its website. Each time the Meta Pixel was triggered, it caused Plaintiffs' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' identity. For example, when Plaintiffs and Class Members visited Defendant's website, their personal health information was transmitted to Facebook, including such engagement as using the website's search bar, using the website's Find a Doctor function, and typing content into online forms. During these same transmissions, Defendant's website would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiff and Class Members provided—including the pages viewed, the physicians viewed, the appointments scheduled, and the locations of those physicians and appointments. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

201. Moreover, each time Plaintiffs used Defendant's Website, Defendant willfully disclosed Plaintiffs' IP address, the information entered on Defendant's Website, the pages viewed, the physicians viewed, the physicians called, the appointments scheduled, and the

locations of those physicians and appointments to Google via Google Analytics.

202. This simultaneous disclosure of information allowed Google to read or learn the contents of communications between Plaintiffs and Defendant.

203. Defendant affirmatively made the decision to intrude on Plaintiffs' privacy by installing source code on its website designed to secretly share patients' Personal Health Information with third parties. For example, Defendant knew that by embedding Meta Pixel, it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' personal health information, including sensitive medical information and personally identifiable data. Defendant was also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Defendant was also aware that installing the Meta Pixel tool would result in dozens (if not hundreds) of unauthorized persons at Facebook and Google viewing the Personal Health Information of Defendant's patients, including the Personal Health Information of Plaintiffs and Class Members. Defendant's decision to affirmatively communicate and share their patients' Personal Health Information with Facebook, Google, and those companies' employees violates the numerous protections afforded by Massachusetts law.

204. Defendant also knew that installing tracking pixels would result in Plaintiffs' and Class Members' Personal Health Information being improperly accessed by Facebook and Google employees so that those companies could sell advertising. Moreover, Defendant was also aware that once it shared Plaintiffs' health information with Facebook that it would no longer have any control over what Facebook did with that information or who Facebook would share that information with. On information and belief, it is likely that the third parties with whom Defendant shared Plaintiffs' Personal Health Information further disseminated that information to additional third parties, including potential advertisers. On information and belief,

Plaintiffs' Personal Health Information was viewed by one or more employees at Facebook for the purpose targeting them with advertising.

205. Defendant made the decision to barter its patients' personal health information to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendant and Facebook, it also betrayed the privacy rights of Plaintiffs and Class Members.

**F. Defendant's interception and disclosure of patient communications permits Facebook, Google, and other third-party advertising companies to engage in cross-device marketing across multiple devices.**

206. In addition to enabling Defendant to advertise to patients and potential patients on non-Defendant websites, Defendant's misuse and exploitation of patient data and communications also facilitates third parties' ability to target advertisements on other computing devices that a patient uses. This is called cross-device targeting.

207. Third parties including Facebook and Google have established a unique ID for individuals that tie together their desktop, laptop, and smartphone computing devices. For example, even if a patient has never visited Defendant's website on their smartphone, cross-device tracking and marketing allows Defendant and other third parties to target patients on that device. In other words, a patient or potential patient who visited Defendant's website on his desktop, but never on his smartphone, can nevertheless be targeted with advertisements by both Defendant and other third parties on his smartphone.

208. Defendant's and other third parties' use of cross-device targeting demonstrates that the data Defendant discloses to third parties is personally identifiable because it enables patients to be tracked across multiple devices that patients own—even if a patient has never communicated with Defendant on one or more of their devices.

209. Defendant has made the decision that access to the targeted advertising (including

retargeting and cross-device tracking) that is enabled by its disclosure of patient data and communications is of commercial benefit to Defendant.

210. Defendant obtains additional revenue from its deployment of third-party tracking tools through which it discloses personally identifying patient data and communications to third parties, including Google and Facebook.

211. Any additional revenue that that Defendant obtained from its unauthorized misuse of its own patients' Personal Health Information is unearned and is the rightful property of the patients (including Plaintiffs and Class Members) from whom it was obtained.

212. Defendant's unauthorized disclosure and misuse of Plaintiffs' and Class Members' Personal Health Information is a form of theft, for which the victims are entitled to recover anything acquired with the stolen assets, even if the items acquired have a value that exceeds the value of that which was stolen.

**G. Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

213. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook, Google, and other third parties. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

214. For example, when Plaintiff John Doe visited Defendant's website in 2022 at www.ummhealth.org there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.

215. Plaintiffs and their fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected

and transmitted to Facebook in the first place.

216. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Terms of Use" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:




217. While disclosing that its website contains "cookies," Defendant's "Terms of Use" falsely promises patients that the "[u]se of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site."[44] Contrary to that promise, Defendant's website automatically transmits personally identifiable information to Facebook using multiple cookies, including c_user, datr, fr, and xs cookies.

218. To locate Defendant's "Privacy Policy," a patient is required to scroll through the "UMass Memorial Health Care Website Terms of Use Statement" to find a link entitled "Read Our Privacy Policy" that is buried in the website's general terms and conditions statement.[45]

219. Defendant's "Privacy Policy" gives no indication to patients that Defendant

[44] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement
[45] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

Date Filed 1/25/2024 10:30 AM
Superior Court - Suffolk
Docket Number 2384CV02448

routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises in its "Privacy Policy"[46] that protecting patients' health information is a priority:

> **JOINT NOTICE OF INFORMATION PRACTICES**
>
> At UMass Memorial Health Care, your privacy is a priority. We follow strict federal and state guidelines to maintain the confidentiality of your medical (protected health) information. We also follow state guidelines regarding how long we must store your medical records and the requirements for proper disposal.

220. These statements are false, deceptive, and misleading in light of Defendant's secret disclosure of patient information to numerous third parties, including Facebook and Google. Defendant's privacy policy is also false, deceptive, and misleading because Defendant in fact routinely sells and/or barter its patients' personal health information to Facebook and Google without patients' knowledge or consent in return for access to the Meta Pixel tool and other significant advertising benefits. This included personally identifiable information protected against disclosure by law, including Plaintiffs' (and Class Members') IP addresses, device identifiers, and browser fingerprints that Facebook and Google used to personally identify Defendant's patients and target them with advertising.

221. Even if a patient stumbled upon Defendant's carefully hidden "Privacy Policy," nothing in that notice would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook and Google to capture and exploit patients' Personal Health Information.

[46] https://www.ummhealth.org/patients-visitors/joint-notice-information-practices

222. Indeed, the very term "Privacy Policy" is deceptive. Research has consistently shown that a majority of Americans who see that a website has a "Privacy Policy" falsely believe that the company with the policy cannot (and will not) disclose information about them to third parties without their consent.

223. Defendant does not have a legal right to share Plaintiffs' and Class Members' Protected Health Information with Facebook or Google, because this information is protected from such disclosure by HIPAA's privacy rules, which protect all electronically protected health information a covered entity like Defendant "creates, receives, maintains, or transmits" in electronic form. 45 C.F.R. § 160.103. HIPAA's privacy rules do not permit Defendant to sell patient information to Facebook in return for access to Meta Pixel. Further, HIPAA does not permit Defendant to disclose patients' Protected Health Information to advertising and marketing companies like Facebook without express written authorization from patients. 45 C.F.R. § 164.508.

224. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing uses. Moreover, no *additional* privacy breach by Facebook is necessary for harm to have accrued to Plaintiffs and Class Members; the secret disclosure by Defendant of its patients' Personal Health Information to Facebook means that a significant privacy injury has *already occurred.*

225. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Further, Defendant

expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

226. Neither Plaintiffs nor Class Members knowingly consented to Defendant's disclosure of their Personal Health Information to Facebook and Google. Nowhere on its website does Defendant tell patients that it routinely shares their Personal Health Information with Facebook and Google. Without disclosing such practices, Defendant cannot have secured consent from Plaintiffs and Class Members for the disclosure of their Personal Health Information to Facebook, Google, and other third-party advertising companies.

227. Accordingly, Defendant lacked authorization to intercept, disclose to Facebook, or use Plaintiffs and Class Members' personal health information, or to procure others (such as Facebook) to intercept, disclose, or use such personal health information.

**H. Defendant's disclosures of Personal Health Information to Facebook, Google, and other third parties are unnecessary.**

228. The disclosures of patient Personal Health Information to Facebook are not necessary for Defendant to maintain its healthcare website or provide medical services to patients.

229. It is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendant to provide medical services to patients without sharing their personal health information with Facebook so that this information can be exploited for advertising purposes.

230. Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical

information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**I. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

231. Patient personal health information is specifically protected by law. *See* G.L. c.214, § 1B (Right to Privacy); G.L. c. 111, § 70E (Patients' and Residents' Rights). The prohibitions against disclosing patient personal health information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes. 45 C.F.R. § 164.514. Both state and federal law also restrict the use of patients' Personal Health information, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

232. HIPAA sets national standards for safeguarding protected health information. For example, HIPAA limits the permissible uses of health information and prohibits disclosure of this information without express written authorization from patients. 45 C.F.R. § 164.502. These prohibitions include prohibitions against disclosing personally identifying data such as patient names, IP addresses, and other unique characteristics or codes. 45 C.F.R. § 164.514(b)(2)(i). HIPAA also requires that covered entities like Defendant implement appropriate safeguards to protect this information. 45 C.F.R. § 164.530(c)(1). And both HIPAA and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. 42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

233. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients'

Personal Health Information to Facebook violated Plaintiffs and Class Member's privacy interests.

234. As patients, Plaintiffs had a reasonable expectation of privacy that their health care provider and its associates would not disclose their personal health information to third parties without their express authorization.

235. The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding such things shameful to be spoken about."[47]

236. The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[48] Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

237. For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust....Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should ... [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[49]

---

[47] *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 n.1 (Mo. 1993).
[48] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html
[49] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).

238. The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [50]

239. Plaintiffs' and Class Members' reasonable expectations of privacy in their personal health information are grounded in, among other things, Defendant's status as a health care provider, Defendant's common law obligation to maintain the confidentiality of patients' personal health information, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendant's express and implied promises of confidentiality.

240. It was reasonable for Plaintiffs and Class Members to assume that Defendant's privacy policies were consistent with Defendant's duties to protect the confidentiality of patients' personal health information.

241. Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

242. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

243. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling

[50] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[51]

244. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[52]

245. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

246. Likewise, a study released in 2021 confirmed that three-quarters of Americans don't want companies selling their private data.[53] The study found that eighty-three percent of Americans expect to have control over how their data is used by a business, and eight in 10 Americans think that there should be laws to protect their personal data.[54] Likewise, over three in four Americans would stop shopping at their business if they found out that the business didn't

[51] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[52] https://www.wired.co.uk/article/apple-ios14-facebook
[53] https://swnsdigital.com/us/2020/01/study-three-quarters-of-americans-dont-want-companies-selling-their-private-data/
[54] *Id.*

keep personal data safe (77%) or sold their data to a third-party (78%).[55]

247. These concerns are not hypothetical. For example, in 2021, the FTC brought charges against Flo Health, a company who, despite its express privacy claims, took control of users' sensitive fertility data and shared it with third parties—a broken promise that, as the FTC described it, "left consumers feeling 'outraged, victimized, and violated.'"[56]

248. Unsurprisingly, Plaintiffs felt similarly outraged and violated when they learned that their trusted medical provider had bartered their Personal Health Information to Facebook and Google without their knowledge or consent.

249. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[57]

250. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

---

[55] *Id.*

[56] https://www.ftc.gov/business-guidance/blog/2021/01/health-app-broke-its-privacy-promises-disclosing-intimate-details-about-users

[57] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

**J. Plaintiffs' Personal Health Data that Defendant collected, disclosed, and used is Plaintiffs' property, has economic value, and its illicit disclosure has caused Plaintiff harm.**

251. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

252. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[58]

253. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[59] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[60]

254. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[61] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[62]

255. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies

[58] https://ig.ft.com/how-much-is-your-personal-data-worth/
[59] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[60] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[61] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[62] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[63]

256. Further demonstrating the financial value of Class Members' medical data, CNBC has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said via phone. "Often, once a day or more."
>
> * * *
>
> [H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other data to identify individuals at higher risk of diseases and then raise their health premiums, or to target advertising to individuals.[64]

257. The CNBC article also explained:

> [D]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers. Just one company alone, IQVIA, said on its website that it has access to more than 600 million patient records globally that are nonidentified, much of which it accesses through provider organizations. The buyers, which include pharma marketers, will often use it for things like clinical trial recruiting. But hospital execs worry that this data

[63] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

[64] Christina Farr, *Hospital execs say they are getting flooded with requests for your health data* (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html, CNBC.COM (last visited April 30, 2023).

> may be used in unintended ways, and not always in the patient's best interest.

258. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[65] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[66]

259. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[67]

260. Plaintiffs were aware that their Personal Health Information had commercial value and expected that they would be *substantially* compensated by any third party who wanted to exploit their health information for advertising purposes.

261. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs' and the Class Member's property.

**K. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' protected health information.**

262. In exchange for disclosing Personal Health Information about its patients, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions. The access to these advertising benefits results in enormous financial savings to companies like Defendant because it reduces

---

[65] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app

[66] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[67] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

their advertising costs. Defendant has run numerous advertising campaigns on Facebook, utilizing the advantages it gained by installing the Meta Pixel on its website.

263. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

264. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

265. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

266. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**L. Facebook's history of egregious privacy violations.**

267. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

268. Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics

in a discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

269. In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked, and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

270. In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[68]

271. Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.[69]

272. In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytics may have harvested the data of up to 87 million users in connection with the 2016 election. This led to another FTC investigation in 2019 into Facebook's data collection and privacy practices,

[68] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter
[69] A similar case is pending in Texas.

resulting in a record-breaking five-billion-dollar settlement.

273. Likewise, a different 2018 report revealed that Facebook had violated users' privacy by granting access to user information to over 150 companies.[70] Some companies were even able to read users' private messages.

274. In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[71] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

275. On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[72]

276. The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something

---

[70] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html
[71] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/
[72] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf

startling: the company was sharing their data with Facebook.[73] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[74]

277. More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose."[75]

278. These revelations were confirmed by an article published by the Markup on June 16, 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[76]

279. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect its patients

[73] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[74] https://slate.com/technology/2022/06/health-data-brokers-privacy.html
[75] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes
[76] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

**M. Defendant's failure to inform its patients that their Personal Health Information has been disclosed to Facebook or to take steps to halt the continued disclosure of such information was malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights.**

280. Hospital systems, like other businesses, have a legal obligation to disclose data breaches to their customers.

281. After publication of the Markup's investigative article in June 2022, hospital systems around the United States began self-reporting data breaches arising from their installation of pixel technology on their websites.[77]

282. For example, in August 2022, Novant Health informed approximately 1.3 million patients that their medical data was disclosed to Facebook due to the installation of the Facebook Meta Pixel on the hospital system's websites.[78] Novant Health's data breach announcement conceded that the Meta Pixel tool installed on its websites "allowed certain private information to be transmitted to Meta from the Novant Health website."[79] Novant Health further admitted that the information about its patients that was disclosed to Facebook included "an impacted patient's: demographic information such as email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes."[80]

[77] https://www.scmagazine.com/analysis/breach/pixel-fallout-expands-community-health-informs-1-5m-of-unauthorized-disclosure
[78] https://www.scmagazine.com/analysis/breach/1-3m-novant-health-patients-notified-of-unintended-disclosure-via-facebook-pixel
[79] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx
[80] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx

283. Likewise, in October 2022, Advocate Aurora Health informed approximately 3 million patients that their personal health information had been disclosed to Facebook via the Meta Pixel installed on Advocate Aurora Health's website.[81]

284. Advocate Aurora Health's data breach notification conceded that patient information had been transmitted to third parties including Facebook and Google when patients used the hospital system's website.[82]

285. Advocate Aurora Health further admitted that a substantial amount of its patients' personal health information has been shared with Facebook and Google including patients' "IP address; dates, times, and/or locations of scheduled appointments; your proximity to an Advocate Aurora Health location; information about your provider; [and] type of appointment or procedure."[83] Even more troubling, Advocate Aurora Health admitted that "[w]e cannot confirm how vendors used the data they collected."[84]

286. Advocate Aurora Health claimed that, in conjunction with its data breach notice, the hospital system had "disabled and/or removed the pixels from our platforms and launched an internal investigation to better understand what patient information was transmitted to our vendors."[85] Advocate Aurora Health also promised its 3 million patients that the company had instituted an "enhanced, robust technology vetting process" to prevent such disclosures of its patients' personal health information in the future.[86]

287. Similarly, in October 2022, WakeMed notified more than 495,000 patients that their personal health information had been transmitted to Facebook through the use of tracking

[81] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3
[82] https://www.advocateaurorahealth.org/
[83] https://www.advocateaurorahealth.org/pixel-notification/faq
[84] https://www.advocateaurorahealth.org/pixel-notification/faq
[85] https://www.advocateaurorahealth.org/pixel-notification/faq
[86] https://www.advocateaurorahealth.org/pixel-notification/faq

pixels installed on its websites.[87] In announcing this data breach, WakeMed admitted that the Facebook Meta Pixel tool had been installed on its website resulting in the transmission of patient information to Facebook.[88] WakeMed further admitted that "[d]epending on the user's activity, the data that may have been transmitted to Facebook could have included information such as: email address, phone number, and other contact information; computer IP address; emergency contact information; information provided during online check-in, such as allergy or medication information; COVID vaccine status; and information about an upcoming appointment, such as appointment type and date, physician selected, and button/menu selections."[89]

288. WakeMed also conceded that it had no idea what Facebook had done with the personal health information that WakeMed had disclosed about its patients.[90] Like the other hospital systems who have come clean about their use of the Meta Pixel tool, WakeMed promised its patients that it had "proactively disabled Facebook's pixel" and had "no plans to use it in the future without confirmation that the pixel no longer has the capacity to transmit potentially sensitive or identifiable information."[91]

289. In November 2022, the fallout from hospital systems' use of the Meta Pixel tool expanded when Community Health Network informed 1.5 million of its patients that their

[87] https://healthitsecurity.com/news/wakemed-faces-data-breach-lawsuit-over-meta-pixel-use
[88] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident
[89] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident
[90] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident
[91] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

personal health information had been routinely transmitted and disclosed to Facebook since at least April 2017.[92]

290. In its data breach notice, Community Health admitted that it had "discovered through our investigation that the configuration of certain technologies allowed for a broader scope of information to be collected and transmitted to each corresponding third-party tracking technology vendor (e.g., Facebook and Google) than Community had ever intended." Community Health further conceded that its use of the Meta Pixel and related third-party tracking technologies had resulted in surreptitiously recording and transmitting a wide range of patient engagements with its websites, including "includes scheduling an appointment online or directly with a provider" and "seeking treatment at a Community or affiliated provider location."[93]

291. Community Health, like WakeMed, Novant, and Advocate Aurora Health, also promised its patients that it had disabled or removed the third-party tracking technologies that it had installed on its website and had instituted new "evaluation and management processes for all website technologies moving forward."[94] Community Health, however, also conceded that it had no idea how Facebook or other third parties had exploited the patient personal health information that had been disclosed to them via the pixel technology.

292. Unlike Community Health, WakeMed, Novant, Advocate Aurora Health, and other responsible hospital systems who have informed their patients of the serious privacy violations resulting from the installation of Facebook's Meta Pixel tool on their websites, Defendant has done nothing. Indeed, not only has Defendant hidden these privacy violations

[92] https://healthitsecurity.com/news/community-health-network-notifies-1.5m-of-data-breach-stemming-from-tracking-tech; *see also* https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach
[93] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach
[94] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

from its patients, but Defendant continued to collect, transmit, and disclose its patients' personal health information to Facebook despite widespread knowledge in the health care community that such collection and disclosure of patient personal health information is patently illegal and in violation of patient's fundamental privacy rights.

293. As these data breach announcements demonstrate, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' personal health information Facebook. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

294. Defendant's decision to hide its use of the Meta Pixel tool from its own patients and its refusal to remove such technologies from its websites even after learning that its patients' personal health information was being routinely collected, transmitted, and exploited by Facebook is malicious, oppressive, and in reckless disregard of Plaintiffs' and Class Members' rights.

## TOLLING, CONCEALMENT, AND ESTOPPEL

295. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

296. Defendant seamlessly incorporated Meta Pixel and other trackers into its websites, providing no indication to users that they were interacting with a website enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that Plaintiffs' and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

297. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendants' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

298. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

299. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of at least the filing of the earliest Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of their data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

**CLASS ACTION ALLEGATIONS**

300. Defendant's conduct violates the law and breaches its express and implied privacy promises.

301. Defendant's unlawful conduct has injured Plaintiffs and Class Members.

302. Defendant's conduct is ongoing.

303. Plaintiffs bring this action individually and as a class action against Defendant.

304. Plaintiffs seek class certification for the following proposed Class:

> **The UMass Memorial Health Class:** During the fullest period allowed by law, all Massachusetts citizens who are, or were, patients of UMass Memorial Health, Inc. or any of its affiliates and who exchanged communications at Defendant's websites, including www.ummhealth.org, www.harringtonhospital.org, and any other UMass Memorial Health affiliated website that caused disclosures of patient personally identifiable information and communications to third parties, including (but not limited to)

Facebook.

305. Excluded from the proposed Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

306. Plaintiffs reserve the right to redefine the Class and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

307. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

308. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Class, based on information and belief, consists of thousands of people dispersed throughout the Commonwealth of Massachusetts, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendants.

309. **Commonality and Predominance:** There are questions of law and fact common to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs' and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate G.L. c. 272, § 99;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs' and Class Members' Personal Health Information to Facebook;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient Personal Health Information to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

310. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

311. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Defendant who used the websites set up by Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

312. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members he seeks to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are an

adequate representative of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

313. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Cass, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

314. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

315. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of G.L. c. 272, § 99
### (On Behalf of Plaintiffs and the Class)

316. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

317. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

318. All conditions precedent to this action have been performed or have occurred.

319. G.L. c. 272, § 99 prohibits any person from willfully and secretly intercepting the contents of any wire communications through the use of any intercepting device unless given prior authority by all parties to a communication to do so.

320. Any person aggrieved by a violation G.L. c. 272, § 99 "shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest."

321. Defendant qualifies as a person under the statute.

322. All alleged communications between Plaintiffs or Class Members and Defendant qualify as wire communications under Massachusetts law because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

323. An "interception" under the statute means "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire … communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G.L. c. 272, § 99B(4).

324. Defendant engaged in and continues to engage in an "interception" by aiding others (including Facebook) to secretly record the contents of Plaintiffs' and Class Members' wire communications.

325. An "intercepting device" is "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire … communication." G.L. c. 272, § 99B(3).

326. The "intercepting devices" used in this case include, but are not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers;

g. Third-party source code utilized by Defendant; and

h. Computer servers of third parties (including Facebook) to which Plaintiffs and Class Members' communications were disclosed.

327. Under the statute, "contents" are defined to mean "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." G.L. c. 272, § 99B(5).

328. Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiffs and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

329. Defendant aided in the interception of "contents" in at least the following forms:

a. The parties to the communications;

b. The precise text of patient search queries;

c. Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

d. The precise text of patient communications about specific doctors;

e. The precise text of patient communications about specific medical conditions;

f. The precise text of patient communications about specific treatments;

g. The precise text of patient communications about scheduling appointments with medical providers;

h. The precise text of patient communications about billing and payment;

i. The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

j. The precise dates and times when patients click to Log-In on Defendant's website(s);

k. Information that is a general summary or informs third parties of the general subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

l. Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

330. Plaintiffs and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook and other third parties.

331. Neither Plaintiffs nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook and other third parties. Nor could they have consented, given that Defendant never sought Plaintiff or Class Members' consent.

332. Plaintiffs and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information to develop marketing and advertising strategies.

333. Under the statute, aggrieved persons are entitled to recover appropriate injunctive relief and "(1) actual damages but not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) a reasonable attorney's fee and other litigation disbursements reasonably incurred."

334. In addition to statutory damages, Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiffs and the Class)**

335. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

336. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

337. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

338. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

339. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

340. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

341. Plaintiffs and Class Members are patients of Defendant.

342. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

343. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

344. The information disclosed included personally identifiable information, Plaintiffs' and Class Members' statuses as patients of Defendant, and the exact contents of communications

exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

345. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

346. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

347. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

348. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

349. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e., "Alzheimer's"), the condition selected from dropdown menus (i.e., "Heart Disease"),

medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

350. Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' personal information.

351. Plaintiffs' and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

352. Plaintiffs' and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

353. Plaintiffs' and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the

harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

354. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

355. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Class)**

356. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

357. Plaintiffs brings this claim on behalf of themselves and all members of the Class.

358. All conditions precedent to this action have been performed or occurred.

359. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

360. As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs or Class Members.

361. Defendant solicited and invited Plaintiffs and Class Members to provide their Private Health Information on its website as part of Defendants' regular business practices. Defendant required and obtained Plaintiffs' and Class Members' Personal Health Information as

part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' Personal Health Information.

362. Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiffs and Class Members.

363. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices.

364. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

365. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

366. Defendant also materially breached its obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security

measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants' website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook.

367. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs' and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

368. Defendant's conduct in sharing Plaintiffs' and Class Members' Personal Health Information with Facebook also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then shared with Facebook). Indeed, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

369. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the diminution in value of their Personal Health Information.

370. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

371. Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendants took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Implied in Fact Contract**
**(On Behalf of Plaintiffs and the Class)**

372. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

373. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

374. Defendant solicited and invited Plaintiffs and Class Members to provide their Personal Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Personal Health Information, which included personally identifiable information such as their names, telephone numbers, IP addresses, Facebook IDs, browser fingerprints, and device identifiers to Defendant as part of acquiring Defendant's medical services and using its Web Properties. Per its contractual, legal, ethical, and fiduciary duties, Defendant was obligated to take adequate measures to protect Plaintiffs' and Class Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook and Google. These facts give rise to the inference that Defendant took on obligations outside the plain terms of any express contracts that they may have had with Plaintiffs and Class Members.

375. Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendant when they sought medical treatment from Defendant. Specifically,

through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendant to retain and protect the privacy of Plaintiffs' and Class Members' Personal Health Information.

376. Defendant required and obtained Plaintiffs' and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' Personal Health Information. Defendant, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly that it would safeguard Plaintiffs' and Class Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiffs and Class Members.

377. Implied in the exchange was a promise by Defendant to ensure that the Personal Health Information of Plaintiffs and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without the knowledge or consent of Plaintiffs and Class Members. By asking for and obtaining Plaintiffs' and Class Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendants' implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' Personal Health Information was necessary to effectuate the contract between the parties.

378. Plaintiffs and Class Members provided their Personal Health Information in reliance on Defendant's implied promise that this information would not be shared with third parties without their consent.

379. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiffs and Class Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendant (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiffs and the Class Members made to Defendant for medical services was intended to ensure the confidentiality of their Personal Health Information.

380. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendant would not allow third parties to collect or exploit their communications with Defendant without their consent.

381. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their Personal Health Information to Defendant but for the prospect of Defendant's promise of medical treatment and other benefits. Conversely, Defendant presumably would not have taken Plaintiffs and Class Members' Personal Health Information if it did not intend to provide them with medical treatment and other benefits.

382. Defendant was therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiffs and Class Members from unauthorized disclosure and/or use by third parties.

383. Plaintiffs and Class Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their Personal Health Information to Defendant among other obligations. Plaintiffs and Class

Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant.

384. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and the Class Members provided their Personal Health Information and compensation for their medical care.

385. Plaintiffs and Class Members relied on Defendant's implied promises to safeguard their Personal Health Information to their detriment. Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' Personal Health Information from disclosure to Facebook and other third parties.

386. Defendant's failure to implement adequate measures to protect the Personal Health Information of Plaintiffs and Class Members and Defendant's intentional disclosure of the same to Facebook violated the purpose of the agreement between the parties: Plaintiffs' and Class Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

387. Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiffs and Class Members.

388. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant

failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

389. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Class Members; and (b) protect Plaintiffs and the Class Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's websites.

390. Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

391. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

392. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiffs and Class Members' Private Health Information without consent. By soliciting and acquiring Plaintiffs' and Class Members' Personal Health Information Defendant assumed an independent duty to handle Plaintiffs' and Class Members' Personal Health Information with due

care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

393. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

394. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

395. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiffs' and Class Members' consent.

396. Defendant also materially breached its contractual obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health

Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendants' website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook and Google.

397. As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

398. As a result of Defendant's material breaches, Plaintiffs and Class Members were deprived of the benefit of their bargain with Defendant because they spent more on medical services with Defendant than they would have if they had known that Defendant was not providing the reasonable data security and confidentiality of patient communications that Defendant represented that it was providing in its privacy policies. Defendant's failure to honor

its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiffs and Class Members overpaying Defendant for the services they received.

399. The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

400. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

401. Defendant's conduct in sharing Plaintiffs' and Class Members' Personal Health Information with third parties also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then disclosed to third parties). For example, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

402. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and

injuries, including, without limitation, the release and disclosure of their Personal Health Information, the loss of control of their Personal Health Information, the diminution in value of their Personal Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

403. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

404. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health Information both because such information remains within Defendant's control and because anytime that Plaintiffs and/or Class Members interact with Defendant's websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information. Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Personal Health Information.

405. Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose their Personal Health Information without their consent.

406. Plaintiffs and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

407. Defendant deliberately and consciously breached these implied contracts by disclosing Plaintiffs' and Class Members' Personal Health Information without consent to third parties like Facebook and Google.

408. Defendant consciously took advantage of Plaintiffs and Class Members, making the opportunistic calculation that it could engage in an intentional and profitable interference with Plaintiffs' and Class Members' legally protected property rights by secretly sharing their Personal Health Information with Facebook and Google, despite its express promises (1) that "uses and disclosures not described in [their notice] may be made with [patients'] signed authorization"; and collected from its website "with any organization or business"; and (2) "[s]ome of the times [Defendant] may need [patients'] signed permission to use and disclose [patients'] information include sale of [patients'] information, [and] marketing purposes . . . ." Defendant consciously decided not to inform its patients that it was routinely sharing their Personal Health Information with third parties with the hope that its misconduct in intentionally breaching its implied contracts with Plaintiffs and Class Members would never come to light.

409. By deliberately breaching its implied contracts with Plaintiffs and Class Members, Defendant was knowingly enriched by the savings in costs that should reasonably have been expended to protect the Personal Health Information of Plaintiffs and Class Members. Defendant was further knowingly enriched by the financial benefits that it received for bartering Plaintiffs' and Class Members' Personal Health Information to third parties like Facebook and Google, including analytics and advertising benefits that Defendant received in exchange for Plaintiffs' and Class Members' health data.

410. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of their Personal Health Information.

411. Plaintiffs and Class Members are entitled to compensatory and consequential damages, including attorney's fees and actual damages, as a result of Defendant's breach of implied contract. Alternatively, because Defendant's deliberate breach of contract resulted in profit to Defendant where the available damages remedy potentially affords inadequate protection to Plaintiffs' and Class Members' contractual entitlement, Plaintiffs and Class Members are entitled to restitution measured by the profits realized by Defendant from its deliberate breach of contract.

412. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendant's control and because anytime that Plaintiffs and/or Class Members interact with Defendant's websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information. Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

413. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

414. Plaintiffs hereby plead this Count in the alternative to Counts IV and V.

415. Plaintiffs bring this claim on behalf of themselves and all members of the Class.

416. Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class

Members under the guise of keeping this information private, and Defendant appreciated this benefit.

417. Defendant gained access to the Personal Health Information provided by Plaintiffs and Class Members by (1) knowingly concealing its use of pixel tracking technologies from the public; (2) lying to the public in its privacy policies about protecting personally identifying information disclosed via the website from unauthorized disclosure to third parties; (3) failing to institute warnings on its website home page that it had installed pixel tracking technologies; (4) failing to provide industry standard privacy safeguards for its patients' health information; (5) intentionally disregarding years of warnings from the United States Department of Health and Human Services that it was obligated to protect its patients' Personal Health Information from unauthorized disclosures to third parties; (6) intentionally violating its own internal privacy policies by making unauthorized disclosures of patients' Personal Health Information; and (7) intentionally violating Massachusetts law.

418. Defendant benefitted from the use of Plaintiffs' and Class Members' Personal Health Information and unjustly retained those benefits at their expense.

419. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Specifically, Defendant bartered Plaintiffs' and Class Members' Personal Health Information to Facebook and Google in return for both advertising benefits and "free" website analytics information. What's more, by sharing its patients' Personal Health Information with Facebook, Defendant gained the ability to utilize Facebook's customize audiences and targeted advertising features, which saved Defendant substantial revenues by making advertising far less expensive

than it would have been otherwise. Defendant also gained access to free website analytics data, which it otherwise would have had to spend substantial amounts of money to provide for itself.

420. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

421. Defendant unjustly retained the monies that Plaintiffs and Class Members paid with the expectation that Defendant would spend a percentage of those funds to implement adequate data security and privacy training to protect their Personal Health Information against unauthorized disclosure to third parties.

422. Plaintiffs and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties like Facebook and Google.

423. Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

424. Facebook and Google are not charities. Facebook and Google were willing to provide Defendant with "free" analytics benefits only because the patient health data that Defendant surreptitiously shared with those companies has an economic value many times in excess of the analytics services that Facebook and Google provided Defendant.

425. Defendant wrongfully secured the benefits it obtained from Plaintiffs and Class Members by intentionally misleading them about how it would use and exploit their Personal Health Information.

426. Defendant's decision to intentionally mislead Plaintiffs and Class Members about its use of pixel tracking technologies for its own financial benefit is a text-book example of an "unjust" enrichment.

427. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

428. Plaintiffs were aware of the economic value of their Personal Health Information and reasonably expected to be *substantially* compensated by any party who shared or accessed their Personal Health Information to sell advertising. Plaintiffs and Class Members did not consent to Defendant giving their health information away for free.

429. By engaging in the acts and failures to act described in this Complaint, Defendant has been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PII and PHI of the Plaintiffs and the Class. Defendant was on notice that its patients' Personal Health Information was protected by law; that its patients' Personal Health Information had substantial monetary value; that cyber criminals and advertising companies were highly desirous of obtaining access to its patients' Personal Health Information, yet failed to take reasonable steps to pay for the level of data security and privacy training that would have presented the unauthorized disclosure of its patients' Personal Health Information to Facebook, Google, and other third parties.

430. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

431. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, ask for judgment in his favor, and that the Court enter an order as follows:

a. Certifying the Class and appointing Plaintiffs as the Class's representatives;

b. Appoint the law firms of Sweeny Merrigan Law, Keller Postman LLC, Ahmad, Zavitsanos, & Mensing P.C., Colonna & Doyle, and Liddle, Sheets Coulson P.C. as proposed interim class counsel;

c. Finding that Defendant's conduct as alleged herein was unlawful;

d. Awarding such injunctive and other equitable relief as the Court deems just and proper, including enjoining Defendant from making any further disclosure of Plaintiffs or Class Members' communications to third parties without the Plaintiffs or Class Members' express, informed, and written consent;

e. Awarding statutory damages of $1,000 per Plaintiffs and Class Members pursuant to G.L. c. 272, § 99;

f. Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

g. Awarding damages for violations of Plaintiffs and Class Members' right to privacy;

h. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

i. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

j. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

k. Awarding costs of suit; and

l. Such other and further relief to which Plaintiffs and Class Members may be entitled.

**RESPECTFULLY SUBMITTED,**
**COUNSEL FOR PLAINTIFF JOHN DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

*<u>/s/ Jonathan T. Merrigan</u>*
J. Tucker Merrigan, BBO# 681627
Thomas T. Merrigan, BBO# 343480
Erin E. McHugh, BBO# 703701
Sweeney Merrigan Law
268 Summer St. LL
Boston, MA 02210
Tel: (617) 391-9001
Fax: (617) 357-9001
tucker@sweeneymerrigan.com
tom@sweeneymerrigan.com
emchugh@sweeneymerrigan.com

Foster C. Johnson (*pro hac vice*)
David Warden (*pro hac vice*)
Nathan Campbell (*pro hac vice*)
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
Houston, Texas 77010
(713) 655-1101
fjohnson@azalaw.com
dwarden@azalaw.com
ncampbell@azalaw.com

Warren Postman (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606

(312) 741-5220
wpd@kellerpostman.com
adj@kellerpostman.com

*Attorneys for John Doe and the Putative Class*

William P. Doyle (556999)
**LAW OFFICES OF COLONNA & DOYLE**
26 Main Street
Lynnfield, MA 01940
T: (781) 245-1127
F: (781) 245-1148
E: bill@colonna-doyle.com

Nicholas A. Coulson*
Lance Spitzig*
**Pro hac vice* applications forthcoming
**LIDDLE SHEETS COULSON P.C.**
975 East Jefferson Avenue
Detroit, MI 48207-3101
T: (313) 392-0015
F: (313) 392-0025
E: ncoulson@lsccounsel.com
E: lspitzig@lsccounsel.com

*Attorneys for Lisa Colleton and the Putative Class*

Dated: January 25, 2024

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, counsel of record for the Plaintiff in this action, do hereby certify that on January 25, 2024, I have served the following First Amended Class Action Complaint and Demand for Jury Trial via email, to all counsel of record.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan

NOTIFY

56

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT

Notice sent 2/3/25 (8) (CMH)

Doe v. Boston Medical Center Corp., 33
Case No. 2384CV000326-BLS1

Doe v. Children's Hospital Corp., 34
Case No. 2384CV00411-BLS1

Vita v. Blue Cross and Blue Shield of Massachusetts, Inc., 18
Case No. 2384CV00542-BLS1

Nova v. Boston Medical Center Corp., 12
Case No. 2384CV01086-BLS1[1]

Doe v. Cape Cod Healthcare, Inc., 33
Case No. 2384CV01236-BLS1

Doe v. Baystate Health Systems, 11
Case No. 2384CV1949-BLS1

Doe v. UMass Memorial Health Care, Inc., 56
Case No. 2384CV02448-BLS1

Colleton v. UMass Memorial Health Care, Inc., 34
Case No. 2384CV02450-BLS1

Doe v. Atrius Health Inc., 35
Case No. 2384CV02704-BLS1

## SCHEDULING ORDER

At a consolidated scheduling conference today, the parties indicated that many of the plaintiffs in the above-referenced cases sought to amend their complaint in light of the recent decision in Vita v. New England Baptist Hospital, 494 Mass. 824 (2024), if they had done so already; and that many of the defendants intend to try to remove their case to the United States

---

[1] At the hearing this date, the parties indicated that this case had been removed to federal court. No notice of removal appears on the docket.

District Court, as defendants in other similar cases have done. After conferring with counsel, it is hereby ORDERED as follows:

Plaintiffs in each of the above-referenced cases are granted leave to file an amended complaint, without prejudice to any defendant raising in a Rule 12 filing any issues that could have been presented in opposition to a motion under Rule 15. Any such amended complaint shall be filed by January 31, 2025.

On March 19, 2025, at 2 p.m., the court will conduct a Rule 16 conference in each of the above-referenced cases that has not been removed. The Rule 16 conference shall be held over Zoom (Mtg ID: 161 888 7367).

Dated: January 15, 2025

Peter B. Krupp
Justice of the Superior Court

I HEREBY ATTEST AND CERTIFY ON
March 7, 2025, THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

Date Filed 1/31/2025 4:42 PM
Superior Court - Suffolk
Docket Number 2384CV02448

BC

57

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, S.S.

SUPERIOR COURT
BUSINESS LITIGATION SESSION

| | | |
|---|---|---|
| JOHN DOE, LISA COLLETON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § | C.A. No. 2384CV02448-BLS1 |
| Plaintiffs, | § | |
| v. | § | |
| UMASS MEMORIAL HEALTH CARE, INC, | § | |
| Defendant. | § | |

**SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

NATURE OF ACTION AND ALLEGATIONS .......... 1

PARTIES TO THE ACTION .......... 2

JURISDICTION AND VENUE .......... 3

FACTUAL BACKGROUND .......... 3

A. Defendant routinely disclosed the protected health information of its patients to third parties including Facebook and Google. .......... 3

B. Plaintiffs' experience with Defendant. .......... 4

C. Defendant misuses sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook. .......... 6

D. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website. .......... 13

E. Facebook's Business Model: Exploiting Users' Personal Information for Profit. .......... 19

F. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites. .......... 22

F. Defendant has discretely embedded the Meta Pixel tool on its website, capturing and disclosing of patients' PII/PHI to Facebook. .......... 29

G. Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information. .......... 42

H. Defendant's disclosures of personal patient data to Facebook, Google, and other third parties are unnecessary. .......... 45

I. Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI, especially with respect to sensitive medical information. .......... 46

J. Defendant harmed Plaintiffs when it illicitly collected, disclosed, and exploited Plaintiffs' PII/PHI —which, after all, is Plaintiffs' property, and has economic value. .. 50

K. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' PII/PHI. .......... 51

TOLLING, CONCEALMENT, AND ESTOPPEL .......... 52

CLASS ACTION ALLEGATIONS .......... 53

CAUSES OF ACTION .......... 57

COUNT I .......... 57

COUNT II .......... 62

COUNT III .......... 65

COUNT IV .......... 69

COUNT V .......... 79

DEMAND FOR JURY TRIAL .......... 83

PRAYER FOR RELIEF .......... 83

Plaintiffs John Doe and Lisa Colleton ("Plaintiffs"), individually and on behalf of all other Citizens of the Commonwealth of Massachusetts similarly situated ("Class Members"), bring suit against Defendant UMass Memorial Health Care, Inc. ("Defendant"), and upon personal knowledge as to Plaintiffs' own conduct and on information and belief as to all other matters based upon investigation by counsel, allege as follows:

## NATURE OF ACTION AND ALLEGATIONS

1. This case arises from Defendant's systematic violation of the medical privacy rights of its patients, exposing highly sensitive personal information to third parties without those patients' knowledge or consent.

2. Defendant assures visitors to its website that it is "committed to protecting your privacy" and that "We have designed our website to allow you to visit most areas without identifying yourself or providing personal information."[1] Contrary to these assurances, Defendant did not follow this policy, nor the law prohibiting such disclosures.

3. At all relevant times, Defendant disclosed information about its patients—including their status as patients, their physicians, their medical treatments, the hospitals they visited, and their personal identities—to Facebook, Google, and other third parties without their patients' knowledge, authorization, or consent.

4. Defendant disclosed this protected health information through the deployment of various digital marketing and automatic rerouting tools embedded on its websites that purposefully and intentionally redirect patients' personal health information to third parties who exploit that information for advertising purposes. Defendant's use of these tools caused its patients' personally identifiable information and the contents of its patients' communications exchanged with

[1] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement

Defendant to be automatically redirected to third parties in violation of those patients' reasonable expectations of privacy, their rights as patients, their rights as citizens of Massachusetts, and both the express and implied promises of Defendant.

5. Defendant's conduct in disclosing such protected health information about its patients to Facebook and other third parties violates both Massachusetts and Federal law.

**PARTIES TO THE ACTION**

6. Defendant UMass Memorial Health Care, Inc. is a Massachusetts corporation with its principal office at One Biotech Park, 365 Plantation Street, Worcester, MA 01605. Defendant is the largest health care system in Central Massachusetts.[2] Defendant owns and manages many healthcare facilities in Massachusetts, including UMass Memorial Medical Center, UMass Memorial Health Harrington Hospital, UMass Memorial Health Marlborough Hospital, Community Healthlink Behavioral Health Services, and UMass Memorial Health Clinton Hospital.[3]

7. Plaintiff John Doe is a Massachusetts citizen residing in Worcester County, Massachusetts, has been treated by Defendant's physicians, and has been a patient of UMass Memorial Medical Center,[4] and thus also a patient of Defendant. John Doe is a user of Defendant's website at www.ummhealth.org.

8. Plaintiff Lisa Colleton is an individual who is over 18 years and resides in Marlborough, Massachusetts. Plaintiff is also a patient of Defendant and a user of Defendant's website at www.ummhealth.org.

[2] https://www.ummhealth.org/umass-memorial-health/about-us
[3] https://www.ummhealth.org/locations
[4] https://www.ummhealth.org/umass-memorial-medical-center

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendant because it regularly conducts business throughout Massachusetts and has its principal place of business at 365 Plantation Street, Worcester, MA 01605. G.L. c. 223A, § 2; G.L. c. 223A, § 3.

10. Venue is appropriate in the Business Litigation Session per the Order to Transfer dated October 23, 2023.

## FACTUAL BACKGROUND

### A. Defendant routinely disclosed the protected health information of its patients to third parties including Facebook and Google.

11. Under G.L. c. 214, § 1B, all persons "have a right against unreasonable, substantial, or serious interference" with their privacy.

12. Medical patients such as Plaintiffs have a legal interest in preserving the confidentiality of their communications with healthcare providers and have reasonable expectations of privacy that their personally identifiable information and communications will not be disclosed to third parties by Defendant without their express written consent and authorization.

13. Patients also have reasonable expectations of privacy that their personal identifiable information and protected health information (together "PII/PHI") and communications will not be disclosed to third parties without their express written consent and authorization.

14. As a health care provider, Defendant has ethical, fiduciary, common law, and statutory duties to protect the confidentiality of patient information and communications.

15. Defendant expressly and impliedly promises patients that it will maintain and protect the confidentiality of PII/PHI and communications.

16. Defendant operates websites for patients, including www.ummhealth.org and www.harringtonhospital.org.

17. Defendant's websites are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, requesting medical records, learning about medical issues treatment options, and joining support groups.

18. Defendant encourages patients to use digital tools on its websites to seek and receive health services.

19. The home page of Defendant's website is designed for use by patients, and provides patients with tools to seek treatment, such as buttons that patients can click to find a doctor, research treatments, and learn about Defendant's services.

20. Defendant also maintains a patient portal, which allows patients to make appointments, access medical records, view lab results, and exchange communications with their health care providers. Collectively herein, Defendant's website and patient portal are defined as Defendant's "Web Properties."

21. Notwithstanding patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant discloses the contents of patients' communications and protected healthcare information via automatic re-routing mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.

**B. Plaintiffs' experience with Defendant.**

22. Plaintiff John Doe was a patient of Defendant for over a decade. While a patient of Defendant, including in 2021 and 2022, John Doe visited Defendant's website regularly at www.ummhealth.org in the course of seeking medical treatment. He used Defendant's website to find a doctor and research locations for treatment. On Defendant's website, John Doe entered data, including sensitive medical information, such as details about his medical conditions and treating

physicians. The information that Plaintiff John Doe transmitted included queries about treatment for a spinal injury that he suffered and for which he sought treatment from Defendant.

23. In addition, John Doe regularly used Defendant's password-protected patient portal to review summaries of his visits and instructions from his treating physicians, schedule appointments, and pay for medical treatment. He most recently used the patient portal to pay for treatment in 2023. When using Defendant's patient portal John Doe also communicated such specific details as his name, his patient status, his treating physician, and the specific medical conditions that he was seeking treatment for and information about.

24. Plaintiff Lisa Colleton has likewise been a patient of Defendant for several years. While a patient of Defendant, she used Defendant's website on many occasions, including at least once in each of April, May, June, July, August, and September 2021. She also visited and used Defendant's password-protected patient portal. At the times she visited Defendant's website and patient portal, she had and remained logged into a Facebook account.

25. Lisa Colleton used Defendant's website to search for medical information, services and physicians, schedule appointments, and pay for treatment. She also used Defendant's patient portal to communicate with her treating physicians. When using Defendant's website and patient portal, Plaintiff Colleton entered data, including sensitive medical information, such as details about her particular medical conditions and treating physicians. The information that Plaintiff Colleton transmitted included queries about treatment for a particular diagnosis she received.

26. Unbeknownst to Plaintiffs, Defendant installed tracking technologies across its webpages and on the login button to its patient portal that caused the medical information they entered on those webpages, their personally identifiable information including their IP Addresses and Brower Fingerprints, and Plaintiffs' interactions with Defendant's webpages, to be transmitted

to third party advertisers without their consent.

27. On information and belief, Defendant also installed tracking technologies inside of its patient portal that caused the medical information Plaintiffs entered on that patient portal, their personally identifiable information including their IP Addresses and Brower Fingerprints, and Plaintiffs' interactions with Defendant's patient portal, to be transmitted to third party advertisers without their consent.

28. Plaintiffs believed that their interactions with Defendant through its web site and patient portal were private and would not be shared with anyone besides their health care providers and their staff. They were dismayed to learn that was not the case.

**C. Defendant misuses sophisticated software to automatically collect and disclose patient PII/PHI to third-party advertising companies like Google and Facebook.**

29. Defendant's disclosures of patients' personal healthcare information occur because Defendant intentionally deploys source code on the websites it operates, including www.ummhealth.org and www.harringtonhospital.org, that causes patients' personally identifiable information (including the exact contents of their communications) to be transmitted to third parties.

30. By design, third parties receive and record the exact contents of patient communications before the full response from Defendant to patients has been rendered on the screen of the patient's computer device and while the communication between Defendant and the patient remains ongoing.

31. For example, when Plaintiffs or a Class Member accessed Defendant's website pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message to Facebook's servers. The information that Defendant sent to Facebook included the private information that Plaintiffs and Class Members communicated to Defendant's website, such as the

type of medical appointment the patient made, the date, and the specific doctor the patient was seeing. Such private information allows third-party advertising companies like Facebook to determine that a specific patient was seeking a specific type of confidential medical treatment. This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being treated for specific types of medical conditions, such as cancer and pregnancy.

32. Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

33. Web browsers are software applications that allow users to exchange electronic communications over the internet.

34. Each exchange of an electronic communication over the internet typically consists of an HTTP request from a client device and an HTTP response from a server. When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

35. In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies. Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

36. In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

37. A web page consists primarily of "Markup" and "Source Code." The markup of a web page comprises the visible portion of that web page. Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen. The

source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

38. For example, typing https://www.ummhealth.org/ into a browser sends an HTTP request to Defendant's website, which returns a HTTP response in the form of the home page of Defendant's website:




39. Source code is not visible on the client device's screen, but it may change the markup of a webpage, thereby changing what is displayed on the client device's screen. Source code may also execute a host of other programmatic instructions, including commanding a web browser to send data transmissions in the form of HTTP requests to the website's server, or, as is the case with Defendant's website, to third parties via pixels.

40. For example, Defendant's website includes software code that transmits patients' HTTP requests to Facebook, including patients' private health information, every time a patient interacts with a page on its website.

41. The basic command that web browsers use to exchange data and user communications is called a GET request.[5] For example, when a patient types "heart failure treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser makes a connection with the server for Defendant's website and sends the following request: "GET search/q=heart+failure+treatment."

42. When a server receives a GET request, the information becomes appended to the next URL (or "Uniform Resource Locator") accessed by the user. For example, if a user enters "respiratory problems" into the query box of a website search engine, and the search engine transmits this information using a GET request method, then the words "respiratory" and "problems" will be appended to the query string at the end of the URL of the webpage showing the search results.

43. The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

44. In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

45. Unbeknownst to users, however, the website's server may also transmit the user's communications to third parties, like Facebook and Google, via third-party tracking tools. Indeed, Google warns website developers and publishers that installing its ad-tracking software on

[5] https://www.w3schools.com/tags/ref_httpmethods.asp

webpages employing GET requests will result in users' personally identifiable information being disclosed to Google. [6]

46. Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

47. In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

48. These tracking pixels can collect dozens of data points about individual website users who interact with a website. For example, when a patient clicked through Defendant's website to the page describing Defendant's "Reproductive Endocrinology and Infertility" services at https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/women%E2%80%99s-health/services-we-provide/reproductive-endocrinology-and-infertility, the source code deployed on Defendant's website caused personally identifiable data and the content of patient communications to be transmitted to third parties like Facebook and Google:

[6] https://support.google.com/platformspolicy/answer/6156630?hl=en




49. By design, the transmission of patient data to third parties occurs before Defendant's responsive communications about "Reproductive Endocrinology and Infertility" have been delivered in full to the patient.

50. For example, one of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

51. Tracking pixels such as the Meta Pixel tool allow Defendant and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendant's websites. When patients visit Defendant's websites, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Defendant's websites. This code is triggered when a patient or visitor interacts with the web page. Each time the Meta Pixel is triggered, the software code is executed and sends patient's PII/PHI directly to Facebook.

52. The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they surreptitiously installed. Instead, these pixels lie in wait until they are triggered by an event, at which time they effectively open a channel through the website funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

53. For example, a patient can trigger an HTTP request by interacting with the search bar on Defendant's website by typing a term such as "breast cancer" into the search bar and then hitting enter. Defendant's server in turn sends an HTTP response, which results in the search results being displayed.

54. This is not the only HTTP request, however, that is created by a patient's interaction with Defendant's website. In fact, at the very same time the web page is instructed to send an HTTP request to Defendant requesting search results, the embedded Meta Pixel, acting as a tap, is triggered, such that the patient's HTTP request is shared with Facebook and Google, informing them of the patient's exact search and the patient's personally identifiable information.

55. In addition to employing the Meta Pixel to track patients, Defendant's web properties and patient portal used Google Analytics, to track and disclose patient activity—including Plaintiffs'—without their consent. Unbeknownst, the installation of this code inside patient portal resulted in disclosures of patients' personal health information, including their patient status, whenever they logged into the patient portal for routine purposes such as reviewing medical records, checking lab results, and communicating with their doctors. The Google Analytics pixel within the patient portal also disclosed when patients viewed specific pages within the patient portal, including prescription information and test results.

56. In addition, through Google Analytics, Defendant disclosed Plaintiffs' activity by tracking and disclosing their IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely disclosed patients' PII/PHI to Google using this technology.

57. A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must enter the third-party source code directly onto their website for every third party they wish to send user data and communications.

58. Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

59. Tag managers are simple enough that non-programmers can use them to deploy and remove digital tracking tools from web-properties with just the click of a few buttons.

60. Defendant deployed Google Tag Manager on its website through an "iframe," a nested "frame" that exists within the Defendant's website that is, in reality, an invisible window through which Defendant funnels tracking pixels for third parties to secretly acquire the content of patient communications without any knowledge, consent, authorization, or further action of patients.

61. By design, none of the tracking is visible to patients visiting Defendant's websites.

**D. Tracking pixels provide third parties with a trove of personally identifying data permitting them to uniquely identify the individuals browsing a website.**

62. Tracking pixels are especially pernicious because they result in the disclosure of a variety of data that permits third parties to determine the unique personal identities of website visitors. While most users believe that the internet provides them with anonymity when, for example, they browse a hospital website for treatment information about a medical condition, that

is not the case when the hospital website has embedded third party tracking devices, as Defendant has.

63. For example, an IP address is a numerical identifier that identifies each computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[7]

64. Because of their uniquely identifying characteristics, IP addresses are considered personally identifiable information. *See* 45 CFR § 164.514. Tracking pixels can (and typically do) collect website visitors' IP addresses.

65. Likewise, internet cookies also provide personally identifiable information. Cookies are small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server. Cookies are typically designed to acquire and record an individual internet user's communications and activities on websites and were developed by programmers to aid with online advertising.

66. Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history. To build individual profiles of internet

[7] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

users, third party advertising companies assign each user a unique (or a set of unique) identifiers to each user.

67. Cookies fall within the personal identifiers protected by HIPAA. *See* 45 C.F.R. § 164.51(b)(2)(i)(H), (J), (M), and (R), and tracking pixels can collect cookies from website visitors.

68. In general, cookies are categorized by (1) duration and (2) party.

69. There are two types of cookies classified by duration.

70. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

71. "Persistent cookies" are designed to survive beyond a single internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites. Persistent cookies are also called "tracking cookies."

72. Cookies are also classified by the party that uses the collected data.

73. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

74. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits Defendant's website will also have cookies on their device from third parties, such as Facebook and Google. Unlike first-party cookies, third-party cookies are not typically

helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

75. Data companies like Facebook have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits. To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

76. Traditionally, first-party and third-party cookies were kept separate. An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Defendant can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendant is not permitted direct access to Facebook third-party cookie values. The reverse *was* also true: Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendant. But Big Data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

77. JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Defendant can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie syncing," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie syncing operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is

associated with a cookie identifier number. The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

78. In effect, cookie syncing is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies. By designing these special third-party cookies that are set for first-party websites, Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking. On information and belief, the letters fbp are an acronym for Facebook Pixel.

79. The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

80. The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

81. Defendant requires patients using its patient portal to have enabled first-party cookies to gain access to its patient portal.

82. The _fbp cookie is used as a unique identifier for patients by Facebook.

83. If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie. Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendant with Facebook users.

84. Defendant has engaged in cookie syncing with Facebook, Google, and other third parties.

85. Defendant's cookie disclosures include the deployment of cookie syncing techniques that cause the disclosure of the first-party cookie values that Defendant assigns to patients to also be made to third parties.

86. Defendant has used and caused the disclosure of patient cookie identifiers with each communication described herein, including patient communications concerning individual providers, conditions, and treatments.

87. A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint." A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

88. These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data. As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[8] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[9] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[10]

89. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[11]

[8] https://www.blog.google/products/chrome/building-a-more-private-web/
[9] https://pixelprivacy.com/resources/browser-fingerprinting/
[10] https://www.blog.google/products/chrome/building-a-more-private-web/
[11] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

90. Browser-fingerprints are considered protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R), and tracking pixels can collect browser-fingerprints from website visitors.

91. Defendant has used and caused the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each intercepted communication described herein, including patient communications concerning individual providers, conditions, and treatments.

92. A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the internet whenever the identifier is encountered. A Facebook ID is an identifiable number string that is connected to a user's Facebook profile.[12] Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[13]

93. Unique personal identifiers such as a person's Facebook ID are protected by HIPAA, 45 C.F.R. § 164.514(2)(i)(R) and are likewise capable of collection through pixel trackers.

94. Each of the individual data elements described above is personally identifiable on their own. However, Defendant's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

## E. Facebook's Business Model: Exploiting Users' Personal Information for Profit.

95. Facebook, a social media platform founded in 2004 and today operated by Meta

[12] https://www.facebook.com/help/211813265517027
[13] https://smallseotools.com/find-facebook-id/

Platforms, Inc., was originally designed as a social networking website for college students.

96. Facebook describes itself as a "real identity" platform.[14] This means that users are permitted only one account and must share "the name they go by in everyday life."[15] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[16]

97. In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more tailored and relevant ads."[17] Facebook has since evolved into one of the largest advertising companies in the world.[18] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[19] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[20]

98. Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[21]

99. Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code. Facebook

[14] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.
[15] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/
[16] https://www.facebook.com/help/406644739431633
[17] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/
[18] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/
[19] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[20] https://www.facebook.com/business/ads/ad-targeting
[21] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

employs algorithms, powered by machine learning tools, to determine what advertisements to show users based on their habits and interests, and utilizes tracking software such as the Meta Pixel to monitor and exploit users' habits and interests.

100. Tracking information about users' habits and interests is a critical component of Facebook's business model because it is precisely this kind of information that allows Facebook to sell advertising to its customers. Facebook uses plug-ins and cookies to track users' browsing histories when they visit third-party websites. Facebook then compiles these browsing histories into personal profiles which are sold to advertisers to generate profits.

101. Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allow an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

102. Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[22] Aided by highly granular data used to target specific

[22] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

103. Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information given its history of violating consumers' privacy through unauthorized use of their personal information in general, and for marketing purposes, specifically.

104. Despite knowing that the Meta Pixel code embedded in its websites was sending patients' PII/PHI to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

105. Additionally, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites results in the disclosure of patients' PII/PHI to Facebook, as evidenced by multiple data breaches experienced by hospitals where data gathered by the Meta Pixel code was stolen by cybercriminals. There is also widespread recognition that such disclosures are not only illegal but fundamentally unethical, given the privacy rights involved.

**F. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

106. To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

107. One of Facebook's most powerful tools is called the "Meta Pixel."

108. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[23] Once activated, the Meta Pixel "tracks the

[23] https://developers.facebook.com/docs/meta-pixel/

people and type of actions they take."[24] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[25] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[26]

109. When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[27] This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

110. The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

111. The transmission is invisible.

112. The transmission is made without any affirmative action taken by the patient.

113. The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[28] When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which

[24] https://www.facebook.com/business/goals/retargeting
[25] https://www.facebook.com/business/help/742478679120153?id=1205376682832142
[26] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[27] *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).
[28] *In re Facebook*, 956 F.3d at 596.

resources to request and where to find them. Thus, the URL provides significant information regarding a user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

114. These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform. In this manner, Facebook tracks users browsing histories on third-party websites, and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[29]

115. For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information such as IP addresses, Facebook IDs, user agent information, device identifiers, and other data. All this personally identifiable data is available to be included each time the Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

116. These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible. Facebook's Meta

[29] *In re Facebook*, 956 F.3d at 596.

Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[30]

117. The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[31]

118. In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they've placed on Facebook and Instagram and tools to target people who have visited their website.[32]

119. Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

120. Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[33] According to Facebook, the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[34]

121. Facebook warns web developers that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[35]

122. Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code

[30] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[31] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector
[32] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites
[33] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/
[34] https://www.oviond.com/understanding-the-facebook-pixel
[35] https://developers.facebook.com/docs/meta-pixel/get-started

from blocking Pixel's execution and to ensure that visitors will be tracked.[36]

123. Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (includingPII/PHI), as well as "optional values" set by the business website. Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID. Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

124. Facebook tracks non-Facebook users through its widespread internet marketing products and source code and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[37]

125. For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.

126. For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[38] HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[39] Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[40]

127. Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and

[36] https://developers.facebook.com/docs/meta-pixel/get-started
[37] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/
[38] https://developers.facebook.com/docs/meta-pixel/
[39] https://developers.facebook.com/docs/meta-pixel/
[40] https://developers.facebook.com/docs/meta-pixel/

specific Facebook ID, which identifies an individual's Facebook user account. Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile. Facebook stores this information on its servers, and, in some instances, maintains this information for years.[41]

128. Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites. When browsing a third-party website that has embedded Facebook code, a user's unique IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets. The IP address enables Facebook to keep track of the website page visits associated with that address.

129. Facebook also places cookies on visitors' computers. It then uses these cookies to store information about each user. For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

130. The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie. One simply needs to log into Facebook, and then type www.facebook.com/#, with the c_user identifier in place of the "#." For example, the c_user cookie for Mark Zuckerberg is 4. Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

131. Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser. Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers. Facebook employs similar cookies such as "datr," "fr," "act,"

[41] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

"presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[42] These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[43]

132. Facebook also uses browser fingerprinting to uniquely identify individuals. Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more. Together, these attributes create a fingerprint that is highly distinctive. The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address. Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like https://www.ummhealth.org/ and target users with advertising based on their web activity.

133. Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website. This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections." Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising. Indeed, Facebook utilizes precisely the type of Personal Health Information that Defendant bartered to Facebook so that Facebook can identify, target, and market products

[42] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.
[43] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

and services to individuals.

**F. Defendant has discretely embedded the Meta Pixel tool on its website, capturing and disclosing of patients' PII/PHI to Facebook.**

134. A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

135. Facebook's intrusion into the personal data of the visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[44] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

136. Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through future Facebook ads. For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria. Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

137. Businesses install the Meta Pixel software code to help drive and decode key

[44] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

performance metrics from visitor traffic to their websites.[45] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[46]

138. For example, when a user on many hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

139. Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or to create an appointment—Facebook code embedded on that page transmits the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

140. Defendant is among the hospital systems who have embedded Meta Pixel on their websites. Via its use of the Meta Pixel, Defendant intercepted and disclosed the contents of Plaintiffs' and Class Members' communications with Defendant, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, and buttons clicked to Search, Find a Doctor, connect, Login, Logout, or Enroll in Defendant's patient portal, summaries of Defendant's responsive communications, the parties to the communications, and the existence of communications at Defendant's websites.

141. When patients like Plaintiffs and the Class Members visited the homepage of Defendant's website, the source code employed by Defendant caused their personally identifiable

[45] https://instapage.com/blog/meta-pixel
[46] https://instapage.com/blog/meta-pixel

information (such as Facebook IDs, their IP address, and their browser fingerprints) to be transmitted to Facebook along information identifying the specific pages on Defendant's website that they viewed. In other words, *every time* that Defendant's patients like Plaintiffs visited its website, Defendant disclosed not only *who* those patients were, but also *what* medical treatments they reviewed on the website, *what* doctors they reviewed on the website, *what* search terms they typed into online forms, and whether they had logged into the Defendant patient portal.

142. For example, a patient searching for a doctor on Defendant's website located at www.harringtonhospital.org is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's hometown, the patient's language preference, and other information that the patient provides:




143. All this data was disclosed to Facebook in real time via the Meta Pixel as patients

transmit their information, along with other data, such as patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also disclosed other personally identifying information to Facebook, such as patient IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

144. Defendant disclosed such personally identifying information and sensitive medical informationeven when patients were searching for doctors on its websites to assist them with conditions such as substance abuse and addiction:




145. Likewise, a patient who desires an appointment at a specific hospital using Defendant's websites also has that information forwarded to Facebook via the Meta Pixel

contemporaneously with its transmission by patients:




146. All this data about patients' interactions with Defendant's website is disclosed to Facebook simultaneously in real time as visitors transmit their information, including information such as the doctor they choose for treatment, the doctor's specialty, the patient's location, the patient's language and gender preferences, and the full-string URLs generated by patient's searches. Along with other data, Defendant also discloses patients' unique Facebook IDs, which are captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also discloses other personally identifying information to Facebook, such as patient and user IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.

147. A patient searching for information about cancer treatment or pregnancy, however, not only shares their Personal Health Information with Defendant, but also unknowingly shares their Personal Health Information with Facebook and Google, such as the fact that the patient is pregnant.

148. All these communications were acquired by Defendant and forwarded to third parties like Facebook and Google via tracking technologies that Defendant installed on its website.

149. In other words, Facebook and Google learned not just that patients were seeking treatment, but where and typically when they were seeking treatment, along with other information that patients would reasonably assume that Defendant was not sharing with third party marketing companies.

150. Defendant discloses patient information from across its website including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for "Services and Treatments" offered by Defendant, communications made by patients using the website's Bill Pay function, communications made when patients access Defendant's patient portal, and communications made when patients are researching specific medical conditions such as COVID-19.

151. Defendant has disclosed patient PII/PHI collected across their websites including (but not limited to) the following communications:

a. when patients search via Defendant's search bars for their required care (e.g., for "substance abuse");

b. when patients search for a physician or provider—which reveal their location and required medical services and medical conditions (e.g., searching for "Gynecology");

c. when patients search for, register for, and/or click on classes or events; and

d. when patients research treatment information and medical services.

152. In other words, Facebook learned not just that patients are seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Defendant is not sharing with third party marketing companies.

153. Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

154. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's websites. The path identifies where a file can be found on a website. Likewise, a query string provides a list of parameters. The query string parameters in this search indicate that a search was done at Defendant's website for information about HIV. In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider and that patient's specific healthcare issue.

155. Defendant also provided Facebook with details about online forms that patients fill out in the form of POST requests. All the information that patients provided when filling out these forms was also disclosed to Facebook.

156. As the above demonstrates, knowing what information a patient is reviewing on Defendant's websites can reveal deeply personal and private information. For example, a simple search for "pregnancy" on Defendant's websites tells Facebook that the patient is likely pregnant.

Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends. But there is nothing visible on Defendant's websites that would indicate to patients that, when they used Defendant's search function, their personally identifiable data and the precise content of their communications with Defendant was being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

157. The amount of data collected is significant. Via the Meta Pixel, when patients interact with its website, Defendant discloses a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested. For example, when a patient types a search term into the search bar on Defendant's website, the website returns links to information relevant to the search term. When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

158. Facebook's Meta Pixel collects and forwards this data to Facebook, including the full-string referral URL (including the exact subpage of the precise terms being reviewed) and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used. In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

159. The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's website. The path identifies where a file can be found on a website. For example, take https://physicians.umassmemorial.org/details/5019/edward-appelbaum-orthopedics-southbridge. Here, the "path" is details/5019/edward-appelbaum-orthopedics-southbridge. Similarly, a patient reviewing information about "Services" that Defendant offers patients such as "Pediatrics" will generate a URL with the path https://www.ummhealth.org/umass-memorial-medical-center/services-treatments/childrens-medical-centerpediatrics.

160. Likewise, a query string provides a list of parameters. A query string includes fields added to a base URL by a user's web browser or other client application. To illustrate, an example of a full-string URL that provides a query string is https://www.ummhealth.org/search-results?search_block_form=cancer&form_build_id=form-LTYWYGzK9G3Apqp3zsv-6B9rFLxKRNgPOSZTLxkXC6k&form_id=search_block_form#gsc.tab=0&gsc.q=cancer&gsc.page=1. The query string parameters in this search indicate that a search was done at Defendant's website for information about cancer. In other words, the Meta Pixel captures information that connects a particular user with a particular health condition to a particular healthcare provider.

161. The contents of patients' search terms shared with Facebook plainly relate to (and disclose) both the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website and the provision of health care to those patients. Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the full-string URL generated by patient searches is acquired by Facebook along with personally identifiable information.

162. Defendant also provides Facebook and Google with details about online forms that patients fill out in the form of POST requests. This results in information that patients provide when filling out these forms also being disclosed to Facebook and Google. For example, when Plaintiffs filled out the online forms that Defendant provides to assist patients in finding treating physicians, Defendant shared every detail that Plaintiffs entered into those forms, including the kind of doctor they searched for, their preferred treatment location, and their preferred gender of the treating physician. All those details from Plaintiffs' communications with Defendant were simultaneously shared with Facebook and Google without Plaintiffs' knowledge or consent, via source code that Defendant had installed on its website.

163. The nature of the collected data is also important. Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition. Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website. This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

164. Defendant also disclosed the same kind of patient data described above to other third parties, including Google, Twitter, New Relic, Acquia, and ShareThis.com via tracking software that Defendant installed on its website. As with the Facebook Meta Pixel, Defendant provides patients and prospective patients with no notice that Defendant is disclosing the contents of their communications to these third parties. Likewise, Defendant does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

165. These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the

web's most dominant analytics platform," which "tracks you whether or not you are logged in."[47] Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers. Defendant routinely discloses patients' personal health information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

166. Google cookies provide personally identifiable data about patients who visit Defendant's website to Google. Defendant transmits personally identifiable Google cookie data to Google.

167. Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites. Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

168. Defendant deploys Google tracking tools on nearly every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google. These transmissions occur simultaneously with patients' communications with Defendant and include communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, bill payments, and registrations and logins to Defendant's patient portal.

169. By compelling visitors to its websites to disclose personally identifiable data and sensitive medical information to Facebook and other third parties, Defendant knowingly discloses information that allows Facebook and other advertisers to link its patients' PII/PHI to their private identities and target them with advertising (or do whatever else Facebook may choose to do with their information, including running "experiments" on its customers by manipulating the

[47] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

information they are shown on their Facebook pages).[48] Defendant intentionally shares the PII/PHI of their patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

170. Because Defendant embedded the Meta Pixel on its website, Defendant disclosed intimate details about Plaintiffs' interactions with its website. Each time the Meta Pixel was triggered, it caused Plaintiffs' information to be secretly transmitted to Facebook's servers, as well as additional information that captures and discloses the communications' content and Plaintiffs' identity. For example, when Plaintiffs and Class Members visited Defendant's website, their personal health information was transmitted to Facebook, including such engagement as using the website's search bar, using the website's Find a Doctor function, and typing content into online forms. During these same transmissions, Defendant's website would also provide Facebook with Plaintiffs' and Class Members' Facebook ID, IP addresses, device IDs, and other information that Plaintiffs and Class Members provided—including the pages viewed, the physicians viewed, the appointments scheduled, and the locations of those physicians and appointments. This is precisely the type of information that state and federal law require healthcare providers to de-identify to protect the privacy of patients.

171. Moreover, each time Plaintiffs used Defendant's Website, Defendant willfully disclosed Plaintiffs' IP address, the information entered on Defendant's Website, the pages viewed, the physicians viewed, the physicians called, the appointments scheduled, and the locations of those physicians and appointments to Google via Google Analytics.

172. This simultaneous disclosure of information allowed Google to read or learn the

[48] https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

contents of communications between Plaintiffs and Defendant.

173. Defendant affirmatively made the decision to intrude on Plaintiffs' privacy by installing source code on its website designed to secretly share patients' Personal Health Information with third parties. For example, Defendant knew that by embedding Meta Pixel, it was permitting Facebook to collect, use, and share Plaintiffs' and the Class Members' personal health information, including sensitive medical information and personally identifiable data. Defendant was also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Defendant was also aware that installing the Meta Pixel tool would result in dozens (if not hundreds) of unauthorized persons at Facebook and Google viewing the Personal Health Information of Defendant's patients, including the Personal Health Information of Plaintiffs and Class Members. Defendant's decision to affirmatively communicate and share their patients' Personal Health Information with Facebook, Google, and those companies' employees violates the numerous protections afforded by Massachusetts law.

174. Defendant also knew that installing tracking pixels would result in Plaintiffs' and Class Members' Personal Health Information being improperly accessed by Facebook and Google employees so that those companies could sell advertising. Moreover, Defendant was also aware that once it shared Plaintiffs' health information with Facebook that it would no longer have any control over what Facebook did with that information or who Facebook would share that information with. On information and belief, it is likely that the third parties with whom Defendant shared Plaintiffs' Personal Health Information further disseminated that information to additional third parties, including potential advertisers. On information and belief, Plaintiffs' Personal Health Information was viewed by one or more employees at Facebook for the purpose targeting them with advertising.

175. Defendant made the decision to barter its patients' personal health information to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendant and Facebook, it also betrayed the privacy rights of Plaintiffs and Class Members.

**G. Plaintiffs and the Class Members did not consent to the interception and disclosure of their protected health information.**

176. Plaintiffs and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and transmitted to Facebook, Google, and other third parties. That is because, among other things, Meta Pixel is seamlessly integrated into Defendant's websites and is invisible to patients visiting those websites.

177. For example, when Plaintiff John Doe visited Defendant's website in 2022 at www.ummhealth.org there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.

178. Plaintiffs and their fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook in the first place.

179. While Defendant purports to have "Privacy Practices," those Privacy Practices are effectively hidden from patients, buried inside a link labeled "Terms of Use" that is concealed at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:

Date Filed 1/31/2025 4:42 PM
Superior Court - Suffolk
Docket Number 2384CV02448




180. While disclosing that its website contains "cookies," Defendant's "Terms of Use" falsely promises patients that the "[u]se of a cookie is in no way linked to any personally identifiable information while on the UMass Memorial site."[49] Contrary to that promise, Defendant's website automatically transmits personally identifiable information to Facebook using multiple cookies, including c_user, datr, fr, and xs cookies.

181. To locate Defendant's "Privacy Policy," a patient is required to scroll through the "UMass Memorial Health Care Website Terms of Use Statement" to find a link entitled "Read Our Privacy Policy" that is buried in the website's general terms and conditions statement.[50]

182. Defendant's "Privacy Policy" gives no indication to patients that Defendant routinely allows Facebook to capture and exploit patients' Personal Health Information. Indeed, Defendant expressly promises in its "Privacy Policy"[51] that protecting patients' health information is a priority:

---

[49] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement
[50] https://www.ummhealth.org/umass-memorial-health-care-website-terms-use-statement
[51] https://www.ummhealth.org/patients-visitors/joint-notice-information-practices

# JOINT NOTICE OF INFORMATION PRACTICES

At UMass Memorial Health Care, your privacy is a priority. We follow strict federal and state guidelines to maintain the confidentiality of your medical (protected health) information. We also follow state guidelines regarding how long we must store your medical records and the requirements for proper disposal.

183. These statements are false, deceptive, and misleading in light of Defendant's secret disclosure of patient information to numerous third parties, including Facebook and Google. Defendant's privacy policy is also false, deceptive, and misleading because Defendant in fact routinely sells and/or barter its patients' personal health information to Facebook and Google without patients' knowledge or consent in return for access to the Meta Pixel tool and other significant advertising benefits. This included personally identifiable information protected against disclosure by law, including Plaintiffs' (and Class Members') IP addresses, device identifiers, and browser fingerprints that Facebook and Google used to personally identify Defendant's patients and target them with advertising.

184. Even if a patient stumbled upon Defendant's carefully hidden "Privacy Policy," nothing in that notice would be understood by any reasonable patient to mean that Defendant is routinely allowing Facebook and Google to capture and exploit patients' Personal Health Information.

185. Defendant does not have a legal right to share Plaintiffs' and Class Members' Protected Health Information with Facebook or Google, because this information is protected from such disclosure by law. *See* G.L. c.214, § 1B; 45 C.F.R. § 164.508. Nor is Defendant permitted to disclose patient's Personal Health Information to advertising and marketing companies like

Facebook without express written authorization from patients.

186. Defendant failed to obtain a valid written authorization from Plaintiffs or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing uses. Moreover, no *additional* privacy breach by Facebook is necessary for harm to have accrued to Plaintiffs and Class Members; the secret disclosure by Defendant of its patients' Personal Health Information to Facebook means that a significant privacy injury has *already occurred*.

187. A patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website. Further, Defendant expressly promised its patients that it would never sell or use their Personal Health Information for marketing purposes without express authorization.

188. Neither Plaintiffs nor Class Members knowingly consented to Defendant's disclosure of their Personal Health Information to Facebook and Google. Nowhere on its website does Defendant tell patients that it routinely shares their Personal Health Information with Facebook and Google. Without disclosing such practices, Defendant cannot have secured consent from Plaintiffs and Class Members for the disclosure of their Personal Health Information to Facebook, Google, and other third-party advertising companies.

189. Accordingly, Defendant lacked authorization to intercept, disclose to Facebook, or use Plaintiffs and Class Members' personal health information, or to procure others (such as Facebook) to intercept, disclose, or use such personal health information.

## H. Defendant's disclosures of personal patient data to Facebook, Google, and other third parties are unnecessary.

190. There is no information anywhere on the websites operated by Defendant that

would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are any of the disclosures of PII/PHI to Facebook or Google necessary for Defendant to maintain its healthcare website.

191. It is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendant to provide medical services to patients without sharing their personal health information with Facebook so that this information can be exploited for advertising purposes.

192. Indeed, after Plaintiffs filed suit in October 2022, Defendant removed the Facebook Meta Pixel from all pages on its website.

193. Despite the wholly unnecessary nature of the Meta Pixel for Defendant to run its business, Defendant willfully chose to implement Meta Pixel and other tracking technologies on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third-parties, including Facebook.

**I. Plaintiffs and Class Members have a reasonable expectation of privacy in their PII/PHI, especially with respect to sensitive medical information.**

194. Plaintiffs and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifying data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of patients' Personal Health Information to Facebook violated Plaintiffs and Class Member's privacy interests.

195. As patients, Plaintiffs had a reasonable expectation of privacy that their health care

provider would not disclose their PII/PHI to third parties without their express authorization.

196. Patient personal health information is specifically protected by law. *See* G.L. c.214, § 1B (Right to Privacy); G.L. c. 111, § 70E (Patients' and Residents' Rights). The prohibitions against disclosing patient personal health information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes. *See* G.L. c. 111, § 70E (Patients' and Residents' Rights); 45 C.F.R. § 164.514(b)(2)(i). Both state and federal law also restrict the use of patients' Personal Health information, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

197. HIPAA sets national standards for safeguarding protected health information. For example, HIPAA limits the permissible uses of health information and prohibits disclosure of this information without express written authorization from patients. 45 C.F.R. § 164.502. These prohibitions include prohibitions against disclosing personally identifying data such as patient names, IP addresses, and other unique characteristics or codes. 45 C.F.R. § 164.514(b)(2)(i). HIPAA also requires that covered entities like Defendant implement appropriate safeguards to protect this information. 45 C.F.R. § 164.530(c)(1). And both HIPAA and Massachusetts law subject medical providers who treat conditions such as substance abuse to heightened duties of confidentiality. 42 C.F.R. § 2.12(a)(1)(i); M.G.L. c. 111B, § 11. This legal framework applies to health care providers, such as Defendant.

198. The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding

such things shameful to be spoken about."[52]

199. The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[53] Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

200. For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care. However, respecting patient privacy in other forms is also fundamental, as an expression of respect for patient autonomy and a prerequisite for trust....Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should ... [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[54]

201. The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [55]

202. Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

[52] *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 n.1 (Mo. 1993).
[53] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html
[54] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).
[55] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

203. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

204. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[56]

205. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[57]

206. The concern about sharing personal medical information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[58]

207. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook. As those critics have

[56] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[57] https://www.wired.co.uk/article/apple-ios14-facebook
[58] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

pointed out, having a patient's personal health information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against.

**J. Defendant harmed Plaintiffs when it illicitly collected, disclosed, and exploited Plaintiffs' PII/PHI —which, after all, is Plaintiffs' property, and has economic value.**

208. It is common knowledge that there is an economic market for consumers' personal data—including the kind of data that Defendant has collected and disclosed from Plaintiffs and Class Members.

209. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[59]

210. In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[60] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[61]

211. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[62] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year

[59] https://ig.ft.com/how-much-is-your-personal-data-worth/
[60] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[61] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/
[62] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

Date Filed 1/31/2025 4:42 PM
Superior Court - Suffolk
Docket Number 2384CV02448

between 2013 and 2020.[63]

212. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[64]

213. Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[65] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[66]

214. A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[67]

215. Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiffs and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook and other third parties without consideration for Plaintiffs' and the Class Member's property.

**K. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of its patients' PII/PHI.**

[63] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[64] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*
[65] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app
[66] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html
[67] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

216. In exchange for disclosing PII/PHI about its patients, Defendant has been compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions. The access to these advertising benefits results in enormous financial savings to companies like Defendant because it reduces their advertising costs. Defendant has run numerous advertising campaigns on Facebook, utilizing the advantages it gained by installing the Meta Pixel on its website.

217. Retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Once an individual's data is disclosed and shared with a third-party marketing company, the advertiser is able to show ads to the user elsewhere on the internet.

218. For example, retargeting could allow a web-developer to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website. Using the Meta Pixel, a website could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

219. Once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

220. The monetization of the data being disclosed by Defendant, both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

## TOLLING, CONCEALMENT, AND ESTOPPEL

221. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

222. Defendant seamlessly incorporated Meta Pixel, Google Analytics, and other tracking pixels into its websites, providing no indication to users that they were interacting with a website enabled by such tracking technologies. Defendant had knowledge that its websites incorporated Meta Pixel and other trackers yet failed to disclose that by interacting with its websites that Plaintiffs' and Class Members' sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook.

223. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendant's conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel.

224. The earliest that Plaintiffs and Class Members, acting with due diligence, could have reasonably discovered this conduct would have been on June 15, 2022, following the release of the Markup's investigation.

225. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure of patients' Personal Health Information has continued unabated through the date of at least the filing of the earliest Original Complaint. What's more, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

226. Defendant's conduct violates the law and breaches its express and implied privacy promises.

227. Defendant's unlawful conduct has injured Plaintiffs and Class Members.

228. Defendant's conduct is ongoing.

229. Plaintiffs bring this action individually and as a class action against Defendant.

230. Plaintiffs seek class certification for the following proposed Classes:

> **The Massachusetts Class:** During the fullest period allowed by law, all current Massachusetts citizens who are, or were, patients of UMass Memorial Health, Inc. or any of its affiliates and who exchanged communications at Defendant's websites, including www.ummhealth.org, www.harringtonhospital.org, and any other UMass Memorial Health affiliated website.
>
> **The Nationwide Class:** During the fullest period allowed by law, all current or former patients of UMass Memorial Health, Inc. or any of its affiliates and who exchanged communications at Defendant's websites, including www.ummhealth.org, www.harringtonhospital.org, and any other UMass Memorial Health affiliated website.

231. Excluded from the proposed Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or its parent has a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

232. Plaintiffs reserve the right to redefine the Classes and/or add Subclasses at, or prior to, the class certification stage, in response to discovery or pursuant to instruction by the Court.

233. This action is properly maintainable as a class action as specifically defined in Massachusetts Rule of Civil Procedure 23.

234. **Numerosity:** While the exact number of Class Members is unknown to Plaintiffs at this time, the Classes, based on information and belief, consist of thousands of people, such that joinder of all members is impracticable. The exact number of Class Members can be determined by review of information maintained by Defendant.

235. **Commonality and Predominance:** There are questions of law and fact common

to Class Members and which predominate over any questions affecting only individual members. A class action will generate common answers to the questions below, which are apt to drive resolution:

a. Whether Defendant's acts and practices violated Plaintiffs' and Class Members' privacy rights;

b. Whether Defendant's acts and practices violate 18 U.S.C. § 2510, et seq.;

c. Whether Defendant's acts and practices violate G.L. c. 214, § 1B;

d. Whether Defendant's acts and practices violate G.L. c. 111, § 70E;

e. Whether Defendant knowingly allowed the surreptitious collection and disclosure of Plaintiffs' and Class Members' PII/PHI to Facebook and other third parties;

f. Whether Defendant's acts and practices constitute a breach of fiduciary duty;

g. Whether Defendant profited from disclosures of patient PII/PHI to third parties including Facebook;

h. Whether Defendant was unjustly enriched;

i. Whether Defendant's acts and practices harmed and continue to harm Plaintiffs and Class Members and, if so, the extent of that injury;

j. Whether Plaintiffs and Class Members are entitled to equitable relief including, but not limited to, injunctive relief, restitution, and disgorgement; and

k. Whether Plaintiffs and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

236. These common questions of law and fact predominate over any questions affecting only the individual Class Members.

237. **Typicality:** Plaintiffs' claims are typical of the claims of other Class Members and Plaintiffs have substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonist to, or in conflict with, the interests of other members of the Class. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients of Defendant who used the websites set up by

Defendant for patients and are victims of Defendant's respective unauthorized disclosures to third parties including Facebook. All claims of Plaintiffs and Class Members are based on Defendant's wrongful conduct and unauthorized disclosures.

238. **Adequacy of Representation:** Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts with Class Members. Accordingly, Plaintiffs are adequate representatives of the Class and, along with counsel, will fairly and adequately protect the interests of the Class and any Subclasses.

239. **Superiority:** A class action is the superior method for fair and efficient adjudication of the controversy. Although all Class Members have claims against Defendant, the likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources would be unnecessarily depleted by prosecution of individual claims. The prosecution of separate actions by individual Class Members could create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendant or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the members of the Class Members who are not parties to the adjudications. If a class action is not permitted, Class Members will continue to suffer losses and Defendant's misconduct will continue without proper remedy.

240. Plaintiffs anticipate no unusual difficulties in the management of this litigation as a class action. The Class is readily ascertainable and direct notice can be provided from the records

maintained by Defendant, electronically or by publication, the cost of which is properly imposed on Defendant.

241. For the above reasons, among others, a class action is superior to other available methods for the fair and efficient adjudication of this action.

## CAUSES OF ACTION

### COUNT I
### Interception of Wire Communications in Violation of 18 U.S.C. § 2510, *et seq.*
### (On Behalf of Plaintiffs and the Nationwide Class)

242. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

243. Plaintiffs bring this claim on behalf of themselves and all members of the Nationwide Class.

244. The Electronic Communications Privacy Act (the "ECPA"), 18 U.S.C. § 2510, protects individuals against eavesdropping committed with an improper purpose.

245. 18 U.S.C. § 2520(a) provides a private right of action any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 of Title 18 of the United States Code.

246. A violation of Chapter 119 and the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was

obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

247. Plaintiffs' communications with Defendant on its web properties and patient portal are covered communications under 18 U.S.C. §§ 2510, 2511.

248. Plaintiffs' and Class Members' communications with Defendant constitute "electronic communications because each communication was the transfer of data or intelligence, including, but not limited to:

a. parties to the communications;
b. the precise text of patient search queries;
c. personally identifiable information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;
d. the precise text of patient communications about specific doctors;
e. the precise text of patient communications about specific medical conditions;
f. the precise text of patient communications about specific treatments;
g. the precise text of patient communications about scheduling appointments with medical providers;
h. the precise text of patient communications about billing and payment;
i. the precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Logins, Registrations, Requests for Appointments, Search, and other buttons;
j. the precise dates and times when patients click to Log-In on Defendant's website(s);
k. the precise dates and times when patients visit Defendant's websites;

l. information that is a general summary or informs third parties of the general subject of communications that Defendant sent back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

249. Plaintiffs and Class Members' communications with Defendant constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Facebook's Meta Pixel;

e. Internet cookies;

f. Defendant's computer servers; and

g. Third-party source code used by Defendant.

250. Whenever Plaintiffs and Patient Class members interacted with Defendant's web properties, including their MyChart patient portal, Defendant, through the source code it imbedded and ran on its web properties, contemporaneously and intentionally divulged the contents of Plaintiffs and Class members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook and Google.

251. Defendant's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs' and Class Members' regarding PII and PHI, treatment, medication, and scheduling.

252. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."

253. Thus, although Defendant is a "part[y] to the communications" at issue, it still incurs liability under the ECPA because it captured and redirected Plaintiffs' information to third parties without consent and for criminal and tortious purposes, as alleged throughout this complaint.

254. Defendant's acquisition of patient communications that were used and disclosed to Facebook and Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and Massachusetts including, among other things:

a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

b. Invasion of privacy in violation of G.L. c. 214, § 1B;

c. Breach of confidentiality of medical records in violation of G.L. c. 111, § 70E; and

d. Breach of the common law duty of confidentiality.

255. For example, under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[]

individually identifiable health information to another person ... without authorization" from the patient.

256. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

257. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

b. Disclosed individually identifiable health information to Facebook and Google without patient authorization.

258. Defendant accessed, obtained, and disclosed Plaintiffs' and Class Members' Personal Health Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

259. As such, Defendant cannot viably claim any exception to ECPA liability.

260. As a result, Defendant harmed Plaintiffs and the Class, breaching the confidentiality of their medical information, violating their privacy, breaching their contract with the hospital, depriving them the full benefit of their bargain with Defendant for care, and causing actual damages in an amount to be proven at trial.

261. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover

statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

262. For these reasons, Plaintiffs, individually, on behalf of the Class members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**
**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

263. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

264. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

265. G.L. c. 214, § 1B provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

266. All health care providers owe their patients a duty not to disclose medical information about a patient without a patient's informed consent.

267. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

268. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

269. Plaintiffs and Class Members are patients of Defendant.

270. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

271. Despite its duty not to disclose Personal Health Information without informed consent and written authorization, Defendant disclosed information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

272. The information disclosed included personally identifiable information, Plaintiffs' and Class Members' statuses as patients of Defendant, and the exact contents of communications exchanged between Plaintiffs and/or Class Members with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

273. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

274. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

275. Defendant's intentional disclosure of patients' Personal Health Information to a third-party advertising company like Facebook without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their Personal Health Information would not be collected, used, and monetized by third party advertising companies.

276. Defendant's disclosure of Personal Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of

the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

277. Given the nature of the Personal Health Information that Defendant disclosed to Facebook, such as patients' names, email addresses, phone numbers, information entered into forms, doctor's names, potential doctor's names, the search terms used to locate doctors (i.e., "Alzheimer's"), the condition selected from dropdown menus (i.e., "Heart Disease"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

278. Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' personal information.

279. Plaintiffs' and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

280. Plaintiffs' and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

281. Plaintiffs' and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

282. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

283. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT III
## Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality
## (On Behalf of Plaintiffs and the Massachusetts Class)

284. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

285. Plaintiffs brings this claim on behalf of themselves and all members of the Massachusetts Class.

286. All conditions precedent to this action have been performed or occurred.

287. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

288. As medical provider for Plaintiffs and Class Members, Defendant owes Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs or Class Members.

289. Defendant solicited and invited Plaintiffs and Class Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Defendant required and obtained Plaintiffs' and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' Personal Health Information.

290. Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiffs and Class Members.

291. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices.

292. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed

to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

293. Defendant breached its duty of confidentiality by disclosing Personal Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

294. Defendant also materially breached its obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendant's website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties,

and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook.

295. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs' and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

296. Defendant's conduct in sharing Plaintiffs' and Class Members' Personal Health Information with Facebook also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then shared with Facebook). Indeed, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

297. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the diminution in value of their Personal Health Information.

298. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

299. Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Personal Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Implied in Fact Contract**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

300. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

301. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

302. Defendant solicited and invited Plaintiffs and Class Members to provide their Personal Health Information on its website as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Personal Health Information, which included personally identifiable information such as their names, telephone

numbers, IP addresses, Facebook IDs, browser fingerprints, and device identifiers to Defendant as part of acquiring Defendant's medical services and using its Web Properties. Per its contractual, legal, ethical, and fiduciary duties, Defendant was obligated to take adequate measures to protect Plaintiffs' and Class Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook and Google. These facts give rise to the inference that Defendant took on obligations outside the plain terms of any express contracts that they may have had with Plaintiffs and Class Members.

303. Plaintiffs and the Class Members entered into valid and enforceable implied contracts with Defendant when they sought medical treatment from Defendant. Specifically, through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendant to retain and protect the privacy of Plaintiffs' and Class Members' Personal Health Information.

304. Defendant required and obtained Plaintiffs' and Class Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiffs' and Class Members' Personal Health Information. Defendant, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly that it would safeguard Plaintiffs' and Class Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiffs and Class Members.

305. Implied in the exchange was a promise by Defendant to ensure that the Personal Health Information of Plaintiffs and Class Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without

the knowledge or consent of Plaintiffs and Class Members. By asking for and obtaining Plaintiffs' and Class Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the confidentiality of Plaintiffs' and Class Members' Personal Health Information was necessary to effectuate the contract between the parties.

306. Plaintiffs and Class Members provided their Personal Health Information in reliance on Defendant's implied promise that this information would not be shared with third parties without their consent.

307. These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiffs and Class Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendant (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiffs and the Class Members made to Defendant for medical services was intended to ensure the confidentiality of their Personal Health Information.

308. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendant would not allow third parties to collect or exploit their communications with Defendant without their consent.

309. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class Members would not have disclosed their Personal Health Information to Defendant but for the prospect of Defendant's promise of medical treatment and other benefits. Conversely, Defendant presumably would not have taken Plaintiffs and Class

Members' Personal Health Information if it did not intend to provide them with medical treatment and other benefits.

310. Defendant was therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiffs and Class Members from unauthorized disclosure and/or use by third parties.

311. Plaintiffs and Class Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their Personal Health Information to Defendant among other obligations. Plaintiffs and Class Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant.

312. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and the Class Members provided their Personal Health Information and compensation for their medical care.

313. Plaintiffs and Class Members relied on Defendant's implied promises to safeguard their Personal Health Information to their detriment. Defendant breached the implied contracts with Plaintiffs and Class Members by failing to reasonably safeguard and protect Plaintiffs' and Class Members' Personal Health Information from disclosure to Facebook and other third parties.

314. Defendant's failure to implement adequate measures to protect the Personal Health Information of Plaintiffs and Class Members and Defendant's intentional disclosure of the same to Facebook violated the purpose of the agreement between the parties: Plaintiffs' and Class Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

315. Instead of safeguarding Plaintiffs' and Class Members' Personal Health Information, Defendant intentionally shared that information with Facebook thereby breaching the implied contracts it had with Plaintiffs and Class Members.

316. Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its websites free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiffs and Class Members would not have purchased medical services from Defendant if they knew that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

317. Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiffs and Class Members; and (b) protect Plaintiffs and the Class Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiffs and Class Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's websites.

318. Both the provision of medical services healthcare and the protection of Plaintiffs and Class Members' Private Health Information were material aspects of these implied contracts.

319. The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiffs and Class Members' Private Health Information unless they consent—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

320. Defendant's express representations, including, but not limited to the express representations found in its Notice of Privacy Practices, memorialize and embody an implied

contractual obligation requiring Defendant refrain from aiding or allowing third parties to collect or Plaintiffs and Class Members' Private Health Information without consent. By soliciting and acquiring Plaintiffs' and Class Members' Personal Health Information Defendant assumed an independent duty to handle Plaintiffs' and Class Members' Personal Health Information with due care and consistent with industry standards to prevent the foreseeable harm that arises from a breach of that duty.

321. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Health Information associated with obtaining healthcare private. To customers such as Plaintiffs and the Class Members, healthcare that allows third parties to secretly collect their Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices. Plaintiffs and Class Members would not have entrusted their Private Health Information to Defendant and entered into these implied contracts with Defendant without an understanding that their Private Health Information would be safeguarded and protected or entrusted their Private Health Information to Defendant in the absence of its implied promise to do so.

322. A meeting of the minds occurred when Plaintiffs and the Class Members agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated healthcare providers, and paid for the provided healthcare in exchange for, amongst other things, (a) the provision of healthcare and medical services and (b) the protection of their Private Health Information.

323. Plaintiffs and the Class Members performed their obligations under the contract when they paid for their healthcare services and provided their Private Health Information.

324. Defendant materially breached its contractual obligation to protect the nonpublic Private Health Information Defendant gathered when it allowed third parties to collect and exploit that information without Plaintiffs' and Class Members' consent.

325. Defendant also materially breached its contractual obligation to protect Plaintiffs' and Class Members' non-public Personal Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third party advertising companies like Facebook, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Facebook, (6) failed to implement internal policies and educational programs to ensure that Defendant's website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook and Google.

326. As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

327. As a result of Defendant's material breaches, Plaintiffs and Class Members were deprived of the benefit of their bargain with Defendant because they spent more on medical services with Defendant than they would have if they had known that Defendant was not providing the reasonable data security and confidentiality of patient communications that Defendant represented that it was providing in its privacy policies. Defendant's failure to honor its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiffs and Class Members overpaying Defendant for the services they received.

328. The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

329. The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs and Class Members' Private Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

330. Defendant's conduct in sharing Plaintiffs' and Class Members' Personal Health Information with third parties also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then disclosed to third parties). For example, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

331. As a direct and proximate result of these failures, Plaintiffs and the Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Personal Health Information, the loss of control of their Personal Health Information, the diminution in value of their Personal Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

332. Plaintiffs and the Class Members are entitled to compensatory and consequential damages suffered as a result.

333. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health Information both because such information remains within Defendant's control and because anytime that Plaintiffs and/or Class Members interact with Defendant's websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information. Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Personal Health Information.

334. Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose their Personal Health Information without their consent.

335. Plaintiffs and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

336. Defendant deliberately and consciously breached these implied contracts by disclosing Plaintiffs' and Class Members' Personal Health Information without consent to third parties like Facebook and Google.

337. Defendant consciously took advantage of Plaintiffs and Class Members, making the opportunistic calculation that it could engage in an intentional and profitable interference with Plaintiffs' and Class Members' legally protected property rights by secretly sharing their Personal Health Information with Facebook and Google, despite its express promises (1) that "uses and disclosures not described in [their notice] may be made with [patients'] signed authorization"; and collected from its website "with any organization or business"; and (2) "[s]ome of the times [Defendant] may need [patients'] signed permission to use and disclose [patients'] information include sale of [patients'] information, [and] marketing purposes . . . ." Defendant consciously decided not to inform its patients that it was routinely sharing their Personal Health Information with third parties with the hope that its misconduct in intentionally breaching its implied contracts with Plaintiffs and Class Members would never come to light.

338. By deliberately breaching its implied contracts with Plaintiffs and Class Members, Defendant was knowingly enriched by the savings in costs that should reasonably have been expended to protect the Personal Health Information of Plaintiffs and Class Members. Defendant

was further knowingly enriched by the financial benefits that it received for bartering Plaintiffs' and Class Members' Personal Health Information to third parties like Facebook and Google, including analytics and advertising benefits that Defendant received in exchange for Plaintiffs' and Class Members' health data.

339. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of their Personal Health Information.

340. Plaintiffs and Class Members are entitled to compensatory and consequential damages, including attorney's fees and actual damages, as a result of Defendant's breach of implied contract. Alternatively, because Defendant's deliberate breach of contract resulted in profit to Defendant where the available damages remedy potentially affords inadequate protection to Plaintiffs' and Class Members' contractual entitlement, Plaintiffs and Class Members are entitled to restitution measured by the profits realized by Defendant from its deliberate breach of contract.

341. Plaintiffs and Class Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendant's control and because anytime that Plaintiffs and/or Class Members interact with Defendant's websites to make appointments, such information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions they risk further disclosure of their Personal Health Information. Plaintiffs and the Class Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

**COUNT V**
**Unjust Enrichment**

**(On Behalf of Plaintiffs and the Massachusetts Class)**

342. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

343. Plaintiffs hereby plead this Count in the alternative to Counts IV.

344. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

345. Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private, and Defendant appreciated this benefit.

346. Defendant gained access to the Personal Health Information provided by Plaintiffs and Class Members by (1) knowingly concealing its use of pixel tracking technologies from the public; (2) lying to the public in its privacy policies about protecting personally identifying information disclosed via the website from unauthorized disclosure to third parties; (3) failing to institute warnings on its website home page that it had installed pixel tracking technologies; (4) failing to provide industry standard privacy safeguards for its patients' health information; (5) intentionally disregarding years of warnings from the United States Department of Health and Human Services that it was obligated to protect its patients' Personal Health Information from unauthorized disclosures to third parties; (6) intentionally violating its own internal privacy policies by making unauthorized disclosures of patients' Personal Health Information; and (7) intentionally violating Massachusetts law.

347. Defendant benefitted from the use of Plaintiffs' and Class Members' Personal Health Information and unjustly retained those benefits at their expense.

348. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Specifically, Defendant bartered Plaintiffs' and Class Members' Personal Health Information to Facebook and Google in return for both advertising benefits and "free" website analytics information. What's more, by sharing its patients' Personal Health Information with Facebook, Defendant gained the ability to utilize Facebook's customize audiences and targeted advertising features, which saved Defendant substantial revenues by making advertising far less expensive than it would have been otherwise. Defendant also gained access to free website analytics data, which it otherwise would have had to spend substantial amounts of money to provide for itself.

349. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

350. Defendant unjustly retained the monies that Plaintiffs and Class Members paid with the expectation that Defendant would spend a percentage of those funds to implement adequate data security and privacy training to protect their Personal Health Information against unauthorized disclosure to third parties.

351. Plaintiffs and the Class Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties like Facebook and Google.

352. Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

353. Facebook and Google are not charities. Facebook and Google were willing to provide Defendant with "free" analytics benefits only because the patient health data that

Defendant surreptitiously shared with those companies has an economic value many times in excess of the analytics services that Facebook and Google provided Defendant.

354. Defendant wrongfully secured the benefits it obtained from Plaintiffs and Class Members by intentionally misleading them about how it would use and exploit their Personal Health Information.

355. Defendant's decision to intentionally mislead Plaintiffs and Class Members about its use of pixel tracking technologies for its own financial benefit is a text-book example of an "unjust" enrichment.

356. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

357. Plaintiffs were aware of the economic value of their Personal Health Information and reasonably expected to be *substantially* compensated by any party who shared or accessed their Personal Health Information to sell advertising. Plaintiffs and Class Members did not consent to Defendant giving their health information away for free.

358. By engaging in the acts and failures to act described in this Complaint, Defendant has been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PII and PHI of the Plaintiffs and the Class. Defendant was on notice that its patients' Personal Health Information was protected by law; that its patients' Personal Health Information had substantial monetary value; that cyber criminals and advertising companies were highly desirous of obtaining access to its patients' Personal Health Information, yet failed to take reasonable steps to pay for the level of data security and privacy training that would have presented

fjohnson@azalaw.com
dwarden@azalaw.com
jkenney@azalaw.com
ncampbell@azalaw.com

Warren Postman (*pro hac vice*)
Alex Dravillas (*pro hac vice*)
Keller Postman LLC
150 N. Riverside Plaza
Suite 4100
Chicago, Illinois 60606
(312) 741-5220
wpd@kellerpostman.com
adj@kellerpostman.com

*Attorneys for John Doe and the Putative Class*

William P. Doyle (556999)
**LAW OFFICES OF COLONNA & DOYLE**
26 Main Street
Lynnfield, MA 01940
T: (781) 245-1127
F: (781) 245-1148
E: bill@colonna-doyle.com

Nicholas A. Coulson*
**Pro hac vice*
**COULSON P.C.**
300 River Place Drive
Suite 1700
Detroit, MI 48207
(313) 644-2685
E: Nick@Coulsonpc.com

*Attorneys for Lisa Colleton and the Putative Class*

I HEREBY ATTEST AND CERTIFY ON March 25, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ______
Assistant Clerk

**CERTIFICATE OF SERVICE**

I, J. Tucker Merrigan, counsel of record for the Plaintiff John Doe in this action, do hereby certify that on January 31, 2025, the foregoing Second Amended Class Action Complaint and Demand for Jury Trial was filed electronically and e-served on all counsel of record.

*/s/ J. Tucker Merrigan*
J. Tucker Merrigan, BBO#: 681627

**COMMONWEALTH OF MASSACHUSETTS**

**SUPERIOR COURT BUSINESS LITIGATION SESSION**

**Suffolk, ss.**

U.S. Dist #25-cv-40022

| | |
|---|---|
| JOHN DOE, LISA COLLETON, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | Case No. 2384CV02448-BLS1 |

**NOTICE OF FILING NOTICE OF REMOVAL**

PLEASE TAKE NOTICE THAT on February 10, 2025, Defendant UMass Memorial Health Care, Inc. ("UMass Memorial") filed a Notice of Removal pursuant to 28 U.S.C. § 1441(c) in the United States District Court for the District of Massachusetts, thereby removing this action. A true and correct copy of the Notice of Removal is attached hereto as Exhibit 1.

PLEASE TAKE FURTHER NOTICE that, upon the filing of the Notice of Removal with the United States District Court for the District of Massachusetts and filing copies thereof with the Clerk at the Suffolk County Superior Court, UMass Memorial has effected removal and the Superior Court shall proceed no further in this action unless the action is remanded pursuant 28 U.S.C. § 1146(d).

Dated: February 10, 2025

Respectfully submitted,

*/s/ James H. Rollinson*
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

*Attorneys for Defendant*

I HEREBY ATTEST AND CERTIFY ON March 7, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: ____________
Assistant Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 10, 2025 copies of the foregoing notice of filing notice of removal were served via email to Plaintiffs' counsels of record.

*/s/ James H. Rollinson*
*One of the attorneys for defendant*

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE, LISA COLLETON, individually and on behalf of all others similarly situated<br><br>Plaintiff,<br><br>v.<br><br>UMASS MEMORIAL HEALTH CARE, INC.,<br><br>Defendant. | Case No. 4:25-cv-40022<br><br>[Trial Court of Massachusetts, The Superior Court, Suffolk County, Docket No. 2384CV02448-BLS1]<br><br>DEFENDANT'S NOTICE OF REMOVAL UNDER 28 U.S.C. § 1441(c) |

**NOTICE OF REMOVAL**

To the Honorable Judges of the United States District Court for the District of Massachusetts and Plaintiff John Doe and Plaintiff Lisa Colleton ("Plaintiffs"):

Plaintiffs' Amended Complaint includes a federal claim against UMass Memorial Health Care, Inc. ("UMass Memorial") for violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511. UMass Memorial therefore removes this case pursuant to federal question jurisdiction. 28 U.S.C. § 1331; 28 U.S.C. § 1441(c).

In support of removal, UMass Memorial provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

**NATURE OF THE CASE**

1. UMass Memorial is a Massachusetts nonprofit charitable corporation that owns and manages many healthcare facilities in Massachusetts.

2. On October 24, 2022, Plaintiff John Doe filed a complaint against UMass Memorial, in the Superior Court of the Commonwealth of Massachusetts for the County of Worcester, Case No. 2285CV01205. *See* Exhibit ("Ex.") 1, *Doe* Complaint.

3. On November 14, 2022, Plaintiff Lisa Colleton filed a complaint against UMass Memorial, in the Superior Court of the Commonwealth of Massachusetts for the County of Worcester, Case No. 2285CV01293. *See* Ex. 8, *Colleton* Complaint.

4. Plaintiff John Doe served UMass Memorial with his Complaint, and the summons was returned on November 18, 2022.

5. Plaintiff John Doe's Complaint challenged UMass Memorial's routine on-line practices as illegal wiretapping under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. *See* Ex. 1, *Doe* Complaint ¶¶ 162–80. Plaintiff John Doe also raised claims of invasion of privacy, breach of fiduciary duty and/or common law duty of confidentiality, breach of express contract, breach of implied contract, and unjust enrichment. *See id.* ¶¶ 181–244.

6. On November 28, 2022, UMass Memorial filed a notice of removal to the United States District Court, informing the court that it removed Plaintiff John Doe's case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See generally*, Ex. 5, *Doe* Notice of Removal.

7. Plaintiff Lisa Colleton served UMass Memorial with her Complaint, and the summons was returned on December 27, 2022.

8. Plaintiff Lisa Colleton challenged UMass Memorial's routine on-line practices as illegal wiretapping under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99. *See* Ex. 8, *Colleton* Complaint ¶¶ 124–135.

9. On December 28, 2022, UMass Memorial filed a notice of removal to the United States District Court, informing the court that it removed Plaintiff Lisa Colleton's case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1). *See generally*, Ex. 11, *Colleton* Notice of Removal.

10. On July 13, 2023, Plaintiff John Doe's case was ordered to be remanded back to the Massachusetts Superior Court because the Court found the case was not within the scope of the federal officer statute. *See* Ex. 6, *Doe* Order of Remand; Ex. 7, *Doe* Memorandum Opinion.

11. On July 13, 2023, Plaintiff Lisa Colleton's case was remanded back to the Massachusetts Superior Court because the Court found the case was not within the scope of the federal officer statute. *See* Ex. 12, *Colleton* Order of Remand; Ex. 13, *Colleton* Memorandum Opinion.

12. On August 14, 2023, Plaintiff John Doe and Plaintiff Lisa Colleton filed a Joint Motion to Consolidate their cases. *See* Ex. 14, Joint Motion to Consolidate. On August 17, 2023, that motion was granted. *See* Ex. 15, Order Granting Joint Motion to Consolidate.

13. On October 23, 2023, the consolidated case was ordered to be transferred to the Business Litigation Session. *See* Ex. 18, *Doe* Order of Transfer; Ex. 19, *Colleton* Order of Transfer. The two cases were consolidated in the Business Litigation Session as Case No. 2384CV02448.

14. On January 25, 2024, Plaintiffs filed a First Amended Complaint again challenging UMass Memorial's use of routine on-line practices as a violation of the Massachusetts Wiretap Act, breach of fiduciary duty and/or common law duty of confidentiality, breach of implied contract, and unjust enrichment. *See* Ex. 20, First Amended Complaint ¶¶ 316–431.

15. On January 25, 2024, UMass Memorial filed a "Unopposed Motion and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases." *See generally* Ex. 21.

16. UMass Memorial requested that all proceedings in this matter be stayed pending the completion of the appeals in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (No. 2384CV00480-BLS1) and *Vita v. New England Baptist Hospital* (No. 2384CV00857-BLS1) because the issues in the appeals overlapped with the issues in this case regarding the interpretation of the Massachusetts Wiretap Act. *See generally id.*

17. On January 31, 2024, the court granted the motion to stay all proceedings pending interlocutory appeal. *See* Ex. 22, Endorsement on Unopposed Motion and Proposed Order to Stay All Proceedings Pending Interlocutory Appeal in Related Cases.

18. On October 24, 2024, the Supreme Judicial Court found in *Vita v. New England Baptist Hosp.*, 494 Mass. 824 (2024) that the Massachusetts Wiretap Act did not apply to the actions at issue.

19. On January 31, 2025, Plaintiffs filed a Second Amended Complaint. *See* Ex. 23, Second Amended Complaint.

20. The Second Amended Complaint includes a new claim against UMass Memorial for violation of the ECPA, 18 U.S.C. § 2511. *See* Ex. 23, Second Amended Complaint ¶¶ 242–62.

## BASIS FOR REMOVAL

21. UMass Memorial removes this case pursuant to federal question jurisdiction. 28 U.S.C. § 1441(c). The statute permits the removal of the entire action when the civil action includes "(A) a claim arising under the Constitution, laws, or treaties of the United States (within the meaning of section 1331 of this title), and (B) a claim not within the original or supplemental jurisdiction of the district court or a claim that has been made nonremovable by statute." *Id.*

"[T]he entire action may be removed if the action would be removable without the inclusion of the claim described in subparagraph (B)." *Id.*

22. This Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *See* 28 U.S.C. § 1331.

23. This case is removable to this Court because Plaintiffs asserted a claim under a law of the United States, specifically the ECPA, 18 U.S.C. § 2511. *See* Ex. 23, Second Amended Complaint ¶¶ 242–62.

24. Because this matter is an action arising under federal law of which this Court has original jurisdiction, as authorized by 28 U.S.C. § 1331, it is subject to removal under 28 U.S.C. § 1441(c).

25. Accordingly, this action is removable to this Court under 28 U.S.C. § 1441(c) and § 1331.

26. By removing this action, UMass Memorial does not waive any defenses available to it.

27. By removing this action, UMass Memorial does not admit any of the allegations in Plaintiffs' Second Amended Complaint.

**PROCEDURAL REQUIREMENTS FOR REMOVAL**

28. UMass Memorial likewise satisfies all of the procedural requirements under 28 U.S.C. § 1446.

29. UMass Memorial timely removes this case. It is filing this Notice of Removal within thirty (30) days of its receipt of the Second Amended Complaint by "service." 28 U.S.C. § 1446.

30. UMass Memorial files this Notice in the United States District Court of the District of Massachusetts, because the state court in which the action is pending, the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk, is within this federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

31. UMass Memorial has attached a copy of process, pleadings, and orders including Plaintiffs' Second Amended Complaint.

32. Upon filing this notice, UMass Memorial will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the state court.

## CONCLUSION

33. As set forth above, Plaintiffs' Second Amended Complaint includes a claim against UMass Memorial that arises under the laws of the United States. Plaintiffs' Second Amended Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1441(c).

**WHEREFORE, UMass Memorial respectfully removes this action from the Superior Court of the Commonwealth of Massachusetts for the County of Suffolk and requests that this Court issue such orders and process as may be necessary to preserve its jurisdiction over this matter.**

Dated: February 10, 2025

Respectfully submitted,

/s/ James H. Rollinson
James H. Rollinson, Esq. (BBO #649407)
BAKER & HOSTETLER LLP
127 Public Street
Suite 2000
Cleveland, OH 44116
jrollinson@bakerlaw.com
T: (216) 621-0200
F: (216) 626-0740

Paul G. Karlsgodt (pro hac vice to be filed)
BAKER & HOSTETLER LLP
1801 California Street
Suite 4400
Denver, CO 80202-2662
pkarlsgodt@bakerlaw.com
T: (303) 764-4013
F: (303) 861-7805

Elizabeth A. Scully (pro hac vice to be filed)
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5304
escully@bakerlaw.com
T: (202) 861-1500
F: (202) 861-1783

Stephen T. Paterniti (BBO #564860)
JACKSON LEWIS P.C.
75 Park Plaza, 4th Floor
Boston, MA 02116
Stephen.Paterniti@jacksonlewis.com
T: (617) 305-1221

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 10, 2025 copies of the foregoing were served to Plaintiffs' counsels of record via email.

*/s/ James H. Rollinson*
*One of the attorneys for defendant*